JUDGE GUZMAN
MAGISTRATE JUDGE KEYS

07 C 6840

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

| | | |
|---|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP., | ) ) | |
| *Claimant,* | ) ) | |
| v. | ) | No. 51 180 01918 06 |
| | ) | |
| DIEHL WOODWORKING MACHINERY, INC., | ) | |
| *Respondent.* | ) | |

## SECOND SUPPLEMENT TO CLAIMS OF CLAIMANT
## WISCONSIN AUTOMATED MACHINERY CORP.

Claimant Wisconsin Automated Machinery Corp. ("WAMCO"), by its undersigned

counsel, hereby supplements its claims against the Respondent, Diehl Woodworking Machinery,

Inc. ("Diehl"):

### Allegations Common to All Counts

1.      WAMCO is a Wisconsin corporation, with its principal place of business located

in Chicago, Illinois.

2.      Diehl is an Indiana corporation with its principal place of business in Wabash

County, Indiana.

3.      Prior to September 2002, Diehl and WAMCO had transacted business together.

During that time, WAMCO had, *inter alia*, provided certain management services to Diehl when

requested by Diehl, for which Diehl paid management fees to WAMCO. The management

consulting and services furnished by WAMCO included business, legal and engineering advice.

4.      In September 2002, Diehl and WAMCO entered into an Asset Purchase

Agreement, a true and correct copy of which is attached hereto and incorporated herein as

**Exhibit 1**. The primary purpose of the Asset Purchase Agreement was the sale of certain

product lines and associated properties by WAMCO to Diehl.

EXHIBIT

8

5.      As part of the transaction covered by the Asset Purchase Agreement, the parties

agreed that Diehl would increase the management fee paid to WAMCO to $15,000/month

commencing January 2003.  For its part, WAMCO agreed to continue providing management

consulting and services requested by Diehl from time to time.

6.      Pursuant to the Asset Purchase Agreement, Diehl paid the $15,000/month

management fee to WAMCO until 2004.

7.      In 2004, Diehl experienced some temporary business difficulties, and the parties

became concerned about its continued viability.  To accommodate Diehl, the parties engaged in

discussions about temporarily reducing the management fee required under the Asset Purchase

Agreement, so Diehl could reduce its expenses.

8.      In August 2005, the parties executed a Memorandum of Agreement (**Exhibit 2**).

The Memorandum of Agreement was never intended to provide a complete expression of the

parties' relationship, or to be a novation of the Asset Purchase Agreement; the instrument clearly

shows that the parties did not mean to change the scope of the management services to be

provided by WAMCO to Diehl, or any other aspect of the Asset Purchase Agreement.  Rather,

the Memorandum of Agreement simply purports to modify Diehl's obligation to pay monthly

management fees.

9.      The Asset Purchase Agreement contemplates subsequent written modification

(¶14.7), and provides that it is to be governed, construed and enforced in accordance with Illinois

law (¶14.8).

10.      The Asset Purchase Agreement also contains an arbitration clause (¶14.13), which

reads as follows, in relevant part:

>       Any controversy, dispute or claim between the parties arising out
>       of, related to or in connection with this Agreement or the
>       performance or breach hereof, including with respect to the

arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; ...In addition to and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator ... [T]he arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

### Count I:  Claim for Declaratory Relief

11.    WAMCO repeats and realleges the foregoing allegations as ¶11 of this Count I, as though the same were fully set forth herein.

12.    WAMCO did not receive any consideration for its reduction of the management fee in 2004, or the execution of the Memorandum of Agreement in 2005.

13.    Illinois governs the construction and enforcement of the Memorandum of Agreement because it relates to the parties' rights and liabilities under the Asset Purchase Agreement relating to management services and fees.

14.    735 ILCS 5/2-701(a) permits anyone interested in a contract or other written instrument to seek a declaration of the rights of the interested parties.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an award providing the following relief:

A.    Declaring that the Memorandum of Agreement is null and void for want of consideration;

B.    Declaring that all rights relating to the management fees due from Diehl to WAMCO are governed by the Asset Purchase Agreement; and

C.    For such other and further relief as this Panel deems necessary and appropriate.

**Count II:**
**Claim for Breach of Asset Purchase Agreement**
**(unmodified by Memorandum of Agreement)**

15.    WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶15 of this Count II, as though the same were fully set forth herein.

16.    WAMCO has performed all conditions on its part to be performed under the Asset Purchase Agreement.

17.    In breach of the Asset Purchase Agreement, Diehl has failed and refused to pay the management fee due to WAMCO.

18.    As a consequence of Diehl's breach of the Asset Purchase Agreement, WAMCO has suffered significant damages, which will continue to increase throughout the remainder of term for which the management fees are due and owing.

19.    Diehl's refusal to pay management fees has been vexatious.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for $231,000 in damages, plus additional management fees at the rate of $15,000/month as may accrue up to, and including the date of the Award, plus WAMCO's arbitral costs, reasonable attorneys' fees, and pre-judgment interest pursuant to the Illinois Interest Act, and for such other and further relief as this Panel deems necessary and appropriate.

**Count III:**
**Alternative Claim for Breach of Asset Purchase Agreement**
**(as modified by the Memorandum of Agreement)**

Pleading in the alternative, WAMCO states as follows:

20.    WAMCO repeats and realleges ¶¶1-10 above as ¶20 of this Count III, as though the same were fully set forth herein.

114384-1                                         4

21.    Even if this Panel finds that the Memorandum of Agreement should not be declared invalid and held for naught, WAMCO nevertheless has a valid claim for against Diehl for breach of contract.

22.    WAMCO has performed all conditions on its part to be performed under the Asset Purchase Agreement, even as modified by the Memorandum of Agreement.

23.    In breach of the Asset Purchase Agreement, even as modified by the Memorandum of Agreement, Diehl has failed and refused to pay the management fee due to WAMCO.

24.    As a consequence of Diehl's breach of the Asset Purchase Agreement, as modified by the Memorandum of Agreement, WAMCO has suffered significant damages, which will continue to increase throughout the remainder of term for which the management fees are due and owing.

25.    Diehl's refusal to pay management fees has been vexatious.

26.    WAMCO brings this claim in the alternative to Count II.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for $141,000 in damages, plus additional management fees of $15,000/month as may accrue up to, and including the date of the Award, plus WAMCO's arbitral costs, reasonable attorneys' fees, and pre-judgment interest pursuant to the Illinois Interest Act, and for such other and further relief as this Panel deems necessary and appropriate.

### Count IV:  Claim on Promissory Note

27.    WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶27 of this Count IV, as though the same were fully set forth herein.

28.    Part of the purchase price contemplated by the Asset Purchase Agreement was to be paid over time, pursuant to a promissory note (the "Note"), which is attached and incorporated as Exhibit A to the Asset Purchase Agreement.  To secure the Note, the Asset Purchase Agreement also incorporates a security agreement (the "Security Agreement").

29.    Diehl executed the Note and Security Agreement in connection with the Asset Purchase Agreement.

30.    WAMCO is presently the holder of the Note.

31.    The Note reads as follows, in relevant part:

In the event that:
       *              *              *              *
(b) there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or
       *              *              *              *
then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

          *              *              *              *

If this Promissory Note is not paid when due, whether at maturity or by acceleration ... the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

          *              *              *              *

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

32.    The Security Agreement defines Diehl as the "Debtor" and WAMCO as its "Secured Party," and reads follows, in relevant part:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party ... howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

\*              \*              \*              \*

"Default" shall mean the occurrence of any one or more of the following events: ... (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

33.    WAMCO deems itself insecure because Diehl has filed a lawsuit, in which it seeks to eliminate the management fee unilaterally, based, in part, upon the following allegation:

9.    Diehl's business conditions require the elimination of the management fee.

A true and correct copy of Diehl's Amended Complaint in that lawsuit is attached as **Exhibit 3**. By Diehl's own admission, the material change in its financial condition constitutes a "default" under the Security Agreement and Note.

34.    WAMCO also deems itself insecure under the Security Agreement because Diehl has failed to make numerous management fee payments to WAMCO, which constitutes a further default.

35.    Upon information and belief, Diehl was also unable to make monthly rental payments of $4,500 during 2006 or 2007.

36.    Consequently, WAMCO is entitled to accelerate the balance due on the Note, and to enforce its rights under the Note and Security Agreement, including its rights to recover its attorneys' fees and costs.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for the following relief:

A.    Finding Diehl in default of its obligations under the Note and Security Agreement, and accelerating the entire amount due and payable under the Note;

B.    Awarding the unpaid principal balance due on the Note to WAMCO, plus interest, and other charges, according to the terms of the Note;

C.    Awarding WAMCO its costs of collection, including its reasonable attorneys' fees and costs, as provided in the Note and Security Agreement; and

D.    For such other and further relief as this Panel deems necessary and appropriate.

### Count V:  Claim on Promissory Note (Failure to Make June 2007 Payment)

37.    WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶37 of this Count V, as though the same were fully set forth herein.

38.    The Note reads as follows, in relevant part:

> FOR VALUE RECEIVED, [Diehl] hereby unconditionally promises to pay to the order of [WAMCO], the principal amount of Six Hundred Thousand Dollars ($600,000), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing January 1, 2003 and on the 1st day of each successive month thereafter through and including December 1, 2008.  Payment of principal hereof and interest hereon shall be made in lawful money of the United States at 5301 W. Dempster, Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this Promissory Note may appoint from time to time.  All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

> \*            \*            \*            \*

> In the event that:

> (a) the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

> \*            \*            \*            \*

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

\*           \*           \*           \*

If this Promissory Note is not paid when due, whether at maturity or by acceleration ... the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

\*           \*           \*           \*

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

39.    In violation of the Note, Diehl did not make its June 2007 payment to WAMCO on or before June 1, 2007. Moreover, in further violation of the Note, Diehl permitted that default to continue for five days by failing to make the June 2007 payment to WAMCO.

40.    Instead, WAMCO made its June 2007 payment to the Clerk of the Wabash County Circuit Court, along with a "supplemental complaint for interpleader" (**Exhibit 4**); the essence of Diehl's interpleader complaint is that WAMCO and its shareholders (Jay Ehrlich and Robert Rozman) should have to fight amongst themselves to see who should receive the funds.

41.    Diehl's payment to the Wabash County Circuit Court as part of an "interpleader" is not a proper tender of payment under Illinois law, which governs the Note. Similarly, it does not comport with the requirements under either Federal law or Indiana law. In particular, Diehl's purported interpleader fails because neither Ehrlich nor Rozman has any direct interest in the debt that is evidenced by the Note. That asset belongs to WAMCO, which has its own corporate identity; one's ownership of stock in a corporation does not give the stockholder a direct claim in

any portion of the corporation's assets. Moreover, it is worth noting that neither Ehrlich nor Rozman has asserted any claims against Diehl.

42.    Consequently, WAMCO has an independent basis to accelerate the Note, and the entire principal balance on the Note is now due and payable. Moreover, WAMCO is entitled to enforce its rights under the Note and Security Agreement, including its rights to recover its attorneys' fees and costs, and to default interest.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for the following relief:

A.    Finding Diehl in default of its obligations under the Note and Security Agreement, and accelerating the entire amount due and payable under the Note;

B.    Awarding the unpaid principal balance due on the Note to WAMCO, plus interest, and other charges, according to the terms of the Note;

C.    Awarding WAMCO its costs of collection, including its reasonable attorneys' fees and costs, as provided in the Note and Security Agreement; and

D.    For such other and further relief as this Panel deems necessary and appropriate.

Respectfully submitted,
**WISCONSIN AUTOMATED MACHINERY CORP.**

DATED:  June 7, 2007            By: _____
                                    One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for WAMCO
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

114384-1                                10

ASSET PURCHASE AGREEMENT
(WOODWORKING PRODUCT LINES)

DATED SEPTEMBER 13, 2002

BETWEEN

WISCONSIN AUTOMATED MACHINERY CORP. (SELLER)

AND

DIEHL WOODWORKING MACHINERY, INC. (PURCHASER)

EXHIBIT
1

## LIST OF EXHIBITS AND SCHEDULES
### Woodworking Product Lines

Exhibit A                    —        Promissory Note

Exhibit B                             Security Agreement


Schedule 3.2                          Payment of Purchase Price

Schedule 3.3                          Allocation of Purchase Price

Schedule 4.4                 —        Unfilled Customer Orders

Schedule 4.5                 —        Unfilled Purchase Orders

Schedule 4.6                 —        Litigation

Schedule 6.4                 —        Machines Sold and Subject to Product Warranty Claims

C:\MSOFFICE\WINWORD\Wisconsin Automates\Product Lines\oDishf\List Exhibits Schedules Final\GSP.wer

## ASSET PURCHASE AGREEMENT
### Woodworking Product Lines

THIS ASSET PURCHASE AGREEMENT, made and entered into this 13th day of September, 2002, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "Seller"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Purchaser");

### W I T N E S S E T H :

WHEREAS, Seller is engaged in, among other things, and owns certain assets and properties used in, the business of designing, manufacturing, selling and repairing woodworking machinery comprising the McKnight Miller, Bell and Challoner product lines (herein collectively called the "Woodworking Product Lines"), and certain other machinery used in the carpet industry and comprising the Dyken product line (herein called the "Carpet Product Line" and, together with the Woodworking Product Lines, collectively called the "Product Lines" and each individually a "Product Line"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Product Lines and certain other assets and properties of Seller relating to the Product Lines in accordance with all of the terms and subject to all of the conditions herein set forth; and

WHEREAS, Seller is willing to undertake not to compete with Purchaser with respect to the Product Lines;

NOW, THEREFORE, in consideration of the premises hereof (which the parties agree are hereby incorporated into and made a part of their agreement herein), of other good and valuable considerations, the receipt of which is hereby acknowledged, and of the mutual covenants herein set forth, the parties hereby agree as follows:

1.    Definitions

In addition to other terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below for the purposes of this Agreement:

1.1    "Agreement" shall mean this Asset Purchase Agreement.

1.2    "Assumed Liabilities" shall mean collectively all of the specifically identified liabilities and obligations of Seller to be assumed by Purchaser hereunder.

1.3    "Closing" shall mean the act of completion of the closing of the transactions contemplated by this Agreement on the Closing Date as set forth in Article 9 hereof.

1.4    "Closing Date" shall mean the date on which the Closing takes place as set forth in paragraph 9.1 hereof.

1.5    "Contract Date" shall mean the date of this Agreement.

1.6    "Excess Inventory" shall mean the number of each such item of Inventory items that are on hand as of the Closing Date that are in excess of two years usage thereof (being twice the number of such item of Inventory sold by Seller during the twelve (12) month period ended June 30, 2002.

1.7    "Excluded Assets" shall mean collectively all of the assets and properties of Seller other than Sale Assets, including without limitation those specifically being excluded from the Sale Assets as provided in paragraph 2.2 hereof.

1.8    "Inspection Date" shall mean July 31, 2002, on which Purchaser inspected the Sale Assets.

1.9    "Sale Assets" shall mean collectively all of the assets and properties of Seller to be sold, assigned, transferred and conveyed to Purchaser hereunder as provided in paragraph 2.1 hereof.

2

2.    Properties and Assets to be Sold to Purchaser

2.1    Sale Assets.    On the terms and subject to the conditions herein set forth, at the Closing, Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and acquire from Seller, the Product Lines, as a going concern, and the following assets relating to any of the Product Lines and on hand as of the Closing Date:

2.1.1    All Inventories relating to any of the Product Lines, including without limitation all raw materials, work in process, including without limitation a 527 Double End Tenoner machine (the "Incomplete Machine"), finished machinery, purchased parts and components, manufactured parts and assemblies, and loaner chain (herein called collectively "Inventory");

2.1.2    Dies, tools, jigs, fixtures, patterns, special tooling and trade fixtures relating to any of the Product Lines, including without limitation all items set forth on Schedule 3.3 hereto under the heading Fixtures & Tooling (herein called collectively "Miscellaneous Tooling");

2.1.3    All trade names, trademarks, trademark registrations and applications, brand names, logos and applications therefor, if any, and the goodwill symbolized thereby, trade secrets, intellectual property, and all rights under all confidentiality agreements and covenants of non-competition, and all rights to recover for any past infringement of any thereof, owned by Seller and relating solely to any of the Product Lines;

2.1.4    All books, records, computer tapes, files (including cabinets containing same) and other papers and documents of Seller pertaining solely to any of the Product Lines or any of the Sale Assets, including without limitation documents of title,

3

warehouse receipts, customer lists, customer files, mailing lists, product literature and manuals, service manuals, instruction manuals, advertising materials, catalogs, sales literature, sales displays, drawings, designs, engineering data, specifications, engineering prints and know-how;

2.1.5    All of Seller's right, title and interest in, to and under all unfilled customer orders being assigned to and assumed by Purchaser as provided in paragraph 4.4 hereof and all customer deposits, if any, received by Seller against such assumed orders only, and all unfilled purchase orders with suppliers, being assigned to and assumed by Purchaser as provided in paragraph 4.5 hereof;

2.1.6    All of Seller's right, title and interest in, to and under paragraph 6.12 of that certain Asset Purchase Agreement, dated June 19, 1992, among Famco Machine Division of Belco Industries, Inc. (which was assigned to Seller) and Medalist Industries, Inc. (the "Medalist Agreement"), relating to the obligations of Medalist Industries, Inc., which has been succeeded to by Illinois Tool Works, and any successors thereto, with respect to product liability claims relating to any products of the Product Lines sold at or prior to June 29, 1992, or with respect to the Show Machines (as defined in the Medalist Agreement).

2.1.7    All other assets, properties and rights specifically set forth in this Agreement as being transferred or assigned to, or purchased by, Purchaser.

2.2    Excluded Assets.  Without in any way expanding the Sale Assets being sold and transferred hereunder and notwithstanding anything to the contrary contained herein, there is specifically excluded from the Sale Assets, and Seller shall retain and shall not transfer to Purchaser, the following assets and properties owned by Seller:

2.2.1    All of Seller's assets and properties used in or related to any of Seller's business and operations other than the Product Lines.

2.2.2    All cash, bank accounts and similar items.

2.2.3    All accounts receivable, notes receivable, drafts, letters of credit and other receivables of Seller (herein collectively called the "Receivables").

2.2.4    All federal, state, local and foreign tax refunds and all tax deposits.

2.2.5    All right, title and interest of Seller in, to or under any policies of insurance, or any benefits payable or paid thereunder, purchased or maintained by Seller (except as otherwise specifically provided herein).

2.2.6    All records not pertaining solely to the Sale Assets.

2.3    <u>Transfer and Assignment of Sale Assets</u>:  Good and marketable title to the Sale Assets shall be sold, assigned, transferred and conveyed to Purchaser by Seller at the Closing, free and clear of all claims, liabilities, taxes, liens, security interests, encumbrances, restrictions and adverse rights of use or ownership.  Subject to Seller's obligations under paragraph 6.1 above, Purchaser is accepting the Sale Assets in the condition existing on the Inspection Date, or such later date on which the particular Sale Asset was acquired by Seller, ordinary wear and tear excepted, on an "as-is" basis. EXCEPT SOLELY AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, THE SALE ASSETS ARE BEING TRANSFERRED WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANT-ABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES (BOTH EXPRESS AND IMPLIED) SELLER HEREBY DISCLAIMS.

2.4    No Assumption of Liabilities.  Except solely for the assumption by Purchaser of the unfilled customer orders (and customer deposits, if any, received by Seller against such customer orders to the extent that same are paid or credited to Purchaser at Closing) and unfilled purchase orders as provided in paragraphs 4.4 and 4.5 hereof, including without limitation the risk of uncollectability of assumed customer orders and warranty claims relating to products shipped by Purchaser pursuant thereto, and any other liability of Seller expressly being assumed by Purchaser hereunder. Purchaser is not assuming and shall not be liable or responsible for any of Seller's debts, liabilities or obligations of any character whatsoever. Seller shall pay and discharge, as they become due and payable, and shall perform and satisfy in accordance with their respective terms, all such debts, liabilities and obligations of Seller not expressly being assumed by Purchaser hereunder. All deposits received by Seller from customers with respect to unfilled customer orders assumed by Purchaser shall be credited against the Purchase Price at the Closing.

3.    Purchase Price and Payment.

3.1    Purchase Price.  Purchaser agrees to pay to Seller, and Seller agrees to accept, as the aggregate purchase price for the Sale Assets (herein called the "Purchase Price"), the sum of $600,000.00, plus or minus any credits or prorations as herein provided.

3.2    Payment.  Payment of the Purchase Price, plus or minus any credits or prorations as herein provided, shall be payable in seventy-two (72) equal monthly installments of $10,000.00 each (comprising principal of, and interest at the rate of 6.198% per annum on, the Purchase Price as shown on Schedule 3.2 attached hereto), the first installment payable on the first day of January, 2003, and each subsequent payment on the first day of each subsequent calendar month until paid in full (i.e. amortizing the Purchase

Price plus interest over the period of repayment in seventy-two (72) equal monthly payments). The Purchaser's obligation to pay the Purchase Price as herein provided shall be evidenced by a Promissory Note, executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit A attached hereto (herein called the "Promissory Note"), which shall be secured and collateralized by the grant of a security interest in all of Purchaser's assets and properties, second in priority solely to the security interest of The LaSalle Bank in such assets, pursuant to a Security Agreement executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit B attached hereto (herein called the "Security Agreement").

3.3     Allocation of Purchase Price.  The Purchase Price shall be allocated for income tax purposes among the Sale Assets and covenant not to compete set forth in Article 11 hereto as set forth in Schedule 3.3 attached hereto and such allocation shall be binding upon the parties for income tax purposes.  The parties shall file their respective income tax returns, including filing with the Internal Revenue Service Form 8594 and all other information as may be required by Section 1060 of the Internal Revenue Code and regulations promulgated thereunder, in accordance with such allocations, and the parties shall not take any position or action inconsistent with such allocation.

4.     Representations, Warranties and Covenants of Seller

Seller hereby represents, warrants and covenants to Purchaser that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

4.1     Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin.  Seller has all requisite corporate

7

power and authority to own, lease and operate its properties and to carry on its business as now conducted and to enter into this Agreement and perform its obligations hereunder.

4.2   *Authority and Binding Obligation*.  All corporate action necessary to authorize the execution and delivery of this Agreement by Seller and the performance by Seller of its obligations hereunder have been duly taken.  The execution and delivery of this Agreement by Seller and the performance of its obligations hereunder do not and will not result in the creation of any lien, charge or encumbrance upon any of the Sale Assets.  This Agreement is a legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

4.3   *Title to Personal Property*.  Seller owns and at the Closing will have the right to convey and will convey to Purchaser good and marketable title, free and clear of any tax, lien, security interest, encumbrance, liability, claim, restriction or adverse right of use or ownership to all of the Sale Assets.

4.4   *Customer Orders*.  Set forth on Schedule 4.4 hereto is a true and correct list of all unfilled customer orders and commitments of Seller on hand as of the Contract Date. All such unfilled customer orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.  Between the Contract Date and the Closing Date, Seller will not accept any customer order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled customer orders and commitments of Seller on hand as of the Closing Date, and Seller shall assign and credit to Purchaser all customer deposits and prepayments received

8

with respect thereto, and Purchaser shall assume the obligations of Seller to fill such assigned unfilled customer orders and commitments accruing from and after the Closing Date in accordance with the terms thereof.

4.5  Purchase Orders.  Set forth on Schedule 4.5 hereto is a true and correct list of all of Seller's unfilled purchase orders and commitments to suppliers on hand as of the Contract Date.  All such unfilled purchase orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.  Between the Contract Date and the Closing Date, Seller will not issue any purchase order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled purchase orders and commitments of Seller on hand as of the Closing Date, and Purchaser shall assume the obligations of Seller accruing from and after the Closing Date in accordance with the terms thereof and the Inventory Purchase Price shall be increased by any prepayments and deposits made by Seller with respect thereto.

4.6  Litigation.  Except as set forth in Schedule 4.6 hereto, there is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Seller, threatened against or relating to Seller's past or present operation of the Product Lines or any of the Sale Assets or that could affect the transactions contemplated by this Agreement, including without limitation relating to products liability, at law, in equity or before any governmental department, commission, board or agency.

4.7  No Material Adverse Change.  Since the Inspection Date, none of the tangible Sale Assets have suffered any destruction or damage, whether or not covered by

insurance, which materially and adversely affects the conduct of the Product Lines business.

4.8    Compliance with Laws.    The business and operations of the Product Lines have been and are being conducted in all material respects in compliance with all applicable laws (including duties imposed by common law), rules and regulations, orders, ordinances, judgments and decrees of all governmental authorities (federal, state and local), including, without limitation, the Clean Water Act, the Clear Air Act, CERCLA, SARA, the Resource Conservation and Recovery Act, as amended ("RCRA"), and all other laws relating to the protection of the environment, human health and safety, including the Occupational Safety and Health Act of 1970, as amended, and any regulations and standards promulgated or issued thereunder.

4.9    Inventory.    The Inventory of Seller other than Excess Inventory will consist of items of a quality which is good, usable and saleable in the usual and ordinary course of business of Seller.

4.10    Product Warranties.    Seller has furnished Purchaser with true and correct copies of all standard written warranties provided to customers of Seller with respect to products of any of the Product Lines (herein called "Product Warranties").

5.    Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

5.1    Organization, Good Standing and Power.    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and

has all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

5.2    Authority and Binding Obligation.  All corporate action necessary to authorize the execution and delivery by Purchaser of this Agreement and the performance of its obligations hereunder have been duly taken.  This Agreement is a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

5.3    Litigation.  There is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Purchaser, threatened against or relating to Purchaser at law, in equity or before any governmental department, commission, board or agency, and Purchaser is not in default with respect to any judgment, injunction, order or decree of any court or governmental agency or instrumentality by which it is bound or subject, and no such judgment, injunction, order or decree is now in effect, which in any way restrains or limits Purchaser in the execution and delivery of this Agreement or the performance by Purchaser of its obligations hereunder.

6.    Additional Covenants

6.1    Conduct of Business.  Seller covenants that from the Contract Date through the Closing Date, Seller will conduct the business of the Product Lines in a manner not materially different from its past practices and only in the usual and ordinary course.

6.2   Negative Covenants.   Between the Contract Date and the Closing Date, Seller represents, warrants, covenants and agrees that Seller will not, without obtaining the prior written consent of Purchaser.

6.2.1    Encumber, mortgage, pledge, or permit any lien to exist against any of the Sale Assets.

6.2.2    Sell, assign, lease or otherwise dispose of any of the Sale Assets, except for the sale of Inventory (including parts but excluding the Incomplete Machine, which shall not be sold) in the ordinary course of business and except for supplies and spare parts used in the ordinary course of business (including in the completion of the Incomplete Machine).

6.2.3.    Make any change in any accounting principle, procedure or practice followed by Seller or in the method of applying same with respect to the Product Lines or write up the value of any Inventory.

6.3   Employees.   Upon the Closing, Seller shall terminate the employment of all of the employees that Purchaser desires to hire in its sole discretion and shall make available to Purchaser and use its reasonable efforts to help Purchaser hire such of employees desired by Purchaser; provided that Purchaser shall not be required or obligated to hire any such employee. Purchaser shall not be obligated to continue any of Seller's policies or benefits with respect to employees, and all of Seller's employees actually hired by Purchaser shall be considered in all respects as new employees of Purchaser.

Seller and not Purchaser shall be responsible for all payments, lawsuits, defense of suits, judgments, reasonable attorneys' fees, and any other costs sustained by Purchaser, including but not limited to all payments and losses resulting from non-

compliance under the terms of any applicable plant closing laws, losses under any pension, thrift, employee savings, bonus or other plan for employee benefits, severance or separation benefits, withholding taxes and contributions, workers or unemployment compensation claims or costs, health care claims or premiums, vacation, sick or other leave or pay, disease or disability claims, discrimination claims, unfair labor practices, safety claims or citations and all other claims against Seller arising out of or relating to any employment relationship with Seller or the termination thereof.

6.4    _Product Warranty Claims._   From and after the Closing, Purchaser shall assume and be solely responsible for all claims made by customers within the applicable period arising under Seller's Product Warranties with respect to products relating to the Product Lines sold or delivered by Seller to or for customers at or prior to the Closing Date and listed on Schedule 6.4 hereof or sold by Seller in the ordinary course of business between the Contract Date and Closing Date.

6.5    _Product Liability Claims._   From and after the Closing, Seller shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered (or delivered on consignment) by Seller or any predecessor thereto at or prior to June 29, 1992, and Purchaser shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products relating to the Product Lines sold and delivered (or delivered on consignment) by Seller after June 29, 1992 and at or prior to the Closing Date or by Purchaser after the Closing Date.   Purchaser shall maintain for a period of at least five (5) years from and after the Closing Date adequate insurance with respect thereto.

6.6    Use of Office Space.  It is understood and agreed that some of the employees hired by Purchaser may not relocate to Purchaser's offices in Indiana.  If so, at Purchaser's request, Seller shall allow such employees to use its offices and facilities in Oshkosh as long as commercially feasible for Seller and Purchaser shall pay Seller a reasonable fee therefor as mutually agreed by the parties.

6.7    Management Fee.  The management fee being paid by Purchaser to Seller and its affiliates for management consulting and services shall be increased to the sum of $15,000.00 per month commencing January 1, 2003, until such time as the parties otherwise mutually agree.

6.8    Completion of Incomplete Machine.  Seller shall use reasonable efforts to complete the Incomplete Machine at or prior to the Closing Date.  If the Incomplete Machine has not been completed at or prior to the Closing Date, Seller shall complete the Incomplete Machine as soon as practicable thereafter.

7.    Conditions Precedent to Obligations of Purchaser.

All of the obligations of Purchaser hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Purchaser) having been fulfilled on or before the Closing Date:

7.1    Representations and Warranties.  The representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Purchaser.

7.2    Performance of Covenants.  Seller shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

7.3    No Litigation.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto which in the reasonable opinion of counsel for Purchaser presents a reasonable possibility that any transaction contemplated by this Agreement would be enjoined or prevented, or that the right of Purchaser to acquire, retain or use the Sale Assets without additional cost would be adversely affected.

8.    Conditions Precedent to Obligations of Seller

All of the obligations of Seller hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Seller) having been fulfilled on or before the Closing Date:

8.1    Representations and Warranties.  The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Seller.

8.2    Performance of Covenants.  Purchaser shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

8.3    No Litigation.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto

which in the reasonable opinion of counsel for Seller presents a reasonable possibility that the transactions contemplated by this Agreement would be enjoined or prevented.

9.    Closing

9.1    Closing Date. The Closing shall take place on October 1, 2002, at the offices of Lawrence, Kamin, Saunders & Uhlenhop, L.L.C., 208 South LaSalle Street, Suite 1750, Chicago, Illinois, at 11:00 a.m., local time, or at such other date, time and place as shall be fixed in writing by the mutual consent of Purchaser and Seller, or as required for the satisfaction of all conditions precedent hereto. The Closing shall be deemed to be effective as of the beginning of business on the Closing Date.

9.2    Seller's Deliveries. At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following, in form and substance satisfactory to Purchaser and its legal counsel:

9.2.1    Certified copies of the appropriate proceedings of the Boards of Directors of Seller authorizing and approving this Agreement and the transactions contemplated herein.

9.2.2    Bills of Sale, assignments and other instruments transferring to Purchaser as of the Closing Date title as provided in paragraph 2.3 of this Agreement to all of the Sale Assets being acquired by Purchaser hereunder.

9.2.3    Assignment(s) transferring to Purchaser the unfilled customer orders, customer deposits and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3    Purchaser's Deliveries.  At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following, in form and substance satisfactory to Seller and its legal counsel:

9.3.1    Certified copy of the appropriate proceedings of the Board of Directors and shareholders of Purchaser authorizing and approving this Agreement and the transactions contemplated hereby.

9.3.2    The Promissory Note, executed by Purchaser in the amount of the Purchase Price as set forth in paragraph 3.2 hereof.

9.3.3    The Security Agreement, executed by Purchaser as set forth in paragraph 3.2 hereof.

9.3.4    Assumption by Purchaser of the unfilled customer orders and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3.5    A resale certificate certifying Purchaser's sales tax resale number.

9.4    Possession.  Upon the Closing, possession of all of the Sale Assets hereunder shall be delivered to Purchaser.

9.5    Records.  After the Closing, if Seller has any legitimate business, accounting or tax reason therefor, Seller and its representatives shall have the right of access to all business records of or pertaining to the Product Lines or Sale Assets that are delivered by Seller to Purchaser hereunder and relating to any period on or prior to the Closing Date, at all reasonable times during business hours, and to make copies thereof at Seller's expense. With respect to any financial, tax and accounting records of Seller relating in any way to the Product Lines or Sale Assets not delivered to Purchaser hereunder (herein

collectively called the "Retained Records"), after the Closing, Seller shall retain same and if Purchaser has any legitimate business, accounting or tax reason therefor, Purchaser and its representatives shall have the right of access to the Retained Records at all reasonable times during business hours, and to make copies thereof at Purchaser's expense.  In the event that within a period of five (5) years after the Closing Date, either Purchaser or Seller desires to dispose of any of such records, such party so desiring to dispose shall give the other party at least thirty (30) days prior written notice thereof and the other party shall have the right within said 30-day period to take possession thereof.

10.    Indemnification and Survival.

    10.1    Indemnification by Seller.  Notwithstanding any investigation by or knowledge of Purchaser, Seller hereby agrees to defend, indemnify and hold Purchaser harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, costs and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Seller in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (ii) any breach of covenant, agreement or undertaking of Seller in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (iii) any failure to comply with any Bulk Sales Law, if applicable; (iv) any liability, debt or obligation of Seller not expressly assumed by Purchaser hereunder; and (v) any and all legal proceedings against or related to Seller or any of the Sale Assets, including without limitation the legal proceedings described in Schedule 4.6 hereto.

10.2    Limitations on Indemnification by Seller. Any liability or undertaking of Seller to indemnify Purchaser under paragraph 10.1, clause (i) hereof, shall be subject to each of the following limitations:

10.2.1    Purchaser shall not be entitled to make a claim for indemnification from Seller under paragraph 10.1, clause (i), hereof unless Purchaser shall have given Seller written notice of such claim prior to two (2) years following the Closing Date; provided, however, that the foregoing limitations period set forth in this paragraph 10.2.1 shall not apply to any indemnification due from Seller arising with respect to any breach of the representations and warranties of Seller contained in paragraphs 4.3 hereof (herein called the "Warranty of Title").

10.2.2    Seller's undertaking to indemnify under paragraph 10.1, clause (i), hereof shall be applicable only if and to the extent that the aggregate indemnification liability from Seller hereunder exceeds Ten Thousand Dollars ($10,000.00); provided, however, that this limitation shall not apply to any indemnification due from Seller with respect to any breach of the Warranty of Title.

10.3    Indemnification by Purchaser. Notwithstanding any investigation by or knowledge of Seller, Purchaser hereby agrees to defend, indemnify and hold harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, cost and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Purchaser in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement; (ii) any

10

breach of covenant, agreement or undertaking of Purchaser in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement, (iii) any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products shipped or delivered by Purchaser after the Closing Date, and any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered by Seller (or any predecessor thereto) at or prior to the Closing Date, if and to the extent not covered by insurance maintained by Seller or Purchaser, as provided in paragraph 6.5 hereof, and (iv) any specifically identified debt, liability or obligation of Seller assumed by Purchaser hereunder at the Closing.

10.4  Survival.  Subject to the limitations period provided in paragraph 10.2.1 hereof, all of the respective representations, warranties and covenants contained in this Agreement or in any other document or instrument delivered by or on behalf of any party hereunder or pursuant hereto, shall survive the Closing Date.

11.  Covenant Not to Compete

Seller hereby covenants and agrees that it shall not, for a period of five (5) years from and after the Closing Date, alone or in conjunction with any other corporation, firm, partnership, person, venture or other entity, directly or indirectly, engage in the design, manufacture, sale or distribution of any products of the type presently being designed, manufactured, sold or distributed by the Product Lines business within the United States of America or in any other geographic area in which the Seller was engaged on the Inspection Date or on the Closing Date.  Seller covenants and agrees that for a period for five (5) years following the Closing Date, it will not induce any employee, customer or supplier of

Purchaser to terminate his or its employment or business relationship with Purchaser, and Seller will not use or reveal any secret or confidential information relating to the business of the Product Lines acquired by Purchaser; provided, however, that the foregoing shall not apply to any information which, following the Closing Date, is received by Seller from a third person other than Purchaser who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Purchaser with respect to such information, or which is public knowledge or within the public domain other than as a result of disclosures by Seller after the Closing Date. It is the desire and intent of the parties that the terms and provisions of this paragraph 11 be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. Accordingly, if and to the extent that any portion of this paragraph 11 shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then said portion shall be deemed reformed to the least extent necessary to make such portion valid and enforceable.

12.    Assignment

Neither this Agreement nor the rights or obligations contained herein shall be assignable by either party except with the written consent of the other party hereto, except by Purchaser to one or more corporations designated in writing by Purchaser prior to the Closing Date; provided, however, that no such assignment shall relieve the assignor of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the foregoing sentence.

13.    <u>Notices</u>.

All notices, requests, demands and other communications hereunder shall be in writing, and shall be deemed to have been given when delivered in person or received by first class, registered or certified U.S. mail, return receipt requested, postage and registration or certification fees prepaid, or delivered by reliable overnight delivery service, providing a receipt evidencing delivery, or by facsimile with a copy also delivered by any of the foregoing means:

If to Seller, to:

Wisconsin Automated Machinery Corp.
c/o American M & M
5301 W. Dempster, Suite 308
Skokie, Illinois 60077
Attention: Paul Ehrlich, President
Fax: (847)067-8646

With a copy to:

Kenneth S. Perlman, Esq.
Lawrence, Kamin, Saunders & Uhlenhop, L.L.C.
208 South LaSalle St., Suite 1750
Chicago, Illinois 60604
Fax: (312)372-2389

If to Purchaser, to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana 46992-0465
Attention: Robert Rozman, President
Fax: (219)563-0206

With a copy to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana 46992-0465
Attention: Mike Ruffner
Fax: (219)0206

or at such other address as hereafter shall be furnished by a notice sent in like manner by such addressee to the others.

14.    Miscellaneous

14.1    Severability. Every provision of this Agreement is intended to be severable, and, if any term or provision is determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

14.2    Exhibits and Headings. The Exhibits to this Agreement are hereby made a part hereof and shall be construed with and as an integral part of this Agreement. The headings of the various Articles and paragraphs of this Agreement have been inserted for convenience only, are not a part of this Agreement, and shall not be deemed in any manner to modify, explain, enlarge, or restrict any of the provisions of this Agreement.

14.3    Expenses. Except where otherwise expressly provided for in this Agreement, each of the parties hereto shall pay their own expenses, including without limitation the fees and expenses of their respective attorneys and accountants, in connection with this Agreement and the transactions contemplated herein, whether or not the Closing takes place. Seller shall pay all sales and use taxes, if any, required on account of the consummation of the transactions contemplated hereby.

14.4    Waiver. Failure or delay on the part of any of the parties hereto to exercise any right, power or privilege hereunder, or under any instrument executed pursuant hereto,

shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or of any other right, power or privilege. All waivers hereunder must be in writing.

14.5  Further Assurances.  Following the Closing, Seller and Purchaser, without further consideration of any kind, shall each execute and deliver, or cause to be executed and delivered, such other instruments, and take, or cause to be taken, such other action, as shall be reasonably requested by any other party hereto to more effectively carry out the transactions contemplated in this Agreement. Seller shall use reasonable efforts to assist Purchaser in effecting a smooth transition in ownership and operation of the Sale Assets after the Closing Date, but Seller shall not be required to incur any cost or expense other than as specifically provided herein.

14.6  Entire Agreement.  This Agreement (including the Exhibits and Schedules hereto and other documents referred to herein as having been delivered or furnished by either party to the other) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

14.7.  Amendments.  This Agreement may not be modified or changed except by an instrument or instruments in writing signed by both of the parties hereto..

14.8  Governing Law.  This Agreement shall be governed and construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions.

14.9  Gender and Number.  Whenever the context requires or permits, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

14.10  Counterparts.  This Agreement may be executed in as many counterparts as may be deemed necessary or convenient, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

14.11  Public Announcement.  The parties will cooperate as to and jointly approve the contents of a general public announcement of this transaction upon the execution and delivery of this Agreement.

14.12  Termination.

14.12.1    This Agreement may be terminated any time prior to the Closing Date: (i) by the mutual written consent of the parties; or (ii) by Seller if any of the conditions provided for in Article 8 hereof shall not have been satisfied, complied with or performed, and Seller shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iii) by Purchaser if any of the conditions provided for in Article 7 hereof shall not have been satisfied, complied with or performed, and Purchaser shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iv) otherwise as expressly provided in this Agreement.

14.12.2    In the event that the Closing shall not take place on or before November 30, 2002, either party shall have the right, exercisable upon giving written notice to the other party within five (5) business days after said date, to terminate this Agreement, unless such failure of Closing shall be due to the breach or default of the party so seeking to terminate this Agreement.

14.12.3    Except for a termination pursuant to clause (i) of subparagraph 14.12.1 hereof, and except otherwise as expressly provided in this Agreement, the right of any party to terminate this Agreement as provided in this paragraph 14.12 shall be in addition to, and not in substitution for, any and all other relief to which such party may be entitled, either at law, in equity or by agreement.

14.13. Arbitration. Any controversy, dispute or claim between the parties arising out of, related to or in connection with this Agreement or the performance or breach hereof, including with respect to the arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; provided that the arbitration shall be by a single arbitrator mutually selected by Purchaser and Seller, and if the parties do not agree within twenty (20) days after the date of notification of a request for such arbitration made by either of the parties, the selection of the single arbitrator shall be made by the American Arbitration Association in accordance with said rules. In addition to, and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator and shall be final, binding and conclusive on the parties, and judgment on the arbitrator's award, including without limitation equitable relief and specific performance, may be entered in and enforced by any court having jurisdiction thereof. Fees and expenses of the American Arbitration Association and of the arbitrator shall be borne as shall be determined by the arbitrator, and the arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

14.14 Fax Copies. Purchaser and Seller agree that "Facsimile" transmissions of signed documents shall be regarded and accepted as if they bore original signatures. Promptly after such Facsimile transmission the original documents bearing the original signatures shall be provided to the other party.

—Signature Page Follows—

26

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Seller").

By_____
Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Purchaser")

By_____
Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin\Automated\Product\Vista\Diehl\Asset\Purch\Agr\Final\KSP.mer

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Seller")

By _____
       Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Purchaser")

By _____
       Robert Rozman, President

D:\MSOFFICE\WINWORD\Wisconsin Automated\Product Line to Diehl\Asset Purch Agt Final\GSP.mar

27

EXHIBIT A

TO

ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

PROMISSORY NOTE

$600,000.00

_____, Illinois
_____, 2002

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the order of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM"), the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing on January 1, 2003, and on the 1st day of each successive month thereafter through and including December 1, 2008. Payment of principal hereof and interest hereon shall be made in lawful money of the United States at 5301 West Dempster, Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this Promissory Note may appoint in writing from time to time. All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (herein called the "Purchase Agreement"), between Diehl and WAM, and the payment of this Promissory Note is secured by a Security Agreement, of even date herewith, between Diehl and WAM, covering all of the assets and properties of

Diehl (herein called the "Security Agreement"), and it is expressly agreed that all of the covenants and agreements contained in the Security Agreement and in the Purchase Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that:

(a)   the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b)   there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

(c)   the undersigned shall die, become insolvent, or admit in writing its inability to pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to or acquiesce in the appointment of a trustee or receiver for it or any of its property or make a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee or receiver shall be appointed for it or for a substantial part of its property and shall not be discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding shall be instituted by or against it, and if instituted against it, is consented to or acquiesced in by it or remains for thirty (30) days undismissed;

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal of and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.

By_____

Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin\Automated\Product\Linslo\Diehl\PromissoryNote.doc\KSP/mer

EXHIBIT B
TO ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

SECURITY AGREEMENT

THIS SECURITY AGREEMENT, made and entered into as of the _____ day of _____, 2002, by and between DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Debtor"), located at 981 South Wabash Street, P. O. Box 465, Wabash, Indiana 46992-0465, and WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("Secured Party"), located at 5301 West Dempster, Suite 308, Skokie, Illinois 60077.

WITNESSETH:

WHEREAS, Debtor issued a certain Promissory Note, of even date herewith (the "Promissory Note"), in the original principal amount of $600,000, payable to the order of Secured Party, which Promissory Note was issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (the "Purchase Agreement") between Debtor and Secured Party; and

WHEREAS, this Security Agreement is being executed to secure full and prompt payment of the Promissory Note;

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.     Definitions.  In addition to other terms defined elsewhere herein, when used herein, the following terms shall have the following meanings:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party, its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

"Default" shall mean the occurrence of any one or more of the following events:  (a) Debtor fails to pay, when due, any amount on any of the Liabilities; (b) non-performance, misrepresentation or breach by Debtor of any representation, warranty or covenant contained herein or in any other agreement between Debtor and Secured Party; (c) Debtor becomes insolvent or unable to pay its debts as they mature or is adjudicated a bankrupt or applied for, consent to or acquiesces in the appointment of a trustee or receiver for it or any of its property or makes an assignment for the benefit of creditors, or in the

absence of such application, consent or acquiescence, a trustee or receiver is appointed for Debtor or for a substantial part of its property; (d) any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is instituted by or against Debtor; (e) any dissolution, merger or consolidation, or transfer of a substantial part of the property of Debtor; (f) any loss, theft, substantial damage or destruction to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

2.    Grant of Security Interest. To secure the payment and performance of all Liabilities, Debtor hereby mortgages to Secured Party and hereby grants and assigns to Secured Party a continuing security interest in and to all properties, assets and interests of each Debtor listed on Exhibit A hereto, whether now or hereafter existing or acquired (herein individually and collectively called the "Collateral"), secondary in and subordinate solely to the lien and security interest of The LaSalle Bank in such Collateral.

3.    Representations: Warranties, Covenants and Agreements of Debtor. Debtor hereby represents, warrants, covenants and agrees that (a) Debtor has been duly organized and is in good standing in the state of its formation listed above; (b) Debtor has full power and authority to execute and deliver this Agreement and perform all of such Debtor's obligations hereunder; (c) Debtor will, from time to time, on request of Secured Party, execute or consent to the execution of such financing statements and other documents (and pay the costs of filing or recording same in all public offices deemed necessary by Secured Party), and do such other acts and things, all as Secured Party may reasonably request, to evidence, perfect and maintain a valid security interest in the Collateral; (d) the Collateral will be kept at Debtor's address shown above, unless Secured Party shall otherwise consent in writing, and Debtor will not sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for the use or sale of Collateral and collection of accounts in the ordinary and usual course of Debtor's business; (e) Debtor will at all times keep the Collateral in first-class order and repair, excepting any loss or damage or destruction that is fully covered by proceeds of insurance; (f) Debtor will at all times keep the Collateral insured against loss, damage, theft and other risks, in such amounts, for such periods and written by such companies, and under such policies and in such form, all as shall be reasonable under all of the circumstances of Debtor's business, and Debtor shall apply any proceeds of such insurance which may be received by either of them toward payment of the Liabilities, whether or not due, in such order of application as Secured Party may determine; (g) Secured Party may examine and inspect the Collateral or any part thereof, wherever located, at any reasonable time or times; and (h) except for the lien and security interest of The LaSalle Bank in the Collateral, to which the lien and security interest granted hereby is secondary in priority and subordinate, and assuming Secured Party has properly perfected, the security interest granted hereby will be a first priority security interest in the Collateral.

4.   Remedies Upon Default.  Whenever a Default shall be existing, all Liabilities may (notwithstanding any provisions of any other agreements between Debtor and Secured Party), at the option of Secured Party, and without demand or notice of any kind, be declared, and thereupon immediately shall become, due and payable, and Secured Party may exercise from time to time any and all rights and remedies available to it under applicable law to the fullest extent permitted thereby, including the rights of a secured party under the Uniform Commercial Code.  Debtor agrees, in case of Default, to assemble, at their expense, all the Collateral at a convenient place acceptable to Secured Party, and to pay all costs of Secured Party of collection of all Liabilities and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses.  Debtor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, demands, advertisements, hearings or process of law in connection with the exercise by Secured Party of any of its rights and remedies upon Default.  Any notification of intended disposition of any of the Collateral shall be deemed reasonable and properly given if given at least five (5) days before such disposition.  Any proceeds of any of the Collateral may be applied by Secured Party to the payment of expenses in connection with the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Secured Party toward payment of such of the Liabilities and in such order of application, as Secured Party may from time to time elect.

5.   General.  No delay on the part of Secured Party in the exercise of any right or remedy shall operate as a waiver thereof, no waiver of any right or remedy shall operate as a future waiver and no single or partial exercise by Secured Party of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

Any notice from Secured Party to Debtor if mailed shall be deemed given when mailed, by registered or certified mail, return receipt requested, postage prepaid, addressed to Debtor either at Debtor's address shown above, or at any other address of Debtor appearing on the records of Secured Party.

The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of Illinois.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  Whenever the context requires or permits words used in the singular herein shall be construed to mean or include the plural and vice-versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

The rights and privileges of Secured Party hereunder shall inure to the benefit of its successors and assigns.

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of the day and year first above written.

Secured Party:                                      Debtor:

WISCONSIN AUTOMATED                                 DIEHL WOODWORKING
MACHINERY CORP.                                        MACHINERY, INC.


By_____                         By_____
      Paul Ehrlich, President                              Robert Rozman, President


C:\ASOFFICE\WINWORD\Wisconsin Automated\ProductLineToDiehl\SecurityAg\DiehLicc\KSPner

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (hereinafter called "Agreement") is made and entered into as of the _____ day of August, 2005, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "WAM"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Diehl"):

## WITNESSETH:

WHEREAS, Diehl has previously paid, and is currently paying, to WAM or its affiliates a monthly management fee for management consulting and services, which fee has varied from time to time upon the mutual agreement of the parties: and

WHEREAS, the parties intend that WAM shall continue to provide such management consulting and services to Diehl, and Diehl shall continue to pay a monthly management fee therefor as business conditions permit and in accordance with the terms and conditions herein set forth:

NOW, THEREFORE, in consideration of the premises hereof (which the parties hereby incorporate and make a part of their agreements herein) and the mutual agreements hereinafter set forth, it is agreed as follows:

1.      Wam hereby waives all unpaid and accrued management fees, if any, due from Diehl prior to July 31, 2005. WAM shall continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl and, effective as of July 31, 2005, Diehl shall pay to WAM, as consideration for such management consulting and services provided, a management fee of $12,500 per month (increased from the immediately preceding fee of $10,000 per month) through December 31, 2005, and $15,000 per month commencing January 31, 2006, through December 31, 2008; provided however that (a) such mutual commitments to provide such services and to pay such management fee shall terminate as of January 1, 2009, unless extended by the mutual agreement of the parties, and (b)from time to time the said management fee might be



EXHIBIT
2

reconsidered and reduced, increased, eliminated and or reinstated by mutual agreement of the parties as Diehl's business conditions requires, and WAM shall only be responsible to provide consulting and services at a level consistent with the then current level of such management fee.

2. The parties shall cooperate and use reasonable efforts to inform each other concerning any change in such business conditions and any related changes in the management fee level and commensurate level of management consulting and services to be provided.

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as of the day and year first above written.

WISCONSIN AUTOMATED MACHINERY CORP.

By _____

Title _____


DIEHL WOODWORKING MACHINERY, INC.

By _____

Title ____PRESIDENT_____

STATE OF INDIANA        )         IN THE WABASH CIRCUIT COURT
                        ) SS:
COUNTY OF WABASH        )         CAUSE NO: 85C01-0508-PL-380


DIEHL WOODWORKING            )
MACHINERY, INC.             )
                            )
        Plaintiff,          )
                            )
    -vs-                    )
                            )
WISCONSIN AUTOMATED         )
MACHINERY CORP., JAY        )
EHRLICH and DIMITRIS        )
LOUKIDIS                    )
                            )
        Defendants.         )

## AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND DAMAGES

### COUNT I

Comes now the plaintiff, Diehl Woodworking Machinery, Inc., (hereinafter "Diehl"), by counsel, and for its first cause of action against defendant, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO") alleges and says as follows:

1.    Diehl is an Indiana corporation with its principal place of business in Wabash County, Indiana.

2.    WAMCO is a Wisconsin corporation.

3.    Defendant, Jay Ehrlich, is a resident of Chicago, Illinois.

4.    Defendant, Dimitris Loukidis, is a resident of Racine, Wisconsin.

5.    In August, 2005, Diehl and WAMCO entered into a Memorandum of Agreement ("Agreement"). A true and exact copy of the Agreement is attached hereto, made a part hereof, and marked as Exhibit "A".



EXHIBIT
3

6.    The Agreement provides, in pertinent part, that the parties intended that WAMCO should provide management consulting services to Diehl and Diehl pay a monthly management fee therefore.

7.    The Agreement further provides that "from time to time said management fee might be reconsidered and reduced, increased, eliminated and/or reinstated by mutual agreement of the parties as Diehl's business conditions require, and WAMCO shall only be responsible to provide consulting services that are consistent with the then current level of such management fee."

8.    From the time of the execution of the Agreement, WAMCO has not provided to Diehl any management consulting and services.

9.    Diehl's business conditions require the elimination of the management fee.

10.   WAMCO has refused to eliminate the fee despite requests to do so by the management of Diehl.

11.   Diehl contends that its obligation to pay the monthly management fee to WAMCO should be eliminated as a result of the failure of consideration and pursuant to the provisions of the Agreement.

12.   WAMCO is no longer an operating entity and instead, serves only as a conduit for the receipt of payments from Diehl in favor of some of its shareholders, including, Jay Ehrlich.

13.   An actual dispute exists between the parties as to whether Diehl's obligation to pay the monthly management fee pursuant to the terms of the Agreement should be terminated.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., prays that the Court enter a judgment declaring the rights of the parties under the Agreement, and declaring that Diehl has no obligation to pay the monthly management fee to WAMCO; for the cost of this action; and for all other just and proper relief in the premises.

## COUNT II

Comes now the plaintiff, Diehl Woodworking Machinery, Inc., by counsel, and for its second cause of action against defendants, Jay Ehrlich and Dimitris Loukidis, alleges and says as follows:

1.    Diehl incorporates herein by this reference the same as if set forth in full the allegations of rhetorical Paragraphs 1 through 11 of Count I of its Complaint.

2.    Defendants, Jay Ehrlich and Dimitris Loukidis, were shareholders and directors of Diehl, which is a closely-held Indiana corporation.

3.    Defendant, Jay Ehrlich, is the President of WAMCO and a shareholder in WAMCO.

4.    Defendant, Dimitris Loukidis, was a shareholder in WAMCO.

5.    Defendants, Jay Ehrlich and Dimitris Loukidis, owned a controlling interest of the shares of WAMCO.

6.    Defendants, Jay Ehrlich and Dimitris Loukidis, as shareholders of Diehl, breached their fiduciary duties owed to Diehl by refusing to permit the termination of the monthly management fee paid by Diehl to WAMCO, despite the fact that WAMCO never provided management consulting and services to Diehl.

3

7.    Diehl has sustained damages in the sum of $174,000.00 in management fees paid to WAMCO since the execution of the Memorandum of Agreement despite the fact that WAMCO has never provided management and consulting services to Diehl.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., prays that the Court enter a judgment in its favor and against defendants, Jay Ehrlich and Dimitris Loukidis, in an amount sufficient to compensate Diehl for the damages sustained as a result of the breach of fiduciary duties by the defendants; for the cost of this action; and for all other just and proper relief in the premises.

CARSON BOXBERGER LLP


By _____
                Larry L. Barnard (11904-49)
                Bruce O. Boxberger (3535-02)
                Attorneys for Plaintiff
                Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Amended Complaint.doc

## CERTIFICATE OF SERVICE

This will certify that on this ____ day of March, 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, Esq., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770.


_____
                (Larry L. Barnard)

4



**Carson Boxberger**
Attorneys

1400 ONE SUMMIT SQUARE
FORT WAYNE, IN 46802-3173
PHO (260) 423-9411 FAX (260) 423-4329
CARSONBOXBERGER.COM

May 29, 2007

*CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Lori Draper, Clerk
Wabash Circuit Court
69 W. Hill St.
Wabash, Indiana 46992-3151

         Re:    <u>Diehl Woodworking v. Wisconsin Automated et al</u>
                 Wabash Circuit Court
                 Cause No: 85C01-0608-PL-380
                 Our File No: 19,554

Dear Ms. Draper:

      Enclosed please find the original and two (2) copies of plaintiff's Supplemental Complaint for Interpleader. Also enclosed please find a check in the sum of $10,000.00 payable to the Clerk of the Wabash Circuit Court in connection with that Complaint for Interpleader.

      If you have any questions with respect to this matter, please feel free to contact me at your convenience. Thank you.

                 Sincerely,

                 CARSON BOXBERGER LLP


                 Larry L. Barnard

LLB/skm
cc:   R. Steven Hearn, Esq.
     Greg Kotsonis, Esq.
Enclosures

F:\Diehl Woodworking Machinery 19,554\Clerk.ltr. 5.29.07.doc

C
O
P
Y



STATE OF INDIANA    )
                      ) SS:
COUNTY OF WABASH    )

IN THE WABASH CIRCUIT COURT

CAUSE NO: 85C01-0608-PL-380

DIEHL WOODWORKING
MACHINERY, INC.            )

         Plaintiff,         )

   -vs-                  )

WISCONSIN AUTOMATED
MACHINERY CORP., JAY
EHRLICH and DIMITRIS
LOUKIDIS                )

        Defendants.      )

    and                  )

ROBERT ROZMAN       )

     Third-Party Defendant)

## SUPPLEMENTAL COMPLAINT FOR INTERPLEADER

Comes now the plaintiff, Diehl Woodworking Machinery, Inc. (hereinafter "Diehl") by counsel, pursuant to Trial Rule 15(B) and Trial Rule 22 of the Indiana Rules of Procedure, and for its cause of action against defendants, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO"), Jay Ehrlich and third-party defendant, Robert Rozman, alleges and says as follows:

1.      Pursuant to the terms of the Asset Purchase Agreement which is attached as Exhibit A to the WAMCO's Counterclaim, Diehl must pay to WAMCO the sum of $10,000.00 per month.

2.      As is reflected by the pleadings in this matter between defendant Ehrlich and third-party defendant, Robert Rozman, a dispute exists in this matter concerning the proper recipient between the shareholders of WAMCO of any funds paid to WAMCO.

3.      Diehl is willing to pay the funds it owes to WAMCO into Court to be held subject to further order of the Court regarding the proper recipient of those funds.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., requests the Court to enter judgment as follows:

1.      To direct plaintiff to deposit all funds due and owing to defendant, WAMCO, with the Clerk of the Court and to discharge Diehl from any and all liability to the defendants and third-party defendant;

2.      To require that the defendants, WAMCO and Jay Ehrlich, and third-party defendant, Robert Rozman, to interplead and litigate among themselves their claims to the deposited funds; and

3.      For the costs of this action and all other appropriate relief.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff
Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Supplemental Complaint.doc

## CERTIFICATE OF SERVICE

This will certify that on this ___ day of May, 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, Esq., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770.

_____
(Larry L. Barnard)