**JUDGE GUZMAN**
**MAGISTRATE JUDGE KEYS**

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

**DAJ**

WISCONSIN AUTOMATED MACHINERY CORP.,      )
                                          )
              *Claimant,*                 )
                                          )
       v.                                 )    No. 51 180 01918 06
                                          )
DIEHL WOODWORKING MACHINERY, INC.,        )    Arbitrator Morson
                                          )
              *Respondent.*               )

**07 C 6840**

## CLAIMANT'S POST-CLOSING BRIEF

Wisconsin Automated Machinery Corp. ("WAMCO"), by its undersigned counsel,
hereby states as follows as its Post-Closing Brief:

I.     **INTRODUCTION**

As stated more fully in its Second Supplement to Claims, WAMCO has five separate

claims against Diehl Woodworking Machinery, Inc. ("Diehl"), which are summarized as follows:

| | |
|---|---|
| Count I: | Declaratory Relief |
| Count II: | Breach of 2002 APA (unmodified by MOA) |
| Count III: | Breach of 2002 Asset Purchase Agreement (as modified by MOA) |
| Count IV: | Breach of Secured Note (Insecurity Clause) |
| Count IV: | Breach of Secured Note (Non-Payment) |

II.     **BACKGROUND FACTS**

A.     **The Parties**

WAMCO is a Wisconsin corporation, with its principal place of business in Chicago, IL.

WAMCO previously manufactured woodworking machinery until it sold those manufacturing

lines. Now it provides management and consulting services. Jay Ehrlich ("Jay") is WAMCO's

president and majority shareholder. Jay is a licensed attorney with experience in commercial,

bankruptcy, and debtor-creditor matters, although he does not actively practice law; Jay works as

a financier at an Illinois firm handling transactions involving non-public companies, including

the purchase, turnaround and sale of distressed companies. Robert Rozman ("Rozman") owns a

**EXHIBIT**
**16**

minority interest in WAMCO, which he acquired from Dmitris "Jim" Loukidis ("Loukidis") in late 2006.

Diehl is an Indiana corporation, with its principal place of business in Wabash, IN. Diehl manufactures and sells woodworking machinery and related equipment, such as parts. Rozman is the president and majority shareholder of Diehl.

WAMCO and Diehl have had common shareholders since the 1990s. At one point, Ehrlich, Ehrlich's father ("Paul") and Loukidis each owned shares in both WAMCO and Diehl. Paul and Loukidis subsequently sold their Diehl shares to Rozman, who now holds a controlling interest in Diehl. Currently, the only common shareholders of WAMCO and Diehl are Jay and Rozman.

**B.    Transactional Documents at Issue in this Arbitration**

This matter involves the enforceability and enforcement of the following transactional documents executed by the parties:

(1)    September 2002 Asset Purchase Agreement ("APA") (**CX-21**)[1];
(2)    Promissory note ("Note") (**CX-21 – Bates ##140-144**) and security agreement ("Security Agreement") (**CX-21 – Bates ##152-158**) executed in connection with the APA (the Note and Security Agreement are sometimes collectively described as the "Secured Note"); and
(3)    August 2005 Memorandum of Agreement ("MOA") (**CX-12**).

The parties do not dispute the execution or genuineness of these documents, although the parties disagree about their meaning and legal effect.

**1.    The APA (CX-21)**

WAMCO sold certain product lines and associated properties to Diehl pursuant to the APA. The APA did not require Diehl to make any cash payments to WAMCO; rather, Diehl would make payments over time, which would be evidenced by the Secured Note documents

---

[1] This brief will refer to WAMCO's trial exhibits as **CX-___**, and to Diehl's trial exhibits as **RX-___**, with references to the Bates page numbers for each document, where applicable.

(APA at ¶3.2). The APA also requires Diehl to increase a fee for "management consulting and services" to $15,000/month, beginning January 1, 2003 (APA at ¶6.7).

The APA contains non-waiver language (¶14.4), as well as a full integration clause (¶14.6). The APA also contemplates subsequent written modifications (¶14.7), and provides that it is to be governed, construed and enforced in accordance with Illinois law (¶14.8). Paragraph 14.13 reads as follows, in relevant part:

> Any controversy, dispute or claim between the parties arising out of, **related to or in connection with this Agreement or the performance or breach hereof**, including with respect to the arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; ... The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator ... *[T]he arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages*.

(Emphasis added).

The evidence presented at the hearing overwhelmingly contradicts any claim by Diehl that the APA resulted from any duress or coercion by WAMCO. The exhibits show that WAMCO and Diehl had been negotiating the APA since May 2001 (**CX-74**; **CX-56**; **CX-57**; **CX-75**; **CX-54**). Rozman also testified that Diehl was represented by its own independent counsel in connection with the negotiation and drafting of the APA (**CX-54**). Diehl signed the APA pursuant to a unanimous resolution by its board (**CX-21 Bates ##162-66**; **CX-22**). Diehl then accepted the benefits and complied with the obligations of the APA for years. Moreover, Resolution #5 of Diehl's June 28, 2005 directors' minutes show that its board voted to "ratify, confirm and adopt all prior acts of the officers and directors of the corporation" (**CX-24 – Bates ##207-09**).

## 2. The reason for the management fee

The APA devotes only one sentence of text (¶6.7) to the management fee, and does not identify the services expected of WAMCO, except to characterize them as "management consulting and services." According to Diehl, no specific management services were contemplated before the execution of the APA (**CX-86 at page 3**). The APA does not provide any termination date for Diehl's obligation to pay $15,000/month in management fees.

Some of Rozman's own e-mails helped him to remember that some function of the management fee is to maintain obligations between the WAMCO shareholders (**CX-2**), that the management fee was "...not really a really management fee for management services provided" (**CX-16 – Bates #0085**), and that it was "... really a method to fund the primary stockholders" (**CX-44 – Bates #0656 at ¶2(b)**). Jay testified that the management fee increase was additional consideration for the sale of WAMCO's manufacturing lines. Diehl did not rebut that evidence.

Diehl has not taken a consistent position about WAMCO's actual provision of management consulting and services. In ¶5 of its Response to WAMCO's Supplement to Claims, Diehl denied "... that WAMCO ever provided management consulting services to Diehl." *And see* Diehl's answer to Interrogatory #20 ("WAMCO has provided no service to Diehl at any time") (**CX-82 at ¶20**).

Likewise, WAMCO offered a substantial number of e-mails from Jay, in which Jay:

- Identified opportunities for Diehl to acquire assets from auctions and bankruptcy sales (**CX-64; CX-65; CX-66; CX-72**);

- Helped procure financing (**CX-73 – Bates ##D71-81**);

- Contributed his legal expertise to Diehl on several occasions involving potential litigation (**CX-64; CX-65; CX-66; CX-70; CX-71**).

Jay also testified that he worked to identify and develop opportunities for Diehl to meet with potential business acquisition candidates.

Rozman originally testified that WAMCO did not provide any services to Diehl. However, many of Rozman's own e-mails contradict that position, and show that Rozman was communicating with Jay about various business matters as recently as June 2006 (*See* **CX-7; CX-8; CX-9; CX-10; CX-47**). When asked to explain these own e-mails acknowledging WAMCO's services, Rozman mumbled something like "I write a lot of e-mails."

A trip taken by Jay to Los Angeles to investigate a potential transaction with CTD Machines in November 2005 deserves special mention. Jay testified that the trip was taken on behalf of Diehl – but at WAMCO's expense. Jay offered a billing statement from WAMCO's corporate credit card showing all the associated charges, including charges for Jay's airplane flight, hotel, car rental and gas (**CX-90**).

Diehl did not rebut Jay's testimony with credible evidence. To the contrary, a chain of e-mails show quite clearly that Rozman knew all about Jay's Los Angeles trip, that Rozman forwarded the information to Paul, and that Rozman prepared an outline of topics for Jay to discuss during that trip, that Rozman had planned to join Jay in Los Angeles so he could participate (**CX-28 – Bates ##320-34; CX-45 – Bates ##667-70**). At the hearing, Rozman had no credible explanation why Diehl claimed that WAMCO had never provided any services, in light of his own e-mails proving otherwise.

### 3. The Secured Note documents (CX-21 Bates ##142-44 and ##152-58)

Rozman testified that the transaction contemplated by the APA closed in early October 2002. At that closing, Diehl executed the Secured Note documents, which memorialize Diehl's payment obligations to WAMCO.

The Note reads as follows, in relevant part:

FOR VALUE RECEIVED, [Diehl] hereby unconditionally promises to pay to the order of [WAMCO], the principal amount of Six Hundred Thousand Dollars ($600,000), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing January 1, 2003 and on the 1st day of each successive month thereafter through and including December 1, 2008. Payment of principal hereof and interest hereon shall be made in lawful money of the United States at ... or at such other place as the holder of this Promissory Note may appoint from time to time. All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

      *          *          *          *

In the event that:

(a) the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b) there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

      *          *          *          *

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

      *          *          *          *

If this Promissory Note is not paid when due, whether at maturity or by acceleration ... the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

The Security Agreement identifies Diehl as the "Debtor" and WAMCO as the "Secured Party." The Security Agreement defines the term "Liabilities" as follows:

> ... all obligations of Debtor hereunder, ***and all other debts, liabilities and obligations of Debtor to Secured Party ... howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due***, including without limitation under the Promissory Note.

(Emphasis added). The Security Agreement then defines the term "Default" as:

... the occurrence of any one or more of the following events: (a) Debtor fails to pay, when due, any amount on any of the Liabilities; ... (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

### 4. Diehl's deferred payment of management fees

In Spring 2004 Diehl faced difficult financial conditions, as evidenced by Rozman's March 15, 2005 letter (**CX-76** at Bates #D0122). To accommodate Diehl, WAMCO agreed to the deferral of some of the management fees required under the APA. WAMCO did not waive any management fees at that time. Indeed, Diehl acknowledged its continuing obligation to pay $15K/month to WAMCO as and for management fees in two separate spreadsheets it produced in discovery (**CX-14** and **CX-77**); these same also show the amounts Diehl actually paid for those months, as well as the unpaid balances due to WAMCO.

### 5. Paul sells his WAMCO shares to Jay

In late 2004 Paul sold his WAMCO shares to Jay, who bought them based upon Paul's representation that WAMCO would continue to receive management fees, and that Diehl would restore the management fees to their prior level. Unfortunately, Paul did not intend to stand behind that representation. Once he had sold his WAMCO shares to Jay, Paul began to look for ways to eliminate Diehl's management fee obligations to WAMCO.

At this point, it is important to understand that Paul and Jay do not get along, and that Jay does not trust Paul. Jay's unrebutted testimony at the arbitration hearing was that Paul is not honest. Rozman's testimony about Paul also supported that characterization; Paul did not tell Rozman about Paul's divestiture of WAMCO shares – while Paul was purportedly negotiating on behalf of WAMCO to reduce the management fee.

It is equally important to note that Paul's motivations are non-economic, as well as economic. WAMCO asks this Panel to consider line item #6 of a September 5, 2006 settlement

proposal from Paul's attorney to the undersigned (**CX-88**), Paul tried to extract a grandparents' visitation schedule with Jay's son as part of a settlement proposal.[2]

### 6. The MOA (CX-12)

After selling his WAMCO shares, Paul began to work with Rozman to "reduce" the management fee in 2005. However, their real intent was to dupe WAMCO into entering into an obligation that Paul and Rozman did not consider binding. As evidenced by e-mails exchanged between Rozman and Paul, neither of them ever intended that Diehl would be bound to pay management fees to WAMCO (**CX-16**; **CX-49**; **CX-46**; **CX-20**). Indeed, at one point, Rozman characterized the management fee as a "gift" (**CX-33**); when asked about this particular e-mail, Rozman agreed that a "gift" does not create a binding obligation.

In August 2005 the parties executed the two-page MOA, which was drafted by counsel for Diehl. The MOA acknowledges Diehl's payment of fees to WAMCO for management consulting and services, and that:

> ... the parties intend that [WAMCO] shall continue to provide such management consulting and services to Diehl, and Diehl shall continue to pay a monthly management fee therefore as business conditions permit and in accordance with the terms and conditions herein set forth.

Paragraph 1 of the MOA then states as follows, in relevant part:

> [WAMCO] hereby waives all unpaid and accrued management fees, if any, due from Diehl prior to July 31, 2005. [WAMCO] shall continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl ...

(*See* **CX-12** at ¶1). Paragraph 1(b) of the MOA also states that the management fee :

> ... might be reconsidered and reduced, increased, eliminated and/or reinstated ***by mutual agreement of the parties*** as Diehl's business conditions requires [sic] ...

(Emphasis added).[3]

---

[2] Having known the Ehrlich family since junior high school, the undersigned considers the current animosity between Paul and Jay terribly sad.

Rozman signed the MOA on behalf of Diehl, pursuant to a resolution signed by all Diehl directors – including Rozman (**Exhibit C-24** Bates #207-11). Loukidis signed it on behalf of WAMCO. The execution and genuineness of the MOA are not disputed, although its legal effect and validity are disputed issues.

**B.**    **Diehl's Failure and Refusal to Pay Management Fees to WAMCO**

    **1.**    **Rozman decides to buy a controlling interest in Diehl**

In early 2006 Rozman decided to buy Diehl shares from Jay, Paul and Loukidis (**CX-1**, **CX-2** and **CX-30**), to give himself a controlling interest. By his own admission, Rozman "didn't want to worry about management fees," and hoped to buy himself a job. Indeed, the primary concern Rozman expressed to Paul in his was "... how Diehl will support [him]" (**CX-31**).

However, Rozman did not want to overpay for the Diehl shares, so he – with Paul's assistance and encouragement – worked to depress the perceived value of Jay's and Loukidis' shares. First, Rozman fed Jay and Loukidis bad news about Diehl. Then he caused Diehl to file suit against them – and WAMCO.

    **2.**    **Diehl seeks a reduction in the amount of its management fee obligation to WAMCO, but WAMCO refuses to consent to any such reduction**

Throughout Spring and Summer 2006, Rozman painted a gloomy picture of Diehl's business conditions (**CX-1 – Bates ##1-12**; **CX-5**; **CX-20**). However, Rozman's interest in acquiring a controlling interest in Diehl stock at exactly that same moment detracts from the credibility of his "gloom and doom" statements about Diehl's business.

Jay disagreed with Rozman's overall business outlook for Diehl; Jay thought the business could return to profitability, as reflected in his responsive e-mails (**CX-6**; **CX-9 – Bates ##52-54**). When questioned at the hearing why he believed Diehl's business conditions were far from

---

[3] WAMCO asks this Panel to recall Rozman's testimony at the hearing – that he neglected to produce an earlier draft of the MOA in discovery – which WAMCO had rejected precisely because the earlier draft of the MOA gave Diehl a unilateral right to alter or eliminate the management fee.

hopeless in early to mid-2006, Jay provided credible explanations, and pointed to some of the financial reports that Diehl produced in discovery.

### 3. <u>Diehl unilaterally stops making management fee payments and files suit</u>

Diehl unilaterally reduced the management fee payment to WAMCO in July 2006, to which WAMCO objected (**CX-15**). On July 26, 2007 Jay sent a lengthy e-mail to Rozman identifying various business concerns and explaining Jay's and WAMCO's positions. Jay then proposed several options by which he believed that Diehl could improve its business health – one of which was to have "... more involvement on my end to work on a day to day basis ..." Jay also proposed the following:

> 3) I can roll up my sleeves and have significantly more involvement on the administrative side so that you [Rozman] are free to explore new products and focus on sales.

Jay then closed by urging Rozman to avoid litigation "... and come to some type of mutually beneficial agreement" (**CX-9 – Bates ##52-54**).

Within a week after Jay sent that e-mail, Diehl unilaterally discontinued the management fee payments and filed suit in Wabash County, IN. Diehl's complaint made the following allegations:

> 9.   Diehl's business conditions require the elimination of the management fee.
> 10.  WAMCO has refused to eliminate the management fee despite requests to do so by Diehl.
> 11.  Diehl contends that ***its obligation to pay the monthly management fee to WAMCO*** should be eliminated as a result of the failure of consideration and pursuant to the provisions of the [MOA].

(**CX-82** at ¶¶9-11) (Emphasis added). Diehl repeated those same allegations in the amended complaint it subsequently filed (**CX-83** at ¶¶9-11).

### 4.   Diehl breaches are vexatious; it has acknowledged that its actions are in bad faith, and that its lawsuit is meritless

Diehl has admitted that it has not acted in good faith, and that its lawsuit is factually baseless.  For example, Diehl's complaint and amended complaint both allege that Diehl's business conditions require elimination of its admitted obligation to pay management fees to WAMCO (**CX-83 at ¶¶9, 11; CX-84 at ¶¶9, 11**).  However, when asked by interrogatory to explain, Diehl answered only that business conditions require "... a closer inspection of Diehl's expenses" (**CX-82 at ¶22**).  When asked further about this silly answer at the hearing, Rozman testified that Diehl – like every other business – routinely looks at its expenses.  Therefore, the underlying premise of Diehl's claim against WAMCO is simply false.

It is also worth noting that Rozman took great pains to line his own pockets.  Rozman testified that Diehl owed a "shareholder debt" to Rozman and certain other Diehl shareholder-employees (**CX-79**), and that much of that "shareholder debt" was owed to Rozman.  Diehl repaid that debt; indeed, Diehl accelerated the final payment of that debt – even as Rozman continued to claim that Diehl was ostensibly in distress (**CX-25**).  Likewise, Rozman caused Diehl to reimburse his *personal* legal fees to acquire Loukidis' WAMCO shares.  In short, while Diehl was ostensibly losing money, Rozman caused it to fund his own personal acquisition of a minority interest in WAMCO – while Diehl was suing WAMCO.

The e-mails produced by Diehl in discovery also prove that Diehl simply intended to use the lawsuit as financial pressure to bludgeon WAMCO into surrender, and Jay into selling his Diehl shares to Rozman for short money.  Rozman's 9/5/06 e-mail to Paul – entitled "the memo I shouldn't have sent" – says that Diehl was "preparing to stall," that "the defense will very quickly run out of financial momentum," and "... we're either playing hardball or beach ball" (**CX-32**).  Likewise, Rozman's 9/29/06 e-mail to Paul reads as follows in relevant part:

> 5. Unless we put full pressure on the situation, it will languish. Only the threat of financially dealing with dual complaints is what will cause Schwartz to realize that the situation requires attention to settlement, and he'll call *our bluff* for awhile.

(**CX-34**) (emphasis added).  Rozman's characterization of Diehl's litigation as a "bluff" speaks for itself; Rozman had no credible explanation for that statement at the hearing.  Similarly, at least one other Rozman e-mail shows that the litigation was simply a way to generate financial pressure, so Rozman could acquire Jay's Diehl shares at a lower price (**CX-38**).

### 5.  WAMCO files this arbitration claim

WAMCO filed its original arbitration claim with the AAA in December 2006, seeking only to recover management fees then due and owing.  In February 2007 WAMCO amended its claim to include a claim on the Note.  At this Panel's request, WAMCO filed a Supplement to Claim and a Second Supplement to Claim, which elaborated on the claims at issue herein.

### 6.  Diehl discontinues making payments under the Note in June 2007

After consistently making monthly payments on the Note – including five payments made after WAMCO filed this arbitration – Diehl did not make its June 2007 Note payment to WAMCO.  Instead, Diehl filed a "supplemental complaint" for interpleader in the litigation (**CX-85**).  Diehl's interpleader complaint alleges that:

- Diehl owes money to WAMCO pursuant to the APA (Id. at ¶1);

- A dispute exists between WAMCO's shareholders (Jay and Rozman) "concerning the proper recipient between the shareholders of WAMCO of any funds paid to WAMCO" (Id. at ¶2); and

- Diehl wishes to withhold payment of its admittedly uncontested debt to WAMCO from WAMCO, and is willing to deposit those funds with the Clerk of the Court.

The interpleader complaint does not allege that either Jay or Rozman are parties to – or third-party beneficiaries of – the APA.  It also does not allege that either Jay or Rozman have claims

against Diehl, or that Diehl might reasonably face exposure to double or multiple liability by paying what it admittedly owes to WAMCO.

Diehl has not made any subsequent payments to WAMCO on the Note; all subsequent payments were also made to the Clerk (**RX-10**).

## III.    ARGUMENT

A.    **As a Matter of Illinois[4] Contract Law, the MOA Fails Because Diehl did not Give any Consideration to WAMCO; Therefore, the APA Governs Diehl's Obligation to Pay Management Fees**

1.    **Diehl's agreement in the MOA to pay management fees that it was already obligated to does not constitute valid consideration to support a contract**

It is axiomatic that past consideration will not support a contract. *E.g.*, Johnson v. Johnson, 244 Ill.App.3d 518, 528 (1st Dist. 1993) ("if the alleged consideration for a promise has been conferred prior to the promise upon which alleged agreement is based, there is no valid contract"); *and see* Baum v. Palmer, 76 N.E. 108, 110 (Ind. 1905) (promissory note executed after borrower received the funds in question was not supported by consideration, in the absence of a new agreement between borrower and lender supported by some new consideration).

Count I of WAMCO's Second Supplemental Claim asks this Panel to declare that the MOA is void because Diehl give no new consideration to WAMCO in connection with the MOA. As discussed *supra*, the APA (signed in 2002) required Diehl to pay $15,000/month in management fees to WAMCO, which Diehl acknowledged in its own spreadsheets (**CX-14** and **CX-77**). Therefore, the MOA gave nothing of value to WAMCO, in which Diehl promised to pay the very same $15,000/month in management fees that it was already obligated to pay. In short, WAMCO did not receive any new value in exchange for (a) its agreement to waive over

---

[4]  By denying Diehl's motions to stay the arbitration, this Panel effectively held that the MOA is a modification of the APA, which is governed by Illinois' contract law (*See* APA at ¶14.8). Nevertheless, Indiana contract law is substantially consistent with that of Illinois on the material issues presented herein.

$100,000 in accrued management fees due and owing from Diehl, and (b) WAMCO's agreement to put a termination date on its entitlement to receive monthly management fees from Diehl.

### 2. Diehl's interpretation of the MOA as a non-binding, or illusory promise is untenable because it would render the MOA unenforceable

An 'illusory promise' appears to be a promise, but on closer examination reveals that the promisor has not actually promised to do anything, or has retained the option to perform. Either way, it is not sufficient consideration to support a contract. W.E. Erickson Construction, Inc. v. Chicago Title Ins. Co., 266 Ill.App.3d 905, 909 (1st Dist. 1994); Mimica v. Area Interstate Trucking, Inc., 250 Ill.App.3d 423, 427 (1st Dist. 1993); Indiana-American Water Co., Inc. v. Town of Seelyville, 698 N.E.2d 1255 (Ind.App. 1998).

In this case, Diehl asks this Panel to interpret the MOA as an illusory promise – which never really required Diehl to do anything. Diehl identifies the "consideration" it allegedly gave to WAMCO for the MOA as a "... promise from Diehl to pay WAMCO for management consulting service" (**CX-82 at ¶15**). However, Rozman's and Paul's e-mails clearly show that Diehl's promise was one Diehl that did not consider binding (**CX-16; CX-49; CX-46; CX-20**). Indeed, the following passage from Rozman's July 10, 2006 e-mail to Paul articulates the issue quite well:

> The fact that we never challenged the matter doesn't mean the agreement is valid, it just means that Diehl has gone along with an unenforceable agreement and not exercised its right to void the agreement.

(**CX-20**). The MOA cannot be "consideration" if it is not enforceable. Otherwise, it is an illusory promise, which is void for want of mutuality. E.g., Wabash Chemical Corp. v. Scholle Chemical Corp., 67 Ill.App.2d 222 (1st Dist. 1966); accord, Paul v. Rosen, 3 Ill.App.3d 423 (1st Dist. 1954).

It is no answer for Diehl to say that the MOA gave Diehl discretion whether or not to request any management services; that would only give Diehl an unlimited right to decide later the nature or extent of its own performance under the MOA – which would render its performance completely optional. The Illinois Supreme Court has completely rejected that type of "phantom consideration" in Dwyer v. Graham, 99 Ill.2d 205 (1983), holding:

> There was no real undertaking or promise by the defendants under the "rental agreement." They were to have "use of rental agreement [ sic ] as long as desired." The option given the defendants was unlimited, and the claimed promise was only illusory. Williston states: "One of the commonest kind of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it merely illusory". [Citation omitted]. In the Restatement (Second) of Contracts section 77, comment *a*, at 195 (1981), it is observed: " *Illusory Promises.* Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."

Id. at 209. *And see*, Indiana-American Water Co., 698N.E.2d at 1259-60 (differentiating enforceable "requirements" contracts from unenforceable "indefinite quantities" contracts). The illustrations to Comment *a* of §77 of the Restatement (Second) of Contracts are equally instructive. They read as follows:

1. A offers to deliver to B at $2 a bushel as many bushels of wheat, not exceeding 5,000, as B may choose to order within the next 30 days. B accepts, agreeing to buy at that price as much as he shall order from A within that time. B's acceptance involves no promise by him, and is not consideration.

2. A promises B to act as B's agent for three years from a future date on certain terms; B agrees that A may so act, but reserves the power to terminate the agreement at any time. B's agreement is not consideration, since it involves no promise by him.

REST 2d CONTR § 77.

### 3. The rules of construction require contracts to be interpreted as valid, fair and sensible

Contracts are always construed in a way which renders the agreement valid, rather than void. Schiro v. W.E. Gould & Co., 18 Ill.2d 538, 542-3 (1960); Indiana-American Water, 698 N.E.2d at 1259 ("Where possible, courts will construe contracts as being valid, rather than void"). Likewise, contracts are interpreted to avoid absurd results or ridiculous interpretations. Omnitrus Merging Corp. v. Illinois Tool Works, Inc., 256 Ill.App.3d 31 (1st Dist. 1993). In NutraSweet Co. v. American Nat. Bank & Trust Co. of Chicago, 262 Ill.App.3d 688, 695 (1st Dist. 1994), the Court held:

> ... where a contract is susceptible to one of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.

Rieth-Riley Const. Co., Inc. v. Auto-Owners Mut. Ins. Co., 408 N.E.2d 640, 645 (Ind.App. 1980) ("In construing a contract, we must adopt the construction which appears to be in accord with justice, common sense and the probable intention of the parties in light of honest and fair dealing").

### 4. *Contra proferentum*

Ambiguous contractual language is construed against the drafter of the language. *E.g.*, Duldulao v. Saint Mary of Nazareth Hosp. Center, 115 Ill.2d 482, 493 (1987); Steve Silveus Ins., Inc. v. Goshert, 2007 WL 2654699, *8 (Ind. App. 2007) ("we resolve an ambiguity in a contract against the drafter"). Rozman testified that Diehl's lawyer prepared the MOA. Therefore, any ambiguities in the MOA must be construed against Diehl and in favor of WAMCO.

5. **The only rational interpretation of the MOA is as a contract requiring WAMCO to make itself available to provide services on an "as requested" basis**

With these principles in mind, WAMCO's agreement in the MOA – assuming this Panel deems it valid at all – was to make itself available to provide services upon request by Diehl. In that respect, the MOA is best analogized to a membership in a health club, the payment of a monthly cable television bill, or other transactions where the member/subscriber has the right to use – or not to use – services upon demand; in such cases, the member/subscriber's obligation to pay arises from the provider's *availability* – not whether the member chose to receive services on a particular date.

The MOA is equally analogous to a "true," "general," or "classic" retainer paid to secure a lawyer's availability to provide services. *See* Dowling v. Chicago Options Assoc., Inc., 2007 WL 1288279, *4 (Ill. Sup. Ct. 2007) ("Such a retainer is paid by a client to the lawyer to secure the lawyer's availability during a specified period of time or for a specified matter. This type of retainer is earned when paid and immediately becomes property of the lawyer, regardless of whether the lawyer ever actually performs any services for the client.").

Jay testified that he understood the MOA as a contract for WAMCO's availability upon demand. That understanding is absolutely consistent with the parties' course of performance. Diehl's pleadings in this case (Response #5 to WAMCO's Claim Supplement) and interrogatory answers (**CX-82** at ¶¶17, 20) state that WAMCO never provided services to Diehl. Therefore, the only logical conclusion is that Diehl's obligation to pay management fees did not – and does not – depend on the actual provision of services by WAMCO.

It is no answer for Diehl to say that WAMCO breached the APA or MOA by failing to provide services, or to make itself available. The evidence at the hearing conclusively established that WAMCO *did* provide various services (**CX-64**; **CX-65**; **CX-66**; **CX-70**; **CX-71**;

**CX-72; CX-73 – Bates ##D71-81**), and that Diehl's denials simply have not been truthful. The evidence also showed that Jay repeatedly offered to help, including his offer to do so just before Diehl filed suit (**CX-9 – Bates ##52-54**).

Moreover, even if this Panel ignores all of the testimony and evidence showing that WAMCO did provide services, Diehl's position – that it never requested or received services from WAMCO – would nevertheless fail. That would only prove that the parties to the MOA did not intend to predicate the payment of fees upon services actually provided.

The interpretation of the MOA urged by Diehl would render the MOA as a void illusory promise. Moreover, it would be absurd to believe that WAMCO waived over $100,000 in accrued management fees in return for an illusory promise by Diehl. *That* is why Rozman withheld the prior draft of the MOA.

C.     <u>Diehl Breached the APA by Failing to Pay Management Fees to WAMCO</u>

Whether this Panel ultimately finds that Diehl's obligation to pay management fees is governed by the APA, or by the MOA, there is no dispute that Diehl did not make its full payment in July 2006, or that Diehl has not made *any* payments since then. As noted *supra*, Diehl has repeatedly acknowledged its obligation to continue making those payments in Court pleadings (**CX-83 at ¶11; CX-84 at ¶11**).

Both the APA and MOA require *mutual agreement* to change the management fee, and Diehl has does not even contend that it has the right to eliminate the management fee unilaterally (**CX-82** at ¶25).

Diehl cannot seriously claim that the APA or MOA are unenforceable, due to "economic duress," "oppression," or any similar defense. A party who accepts the benefits flowing from a contract for any considerable length of time ratifies the contract. *E.g.*, <u>Inland Land Appreciation Fund, L.P. v. County of Kane</u>, 344 Ill.App.3d 720, 728 (2nd Dist. 2003) (acceptance of contract

benefits for 8 months constituted ratification and precluded later claim for economic duress).

Moreover, as noted *supra*, Diehl's board – including directors who had no interest in WAMCO

at the time (like Rozman) authorized Diehl to sign both documents.

### D. Diehl has Defaulted on the Secured Note, Justifying Acceleration of the Debt and Payment of WAMCO's Reasonable Attorneys' Fees

WAMCO's claim on the Secured Note is straightforward.  Diehl executed the Note and

subsequently defaulted.  As the holder of the Note, WAMCO is entitled to enforce it.

810 ILCS 5/3-104(a) defines a "negotiable instrument" as:

> ... an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>
> (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder:
>
> (2) is payable on demand or at a definite time; and
>
> (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order must contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of any obligor.[5]

The Note qualifies as a "negotiable instrument."  It promises to pay a fixed sum, plus accrued

interest.  It is payable to the order of WAMCO or its order at a definite time – monthly payments

are due on the first day of each month starting at a date certain, and it contains no other

instructions beyond paying the amounts owed.

Diehl admitted signing the Secured Note.  Likewise, admitted the debt in its interpleader

complaint (**CX-85**).  Given these admissions, there is nothing left to dispute.  Illinois law entitles

WAMCO to be paid.  810 ILCS 5/3-308(b) ("a plaintiff producing the instrument is fully entitled

to payment if the plaintiff proves entitlement to enforce the instrument under Section 3-301,

---

[5] An "instrument" necessarily means a "negotiable instrument."  810 ILCS 5/3-104(b).

unless the defendant proves a defense or claim in recoupment"). Diehl did not establish any

defense, and made no claim in recoupment.

As the possessor and holder of the Note, Diehl plainly qualifies as a party entitled to

enforce it. See 810 ILCS 5/3-301(i). And, with respect to a negotiable instrument made payable

to an identified person, the "holder" necessarily means "the person in possession." 810 ILCS

5/1-201(20).

As discussed *supra*, upon any event of default by Diehl, the Note permits WAMCO to:

> ... declare all unpaid principal and interest on this Promissory
> Note to be due and payable, whereupon all unpaid principal of and
> accrued interest on this Promissory Note shall forthwith be and
> become due and payable.

Moreover, Diehl's failure to make timely payment when due, whether at maturity or by

acceleration, entitles WAMCO to recover all of its costs of collection, including its reasonable

attorneys' fees.

## 1. WAMCO properly deemed itself insecure under the Security Agreement

The Security Agreement defines "Default" to include:

> (g) any change in Debtor's financial condition or ability to pay the
> Liabilities deemed by Secured Party to be materially adverse or
> the occurrence of any other event as a result of which Secured
> Party deems itself insecure.

In this case, WAMCO deemed itself insecure due to its perception of materially adverse changes

in Diehl's financial condition; WAMCO then accelerated the Note (**CX-19**).

The facts strongly support WAMCO's determination of insecurity and acceleration, to

wit:

- Diehl stopped paying management fees to WAMCO;

- Diehl alleged in multiple court pleadings that its business conditions "require the
  elimination of the management fee" (**CX-83**; **CX-84**);

- The timing of Diehl's lawsuit – within a week after Jay offered to "roll up his sleeves" and help on a day-to-day basis (**CX-9 – Bates ##52-54**);

- Rozman admitted in a September 28, 2006 e-mail to Paul that Diehl "can't afford" the management fee (**CX-33 – Bates ##514-18**);

- Diehl has admitted materially adverse changes in its financial condition (**CX-82 at ¶49**);

- Diehl refused to provide current financial information to WAMCO showing that it could continue to afford its current obligations.  Indeed, Diehl resisted producing that information until forced to do so by this Panel; and

- Since the filing of the lawsuit, Rozman continued to issue a steady stream of "gloom and doom" communications about Diehl's business conditions, on the following dates:

    o **CX-33** (9/28/06)
    o **CX-35** (10/9/06)
    o **CX-36** (11/3/06)
    o **CX-37** (11/7/06)
    o **CX-39** (12/19/06)
    o **CX-29** (12/20/06)
    o **CX-23** (12/22/06)
    o **CX-40** (4/7/06)
    o **CX-41** (4/27/07)

Consequently, given the information available to it at the time, WAMCO's determination of insecurity was reasonable, and its acceleration of the debt then due under the Note was justified.

2. **Diehl breached the Note and Security Agreement by failing to pay management fees to WAMCO**

The Note provides for acceleration if Diehl breaches any term of the Security Agreement. As discussed above, a "Default" under the Security Agreement occurs where Diehl fails to pay any "Liabilities," which the Security Agreement defines to include all obligations from Diehl to WAMCO.  Diehl's obligation to pay management fees to WAMCO is such a "Liability." Indeed, Diehl admitted its obligation to pay management fees in ¶11 of its complaint (**CX-83**) and amended complaint (**CX-84**), and asked the Court to *eliminate* that obligation.

### 3. Diehl breached the Note and Security Agreement by failing to make monthly principal and interest payments to WAMCO

Diehl has not made a Note payment to WAMCO since May 1, 2007, when it made its $10,000 payment for May 2007. To the extent this Panel finds that the Note was not previously accelerated, Diehl's non-payment constitutes an "event of default" under the Note for two reasons:

#### a. Diehl's payments to the Clerk of the Court do not constitute proper payments under the Note

The Note requires Diehl to pay $10,000/month *to its holder* on or before the first day of each month. Any failure by Diehl to make timely payment *to the Note holder*, which failure continues for at least five days, constitutes an "event of default," and triggers the remedies available under the Note, including acceleration. Therefore, it is no answer for Diehl to say that it made the payments to someone else – namely the Clerk of the Court. Diehl did not have WAMCO's permission to make those payments to anyone other than WAMCO.

In any event, the uncontroverted evidence proves that Diehl's "interpleader" is a sham because it is groundless. Fed.R.Civ.Pro. 22(1) reads as follows, in relevant part:

> Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. ...

By the plain language of Rule 22(1), an interpleader claim requires (a) multiple persons having claims against the plaintiff, (b) which may expose the plaintiff to double or multiple liability. Diehl cannot face exposure to multiple liability if it pays WAMCO, because only WAMCO has asserted claims against Diehl under the APA, the Secured Note, or the MOA. The same analysis applies to an interpleader claim under Indiana law (its interpleader complaint was filed prior to the removal of the lawsuit from Indiana state court). Interpleader actions in Indiana are governed

by Rule 22 of the Indiana Rules of Trial Procedure, which is largely identical to the Federal

interpleader rule.[6]

Rozman testified at the hearing that neither he nor Jay has asserted a competing claim

against Diehl – or against any of the funds due from Diehl to WAMCO under the Note. That is

hardly surprising, because neither Jay nor Rozman is a party to – or a third-party beneficiary of –

the APA, the Secured Note or the MOA.

The entire premise of Diehl's "interpleader" – that:

> ... a dispute exists in this matter concerning the proper recipient
> between the shareholders of WAMCO of any funds paid to
> WAMCO.

fails as a matter of elementary Wisconsin corporate law.[7] Disputes between corporate

shareholders does not impair the corporation's contractual rights against third parties. In

Shepard v. State, 197 N.W. 344 (1924), the Supreme Court of Wisconsin long ago declared:

> The property of a corporation is its property and not that of the
> stockholders. There is a fundamental difference between the
> capital of a corporation and its capital stock. The former belongs
> to the corporation; the latter, when issued, to the stockholders.

Id. at 346; Fowler v. Shadel, 400 F.3d 1016, 1019 (7th Cir. 2005). It is **WAMCO** – not Jay or

Rozman – which owns the right to payment from Diehl under the APA, the Secured Note and/or

the MOA. By contrast, neither Jay nor Rozman owns any rights in WAMCO's assets.

Therefore, any disputes between Rozman and Jay relate solely to their ownership of capital stock

in WAMCO, but do not affect WAMCO's rights against Diehl.

Diehl cannot do an "end around" WAMCO's rights by pretending that WAMCO does not

exist. A corporation is a separate legal entity. Conservatorship of Prom v. Sumitomo Rubber

Ind., Ltd., 224 Wis.2d 743, 760 (Wis. App. 1999); *accord*, North Gate Corp. v. Nat'l. Food

---

[6] Indiana T.R.22(C)(3) requires a party seeking interpleader to allege that it "... is or may be exposed to double or multiple liability." Diehl's interpleader complaint (**CX-85**) makes no such allegation.

[7] WAMCO is a Wisconsin corporation, and the rights of its shareholders are governed by Wisconsin corporate law.

Stores. Inc., 30 Wis.2d 317, 324 (1966) (ordinary rule is that a corporation is an entity separate

from its shareholders).

> **b.  The Note provides for acceleration if Diehl
> breaches any term of the Security Agreement**

As discussed above, a "Default" under the Security Agreement occurs if Diehl fails to

pay any "Liabilities," which the Security Agreement defines to include all obligations from Diehl

to WAMCO – including debts due under the Note.

### E.    Diehl Cannot Claim the Benefit of its own Breach

One of the arguments suggested by Diehl at the hearing is that WAMCO has no income,

and is therefore incapable of providing any "management consulting and services."  Even if that

were true, Diehl could not make that argument here.

Under Illinois law, the "wrongful prevention" doctrine provides that a party who prevents

the fulfillment of a condition upon which his own liability rests many not defeat his liability by

asserting the failure of the condition he himself has rendered impossible.  Cummings v. Beaton

& Assoc., Inc., 249 Ill.App.3d 287, 294 (1st Dist. 1992).  To the extent it caused WAMCO's lack

of income, Diehl cannot now assert that alleged lack of income as a defense against its own

contractual liability.

### F.    The Secured Note and the MOA Clearly Relate to the APA, and are
Therefore Subject to Arbitration, Pursuant to ¶14.13 of the APA

This Panel has twice addressed the arbitrability issue.  On both occasions, the Panel

rejected Diehl's request to stay the arbitration, and found the dispute subject to arbitration.

Nevertheless, at the August 13th hearing, Diehl's counsel specifically preserved its "lack of

arbitrability" defense, and announced that he would pursue his then-pending motion to stay the

arbitration before the U.S. District Court.  Two days later, on August 15th, Diehl filed a notice of

intent to withdraw its motion to stay the arbitration (**CX-92**).[8]  By withdrawing its motion to

stay, Diehl has effectively conceded the arbitrability issue.

To the extent this Panel considers its rulings regarding arbitrability as merely interim or

temporary relief, WAMCO offers the following analysis:

### 1.  <u>Disputes arising from the APA and Secured Note are clearly arbitrable</u>

There is no dispute that the APA requires arbitration of all related disputes, or that the

Secured Note documents were executed in conjunction with the APA.  All disputes and/or claims

relating to the APA and/or Secured Note must be arbitrated, and there is no basis to avoid

arbitration of those issues.

Diehl cannot legitimately respond that this Court "unenforceability" defense belongs in

Court.  Under the <u>Federal Arbitration Act</u> ("FAA"), a Court presented with an arbitration

agreement resolves only questions about the *existence* of an agreement to arbitrate.  The trial

court determines only whether: (1) a valid agreement to arbitrate exists between the parties; and

(2) the dispute in question falls within the scope of that agreement.  <u>Personal Sec. & Safety</u>

<u>Systems, Inc. v. Motorola, Inc.</u>, 297 F.3d 388, 392 (5th Cir. 2002).[9]

A dispute about the *existence* of an agreement to arbitrate focuses on its formation,

whereas, a challenge to the *validity* of an agreement – whether based upon "unconscionability"

or otherwise – focuses on its legality and scope.  These two issues are inherently different, and

require very different treatment.  *See* <u>Buckeye Check Cashing, Inc. v. Cardenga</u>, 126 S.Ct. 1204,

---

[8]  WAMCO hereby submits the Notice of Withdrawal for admission into evidence as an exhibit.
WAMCO could not present Diehl's withdrawal of its motion to stay at the August 13th hearing, because it
did not receive that withdrawal notice until after the hearing concluded.
[9]  An interesting question arises whether the FAA or the Illinois <u>Arbitration Act</u> ("ILAA") governs the
question of arbitrability.  The APA and MOA each involve interstate commerce (citizens of different
states), which implicates the FAA.  However, to the extent the MOA modifies the APA, ¶14.8 of the APA
implicates the ILAA.  WAMCO submits that the result would be the same under either statute.

1207, FN 1 (2006) ("The issue of the contract's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded.")

There is no question that the Note and Security Agreement are part and parcel of the APA. As discussed *supra*, ¶3.2 of the APA references the Note and Security Agreement, and attaches specimens of each document as exhibits.

### 2. The MOA is related to, and arises from, the APA; therefore, the interpretation and enforcement of the MOA is arbitrable

Where an arbitration clause purports to cover all disputes "related to" or "connected with" the agreement, courts applying the FAA have not limited arbitrability to claims literally arising under the contract containing the arbitration clause; such an arbitration clause embraces *all* disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute. Personal Sec. & Safety Systems at 392 (requiring arbitration of dispute with a "significant relationship to" the subject matter of the transaction). In this case, the all-inclusive arbitration language of APA ¶14.13 manifests the parties' intent to submit *all* related disputes to arbitration.

The MOA is obviously a modification of the APA because the essence of the MOA is the *continued* provision by WAMCO of management consulting and services to Diehl, in exchange for Diehl's *continued* payment of management fees at a modified rate. The use of the phrases "continue to provide" and "continue to pay" obviously refer to extensions of obligations under a prior agreement. Paragraph 1 of the MOA then identifies the amount to be paid to WAMCO on a prospective basis, which alters Diehl's prior payment obligation. Moreover, the MOA does not describe the "management consulting and services" WAMCO must continue to provide; to understand the MOA, the reader must refer to extrinsic evidence to understand the services WAMCO *previously* provided.

Diehl's contrary argument – that the parties need not arbitrate because the MOA itself does not contain an arbitration clause, and does not specifically refer to the APA – is overly simplistic and ignores the points raised above. One cannot read a "modification" in a vacuum, because it necessarily requires an understanding of the agreement being modified. At the hearing, Rozman admitted that one would need to look outside the MOA to understand what "management consulting and services" WAMCO was supposed to provide.

Contracts expressing a complete agreement will typically include an integration clause. Air Safety, Inc. v. Teachers Realty Corp., 185 Ill.2d 457, 465 (1999) (an integration clause is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement); I.C.C. Prot. Coatings, Inc. v. A.E. Staley Mfg. Co., 695 N.E.2d 1030, 1035 (Ind. App. 1998). The converse is equally true, especially between sophisticated business entities. In this case the MOA contains no integration clause – notwithstanding that the APA did so. The parties' omission of integration language in the MOA reflects their intent that the MOA is not a complete expression of their agreement.

Rozman's August 15, 1005 e-mail (**CX-16** at Bates ##0008-0009) describing the MOA as an "amendment of our formal agreement," and as a reflection of "the spirit of our original agreement" – further support WAMCO's position. At the hearing, Rozman testified that the APA was the "formal" agreement referenced in this e-mail.

G.    **Damages**

1. **Principal and interest due on the Note**

| | |
|---|---|
| Principal unpaid balance: | $186,481.31 |
| Accrued interest as of 9/19/07: | $   6,527.49 |
| **TOTAL as of September 19, 2007:** | **$193,008.80** |

WAMCO has calculated this element of damages based upon the principal balance of the Promissory Note at the date of acceleration, plus interest due thereafter at 9.198 % *per annum* on

that balance (the default rate permitted under the Note), less credits for payments by Diehl. An

additional $47.65 *per diem* in interest will accrue for each day after September 19, 2007.

### 2. Unpaid management fees

In August 2005, Diehl owed **$120,000** in accrued, unpaid management fees to WAMCO.

These fees were purportedly waived by the MOA.

Another $10,000 went unpaid between September 2005 and December 2005, after giving

credit for partial payments by Diehl. Since June 2006, the following management fees are due

and owing from Diehl to WAMCO:

| | |
|---|---|
| July 2006: | $ 6,000 |
| August 2006: | $ 15,000 |
| September 2006: | $ 15,000 |
| October 2006: | $ 15,000 |
| November 2006: | $ 15,000 |
| December 2006: | $ 15,000 |
| January 2007: | $ 15,000 |
| February 2007: | $ 15,000 |
| March 2007: | $ 15,000 |
| April 2007: | $ 15,000 |
| May 2007: | $ 15,000 |
| June 2007: | $ 15,000 |
| July 2007: | $ 15,000 |
| August 2007: | $ 15,000 |
| September 2007: | $ 15,000 |

The total amount accrued after the MOA (including the $10,000 unpaid between September 2005

and December 2005) is **$226,000**. If this Panel adds the pre-MOA and post-MOA management

fees, the amount is **$346,000**. An additional $15,000 in management fees will become due and

owing on the first day of each successive month.

WAMCO is also entitled to 5% pre-judgment interest on the unpaid balances from their

due dates, pursuant to §2 of the Illinois Interest Act.

3. **Attorneys' fees and costs**

Paragraph 14.13 of the APA gives this Panel discretion to award attorneys' fees and costs

to the prevailing party in the event of a breach. Diehl's willful and dishonest behavior warrants

such an award here. The Note requires an award of attorneys' fees and costs relating to

WAMCO's efforts to collect on the debt, due to Diehl's non-payment, as well as its dishonest

litigation tactics.

WAMCO has incurred $94,278 in attorneys' fees in connection with the enforcement of

the management fee, and in collection of the debt evidenced by the Note. The charges are

identified in the affidavits submitted by the undersigned ($84,968 incurred through 9/4/07 – *see*

original affidavit; $9,310 incurred since 9/4/07, – *see* supplemental affidavit). WAMCO has also

incurred AAA filing fees and charges in connection with this claim, which it seeks to recover.

Diehl's counsel has not filed a fee affidavit.

WHEREFORE, Wisconsin Automated Machinery Corp. moves this Panel to enter an

Award in its favor, and against Diehl Woodworking Machinery, Inc., for the relief requested in

WAMCO's Second Supplement to Claims, and for such other and further relief as the Arbitrator

deems necessary and appropriate.

> Respectfully submitted,
> **WISCONSIN AUTOMATED MACHINERY
> CORP.**

**DATED:** September 19, 2007        By: _____

One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for Wisconsin Automated
  Machinery Corp.
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

120116-1                              29

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DIEHL WOODWORKING )
MACHINERY, INC. )
)
         Plaintiff, )
                case 3:07-cv-00263-JVB-CAN   document 59   filed 08/15/2007   page 1 of
-vs- )             CIVIL NO: 3:07-CV-263
)
WISCONSIN AUTOMATED )
MACHINERY CORP., JAY )
EHRLICH and DIMITRIS )
LOUKIDIS )
)
        Defendants. )

**NOTICE OF WITHDRAWAL OF
MOTION TO STAY ARBITRATION**

       Comes now the plaintiff, Diehl Woodworking Machinery, Inc. (hereinafter

"Diehl"), by counsel, and hereby provides notice of the withdrawal of its Motion to Stay

Arbitration. In support of this Notice, Diehl would show the Court as follows:

       1.     Prior to the removal of this action, Diehl filed a Motion to Stay

Arbitration.

       2.     This Court has scheduled a hearing on the Motion to Stay Arbitration for

August 16, 2007 at 11:00 a.m.

       3.     The hearing of arbitration at issue was conducted in Chicago, Illinois on

Monday, August 13, 2007.

       4.     As the hearing has already been conducted, Diehl wishes to withdraw its

Motion to Stay the Arbitration.



EXHIBIT

C-92

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., hereby notifies

the Court it withdraws its Motion to Stay Arbitration set for hearing on August 16, 2007

and for all other just and proper relief in the premises.

CARSON BOXBERGER LLP

By s/Larry L. Barnard
Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff and Third-
Party Defendant

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Notice of Withdrawal.doc

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following: **Stephen Downs, Esq; R. Steven Hearn, Esq. and Andrew Schwartz, Esq.**

s/Larry L. Barnard
(Larry L. Barnard)

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

| | | |
|---|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP., | ) | |
| *Claimant,* | ) | |
| | ) | |
| v. | ) | No. 51 180 01918 06 |
| | ) | |
| DIEHL WOODWORKING MACHINERY, INC., | ) | Arbitrator Morsch |
| *Respondent.* | ) | |

## SUPPLEMENTAL AFFIDAVIT OF ANDREW R. SCHWARTZ

Andrew R. Schwartz, a licensed attorney at law, certifies and states as follows pursuant to 735 ILCS 5/1-109:

1.    I have personal knowledge of the facts alleged herein, and would so testify under oath if called as a witness at trial.

2.    I am an attorney at law.  I have been licensed to practice before the Courts of the State of Illinois continuously from November 10, 1988 to the present.  I am also licensed to practice before the U.S. District Courts for the Northern District of Illinois, District of Colorado, and Western District of Wisconsin, as well as the U.S. Court of Appeals for the Seventh Circuit. I also have several *pro hac vice* admissions, including an admission to practice before the U.S. District Court for the Northern District of Indiana in a related lawsuit now pending there involving the parties to this case.

3.    I am a partner at Sugar, Friedberg & Felsenthal LLP ("SF&F"), where I concentrate my practice in commercial and civil litigation.  I have access to, and am a "custodian" of our billing records.

4.    I have substantial experience handling commercial, civil and matrimonial litigation. In my 18+ years of practice before the Courts of this State, I have handled hundreds of civil cases, including numerous contested matrimonial cases.  I hold an AV (highest) rating from

Martindale-Hubbell, and I was honored as one of the top attorneys in Illinois in the 2007 edition of *Illinois Super Lawyers*. I also have several publications to my credit, including an IICLE chapter on fraudulent transfer litigation, two *Illinois Bar Journal* articles on civil litigation, and an article on attorneys' fee litigation published in the ISBA Matrimonial Section newsletter. A copy of my current resume is attached as **Appendix 1** to the affidavit I previously submitted.

5.    The other SF&F timekeepers are associate attorneys at my office, whose rates are commensurate with their expertise and experience.

6.    SF&F represents Wisconsin Automated Machinery Corp. ("WAMCO") in the above-captioned matter. I am the SF&F billing partner responsible for this matter.

7.    SF&F has rendered valuable legal services to WAMCO and incurred certain charges in connection with the arbitration of this matter, and in connection with the related lawsuit now pending before the U.S. District Court for the Northern District of Indiana. The pertinent services and charges are accurately described in the attached petition.

8.    SF&F's charges are reasonable and proper. In support, I state as follows:

a.  I have substantial experience in civil and commercial litigation;

b.  My billing rate ($350/hr) is well within the range of fees charged by litigators practicing in the Chicago metropolitan area with comparable experience.

c.  The services rendered and costs are reasonable and were necessarily incurred in providing legal representation to WAMCO;

d.  The amount in controversy exceeds $500,000.

d.  Some of the issues in this case have involved contract and arbitration law, as well as relatively complex questions of choice-of-law, comity and civil procedure.

9.    I have kept careful records of the time spent working on behalf of WAMCO in connection with this case.

10.    Billing records are kept in the ordinary course of our practice at SF&F, using TABS III (ABA-approved legal billing software).    For each billable service, the SF&F timekeeper providing that service records each time entry at or immediately after he or she performs each and every item of billable work.    This is done by entering the following data, either onto time sheets, or by inputting it directly into a computer that is networked to our server:

- client;
- matter;
- date;
- billing attorney's initials;
- billing code;
- description of service; and
- hours spent, or fraction thereof.

11.    Similarly, costs are recorded by the individual advancing them, and given to the SF&F secretary for compilation.

12.    A billing secretary subsequently inputs the information written onto time cards into TABS III.    At the end of each billing period, our bookkeeper compiles and prints a detailed computer billing "time run" from the data entered by the timekeepers.

13.    Before an SF&F bill is finalized and submitted to WAMCO, I review a draft bill, at which time I check it for accuracy, and may discount or waive certain charges.    Any changes made to the time run are reflected in the final statement sent to the client.    SF&F followed this procedure with respect to the billing statements generated for WAMCO.

14.    My prior affidavit was submitted on September 5, 2007 and showed entries through and including 9/4/07.    That affidavit did not include the following additional time spent in connection with this matter since then:

```
09/05/07   91   1    P       10   350.00      3.20      1120.00  Draft fee affidavit
09/05/07   91   1    P       61   350.00      0.30       105.00  E-mail to JE forwarding same for review and
                                                                  comment; teleconf. w/ JE re: same
09/05/07   91   1    P       61   350.00      0.10        35.00  E-mail to AAA forwarding fee affidavit
09/10/07   91   1    P        2   350.00      0.20        70.00  Telephone call with JE re: mediation
09/10/07   91   1    P       10   350.00      0.80       280.00  Draft post-closing brief
09/11/07   91   1    P       10   350.00      1.00       350.00  Draft post-closing brief
09/12/07   91   1    P        6   350.00      1.00       350.00  Letter to Mediator Whiteleather
```

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/13/07 | 91 | 1 | P | 2 | 350.00 | 1.20 | 420.00 Telephone call with J. Ehrlich regarding mediation issues; review e-mail traffic; reply to same; letter to mediator (cont'd) |
| 09/14/07 | 91 | 1 | P | 2 | 350.00 | 0.20 | 70.00 Telephone call with JE re: settlement issues |
| 09/14/07 | 91 | 1 | P | 12 | 350.00 | 0.40 | 140.00 Review e-mail traffic; reply to same |
| 09/16/07 | 91 | 1 | P | 10 | 350.00 | 3.10 | 1085.00 Draft post-closing brief. |
| 09/17/07 | 91 | 1 | P | 2 | 350.00 | 0.20 | 70.00 Telephone call with Jay re: settlement issues |
| 09/17/07 | 91 | 1 | P | 10 | 350.00 | 2.80 | 980.00 Draft post-closing brief (continued) |
| 09/17/07 | 91 | 1 | P | 2 | 350.00 | 0.50 | 175.00 Telephone calls (x4) with JE re: mediation/ settlement issues; no serious settlement offer by Diehl/Rozman/Loukidis |
| 09/18/07 | 91 | 1 | P | 10 | 350.00 | 5.30 | 1855.00 Draft post-closing brief (continued) |
| 09/19/07 | 91 | 1 | P | 10 | 350.00 | 6.30 | 2205.00 Draft post-closing brief |

I extracted all of the current line items for which WAMCO seeks reimbursement from a work-in-progress report on our SF&F billing system for WAMCO's account, showing time since September 4, 2007.

FURTHER AFFIANT SAITH NAUGHT.

The undersigned hereby states on his oath that the factual allegations contained in the foregoing **Affidavit** are true and correct to the best of my knowledge and belief.

ANDREW R. SCHWARTZ

Subscribed and sworn to this
19th day of September, 2007

Notary Public

"OFFICIAL SEAL"
JENNIFER L. SHERPAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/17/2007