# PLEADINGS BINDER

Jay Ehrlich                                                    8505.000 Binder #1

Diehl Woodworking v. WAMCO Arbitration

ARS                                                                Litigation

| | | | |
|---|---|---|---|
| 1. | 12/20/06 | Claimant | Demand for Arbitration |
| 2. | 2/16/07 | Claimant | Amended Demand for Arbitration |
| 3. | 3/2007 | Resp. | Answering Statement Of Diehl Woodoworking Machinery, Inc. |
| 3a. | 4/16/07 | Case Mngr. | Confirmation of up coming events |
| 4. | 4/25/07 | Claimant | Supplement To Claims Of Claimant Wisconsin Automated Machinery Corp. |
| 5. | 5/9/07 | Resp. | Respondent's Response To Supplement To Claims Of Claimant Wisconsin Automated Machinery Corp. |
| 6. | 5/31/07 | Claimant | Claimant's Motion For Discovery Sanctions |
| 7. | 6/7/07 | Claimant | Second Supplement To Claims Of Claimant Wisconsin Automated Machinery Corp. |
| 8. | 6/12/07 | Resp. | Respondent's Response To Claimant's Motion For Discovery Of Sanctions |
| 9. | 6/26/07 | Resp. | Respondent's Answer To Count V of Claimant's Second Supplement To Claims |
| 10. | 6/27/07 | Plf | Claimant's Interrogatories To Be Answered Under Oath By Diehl Woodworking Machinery, Inc. |
| 11. | 6/27/07 | Plf | Claimant's Document Requests To Respondent Diehl Woodworking Machinery, Inc. |
| 12. | 6/29/07 | Case Mngr. | Confirmation of upcoming events |
| 13. | 7/11/07 | Case Mngr. | Confirmation of upcoming events |
| 14. | 8/07/07 | Resp. | Motion To Continue Hearing |
| 15. | 8/08/07 | Claimant | Claimant's Witness List/List of Hearing Exhibits |

115302

16.   8/9/07 Resp.          Respondent's Witness and Exhibit List

17.   9/5/07 Claimant       Affidavit of Andrew R. Schwartz

18.   9/19/07 Claimant      Claimant's Post-Closing Brief

19.   10/2/07   Arbitrator  Award Of Arbitrator
                            1.  On or before October 31,2007, Diehl shall pay to
                                WAMCO $50,000.00 for the installments on the
                                Promissory Note due in June, July, August, September
                                and October 2007, plus interest at the rate of 5% per
                                annum on each installment from the date on which it
                                was due to the date of payment
                            2.  WAMCO shall consent to any motion made by Diehl
                                for leave to withdraw the funds deposited with the
                                Clerk of Court, but Diehl shall be obligated to make
                                the payment set forth in Paragraph 1 whether or not
                                such funds are withdrawn.

1

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
here is no additional administrative fee for this service.

| Name of Respondent<br>Diehl Woodworking Machinery, Inc. | | | Name of Representative (if known)<br>Bruce Boxberger | | |
|---|---|---|---|---|---|
| Address<br>981 S. Wabash Street | | | Name of Firm (if applicable)<br>Carson Boxberger LLP | | |
| | | | Representative's Address<br>1400 One Summit Square | | |
| City<br>Wabash | State<br>IN | Zip Code<br>46992 | City<br>Fort Wayne | State<br>IN | Zip Code<br>46802-3173 |
| Phone No.<br>(260) 563-2102 | | Fax No.<br>(260) 563-0206 | Phone No.<br>(260) 423-9411 | | Fax No.<br>(260) 423-4329 |
| Email Address:<br>rfr@diehlmachines.com | | | Email Address:<br>boxberger@carsonboxberger.com | | |

The named claimant, a party to an arbitration agreement dated Sept. 13, 2002* , which provides for arbitration under the
Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

   Breach of contract

| Dollar Amount of Claim $99,000.00 | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Commercial Litigator

Hearing locale Chicago, IL _____   (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br><br>_____ hours or  1  days | Type of Business:  Claimant Management/Investment<br><br>Respondent _____ Manufacturing _____ |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required
by California law.  ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration
Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☒ Dallas, TX   ☐ East Providence, RI
☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you
may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)     Date:<br>12/20/06 | Name of Representative<br>Andrew R. Schwartz | | |
|---|---|---|---|
| Name of Claimant<br>Wisconsin Automated Machinery Corp. | Name of Firm (if applicable)<br>Sugar, Friedberg & Felsenthal LLP | | |
| Address (to be used in connection with this case)<br>30 N. LaSalle Street, #3000 | Representative's Address<br>30 N. LaSalle Street, #3000 | | |
| City<br>Chicago | State<br>IL | Zip Code<br>60602 | City<br>Chicago | State<br>IL | Zip Code<br>60602 |
| Phone No.<br>(312) 704-9400 | | Fax No.<br>(312) 372-7951 | Phone No.<br>(312) 704-9400 | | Fax No.<br>(312) 372-7951 |
| Email Address:<br>Misonst@aol.com | | | Email Address:<br>aschwartz@sff-law.com | | |

   begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as
provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

* as modified, if modified, by an August 2005 "Memorandum of Agreement."

2

# Online Filing Confirmation For Additional Claim

Thank you for submitting your claim to the AAA.

Claim Summary

| | |
|---|---|
| **Claim Amount:** | $225,000.00 |
| **Claim Description:** | Default on promissory note and asset purchase agreement |
| **Filing Fee:** | $2,750.00 |
| **No. of Neutrals:** | 1 |

Your additional claim demand has been submitted successfully.

3

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

WISCONSIN AUTOMATED          )
MACHINERY CORP.              )
                             )
            Claimant         )
                             )        Chicago, Illinois
                             )
     and                     )        Claim No:  51 180 01918 06
                             )
DIEHL WOODWORKING            )
MACHINERY, INC.              )
                             )
            Respondent       )

## ANSWERING STATEMENT OF
## DIEHL WOODWORKING MACHINERY, INC.

### I. OBJECTION TO ARBITRATION

Respondent, Diehl Woodworking Machinery, Inc. (hereinafter "Diehl") objects to

the arbitrability of the initial claim made in the Demand for Arbitration for the payment

of a management fee to the claimant, Wisconsin Automated Machinery Corp. (hereinafter

"WAMCO").    WAMCO's arbitration demand is based on the terms of the Asset

Purchase Agreement which was attached as Exhibit 1 to its Demand for Arbitration.

However, a cursory review of that agreement establishes that it does not create a right to

the management fee.    Indeed, attached as Exhibit 2 is a subsequent Memorandum

Agreement dealing with payment of a management fee.  That Memorandum Agreement

currently governs the parties with respect to the management fee and contains no

arbitration provision.

Indeed, the issue of the arbitrability of this dispute has already been ruled upon in

an action entitled to Diehl Woodworking Machinery, Inc. v. Wisconsin Automated

Machinery Corp., et al in the Wabash Circuit Court under Cause No: 85C01-06080PL-

380.  That is a declaratory judgment action filed by Diehl in the Wabash Circuit Court of

the State of Indiana on August 2, 2006 seeking a declaration of the rights of the parties under the Memorandum of Agreement attached as Exhibit 2 to WAMCO's Demand for Arbitration. In response to that Complaint for Declaratory Judgment, WAMCO filed its Motion to Dismiss or to Compel Arbitration, arguing that that case must be arbitrated pursuant to the terms of the Asset Purchase Agreement. (See attached Exhibit A, Brief in Support of Defendant's Motion to Dismiss). Diehl filed a Memorandum in Opposition to that Motion to Dismiss, arguing that the dispute was not subject to arbitration. (See attached Exhibit B). The Wabash Circuit Court denied the Motion effectively determining that it would not compel arbitration of the issues relating to the Memorandum of Agreement and the management fee. (See attached Exhibit C).

Accordingly, the courts of the State of Indiana have already determined that the dispute relating to the management fee and the Memorandum Agreement are not arbitral and Diehl objects to any attempt to arbitrate that dispute in this forum.

## II. DENIAL OF CLAIM

With respect to the amendment of the Demand for Arbitration seeking to arbitrate a "dispute" concerning the payment of the promissory note executed as part of the Asset Purchase Agreement, Diehl concedes that if there was a valid dispute concerning the payment of that note, it would subject to arbitration pursuant to the Asset Purchase Agreement. However, Diehl contends that WAMCO's attempt to raise this issue in this proceeding is simply a ruse to bring the management fee dispute into arbitration. Indeed, WAMCO cannot allege that Diehl has failed to make any payment pursuant to the terms of the promissory note, because all payments have been made. Instead, based on its pleadings in the Wabash Circuit Court, it appears that WAMCO is contending that it may invoke the insecurity language of the Security Agreement in order to accelerate the

2

payments under the terms of the promissory note. However, attached as Exhibit D is correspondence between Diehl and its bank, National City Bank of Indiana, reflecting that Diehl has available to it more than sufficient funds to pay any amounts due and owing under the terms of the promissory note, and that, WAMCO is in no way insecure with respect to the payment of that note. Stated simply, WAMCO is trying to find a way around litigating the issue of the management fee in Indiana state court and has raised its insecurity claim for the payment of the promissory note under the Asset Purchase Agreement as a red-herring in order to draw that matter into this arbitration proceeding.

Diehl respectfully requests that the arbitrator determine that, pursuant to the ruling of the Wabash Circuit Court, that the management fee is not subject to arbitration, and that WAMCO take nothing by way of its claim under the terms of the promissory note to the Asset Purchase Agreement.

CARSON BOXBERGER LLP


By _____
        Larry L. Barnard (11904-49)
        Bruce O. Boxberger (3535-02)

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\WAMCO Shares Dispute\Statement.doc

## CERTIFICATE OF SERVICE

This will certify that on this ____ day of March, 2007 a true and complete copy of the above and foregoing document was mailed to Andrew Schwartz, 300 N. LaSalle St., #3000, Chicago, Illinois 60602.


                                        _____
                                             (Larry L. Barnard)

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DIEHL WOODWORKING MACHINERY, INC. | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 3:06-CV-517 AS |
| WISCONSIN AUTOMATED MACHINERY | ) |
| CORP., JAY EHRLICH and DIMITRIS | ) |
| LOUKIDIS, | ) |
| | ) |
| Defendants | ) |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants Wisconsin Automated Machinery Corp. ("WAMCO") and Jay Ehrlich

("Ehrlich"), by counsel, pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2) and (b)(6),

argue as follows in support of their motion to dismiss the Plaintiff's Complaint:

### I.    INTRODUCTION

The plaintiff's complaint fails as a matter of law for several different reasons, which can

be summarized as follows:

- *First*, this Court does not have subject-matter jurisdiction, because the entire dispute is properly the subject of arbitration;

- *Second*, arguing in the alternative, this Court does not have personal jurisdiction over WAMCO or Ehrlich; and

- *Third*, arguing in the alternative, Count I of the Complaint does not state a legally viable claim against WAMCO. Count I asks this Court to impose a unilateral modification of a management agreement – with plainly mutual consent – and WAMCO does not consent;

- *Fourth*, arguing in the alternative, Count II of the Complaint does not state a legally viable claim against Ehrlich under Indiana law for breach of fiduciary duty.



These arguments are explained more fully in the following sections, which are supported by the authorities cited below.

## II.   PROCEDURAL STANDARD

Federal Rule of Civil Procedure 12(b) permits a defendant to assert the following defenses by motion:

> (1) Lack of jurisdiction over the subject matter,
> (2) Lack of jurisdiction over the person,
>         *       *       *       *
> (6) Failure to state a claim upon which relief can be granted...

There are at least three procedural vehicles by which this court can resolve the issue related to the claim for arbitration, *see DeGrogg v. Masotech Forming Technologies-Fort Wayne, Inc.*, 179 F. Supp.2d 896, n. 2 (N.D. Ind. 2001):

> (1)   The court can dismiss the litigation for failing to state a claim under Fed. R. Civ. P. 12(b)(6);
>
> (2)   The court can dismiss the litigation for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1); or
>
> (3)   The court can compel litigation and/or stay these proceedings under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), particularly sections 3 and 4 of the FAA.

In this particular case, the Defendants contend that the court should dismiss this claim under Fed. R. Civ. P. 12(b)(6), as Plaintiff should have requested arbitration for the claims.

Defendants also base their claims of dismissal on Fed. R. Civ. P. 12(b)(1), although they were the parties who brought this case to the District Court by their Notice of Removal. Motions to compel arbitration are claims that the court is deprived of subject matter jurisdiction during the course of arbitration. *See Evans v. Hudson Coal Co.*, 165 F.2d 970, 972 (3rd Cir. 1948).

In deciding a motion to dismiss based upon Federal Rule of Civil Procedure 12(b)(1), a court should liberally construe the complaint and is not bound to accept as true allegations of jurisdiction where a party properly raises factual questions of subject matter jurisdiction. The court may look beyond the jurisdictional allegations to examine any evidence submitted to determine if subject matter jurisdiction in fact exists. *Roman v. United States Postal Serv.,* 821 F.2d 382, 385 (7th Cir.1987). Similarly, under Indiana law, when reviewing an Ind. Trial Rule 12(B)(1) motion to dismiss for lack of subject matter jurisdiction, the relevant question is whether the type of claim presented falls within the general scope of the authority conferred upon the court by constitution or statute. The trial court may consider facts outside the pleadings when ruling on a TR.12(B)(1) motion. *Indianapolis-Marion County Public Library v. Shook, LLC,* 835 N.E.2d 533, 539-40 (Ind.App. 2005).

A Fed. Rule Civ. Pro.12(b)(6) motion tests the legal sufficiency of the complaint. The legal standard for addressing a motion to dismiss under Rule 12(b)(6) is well known. A claim is subject to dismissal when it "fail[s] to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss, the Court shall "accept as true all well-pleaded factual allegations [in the complaint] and draw all reasonable inferences in favor of the plaintiff." *See Dawson v. Gen. Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992). "Dismissal under Rule 12(b)(6) is proper only if the plaintiff could prove no set of facts in support of his claims that would entitle him to relief." *Chavez v. Illinois State Police,* 251 F.3d 612, 648 (7th Cir. 2001) *(quoting Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Veazey v. Communications & Cable of Chic., Inc.,* 194 F.3d 850, 854 (7th Cir.1999); see also *Ogden v. Premier Properties, USA, Inc.,* 755 N.E.2d 661, 665 (Ind.App. 2001). Only well-pleaded material facts in the complaint are deemed admitted for purposes of the motion. By

85207-1                                   3

contrast, allegations are not taken as true where they are contradicted by other allegations, or by exhibits attached to or incorporated in the pleading. *Id.* [1]

## III. ARGUMENT

### A. The Plaintiff's Complaint Should be Dismissed for Lack of Subject-Jurisdiction Because This Matter Belongs in Arbitration, or, Alternatively, This Court Should Compel Arbitration

Both Federal law and Indiana law recognize a strong policy favoring enforcement of arbitration agreements. As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint. Rule 10(c) provides, however, "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c). "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Wright v. Assoc. Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). This exception is "aimed at cases interpreting, for example, a contract." *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998). "The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material." *Rosenblum v. Travelbyus.com, Ltd.,* 299 F.3d 657, 661 (7th Cir. 2002); *see also Beanstalk Group, Inc. v. AM Gen. Corp.,* 283 F.3d 856, 858 (7th Cir. 2002).

Under Indiana law, the party seeking to compel arbitration has the burden to show the existence of an enforceable arbitration agreement. When determining whether the parties have agreed to arbitrate a dispute, Indiana law applies ordinary contract principles governed by state law. When construing arbitration agreements, every doubt is to be resolved in favor of

---

[1] Under Indiana law, lack of standing and "real party in interest" objections are properly raised by a TR.12(B)(6) motion. *See Hosler ex rel. Hosler v. Caterpillar, Inc.,* 710 N.E.2d 193, 197 (Ind. App. 1999).

arbitration, and the parties are bound to arbitrate all matters, not explicitly excluded, that reasonably fit within the language used. *Polinsky v. Violi*, 803 N.E.2d 684, 687 (Ind.App. 2004).

The party seeking to compel arbitration must establish the existence of an enforceable arbitration agreement and that the parties intended to arbitrate the issue in dispute. Parties to a contract or those in privity with them have rights under the contract. This principle applies to contracts requiring arbitration of claims. *Id.*

In this case the Memorandum of Agreement clearly references a prior agreement regarding management fees:

- The first recital states that "... Diehl *has previously paid, and is currently paying*, to [WAMCO] or its affiliates a monthly management fee for management consulting and services ..." (emphasis added).

- The second recital says "... the parties intend that [WAMCO] *shall continue to provide* such management consulting and services ..." (emphasis added).

- The third paragraph states "NOW, THEREFORE, in consideration of the premises hereof (*which the parties hereby incorporate and make a part of their agreements herein*) *and* the mutual agreements hereinafter set forth ..." (emphasis added).

The referenced agreement is a September 13, 2002 Asset Purchase Agreement, by which the plaintiff purchased various assets from WAMCO (Exhibit A). As noted above, this Court may consider facts outside the pleadings when ruling on a Fed. Rule Civ. Pro. 12(b)(1) motion, and may therefore consider the Asset Purchase Agreement. *See e.g., Indianapolis-Marion County Public Library*, 835 N.E.2d at 539-40.

The following terms of the Asset Purchase Agreement are material to this dispute:

- Paragraph 6.7 requires the plaintiff to increase a management fee it had been paying to WAMCO to $15,000/month commencing January 1, 2003 "until such time as the parties otherwise mutually agree";

- Paragraph 14.7 required amendments to be in writing and signed by both of the parties; and

85207-1                                                                5

- Paragraph 14.13 requires all controversies, disputes or claims between the parties to be submitted to arbitration before the American Arbitration Association in Chicago.

The parties' agreement to arbitrate their disputes precludes this Court's subject-matter jurisdiction. The complaint should be dismissed, or, alternatively, this Court should order the parties to resolve the dispute by submitting it to arbitration before the AAA in Chicago.

**B.  In the Alternative, the Plaintiff's Complaint Should be Dismissed Pursuant to F.R.C.P. 12(b)(2) Because This Court has no Personal Jurisdiction Over Ehrlich or WAMCO**

Even if this Court overlooks the parties' agreement to arbitrate the dispute, the complaint must be dismissed against WAMCO and Ehrlich for lack of personal jurisdiction.

Paragraphs 2 and 3 of Count I (incorporated by reference into Count II) allege that WAMCO is a Wisconsin corporation, and that Ehrlich is a resident of Illinois. This Court's personal jurisdiction over WAMCO and Ehrlich is therefore governed by Indiana Trial Rule 4.4(A), which lists eight different categories of acts by nonresidents of Indiana as submitting to the jurisdiction of Indiana courts.

The complaint does not allege that WAMCO or Ehrlich have done any of the acts described in Tr. Rule 4.4(A). Therefore, there are no allegations from which this Court could infer that WAMCO and Ehrlich have submitted themselves to this Court's *in personam* jurisdiction, and the complaint should be dismissed.

**C.    In the Alternative, Count I of the Plaintiff's Complaint
Should be Dismissed Because it Fails to State a Viable
Cause of Action Against WAMCO**

Even if this Court overlooks the parties' agreement to arbitrate the dispute, Count I

nevertheless fails – and fails miserably – because it asks this Court to re-write a Memorandum of

Agreement between the plaintiff and WAMCO (Exhibit A to the complaint) in order to give the

plaintiff a better deal than it made.   The plaintiff then asks this Court to let it unilaterally

terminate its contractual obligations to WAMCO.   In "support," the plaintiff cites to ¶1(b) of the

Memorandum of Agreement, which states as follows, in relevant part:

> (b) from time to time said management fee might be reconsidered and
> reduced, increased, eliminated and/or reinstated *by mutual agreement of
> the parties* as [the plaintiff's] business conditions requires [sic] ...

*See* Count I at ¶7; Exhibit A to Complaint at ¶1(b) (emphasis added).

The Memorandum of Agreement unambiguously requires the consent of *both* parties to

change or eliminate the management fee; the plain language of the instrument requiring a *mutual*

agreement to "reconsider," "reduce," "increase," "eliminate" and/or "reinstate" the management

fee prevents one party from doing so unilaterally.   In short, the exhibit attached to the plaintiff's

complaint contradicts its entire theory of relief against WAMCO.

Indiana has long allowed contracting parties to enter into any agreement to which the

parties see fit, as long as the agreement is not illegal or against public policy.   *E.g.*, *Zollman v.

Geneva Leasing Associates, Inc.*, 780 N.E.2d 387, 392 (Ind.App. 2002).   The unambiguous

language of a contract is conclusive and binding on the parties and the court.   Courts will neither

construe unambiguous provisions nor add provisions not agreed upon by the parties.   *Liggett v.

Young*, 851 N.E.2d 968, 977 (Ind. App. 2006); *and see Wenning v. Calhoun*, 827 N.E.2d 627,

630 (Ind. App. 2005) ("The court cannot re-write and then enforce contracts, which, to the knowledge of the court, the parties themselves did not enter into").

For this reason, Count I fails as a matter of law and should be dismissed with prejudice pursuant to Fed. Rule Civ. Pro. 12(b)(6).

**D. In the Alternative, Count II of the Plaintiff's Complaint Should be Dismissed Because it Fails to State a Viable Cause of Action Against Ehrlich**

Even if this Court overlooks the parties' agreement to arbitrate the dispute and the lack of personal jurisdiction over Ehrlich, Count II nevertheless fails as a matter of law for several reasons. The essence of Count II is that:

> ... Ehrlich and Dimitris Loukidis, *as shareholders of Diehl*, have breached their *fiduciary duty to Diehl* by refusing to permit the termination of the monthly management fee paid by Diehl to WAMCO.

*See* Count II at ¶6 (emphasis added).

**1. The plaintiff lacks standing to pursue Count II because Ehrlich does not owe any fiduciary duty *to the plaintiff* as its shareholder**

Every action to be prosecuted in the name of the real party in interest; a real party in interest objection asserts that plaintiff is not the owner of the claim sued on. Similarly, the traditional private standing doctrine requires a party to demonstrate both a personal stake in the outcome of the lawsuit and, at a minimum, that he is in immediate danger of sustaining some direct injury as a result of the conduct at issue. *See eg, Hosler*, 710 N.E.2d at 197.

Under Indiana law, shareholders in a closely-held corporation stand in a fiduciary relationship ***to each other***. *E.g., Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 307 (Ind. App. 2000). The plaintiff does not allege that it is Ehrlich's fellow shareholder; therefore, it has no standing to claim that Ehrlich breached this fiduciary duty.

### 2. Ehrlich's alleged refusal to permit the termination of the WAMCO management fee is not an act involving Ehrlich's capacity as a shareholder of the plaintiff

Even if this Court overlooks the plaintiff's lack of standing, Count II nevertheless fails as a matter of law. The fiduciary duty of a shareholder in a closely-held corporation attaches only to acts done in the capacity of a director, officer, or shareholder. *Riggin*, 738 N.E.2d at 307. Conversely, no fiduciary duty attaches to actions that are not "done in the capacity of a director, officer, or shareholder" of the plaintiff.

As the very existence of this lawsuit attests, Ehrlich's actions as a ***shareholder*** of the plaintiff have not prevented it from seeking to terminate the management fee. Rather, the plaintiff claims that ***WAMCO*** has refused to consent to that termination (*See* Count I, ¶10 – incorporated by reference in Count II, ¶1). In other words, the claim in Count II is that Ehrlich has not caused WAMCO to do what the plaintiff wants.

To the extent Ehrlich has acted on behalf of WAMCO, he does so in his capacity as a ***WAMCO*** officer or director. Under Wisconsin law (which applies because WAMCO is a Wisconsin corporation), a corporation acts only through ***its own*** officers and directors (*City of Kiel v. Frank Shoe Mfg. Co.*, 245 Wis. 292, 297 (1944)) – not through the actions of a shareholder in a different company. Consequently, Ehrlich's actions on behalf of WAMCO are *per se* not violations of his fiduciary duty as a shareholder of the plaintiff.

### 3. Plaintiff has not alleged – and cannot allege that Ehrlich has failed to deal fairly, honestly and openly with the plaintiff or its other shareholders

Even if this Court overlooks the plaintiff's lack of standing and the fact that Ehrlich's actions on behalf of WAMCO were taken in his capacity as a WAMCO officer/director, the

complaint nevertheless fails to state a cognizable breach of fiduciary duty claim. Indeed, the very same Memorandum of Agreement attached to the complaint disproves that argument.

The fiduciary duty between shareholders in a closely-held corporation requires them to "deal fairly, honestly, and openly" with the corporation and their fellow shareholders. *Polinsky* at 688. That duty does *not* require a shareholder to cause third parties to release the corporation from its prior lawful obligations.

The plaintiff's complaint alleges that it entered into the Memorandum of Agreement in August 2005, which date also appears on the document itself (*See* Count I at ¶5). The complaint does not allege – or even suggest – that the plaintiff's signature on the Memorandum of Agreement resulted from any coercion or deception, or any circumstances which might vitiate the formation of a valid contract.[2]

Taking the plaintiff's allegations as true, Ehrlich's alleged actions do not constitute a breach of fiduciary duty, because he has not acted "unfairly," "dishonestly," or less than "openly." The plaintiff considered the Memorandum of Agreement "fair" in August 2005, or it would have signed the document; therefore, any insistence that the plaintiff honor its bargain is neither "unfair" nor "dishonest." Likewise, the plaintiff has obviously known of the existence of the Memorandum of Agreement for over a year – which defeats any possible argument that Ehrlich has not dealt "openly."

In short, the plaintiff cannot obtain the unilateral reformation it seeks indirectly, by bringing a non-existent "breach of fiduciary duty" claim. As noted *supra*, Indiana gives parties the freedom to enter into contracts, as long as those contracts are not illegal or against public policy. *Zollman*, 780 N.E.2d at 392. A necessary component of that freedom is a contracting

---

[2] It is also worth noting that neither Ehrlich nor his co-defendant Dimitris Loukidis signed the Memorandum of Agreement on behalf of the plaintiff.

10

party's duty to fulfill that promise, and the Court's inability to re-write them by adding terms to which the parties never agreed. *Liggett*, 851 N.E.2d at 977; *Wenning*, 827 N.E.2d at 630.

### 4. The plaintiff has not sustained any damages

By asking to terminate its contractual obligation to pay $15,000 per month as a management fee to WAMCO under the Memorandum of Agreement, the plaintiff necessarily admits its contractual obligation to pay that monthly fee. The fact that the plaintiff must pay a legal obligation it admittedly owes does not cause it any harm, or create any actionable damage. Otherwise, the law of contracts would cease to exist.

For these reasons, Count II fails as a matter of law and should be dismissed with prejudice as against Ehrlich pursuant to Fed. Rule Civ. Pro 12(b)(6).

## IV. CONCLUSION

The plaintiff's complaint is frivolous and should be dismissed for the reasons discussed above.

WHEREFORE, the Defendants Wisconsin Automated Machinery, Corp. and Jay Ehrlich respectfully move this Court to dismiss the plaintiff's complaint as to them, together with all other just and proper relief as the court deems necessary and appropriate.

85207-1                          11

Respectfully submitted,

**ROTHBERG LOGAN & WARSCO LLP**

Dated: September 29, 2006

By /s/ Theodore T. Storer
  R. Steven Hearn (7618-43)
  Theodore T. Storer
  Attorneys for Defendants Wisconsin Automated
  Machinery Corp. and Jay Ehrlich
  **ROTHBERG LOGAN & WARSCO LLP**
  212 North Buffalo Street
  Warsaw, Indiana 46580
  Telephone:574-267-8802

  Suite 2100, 110 West Berry Street
  Post Office Box 11647
  Fort Wayne, Indiana 46859-1647
  Telephone:(260) 422-9454
  Facsimile: (260) 422-1622

## CERTIFICATE OF SERVICE

   The undersigned hereby certifies that he served a true and correct copy of the above and foregoing Memorandum in Support of Motion to Dismiss or in the alternative to Compel Arbitration, upon:

Dimitris Loukidis     Larry L. Barnard
3730 Warren Court     **Carson Boxberger LLP**
Racine, WI 53405     1400 One Summit Square
           Fort Wayne, IN 46802
           *llb@carsonboxberger.com*

by ECF and/or by depositing the same in the United States mail, postage prepaid, on September 29, 2006.

         /s/ Theodore T. Storer
         Theodore T. Storer

STATE OF INDIANA        )
                        ) SS:
COUNTY OF WABASH        )

IN THE WABASH CIRCUIT COURT

CAUSE NO: 85C01-0608-PL-380

DIEHL WOODWORKING       )
MACHINERY, INC.         )
                        )
        Plaintiff,      )
                        )
    -vs-                )
                        )
WISCONSIN AUTOMATED     )
MACHINERY CORP., JAY    )
EHRLICH and DIMITRIS    )
LOUKIDIS                )
                        )
        Defendants.     )

**FILED**

DEC 19 2006

~~Lori J Draper~~
WABASH CIRCUIT SUPERIOR COURT CLERK

## <u>MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS</u>

In their Motion to Dismiss, defendants, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO") and Jay Ehrlich seek dismissal of this action pursuant to Trial Rule 12 of the Indiana Rules of Procedure on several distinct grounds. First, WAMCO and Ehrlich contend that this court lacks subject matter jurisdiction in this case because this dispute is subject to arbitration. Second, WAMCO and Ehrlich contend that this Court lacks personal jurisdiction over them. Third, WAMCO and Ehrlich contend that Count I of the Complaint does not state a cause of action against WAMCO. Finally, WAMCO and Ehrlich contend that Count II of the Complaint does not state a cause of action against Ehrlich for breach of fiduciary duty. However, each of these arguments must fail.

First, this Court has subject matter jurisdiction of this action. Moreover, the contract at issue in this case does not contain an arbitration provision. Indeed, despite



EXHIBIT
B

WAMCO's and Ehlrich's assertions to the contrary, nor does it incorporate by reference any agreement which contains an arbitration provision. Second, WAMCO and Ehrlich have wholly failed to meet their burden to establish that this Court lacks personal jurisdiction over them. Indeed, WAMCO and Ehrlich have presented no evidence whatsoever with respect to the issue of personal jurisdiction. Third, Count I of the Complaint states a claim for relief in the form of a declaratory judgment as to the parties' rights and obligations under the contract at issue. Finally, Count II states a claim against Ehrlich in that Ehrlich owes a fiduciary duty not only to his fellow shareholders in plaintiff, Diehl Woodworking Machinery, Inc. (hereinafter "Diehl"), but also to Diehl itself. Accordingly, the Motion to Dismiss should be denied.

## I. **This Court has Subject Matter Jurisdiction Over this Action**.

WAMCO and Ehrlich contend that this Court lacks subject matter jurisdiction over this action because this is a matter which should be subject to arbitration. A party challenging a trial court's subject matter jurisdiction bears the burden of proving that jurisdiction does not exist. Indianapolis-Marion County Public Library v. Shook, LLC, 835 N.E.2d. 533, 539 (Ind.App. 2005). Subject matter jurisdiction is the power to hear and determine cases of a general class to which the proceedings before the court belong. Id. In determining a motion under Trial Rule 12(B)(1) to dismiss for lack of subject matter jurisdiction, the relevant question is whether the type of claim presented falls within the general scope of the authority conferred upon the court by the constitution or statute. Id.

2

In this case, there can be no dispute that this court has subject matter jurisdiction over Diehl's claim for a declaratory judgment to determine the parties' obligations under the contract at issue. First, Ind. Code §34-14-1-1 grants to the courts of this state jurisdiction to determine declaratory judgment proceedings. Second, the Indiana Supreme Court has recognized that the trial courts in this state have jurisdiction over contract claims. Austin Lakes Joint Venture v. Avon Utilities, Inc., 648 N.E.2d 641, 649 (Ind. 1995); Indianapolis-Marion County Public Library supra at 540. Accordingly, as a general matter, it is clear that this court has subject matter jurisdiction over this action.

Moreover, despite the assertions of WAMCO and Ehrlich to the contrary, this Court is under no obligation to enter an Order to compel arbitration. Under Indiana law, a party seeking to compel arbitration has the burden of demonstrating the existence of an enforceable agreement to arbitrate the dispute. Showboat Marina Casino Partnership v. Tonn & Blank Construction, 790 N.E.2d 595, 597 (Ind.App. 2003); Mislenkov v. Accurate Metal Detinning, Inc., 743 N.E.2d 286, 289 (Ind.App. 2001). Second, the party must prove that the disputed matter is the type of claim the parties agreed to arbitrate. Id. However, the parties are only bound to arbitrate those issues that by clear language they have agreed to arbitrate; arbitration agreements will not be extended by construction or implication. Showboat Marina at 598; Mislenkov, supra.

In this case, there is no arbitration agreement contained in the Memorandum of Agreement attached as Exhibit A to Diehl's Complaint (hereinafter "Agreement") and which is the subject of this action. Instead, WAMCO and Ehrlich argue that the 2002 Asset Purchase Agreement between the parties is somehow incorporated by reference in the Agreement. However, a cursory review of the Agreement contract discloses that

3

there is no incorporation of the prior Asset Purchase Agreement in the Agreement at issue in this case. Certainly, there is no explicit reference to the 2002 Asset Purchase Agreement. Instead, WAMCO and Ehrlich would have this Court do what Indiana case law says it cannot, to extend the arbitration agreement contained in the 2002 Asset Purchase Agreement by construction or implication.

In short, Diehl did not agree to arbitrate any dispute arising under the Agreement at issue in this case. On that basis alone, the Motion to Dismiss or Compel Arbitration should be denied.[1]

## II. WAMCO and Ehrlich Have Failed to Meet Their Burden of Establishing That This Court Lacks Personal Jurisdiction.

WAMCO and Ehrlich argue that because the Complaint in this matter does not allege any of the acts set forth under Trial Rule 4.4(A) of the Indiana Rules of Procedure, there is no basis from which this Court can infer that they have submitted themselves to this Court's personal jurisdiction and, therefore, this action must be dismissed. However, because Indiana state trial courts are courts of general jurisdiction, jurisdiction is presumed. Anthem Insurance Company, Inc. v.  Tennant Healthcare Corporation, 730 N.E.2d. 1227, 1231 (Ind. 2000), overruled in part on other grounds, LinkAmerica Corporation v. Albert, 2006 W.L. 3491623 (Ind. 2006). Accordingly, there is no need for a plaintiff to allege jurisdiction in its Complaint. North Texas Steel Company, Inc. v. R.R. Donnelley & Sons Company, 769 N.E.2d. 513, 519 (Ind.App. 1997). A party challenging jurisdiction must establish a lack of jurisdiction by a preponderance of the

---

[1] The arbitration provision of the Asset Purchase Agreement does not require arbitration of all future disputes between Diehl and WAMCO. Indeed, a review of that provision discloses that it simply requires the party to arbitrate any dispute or claims between the parties arising out of that 2002 Asset Purchase Agreement. Diehl makes no such claims in this matter.

evidence, unless the lack of jurisdiction is apparent on the face of the Complaint. Id; Anthem, supra.

In this case, WAMCO and Ehrlich have neither argued that the lack of jurisdiction is apparent on the face of the Complaint or presented any evidence to meet their burden of proof of the lack of personal jurisdiction. Instead, WAMCO and Ehrlich have simply alleged that Diehl failed to plead a basis for jurisdiction in its Complaint. Clearly, Diehl was under no obligation to do so under Indiana law and the Motion to Dismiss for lack of personal jurisdiction should be denied on that basis.

Moreover, it seems clear that personal jurisdiction is present in this case. While following the 2003 amendment to Indiana Trial Rule 4.4(A), it is no longer necessary to demonstrate the presence of one of the enumerated acts found in that rule in order to assert personal jurisdiction over a non-resident defendant, the enumerated acts found serve as a handy checklist of activities that support personal jurisdiction. LinkAmerica, supra at *3. In this case, Trial Rule 4.4(A)(4) provides for jurisdiction over a non-resident having contracted to supply services to be furnished in this state. Clearly, the dispute in this case between Diehl and WAMCO, involves WAMCO's obligations to provide management consulting services to Diehl, an Indiana corporation, with a principal place of business in Wabash County, Indiana. Accordingly, WAMCO and Ehrlich, who was a shareholder and director in Diehl, are clearly subject to personal jurisdiction in this matter. Therefore, the Motion to Dismiss should be denied on that basis.

5

### III. **Count I of the Complaint States a Claim For Relief Against WAMCO.**

WAMCO contends that Count I of Diehl's Complaint fails to state a claim upon which relief can be granted against it because Diehl is asking the Court to rewrite the Agreement in order to give Diehl a better deal than it made. However, it is beyond dispute that Diehl has a right to seek a declaratory judgment of its rights and obligations under the Agreement.

A Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Trial Rule 12(B)(6) tests the legal sufficiency of a claim and not the facts supporting the claim. Indianapolis-Marion County Public Library, supra at 538. A court may grant a Motion to Dismiss only if it is apparent that the facts alleged in the complaint are incapable of supporting relief under any set of circumstances. Id. Put another way, courts look only to the complaint when determining whether any facts support the claim. Id.

In this case, Count I of Diehl's Complaint asks the Court to enter a declaratory judgment declaring the rights and obligations of the parties under the terms of the Agreement. Specifically, Diehl seeks to have this Court determine whether it has a continuing obligation to pay the management fee when WAMCO is not providing any management consulting services as set forth in the Agreement.

Pursuant to Ind. Code §34-14-1-2, a party to a written contract may have determined any question of construction or validity of the contract and obtain a declaration of its rights and obligations thereunder. That is precisely what Diehl seeks in this case. Diehl seeks an order of this Court finding that where the only consideration it received for payment of the management fees under the Agreement, that being the

6

management consulting services to be performed by WAMCO has failed, it has no further obligation under the terms of the Agreement to continue to pay the management fee. Clearly, there are facts under which Diehl would be entitled to declaratory relief in this matter and, therefore, the Motion to Dismiss for failure to state a claim must be denied.

### IV. Count II States a Cause of Action for Breach of Fiduciary Duty Against Ehrlich.

Ehrlich contends that Count II fails to state a claim upon which relief can be granted against him because he owes no duty to Diehl as a shareholder. Instead, Ehrlich argues that any duty he owed would be to the other shareholders of Diehl. However, this argument is simply not supported by Indiana law.

The duty imposed on a fiduciary is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation. G&N Aircraft, Inc. v. Boehm, 743 N.E.2d. 227, 240 (Ind.App. 2001). A shareholder in a close corporation must deal fairly, honestly and openly with the corporation and his fellow stockholders. Id; McClinden v. Coco, 765 N.E.2d. 606, 615 (Ind.App. 2002). Shareholders may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and the corporation. Id.

Accordingly, in this case, Ehrlich owed a fiduciary duty not only to his fellow stockholders, but to Diehl as well. The Complaint in this case alleges that he, on behalf of WAMCO, breached that duty by continuing to require Diehl to pay the management fee, despite the fact that WAMCO was not providing any management consulting services.

7

Ehrlich further argues that Count II fails to state a claim upon which relief can be granted because he was not alleged to have been acting as a shareholder of Diehl. However, the claim against him in this case is for breach of his fiduciary duty of loyalty to Diehl in the manner in which he dealt with Diehl. As noted above, as a shareholder and director in a close corporation, Ehrlich was under an obligation not to be distracted from the performance of his duties by his personal interest and to deal fairly, honestly and openly with Diehl. G&N Aircraft, supra. Moreover, Indiana courts have recognized a breach of a fiduciary duty to a corporation against a shareholder or director acting in a different capacity who, for himself or another entity, deprives the corporation of a business opportunity. McClinden, supra. Clearly, such a breach of duty was not undertaken as the shareholder for the corporation, but rather in a capacity competing with the corporation. Accordingly, despite Ehrlich assertion to the contrary, Ehrlich can be liable in this case for breaching the fiduciary duty owed to Diehl as a result of his actions in controlling WAMCO.

Finally, Ehrlich argues that the Complaint fails to state a claim because it does not alleged that he has acted dishonestly or less than openly. However, this ignores the fact that Ehrlich has a duty of loyalty to Diehl and a duty to act fairly to Diehl. Certainly, a jury could determine that Ehrlich is not acting with loyalty to Diehl by requiring Diehl to continue to pay a management fee to WAMCO for management consulting services it is not receiving. Moreover, a jury could conclude Ehrlich is not dealing fairly with Diehl by continuing to require such payments to WAMCO when they have not been earned. Accordingly, there are facts which would support the claims for breach of fiduciary duty in this case and, therefore, the Motion to Dismiss should be denied on that basis.

8

## V. Conclusion

For all the foregoing reasons, WAMCO's and Ehrlich's Motion to Dismiss should

be denied its in entirety.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Attorneys for Plaintiff

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Memo in Opposition.doc

## CERTIFICATE OF SERVICE

This will certify that on this 18th day of December, 2006, a true and complete copy of the above and foregoing document was mailed to Ted Storer, Esq., Courthouse Mail #56 and Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202.

_____
(Larry L. Barnard)

9

CIVIL NOTICE
WABASH CIRCUIT COURT
WABASH COUNTY JUDICIAL CENTER
49 WEST HILL STREET
WABASH IN 46992

DIEHL WOODWORKING V WISCONSIN                    85C01-0608-PL-380
----------------------------------------------------------------------

    TO: LARRY L BARNARD
        CARSON BOXBERGER
        1400 ONE SUMMIT SQUARE
        FORT WAYNE IN 46802


----------------------------------------------------------------------
        ATTORNEYS                              PARTIES
----------------------------------------------------------------------
                                       PLAINTIFF(S)
   11904-49   LARRY BARNARD              DIEHL WOODWORKING MACHINERY INC
   3535-02    BRUCE BOXBERGER

                                       DEFENDANT(S)
   7618-43    R STEVEN HEARN             WISCONSIN AUTOMATED MACHINERY CORP
   17576-02   THEODORE STORER
                                        DIMITRIS LOUKIDIS
   7618-43    R STEVEN HEARN             JAY EHRLICH
    576-02    THEODORE STORER
----------------------------------------------------------------------


   01/16/2007

Plaintiff appears by Counsel Barnard.  Defendant appears by Counsel Hearn.
 Oral argument heard and issues taken under advisement.*


   01/16/2007

Having previously taken issues under advisement, Court does now deny, in
all respects, Defendant's Motion to Dismiss or, in the alternative, to
Compel Arbitration.  OE on Order for Mediation.*



# National City.

National City Bank of Indiana
110 West Berry Street
Fort Wayne, Indiana 46802

**Brian J. Heflin**
Assistant Vice President
Phone: (260) 461-6275
Fax: (260) 461-6203

March 7, 2007

Mr. Robert F. Rozman
President
981 South Wabash Street
Wabash, IN 46992

Dear Robert,

Please accept this letter as confirmation that Diehl Woodworking Machinery, Inc. is in good standing with National City Bank. National City recently renewed our $1 million revolving line of credit facility. The line has a balance of $184,000 or $806,000 in availability as of March 07, 2007. We are very pleased to offer this written summary and look forward to working diligently to serve your existing and future financial requirements.

Sincerely,

Brian J. Heflin

**EXHIBIT**

3a

**American Arbitration Association**

*Dispute Resolution Services Worldwide*

*Central Case Management Center*
Molly Bargenquest
Vice President
Tracey Patten
Assistant Vice President

April 16, 2007

13455 Noel Road - Suite 1750, Dallas, TX 75240
telephone: 972-702-8222 facsimile: 972-490-9008
internet: http://www.adr.org/

**VIA EMAIL ONLY**

Andrew R. Schwartz, Esq.
Sugar, Friedberg & Felsenthal
30 North LaSalle Street, Suite 3000
Chicago, IL 60602

**VIA FACSIMILE ONLY**

Bruce O. Boxberger, Esq.
Carson Boxberger LLP
1400 One Summit Square
Ft. Wayne, IN 46802

Re: 51 180 01918 06
    Wisconsin Automated Machinery Corp.
    and
    Diehl Woodworking Machinery
    - Chicago, Illinois
    Claim: 225,000.00

Gentlemen:

This will confirm a preliminary hearing in the above matter was held on April 12, 2007, and the following arrangements were made:

An additional preliminary hearing shall be held May 15, 2007 at 11:00 A.M. C.D.T.

Claimant shall file a supplement to claims on or before April 26, 2007.

Respondent shall file a response to claims on or before May 9, 2007.

Not later than July 31, 2007 the parties shall exchange copies of (or, when appropriate, make available for inspection) all exhibits to be offered and all schedules, summaries, diagrams and charts to be used at the hearing. Each proposed exhibit shall be pre-marked for identification and tabbed in 3-ring binders to the extent possible.

The Association does not require a set of exhibits for our file.

The hearing has been set for August 13 and 14, 2007, pursuant to the enclosed Notice of Hearing.

This case will be administered by facilitating the exchange of appropriate written documents through the AAA. Please submit all correspondence to the undersigned for transmittal to the arbitrator, copying the other party.

All deadlines shown herein will be strictly enforced. After such deadline, the parties may not file such motions except with the permission of the arbitrator, good cause having been shown.

This order shall continue in effect unless and until amended by subsequent order of the arbitrator.

You may also share and manage correspondence through AAA's WebFile. The Case Manager will determine who should receive viewing privileges and grant access accordingly.

Each party has been billed $6,200.00 as a deposit to cover the arbitrator's anticipated compensation and expenses for this matter. This amount was determined by the arbitrator and based on the overall case schedule that the parties arrived at during the Preliminary Hearing. As we discussed at the conclusion of the Preliminary Hearing, payment is to be received by the Association no later than July 13, 2007, which is thirty days prior to the first evidentiary hearing. You will be receiving an automatically generated invoice within two weeks and every thirty days thereafter, until the balance is paid. Should you need a copy immediately to facilitate payment please let me know. This will also confirm our discussion that we will be informing the arbitrator of the amount on deposit as of the due date, and if full deposits are not on hand the arbitrator may suspend this proceeding pending the parties' compliance with the rules.

Additionally, each party's invoice will reflect any applicable administrative fees due the Association.

You may also view case financial information, as well as make payments with a credit card online via AAA's WebFile.

If you have any questions, please do not hesitate to call.

Sincerely,

Wilma Rooney
Case Manager
866 440 1796
RooneyW@adr.org

*Supervisor Information: Jennifer L. Bell, 972 702 8222, Bellj@adr.org*

Encl.

cc: Thomas H. Morsch, Esq., w/ encl., **VIA FACSIMILE ONLY**
    Larry Barnard, Esq., w/ encl., **VIA FACSIMILE ONLY**

# AMERICAN ARBITRATION ASSOCIATION
## Notice of Hearing

April 16, 2007

Andrew R. Schwartz, Esq.
Sugar, Friedberg & Felsenthal
30 North LaSalle Street, Suite 3000
Chicago, IL 60602

Bruce O. Boxberger, Esq.
Carson Boxberger LLP
1400 One Summit Square
Ft. Wayne, IN 46802

Re: 51 180 01918 06
    Wisconsin Automated Machinery Corp.
    and
    Diehl Woodworking Machinery
    - Chicago, Illinois
    Claim: 225,000.00


PLEASE TAKE NOTICE that a hearing in the above-entitled arbitration will be held as follows:

Place:  American Arbitration Association
        225 N. Michigan Ave.
        Suite 1840
        Chicago, IL 60601

Date:  August 13 and 14, 2007
Time:  09:00 AM
Before: Thomas H. Morsch

NOTE: Should you require special equipment for the hearing, please contact your Case Manager

Please attend promptly with your witnesses and be prepared to present your proofs.

        Wilma Rooney
        Case Manager
        866 440 1796

NOTICE: The arbitrator have arranged their schedule and reserved the above date(s). Therefore, every effort should be made to appear on the date(s) scheduled. In the event that unforeseen circumstances make it impossible to attend the hearing as scheduled, a party requesting a postponement should obtain the agreement of the other party(s). If there is no mutual agreement, the arbitrator will make a determination. All requests for postponements must be communicated to the Case Manager, not the arbitrator. There should be no direct communication between the parties and the neutral arbitrator. In some instances, postponements are subject to cancellation fees by the arbitrator. Any party wishing a stenographic record must make arrangements directly with the stenographer and notify the other party(s) of the arrangements in advance of the hearings.

cc: Thomas H. Morsch, Esq.

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

| STMT DATE | AMOUNT DUE |
|---|---|
| 04/16/2007 | 8200.00 |

| CASE# |
|---|
| 51-180-01918-06 01 WIRO-R |

Payment Due Upon Receipt

## INVOICE/STATEMENT

Andrew R. Schwartz Esq.
Sugar, Friedberg & Felsenthal
30 North LaSalle Street, Suite 3000
Chicago IL 60602

Representing Wisconsin Automated Machinery Corp.
Re: Diehl Woodworking Machinery
- Chicago, Illinois
Claim: 225,000.00

Please Detach and Return with Payment to the Above Address          Please Indicate Case No. on check

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME    Andrew R. Schwartz Esq.
Sugar, Friedberg & Felsenthal
30 North LaSalle Street, Suite 3000
Chicago IL 60602

Representing Wisconsin Automated Machinery Corp.
Re: Diehl Woodworking Machinery
- Chicago, Illinois
Claim: 225,000.00

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 04/16/2007 | 51-180-01918-06 01 WIRO-R | 0.00 | 5150.00- | 13350.00 | 8200.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 12/22/2006 | 9385809 | Initial Administrative Fee | 1800.00 | | |
| 12/22/2006 | VQCA0D4E69B3 | Payment recvd from : Jay Ehrlich | | 1800.00 - | |
| 12/16/2007 | 9412837 | Initial Administrative Fee | 2750.00 | | |
| 02/1 | VUHA0E14FBF5 | Payment recvd from : Jay Ehrlich | | 2750.00 - | |
| 03/08/2007 | 9420669 | Your Share of the Neutral Compensation Deposit covering 4 hours of Preliminary Matters | 600.00 | | |
| 04/09/2007 | 54866583 | Payment recvd from : Wisconsin Automated Machinery Corp | | 600.00 - | |
| 04/12/2007 | 9444376 | Case Service Fee | 750.00 | | |
| 04/12/2007 | 9444377 | Case Service Fee | 1250.00 | | 750.00 |
| 04/12/2007 | 9444439 | Your Share of the Neutral Compensation Deposit covering 2 days of Hearing | 5000.00 | | 1250.00 |
| 04/16/2007 | 9445266 | Your Share of the Neutral Compensation Deposit covering 8 hours of Study | 1200.00 | | 5000.00 |
| | | | | | 1200.00 |

**Remarks:** For any inquiry please call: 866-440-1796
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 8200.00 |
|---|---|

Please Indicate Case No. on check

| INVOICE SUMMARY: | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|
| INITIAL/COUNTER-CLAIM FEES | 6550.00 | 4550.00 | 2000.00 |
| HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 0.00 | 0.00 | 0.00 |
| REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| NEUTRAL COMPENSATION/EXPENSES | 6800.00 | 600.00 | 6200.00  EIN: 13-0429745 |

# American Arbitration Association
*Dispute Resolution Services Worldwide*

| | STMT DATE | AMOUNT DUE |
|---|---|---|
| | 04/16/2007 | 6800.00 |

| CASE# |
|---|
| 51-180-01918 02 WIRO-R |

**Payment Due Upon Receipt**

## INVOICE/STATEMENT

Bruce O. Boxberger
Carson Boxberger LLP
1400 One Summit Square
Ft. Wayne IN 46802

Representing Diehl Woodworking Machinery
Re: Wisconsin Automated Machinery Corp.

### Please Detach and Return with Payment to the Above Address    Please Indicate Case No. on check

13455 Noel Road - Suite 1750
Dallas, TX 75240

# American Arbitration Association
*Dispute Resolution Services Worldwide*

NAME   Bruce O. Boxberger
Carson Boxberger LLP
1400 One Summit Square
Ft. Wayne IN 46802

Representing Diehl Woodworking Machinery
Re: Wisconsin Automated Machinery Corp.

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 04/16/2007 | 51-180-01918-06 02 WIRO-R | 0.00 | 0.00 | 6800.00 | 6800.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 03/06/2007 | 9420670 | Your Share of the Neutral Compensation Deposit covering 4 hours of Preliminary Matters | 600.00 | | |
| | | | | | 600.00 |
| 04/12/2007 | 9444440 | Your Share of the Neutral Compensation Deposit covering 2 days of Hearing | 5000.00 | | |
| | | | | | 5000.00 |
| 04/16/2007 | 9445287 | Your Share of the Neutral Compensation Deposit covering 8 hours of Study | 1200.00 | | |
| | | | | | 1200.00 |

**Remarks:** For any inquiry please call: 866-440-1796
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 6800.00 |
|---|---|

Please Indicate Case No. on check

| INVOICE SUMMARY: | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|
| INITIAL/COUNTER-CLAIM FEES | 0.00 | 0.00 | 0.00 |
| HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 0.00 | 0.00 | 0.00 |
| REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| NEUTRAL COMPENSATION/EXPENSES | 6800.00 | 0.00 | 6800.00   EIN: 13-0429745 |

4

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

WISCONSIN AUTOMATED MACHINERY  )
CORP.,                         )
        *Claimant,*            )
                               )
   v.                          )    No. 51 180 01918 06
                               )
DIEHL WOODWORKING MACHINERY, INC.,  )
        *Respondent.*          )

## SUPPLEMENT TO CLAIMS OF CLAIMANT
## WISCONSIN AUTOMATED MACHINERY CORP.

Claimant Wisconsin Automated Machinery Corp. ("WAMCO"), by its undersigned

counsel, hereby supplements its claims against the Respondent, Diehl Woodworking Machinery,

Inc. ("Diehl"):

### Allegations Common to All Counts

1.     WAMCO is a Wisconsin corporation, with its principal place of business located

in Chicago, Illinois.

2.     Diehl is an Indiana corporation with its principal place of business in Wabash

County, Indiana.

3.     Prior to September 2002, Diehl and WAMCO had transacted business together.

During that time, WAMCO had, *inter alia,* provided certain management services to Diehl when

requested by Diehl, for which Diehl paid management fees to WAMCO.  The management

consulting and services furnished by WAMCO included business, legal and engineering advice.

4.     In September 2002, Diehl and WAMCO entered into an Asset Purchase

Agreement, a true and correct copy of which is attached hereto and incorporated herein as

**Exhibit 1**.  The primary purpose of the Asset Purchase Agreement was the sale of certain

product lines and associated properties by WAMCO to Diehl.

5.    As part of the transaction covered by the Asset Purchase Agreement, the parties

agreed that Diehl would increase the management fee paid to WAMCO to $15,000/month

commencing January 2003. For its part, WAMCO agreed to continue providing management

consulting and services requested by Diehl from time to time.

6.    Pursuant to the Asset Purchase Agreement, Diehl paid the $15,000/month

management fee to WAMCO until 2004.

7.    In 2004, Diehl experienced some temporary business difficulties, and the parties

became concerned about its continued viability. To accommodate Diehl, the parties engaged in

discussions about temporarily reducing the management fee required under the Asset Purchase

Agreement, so Diehl could reduce its expenses.

8.    In August 2005, the parties executed a Memorandum of Agreement (**Exhibit 2**).

The Memorandum of Agreement was never intended to provide a complete expression of the

parties' relationship, or to be a novation of the Asset Purchase Agreement; the instrument clearly

shows that the parties did not mean to change the scope of the management services to be

provided by WAMCO to Diehl, or any other aspect of the Asset Purchase Agreement. Rather,

the Memorandum of Agreement simply purports to modify Diehl's obligation to pay monthly

management fees.

9.    The Asset Purchase Agreement contemplates subsequent written modification

(¶14.7), and provides that it is to be governed, construed and enforced in accordance with Illinois

law (¶14.8).

10.    The Asset Purchase Agreement also contains an arbitration clause (¶14.13), which

reads as follows, in relevant part:

> Any controversy, dispute or claim between the parties arising out
> of, related to or in connection with this Agreement or the
> performance or breach hereof, including with respect to the

arbitrability of such controversy, dispute or claim and the scope
and applicability of this paragraph 14.13, shall be submitted to
and settled by arbitration conducted by the American Arbitration
Association in Chicago, Illinois, in accordance with its commercial
arbitration rules as then in effect; ...In addition to and not in
substitution for any and all other relief in law or equity, the
arbitrator may grant equitable relief and specific performance to
compel compliance hereunder.  The determination of the
arbitrator shall be accompanied by a written opinion of the
arbitrator ... [T]he arbitrator may in his discretion award
attorneys' fees and expenses in addition to any other remedy that
is allowed and regardless of whether such remedy includes an
award of damages.

### Count I:  Claim for Declaratory Relief

11.     WAMCO repeats and realleges the foregoing allegations as ¶11 of this Count I, as
though the same were fully set forth herein.

12.     WAMCO did not receive any consideration for its reduction of the management
fee in 2004, or the execution of the Memorandum of Agreement in 2005.

13.     Illinois governs the construction and enforcement of the Memorandum of
Agreement because it relates to the parties' rights and liabilities under the Asset Purchase
Agreement relating to management services and fees.

14.     735 ILCS 5/2-701(a) permits anyone interested in a contract or other written
instrument to seek a declaration of the rights of the interested parties.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an
award providing the following relief:

A.     Declaring that the Memorandum of Agreement is null and void for want of
consideration;

B.     Declaring that all rights relating to the management fees due from Diehl to
WAMCO are governed by the Asset Purchase Agreement; and

C.     For such other and further relief as this Panel deems necessary and appropriate.

114384-1                                    3

## Count II:
### Claim for Breach of Asset Purchase Agreement
### (unmodified by Memorandum of Agreement)

15.     WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶15 of this Count II, as though the same were fully set forth herein.

16.     WAMCO has performed all conditions on its part to be performed under the Asset Purchase Agreement.

17.     In breach of the Asset Purchase Agreement, Diehl has failed and refused to pay the management fee due to WAMCO.

18.     As a consequence of Diehl's breach of the Asset Purchase Agreement, WAMCO has suffered significant damages, which will continue to increase throughout the remainder of term for which the management fees are due and owing.

19.     Diehl's refusal to pay management fees has been vexatious.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for $231,000 in damages, plus additional management fees at the rate of $15,000/month as may accrue up to, and including the date of the Award, plus WAMCO's arbitral costs, reasonable attorneys' fees, and pre-judgment interest pursuant to the Illinois Interest Act, and for such other and further relief as this Panel deems necessary and appropriate.

## Count III:
### Alternative Claim for Breach of Asset Purchase Agreement
### (as modified by the Memorandum of Agreement)

Pleading in the alternative, WAMCO states as follows:

20.     WAMCO repeats and realleges ¶¶1-10 above as ¶20 of this Count III, as though the same were fully set forth herein.

21.   Even if this Panel finds that the Memorandum of Agreement should not be declared invalid and held for naught, WAMCO nevertheless has a valid claim for against Diehl for breach of contract.

22.   WAMCO has performed all conditions on its part to be performed under the Asset Purchase Agreement, even as modified by the Memorandum of Agreement.

23.   In breach of the Asset Purchase Agreement, even as modified by the Memorandum of Agreement, Diehl has failed and refused to pay the management fee due to WAMCO.

24.   As a consequence of Diehl's breach of the Asset Purchase Agreement, as modified by the Memorandum of Agreement, WAMCO has suffered significant damages, which will continue to increase throughout the remainder of term for which the management fees are due and owing.

25.   Diehl's refusal to pay management fees has been vexatious.

26.   WAMCO brings this claim in the alternative to Count II.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for $141,000 in damages, plus additional management fees of $15,000/month as may accrue up to, and including the date of the Award, plus WAMCO's arbitral costs, reasonable attorneys' fees, and pre-judgment interest pursuant to the Illinois Interest Act, and for such other and further relief as this Panel deems necessary and appropriate.

## Count IV:  Claim on Promissory Note

27.   WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶27 of this Count IV, as though the same were fully set forth herein.

28.     Part of the purchase price contemplated by the Asset Purchase Agreement was to be paid over time, pursuant to a promissory note (the "Note"), which is attached and incorporated as Exhibit A to the Asset Purchase Agreement.  To secure the Note, the Asset Purchase Agreement also incorporates a security agreement (the "Security Agreement").

29.     Diehl executed the Note and Security Agreement in connection with the Asset Purchase Agreement.

30.     WAMCO is presently the holder of the Note.

31.     The Note reads as follows, in relevant part:

In the event that:

      *          *          *          *

(b) there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

      *          *          *          *

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

      *          *          *          *

If this Promissory Note is not paid when due, whether at maturity or by acceleration ... the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

      *          *          *          *

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

32.     The Security Agreement defines Diehl as the "Debtor" and WAMCO as its "Secured Party," and reads follows, in relevant part:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party ... howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

<div align="center">*          *          *          *</div>

"Default" shall mean the occurrence of any one or more of the following events: ... (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

33.    WAMCO deems itself insecure because Diehl has filed a lawsuit, in which it seeks to eliminate the management fee unilaterally, based, in part, upon the following allegation:

9.  Diehl's business conditions require the elimination of the management fee.

A true and correct copy of Diehl's Amended Complaint in that lawsuit is attached as **Exhibit 3**. By Diehl's own admission, the material change in its financial condition constitutes a "default" under the Security Agreement and Note.

34.    WAMCO also deems itself insecure under the Security Agreement because Diehl has failed to make numerous management fee payments to WAMCO, which constitutes a further default.

35.    Upon information and belief, Diehl was also unable to make monthly rental payments of $4,500 during 2006 or 2007.

36.    Consequently, WAMCO is entitled to accelerate the balance due on the Note, and to enforce its rights under the Note and Security Agreement, including its rights to recover its attorneys' fees and costs.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for the following relief:

A.   Finding Diehl in default of its obligations under the Note and Security

Agreement, and accelerating the entire amount due and payable under the Note;

B.   Awarding the unpaid principal balance due on the Note to WAMCO, plus interest,

and other charges, according to the terms of the Note;

C.   Awarding WAMCO its costs of collection, including its reasonable attorneys'

fees and costs, as provided in the Note and Security Agreement; and

D.   For such other and further relief as this Panel deems necessary and appropriate.

Respectfully submitted,

WISCONSIN AUTOMATED MACHINERY
CORP.

DATED:  April 25, 2007          By:  _____
                                     One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for WAMCO
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

114384-1                        8

ASSET PURCHASE AGREEMENT
(WOODWORKING PRODUCT LINES)

DATED SEPTEMBER 13, 2002

BETWEEN

WISCONSIN AUTOMATED MACHINERY CORP. (SELLER)

AND

DIEHL WOODWORKING MACHINERY, INC. (PURCHASER)

EXHIBIT

1

## LIST OF EXHIBITS AND SCHEDULES
### Woodworking Product Lines

Exhibit A      -      Promissory Note

Exhibit B      -      Security Agreement


Schedule 3.2    -    Payment of Purchase Price

Schedule 3.3    -    Allocation of Purchase Price

Schedule 4.4    -    Unfilled Customer Orders

Schedule 4.5    -    Unfilled Purchase Orders

Schedule 4.6    -    Litigation

Schedule 6.4    -    Machines Sold and Subject to Product Warranty Claims

C:\MSOFFICE\WINWORD\Wisconsin\Automated\ProductLine\oDish\ListExhibitsSchedulesFinalKSP\mer

## ASSET PURCHASE AGREEMENT
### Woodworking Product Lines

THIS ASSET PURCHASE AGREEMENT, made and entered into this 13th day of September, 2002, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "Seller"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Purchaser");

### WITNESSETH:

WHEREAS, Seller is engaged in, among other things, and owns certain assets and properties used in the business of designing, manufacturing, selling and repairing woodworking machinery comprising the McKnight Miller, Bell and Challoner product lines (herein collectively called the "Woodworking Product Lines"), and certain other machinery used in the carpet industry and comprising the Dyken product line (herein called the "Carpet Product Line" and, together with the Woodworking Product Lines, collectively called the "Product Lines" and each individually a "Product Line"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Product Lines and certain other assets and properties of Seller relating to the Product Lines in accordance with all of the terms and subject to all of the conditions herein set forth; and

WHEREAS, Seller is willing to undertake not to compete with Purchaser with respect to the Product Lines;

NOW, THEREFORE, in consideration of the premises hereof (which the parties agree are hereby incorporated into and made a part of their agreement herein), of other good and valuable considerations, the receipt of which is hereby acknowledged, and of the mutual covenants herein set forth, the parties hereby agree as follows:

1.   Definitions

In addition to other terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below for the purposes of this Agreement:

1.1   "Agreement" shall mean this Asset Purchase Agreement.

1.2   "Assumed Liabilities" shall mean collectively all of the specifically identified liabilities and obligations of Seller to be assumed by Purchaser hereunder.

1.3   "Closing" shall mean the act of completion of the closing of the transactions contemplated by this Agreement on the Closing Date as set forth in Article 9 hereof.

1.4   "Closing Date" shall mean the date on which the Closing takes place as set forth in paragraph 9.1 hereof.

1.5   "Contract Date" shall mean the date of this Agreement.

1.6   "Excess Inventory" shall mean the number of each such item of Inventory items that are on hand as of the Closing Date that are in excess of two years usage thereof (being twice the number of such item of Inventory sold by Seller during the twelve (12) month period ended June 30, 2002.

1.7   "Excluded Assets" shall mean collectively all of the assets and properties of Seller other than Sale Assets, including without limitation those specifically being excluded from the Sale Assets as provided in paragraph 2.2 hereof.

1.8   "Inspection Date" shall mean July 31, 2002, on which Purchaser inspected the Sale Assets.

1.9   "Sale Assets" shall mean collectively all of the assets and properties of Seller to be sold, assigned, transferred and conveyed to Purchaser hereunder as provided in paragraph 2.1 hereof.

2

2.    Properties and Assets to be Sold to Purchaser

    2.1    Sale Assets. On the terms and subject to the conditions herein set forth, at the Closing, Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and acquire from Seller, the Product Lines, as a going concern, and the following assets relating to any of the Product Lines and on hand as of the Closing Date:

    2.1.1    All inventories relating to any of the Product Lines, including without limitation all raw materials, work in process, including without limitation a 527 Double End Tenoner machine (the "Incomplete Machine"), finished machinery, purchased parts and components, manufactured parts and assemblies, and loaner chain (herein called collectively "Inventory");

    2.1.2    Dies, tools, jigs, fixtures, patterns, special tooling and trade fixtures relating to any of the Product Lines, including without limitation all items set forth on Schedule 3.3 hereto under the heading Fixtures & Tooling (herein called collectively "Miscellaneous Tooling");

    2.1.3    All trade names, trademarks, trademark registrations and applications, brand names, logos and applications therefor, if any, and the goodwill symbolized thereby, trade secrets, intellectual property, and all rights under all confidentiality agreements and covenants of non-competition, and all rights to recover for any past infringement of any thereof, owned by Seller and relating solely to any of the Product Lines;

    2.1.4    All books, records, computer tapes, files (including cabinets containing same) and other papers and documents of Seller pertaining solely to any of the Product Lines or any of the Sale Assets, including without limitation documents of title,

warehouse receipts, customer lists, customer files, mailing lists, product literature and manuals, service manuals, instruction manuals, advertising materials, catalogs, sales literature, sales displays, drawings, designs, engineering data, specifications, engineering prints and know-how;

        2.1.5     All of Seller's right, title and interest in, to and under all unfilled customer orders being assigned to and assumed by Purchaser as provided in paragraph 4.4 hereof and all customer deposits, if any, received by Seller against such assumed orders only, and all unfilled purchase orders with suppliers, being assigned to and assumed by Purchaser as provided in paragraph 4.5 hereof;

        2.1.6     All of Seller's right, title and interest in, to and under paragraph 6.12 of that certain Asset Purchase Agreement, dated June 19, 1992, among Famco Machine Division of Belco Industries, Inc. (which was assigned to Seller) and Medalist Industries, Inc. (the "Medalist Agreement"), relating to the obligations of Medalist Industries, Inc., which has been succeeded to by Illinois Tool Works, and any successors thereto, with respect to product liability claims relating to any products of the Product Lines sold at or prior to June 29, 1992, or with respect to the Show Machines (as defined in the Medalist Agreement).

        2.1.7     All other assets, properties and rights specifically set forth in this Agreement as being transferred or assigned to, or purchased by, Purchaser.

    2.2   <u>Excluded Assets</u>. Without in any way expanding the Sale Assets being sold and transferred hereunder and notwithstanding anything to the contrary contained herein, there is specifically excluded from the Sale Assets, and Seller shall retain and shall not transfer to Purchaser, the following assets and properties owned by Seller:

4

2.2.1    All of Seller's assets and properties used in or related to any of Seller's business and operations other than the Product Lines.

2.2.2    All cash, bank accounts and similar items.

2.2.3    All accounts receivable, notes receivable, drafts, letters of credit and other receivables of Seller (herein collectively called the "Receivables").

2.2.4    All federal, state, local and foreign tax refunds and all tax deposits.

2.2.5    All right, title and interest of Seller in, to or under any policies of insurance, or any benefits payable or paid thereunder, purchased or maintained by Seller (except as otherwise specifically provided herein).

2.2.6    All records not pertaining solely to the Sale Assets.

2.3    <u>Transfer and Assignment of Sale Assets</u>:  Good and marketable title to the Sale Assets shall be sold, assigned, transferred and conveyed to Purchaser by Seller at the Closing, free and clear of all claims, liabilities, taxes, liens, security interests, encumbrances, restrictions and adverse rights of use or ownership.  Subject to Seller's obligations under paragraph 6.1 above, Purchaser is accepting the Sale Assets in the condition existing on the Inspection Date, or such later date on which the particular Sale Asset was acquired by Seller, ordinary wear and tear excepted, on an "as-is" basis. EXCEPT SOLELY AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, THE SALE ASSETS ARE BEING TRANSFERRED WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANT-ABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES (BOTH EXPRESS AND IMPLIED) SELLER HEREBY DISCLAIMS.

2.4   <u>No Assumption of Liabilities</u>.  Except solely for the assumption by Purchaser of the unfilled customer orders (and customer deposits, if any, received by Seller against such customer orders to the extent that same are paid or credited to Purchaser at Closing) and unfilled purchase orders as provided in paragraphs 4.4 and 4.5 hereof, including without limitation the risk of uncollectability of assumed customer orders and warranty claims relating to products shipped by Purchaser pursuant thereto, and any other liability of Seller expressly being assumed by Purchaser hereunder, Purchaser is not assuming and shall not be liable or responsible for any of Seller's debts, liabilities or obligations of any character whatsoever.  Seller shall pay and discharge, as they become due and payable, and shall perform and satisfy in accordance with their respective terms, all such debts, liabilities and obligations of Seller not expressly being assumed by Purchaser hereunder. All deposits received by Seller from customers with respect to unfilled customer orders assumed by Purchaser shall be credited against the Purchase Price at the Closing.

3.   <u>Purchase Price and Payment</u>.

3.1   <u>Purchase Price</u>.  Purchaser agrees to pay to Seller, and Seller agrees to accept, as the aggregate purchase price for the Sale Assets (herein called the "Purchase Price"), the sum of $600,000.00, plus or minus any credits or prorations as herein provided.

3.2   <u>Payment</u>.  Payment of the Purchase Price, plus or minus any credits or prorations as herein provided, shall be payable in seventy-two (72) equal monthly installments of $10,000.00 each (comprising principal of, and interest at the rate of 6.198% per annum on, the Purchase Price as shown on Schedule 3.2 attached hereto), the first installment payable on the first day of January, 2003, and each subsequent payment on the first day of each subsequent calendar month until paid in full (i.e. amortizing the Purchase

Price plus interest over the period of repayment in seventy-two (72) equal monthly payments). The Purchaser's obligation to pay the Purchase Price as herein provided shall be evidenced by a Promissory Note, executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit A attached hereto. (herein called the "Promissory Note"), which shall be secured and collateralized by the grant of a security interest in all of Purchaser's assets and properties, second in priority solely to the security interest of The LaSalle Bank in such assets, pursuant to a Security Agreement executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit B attached hereto (herein called the "Security Agreement").

3.3    Allocation of Purchase Price.   The Purchase Price shall be allocated for income tax purposes among the Sale Assets and covenant not to compete set forth in Article 11 hereto as set forth in Schedule 3.3 attached hereto and such allocation shall be binding upon the parties for income tax purposes.   The parties shall file their respective income tax returns, including filing with the Internal Revenue Service Form 8594 and all other information as may be required by Section 1060 of the Internal Revenue Code and regulations promulgated thereunder, in accordance with such allocations, and the parties shall not take any position or action inconsistent with such allocation.

4.    Representations, Warranties and Covenants of Seller

Seller hereby represents, warrants and covenants to Purchaser that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

4.1    Organization.   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin.   Seller has all requisite corporate

7

power and authority to own, lease and operate its properties and to carry on its business as now conducted and to enter into this Agreement and perform its obligations hereunder.

4.2   <u>Authority and Binding Obligation</u>.  All corporate action necessary to authorize the execution and delivery of this Agreement by Seller and the performance by Seller of its obligations hereunder have been duly taken.  The execution and delivery of this Agreement by Seller and the performance of its obligations hereunder do not and will not result in the creation of any lien, charge or encumbrance upon any of the Sale Assets.  This Agreement is a legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

4.3   <u>Title to Personal Property</u>.  Seller owns and at the Closing will have the right to convey and will convey to Purchaser good and marketable title, free and clear of any tax, lien, security interest, encumbrance, liability, claim, restriction or adverse right of use or ownership to all of the Sale Assets.

4.4   <u>Customer Orders</u>.  Set forth on Schedule 4.4 hereto is a true and correct list of all unfilled customer orders and commitments of Seller on hand as of the Contract Date. All such unfilled customer orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.  Between the Contract Date and the Closing Date, Seller will not accept any customer order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled customer orders and commitments of Seller on hand as of the Closing Date, and Seller shall assign and credit to Purchaser all customer deposits and prepayments received

8

with respect thereto, and Purchaser shall assume the obligations of Seller to fill such assigned unfilled customer orders and commitments accruing from and after the Closing Date in accordance with the terms thereof.

4.5    <u>Purchase Orders</u>.  Set forth on Schedule 4.5 hereto is a true and correct list of all of Seller's unfilled purchase orders and commitments to suppliers on hand as of the Contract Date.  All such unfilled purchase orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.  Between the Contract Date and the Closing Date, Seller will not issue any purchase order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled purchase orders and commitments of Seller on hand as of the Closing Date, and Purchaser shall assume the obligations of Seller accruing from and after the Closing Date in accordance with the terms thereof and the Inventory Purchase Price shall be increased by any prepayments and deposits made by Seller with respect thereto.

4.6    <u>Litigation</u>.  Except as set forth in Schedule 4.6 hereto, there is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Seller, threatened against or relating to Seller's past or present operation of the Product Lines or any of the Sale Assets or that could affect the transactions contemplated by this Agreement, including without limitation relating to products liability, at law, in equity or before any governmental department, commission, board or agency.

4.7    <u>No Material Adverse Change</u>.  Since the Inspection Date, none of the tangible Sale Assets have suffered any destruction or damage, whether or not covered by

9

insurance, which materially and adversely affects the conduct of the Product Lines business.

4.8   <u>Compliance with Laws</u>. The business and operations of the Product Lines have been and are being conducted in all material respects in compliance with all applicable laws (including duties imposed by common law), rules and regulations, orders, ordinances, judgments and decrees of all governmental authorities (federal, state and local), including, without limitation, the Clean Water Act, the Clear Air Act, CERCLA, SARA, the Resource Conservation and Recovery Act, as amended ("RCRA"), and all other laws relating to the protection of the environment, human health and safety, including the Occupational Safety and Health Act of 1970, as amended, and any regulations and standards promulgated or issued thereunder.

4.9   <u>Inventory</u>. The Inventory of Seller other than Excess Inventory will consist of items of a quality which is good, usable and saleable in the usual and ordinary course of business of Seller.

4.10   <u>Product Warranties</u>. Seller has furnished Purchaser with true and correct copies of all standard written warranties provided to customers of Seller with respect to products of any of the Product Lines (herein called "Product Warranties").

5.   <u>Representations and Warranties of Purchaser</u>.

Purchaser hereby represents and warrants to Seller that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

5.1   <u>Organization, Good Standing and Power</u>. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and

has all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

5.2    Authority and Binding Obligation.  All corporate action necessary to authorize the execution and delivery by Purchaser of this Agreement and the performance of its obligations hereunder have been duly taken.  This Agreement is a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

5.3    Litigation.  There is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Purchaser, threatened against or relating to Purchaser at law, in equity or before any governmental department, commission, board or agency, and Purchaser is not in default with respect to any judgment, injunction, order or decree of any court or governmental agency or instrumentality by which it is bound or subject, and no such judgment, injunction, order or decree is now in effect, which in any way restrains or limits Purchaser in the execution and delivery of this Agreement or the performance by Purchaser of its obligations hereunder.

6.    Additional Covenants

6.1    Conduct of Business.  Seller covenants that from the Contract Date through the Closing Date, Seller will conduct the business of the Product Lines in a manner not materially different from its past practices and only in the usual and ordinary course.

6.2    <u>Negative Covenants</u>.   Between the Contract Date and the Closing Date, Seller represents, warrants, covenants and agrees that Seller will not, without obtaining the prior written consent of Purchaser:

6.2.1    Encumber, mortgage, pledge, or permit any lien to exist against any of the Sale Assets.

6.2.2    Sell, assign, lease or otherwise dispose of any of the Sale Assets, except for the sale of Inventory (including parts but excluding the Incomplete Machine, which shall not be sold) in the ordinary course of business and except for supplies and spare parts used in the ordinary course of business (including in the completion of the Incomplete Machine).

6.2.3    Make any change in any accounting principle, procedure or practice followed by Seller or in the method of applying same with respect to the Product Lines or write up the value of any Inventory.

6.3    <u>Employees</u>.  Upon the Closing, Seller shall terminate the employment of all of the employees that Purchaser desires to hire in its sole discretion and shall make available to Purchaser and use its reasonable efforts to help Purchaser hire such of employees desired by Purchaser; provided that Purchaser shall not be required or obligated to hire any such employee.  Purchaser shall not be obligated to continue any of Seller's policies or benefits with respect to employees, and all of Seller's employees actually hired by Purchaser shall be considered in all respects as new employees of Purchaser.

Seller and not Purchaser shall be responsible for all payments, lawsuits, defense of suits, judgments, reasonable attorneys' fees, and any other costs sustained by Purchaser, including but not limited to all payments and losses resulting from non-

compliance under the terms of any applicable plant closing laws, losses under any pension, thrift, employee savings, bonus or other plan for employee benefits, severance or separation benefits, withholding taxes and contributions, workers or unemployment compensation claims or costs, health care claims or premiums, vacation, sick or other leave or pay, disease or disability claims, discrimination claims, unfair labor practices, safety claims or citations and all other claims against Seller arising out of or relating to any employment relationship with Seller or the termination thereof.

6.4    <u>Product Warranty Claims.</u>    From and after the Closing, Purchaser shall assume and be solely responsible for all claims made by customers within the applicable period arising under Seller's Product Warranties with respect to products relating to the Product Lines sold or delivered by Seller to or for customers at or prior to the Closing Date and listed on Schedule 6.4 hereof or sold by Seller in the ordinary course of business between the Contract Date and Closing Date.

6.5    <u>Product Liability Claims.</u>    From and after the Closing, Seller shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered (or delivered on consignment) by Seller or any predecessor thereto at or prior to June 29, 1992, and Purchaser shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products relating to the Product Lines sold and delivered (or delivered on consignment) by Seller after June 29, 1992 and at or prior to the Closing Date or by Purchaser after the Closing Date. Purchaser shall maintain for a period of at least five (5) years from and after the Closing Date adequate insurance with respect thereto.

6.6    Use of Office Space.  It is understood and agreed that some of the employees hired by Purchaser may not relocate to Purchaser's offices in Indiana.  If so, at Purchaser's request, Seller shall allow such employees to use its offices and facilities in Oshkosh as long as commercially feasible for Seller and Purchaser shall pay Seller a reasonable fee therefor as mutually agreed by the parties.

6.7    Management Fee.  The management fee being paid by Purchaser to Seller and its affiliates for management consulting and services shall be increased to the sum of $15,000.00 per month commencing January 1, 2003, until such time as the parties otherwise mutually agree.

6.8    Completion of Incomplete Machine.  Seller shall use reasonable efforts to complete the Incomplete Machine at or prior to the Closing Date.  If the Incomplete Machine has not been completed at or prior to the Closing Date, Seller shall complete the Incomplete Machine as soon as practicable thereafter.

7.    Conditions Precedent to Obligations of Purchaser.

All of the obligations of Purchaser hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Purchaser) having been fulfilled on or before the Closing Date:

7.1    Representations and Warranties.  The representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Purchaser.

7.2    <u>Performance of Covenants</u>.  Seller shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

7.3    <u>No Litigation</u>.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto which in the reasonable opinion of counsel for Purchaser presents a reasonable possibility that any transaction contemplated by this Agreement would be enjoined or prevented, or that the right of Purchaser to acquire, retain or use the Sale Assets without additional cost would be adversely affected.

8.    <u>Conditions Precedent to Obligations of Seller</u>

All of the obligations of Seller hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Seller) having been fulfilled on or before the Closing Date:

8.1    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Seller.

8.2    <u>Performance of Covenants</u>.  Purchaser shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

8.3    <u>No Litigation</u>.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto

which in the reasonable opinion of counsel for Seller presents a reasonable possibility that the transactions contemplated by this Agreement would be enjoined or prevented.

9.   Closing

9.1   <u>Closing Date</u>.  The Closing shall take place on October 1, 2002, at the offices of Lawrence, Kamin, Saunders & Uhlenhop, L.L.C., 208 South LaSalle Street, Suite 1750, Chicago, Illinois, at 11:00 a.m., local time, or at such other date, time and place as shall be fixed in writing by the mutual consent of Purchaser and Seller, or as required for the satisfaction of all conditions precedent hereto.  The Closing shall be deemed to be effective as of the beginning of business on the Closing Date.

9.2   <u>Seller's Deliveries</u>.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following, in form and substance satisfactory to Purchaser and its legal counsel:

9.2.1    Certified copies of the appropriate proceedings of the Boards of Directors of Seller authorizing and approving this Agreement and the transactions contemplated herein.

9.2.2    Bills of Sale, assignments and other instruments transferring to Purchaser as of the Closing Date title as provided in paragraph 2.3 of this Agreement to all of the Sale Assets being acquired by Purchaser hereunder.

9.2.3    Assignment(s) transferring to Purchaser the unfilled customer orders, customer deposits and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3   Purchaser's Deliveries.   At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following, in form and substance satisfactory to Seller and its legal counsel:

9.3.1   Certified copy of the appropriate proceedings of the Board of Directors and shareholders of Purchaser authorizing and approving this Agreement and the transactions contemplated hereby.

9.3.2   The Promissory Note, executed by Purchaser in the amount of the Purchase Price as set forth in paragraph 3.2 hereof.

9.3.3   The Security Agreement, executed by Purchaser as set forth in paragraph 3.2 hereof.

9.3.4   Assumption by Purchaser of the unfilled customer orders and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3.5   A resale certificate certifying Purchaser's sales tax resale number.

9.4   Possession.   Upon the Closing, possession of all of the Sale Assets hereunder shall be delivered to Purchaser.

9.5   Records.   After the Closing, if Seller has any legitimate, business, accounting or tax reason therefor, Seller and its representatives shall have the right of access to all business records of or pertaining to the Product Lines or Sale Assets that are delivered by Seller to Purchaser hereunder and relating to any period on or prior to the Closing Date, at all reasonable times during business hours, and to make copies thereof at Seller's expense. With respect to any financial, tax and accounting records of Seller relating in any way to the Product Lines or Sale Assets not delivered to Purchaser hereunder (herein

17

collectively called the "Retained Records"), after the Closing, Seller shall retain same and if Purchaser has any legitimate business, accounting or tax reason therefor, Purchaser and its representatives shall have the right of access to the Retained Records at all reasonable times during business hours, and to make copies thereof at Purchaser's expense. In the event that within a period of five (5) years after the Closing Date, either Purchaser or Seller desires to dispose of any of such records, such party so desiring to dispose shall give the other party at least thirty (30) days prior written notice thereof and the other party shall have the right within said 30-day period to take possession thereof.

10.    Indemnification and Survival.

    10.1    Indemnification by Seller. Notwithstanding any investigation by or knowledge of Purchaser, Seller hereby agrees to defend, indemnify and hold Purchaser harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, costs and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Seller in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (ii) any breach of covenant, agreement or undertaking of Seller in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (iii) any failure to comply with any Bulk Sales Law, if applicable; (iv) any liability, debt or obligation of Seller not expressly assumed by Purchaser hereunder; and (v) any and all legal proceedings against or related to Seller or any of the Sale Assets, including without limitation the legal proceedings described in Schedule 4.6 hereto.

10.2  <u>Limitations on Indemnification by Seller</u>.  Any liability or undertaking of Seller to indemnify Purchaser under paragraph 10.1, clause (i) hereof, shall be subject to each of the following limitations:

10.2.1      Purchaser shall not be entitled to make a claim for indemnification from Seller under paragraph 10.1, clause (i), hereof unless Purchaser shall have given Seller written notice of such claim prior to two (2) years following the Closing Date; provided, however, that the foregoing limitations period set forth in this paragraph 10.2.1 shall not apply to any indemnification due from Seller arising with respect to any breach of the representations and warranties of Seller contained in paragraphs 4.3 hereof (herein called the "Warranty of Title").

10.2.2      Seller's undertaking to indemnify under paragraph 10.1, clause (i), hereof shall be applicable only if and to the extent that the aggregate indemnification liability from Seller hereunder exceeds Ten Thousand Dollars ($10,000.00); provided, however, that this limitation shall not apply to any indemnification due from Seller with respect to any breach of the Warranty of Title.

10.3  <u>Indemnification by Purchaser</u>.   Notwithstanding any investigation by or knowledge of Seller, Purchaser hereby agrees to defend, indemnify and hold harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, cost and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Purchaser in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement; (ii) any

breach of covenant, agreement or undertaking of Purchaser in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement, (iii) any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products shipped or delivered by Purchaser after the Closing Date, and any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered by Seller (or any predecessor thereto) at or prior to the Closing Date, if and to the extent not covered by insurance maintained by Seller or Purchaser, as provided in paragraph 6.5 hereof, and (iv) any specifically identified debt, liability or obligation of Seller assumed by Purchaser hereunder at the Closing.

10.4 <u>Survival</u>.  Subject to the limitations period provided in paragraph 10.2.1 hereof, all of the respective representations, warranties and covenants contained in this Agreement or in any other document or instrument delivered by or on behalf of any party hereunder or pursuant hereto, shall survive the Closing Date.

11.    <u>Covenant Not to Compete</u>

Seller hereby covenants and agrees that it shall not, for a period of five (5) years from and after the Closing Date, alone or in conjunction with any other corporation, firm, partnership, person, venture or other entity, directly or indirectly, engage in the design, manufacture, sale or distribution of any products of the type presently being designed, manufactured, sold or distributed by the Product Lines business within the United States of America or in any other geographic area in which the Seller was engaged on the Inspection Date or on the Closing Date.  Seller covenants and agrees that for a period for five (5) years following the Closing Date, it will not induce any employee, customer or supplier of

Purchaser to terminate his or its employment or business relationship with Purchaser, and Seller will not use or reveal any secret or confidential information relating to the business of the Product Lines acquired by Purchaser; provided, however, that the foregoing shall not apply to any information which, following the Closing Date, is received by Seller from a third person other than Purchaser who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Purchaser with respect to such information, or which is public knowledge or within the public domain other than as a result of disclosures by Seller after the Closing Date. It is the desire and intent of the parties that the terms and provisions of this paragraph 11 be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. Accordingly, if and to the extent that any portion of this paragraph 11 shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then said portion shall be deemed reformed to the least extent necessary to make such portion valid and enforceable.

12.   Assignment

Neither this Agreement nor the rights or obligations contained herein shall be assignable by either party except with the written consent of the other party hereto, except by Purchaser to one or more corporations designated in writing by Purchaser prior to the Closing Date; provided, however, that no such assignment shall relieve the assignor of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the foregoing sentence.

13.  Notices.

All notices, requests, demands and other communications hereunder shall be in writing, and shall be deemed to have been given when delivered in person or received by first class, registered or certified U.S. mail, return receipt requested, postage and registration or certification fees prepaid, or delivered by reliable overnight delivery service, providing a receipt evidencing delivery, or by facsimile with a copy also delivered by any of the foregoing means:

If to Seller, to:

> Wisconsin Automated Machinery Corp.
> c/o American M & M
> 5301 W. Dempster, Suite 308
> Skokie, Illinois 60077
> Attention: Paul Ehrlich, President
> Fax: (847)067-8646

With a copy to:

> Kenneth S. Perlman, Esq.
> Lawrence, Kamin, Saunders & Uhlenhop, L.L.C.
> 208 South LaSalle St., Suite 1750
> Chicago, Illinois 60604
> Fax: (312)372-2389

If to Purchaser, to:

> Diehl Woodworking Machinery, Inc.
> 981 South Wabash Street
> P. O. Box 465
> Wabash, Indiana 46992-0465
> Attention: Robert Rozman, President
> Fax: (219)563-0206

With a copy to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana 46992-0465
Attention: Mike Ruffner
Fax: (219)0206

or at such other address as hereafter shall be furnished by a notice sent in like manner by such addressee to the others.

14.   Miscellaneous

14.1   Severability.  Every provision of this Agreement is intended to be severable, and, if any term or provision is determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

14.2   Exhibits and Headings.  The Exhibits to this Agreement are hereby made a part hereof and shall be construed with and as an integral part of this Agreement.  The headings of the various Articles and paragraphs of this Agreement have been inserted for convenience only, are not a part of this Agreement, and shall not be deemed in any manner to modify, explain, enlarge, or restrict any of the provisions of this Agreement.

14.3   Expenses.  Except where otherwise expressly provided for in this Agreement, each of the parties hereto shall pay their own expenses, including without limitation the fees and expenses of their respective attorneys and accountants, in connection with this Agreement and the transactions contemplated herein, whether or not the Closing takes place.   Seller shall pay all sales and use taxes, if any, required on account of the consummation of the transactions contemplated hereby.

14.4   Waiver.  Failure or delay on the part of any of the parties hereto to exercise any right, power or privilege hereunder, or under any instrument executed pursuant hereto,

shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or of any other right, power or privilege. All waivers hereunder must be in writing.

14.5    Further Assurances.  Following the Closing, Seller and Purchaser, without further consideration of any kind, shall each execute and deliver, or cause to be executed and delivered, such other instruments, and take, or cause to be taken, such other action, as shall be reasonably requested by any other party hereto to more effectively carry out the transactions contemplated in this Agreement.  Seller shall use reasonable efforts to assist Purchaser in effecting a smooth transition in ownership and operation of the Sale Assets after the Closing Date, but Seller shall not be required to incur any cost or expense other than as specifically provided herein.

14.6    Entire Agreement.  This Agreement (including the Exhibits and Schedules hereto and other documents referred to herein as having been delivered or furnished by either party to the other) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

14.7    Amendments.  This Agreement may not be modified or changed except by an instrument or instruments in writing signed by both of the parties hereto.

14.8    Governing Law.  This Agreement shall be governed and construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions.

14.9    Gender and Number.  Whenever the context requires or permits, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

14.10. Counterparts. This Agreement may be executed in as many counterparts as may be deemed necessary or convenient, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

14.11 Public Announcement. The parties will cooperate as to and jointly approve the contents of a general public announcement of this transaction upon the execution and delivery of this Agreement.

14.12 Termination

14.12.1     This Agreement may be terminated any time prior to the Closing Date: (i) by the mutual written consent of the parties; or (ii) by Seller if any of the conditions provided for in Article 8 hereof shall not have been satisfied, complied with or performed, and Seller shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iii) by Purchaser if any of the conditions provided for in Article 7 hereof shall not have been satisfied, complied with or performed, and Purchaser shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iv) otherwise as expressly provided in this Agreement.

14.12.2     In the event that the Closing shall not take place on or before November 30, 2002, either party shall have the right, exercisable upon giving written notice to the other party within five (5) business days after said date, to terminate this Agreement, unless such failure of Closing shall be due to the breach or default of the party so seeking to terminate this Agreement.

14.12.3     Except for a termination pursuant to clause (i) of subparagraph 14.12.1 hereof, and except otherwise as expressly provided in this Agreement, the right of any party to terminate this Agreement as provided in this paragraph 14.12 shall be in addition to, and not in substitution for, any and all other relief to which such party may be entitled, either at law, in equity or by agreement.

14.13. Arbitration. Any controversy, dispute or claim between the parties arising out of, related to or in connection with this Agreement or the performance or breach hereof, including with respect to the arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; provided that the arbitration shall be by a single arbitrator mutually selected by Purchaser and Seller, and if the parties do not agree within twenty (20) days after the date of notification of a request for such arbitration made by either of the parties, the selection of the single arbitrator shall be made by the American Arbitration Association in accordance with said rules. In addition to, and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator and shall be final, binding and conclusive on the parties, and judgment on the arbitrator's award, including without limitation equitable relief and specific performance, may be entered in and enforced by any court having jurisdiction thereof. Fees and expenses of the American Arbitration Association and of the arbitrator shall be borne as shall be determined by the arbitrator, and the arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

14.14 Fax Copies. Purchaser and Seller agree that "Facsimile" transmissions of signed documents shall be regarded and accepted as if they bore original signatures. Promptly after such Facsimile transmission the original documents bearing the original signatures shall be provided to the other party.

—Signature Page Follows—

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Seller").

By _____

Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Purchaser")

By _____

Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin Automated\Product, Inc\to Diehl\Asset Purch Ag\Final\KSP\mar

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY
CORP. ("Seller")

By _____
    Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY,
INC. ("Purchaser")

By _____
    Robert Roziman, President

C:\WSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\AssetPurchAgtFinal\KSP\mer

27

EXHIBIT A
TO
ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

## PROMISSORY NOTE

$600,000.00

_____, Illinois
_____, 2002

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the order of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM"), the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing on January 1, 2003, and on the 1st day of each successive month thereafter through and including December 1, 2008. Payment of principal hereof and interest hereon shall be made in lawful money of the United States at 5301 West Dempster, Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this Promissory Note may appoint in writing from time to time. All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (herein called the "Purchase Agreement"), between Diehl and WAM, and the payment of this Promissory Note is secured by a Security Agreement, of even date herewith, between Diehl and WAM, covering all of the assets and properties of

Diehl (herein called the "Security Agreement"), and it is expressly agreed that all of the covenants and agreements contained in the Security Agreement and in the Purchase Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that:

(a)   the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b)   there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

(c)   the undersigned shall die, become insolvent, or admit in writing its inability to pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to or acquiesce in the appointment of a trustee or receiver for it or any of its property or make a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee or receiver shall be appointed for it or for a substantial part of its property and shall not be discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding shall be instituted by or against it, and if instituted against it, is consented to or acquiesced in by it or remains for thirty (30) days undismissed;

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal of and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.

By_____
        Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin Automated\Product Lists\Diehl\Promissory Note.doc\KSP/mer

EXHIBIT B
TO ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

SECURITY AGREEMENT

THIS SECURITY AGREEMENT, made and entered into as of the _____ day of _____, 2002, by and between DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Debtor"), located at 981 South Wabash Street, P. O. Box 465, Wabash, Indiana 46992-0465, and WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("Secured Party"), located at 5301 West Dempster, Suite 308, Skokie, Illinois 60077:

WITNESSETH:

WHEREAS, Debtor issued a certain Promissory Note, of even date herewith (the "Promissory Note"), in the original principal amount of $600,000, payable to the order of Secured Party, which Promissory Note was issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (the "Purchase Agreement") between Debtor and Secured Party; and

WHEREAS, this Security Agreement is being executed to secure full and prompt payment of the Promissory Note;

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.    Definitions. In addition to other terms defined elsewhere herein, when used herein, the following terms shall have the following meanings:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party, its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

"Default" shall mean the occurrence of any one or more of the following events: (a) Debtor fails to pay, when due, any amount on any of the Liabilities; (b) non-performance, misrepresentation or breach by Debtor of any representation, warranty or covenant contained herein or in any other agreement between Debtor and Secured Party; (c) Debtor becomes insolvent or unable to pay its debts as they mature or is adjudicated a bankrupt or applied for, consent to or acquiesces in the appointment of a trustee or receiver for it or any of its property or makes an assignment for the benefit of creditors, or in the

absence of such application, consent or acquiescence, a trustee or receiver is appointed for Debtor or for a substantial part of its property; (d) any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is instituted by or against Debtor; (e) any dissolution, merger or consolidation, or transfer of a substantial part of the property of Debtor; (f) any loss, theft, substantial damage or destruction to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

2.    Grant of Security Interest.  To secure the payment and performance of all Liabilities, Debtor hereby mortgages to Secured Party and hereby grants and assigns to Secured Party a continuing security interest in and to all properties, assets and interests of each Debtor listed on Exhibit A hereto, whether now or hereafter existing or acquired (herein individually and collectively called the "Collateral"), secondary in and subordinate solely to the lien and security interest of The LaSalle Bank in such Collateral.

3.    Representations; Warranties, Covenants and Agreements of Debtor.  Debtor hereby represents, warrants, covenants and agrees that (a) Debtor has been duly organized and is in good standing in the state of its formation listed above; (b) Debtor has full power and authority to execute and deliver this Agreement and perform all of such Debtor's obligations hereunder; (c) Debtor will, from time to time, on request of Secured Party, execute or consent to the execution of such financing statements and other documents (and pay the costs of filing or recording same in all public offices deemed necessary by Secured Party), and do such other acts and things, all as Secured Party may reasonably request, to evidence, perfect and maintain a valid security interest in the Collateral; (d) the Collateral will be kept at Debtor's address shown above, unless Secured Party shall otherwise consent in writing, and Debtor will not sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for the use or sale of Collateral and collection of accounts in the ordinary and usual course of Debtor's business; (e) Debtor will at all times keep the Collateral in first-class order and repair, excepting any loss or damage or destruction that is fully covered by proceeds of insurance; (f) Debtor will at all times keep the Collateral insured against loss, damage, theft and other risks, in such amounts, for such periods and written by such companies, and under such policies and in such form, all as shall be reasonable under all of the circumstances of Debtor's business, and Debtor shall apply any proceeds of such insurance which may be received by either of them toward payment of the Liabilities, whether or not due, in such order of application as Secured Party may determine; (g) Secured Party may examine and inspect the Collateral or any part thereof, wherever located, at any reasonable time or times; and (h) except for the lien and security interest of The LaSalle Bank in the Collateral, to which the lien and security interest granted hereby is secondary in priority and subordinate, and assuming Secured Party has properly perfected, the security interest granted hereby will be a first priority security interest in the Collateral.

4. _Remedies Upon Default._ Whenever a Default shall be existing, all Liabilities may (notwithstanding any provisions of any other agreements between Debtor and Secured Party), at the option of Secured Party, and without demand or notice of any kind, be declared, and thereupon, immediately shall become, due and payable, and Secured Party may exercise from time to time any and all rights and remedies available to it under applicable law to the fullest extent permitted thereby, including the rights of a secured party under the Uniform Commercial Code. Debtor agrees, in case of Default, to assemble, at their expense, all the Collateral at a convenient place acceptable to Secured Party, and to pay all costs of Secured Party of collection of all Liabilities and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses. Debtor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, demands, advertisements, hearings or process of law in connection with the exercise by Secured Party of any of its rights and remedies upon Default. Any notification of intended disposition of any of the Collateral shall be deemed reasonable and properly given if given at least five (5) days before such disposition. Any proceeds of any of the Collateral may be applied by Secured Party to the payment of expenses in connection with the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Secured Party toward payment of such of the Liabilities and in such order of application, as Secured Party may from time to time elect.

5. _General._ No delay on the part of Secured Party in the exercise of any right or remedy shall operate as a waiver thereof, no waiver of any right or remedy shall operate as a future waiver and no single or partial exercise by Secured Party of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

Any notice from Secured Party to Debtor if mailed shall be deemed given when mailed, by registered or certified mail, return receipt requested, postage prepaid, addressed to Debtor either at Debtor's address shown above, or at any other address of Debtor appearing on the records of Secured Party.

The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of Illinois. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Whenever the context requires or permits words used in the singular herein shall be construed to mean or include the plural and vice-versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

The rights and privileges of Secured Party hereunder shall inure to the benefit of its successors and assigns.

3

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of the day and year first above written.

Secured Party:                              Debtor:

WISCONSIN AUTOMATED                         DIEHL WOODWORKING
  MACHINERY CORP.                             MACHINERY, INC.


By_____          By_____
    Paul Ehrlich, President                 Robert Rozman, President


C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLine\toDiehl\SecurityAgtDiehl.doc\KSPvner

4

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (hereinafter called "Agreement") is made and entered into as of the _____ day of August, 2005. by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "WAM"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Diehl"):

### WITNESSETH:

WHEREAS, Diehl has previously paid, and is currently paying. to WAM or its affiliates a monthly management fee for management consulting and services. which fee has varied from time to time upon the mutual agreement of the parties: and

WHEREAS, the parties intend that WAM shall continue to provide such management consulting and services to Diehl. and Diehl shall continue to pay a monthly management fee therefor as business conditions permit and in accordance with the terms and conditions herein set forth:

NOW, THEREFORE. in consideration of the premises hereof (which the parties hereby incorporate and make a part of their agreements herein) and the mutual agreements hereinafter set forth. it is agreed as follows:

1. Wam hereby waives all unpaid and accrued management fees. if any. due from Diehl prior to July 31, 2005. WAM shall continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl and, effective as of July 31, 2005, Diehl shall pay to WAM, as consideration for such management consulting and services provided, a management fee of $12,500 per month (increased from the immediately preceding fee of $10,000 per month) through December 31, 2005, and $15,000 per month commencing January 31, 2006. through December 31, 2008; provided however that (a) such mutual commitments to provide such services and to pay such management fee shall terminate as of January 1, 2009, unless extended by the mutual agreement of the parties, and (b) from time to time the said management fee might be



reconsidered and reduced, increased, eliminated and or reinstated by mutual agreement of the parties as Diehl's business conditions requires, and WAM shall only be responsible to provide consulting and services at a level consistent with the then current level of such management fee.

2. The parties shall cooperate and use reasonable efforts to inform each other concerning any change in such business conditions and contemplated changes in the management fee level and commensurate level of management consulting and services to be provided.

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as of the day and year first above written.

WISCONSIN AUTOMATED MACHINERY COP.

By _____

Title _____

DIEHL WOODWORKING MACHINERY INC.

By _____

Title _____ PRESIDENT

STATE OF INDIANA    )           IN THE WABASH CIRCUIT COURT
                    ) SS:
COUNTY OF WABASH    )           CAUSE NO: 85C01-0608-PL-380


DIEHL WOODWORKING              )
MACHINERY, INC.                )
                               )
            Plaintiff,         )
                               )
      -vs-                     )
                               )
WISCONSIN AUTOMATED            )
MACHINERY CORP., JAY           )
EHRLICH and DIMITRIS           )
LOUKIDIS                       )
                               )
            Defendants.        )

### AMENDED COMPLAINT FOR
### DECLARATORY JUDGMENT AND DAMAGES

#### COUNT I

Comes now the plaintiff, Diehl Woodworking Machinery, Inc., (hereinafter "Diehl"), by counsel, and for its first cause of action against defendant, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO") alleges and says as follows:

1.      Diehl is an Indiana corporation with its principal place of business in Wabash County, Indiana.

2.      WAMCO is a Wisconsin corporation.

3.      Defendant, Jay Ehrlich, is a resident of Chicago, Illinois.

4.      Defendant, Dimitris Loukidis, is a resident of Racine, Wisconsin.

5.      In August, 2005, Diehl and WAMCO entered into a Memorandum of Agreement ("Agreement"). A true and exact copy of the Agreement is attached hereto, made a part hereof, and marked as Exhibit "A".

**EXHIBIT**
**3**

6.     The Agreement provides, in pertinent part, that the parties intended that WAMCO should provide management consulting services to Diehl and Diehl pay a monthly management fee therefore.

7.     The Agreement further provides that "from time to time said management fee might be reconsidered and reduced, increased, eliminated and/or reinstated by mutual agreement of the parties as Diehl's business conditions require, and WAMCO shall only be responsible to provide consulting services that are consistent with the then current level of such management fee."

8.     From the time of the execution of the Agreement, WAMCO has not provided to Diehl any management consulting and services.

9.     Diehl's business conditions require the elimination of the management fee.

10.     WAMCO has refused to eliminate the fee despite requests to do so by the management of Diehl.

11.     Diehl contends that its obligation to pay the monthly management fee to WAMCO should be eliminated as a result of the failure of consideration and pursuant to the provisions of the Agreement.

12.     WAMCO is no longer an operating entity and instead, serves only as a conduit for the receipt of payments from Diehl in favor of some of its shareholders, including, Jay Ehrlich.

13.     An actual dispute exists between the parties as to whether Diehl's obligation to pay the monthly management fee pursuant to the terms of the Agreement should be terminated.

2

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., prays that the Court enter a judgment declaring the rights of the parties under the Agreement, and declaring that Diehl has no obligation to pay the monthly management fee to WAMCO; for the cost of this action; and for all other just and proper relief in the premises.

<div align="center">COUNT II</div>

Comes now the plaintiff, Diehl Woodworking Machinery, Inc., by counsel, and for its second cause of action against defendants, Jay Ehrlioh and Dimitris Loukidis, alleges and says as follows:

1.    Diehl incorporates herein by this reference the same as if set forth in full the allegations of rhetorical Paragraphs 1 through 11 of Count I of its Complaint.

2.    Defendants, Jay Ehrlioh and Dimitris Loukidis, were shareholders and directors of Diehl, which is a closely-held Indiana corporation.

3.    Defendant, Jay Ehrlich, is the President of WAMCO and a shareholder in WAMCO.

4.    Defendant, Dimitris Loukidis, was a shareholder in WAMCO.

5.    Defendants, Jay Ehrlich and Dimitris Loukidis, owned a controlling interest of the shares of WAMCO.

6.    Defendants, Jay Ehrlich and Dimitris Loukidis, as shareholders of Diehl, breached their fiduciary duties owed to Diehl by refusing to permit the termination of the monthly management fee paid by Diehl to WAMCO, despite the fact that WAMCO never provided management consulting and services to Diehl.

<div align="center">3</div>

7.    Diehl has sustained damages in the sum of $174,000.00 in management fees paid to WAMCO since the execution of the Memorandum of Agreement despite the fact that WAMCO has never provided management and consulting services to Diehl.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., prays that the Court enter a judgment in its favor and against defendants, Jay Ehrlich and Dimitris Loukidis, in an amount sufficient to compensate Diehl for the damages sustained as a result of the breach of fiduciary duties by the defendants; for the cost of this action; and for all other just and proper relief in the premises.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff
Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Amended Complaint.doc

## CERTIFICATE OF SERVICE

This will certify that on this ____ day of March, 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, Esq., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770.

_____

(Larry L. Barnard)

4

5

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| WISCONSIN AUTOMATED<br>MACHINERY CORP. | )<br>)<br>) |
| Claimant | )<br>) |
| | )    Chicago, Illinois |
| and | )<br>)    Claim No: 51 180 01918 06 |
| DIEHL WOODWORKING<br>MACHINERY, INC. | )<br>)<br>) |
| Respondent | ) |

## RESPONDENT'S RESPONSE TO SUPPLEMENT TO CLAIMS
## OF CLAIMANT WISCONSIN AUTOMATED MACHINERY CORP.

Comes now the Respondent, Diehl Woodworking Machinery, Inc. (hereinafter "Diehl"), by counsel, and for its answer to the Supplemental to Claims of Claimant, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO") alleges and says as follows:

1.      With respect to the allegations in rhetorical Paragraph 1 of WAMCO's Supplement to Claims, Diehl admits WAMCO is a Wisconsin corporation. Diehl denies that WAMCO has any principal place of business as it conducts no business other than to collect monies paid to it by Diehl.

2.      Diehl admits the allegations of rhetorical Paragraph 2 of WAMCO's Supplement to Claims.

3.      With respect to the allegations of rhetorical Paragraph 3 of WAMCO's Supplement to Claims, Diehl admits that prior to September, 2002 Diehl and WAMCO transacted business together. Diehl denies that WAMCO ever provided any management services to Diehl, despite the fact that Diehl paid a management fee to WAMCO.

4.     Diehl admits that in September, 2002 it entered into Asset Purchase Agreement with WAMCO.    Diehl denies the remaining allegations of rhetorical Paragraph 4 of WAMCO's Supplement to Claims.

5.     With respect to the allegations of rhetorical Paragraph 5 of WAMCO's Supplement to Claims, Diehl states that the terms of the Asset Purchase Agreement speak for themselves.    Diehl denies that WAMCO ever provided management consulting services to Diehl.

6.     With respect to the allegations of rhetorical Paragraph 6 of WAMCO's Supplement to Claims, Diehl admits that it paid the management fee on a monthly basis.

7.     With respect to the allegations of rhetorical Paragraph 7 of WAMCO's Supplement to Claims, Diehl admits that the parties engaged in discussions about reducing the management fee paid  by Diehl to WAMCO.  Diehl denies the remaining allegations of rhetorical Paragraph 7.

8.     With respect to the allegations of rhetorical Paragraph 8 of WAMCO's Supplement to Claims, Diehl admits that the parties executed the Memorandum of Agreement in August, 2005.    Diehl denies the remaining allegations set forth in rhetorical Paragraph 8.

9.     With respect to the allegations of rhetorical Paragraph 9 of WAMCO's Supplement to Claims, Diehl states that the terms of the Asset Purchase Agreement speak for themselves.

10.    With respect to the allegations of rhetorical Paragraph 10 of WAMCO's Supplement to Claims, Diehl states that the terms of the Asset Purchase Agreement speak for themselves.

2

## COUNT I

Comes now, Diehl, by counsel, and for its Answer to Count I of WAMCO's Supplement to Claims, alleges and says as follows:

11.    Diehl incorporates herein by this reference the same as if set forth in full its answers to rhetorical Paragraphs 1 through 10 of WAMCO's Supplement to Claims.

12.    Diehl denies the allegations of rhetorical Paragraph 12 of Count I of WAMCO's Supplement to Claims.

13.    Diehl denies the allegations of rhetorical Paragraph 13 of Count I of WAMCO's Supplement to Claims.

14.    With respect to the allegations of rhetorical Paragraph 14 of Count I of WAMCO's Supplement to Claims, Diehl states that the terms of the statute speak for themselves.

WHEREFORE, Diehl prays that WAMCO take nothing by way of Count I of its Supplement to Claims; and for all other just and proper relief in the premises.

## COUNT II

Comes now, Diehl, by counsel, and for its Answer to Count II of WAMCO's Supplement to Claims, alleges and says as follows:

15.    Diehl incorporates herein by this reference the same as if set forth in full its answers to rhetorical Paragraphs 1 through 14 of WAMCO's Supplement to Claims.

16.    Diehl denies the allegations of rhetorical Paragraph 16 of Count II of WAMCO's Supplement to Claims.

17.    Diehl denies the allegations of rhetorical Paragraph 17 of Count II of WAMCO's Supplement to Claims.

18.    Diehl denies the allegations of rhetorical Paragraph 18 of Count II of WAMCO's Supplement to Claims.

19.    Diehl denies the allegations of rhetorical Paragraph 19 of Count II of WAMCO's Supplement to Claims.

WHEREFORE, Diehl prays that the arbitrator enter an Award in its favor and t WAMCO take nothing on Count II of its Supplement to Claims; and for all other just and proper relief in the premises.

<div align="center">COUNT III</div>

Comes now, Diehl, by counsel, and for its Answer to Count III of WAMCO's Supplement to Claims, alleges and says as follows:

20.    Diehl incorporates herein by this reference the same as if set forth in full its answers to rhetorical Paragraphs 1 through 19 of WAMCO's Supplement to Claims.

21.    Diehl denies the allegations of rhetorical Paragraph 21 of Count III of WAMCO's Supplement to Claims.

22.    Diehl denies the allegations of rhetorical Paragraph 22 of Count III of WAMCO's Supplement to Claims.

23.    Diehl denies the allegations of rhetorical Paragraph 23 of Count III of WAMCO's Supplement to Claims.

24.    Diehl denies the allegations of rhetorical Paragraph 24 of Count III of WAMCO's Supplement to Claims.

25.    Diehl denies the allegations of rhetorical Paragraph 25 of Count III of WAMCO's Supplement to Claims.

26.    Diehl is without sufficient information to admit or deny the allegations of rhetorical Paragraph 26 of Count III and, therefore, denies the same.

WHEREFORE, Diehl prays that the arbitrator enter an Award in its favor and WAMCO take nothing on Count III of its Supplement to Claims; and for all other just and proper relief in the premises.

## COUNT IV

Comes now, Diehl, by counsel, and for its Answer to Count IV of WAMCO's Supplement to Claims, alleges and says as follows:

27.    Diehl incorporates herein by this reference the same as if set forth in full its answers to rhetorical Paragraphs 1 through 26 of WAMCO's Supplement to Claims.

28.    With respect to the allegations of rhetorical Paragraph 28 of Count IV of WAMCO's Supplement to Claims, Diehl asserts that the terms of the Asset Purchase Agreement speak for themselves.

29.    Diehl admits the allegations of rhetorical Paragraph 29 of Count IV of WAMCO's Supplement to Claims.

30.    Diehl is without sufficient information to admit or deny the allegations of rhetorical Paragraph 30 Count IV and, therefore, denies the same.

31.    With respect to the allegations of rhetorical Paragraph 31 of Count IV of WAMCO's Supplement to Claims, Diehl states that the terms of the Note speak for themselves.

32.    With respect to the allegations of rhetorical Paragraph 32 of Count IV of WAMCO's Supplement to Claims, Diehl states the terms of the Security Agreement speak for themselves.

33.    Diehl denies the allegations of rhetorical Paragraph 33 of Count IV of WAMCO's Supplement to Claims.

34.    Diehl denies the allegations of rhetorical Paragraph 34 of Count IV of WAMCO's Supplement to Claims.

35.    Diehl denies the allegations of rhetorical Paragraph 35 of Count IV of WAMCO's Supplement to Claims.

36.    Diehl denies the allegations of rhetorical Paragraph 36 of Count IV of WAMCO's Supplement to Claims.

WHEREFORE, Diehl prays that the arbitrator enter an Award in its favor and WAMCO taken nothing on Count IV of its Supplement to Claims; and for all other just and proper relief in the premises.

### AFFIRMATIVE DEFENSES

Comes now Diehl, by counsel, and for its Affirmative Defenses to the Supplement to Claims of WAMCO alleges and says as follows:

1.    The dispute over the management fee set forth in the Memorandum Agreement is not subject to arbitration.

2.    There was no consideration given by WAMCO for the payment of the management fee by Diehl in that WAMCO failed to provide any management or consulting services to Diehl at any time.

3.    The terms of the Asset Purchase Agreement are unenforceable.

4.    There is no insecurity under the terms of the Note and Security Agreement and that Diehl has always and continues to make payments under the Asset Purchase Agreement and is able to pay the entire amount if required to do so.

WHEREFORE, Diehl prays that the arbitrator enter an Award in its favor; that WAMCO take nothing by its Supplement to Claims, and for all other just and proper relief in the premises.

6

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\WAMCO Shares Dispute\Response.doc

## CERTIFICATE OF SERVICE

This will certify that on this 9th day of May, 2007 a true and complete copy of the above and foregoing document was mailed to Andrew Schwartz, 30 N. LaSalle St., #3000, Chicago, Illinois 60602.

_____

(Larry L. Barnard)

$\int_6$

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## CHICAGO, ILLINOIS

| | |
|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP., )<br>_Claimant,_ )<br> )<br>v. )<br> )<br>DIEHL WOODWORKING MACHINERY, INC., )<br>_Respondent._ ) | No. 51 180 01918 06 |

# CLAIMANT'S MOTION FOR DISCOVERY SANCTIONS

Claimant Wisconsin Automated Machinery Corp. ("WAMCO"), by its undersigned

counsel, hereby moves for discovery sanctions against the Respondent, Diehl Woodworking

Machinery, Inc. ("Diehl"). In support, WAMCO states as follows:

## I.    INTRODUCTION

Diehl has deliberately disobeyed the Arbitrator's order to provide written discovery

responses which will enable WAMCO to prosecute its arbitral claims. Diehl's conduct warrants

the appropriate sanction – the entry of an arbitral award in favor of WAMCO.

## II.    BACKGROUND FACTS

### A.    Transactional Documents at Issue in this Arbitration

1.    This matter involves the enforceability and enforcement of certain transactional

documents executed by the parties, namely: (1) an Asset Purchase Agreement executed in

September 2002 ("APA"); (2) a promissory note ("Note") and security agreement ("Security

Agreement") executed in connection with the APA (collectively, the "Secured Note"); (3) a

memorandum of agreement executed in August 2005 ("MOA"). The genuineness of these

documents is undisputed, although the parties disagree about their meaning and legal effect.

2.    The primary stated purpose of the APA was the sale of certain product lines and associated properties by WAMCO to Diehl. The APA also required WAMCO to continue to provide management services as requested by Diehl, for which Diehl would pay a monthly management fee to WAMCO.

3.    The APA did not require Diehl to pay any cash to WAMCO; rather, the payments were to be made over time. The Secured Note was executed in connection with the APA.

4.    The Secured Note identifies Diehl as the "Debtor" and WAMCO as the "Secured Party." The Secured Note also identifies certain events of default, which are discussed in ¶¶31 and 32 of WAMCO's Supplement to Claims. In particular, the Security Agreement defines "default" to include:

> ... any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

The Security Agreement defines Diehl's "Liabilities" as:

> ... all obligations of Debtor hereunder, ***and all other debts, liabilities and obligations of Debtor to Secured Party ... howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due***, including without limitation under the Promissory Note.

(Emphasis added).

5.    In August 2005 the parties executed the MOA, which states that Diehl would continue paying monthly management fees; in exchange, WAMCO would:

> ... continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl ...

(*See* MOA at ¶1). In short, Diehl could ask WAMCO to provide management consulting and services; upon such request, WAMCO would provide the requested services to Diehl.

6.      The validity of the MOA is a disputed issue, which WAMCO has asked the

Arbitrator to resolve by making a declaration of rights.

**B.      Diehl's Failure and Refusal to Pay Management Fees to WAMCO**

7.      Whether it is the APA or the MOA that governs Diehl's obligation to pay

management fees, there is no question that Diehl stopped making those payments to WAMCO in

August 2006.

8.      Also in August 2006, Diehl filed suit in Wabash County, Indiana (the "Wabash

Litigation"), in which it unilaterally seeks, *inter alia*, to eliminate the management fee.

Paragraph 9 of Diehl's complaint in the Wabash Litigation reads:

> Diehl's business conditions require the elimination of the
> management fee.

This allegation – made by ***Diehl*** – caused WAMCO to deem itself insecure under the Secured

Note, and to bring its claim to enforce the Secured Note in this arbitration action.

9.      The Wabash Litigation is currently pending, and Diehl is represented in that case

by the same attorneys representing it in this arbitration.

**C.      Claims Asserted by WAMCO in this Arbitration**

10.     As expressed more fully in its Supplement to Claims, WAMCO has asserted four

separate claims against Diehl, which are summarized as follows:

| | |
|---|---|
| Count I: | Declaratory Relief |
| Count II: | Breach of 2002 APA (unmodified by MOA) |
| Count III: | Breach of 2002 Asset Purchase Agreement (as modified by MOA) |
| Count IV: | Enforcement of Secured Note |

**D.      WAMCO's Discovery Requests in this Arbitration**

11.     In early March 2007 in the Wabash Litigation, Jay Ehrlich (another defendant

named in that case) issued interrogatories and document requests to Diehl (**Exhibits 1** and **2**).

115788-1                                                   3

Many of the same issues presented in this matter are covered by Mr. Ehrlich's written discovery in the Wabash Litigation.

12.    The Arbitrator conducted a telephonic hearing on April 12, 2007. At that time, WAMCO's undersigned counsel reported that Diehl's responses to Mr. Ehrlich's written discovery in the Wabash Litigation were due in early May, and suggested that Diehl serve copies of its answers to Mr. Ehrlich's written discovery in the Wabash Litigation. Diehl's counsel agreed, and the Arbitrator entered an order to that effect.

13.    The Arbitrator held a second telephonic hearing on May 15, 2007, at which the parties' counsel reported that Diehl had not yet served its responses to Mr. Ehrlich's written discovery in the Wabash Litigation. Diehl requested an additional ten days (until May 25, 2007), to which WAMCO's undersigned counsel agreed. Diehl did not advise the Arbitrator of any objection to any of Mr. Ehrlich's interrogatories or document requests.

14.    On May 15, 2007 – after the telephone conference, WAMCO's undersigned counsel sent a confirming e-mail to the AAA case administrator, with copies to counsel for Diehl, and to the Arbitrator (**Exhibit 3**). That e-mail reads as follows:

> My understanding of Arbitrator Morsch's order today was that, on or before 5/25/07, Diehl would (1) serve me with a copy of Diehl's answers to the interrogatories served by Jay Ehrlich in the Wabash County litigation, and (2) ***provide me with a copy of all documents responsive*** to the document request served by Jay Ehrlich in the Wabash County litigation.

(Emphasis added). The Arbitrator immediately confirmed that understanding by reply e-mail (**Exhibit 3**). Diehl's counsel did not respond to either e-mail.

15.    On May 25, 2007 WAMCO's undersigned counsel received Diehl's answers to Mr. Ehrlich's interrogatories (**Exhibit 4**), Diehl's responses to Mr. Ehrlich's document requests (**Exhibit 5**), and a 3-ring notebook containing 334 pages of documents.

16.     One of the documents produced by Diehl is an e-mail from Diehl's president,

Robert Rozman, to Paul Ehrlich, who formerly owned shares in Diehl and WAMCO (**Exhibit 6**).

Mr. Rozman's e-mail references an August 13, 2005 e-mail from Paul Ehrlich. However, the

August 13, 2005 e-mail from Paul Ehrlich is not included among the documents produced.

## III.    ARGUMENT

### A.    General Rules Governing Discovery[1]

#### 1.  The scope of discovery is intentionally broad and anticipates that the responding party must bear a certain amount of inconvenience

17.     The goal of discovery is always full disclosure about the subject matter of the

dispute, so that both sides can educate themselves fully about the facts of the case.  Illinois

Supreme Court Rule 201(b)(1) reads as follows, in relevant part:

> Except as provided in these rules, a party may obtain by discovery
> *full disclosure regarding any matter relevant to the subject
> matter involved in the pending action,* whether it relates to the
> claim or defense of the party seeking disclosure or of any other
> party ...

(Emphasis added).  Under Rule 201(b)(1), both parties are entitled to full disclosure by discovery

of any relevant matter, including matters that relate to the defense of a party.  *E.g.*, Fosse v.

Pensabene, 362 Ill.App.3d 172, 182 (2nd Dist. 2005).  Indiana law is identical.  TR.26(B)(1) of

the Indiana Rules of Trial Procedure reads as follows:

> Parties may obtain discovery regarding any matter, not privileged,
> which is *relevant to the subject-matter involved in the
> pending action,* whether it relates to the claim or defense of the
> party seeking discovery or the claim or defense of any other party,
> including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things
> and the identity and location of persons having knowledge of any
> discoverable matter.  It is not ground for objection that the
> information sought will be inadmissible at the trial if the

---

[1] A choice-of-law question might theoretically exist because the APA provides for the application of
Illinois law, while Mr. Ehrlich's written discovery requests were issued in an Indiana case.  That question
is not important here, because the law is the same in both states, as discussed herein.

> information sought appears reasonably calculated to lead to the
> discovery of admissible evidence.

(Emphasis added).

18.     Pre-trial discovery is deliberately broad. It "... presupposes a range of relevance

and materiality which includes not only what is admissible at the trial, but also that which leads

to what is admissible at the trial." Monier v. Chamberlain, 35 Ill.2d 351, 357 (1966). Again,

Indiana law is identical. See TR.26(B)(1); Costanzi v. Ryan, 175 Ind. App. 257, 271 (Ind. App.

1978) ("discovery is proper for information reasonably calculated to lead to the discovery of

admissible evidence").

19.     Likewise, any discovery request necessarily imposes *some* burden upon the party

called to respond.

## 2.  A party may not avoid discovery by asserting blanket assertions of privilege

20.     Privileges are strongly disfavored and must be strictly construed as exceptions to

the general duty to disclose. See Lawndale Restoration Ltd. Partnership v. Acordia of Illinois,

Inc., 367 Ill.App.3d 24, 32 (1st Dist. 2006); Chicago Trust Co. v. Cook County Hosp., 298

Ill.App.3d 396, 401 (1st Dist. 1998) (rejecting privilege claims where party claiming privileges

failed to meet its burden to demonstrate their applicability); Krupp v. Chicago Trans. Auth., 8

Ill.2d 37, 42 (1956) ("For one who claims to be exempt by reason of privilege from the general

rule which compels all persons to disclose the truth has the burden of showing the facts which

give rise to the privilege. 'His mere assertion that the matter is confidential and privileged will

not suffice'"); Howard v. Dravet, 813 N.E.2d 1217, 1221 (Ind. App. 2004) ("Blanket claims of

privilege are not favored. The party seeking to avoid discovery has the burden of establishing

the essential elements of the privilege being invoked. ... When a "blanket" assertion of privilege

is made, it will not suffice to block discovery").

**B.**   **Diehl's Interrogatory Answers are Deliberately Incomplete and Evasive**

21.   Most of Diehl's interrogatory answers are deliberately evasive; indeed, many of

them provide absolutely no responsive information.

### 1.   Diehl's use of blanket privilege assertions to avoid answering interrogatories is improper

22.   Instruction #3 of Mr. Ehrlich's interrogatories, which contemplates privilege

assertions by Diehl, reads as follows:

> If any information is withheld on the basis of privilege, state with
> respect thereto the privilege on which *you* are relying; the holder of
> the privilege, and the type of information being withheld, in
> compliance with Indiana law.

23.   Notwithstanding that instruction, Diehl's interrogatory answers ##5, 6, 32-35 and

47 do not contain *any* factual information, or refer to any documents.  Instead, answers ##5, 6,

32-35 simply read as follows:

> **ANSWER:**   Objection.  Plaintiff asserts this interrogatory as
> overly broad and burdensome and is not reasonably calculated to
> lead to the discovery of admissible evidence.  In addition, plaintiff
> asserts that there may be communications responsive to this
> interrogatory that are not discoverable due to attorney-client
> privilege.

Similarly, its answer to #47 asserts a blanket attorney-client and attorney work-product privilege.

Diehl does not provide a privilege log for any of these interrogatory answers, and openly refuses

to do so with respect to its answer to #47.

24.   As discussed *supra*, Diehl's blanket assertions of privilege are not sufficient to

block discovery, under either Illinois or Indiana law.

25.   Diehl has not met *its* burden to demonstrate the existence of any valid privileges

against discovery.  Indeed, Diehl's answers to interrogatories ##5, 6, 32-35 and 47 do not even

claim the actual existence of any privileged communications; these answers merely state that:

115788-1                                                    7

... ***there may be*** communications responsive to this interrogatory
that are not discoverable due to attorney-client privilege.

(Emphasis added). In other words, Diehl asserts the ***mere possibility*** of privileged materials as a

basis to avoid answering the interrogatories.

26.    Under both Illinois and Indiana law, the Arbitrator should not presume the

existence of a privilege, or any other basis for Diehl to refuse to answer the interrogatories.

### 2. Diehl's "subject-matter relevance" and "overly broad and burdensome" objections are frivolous

#### a. Interrogatories ##5, 6 and 32-35 are clearly relevant to the subject matter of the claims and defenses asserted in this arbitration

27.    Mr. Ehrlich's interrogatories ##5, 6 and 32-35 all relate directly to the subject

matter of this arbitration, and Diehl's objections are a transparent attempt to avoid producing

information which will hurt its case.

28.    Interrogatory #5 reads as follows:

> *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to WAMCO.*

This interrogatory is clearly calculated to provide admissible information in this arbitration, and

to lead to information that would be admissible – especially in the context of discovery.

WAMCO is the claimant in this case, and it is reasonably likely that a communication by Diehl

relating to WAMCO would tend to prove or disprove the claims and defenses at issue here.

29.    Interrogatory #6 reads as follows:

> *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to Loukidis.*

This interrogatory is equally clearly calculated to provide admissible information in this

arbitration, and to lead to information that would be admissible, for the following reasons:

> a. Loukidis is a former shareholder, director and officer of WAMCO and Diehl; it appears that Loukidis signed the MOA on behalf of WAMCO.

115788-1                                           8

b. Loukidis sold his Diehl shares to Rozman last year, which suggests the existence of communications about the value of Loukidis' Diehl shares; that issue relates to the Diehl's allegation that its "business conditions require the elimination of the management fee," and to whether a "default" has occurred under the Security Agreement.

Communications by Diehl relating to Loukidis would therefore tend to prove or disprove material disputed issues in this case.

30.    Interrogatories ##32-35 read as follows:

32. Has *Diehl* paid any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

33. If *your* answer to the preceding interrogatory is affirmative, state the date and amount of each such payment, and *identify* all *communications* and *documents relating to* such payment.

34. Has *Diehl* promised to pay any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

35. If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* and *documents relating to* each such promise.

These interrogatories are all clearly relevant to WAMCO's claims to enforce the management fee and the Secured Note. As discussed *supra*, Diehl put its financial position at issue as a reason for discontinuing its payment of management fees to WAMCO in the Wabash Litigation. That allegation, in turn, led to WAMCO's claim to enforce the Secured Note. Rozman is Diehl's president and majority shareholder. If Diehl has sufficient economic resources to pay Rozman's personal legal bills, that fact may be considered in the Arbitrator's decision about the merits of each of these claims.

**b.  Interrogatories ##5, 6 and 32-35 are neither overly broad nor unduly burdensome, and these objections are frivolous**

31.     The scope of discovery is intentionally broad, and a party seeking discovery need only establish **subject matter** relevance. Therefore, interrogatories ##5, 6 and 32-35 are not "overbroad."

32.     Diehl offers no support for its statement that answering these interrogatories would impose any kind of "undue" burden.

### 3. Diehl's evasive answers are improper, and warrant discovery sanctions

33.     Diehl's answers to interrogatories ##13, 17, 20, 22 and 23 are evasive, and do not answer the questions posed. In particular:

a.  Answer #13 refers to documents which Diehl has not produced;

b.  Interrogatory #17 asks the following question:

> What "management consulting and services" was *WAMCO* supposed to provide to *Diehl* pursuant to the *Memorandum of Agreement?*

WAMCO's question asks Diehl to explain a vague term of the MOA by stating its position about what the parties **actually agreed** to do. However, Diehl evades that question and responds that "Management and Consulting Services **could** have included ..." various services.

c.  Interrogatory #20 asks the following question:

> Has *WAMCO* refused to provide any services to *Diehl* since the execution of the *Memorandum of Agreement?*

This calls for a simple yes or no answer, which Diehl refuses to provide.

d.  Interrogatory #22 reads as follows:

> *Describe* the "business conditions" which require the elimination of the management fee, as alleged in ¶9 of *your* complaint and ¶9 of *your* amended complaint, and *identify* any *documents* containing information *relating to your* answer to this interrogatory.

This interrogatory calls for a description of the alleged business conditions requiring the elimination of the management fee. Diehl's answer does not address

that question, stating instead merely that "... the declining market for Diehl's products has required a closer inspection of [its] expenses."

e. Interrogatory #23 reads as follows:

> *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

This interrogatory asks Diehl to identify communications. The portion of Diehl's answer which states that "... Ehrlich/WAMCO was aware of the deterioration of markets served by Diehl" does not respond. Moreover, Diehl's answer appears to refer to financial information that was not produced in response to the request for production.

## C.    Diehl's Refusal to Provide Responsive Documents Violates the Arbitrator's May 15, 2007 Order, and is Deliberately Incomplete and Evasive

### 1.    Diehl's waived its right to object to any document requests within this arbitration

34.    Had Diehl wished to object to some or all of the document requests, its counsel could – and should – have advised the Arbitrator of objections to some or all of Mr. Ehrlich's document requests and sought a ruling.

35.    Diehl did not make any such objection within this arbitration, and therefore waived its right to object.

36.    Since Diehl did not make any objection, and agreed to produce the documents, the Arbitrator did *not* give Diehl the right to withhold *anything* from WAMCO's counsel. To the contrary, as made explicit by **Exhibit 3**, the Arbitrator commanded Diehl simply to provide all documents.

37.    Notwithstanding that instruction, Diehl has refused to provide documents responsive to requests ##16, 17, 23-26, 35, 39-42, 53, 55 and 57-59.

### 2. Diehl's use of blanket privilege assertions to avoid producing documents is improper

38.     Instruction #3 of Mr. Ehrlich's document requests, which contemplates privilege

assertions by Diehl, reads as follows:

> If any *documents* are withheld on the basis of privilege, provide a
> privilege log identifying each *document* withheld. With respect to
> each *document* withheld, *describe* the privilege on which *you* are
> relying; the holder of the privilege, and the all other information
> required by Indiana law.

39.     Diehl has not provided a privilege log, or otherwise met *its* burden to demonstrate

the existence of any valid privileges against the production of documents. Indeed, Diehl's

responses to requests ##24-26 do not even claim the actual existence of any privileged

documents; these responses merely state that:

> ... *there may be* documents responsive to this interrogatory that
> are not discoverable due to attorney-client privilege.

(Emphasis added). In other words, Diehl asserts the *mere possibility* of privileged materials as a

basis to avoid producing documents.

40.     Diehl's response to request #35 asserts attorney-client privilege, but does not

attach a privilege log.

41.     Under both Illinois and Indiana law, the Arbitrator should not presume the

existence of a privilege, or any other basis for Diehl to refuse to produce documents.

### 2. Diehl's "subject-matter relevance" and "overly broad and burdensome" objections are frivolous

42.     Diehl's responses to document requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59

all contain the following statement:

> *Response:*   Objection. Plaintiff asserts this Request is overly
> broad and burdensome and is not reasonably calculated to lead to
> the discovery of admissible evidence.

### a. Requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 are clearly relevant to the subject matter of the claims and defenses asserted in this arbitration

43.    Requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 all relate directly to the subject matter of this arbitration, and Diehl's objections are a transparent attempt to avoid producing information which will hurt its case.

44.    Most of the documents which Diehl has refused to produce relate to Diehl's financial condition – which must be examined to determine whether a "default" has occurred under the Secured Note.

45.    Requests ##16 and 17 ask Diehl to produce:

16. All *documents relating to Rozman*'s acquisition of all or any part of *Loukidis'* interests in *WAMCO* and *Diehl.*
17. All *communications relating to Rozman*'s acquisition of all or any part of *Loukidis'* interests in *WAMCO* and *Diehl.*

As discussed *supra*, Diehl put its financial position at issue as the reason for discontinuing its payment of management fees to WAMCO in the Wabash Litigation. That allegation, in turn, led to WAMCO's claim to enforce the Secured Note. Therefore, *all* documents and communications relating to Diehl's financial position are discoverable – including those which show how the Diehl shares Loukidis sold to Rozman were valued.[2]

46.    Requests ##23, 39-42, 53, 55 and 57-59 ask Diehl to produce:

23. All of *Diehl*'s payroll records for the years 2002 through 2007, inclusive.

     *        *        *        *

39. All credit applications by *Diehl* to any bank or other lender during the last 5 calendar years.
40. All loan documents executed by *Diehl* in favor of a bank or other lender during the last 5 calendar years.
41. All *communications* between *Diehl* and any bank or other lender during the last 5 calendar years.

---

[2] WAMCO believes that Loukidis sold his Diehl and WAMCO stock to Rozman as part of the same transaction.

13

42. All *documents* executed by *Diehl* and any bank or other lender during the last 5 calendar years.

    \*          \*          \*          \*

53. Financial statements prepared by, or on behalf of *Diehl* for the years 2001 – date, inclusive.

    \*          \*          \*          \*

55. Monthly transactional reports listing all *Diehl* receipts and disbursements for each month from January 1, 2001 – present, inclusive.

    \*          \*          \*          \*

57. All statements received by *Diehl* from any bank, S&L, credit union, or other fiduciary institutions showing all accounts in which *Diehl* has held any funds or other assets for the years 2001 – present, inclusive. Include the portions of each such statement itemizing the details of all transactions.

These requests all seek financial information about Diehl, which relates directly to WAMCO's

claims. Diehl obviously has no basis to refuse to produce the requested documents.

47.    Requests ##25, 26, 58 and 59 ask Diehl to produce:

25. All *communications* and *documents relating to* payments by *Diehl* to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman*.

26. All *communications* and *documents relating to* promises by *Diehl* to pay legal fees to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman*.

    \*          \*          \*          \*

58. All engagement agreements between *Diehl* and any professionals who have represented it from January 2003 – present, inclusive. Include all attorneys engaged by *Diehl*.

59. Complete, unredacted copies of all bills received by *Diehl* from any and all professionals from January 2003 – present, inclusive.

These requests are equally relevant to WAMCO's claims to enforce the management fee and the

Secured Note. As discussed *supra*, Diehl put its financial position at issue as a reason for

discontinuing its payment of management fees to WAMCO in the Wabash Litigation. If Diehl

has sufficient economic resources to pay Rozman's personal legal bills, that fact may be

considered in the Arbitrator's decision.

### b. Requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 are neither overly broad nor unduly burdensome, and these objections are frivolous

48.    As discussed *supra*, the scope of discovery is intentionally broad, and a party seeking discovery need only establish **subject matter** relevance. Therefore, requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 are not "overbroad."

49.    Diehl offers no support for its statement that the production of documents responsive to these requests would impose an "undue" burden. To put things in perspective, this case involves disputes worth hundreds of thousands of dollars. WAMCO cannot imagine that a complete production would require more than 1,000-2,000 pages of materials.

### c. Diehl has offered no reason for its failure to produce Paul Ehrlich's August 13, 2005 e-mail

50.    Given the nature of **Exhibit 6**, Paul Ehrlich's August 13, 2005 e-mail obviously relates to the management fee, and to Diehl's financial condition. Therefore, Diehl had no basis for refusing to produce it.

## IV.    CONCLUSION

It would be manifestly unfair to allow Diehl to benefit by ignoring its discovery obligations and violating the Arbitrator's order. The written discovery responses that Diehl has refused to provide all go directly to the merits of this arbitration. Diehl obviously possesses all financial information about its business, which WAMCO needs to advocate its case properly.

Diehl's decision not to provide that information speaks volumes about the merits of this case. It also requires the imposition of an appropriate sanction. However, unlike a trial judge, the Arbitrator in this case lacks the power to enforce a discovery sanction, or to hold a party in contempt. Therefore, the sanction must be the entry of an arbitral award in favor of WAMCO and against Diehl.

WHEREFORE, WAMCO moves this Panel to enter an Award in its favor, and against

Diehl, for the relief requested in WAMCO's Supplement to Claims, and for such other and

further relief as the Arbitrator deems necessary and appropriate.

Respectfully submitted,

**WISCONSIN AUTOMATED MACHINERY CORP.**

**DATED:** May 31, 2007

By: _____
One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for Wisconsin Automated
  Machinery Corp.
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

| STATE OF INDIANA | ) | IN THE WABASH CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF WABASH | ) | CAUSE NO: 85C01-0608-PL-380 |

DIEHL WOODWORKING MACHINERY, INC., )
       *Plaintiff,* )
        )
       v. )
        )
WISCONSIN AUTOMATED MACHINERY )
CORP., JAY EHRLICH and DIMITRIS )
LOUKIDIS, )
       *Defendants.* )

## JAY EHRLICH'S FIRST SET OF INTERROGATORIES
## TO BE ANSWERED UNDER OATH BY
## <u>PLAINTIFF DIEHL WOODWORKING MACHINERY, INC.</u>

To:   *Bruce O. Boxberger, Esq*, CARSON BOXBERGER LLP, 1400 One Summit Square, Fort Wayne, IN 46802

Pursuant to <u>Rule</u> 33 of the <u>Indiana Trial Rules</u>, Defendant Jay Ehrlich, by his undersigned counsel, hereby requests the plaintiff, Diehl Woodworking Machinery, Inc. to answer the following Interrogatories under oath within 30 days:

### DEFINITIONS AND INSTRUCTIONS

### <u>Definitions</u>

1.    *"Plaintiff," "you"* and *"Diehl"* shall mean the plaintiff, Diehl Woodworking Machinery, Inc., and any person acting or purporting to act on behalf of Diehl Woodworking Machinery, Inc.

2.    *"WAMCO"* shall mean the defendant, Wisconsin Automated Machinery, Corp., and any person acting or purporting to act on behalf of Wisconsin Automated Machinery, Corp.

3.    *"Lawsuit"* shall mean the above-captioned case.

4.    *"Ehrlich"* shall mean the defendant, Jay Ehrlich.

5.    *"Loukidis"* shall mean the defendant, Dmitris Loukidis.



EXHIBIT
1

6.    *"Rozman"* shall mean Robert F. Rozman and any person acting or purporting to act on behalf of Robert F. Rozman.

7.    *"Carson Boxberger"* shall mean CARSON BOXBERGER LLP and any person acting or purporting to act on behalf of CARSON BOXBERGER LLP.

8.    *"Memorandum of Agreement"* shall mean the two-page instrument attached as Exhibit "A" to *Diehl*'s complaint.

9.    *"Asset Purchase Agreement"* shall mean the instrument attached as **Exhibit 1** to *WAMCO*'s Answer, Affirmative Defenses and Counterclaim.

10.   *"Document"* shall mean any printed, typewritten, handwritten, machine readable, or otherwise recorded matter of any character, including, but not limited to, letters, memoranda, computer records, e-mails, computer data bases, computer printouts, computer cards, computer disks, computer hard drives, computer CD-ROM disks, charges, pleadings, telegrams, notes, catalogues, brochures, advertisements, diaries, reports, calendars, interoffice communications, statements, announcements, printouts, drawings, graphs, charts, photographs, tape recordings, phono records, disks, hard drives or data compilations or any other items included within the definition of "document" under Indiana law, and all nonidentical copies of the *document* by whatever means made.

11.   *"Communications"* shall include all discussions, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, telecopies, e-mails, or other forms of written or verbal intercourse, however transmitted, including reports, notes, memoranda, lists, agenda, and other *documents* and records of *communications*, and when used shall require a statement of the name of the individual who made the *communication*, the person(s) to whom he made it, the date it was made and the form in which it was made.

111825-1                                  2

12.    *"Person"* shall mean a natural person or business entity, as the context may require.

13.    *"Relating to"* shall mean the following: containing, comprising, constituting, stating, setting forth, recording, contradicting, referring to, describing, discussing, reflecting, interpreting, identifying, concerning, or in any way pertaining to, or logically or factually connected to, in whole or in part, that matter, *document, communication, person* or subject.

14.    *"Identification," "identify"* or *"identify"*:

a) when referring to a *person*, shall mean that *you* shall set forth the name, present or last known business address, and, if a natural person, their last known home address, telephone number, employer, and title(s). Once a *person* has been *identified* in an interrogatory answer, it shall be sufficient thereafter when *identifying* that *person* to state merely his/her/its name; and

b) when referring to a *document* shall mean that *you* shall set forth the title or other means of *identification* of each such *document*, the date of each *document*, *identification* of the author or originator of that *document*, the names of all recipients, and the *identification* of the *person*(s) who have possession, custody or control of each *document*, or copies of it.

c) when referring to a *communication* means that *you* shall state the following information about each such *communication*, with specificity and particularity, (a) the date the *communication* was made, (b) the manner in which the *communication* was made (i.e., spoken in person, spoken by telephone, via e-mail, etc.), (c) the *identity* of the *person* making the *communication*, (d) the *identity* of each person(s) to whom the *communication* was made, (e) where the *person* making the *communication* was located at the time, and (f) the *identity* of all other *persons* present when the *communication* was made.

15.    *"Describe"* and *"description"* shall have their ordinary dictionary meanings, and shall require *you*, with specificity and particularity, to narrate, express, explain, set forth, relate, depict, delineate and/or portray in detail the facts necessary to respond to each interrogatory which asks *you* to *describe*, or to furnish a *description*.

16.    Except as otherwise provided herein, all other terms used in these requests are intended to have the same meaning that they have under Indiana law pertaining to discovery, unless the context requires a different meaning.

## Instructions

1.    These interrogatories are continuing in nature, and *you* must provide such additional information and documents as *you*, *your* attorney, or anyone acting on *your* behalf or in concert with *you* may have or may obtain between the time *your* answers and/or responses are first served and the time of trial or pertinent hearing. In answer to these interrogatories, *you* must furnish all information available to *you* or *your* attorney, including, but not limited to, information in the possession of any attorneys, agents, investigators, representatives, or anyone acting in cooperation or in concert with the case to be defended by *you*.

2.    If any interrogatory cannot be answered in full, after exercising due diligence to secure the information requested, please so state and answer the interrogatory to the extent possible, specifying the inability to answer the remainder of any such interrogatory and stating whatever information or knowledge presently is available concerning the portion of the interrogatory that could not be answered.

3.    If any information is withheld on the basis of privilege, state with respect thereto the privilege on which *you* are relying; the holder of the privilege, and the type of information being withheld, in compliance with Indiana law.

### INTERROGATORIES

1.    *Identify* the *person*(s) answering these interrogatories and, if different, the *person*(s) verifying or certifying the accuracy of these interrogatories.

*ANSWER:*

2.      *Identify* all *persons* with knowledge of the allegations in *Diehl*'s complaint.

*ANSWER:*

3.      *Identify* each *person* whom *Diehl* expects to call as an expert witness at trial. For each expert witness *identified*, state the subject matter on which the expert is expected to testify, and state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

*ANSWER:*

4.      *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to Ehrlich.*

*ANSWER:*

5.     *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to* *WAMCO*.

*ANSWER:*

6.     *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to* *Loukidis*.

*ANSWER:*

7.     *Identify* all *documents relating to Ehrlich.*

*ANSWER:*

8.     *Identify* all *documents relating to WAMCO.*

*ANSWER:*

9.     *Identify* all *documents relating to Loukidis.*

*ANSWER:*

10.    Has *Diehl* agreed to release, relinquish, refrain from suing, or refrain from

enforcing any claims that *Diehl* has asserted against *Loukidis* in the *lawsuit*?

*ANSWER:*

11.    How did *Ehrlich* and/or *Loukidis* breach their fiduciary duties as *Diehl*

shareholders, as alleged in ¶6 of *your* complaint? *Describe* all facts in sufficient detail to provide

this explanation.

*ANSWER:*

12.    Has *Rozman* acquired all of *Loukidis'* interests in *WAMCO* and *Diehl?*

*ANSWER:*

13.    If *your* answer to the preceding interrogatory is affirmative, *identify* all

*communications* and *documents relating to* the transactions by which *Rozman* acquired *Loukidis'*

interests in *WAMCO* and *Diehl.*

*ANSWER:*

14.     Since acquiring all of *Loukidis'* interests in *WAMCO*, *describe* the actions that

*Rozman* has taken to rectify *Loukidis'* alleged breach of fiduciary duty as a *Diehl* shareholder.

*ANSWER:*

15.     What did *WAMCO* receive from *Diehl* in return for *WAMCO*'s execution of the

*Memorandum of Agreement?*

*ANSWER:*

16.     *Describe* all payments by *Diehl* to *WAMCO* since the execution of the

*Memorandum of Agreement.*

*ANSWER:*

17.    What "management consulting and services" was *WAMCO* supposed to provide

to *Diehl* pursuant to the *Memorandum of Agreement*?

*ANSWER:*

18.    Has *Diehl* requested any services from *WAMCO* since the execution of the

*Memorandum of Agreement*?

*ANSWER:*

19.    If *your* answer to the preceding interrogatory is affirmative, *identify* all

*communications* between *Diehl* and *WAMCO* by which *Diehl* requested such services from

*WAMCO*.

*ANSWER:*

20.    Has *WAMCO* refused to provide any services to *Diehl* since the execution of the
*Memorandum of Agreement*?

***ANSWER:***

21.    If *your* answer to the preceding interrogatory is affirmative, *identify* all
*communications* between *WAMCO* and *Diehl* in which *WAMCO* refused to provide the services
requested by *Diehl*.

***ANSWER:***

22.    *Describe* the "business conditions" which require the elimination of the
management fee, as alleged in ¶9 of *your* complaint and ¶9 of *your* amended complaint, and
*identify* any *documents* containing information *relating to your* answer to this interrogatory.

*ANSWER:*

23     *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

*ANSWER:*

24.    *Describe* all facts in support of the allegation in ¶11 of *your* complaint about "the failure of consideration" under the *Memorandum of Agreement.*

*ANSWER:*

25.    Do *you* contend that the *Memorandum of Agreement* permits *Diehl* to eliminate the management fee without the consent of *WAMCO?*

*ANSWER:*


26    *Identify* all current *Diehl* shareholders, as well as their respective ownership interests in *Diehl.*

*ANSWER:*


27.    *Describe* the damages *Diehl* has allegedly sustained damages as a result of the actions by *Ehrlich* and *Loukidis.*

*ANSWER:*


28.    *Identify* each *Diehl* director and officer who voted to authorize the filing of the *lawsuit* and *identify* all *documents* and *communications relating to* that decision.

*ANSWER:*

29.    *Identify* cach *Diehl* director and officer who voted to authorize the filing of the *lawsuit* and identify all *documents relating to* that decision.

*ANSWER:*

30.    *Identify* all directors and officers of *Diehl.*

*ANSWER:*

31.    With respect to each *Diehl* director and officer identified in the answer to the preceding interrogatory, state the total amount of compensation (salary, bonus and otherwise) paid to him/her for the years 2005, 2006 and 2007 (annualized for 2007).

111825-1                          14

*ANSWER:*

32. Has *Diehl* paid any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

*ANSWER:*

33. If *your* answer to the preceding interrogatory is affirmative, state the date and amount of each such payment, and *identify* all *communications* and *documents relating to* such payment.

*ANSWER:*

34. Has *Diehl* promised to pay any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

*ANSWER:*

35. If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* and *documents relating to* each such promise.

*ANSWER:*

36. *Identify* all *communications* and *documents relating to* all agreements between *WAMCO* and *Diehl* to reduce any management fees payable by *Diehl* to *WAMCO*, and *describe* the terms of such agreements.

*ANSWER:*

37. *Identify* the individuals who acted on behalf of *WAMCO* and *Diehl relating to* the amount of the reduction of the management fee to be paid by *Diehl*.

*ANSWER:*

38. *Identify* all *communications* between Paul Ehrlich and *Rozman relating to* the reduction of the management fee between *WAMCO* and *Diehl*.

*ANSWER:*

39. *Identify* all *documents* and *communications relating to* the agreement *described* in *your* answer to the preceding interrogatory.

*ANSWER:*

40.    *Identify* any instances of assertion of product liability claims against *WAMCO*, or against *Diehl* arising out of the *Asset Purchase Agreement*.

*ANSWER:*

41.    *Identify* all *documents* and *communications relating to* contractual obligations of *WAMCO* to *Diehl*.

*ANSWER:*

42.    *Identify* all waivers granted by *Diehl* to *WAMCO relating to* contractual obligations owed by *WAMCO* to *Diehl*.

*ANSWER:*

43.     *Identify* all *communications* with Michael Moss *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

44.     *Identify* all *communications* with Paul Ehrlich *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

45.     *Identify* all *communications* with Michael Ruffner *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

46. *Identify* all *communications* with Gregory Kotsonis *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

47. *Identify* all *communications* with *Carson Boxberger relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

48. *Identify* all *communications* with Bernard Schlifke *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

49.    Have there been any changes in *Diehl's* financial condition since September 13, 2002 which are materially adverse to *Diehl*?

*ANSWER:*

50.    If *your* answer to the preceding interrogatory is affirmative, *describe* each such change in *Diehl's* financial condition.

*ANSWER:*

51.    Why did *Diehl* execute the *Memorandum of Agreement*?

*ANSWER:*

52.    Why did *Diehl* execute the *Asset Purchase Agreement*?

*ANSWER:*

53.    *Describe* all facts and on which *you* base *your* affirmative defense of
unconscionability.

*ANSWER:*

Respectfully submitted,

ROTHBERG  LOGAN & WARSCO  LLP

DATED: March 9, 2007          By: _____
                                          R. Steven Hearn (7618-43)
                                          ROTHBERG LOGAN & WARSCO LLP
                                          212 North Buffalo Street
                                          Warsaw, Indiana 46580
                                          Telephone:574-267-8802
                                          **Attorneys for Wisconsin Automated
                                          Machinery Corp. and Jay Ehrlich**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he mailed a true and correct copy of the above and foregoing to:

Dimitris Loukidis
3730 Warren Court
Racine, WI  53405

Bruce Boxberger
Counsel for Plaintiff
1400 One Summit Square
Fort Wayne, IN  46802

by depositing the same in the United States mail, postage prepaid, on March 7ᴿ, 2007.

R. Steven Hearn

G:\word\docs\IAS\Helvik\Wisconsin Automated Machinery\PL(I Interrogatories to Diehl DOC

| | |
|---|---|
| STATE OF INDIANA ) | IN THE WABASH CIRCUIT COURT |
| ) SS: | |
| COUNTY OF WABASH ) | CAUSE NO: 85C01-0608-PL-380 |

DIEHL WOODWORKING MACHINERY, INC., )
         *Plaintiff,* )
          )
          )
      v. )
          )
WISCONSIN AUTOMATED MACHINERY )
CORP., JAY EHRLICH and DIMITRIS )
LOUKIDIS, )
         *Defendants.* )

## JAY EHRLICH'S FIRST SET OF DOCUMENT REQUESTS
## TO PLAINTIFF DIEHL WOODWORKING MACHINERY, INC.

To:    *Bruce O. Boxberger, Esq.*, CARSON BOXBERGER LLP, 1400 One Summit Square, Fort Wayne, IN 46802

    Pursuant to Rule 34 of the Indiana Trial Rules, Defendant Jay Ehrlich, by his undersigned counsel, hereby requests the plaintiff, Diehl Woodworking Machinery, Inc. to produce the following documents within 30 days:

### DEFINITIONS AND INSTRUCTIONS

### Definitions

    1.    *"Plaintiff," "you"* and *"Diehl"* shall mean the plaintiff, Diehl Woodworking Machinery, Inc., and any person acting or purporting to act on behalf of Diehl Woodworking Machinery, Inc.

    2.    *"WAMCO"* shall mean the defendant, Wisconsin Automated Machinery, Corp., and any person acting or purporting to act on behalf of Wisconsin Automated Machinery, Corp.

    3.    *"Lawsuit"* shall mean the above-captioned case

    4.    *"Ehrlich"* shall mean the defendant, Jay Ehrlich.

    5.    *"Loukidis"* shall mean the defendant, Dmitris Loukidis.



EXHIBIT
2

6.      *"Rozman"* shall mean Robert F. Rozman and any person acting or purporting to act on behalf of Robert F. Rozman.

7.      *"Carson Boxberger"* shall mean CARSON BOXBERGER LLP and any person acting or purporting to act on behalf of CARSON BOXBERGER LLP.

8.      *"Memorandum of Agreement"* shall mean the two-page instrument attached as Exhibit "A" to *Diehl's* complaint.

9.      *"Asset Purchase Agreement"* shall mean the instrument attached as **Exhibit 1** to *WAMCO's* Answer, Affirmative Defenses and Counterclaim.

10.     *"Document"* shall mean any printed, typewritten, handwritten, machine readable, or otherwise recorded matter of any character, including, but not limited to, letters, memoranda, computer records, e-mails, computer data bases, computer printouts, computer cards, computer disks, computer hard drives, computer CD-ROM disks, charges, pleadings, telegrams, notes, catalogues, brochures, advertisements, diaries, reports, calendars, interoffice communications, statements, announcements, printouts, drawings, graphs, charts, photographs, tape recordings, phono records, disks, hard drives or data compilations or any other items included within the definition of "document" under Indiana law, and all nonidentical copies of the *document* by whatever means made.

11.     *"Communications"* shall include all discussions, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, telecopies, e-mails, or other forms of written or verbal intercourse, however transmitted, including reports, notes, memoranda, lists, agenda, and other *documents* and records of *communications*, and when used shall require a statement of the name of the individual who made the *communication*, the person(s) to whom he made it, the date it was made and the form in which it was made.

Case 1:07-cv-06840    Document 19-2    Filed 02/26/2008    Page 142 of 148

12.   "*Person*" shall mean a natural person or business entity, as the context may require.

13.   "*Relating to*" shall mean the following: containing, comprising, constituting, stating, setting forth, recording, contradicting, referring to, describing, discussing, reflecting, interpreting, identifying, concerning, or in any way pertaining to, or logically or factually connected to, in whole or in part, that matter, *document, communication, person* or subject.

14.   Except as otherwise provided herein, all other terms used in these requests are intended to have the same meaning that they have under Indiana law pertaining to discovery, unless the context requires a different meaning.

## Instructions

1.   These requests are continuing in nature, and *you* must provide such additional information and *documents* as *you*, *your* attorney, or anyone acting on *your* behalf or in concert with *you* may have or may obtain between the time *your* answers and/or responses are first served and the time of trial or pertinent hearing. In response to these requests, *you* must produce all *documents* available to *you* or *your* attorney, including, but not limited to, *documents* in the possession of any attorneys, agents, investigators, representatives, or anyone acting in cooperation or in concert with the case to be defended by *you*.

2.   If any request cannot be answered in full, after exercising due diligence to secure the documents requested, please so state and answer the requests to the extent possible, specifying the inability to produce the remainder of any such *documents* and stating whatever information or knowledge presently is available concerning the *documents* that could not be provided.

3.   If any *documents* are withheld on the basis of privilege, provide a privilege log identifying each *document* withheld. With respect to each *document* withheld, *describe* the

privilege on which *you* are relying; the holder of the privilege, and the all other information
required by Indiana law.

## DOCUMENTS REQUESTED

1.    All *documents identified* in *your* answers to interrogatories.

**RESPONSE:**

2.    All *communications identified* in *your* answers to interrogatories.

**RESPONSE:**

3.    All *documents* on which *you* base any interrogatory answer.

**RESPONSE:**

4.    All *communications* on which *you* base any interrogatory answer.

**RESPONSE:**

5.    All *documents* on which *you* base any allegation in any pleading *you* have filed in
the *lawsuit*.

**RESPONSE:**

6.    All *communications* on which *you* base any allegation in any pleading *you* have filed in the *lawsuit*.

**RESPONSE:**

7.    All reports prepared by any *person Diehl* expects to call as an expert witness at trial.

**RESPONSE:**

8.    All *documents* relied upon by any *person Diehl* expects to call as an expert witness at trial.

**RESPONSE:**

9.    All *documents relating to Ehrlich*.

**RESPONSE:**

10.    All *communications* between *Diehl* and *Ehrlich* during the last five calendar

years.

**RESPONSE:**

11.    All *documents relating to WAMCO*.

**RESPONSE:**

12.    All *communications* between *Diehl* and *WAMCO* during the last five calendar

years.

**RESPONSE:**

13.    All *documents relating to Loukidis.*

**RESPONSE:**

14. All *communications* between *Diehl* and *Loukidis relating to* the *lawsuit*.

**RESPONSE:**

15. All *documents* executed by *Loukidis relating to* the *lawsuit*.

**RESPONSE:**

16. All *documents relating to Rozman*'s acquisition of all or any part of *Loukidis'* interests in *WAMCO* and *Diehl*.

**RESPONSE:**

17. All *communications relating to Rozman*'s acquisition of all or any part of *Loukidis'* interests in *WAMCO* and *Diehl*.

**RESPONSE:**

18. All *documents relating to* payments by *Diehl* to *WAMCO* since the execution of the *Memorandum of Agreement*.

**RESPONSE:**

19. All *documents relating to* payments by *Diehl* to *WAMCO* since the execution of the *Asset Purchase Agreement*.

**RESPONSE:**

20. *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

**RESPONSE:**

21. All *Diehl* shareholders, as well as their respective ownership interests in *Diehl*.

**RESPONSE:**

22.    All *documents relating to* the damages *Diehl* has allegedly suffered as a result of the actions by *Ehrlich* and *Loukidis.*

RESPONSE:

23.    All of *Diehl's* payroll records for the years 2002 through 2007, inclusive.

RESPONSE:

24.    Copies of all bills received by *Diehl* from *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman.*

RESPONSE:

25.    All *communications* and *documents relating to* payments by *Diehl* to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman.*

RESPONSE: