$\int$

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**CHICAGO, ILLINOIS**

| | |
|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP., <br>      *Claimant,* <br><br> v. <br><br> DIEHL WOODWORKING MACHINERY, INC., <br>      *Respondent.* | ) <br> ) <br> ) <br> ) <br> ) <br> )     No. 51 180 01918 06 <br> ) <br> ) <br> ) |

## CLAIMANT'S MOTION FOR DISCOVERY SANCTIONS

Claimant Wisconsin Automated Machinery Corp. ("WAMCO"), by its undersigned counsel, hereby moves for discovery sanctions against the Respondent, Diehl Woodworking Machinery, Inc. ("Diehl"). In support, WAMCO states as follows:

### I. INTRODUCTION

Diehl has deliberately disobeyed the Arbitrator's order to provide written discovery responses which will enable WAMCO to prosecute its arbitral claims. Diehl's conduct warrants the appropriate sanction – the entry of an arbitral award in favor of WAMCO.

### II. BACKGROUND FACTS

#### A. Transactional Documents at Issue in this Arbitration

1. This matter involves the enforceability and enforcement of certain transactional documents executed by the parties, namely: (1) an Asset Purchase Agreement executed in September 2002 ("APA"); (2) a promissory note ("Note") and security agreement ("Security Agreement") executed in connection with the APA (collectively, the "Secured Note"); (3) a memorandum of agreement executed in August 2005 ("MOA"). The genuineness of these documents is undisputed, although the parties disagree about their meaning and legal effect.

2.    The primary stated purpose of the APA was the sale of certain product lines and associated properties by WAMCO to Diehl. The APA also required WAMCO to continue to provide management services as requested by Diehl, for which Diehl would pay a monthly management fee to WAMCO.

3.    The APA did not require Diehl to pay any cash to WAMCO; rather, the payments were to be made over time. The Secured Note was executed in connection with the APA.

4.    The Secured Note identifies Diehl as the "Debtor" and WAMCO as the "Secured Party." The Secured Note also identifies certain events of default, which are discussed in ¶¶31 and 32 of WAMCO's Supplement to Claims. In particular, the Security Agreement defines "default" to include:

> ... any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

The Security Agreement defines Diehl's "Liabilities" as:

> ... all obligations of Debtor hereunder, **and all other debts, liabilities and obligations of Debtor to Secured Party ... howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due**, including without limitation under the Promissory Note.

(Emphasis added).

5.    In August 2005 the parties executed the MOA, which states that Diehl would continue paying monthly management fees; in exchange, WAMCO would:

> ... continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl ...

(*See* MOA at ¶1). In short, Diehl could ask WAMCO to provide management consulting and services; upon such request, WAMCO would provide the requested services to Diehl.

6.     The validity of the MOA is a disputed issue, which WAMCO has asked the

Arbitrator to resolve by making a declaration of rights.

## B.     Diehl's Failure and Refusal to Pay Management Fees to WAMCO

7.     Whether it is the APA or the MOA that governs Diehl's obligation to pay

management fees, there is no question that Diehl stopped making those payments to WAMCO in

August 2006.

8.     Also in August 2006, Diehl filed suit in Wabash County, Indiana (the "Wabash

Litigation"), in which it unilaterally seeks, *inter alia*, to eliminate the management fee.

Paragraph 9 of Diehl's complaint in the Wabash Litigation reads:

> Diehl's business conditions require the elimination of the
> management fee.

This allegation – made by **Diehl** – caused WAMCO to deem itself insecure under the Secured

Note, and to bring its claim to enforce the Secured Note in this arbitration action.

9.     The Wabash Litigation is currently pending, and Diehl is represented in that case

by the same attorneys representing it in this arbitration.

## C.     Claims Asserted by WAMCO in this Arbitration

10.     As expressed more fully in its Supplement to Claims, WAMCO has asserted four

separate claims against Diehl, which are summarized as follows:

| Count I: | Declaratory Relief |
|---|---|
| Count II: | Breach of 2002 APA (unmodified by MOA) |
| Count III: | Breach of 2002 Asset Purchase Agreement (as modified by MOA) |
| Count IV: | Enforcement of Secured Note |

## D.     WAMCO's Discovery Requests in this Arbitration

11.     In early March 2007 in the Wabash Litigation, Jay Ehrlich (another defendant

named in that case) issued interrogatories and document requests to Diehl (**Exhibits 1** and **2**).

Many of the same issues presented in this matter are covered by Mr. Ehrlich's written discovery in the Wabash Litigation.

12.     The Arbitrator conducted a telephonic hearing on April 12, 2007. At that time, WAMCO's undersigned counsel reported that Diehl's responses to Mr. Ehrlich's written discovery in the Wabash Litigation were due in early May, and suggested that Diehl serve copies of its answers to Mr. Ehrlich's written discovery in the Wabash Litigation. Diehl's counsel agreed, and the Arbitrator entered an order to that effect.

13.     The Arbitrator held a second telephonic hearing on May 15, 2007, at which the parties' counsel reported that Diehl had not yet served its responses to Mr. Ehrlich's written discovery in the Wabash Litigation. Diehl requested an additional ten days (until May 25, 2007), to which WAMCO's undersigned counsel agreed. Diehl did not advise the Arbitrator of any objection to any of Mr. Ehrlich's interrogatories or document requests.

14.     On May 15, 2007 – after the telephone conference, WAMCO's undersigned counsel sent a confirming e-mail to the AAA case administrator, with copies to counsel for Diehl, and to the Arbitrator (**Exhibit 3**). That e-mail reads as follows:

> My understanding of Arbitrator Morsch's order today was that, on or before 5/25/07, Diehl would (1) serve me with a copy of Diehl's answers to the interrogatories served by Jay Ehrlich in the Wabash County litigation, and (2) ***provide me with a copy of all documents responsive*** to the document request served by Jay Ehrlich in the Wabash County litigation.

(Emphasis added). The Arbitrator immediately confirmed that understanding by reply e-mail (**Exhibit 3**). Diehl's counsel did not respond to either e-mail.

15.     On May 25, 2007 WAMCO's undersigned counsel received Diehl's answers to Mr. Ehrlich's interrogatories (**Exhibit 4**), Diehl's responses to Mr. Ehrlich's document requests (**Exhibit 5**), and a 3-ring notebook containing 334 pages of documents.

16.     One of the documents produced by Diehl is an e-mail from Diehl's president,

Robert Rozman, to Paul Ehrlich, who formerly owned shares in Diehl and WAMCO (**Exhibit 6**).

Mr. Rozman's e-mail references an August 13, 2005 e-mail from Paul Ehrlich. However, the

August 13, 2005 e-mail from Paul Ehrlich is not included among the documents produced.

## III.     ARGUMENT

### A.     General Rules Governing Discovery[1]

#### 1.     The scope of discovery is intentionally broad and anticipates that the responding party must bear a certain amount of inconvenience

17.     The goal of discovery is always full disclosure about the subject matter of the

dispute, so that both sides can educate themselves fully about the facts of the case.  Illinois

Supreme Court Rule 201(b)(1) reads as follows, in relevant part:

> Except as provided in these rules, a party may obtain by discovery
> ***full disclosure regarding any matter relevant to the subject
> matter involved in the pending action,*** whether it relates to the
> claim or defense of the party seeking disclosure or of any other
> party ...

(Emphasis added).  Under Rule 201(b)(1), both parties are entitled to full disclosure by discovery

of any relevant matter, including matters that relate to the defense of a party.  *E.g.*, Fosse v.

Pensabene, 362 Ill.App.3d 172, 182 (2nd Dist. 2005).  Indiana law is identical.  TR.26(B)(1) of

the Indiana Rules of Trial Procedure reads as follows:

> Parties may obtain discovery regarding any matter, not privileged,
> which is ***relevant to the subject-matter involved in the
> pending action,*** whether it relates to the claim or defense of the
> party seeking discovery or the claim or defense of any other party,
> including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things
> and the identity and location of persons having knowledge of any
> discoverable matter.  It is not ground for objection that the
> information sought will be inadmissible at the trial if the

---

[1] A choice-of-law question might theoretically exist because the APA provides for the application of Illinois law, while Mr. Ehrlich's written discovery requests were issued in an Indiana case.  That question is not important here, because the law is the same in both states, as discussed herein.

> information sought appears reasonably calculated to lead to the
> discovery of admissible evidence.

(Emphasis added).

18.     Pre-trial discovery is deliberately broad. It "... presupposes a range of relevance

and materiality which includes not only what is admissible at the trial, but also that which leads

to what is admissible at the trial." Monier v. Chamberlain, 35 Ill.2d 351, 357 (1966). Again,

Indiana law is identical. *See* TR.26(B)(1); Costanzi v. Ryan, 175 Ind. App. 257, 271 (Ind. App.

1978) ("discovery is proper for information reasonably calculated to lead to the discovery of

admissible evidence").

19.     Likewise, any discovery request necessarily imposes *some* burden upon the party

called to respond.

## 2. A party may not avoid discovery by asserting blanket assertions of privilege

20.     Privileges are strongly disfavored and must be strictly construed as exceptions to

the general duty to disclose. *See* Lawndale Restoration Ltd. Partnership v. Acordia of Illinois,

Inc., 367 Ill.App.3d 24, 32 (1st Dist. 2006); Chicago Trust Co. v. Cook County Hosp., 298

Ill.App.3d 396, 401 (1st Dist. 1998) (rejecting privilege claims where party claiming privileges

failed to meet its burden to demonstrate their applicability); Krupp v. Chicago Trans. Auth., 8

Ill.2d 37, 42 (1956) ("For one who claims to be exempt by reason of privilege from the general

rule which compels all persons to disclose the truth has the burden of showing the facts which

give rise to the privilege. 'His mere assertion that the matter is confidential and privileged will

not suffice'"); Howard v. Dravet, 813 N.E.2d 1217, 1221 (Ind. App. 2004) ("Blanket claims of

privilege are not favored. The party seeking to avoid discovery has the burden of establishing

the essential elements of the privilege being invoked. ... When a "blanket" assertion of privilege

is made, it will not suffice to block discovery").

**B.**    **Diehl's Interrogatory Answers are Deliberately Incomplete and Evasive**

21.    Most of Diehl's interrogatory answers are deliberately evasive; indeed, many of

them provide absolutely no responsive information.

### 1.  Diehl's use of blanket privilege assertions to avoid answering interrogatories is improper

22.    Instruction #3 of Mr. Ehrlich's interrogatories, which contemplates privilege

assertions by Diehl, reads as follows:

> If any information is withheld on the basis of privilege, state with
> respect thereto the privilege on which *you* are relying; the holder of
> the privilege, and the type of information being withheld, in
> compliance with Indiana law.

23.    Notwithstanding that instruction, Diehl's interrogatory answers ##5, 6, 32-35 and

47 do not contain *any* factual information, or refer to any documents.  Instead, answers ##5, 6,

32-35 simply read as follows:

> **ANSWER:**    Objection.  Plaintiff asserts this interrogatory as
> overly broad and burdensome and is not reasonably calculated to
> lead to the discovery of admissible evidence.  In addition, plaintiff
> asserts that there may be communications responsive to this
> interrogatory that are not discoverable due to attorney-client
> privilege.

Similarly, its answer to #47 asserts a blanket attorney-client and attorney work-product privilege.

Diehl does not provide a privilege log for any of these interrogatory answers, and openly refuses

to do so with respect to its answer to #47.

24.    As discussed *supra*, Diehl's blanket assertions of privilege are not sufficient to

block discovery, under either Illinois or Indiana law.

25.    Diehl has not met *its* burden to demonstrate the existence of any valid privileges

against discovery.  Indeed, Diehl's answers to interrogatories ##5, 6, 32-35 and 47 do not even

claim the actual existence of any privileged communications; these answers merely state that:

115788-1                                                        7

> ... ***there may be*** communications responsive to this interrogatory
> that are not discoverable due to attorney-client privilege.

(Emphasis added). In other words, Diehl asserts the ***mere possibility*** of privileged materials as a

basis to avoid answering the interrogatories.

26.    Under both Illinois and Indiana law, the Arbitrator should not presume the

existence of a privilege, or any other basis for Diehl to refuse to answer the interrogatories.

## 2. Diehl's "subject-matter relevance" and "overly broad and burdensome" objections are frivolous

### a. Interrogatories ##5, 6 and 32-35 are clearly relevant to the subject matter of the claims and defenses asserted in this arbitration

27.    Mr. Ehrlich's interrogatories ##5, 6 and 32-35 all relate directly to the subject

matter of this arbitration, and Diehl's objections are a transparent attempt to avoid producing

information which will hurt its case.

28.    Interrogatory #5 reads as follows:

> *Identify* all *communications* between *Diehl* and any other *person*(s)
> *relating to WAMCO.*

This interrogatory is clearly calculated to provide admissible information in this arbitration, and

to lead to information that would be admissible – especially in the context of discovery.

WAMCO is the claimant in this case, and it is reasonably likely that a communication by Diehl

relating to WAMCO would tend to prove or disprove the claims and defenses at issue here.

29.    Interrogatory #6 reads as follows:

> *Identify* all *communications* between *Diehl* and any other *person*(s)
> *relating to Loukidis.*

This interrogatory is equally clearly calculated to provide admissible information in this

arbitration, and to lead to information that would be admissible, for the following reasons:

> a. Loukidis is a former shareholder, director and officer of WAMCO and
> Diehl; it appears that Loukidis signed the MOA on behalf of WAMCO.

      b.  Loukidis sold his Diehl shares to Rozman last year, which suggests the existence of communications about the value of Loukidis' Diehl shares; that issue relates to the Diehl's allegation that its "business conditions require the elimination of the management fee," and to whether a "default" has occurred under the Security Agreement.

Communications by Diehl relating to Loukidis would therefore tend to prove or disprove

material disputed issues in this case.

      30.    Interrogatories ##32-35 read as follows:

      32. Has *Diehl* paid any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

      33. If *your* answer to the preceding interrogatory is affirmative, state the date and amount of each such payment, and *identify* all *communications* and *documents relating to* such payment.

      34. Has *Diehl* promised to pay any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

      35. If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* and *documents relating to* each such promise.

These interrogatories are all clearly relevant to WAMCO's claims to enforce the management

fee and the Secured Note. As discussed *supra*, Diehl put its financial position at issue as a

reason for discontinuing its payment of management fees to WAMCO in the Wabash Litigation.

That allegation, in turn, led to WAMCO's claim to enforce the Secured Note.  Rozman is Diehl's

president and majority shareholder.  If Diehl has sufficient economic resources to pay Rozman's

personal legal bills, that fact may be considered in the Arbitrator's decision about the merits of

each of these claims.

### b.  Interrogatories ##5, 6 and 32-35 are neither overly broad nor unduly burdensome, and these objections are frivolous

31.     The scope of discovery is intentionally broad, and a party seeking discovery need only establish *subject matter* relevance.  Therefore, interrogatories ##5, 6 and 32-35 are not "overbroad."

32.     Diehl offers no support for its statement that answering these interrogatories would impose any kind of "undue" burden.

### 3.  Diehl's evasive answers are improper, and warrant discovery sanctions

33.     Diehl's answers to interrogatories ##13, 17, 20, 22 and 23 are evasive, and do not answer the questions posed.  In particular:

    a.  Answer #13 refers to documents which Diehl has not produced;

    b.  Interrogatory #17 asks the following question:

> What "management consulting and services" was *WAMCO* supposed to provide to *Diehl* pursuant to the *Memorandum of Agreement?*

WAMCO's question asks Diehl to explain a vague term of the MOA by stating its position about what the parties *actually agreed* to do.  However, Diehl evades that question and responds that "Management and Consulting Services *could* have included ..." various services.

    c.  Interrogatory #20 asks the following question:

> Has *WAMCO* refused to provide any services to *Diehl* since the execution of the *Memorandum of Agreement?*

This calls for a simple yes or no answer, which Diehl refuses to provide.

    d.  Interrogatory #22 reads as follows:

> *Describe* the "business conditions" which require the elimination of the management fee, as alleged in ¶9 of *your* complaint and ¶9 of *your* amended complaint, and *identify* any *documents* containing information *relating to your* answer to this interrogatory.

This interrogatory calls for a description of the alleged business conditions requiring the elimination of the management fee.  Diehl's answer does not address

that question, stating instead merely that "... the declining market for Diehl's products has required a closer inspection of [its] expenses."

e.  Interrogatory #23 reads as follows:

> *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl's* business conditions.

This interrogatory asks Diehl to identify communications. The portion of Diehl's answer which states that "... Ehrlich/WAMCO was aware of the deterioration of markets served by Diehl" does not respond. Moreover, Diehl's answer appears to refer to financial information that was not produced in response to the request for production.

## C.   Diehl's Refusal to Provide Responsive Documents Violates the Arbitrator's May 15, 2007 Order, and is Deliberately Incomplete and Evasive

### 1.  Diehl's waived its right to object to any document requests within this arbitration

34.   Had Diehl wished to object to some or all of the document requests, its counsel could – and should – have advised the Arbitrator of objections to some or all of Mr. Ehrlich's document requests and sought a ruling.

35.   Diehl did not make any such objection within this arbitration, and therefore waived its right to object.

36.   Since Diehl did not make any objection, and agreed to produce the documents, the Arbitrator did *not* give Diehl the right to withhold *anything* from WAMCO's counsel. To the contrary, as made explicit by **Exhibit 3**, the Arbitrator commanded Diehl simply to provide all documents.

37.   Notwithstanding that instruction, Diehl has refused to provide documents responsive to requests ##16, 17, 23-26, 35, 39-42, 53, 55 and 57-59.

### 2. Diehl's use of blanket privilege assertions to avoid producing documents is improper

38.    Instruction #3 of Mr. Ehrlich's document requests, which contemplates privilege

assertions by Diehl, reads as follows:

> If any *documents* are withheld on the basis of privilege, provide a
> privilege log identifying each *document* withheld.  With respect to
> each *document* withheld, *describe* the privilege on which *you* are
> relying; the holder of the privilege, and the all other information
> required by Indiana law.

39.    Diehl has not provided a privilege log, or otherwise met *its* burden to demonstrate

the existence of any valid privileges against the production of documents.  Indeed, Diehl's

responses to requests ##24-26 do not even claim the actual existence of any privileged

documents; these responses merely state that:

> ... *there may be* documents responsive to this interrogatory that
> are not discoverable due to attorney-client privilege.

(Emphasis added).  In other words, Diehl asserts the *mere possibility* of privileged materials as a

basis to avoid producing documents.

40.    Diehl's response to request #35 asserts attorney-client privilege, but does not

attach a privilege log.

41.    Under both Illinois and Indiana law, the Arbitrator should not presume the

existence of a privilege, or any other basis for Diehl to refuse to produce documents.

### 2. Diehl's "subject-matter relevance" and "overly broad and burdensome" objections are frivolous

42.    Diehl's responses to document requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59

all contain the following statement:

> **Response:**  Objection.  Plaintiff asserts this Request is overly
> broad and burdensome and is not reasonably calculated to lead to
> the discovery of admissible evidence.

### a. Requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 are clearly relevant to the subject matter of the claims and defenses asserted in this arbitration

43.    Requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 all relate directly to the subject matter of this arbitration, and Diehl's objections are a transparent attempt to avoid producing information which will hurt its case.

44.    Most of the documents which Diehl has refused to produce relate to Diehl's financial condition – which must be examined to determine whether a "default" has occurred under the Secured Note.

45.    Requests ##16 and 17 ask Diehl to produce:

> 16. All *documents relating to Rozman*'s acquisition of all or any part of *Loukidis*' interests in *WAMCO* and *Diehl*.
>
> 17. All *communications relating to Rozman*'s acquisition of all or any part of *Loukidis*' interests in *WAMCO* and *Diehl*.

As discussed *supra*, Diehl put its financial position at issue as the reason for discontinuing its payment of management fees to WAMCO in the Wabash Litigation.  That allegation, in turn, led to WAMCO's claim to enforce the Secured Note.  Therefore, ***all*** documents and communications relating to Diehl's financial position are discoverable – including those which show how the Diehl shares Loukidis sold to Rozman were valued.[2]

46.    Requests ##23, 39-42, 53, 55 and 57-59 ask Diehl to produce:

> 23. All of *Diehl*'s payroll records for the years 2002 through 2007, inclusive.
>
>     \*        \*        \*        \*
>
> 39. All credit applications by *Diehl* to any bank or other lender during the last 5 calendar years.
>
> 40. All loan documents executed by *Diehl* in favor of a bank or other lender during the last 5 calendar years.
>
> 41. All *communications* between *Diehl* and any bank or other lender during the last 5 calendar years.

---

[2] WAMCO believes that Loukidis sold his Diehl and WAMCO stock to Rozman as part of the same transaction.

42. All *documents* executed by *Diehl* and any bank or other lender during the last 5 calendar years.

       \*          \*          \*          \*

53. Financial statements prepared by, or on behalf of *Diehl* for the years 2001 – date, inclusive.

       \*          \*          \*          \*

55. Monthly transactional reports listing all *Diehl* receipts and disbursements for each month from January 1, 2001 – present, inclusive.

       \*          \*          \*          \*

57. All statements received by *Diehl* from any bank, S&L, credit union, or other fiduciary institutions showing all accounts in which *Diehl* has held any funds or other assets for the years 2001 – present, inclusive. Include the portions of each such statement itemizing the details of all transactions.

These requests all seek financial information about Diehl, which relates directly to WAMCO's

claims. Diehl obviously has no basis to refuse to produce the requested documents.

    47.     Requests ##25, 26, 58 and 59 ask Diehl to produce:

25. All *communications* and *documents relating to* payments by *Diehl* to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman.*

26. All *communications* and *documents relating to* promises by *Diehl* to pay legal fees to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman.*

       \*          \*          \*          \*

58. All engagement agreements between *Diehl* and any professionals who have represented it from January 2003 – present, inclusive. Include all attorneys engaged by *Diehl.*

59. Complete, unredacted copies of all bills received by *Diehl* from any and all professionals from January 2003 – present, inclusive.

These requests are equally relevant to WAMCO's claims to enforce the management fee and the

Secured Note. As discussed *supra*, Diehl put its financial position at issue as a reason for

discontinuing its payment of management fees to WAMCO in the Wabash Litigation. If Diehl

has sufficient economic resources to pay Rozman's personal legal bills, that fact may be

considered in the Arbitrator's decision.

### b. Requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 are neither overly broad nor unduly burdensome, and these objections are frivolous

48.    As discussed *supra*, the scope of discovery is intentionally broad, and a party seeking discovery need only establish **subject matter** relevance. Therefore, requests ##16, 17, 23-26, 39-42, 53, 55 and 57-59 are not "overbroad."

49.    Diehl offers no support for its statement that the production of documents responsive to these requests would impose an "undue" burden. To put things in perspective, this case involves disputes worth hundreds of thousands of dollars. WAMCO cannot imagine that a complete production would require more than 1,000-2,000 pages of materials.

### c. Diehl has offered no reason for its failure to produce Paul Ehrlich's August 13, 2005 e-mail

50.    Given the nature of **Exhibit 6**, Paul Ehrlich's August 13, 2005 e-mail obviously relates to the management fee, and to Diehl's financial condition. Therefore, Diehl had no basis for refusing to produce it.

## IV.    CONCLUSION

It would be manifestly unfair to allow Diehl to benefit by ignoring its discovery obligations and violating the Arbitrator's order. The written discovery responses that Diehl has refused to provide all go directly to the merits of this arbitration. Diehl obviously possesses all financial information about its business, which WAMCO needs to advocate its case properly.

Diehl's decision not to provide that information speaks volumes about the merits of this case. It also requires the imposition of an appropriate sanction. However, unlike a trial judge, the Arbitrator in this case lacks the power to enforce a discovery sanction, or to hold a party in contempt. Therefore, the sanction must be the entry of an arbitral award in favor of WAMCO and against Diehl.

115788-1                                    15

WHEREFORE, WAMCO moves this Panel to enter an Award in its favor, and against

Diehl, for the relief requested in WAMCO's Supplement to Claims, and for such other and

further relief as the Arbitrator deems necessary and appropriate.


Respectfully submitted,

**WISCONSIN AUTOMATED MACHINERY CORP.**

**DATED:** May 31, 2007

By: _____
One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for Wisconsin Automated
  Machinery Corp.
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE WABASH CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF WABASH | ) | CAUSE NO: 85C01-0608-PL-380 |

DIEHL WOODWORKING MACHINERY, INC., )
     *Plaintiff,* )
        )
     v. )
        )
WISCONSIN AUTOMATED MACHINERY )
CORP., JAY EHRLICH and DIMITRIS )
LOUKIDIS, )
     *Defendants.* )

## JAY EHRLICH'S FIRST SET OF INTERROGATORIES
## TO BE ANSWERED UNDER OATH BY
## <u>PLAINTIFF DIEHL WOODWORKING MACHINERY, INC.</u>

To:   *Bruce O. Boxberger, Esq*, CARSON BOXBERGER LLP, 1400 One Summit Square, Fort Wayne, IN 46802

     Pursuant to <u>Rule</u> 33 of the <u>Indiana Trial Rules</u>, Defendant Jay Ehrlich, by his undersigned

counsel, hereby requests the plaintiff, Diehl Woodworking Machinery, Inc. to answer the

following Interrogatories under oath within 30 days:

### DEFINITIONS AND INSTRUCTIONS

### <u>Definitions</u>

    1.    *"Plaintiff," "you"* and *"Diehl"* shall mean the plaintiff, Diehl Woodworking

Machinery, Inc., and any person acting or purporting to act on behalf of Diehl Woodworking

Machinery, Inc.

    2.    *"WAMCO"* shall mean the defendant, Wisconsin Automated Machinery, Corp.,

and any person acting or purporting to act on behalf of Wisconsin Automated Machinery, Corp.

    3.    *"Lawsuit"* shall mean the above-captioned case.

    4.    *"Ehrlich"* shall mean the defendant, Jay Ehrlich.

    5.    *"Loukidis"* shall mean the defendant, Dmitris Loukidis.



EXHIBIT
1

6.    *"Rozman"* shall mean Robert F. Rozman and any person acting or purporting to act on behalf of Robert F. Rozman.

7.    *"Carson Boxberger"* shall mean CARSON BOXBERGER LLP and any person acting or purporting to act on behalf of CARSON BOXBERGER LLP.

8.    *"Memorandum of Agreement"* shall mean the two-page instrument attached as Exhibit "A" to *Diehl*'s complaint.

9.    *"Asset Purchase Agreement"* shall mean the instrument attached as **Exhibit 1** to *WAMCO*'s Answer, Affirmative Defenses and Counterclaim.

10.    *"Document"* shall mean any printed, typewritten, handwritten, machine readable, or otherwise recorded matter of any character, including, but not limited to, letters, memoranda, computer records, e-mails, computer data bases, computer printouts, computer cards, computer disks, computer hard drives, computer CD-ROM disks, charges, pleadings, telegrams, notes, catalogues, brochures, advertisements, diaries, reports, calendars, interoffice communications, statements, announcements, printouts, drawings, graphs, charts, photographs, tape recordings, phono records, disks, hard drives or data compilations or any other items included within the definition of "document" under Indiana law, and all nonidentical copies of the *document* by whatever means made.

11.    *"Communications"* shall include all discussions, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, telecopies, e-mails, or other forms of written or verbal intercourse, however transmitted, including reports, notes, memoranda, lists, agenda, and other *documents* and records of *communications*, and when used shall require a statement of the name of the individual who made the *communication*, the person(s) to whom he made it, the date it was made and the form in which it was made.

12.     *"Person"* shall mean a natural person or business entity, as the context may require.

13.     *"Relating to"* shall mean the following: containing, comprising, constituting, stating, setting forth, recording, contradicting, referring to, describing, discussing, reflecting, interpreting, identifying, concerning, or in any way pertaining to, or logically or factually connected to, in whole or in part, that matter, *document, communication, person* or subject.

14.     *"Identification," "identify"* or *"identify"*:

a)  when referring to a *person*, shall mean that *you* shall set forth the name, present or last known business address, and, if a natural person, their last known home address, telephone number, employer, and title(s). Once a *person* has been *identified* in an interrogatory answer, it shall be sufficient thereafter when *identifying* that *person* to state merely his/her/its name; and

b)  when referring to a *document* shall mean that *you* shall set forth the title or other means of *identification* of each such *document*, the date of each *document*, *identification* of the author or originator of that *document*, the names of all recipients, and the *identification* of the *person*(s) who have possession, custody or control of each *document*, or copies of it.

c)  when referring to a *communication* means that *you* shall state the following information about each such *communication*, with specificity and particularity, (a) the date the *communication* was made, (b) the manner in which the *communication* was made (i.e., spoken in person, spoken by telephone, via e-mail, etc.), (c) the *identity* of the *person* making the *communication*, (d) the *identity* of each person(s) to whom the *communication* was made, (e) where the *person* making the *communication* was located at the time, and (f) the *identity* of all other *persons* present when the *communication* was made.

15.     *"Describe"* and *"description"* shall have their ordinary dictionary meanings, and shall require *you*, with specificity and particularity, to narrate, express, explain, set forth, relate, depict, delineate and/or portray in detail the facts necessary to respond to each interrogatory which asks *you* to *describe*, or to furnish a *description*.

16.     Except as otherwise provided herein, all other terms used in these requests are intended to have the same meaning that they have under Indiana law pertaining to discovery, unless the context requires a different meaning.

## Instructions

1.    These interrogatories are continuing in nature, and *you* must provide such additional information and documents as *you*, *your* attorney, or anyone acting on *your* behalf or in concert with *you* may have or may obtain between the time *your* answers and/or responses are first served and the time of trial or pertinent hearing.  In answer to these interrogatories, *you* must furnish all information available to *you* or *your* attorney, including, but not limited to, information in the possession of any attorneys, agents, investigators, representatives, or anyone acting in cooperation or in concert with the case to be defended by *you*.

2.    If any interrogatory cannot be answered in full, after exercising due diligence to secure the information requested, please so state and answer the interrogatory to the extent possible, specifying the inability to answer the remainder of any such interrogatory and stating whatever information or knowledge presently is available concerning the portion of the interrogatory that could not be answered.

3.    If any information is withheld on the basis of privilege, state with respect thereto the privilege on which *you* are relying; the holder of the privilege, and the type of information being withheld, in compliance with Indiana law.

### INTERROGATORIES

1.    *Identify* the *person*(s) answering these interrogatories and, if different, the *person*(s) verifying or certifying the accuracy of these interrogatories.

*ANSWER:*

2. *Identify* all *persons* with knowledge of the allegations in *Diehl*'s complaint.

*ANSWER:*

3. *Identify* each *person* whom *Diehl* expects to call as an expert witness at trial. For each expert witness *identified*, state the subject matter on which the expert is expected to testify, and state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

*ANSWER:*

4. *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to Ehrlich.*

*ANSWER:*

5.    *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to* WAMCO.

*ANSWER:*

6.    *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to* Loukidis.

*ANSWER:*

7.    *Identify* all *documents relating to Ehrlich.*

*ANSWER:*

8.     *Identify* all *documents relating to WAMCO*.

*ANSWER:*

9.     *Identify* all *documents relating to Loukidis*.

*ANSWER:*

10.    Has *Diehl* agreed to release, relinquish, refrain from suing, or refrain from

enforcing any claims that *Diehl* has asserted against *Loukidis* in the *lawsuit*?

*ANSWER:*

11.     How did *Ehrlich* and/or *Loukidis* breach their fiduciary duties as *Diehl*

shareholders, as alleged in ¶6 of *your* complaint? *Describe* all facts in sufficient detail to provide

this explanation.

*ANSWER:*

12.     Has *Rozman* acquired all of *Loukidis'* interests in *WAMCO* and *Diehl*?

*ANSWER:*

13.     If *your* answer to the preceding interrogatory is affirmative, *identify* all

*communications* and *documents relating to* the transactions by which *Rozman* acquired *Loukidis'*

interests in *WAMCO* and *Diehl.*

*ANSWER:*

14.    Since acquiring all of *Loukidis'* interests in *WAMCO*, *describe* the actions that

*Rozman* has taken to rectify *Loukidis'* alleged breach of fiduciary duty as a *Diehl* shareholder.

*ANSWER:*

15.    What did *WAMCO* receive from *Diehl* in return for *WAMCO*'s execution of the

*Memorandum of Agreement*?

*ANSWER:*

16.    *Describe* all payments by *Diehl* to *WAMCO* since the execution of the

*Memorandum of Agreement*.

*ANSWER:*

17.    What "management consulting and services" was *WAMCO* supposed to provide

to *Diehl* pursuant to the *Memorandum of Agreement*?

*ANSWER:*

18.    Has *Diehl* requested any services from *WAMCO* since the execution of the

*Memorandum of Agreement*?

*ANSWER:*

19.    If *your* answer to the preceding interrogatory is affirmative, *identify* all

*communications* between *Diehl* and *WAMCO* by which *Diehl* requested such services from

*WAMCO.*

*ANSWER:*

20.    Has *WAMCO* refused to provide any services to *Diehl* since the execution of the *Memorandum of Agreement*?

***ANSWER:***

21.    If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* between *WAMCO* and *Diehl* in which *WAMCO* refused to provide the services requested by *Diehl*.

***ANSWER:***

22.    *Describe* the "business conditions" which require the elimination of the management fee, as alleged in ¶9 of *your* complaint and ¶9 of *your* amended complaint, and *identify* any *documents* containing information *relating to your* answer to this interrogatory.

*ANSWER:*

23      *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

*ANSWER:*

24.     *Describe* all facts in support of the allegation in ¶11 of *your* complaint about "the failure of consideration" under the *Memorandum of Agreement.*

*ANSWER:*

25.     Do *you* contend that the *Memorandum of Agreement* permits *Diehl* to eliminate the management fee without the consent of *WAMCO?*

*ANSWER:*

26    *Identify* all current *Diehl* shareholders, as well as their respective ownership interests in *Diehl*.

*ANSWER:*

27.    *Describe* the damages *Diehl* has allegedly sustained damages as a result of the actions by *Ehrlich* and *Loukidis*.

*ANSWER:*

28.    *Identify* each *Diehl* director and officer who voted to authorize the filing of the *lawsuit* and *identify* all *documents* and *communications relating to* that decision.

*ANSWER:*

29. *Identify* each *Diehl* director and officer who voted to authorize the filing of the *lawsuit* and identify all *documents relating to* that decision.

*ANSWER:*

30. *Identify* all directors and officers of *Diehl*.

*ANSWER:*

31. With respect to each *Diehl* director and officer identified in the answer to the preceding interrogatory, state the total amount of compensation (salary, bonus and otherwise) paid to him/her for the years 2005, 2006 and 2007 (annualized for 2007).

*ANSWER:*

32. Has *Diehl* paid any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

*ANSWER:*

33. If *your* answer to the preceding interrogatory is affirmative, state the date and amount of each such payment, and *identify* all *communications* and *documents relating to* such payment.

*ANSWER:*

34. Has *Diehl* promised to pay any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

*ANSWER:*

35. If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* and *documents relating to* each such promise.

*ANSWER:*

36. *Identify* all *communications* and *documents relating to* all agreements between *WAMCO* and *Diehl* to reduce any management fees payable by *Diehl* to *WAMCO*, and *describe* the terms of such agreements.

*ANSWER:*

37.     *Identify* the individuals who acted on behalf of *WAMCO* and *Diehl relating to* the amount of the reduction of the management fee to be paid by *Diehl*.

*ANSWER:*

38.     *Identify* all *communications* between Paul Ehrlich and *Rozman relating to* the reduction of the management fee between *WAMCO* and *Diehl*.

*ANSWER:*

39.     *Identify* all *documents* and *communications relating to* the agreement *described* in *your* answer to the preceding interrogatory.

*ANSWER:*

40. *Identify* any instances of assertion of product liability claims against *WAMCO*, or against *Diehl* arising out of the *Asset Purchase Agreement*.

*ANSWER:*

41. *Identify* all *documents* and *communications relating to* contractual obligations of *WAMCO* to *Diehl*.

*ANSWER:*

42. *Identify* all waivers granted by *Diehl* to *WAMCO relating to* contractual obligations owed by *WAMCO* to *Diehl*.

*ANSWER:*

43.    *Identify* all *communications* with Michael Moss *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

44.    *Identify* all *communications* with Paul Ehrlich *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

45.    *Identify* all *communications* with Michael Ruffner *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

46.     *Identify* all *communications* with Gregory Kotsonis *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

47.     *Identify* all *communications* with *Carson Boxberger relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

48.     *Identify* all *communications* with Bernard Schlifke *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*

111825-1                              20

49.    Have there been any changes in *Diehl*'s financial condition since September 13, 2002 which are materially adverse to *Diehl*?

*ANSWER:*

50.    If *your* answer to the preceding interrogatory is affirmative, *describe* each such change in *Diehl*'s financial condition.

*ANSWER:*

51.    Why did *Diehl* execute the *Memorandum of Agreement*?

*ANSWER:*

52.    Why did *Diehl* execute the *Asset Purchase Agreement*?

*ANSWER:*

53.    *Describe* all facts and on which *you* base *your* affirmative defense of unconscionability.

*ANSWER:*

Respectfully submitted,

ROTHBERG LOGAN & WARSCO LLP

DATED: March 9, 2007        By: _____
                                    R. Steven Hearn (7618-43)
                                    ROTHBERG LOGAN & WARSCO LLP
                                    212 North Buffalo Street
                                    Warsaw, Indiana 46580
                                    Telephone:574-267-8802
                                    **Attorneys for Wisconsin Automated**
                                    **Machinery Corp. and Jay Ehrlich**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he mailed a true and correct copy of the above and foregoing to:

Dimitris Loukidis                    Bruce Boxberger
3730 Warren Court                    Counsel for Plaintiff
Racine, WI  53405                    1400 One Summit Square
                                     Fort Wayne, IN  46802

by depositing the same in the United States mail, postage prepaid, on March 7, 2007.

R. Steven Hearn

G:\word\docs\IASI\heivil\Wisconsin Automated Machinery\PL\11 Interrogatories to Diehl.DOC

| | |
|---|---|
| STATE OF INDIANA ) | IN THE WABASH CIRCUIT COURT |
| ) SS: | |
| COUNTY OF WABASH ) | CAUSE NO: 85C01-0608-PL-380 |

DIEHL WOODWORKING MACHINERY, INC.,  )
        *Plaintiff,*  )
          )
        v.  )
          )
WISCONSIN AUTOMATED MACHINERY  )
CORP., JAY EHRLICH and DIMITRIS  )
LOUKIDIS,  )
        *Defendants.*  )

## JAY EHRLICH'S FIRST SET OF DOCUMENT REQUESTS
## TO PLAINTIFF DIEHL WOODWORKING MACHINERY, INC.

To:    *Bruce O. Boxberger, Esq.*, CARSON BOXBERGER LLP, 1400 One Summit Square, Fort Wayne, IN 46802

Pursuant to Rule 34 of the Indiana Trial Rules, Defendant Jay Ehrlich, by his undersigned

counsel, hereby requests the plaintiff, Diehl Woodworking Machinery, Inc. to produce the

following documents within 30 days:

### DEFINITIONS AND INSTRUCTIONS

### Definitions

1.    "*Plaintiff,*" "*you*" and "*Diehl*" shall mean the plaintiff, Diehl Woodworking

Machinery, Inc., and any person acting or purporting to act on behalf of Diehl Woodworking

Machinery, Inc.

2.    "*WAMCO*" shall mean the defendant, Wisconsin Automated Machinery, Corp.,

and any person acting or purporting to act on behalf of Wisconsin Automated Machinery, Corp.

3.    "*Lawsuit*" shall mean the above-captioned case

4.    "*Ehrlich*" shall mean the defendant, Jay Ehrlich.

5.    "*Loukidis*" shall mean the defendant, Dmitris Loukidis.



EXHIBIT
2

6. *"Rozman"* shall mean Robert F. Rozman and any person acting or purporting to act on behalf of Robert F. Rozman.

7. *"Carson Boxberger"* shall mean CARSON BOXBERGER LLP and any person acting or purporting to act on behalf of CARSON BOXBERGER LLP.

8. *"Memorandum of Agreement"* shall mean the two-page instrument attached as Exhibit "A" to *Diehl's* complaint.

9. *"Asset Purchase Agreement"* shall mean the instrument attached as **Exhibit 1** to *WAMCO's* Answer, Affirmative Defenses and Counterclaim.

10. *"Document"* shall mean any printed, typewritten, handwritten, machine readable, or otherwise recorded matter of any character, including, but not limited to, letters, memoranda, computer records, e-mails, computer data bases, computer printouts, computer cards, computer disks, computer hard drives, computer CD-ROM disks, charges, pleadings, telegrams, notes, catalogues, brochures, advertisements, diaries, reports, calendars, interoffice communications, statements, announcements, printouts, drawings, graphs, charts, photographs, tape recordings, phono records, disks, hard drives or data compilations or any other items included within the definition of "document" under Indiana law, and all nonidentical copies of the *document* by whatever means made.

11. *"Communications"* shall include all discussions, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, telecopies, e-mails, or other forms of written or verbal intercourse, however transmitted, including reports, notes, memoranda, lists, agenda, and other *documents* and records of *communications*, and when used shall require a statement of the name of the individual who made the *communication*, the person(s) to whom he made it, the date it was made and the form in which it was made.

12.    "*Person*" shall mean a natural person or business entity, as the context may require.

13.    "*Relating to*" shall mean the following: containing, comprising, constituting, stating, setting forth, recording, contradicting, referring to, describing, discussing, reflecting, interpreting, identifying, concerning, or in any way pertaining to, or logically or factually connected to, in whole or in part, that matter, *document, communication, person* or subject.

14.    Except as otherwise provided herein, all other terms used in these requests are intended to have the same meaning that they have under Indiana law pertaining to discovery, unless the context requires a different meaning.

## Instructions

1.    These requests are continuing in nature, and *you* must provide such additional information and *documents* as *you, your* attorney, or anyone acting on *your* behalf or in concert with *you* may have or may obtain between the time *your* answers and/or responses are first served and the time of trial or pertinent hearing. In response to these requests, *you* must produce all *documents* available to *you* or *your* attorney, including, but not limited to, *documents* in the possession of any attorneys, agents, investigators, representatives, or anyone acting in cooperation or in concert with the case to be defended by *you*.

2.    If any request cannot be answered in full, after exercising due diligence to secure the documents requested, please so state and answer the requests to the extent possible, specifying the inability to produce the remainder of any such *documents* and stating whatever information or knowledge presently is available concerning the *documents* that could not be provided.

3.    If any *documents* are withheld on the basis of privilege, provide a privilege log identifying each *document* withheld. With respect to each *document* withheld, *describe* the

privilege on which *you* are relying; the holder of the privilege, and the all other information required by Indiana law.

## DOCUMENTS REQUESTED

1.    All *documents identified* in *your* answers to interrogatories.

**RESPONSE:**

2.    All *communications identified* in *your* answers to interrogatories.

**RESPONSE:**

3.    All *documents* on which *you* base any interrogatory answer.

**RESPONSE:**

4.    All *communications* on which *you* base any interrogatory answer.

**RESPONSE:**

5.    All *documents* on which *you* base any allegation in any pleading *you* have filed in the *lawsuit*.

**RESPONSE:**

6.      All *communications* on which *you* base any allegation in any pleading *you* have

filed in the *lawsuit*.

**RESPONSE:**                                                    .

7.      All reports prepared by any *person Diehl* expects to call as an expert witness at

trial.

**RESPONSE:**

8.      All *documents* relied upon by any *person Diehl* expects to call as an expert

witness at trial.

**RESPONSE:**

9.      All *documents relating to Ehrlich.*

**RESPONSE:**

10. All *communications* between *Diehl* and *Ehrlich* during the last five calendar years.

**RESPONSE:**

11. All *documents relating to WAMCO.*

**RESPONSE:**

12. All *communications* between *Diehl* and *WAMCO* during the last five calendar years.

**RESPONSE:**

13. All *documents relating to Loukidis.*

**RESPONSE:**

14. All *communications* between *Diehl* and *Loukidis relating to* the *lawsuit*.

**RESPONSE:**

15. All *documents* executed by *Loukidis relating to* the *lawsuit*.

**RESPONSE:**

16. All *documents relating to Rozman*'s acquisition of all or any part of *Loukidis*' interests in *WAMCO* and *Diehl*.

**RESPONSE:**

17. All *communications relating to Rozman*'s acquisition of all or any part of *Loukidis*' interests in *WAMCO* and *Diehl*.

**RESPONSE:**

18.    All *documents relating to* payments by *Diehl* to *WAMCO* since the execution of the *Memorandum of Agreement.*

**RESPONSE:**

19.    All *documents relating to* payments by *Diehl* to *WAMCO* since the execution of the *Asset Purchase Agreement.*

**RESPONSE:**

20.    *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

**RESPONSE:**

21.    All *Diehl* shareholders, as well as their respective ownership interests in *Diehl.*

**RESPONSE:**

22.    All *documents relating to* the damages *Diehl* has allegedly suffered as a result of the actions by *Ehrlich* and *Loukidis*.

**RESPONSE:**

23.    All of *Diehl*'s payroll records for the years 2002 through 2007, inclusive.

**RESPONSE:**

24.    Copies of all bills received by *Diehl* from *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman*.

**RESPONSE:**

25.    All *communications* and *documents relating to* payments by *Diehl* to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman*.

**RESPONSE:**

26.    All *communications* and *documents relating to* promises by *Diehl* to pay legal fees to *Carson Boxberger* for legal services rendered by *Carson Boxberger* to, or on behalf of, *Rozman*.

**RESPONSE:**

27.    All *communications* and *documents relating to* agreements between *WAMCO* and *Diehl* to reduce any management fees payable by *Diehl* to *WAMCO*.

**RESPONSE:**

28.    All *communications relating to* any reductions of the management fee between *WAMCO* and *Diehl*.

**RESPONSE:**

29.    All *documents* and *communications relating to* contractual obligations of *WAMCO* to *Diehl*.

**RESPONSE:**

30.     All waivers granted by *Diehl* to *WAMCO relating to* contractual obligations owed by *WAMCO* to *Diehl.*

**RESPONSE:**

31.     All *communications* with Michael Moss *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement.*

**RESPONSE:**

32.     All *communications* with Paul Ehrlich *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement.*

**RESPONSE:**

33.     All *communications* with Michael Ruffner *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement.*

**RESPONSE:**

34. All *communications* with Gregory Kotsonis *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

**RESPONSE:**

35. All *communications* with *Carson Boxberger relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

**RESPONSE:**

36. All *communications* with Bernard Schlifke *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

**RESPONSE:**

37. All *documents* executed by *Diehl* in connection with the *Asset Purchase Agreement*.

**RESPONSE:**

38.     All *documents* executed by *Diehl* at the closing of the sale contemplated by the
*Asset Purchase Agreement*.

**RESPONSE:**

39.     All credit applications by *Diehl* to any bank or other lender during the last 5
calendar years.

**RESPONSE:**

40.     All loan documents executed by *Diehl* in favor of a bank or other lender during
the last 5 calendar years.

**RESPONSE:**

41.     All *communications* between *Diehl* and any bank or other lender during the last 5
calendar years.

**RESPONSE:**

42.    All *documents* executed by *Diehl* and any bank or other lender during the last 5 calendar years.

**RESPONSE:**

43.    *Diehl*'s articles of incorporation, including any and all amendments.

**RESPONSE:**

44.    *Diehl*'s by-laws, including any and all amendments.

**RESPONSE:**

45.    All *Diehl* shareholder resolutions during the past five calendar years.

**RESPONSE:**

46.    All *Diehl* director resolutions during the past five calendar years.

**RESPONSE:**




47.    Minutes of all *Diehl* shareholder meetings during the past five calendar years.

**RESPONSE:**




48.    Notes and/or transcriptions of all *Diehl* shareholder meetings during the past five calendar years.

**RESPONSE:**




49.    Minutes of all *Diehl* director meetings during the past five calendar years.

**RESPONSE:**




50.    Notes and/or transcriptions of all *Diehl* director meetings during the past five calendar years.

**RESPONSE:**

51.     Notices of all *Diehl* shareholders meetings during the past five calendar years.

**RESPONSE:**

52.     Notices of all *Diehl* director meetings during the past five calendar years.

**RESPONSE:**

53.     Financial statements prepared by, or on behalf of *Diehl* for the years 2001 – date, inclusive.

**RESPONSE:**

54.     *Diehl* corporate income tax returns for the years 2001 – date, inclusive. Include all schedules and worksheets.

**RESPONSE:**

55. Monthly transactional reports listing all *Diehl* receipts and disbursements for each month from January 1, 2001 – present, inclusive.

RESPONSE:

56. Any and all shareholder agreements, voting trust agreements or other agreements by and among *Diehl* shareholders, including any amendments thereto.

RESPONSE:

57. All statements received by *Diehl* from any bank, S&L, credit union, or other fiduciary institutions showing all accounts in which *Diehl* has held any funds or other assets for the years 2001 – present, inclusive. Include the portions of each such statement itemizing the details of all transactions.

RESPONSE:

58. All engagement agreements between *Diehl* and any professionals who have represented it from January 2003 – present, inclusive. Include all attorneys engaged by *Diehl*.

RESPONSE:

59. Complete, unredacted copies of all bills received by *Diehl* from any and all professionals from January 2003 – present, inclusive.

**RESPONSE:**

60. All *documents* and *communications relating to* products liability claims asserted against *Diehl* within the past five calendar years.

**RESPONSE:**

61. All *documents* and *communications relating to* due diligence provided by *WAMCO relating to* potential acquisitions by *Diehl* within the past five calendar years.

**RESPONSE:**

62. All *documents* and *communications relating to* insurance subrogation claims involving *Diehl* within the past five calendar years.

**RESPONSE:**

Respectfully submitted,

ROTHBERG LOGAN & WARSCO LLP

DATED: March 9, 2007          By: _____

R. Steven Hearn (7618-43)
ROTHBERG LOGAN & WARSCO LLP
212 North Buffalo Street
Warsaw, Indiana 46580
Telephone: 574-267-8802
**Attorneys for Wisconsin Automated**
**Machinery Corp. and Jay Ehrlich**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he mailed a true and correct copy of the above and foregoing to:

Dimitris Loukidis
3730 Warren Court
Racine, WI 53405

Bruce Boxberger
Counsel for Plaintiff
1400 One Summit Square
Fort Wayne, IN 46802

by depositing the same in the United States mail, postage prepaid, on March 9, 2007.

_____
R. Steven Hearn

**Andrew Schwartz**

**From:** Thomas Morsch [tmorsch@law.northwestern.edu]

**`nt:** Tuesday, May 15, 2007 3:41 PM

**, o:** Andrew Schwartz; Wilma Rooney; barnard@carsonboxberger.com

**Cc:** boxberger@carsonboxberger.com; Addisonst@aol.com

**Subject:** RE: 51 180 1918 06 Wisconsin Automated Machinery and Diehl Woodworking Machinery

That is correct.

At 03:33 PM 5/15/2007, Andrew Schwartz wrote:

Wilma:

My understanding of Arbitrator Morsch's order today was that, on or before 5/25/07, Diehl would (1) serve me with a copy of Diehl's answers to the interrogatories served by Jay Ehrlich in the Wabash County litigation, and (2) provide me with a copy of all documents responsive to the document request served by Jay Ehrlich in the Wabash County litigation.

Andrew R. Schwartz
Litigation Group
SUGAR, FRIEDBERG & FELSENTHAL LLP
30 N. LaSalle St., Suite #3000
Chicago, IL 60602
Tel.: (312) 704-2182
FAX.: (312) 372-7951
E-mail: aschwartz@sff-law.com

This e-mail and any attachments are confidential, and may be protected by the attorney-client and other privileges. It is intended solely for the use of the addressee, and is the property of Sugar, Friedberg & Felsenthal LLP. If you are not the intended recipient, any disclosure, copying, distribution or use of this e-mail or any attachments is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and deleting all copies, including attachments, from your system. To the extent the above content contains an opinion on one or more Federal tax issues, such opinion was not written to be used, and cannot be used, for the purpose of avoiding penalties. If you would like a written opinion on the one or more Federal tax issues addressed above upon which you can rely for the purpose of avoiding penalties, please contact us.

**From:** Wilma Rooney [ mailto:Rooneyw@adr.org]
**Sent:** Tuesday, May 15, 2007 1:00 PM
**To:** Andrew Schwartz; barnard@carsonboxberger.com
**Cc:** boxberger@carsonboxberger.com; tmorsch@law.northwestern.edu
**Subject:** 51 180 1918 06 Wisconsin Automated Machinery and Diehl Woodworking Machinery

Gentlemen,

We are transmitting our letter dated May 14, 2007.

Regards

Wilma Rooney
Case Manager
American Arbitration Association
13455 Noel Rd., Tower Two
Suite 1750
Dallas, TX 75240
Phone: 972-774-6981
Fax: 972-490-9008

EXHIBIT
3

Thomas Morsch
Professor of Clinical Law and
Lindenberg Family Director
Small Business Opportunity Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0321

5/31/2007

STATE OF INDIANA          )          IN THE WABASH CIRCUIT COURT
                          ) SS:
COUNTY OF WABASH          )          CAUSE NO:  85C01-0608-PL-380

DIEHL WOODWORKING MACHINERY, INC.,  )
          *Plaintiff*,                    )
                                          )
          v.                              )
                                          )
WISCONSIN AUTOMATED MACHINERY             )
CORP., JAY EHRLICH and DIMITRIS           )
LOUKIDIS,                                 )
          *Defendants*.                   )

## PLAINTIFF DIEHL WOODWORKING MACHINERY, INC.'S ANSWERS TO JAY EHRLICH'S FIRST SET OF INTERROGATORIES

Comes now Plaintiff, Diehl Woodworking Machinery, Inc., by its attorneys, Carson Boxberger LLP, pursuant to Rule 33 of the Indiana Rules of Trial Procedure, and respectfully answers the following Interrogatories propounded by Defendant, Jay Ehrlich, as follows:

1.    *Identify* the *person*(s) answering these interrogatories and, if different, the *person*(s) verifying or certifying the accuracy of these interrogatories.

*ANSWER:*    Robert F. Rozman
             President, Diehl Machines

2.    *Identify* all *persons* with knowledge of the allegations in *Diehl*'s complaint.

*ANSWER:*    Robert F. Rozman
             Gary Frederickson
             Richard Meldrum
             Jan Zolman
             Mike Ruffner
             Paul Ehrlich

3.    *Identify* each *person* whom *Diehl* expects to call as an expert witness at trial.  For each expert witness *identified*, state the subject matter on which the expert is expected to testify, and state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

EXHIBIT
4

*ANSWER:*    Plaintiff has not retained any expert at this time.    However, Plaintiff will supplement this Answer in accordance with the Court's Scheduling Order and Fed. Rule of Civil Procedure, Rule 26.

   4.    *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to*

*Ehrlich.*

*ANSWER:*    Objection.  Plaintiff asserts this interrogatory as overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.  Notwithstanding, *see* response to Request for Production No. 9.

   5.    *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to*

*WAMCO.*  In addition, Plaintiff asserts that there may be communications responsive to this

Interrogatory that are not discoverable due to attorney-client privilege.

*ANSWER:*    Objection.  Plaintiff asserts this interrogatory as overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.

   6.    *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to*

*Loukidis.*

*ANSWER:*    Objection.  Plaintiff asserts this interrogatory as overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.

   7.    *Identify* all *documents relating to Ehrlich.*

*ANSWER:*    *See* Response to Request for Production No. 9.

   8.    *Identify* all *documents relating to WAMCO.*

*ANSWER:*    *See* Response to Request for Production No. 11.

   9.    *Identify* all *documents relating to Loukidis.*

*ANSWER:*    *See* Response to Request for Production No. 13.

10.    Has *Diehl* agreed to release, relinquish, refrain from suing, or refrain from enforcing any claims that *Diehl* has asserted against *Loukidis* in the *lawsuit*?

*ANSWER:*    No.

11.    How did *Ehrlich* and/or *Loukidis* breach their fiduciary duties as *Diehl* shareholders, as alleged in ¶6 of *your* complaint? *Describe* all facts in sufficient detail to provide this explanation.

*ANSWER:*    Ehrlich/Loukidis/WAMCO, as the owners of 35.5% of Diehl stock, as directors of the company, and as officers of the company could clearly see the deteriorating business conditions prevailing in the market place and the resulting impact on Diehl. Furthermore, they experienced the same conditions at WAMCO during its operation. They were privileged to the receipt of financial documents, privileged to letters sent by Robert Rozman outlining the serious business situation and rejected the validity of the prevailing circumstance. In light of the prevailing market conditions fully known to Ehrlich/Loukidis/WAMCO, and in light of no management or consulting services being performed or requested by Diehl, Diehl believes it unconscionable for Ehrlich/Loukidis/WAMCO, given their position with and knowledge of Diehl and the DIEHL/WAMCO relationship, to continue to demand payment of such fee, to their benefit and to the detriment of Diehl.

12.    Has *Rozman* acquired all of *Loukidis'* interests in *WAMCO* and *Diehl*?

*ANSWER:*    Yes.

13.    If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* and *documents relating to* the transactions by which *Rozman* acquired *Loukidis'* interests in *WAMCO* and *Diehl*.

*ANSWER:*    *See* Response to Request for Production No. 12.

14.    Since acquiring all of *Loukidis'* interests in *WAMCO*, *describe* the actions that *Rozman* has taken to rectify *Loukidis'* alleged breach of fiduciary duty as a *Diehl* shareholder.

*ANSWER:*    Rozman does not control the actions of WAMCO and is unable to rectify the breach of fiduciary duty.

15.    What did *WAMCO* receive from *Diehl* in return for *WAMCO's* execution of the *Memorandum of Agreement*?

3

*ANSWER:*    A promise from Diehl to pay WAMCO for management consulting service.

16.    *Describe* all payments by *Diehl* to *WAMCO* since the execution of the *Memorandum of Agreement.*

*ANSWER:*    Diehl has paid WAMCO $161,500 from August 2005 through July 2006.

17.    What "management consulting and services" was *WAMCO* supposed to provide to *Diehl* pursuant to the *Memorandum of Agreement*?

*ANSWER:*    Management Consulting and Services could have included:

a)    To understand the condition of Diehl's market.
b)    To understand how a manufacturing firm operates.
c)    To have initiated a request for a meeting to sit down and discuss the demanding issues facing the firm.
d)    To have visited the Diehl plant, with the purpose of observing the situation, and make positive recommendations to benefit the firm.
e)    To have created some constructive document reflecting its' observations regarding the Diehl/WAMCO circumstance and evaluated the situation.
f)    To have prepare some formal report reflecting "management recommendations."
g)    To examine the marketplace and make recommendations regarding the operation of the business.
h)    To understand how a special manufacturing firm operates with a standard cost system.
i)    To generate a viable acquisition candidate.

However, WAMCO provided no such services at any time and Diehl is not aware of any such service WAMCO could have adequately provided.

18.    Has *Diehl* requested any services from *WAMCO* since the execution of the *Memorandum of Agreement*?

*ANSWER:*    No.

19.    If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* between *Diehl* and *WAMCO* by which *Diehl* requested such services from *WAMCO.*

*ANSWER:*    Not applicable.

4

20.    Has *WAMCO* refused to provide any services to *Diehl* since the execution of the

*Memorandum of Agreement*?

*ANSWER:*    WAMCO has provided no service to Diehl at any time.  It is apparent to Diehl
that WAMCO is incapable of providing services to Diehl.  Therefore, no services have been
requested by Diehl.

21.    If *your* answer to the preceding interrogatory is affirmative, *identify* all

*communications* between *WAMCO* and *Diehl* in which *WAMCO* refused to provide the services

requested by *Diehl*.

*ANSWER:*    Not applicable.

22.    *Describe* the "business conditions" which require the elimination of the

management fee, as alleged in ¶9 of *your* complaint and ¶9 of *your* amended complaint, and

*identify* any *documents* containing information *relating to your* answer to this interrogatory.

*ANSWER:*    While Diehl is capable of paying its creditors, the declining market for Diehl's
products has required a closer inspection of Diehl's expenses.  See Response to Request for
Production No. 6.

23.    *Identify* all *communications* from August 2005 to the present between *WAMCO*

and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

*ANSWER:*    As a Diehl director, officer and principle shareholder of Diehl during the period of
August 2005 to July 2006, Ehrlich/WAMCO was aware of the deterioration of markets served by
Diehl.  As such, we refer Ehrlich/WAMCO to the weekly, monthly and annual statements
provided to him in his positions with Diehl, regarding the trend of these conditions, along with
the annual summary of financial information provided in Response to Request for Production
Nos. 6 and 27.

24.    *Describe* all facts in support of the allegation in ¶11 of *your* complaint about "the

failure of consideration" under the *Memorandum of Agreement*.

*ANSWER:*    Consideration for the Memorandum of Agreement was WAMCO's promise to
provide management service in exchange for a fee.  The fee has been provided, yet no services
have been provided, nor is WAMCO capable of providing such services.

25.    Do *you* contend that the *Memorandum of Agreement* permits *Diehl* to eliminate

the management fee without the consent of *WAMCO*?

*ANSWER:*    No.    However, Diehl contends there has never been consideration for the management fee and asks this Court to terminate Diehl's obligation to pay such.

26.    *Identify* all current *Diehl* shareholders, as well as their respective ownership interests in *Diehl*.

*ANSWER:*    
| Robert F. Rozman | 69.875% |
|---|---|
| Joy Ehrlich | 17.5% |
| Michael Ruffner | 4.25% |
| Gary Fredrickson | 2.5% |
| Richard Meldrum | 2.5% |
| Jan Zolman | 3.375% |

27.    *Describe* the damages *Diehl* has allegedly sustained damages as a result of the actions by *Ehrlich* and *Loukidis*.

*ANSWER:*    Diehl has paid WAMCO management fees of $62,500 during 2005 and a similar unnecessary expense of $99,000.00 during 2006, for which no services have been provided Diehl has also incurred legal expenses in excess of $10,000 related to recovery of these funds, and lost management time due to the necessity to address this dispute.

28.    *Identify* each *Diehl* director and officer who voted to authorize the filing of the *lawsuit* and *identify* all *documents* and *communications relating to* that decision.

*ANSWER:*    Every officer and director with the exception of J. Ehrlich and Dimitris Loukidis voted to authorize the filing of the legal action made the subject of this complaint.

The relevant documents memorializing these actions are reflected in the Minutes of the Diehl Woodworking Machinery Special Shareholders Meeting and subsequent Board of Directors Meeting held on September 19, 2006. See Response to Request for Production No. 47.

29.    *Identify* each *Diehl* director and officer who voted to authorize the filing of the *lawsuit* and identify all *documents relating to* that decision.

*ANSWER:*    Objection.  Plaintiff asserts this interrogatory as cumulative to Interrogatory No. 28.

30.    *Identify* all directors and officers of *Diehl*.

*ANSWER:*    Robert Rozman, Chairman of the Board, President of Diehl Machines
Michael Ruffner, Board Member, Treasurer, Secretary
Gary Fredrickson, Board Member

31.    With respect to each *Diehl* director and officer identified in the answer to the preceding interrogatory, state the total amount of compensation (salary, bonus and otherwise) paid to him/her for the years 2005, 2006 and 2007 (annualized for 2007).

| ANSWER: | 2005 | 2006 | 2007 |
|---------|------|------|------|
| Robert Rozman | $146K | $136K | $146K |
| Michael Ruffner | 94K | 81K | 30K |
| Gary Fredrickson | 99K | 84K | 84K |

32.    Has *Diehl* paid any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

*ANSWER:*    Objection. Plaintiff asserts this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.

33.    If *your* answer to the preceding interrogatory is affirmative, state the date and amount of each such payment, and *identify* all *communications* and *documents relating to* such payment.

*ANSWER:*    Objection. Plaintiff asserts this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.

34.    Has *Diehl* promised to pay any legal fees to *Carson Boxberger* for any legal representation by *Carson Boxberger* on behalf of *Rozman*?

*ANSWER:*    Objection. Plaintiff asserts this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.

35.    If *your* answer to the preceding interrogatory is affirmative, *identify* all *communications* and *documents relating to* each such promise.

7

*ANSWER:*    Objection.  Plaintiff asserts this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Plaintiff asserts that there may be communications responsive to this interrogatory that are not discoverable due to attorney-client privilege.

36.    *Identify* all *communications* and *documents relating to* all agreements between *WAMCO* and *Diehl* to reduce any management fees payable by *Diehl* to *WAMCO*, and *describe* the terms of such agreements.

*ANSWER:*    *See* Response to Request for Production No. 27.

37.    *Identify* the individuals who acted on behalf of *WAMCO* and *Diehl relating to* the amount of the reduction of the management fee to be paid by *Diehl*.

*ANSWER:*    Ehrlich (WAMCO) and Rozman (Diehl).

38.    *Identify* all *communications* between Paul Ehrlich and *Rozman relating to* the reduction of the management fee between *WAMCO* and *Diehl*.

*ANSWER:*    *See* Response to Request for Production No. 27.

39.    *Identify* all *documents* and *communications relating to* the agreement *described* in *your* answer to the preceding interrogatory.

*ANSWER:*    Not applicable.

40.    *Identify* any instances of assertion of product liability claims against *WAMCO*, or against *Diehl* arising out of the *Asset Purchase Agreement*.

*ANSWER:*    Plaintiff is not aware of any such claims.

41.    *Identify* all *documents* and *communications relating to* contractual obligations of *WAMCO* to *Diehl*.

*ANSWER:*    The Asset Purchase Agreement and Memorandum of Agreement.

42.    *Identify* all *waivers* granted by *Diehl* to *WAMCO relating to* contractual obligations owed by *WAMCO* to *Diehl*.

*ANSWER:*    Plaintiff is not aware of any such waivers.

8

43.    *Identify* all *communications* with Michael Moss *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*    Plaintiff is not aware of any such communications.

44.    *Identify* all *communications* with Paul Ehrlich *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*    *See* Response to Request for Production No. 27.

45.    *Identify* all *communications* with Michael Ruffner *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*    Plaintiff acknowledges Rozman and Ruffner had several conversations relating to either this lawsuit, the Memorandum of Agreement or Asset Purchase Agreement. However, no written communications or notes of these conversations exist.

46.    *Identify* all *communications* with Gregory Kotsonis *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*    Plaintiff is not aware of any such communications.

47.    *Identify* all *communications* with Carson Boxberger *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*    Objection. Plaintiff asserts this interrogatory, even on its face, requests only that which is not discoverable due to attorney-client privilege and attorney work product. As such no privilege log will be produced.

48.    *Identify* all *communications* with Bernard Schlifke *relating to* the *lawsuit*, the *Memorandum of Agreement* and/or the *Asset Purchase Agreement*.

*ANSWER:*    Plaintiff is not aware of any such communications.

49.    Have there been any changes in *Diehl*'s financial condition since September 13, 2002 which are materially adverse to *Diehl*?

*ANSWER:*    Yes. While Diehl is capable of paying its creditors, the declining market for Diehl's products has required a closer inspection of Diehl's expenses. See Response to Request for Production No. 6.

50.    If *your* answer to the preceding interrogatory is affirmative, *describe* each such

change in *Diehl's* financial condition.

*ANSWER:*    *See* Response to Request for Production No. 6.

51.    Why did *Diehl* execute the *Memorandum of Agreement*?

*ANSWER:*    To establish the first contractual and legitimate basis for the payment of management fees by Diehl to WAMCO. Up to the execution of the Memorandum of Agreement and even after, management fees were being paid solely because the majority of Diehl shareholders, who concurrently held the majority interest of WAMCO stock, willed that it be that way.

52.    Why did *Diehl* execute the *Asset Purchase Agreement*?

*ANSWER:*    It was executed in its format (a non-arms length transaction) because WAMCO shareholders held the controlling interest in Diehl Machines. While Diehl hoped it to be in its best interest, Diehl was not capable of negotiating the agreement independent of the WAMCO's shareholders best interests.

53.    *Describe* all facts and on which *you* base *your* affirmative defense of

unconscionability.

*ANSWER:*    WAMCO was abundantly aware of the potential conflict of interest by their concurrent ownership of the majority of Diehl Machines stock, yet representing them to be two independent firms. During any and all of the transactions and relations between the two firms, WAMCO had a responsibility to treat Diehl equitably because Diehl could not take any independent actions to alter or reject directives placed upon it by the synonymous WAMCO/DIEHL shareholders, who owned controlling interest in both firms. WAMCO violated that relationship on several occasions, most egregiously with continual demand for payment of a management fee when Diehl obtained no tangible or intangible benefit for the fees paid. The sole benefit of the management fee was to WAMCO, at the expense of Diehl, in a most unconscionable act.

I solemnly affirm, under the penalties of perjury, that I have read the foregoing

Answers to Interrogatories and that they are true and correct.

DATED: _May 24, 2007_

Diehl Woodworking Machines, Inc.

By: _Robert F. Rozman_
    /Robert F. Rozman,
    Diehl Woodworking
    Machines, Inc., President

Respectfully submitted,

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff
Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: 260.423.9411
F:\diehl Woodworking Machinery 19,554\Answers to Interrogatories (Diehl).DOC

## CERTIFICATE OF SERVICE

This will certify that on this 24 day of May , 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, ESQ., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770

_____
(Larry L. Barnard)

STATE OF INDIANA      )              IN THE WABASH CIRCUIT COURT
                         ) SS:
COUNTY OF WABASH    )              CAUSE NO: 85C01-0608-PL-380

DIEHL WOODWORKING MACHINERY, INC.,  )
         *Plaintiff,*                  )
                                   )
      v.                           )
                                 )
WISCONSIN AUTOMATED MACHINERY   )
CORP., JAY EHRLICH and DIMITRIS     )
LOUKIDIS,                          )
         *Defendants.*                )

## <u>PLAINTIFF DIEHL WOODWORKING MACHINERY, INC.'S<br>RESPONSES TO JAY EHRLICH'S FIRST SET<br>OF DOCUMENT REQUESTS</u>

Comes now Plaintiff, Diehl Woodworking Machinery, Inc., by its attorneys, Carson

Boxberger LLP, pursuant to Rule 34 of the Indiana Rules of Trial Procedure, and respectfully

responds to the following First Set of Document Requests by Defendant, Jay Ehrlich, as follows:

1.      All documents identified in your answers to interrogatories.

      **Response:**    See Tab 9, 11, 13, 12, 6, 27, 47 and 28 attached.

2.      All communications identified in your answer to interrogatories.

      **Response:**    See Tab 9, 11, 13, 12, 6, 27, 47 and 28 attached.

3.      All documents on which you base any interrogatory answer.

      **Response:**    See Tab 9, 11, 13, 12, 6, 27, 47 and 28 attached.

4.      All communications on which you base any interrogatory answer.

      **Response:**    See Tab 9, 11, 13, 12, 6, 27, 47 and 28 attached.

5.      All documents on which you base any allegation in any pleading you have filed in

the lawsuit.

      **Response:**    See Tab 6 attached.


EXHIBIT
5

6.    All communications on which you base any allegation in any pleading you have filed in the lawsuit.

    **Response:**    See Tab 6 attached.

7.    All reports prepared by any person Diehl expects to call as an expert witness at trial.

    **Response:**    No documents responsive to this request.

8.    All documents relied upon by any person Diehl expects to call as an expert witness at trial.

    **Response:**    No documents responsive to this request.

9.    All documents relating to Ehrlich.

    **Response:**    See Tab 9 attached.

10.    All communications between Diehl and Ehrlich during the last five calendar years.

    **Response:**    See Tab 9 attached.

11.    All documents relating to WAMCO.

    **Response:**    These documents are found in various Request Sections because they deal with a topic, such as the Management Fee or are contained in a memo with several topics, WAMCO being just one of them. During the past five years, there were no documents that specifically dealt with WAMCO, because prior to R. Rozman's purchase of the Diehl stock owned by P. Ehrlich and J. Loukidis, both Diehl and WAMCO are one in the same. Consequently, the only document dealing with WAMCO was the original memoranda drafted by R. Rozman when the plans for transferring WAMCO to Diehl began in 2001. See Tab 11.

12.    All communications between Diehl and WAMCO during the last five calendar years.

    **Response:**    See Response to Request for Production No. 11.

13.    All documents relating to Loukidis.

    **Response:**    See Tab 13 attached.

14.    All communications between Diehl and Loukidis relating to the lawsuit.

      **Response:**    See Tab 13 attached.

15.    All documents executed by Loukidis relating to the lawsuit.

      **Response:**    Plaintiff has no documents responsive to this Request.

16.    All documents relating to Rozman's acquisition of all or any part of Loukidis' interests in WAMCO and Diehl.

      **Response:**    Objection.    Plaintiff asserts this request for production is not reasonably calculated to lead to the discovery of admissible evidence.

17.    All communications relating to Rozman's acquisition of all or any part of Loukidis' interests in WAMCO and Diehl.

      **Response:**    Objection.    Plaintiff asserts this request for production is not reasonably calculated to lead to the discovery of admissible evidence.

18.    All documents relating to payments by Diehl to WAMCO since the execution of the Memorandum of Agreement.

      **Response:**    See Tab 19 attached.

19.    All documents relating to payments by Diehl to WAMCO since the execution of the Asset Purchase Agreement.

      **Response:**    See Tab 19 attached.

20.    Identify all communications from August 2005 to the present between WAMCO and Diehl by which Diehl notified WAMCO about any change in Diehl's business conditions.

      **Response:**    See Tab 6 attached.

21.    All Diehl shareholders, as well as their respective ownership interests in Diehl.

      **Response:**    See Response to Interrogatory No. 26.

22.    All documents relating to the damages Diehl has allegedly suffered as a result of

the actions by Ehrlich and Loukidis.

**Response:**    See Answer to Interrogatory No. 27.

23.    All of Diehl's payroll records for the years 2002 through 2007, inclusive.

**Response:**    Objection.    Plaintiff asserts this request is overly broad and
burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

24.    Copies of all bills received by Diehl from Carson Boxberger for legal services

rendered by Carson Boxberger to, or on behalf of, Rozman.

**Response:**    Objection.    Plaintiff asserts this request is overly broad and
burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. In
addition, plaintiff asserts that there may be documents responsive to this request that are not
discoverable due to attorney-client privilege.

25.    All communications and documents relating to payments by Diehl to Carson

Boxberger for legal services rendered by Carson Boxberger to, or on behalf of, Rozman.

**Response:**    Objection.    Plaintiff asserts this request is overly broad and
burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. In
addition, plaintiff asserts that there may be documents responsive to this request that are not
discoverable due to attorney-client privilege.

26.    All communications and documents relating to promises by Diehl to pay legal

fees to Carson Boxberger for legal services rendered by Carson Boxberger to, or on behalf of,

Rozman.

**Response:**    Objection.    Plaintiff asserts this request is overly broad and
burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. In
addition, plaintiff asserts that there may be documents responsive to this request that are not
discoverable due to attorney-client privilege.

27.    All communications and documents relating to agreements between WAMCO

and Diehl to reduce any management fees payable by Diehl to WAMCO.

**Response:**    See Tabs 27, 47 and 49 attached.

4

28.    All communications relating to any reductions of the management fee between WAMCO and Diehl.

     **Response:**    See Tabs 27, 47 and 49 attached.

29.    All documents and communications relating to contractual obligations of WAMCO to Diehl.

     **Response:**    See Tabs 29 and 37 attached.

30.    All waivers granted by Diehl to WAMCO relating to contractual obligations owed by WAMCO to Diehl.

     **Response:**    Plaintiff has no documents responsive to this Request.

31.    All communications with Michael Moss relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement.

     **Response:**    Plaintiff has no documents responsive to this Request.

32.    All communications with Paul Ehrlich relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement.

     **Response:**    See Tabs 32, 6, 9 and 27 attached.

33.    All communications with Michael Ruffner relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement.

     **Response:**    See Tabs 6, 9 and 27 attached.

34.    All communications with Gregory Kotsonis relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement.

     **Response:**    Plaintiff has no documents responsive to this Request.

35.    All communications with Carson Boxberger relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement.

**Response:**    Objection. Plaintiff asserts documents responsive to this Request are not discoverable due to attorney-client privilege.

36.    All communications with Bernard Schlifke relating to the lawsuit, the Memorandum of Agreement and/or the Assert Purchase Agreement.

**Response:**    Plaintiff has no documents responsive to this Request.

37.    All documents executed by Diehl in connection with the Asset Purchase Agreement.

**Response:**    See Tab 37 attached.

38.    All documents executed by Diehl at the closing of the sale contemplated by the Asset Purchase Agreement.

**Response:**    See Tab 38 attached.

39.    All credit applications by Diehl to any bank or other lender during the last 5 calendar years.

**Response:**    Objection. Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

40.    All loan documents executed by Diehl in favor of a bank or other lender during the last 5 calendar years.

**Response:**    Objection. Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

41.    All communications between Diehl and any bank or other lender during the last 5 calendar years.

**Response:**    Objection. Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

6

42.    All documents executed by Diehl and any bank or other lender during the last 5 calendar years.

**Response:**    Objection.    Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

43.    Diehl's articles of incorporation, including any and all amendments.

**Response:**    See Tab 43 attached.

44.    Diehl's by-laws, including any and all amendments.

**Response:**    See Tab 44 attached.

45.    All Diehl shareholder resolutions during the past five calendar years.

**Response:**    See Tabs 45 and 47 attached.

46.    All Diehl director resolutions during the past five calendar years.

**Response:**    See Tab 49 attached.

47.    Minutes of all Diehl shareholder meetings during the past five calendar years.

**Response:**    See Tab 47 attached.

48.    Notes and/or transcriptions of all Diehl shareholder meetings during the past five calendar years.

**Response:**    While a transcript was made of the invalid August 17th, 2006 Annual Shareholders Meeting, the events of that meeting being re-addressed in the Special Shareholders Meeting, which took place on the September 19, 2006, without a transcript being made. For the record, the meeting was invalid because the Board did not meet and formally announce notice of the Annual Shareholders Meeting. As such, the document is also deemed invalid, though produced.

49.    Minutes of all Diehl director meetings during the past five calendar years.

**Response:**    See Tab 49 attached.

50.    Notes and/or transcriptions of all Diehl director meetings during the past five calendar years.

**Response:**    A transcript was also made of invalid August 17th, 2006 Directors Meeting, held immediately after the aforementioned Special Shareholders Meeting. This Board of Directors Meeting was invalid because the directors were elected at the proceeding invalid Shareholders Meeting, and therefore, despite their waiving formal notice because all were present, some of the directors present were not valid. As such, the document is also deemed invalid, though produced.

51.    Notices of all Diehl shareholders meetings during the past five calendar years.

**Response:**    See Tab 51 attached.

52.    Notices of all Diehl director meetings during the past five calendar years.

**Response:**    Plaintiff has no documents responsive to this Request. The notice to all such meetings to my knowledge was waived as the result of all members being present and acknowledging such actions.

53.    Financial statements prepared by, or on behalf of Diehl for the years 2001 – date, inclusive.

**Response:**    Objection.    Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

54.    Diehl corporate income tax returns for the years 2001 – date, inclusive.  Include all schedules and worksheets.

**Response:**    See Tab 54 attached.

55.    Monthly transactional reports listing all Diehl receipts and disbursements for each month from January 1, 201 – present, inclusive.

**Response:**    Objection.    Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

56.    Any and all shareholder agreements, voting trust agreements or other agreements by and among Diehl shareholders, including any amendments thereto.

**Response:**    See Tab 56 attached.

57.    All statements received by Diehl from any bank, S&L, credit union, or other fiduciary institutions showing all accounts in which Diehl has held any funds or other assets for

8

the years 2001 – present, inclusive. Include the portions of each such statement itemizing the details of all transactions.

**Response:**    Objection.    Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

58.    All engagement agreements between Diehl and any professionals who have represented it from January 2003 – present, inclusive. Include all attorneys engaged by Diehl.

**Response:**    Objection.    Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

59.    Complete, unredacted copies of all bills received by Diehl from any and all professionals from January 2003 – present, inclusive.

**Response:**    Objection.    Plaintiff asserts this Request is overly broad and burdensome and is not reasonably calculated to lead to the discovery of admissible evidence.

60.    All documents and communications relating to products liability claims asserted against Diehl within the past five calendar years.

**Response:**    Plaintiff has no documents responsive to this Request.

61.    All documents and communications relating to due diligence provided by WAMCO relating to potential acquisitions by Diehl within the past five calendar years.

**Response:**    See Tab 61 attached.

62.    All documents and communications relating to insurance subrogation claims involving Diehl within the past five calendar years.

**Response:**    Plaintiff has no documents responsive to this Request.

Respectfully submitted,

**CARSON BOXBERGER LLP**

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff
Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: 260.423.9411
F:\Diehl Woodworking Machinery 19,554\Response to R4Prod (Diehl).DOC

## CERTIFICATE OF SERVICE

This will certify that on this 24th day of May, 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, ESQ., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770

_____
(Larry L. Barnard)

## Robert Rozman

**From:** "Robert Rozman" <rfr@diehlmachines.com>
**To:** "Paul Ehrlich" <peerlesssaws@msn.com>
**Sent:** Monday, August 15, 2005 1:06 PM
**Subject:** Diehl Mgmt Fee Obligation, Diehl Lease & Other Issues

Paul...attached is my repsonse to yours of the 13th.

August 15, 2005

RE:   Your email of August 13, 2005



Paul...

I will send a note to Ken regarding my position about the Mgmt. Fee and Diehl's need to have a flexible, but reasonable obligation regarding the amount. Given its terminal nature, the entire program essentially represents an exit strategy that I would think wants to preserve Diehl's ability to pay at least something, should its economic conditions revert to those of just a year ago. As an example, though the opportunity to design and manufacture four Dyken machines for the Knauf organization remains, they shouldn't even be identified as a D-50 anymore. In the past month, those machines have taken on such a different composition that new numbers will have to be assigned to reflect their configuration. That means engineering, time, risk and not just replicating what used to be built. The point is that just like in the case of PELLA, most of the products that Diehl now offers are opportunities, not entitlements like they were. Nobody wants the "same old-same old", they can get that from China for a lot less.

The real issue here is that Diehl's ability to continue as an ongoing operation and simultaneously support the currently planned cash withdrawal schedule is not automatic. The fact that two separate entities don't really exist in Diehl and WAMCO should make this kind of understanding possible, and that seems to have been the way things have been handled successfully thus far. Given the makeup of both entities, I see no reason to change that method of operation, and now it's time to make sure that spirit is reflected in the amendment of our formal agreement.

At this point, my development of any strategic plan for Diehl is problematic. On one hand, there really is no need for me to adjudge the worth any management fees or lease payments being paid as a minority stockholder who has no long-term controlling ownership opportunity with the firm. On the other hand, if I'm negotiating as a potential successor, I look at the situation more cautiously, seeking to preserve as much of Diehl's base as possible for long-term survival. When you add to that the constant calls to Mike this year asking about cash position, and it appears that the management fee is clearly about only one thing. So...while I fully understand that my job is to steer Diehl through the changing marketplace no matter the owner, the ultimate results of this issue will impact my opinions,

as they would yours if you were in my situation.

Given those thoughts, my recommendations are as follows:

1)    The Management Fee to WAMCO. We all know that the management fee is not
      really a management fee for management services provided. Consequently, Diehl
      will make every attempt to meet its obligations, but since we *don't really have two
      independent parties* here, the agreement should reflect exactly what you indicated
      in your note to me, "that Diehl doesn't consider it to have a binding obligation to
      pay $15,000 per month". Concurrently, Diehl has an obligation to pay and it will
      pay, provided the business conditions permit, but we all know that can change.
      All we have to do here is formally reflect the spirit of our original agreement,
      recognizing the current situation and more volatile nature of our business. The
      dramatic downturn in Challoner parts business should have taught all of us how
      we can't plan for the future in this kind of business anymore. I think Ken can
      formally represent that situation for us and let us review it, don't you?

2)    The Lease. I would make the following recommendations: a) amend the lease to
      reflect the revised $4,500 per month charge; b) a rider should reflect a course of
      action similar to that of the management fee, indicating that if business conditions
      deteriorate, the per month charge can be re-negotiated to reflect those conditions;
      c) a rider should be added to reflect a sharing of any catastrophic repair costs
      related to the building. Given the 100 year age of the building, its current
      condition and the imminent need for major building repair over the next 10 years,
      in the event we have catastrophic damage or are attempting to prevent it, the
      payment could be affected; d) ask Wabash for an option to buy both at the lease's
      current expiration date and for January 1, 2006.

3)    The Shareholder Agreement. I'd be lying if I didn't tell you that this situation
      affects my thinking. If the agreement remains the same regarding the purchase of

7

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## CHICAGO, ILLINOIS

| | |
|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP.,<br>   *Claimant,*<br><br>v.<br><br>DIEHL WOODWORKING MACHINERY, INC.,<br>   *Respondent*. | )<br>)<br>)<br>)<br>)  No. 51 180 01918 06<br>)<br>)<br>) |

## SECOND SUPPLEMENT TO CLAIMS OF CLAIMANT
## WISCONSIN AUTOMATED MACHINERY CORP.

Claimant Wisconsin Automated Machinery Corp. ("WAMCO"), by its undersigned

counsel, hereby supplements its claims against the Respondent, Diehl Woodworking Machinery,

Inc. ("Diehl"):

### Allegations Common to All Counts

1.  WAMCO is a Wisconsin corporation, with its principal place of business located

in Chicago, Illinois.

2.  Diehl is an Indiana corporation with its principal place of business in Wabash

County, Indiana.

3.  Prior to September 2002, Diehl and WAMCO had transacted business together.

During that time, WAMCO had, *inter alia*, provided certain management services to Diehl when

requested by Diehl, for which Diehl paid management fees to WAMCO. The management

consulting and services furnished by WAMCO included business, legal and engineering advice.

4.  In September 2002, Diehl and WAMCO entered into an Asset Purchase

Agreement, a true and correct copy of which is attached hereto and incorporated herein as

**Exhibit 1**. The primary purpose of the Asset Purchase Agreement was the sale of certain

product lines and associated properties by WAMCO to Diehl.

5.      As part of the transaction covered by the Asset Purchase Agreement, the parties

agreed that Diehl would increase the management fee paid to WAMCO to $15,000/month

commencing January 2003. For its part, WAMCO agreed to continue providing management

consulting and services requested by Diehl from time to time.

6.      Pursuant to the Asset Purchase Agreement, Diehl paid the $15,000/month

management fee to WAMCO until 2004.

7.      In 2004, Diehl experienced some temporary business difficulties, and the parties

became concerned about its continued viability. To accommodate Diehl, the parties engaged in

discussions about temporarily reducing the management fee required under the Asset Purchase

Agreement, so Diehl could reduce its expenses.

8.      In August 2005, the parties executed a Memorandum of Agreement (**Exhibit 2**).

The Memorandum of Agreement was never intended to provide a complete expression of the

parties' relationship, or to be a novation of the Asset Purchase Agreement; the instrument clearly

shows that the parties did not mean to change the scope of the management services to be

provided by WAMCO to Diehl, or any other aspect of the Asset Purchase Agreement. Rather,

the Memorandum of Agreement simply purports to modify Diehl's obligation to pay monthly

management fees.

9.      The Asset Purchase Agreement contemplates subsequent written modification

(¶14.7), and provides that it is to be governed, construed and enforced in accordance with Illinois

law (¶14.8).

10.     The Asset Purchase Agreement also contains an arbitration clause (¶14.13), which

reads as follows, in relevant part:

> Any controversy, dispute or claim between the parties arising out
> of, related to or in connection with this Agreement or the
> performance or breach hereof, including with respect to the

arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; ...In addition to and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator ... [T]he arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

### Count I:  Claim for Declaratory Relief

11.    WAMCO repeats and realleges the foregoing allegations as ¶11 of this Count I, as though the same were fully set forth herein.

12.    WAMCO did not receive any consideration for its reduction of the management fee in 2004, or the execution of the Memorandum of Agreement in 2005.

13.    Illinois governs the construction and enforcement of the Memorandum of Agreement because it relates to the parties' rights and liabilities under the Asset Purchase Agreement relating to management services and fees.

14.    735 ILCS 5/2-701(a) permits anyone interested in a contract or other written instrument to seek a declaration of the rights of the interested parties.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an award providing the following relief:

A.    Declaring that the Memorandum of Agreement is null and void for want of consideration;

B.    Declaring that all rights relating to the management fees due from Diehl to WAMCO are governed by the Asset Purchase Agreement; and

C.    For such other and further relief as this Panel deems necessary and appropriate.

### Count II:
### Claim for Breach of Asset Purchase Agreement
### (unmodified by Memorandum of Agreement)

15.    WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶15 of this Count II, as though the same were fully set forth herein.

16.    WAMCO has performed all conditions on its part to be performed under the Asset Purchase Agreement.

17.    In breach of the Asset Purchase Agreement, Diehl has failed and refused to pay the management fee due to WAMCO.

18.    As a consequence of Diehl's breach of the Asset Purchase Agreement, WAMCO has suffered significant damages, which will continue to increase throughout the remainder of term for which the management fees are due and owing.

19.    Diehl's refusal to pay management fees has been vexatious.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for $231,000 in damages, plus additional management fees at the rate of $15,000/month as may accrue up to, and including the date of the Award, plus WAMCO's arbitral costs, reasonable attorneys' fees, and pre-judgment interest pursuant to the Illinois Interest Act, and for such other and further relief as this Panel deems necessary and appropriate.

### Count III:
### Alternative Claim for Breach of Asset Purchase Agreement
### (as modified by the Memorandum of Agreement)

Pleading in the alternative, WAMCO states as follows:

20.    WAMCO repeats and realleges ¶¶1-10 above as ¶20 of this Count III, as though the same were fully set forth herein.

21.     Even if this Panel finds that the Memorandum of Agreement should not be declared invalid and held for naught, WAMCO nevertheless has a valid claim for against Diehl for breach of contract.

22.     WAMCO has performed all conditions on its part to be performed under the Asset Purchase Agreement, even as modified by the Memorandum of Agreement.

23.     In breach of the Asset Purchase Agreement, even as modified by the Memorandum of Agreement, Diehl has failed and refused to pay the management fee due to WAMCO.

24.     As a consequence of Diehl's breach of the Asset Purchase Agreement, as modified by the Memorandum of Agreement, WAMCO has suffered significant damages, which will continue to increase throughout the remainder of term for which the management fees are due and owing.

25.     Diehl's refusal to pay management fees has been vexatious.

26.     WAMCO brings this claim in the alternative to Count II.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for $141,000 in damages, plus additional management fees of $15,000/month as may accrue up to, and including the date of the Award, plus WAMCO's arbitral costs, reasonable attorneys' fees, and pre-judgment interest pursuant to the Illinois Interest Act, and for such other and further relief as this Panel deems necessary and appropriate.

## Count IV:  Claim on Promissory Note

27.     WAMCO repeats and realleges the foregoing allegations of this Supplement to Claims as ¶27 of this Count IV, as though the same were fully set forth herein.

28. Part of the purchase price contemplated by the Asset Purchase Agreement was to be paid over time, pursuant to a promissory note (the "Note"), which is attached and incorporated as Exhibit A to the Asset Purchase Agreement. To secure the Note, the Asset Purchase Agreement also incorporates a security agreement (the "Security Agreement").

29. Diehl executed the Note and Security Agreement in connection with the Asset Purchase Agreement.

30. WAMCO is presently the holder of the Note.

31. The Note reads as follows, in relevant part:

> In the event that:
>
>         *           *           *           *
>
> (b) there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or
>
>         *           *           *           *
>
> then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.
>
>         *           *           *           *
>
> If this Promissory Note is not paid when due, whether at maturity or by acceleration ... the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.
>
>         *           *           *           *
>
> The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

32. The Security Agreement defines Diehl as the "Debtor" and WAMCO as its "Secured Party," and reads follows, in relevant part:

"Liabilities" shall mean all obligations of Debtor hereunder, and all
other debts, liabilities and obligations of Debtor to Secured Party
… howsoever created, arising or evidenced, whether direct or
indirect, absolute or contingent, now or hereafter existing, or due
or to become due, including without limitation under the
Promissory Note.

&ast;   &ast;   &ast;   &ast;

"Default" shall mean the occurrence of any one or more of the
following events: … (g) any change in Debtor's financial condition
or ability to pay the Liabilities deemed by Secured Party to be
materially adverse or the occurrence of any other event as a result
of which Secured Party deems itself insecure.

33.    WAMCO deems itself insecure because Diehl has filed a lawsuit, in which it

seeks to eliminate the management fee unilaterally, based, in part, upon the following allegation:

9. Diehl's business conditions require the elimination of the
management fee.

A true and correct copy of Diehl's Amended Complaint in that lawsuit is attached as **Exhibit 3**.

By Diehl's own admission, the material change in its financial condition constitutes a "default"

under the Security Agreement and Note.

34.    WAMCO also deems itself insecure under the Security Agreement because Diehl

has failed to make numerous management fee payments to WAMCO, which constitutes a further

default.

35.    Upon information and belief, Diehl was also unable to make monthly rental

payments of $4,500 during 2006 or 2007.

36.    Consequently, WAMCO is entitled to accelerate the balance due on the Note, and

to enforce its rights under the Note and Security Agreement, including its rights to recover its

attorneys' fees and costs.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an

Award in its favor, and against Diehl Woodworking Machinery, Inc., for the following relief:

A.  Finding Diehl in default of its obligations under the Note and Security

Agreement, and accelerating the entire amount due and payable under the Note;

B.  Awarding the unpaid principal balance due on the Note to WAMCO, plus interest,

and other charges, according to the terms of the Note;

C.  Awarding WAMCO its costs of collection, including its reasonable attorneys'

fees and costs, as provided in the Note and Security Agreement; and

D.  For such other and further relief as this Panel deems necessary and appropriate.

### Count V:  Claim on Promissory Note (Failure to Make June 2007 Payment)

37.  WAMCO repeats and realleges the foregoing allegations of this Supplement to

Claims as ¶37 of this Count V, as though the same were fully set forth herein.

38.  The Note reads as follows, in relevant part:

> FOR VALUE RECEIVED, [Diehl] hereby unconditionally promises
> to pay to the order of [WAMCO], the principal amount of Six
> Hundred Thousand Dollars ($600,000), with interest on the
> balance of principal remaining from time to time unpaid at the
> rate of 6.198% (herein called the "Interest Rate"), such principal
> sum and interest to be payable in seventy-two (72) equal monthly
> installments of Ten Thousand Dollars ($10,000.00) each,
> commencing January 1, 2003 and on the 1st day of each
> successive month thereafter through and including December 1,
> 2008.  Payment of principal hereof and interest hereon shall be
> made in lawful money of the United States at 5301 W. Dempster,
> Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at
> such other place as the holder of this Promissory Note may
> appoint from time to time.  All past due principal shall bear
> interest at the rate equal to the Interest Rate from time to time in
> effect, plus three percent (3%) per annum, payable on demand.
>
>       *      *      *      *
>
> In the event that:
>
> (a) the undersigned shall fail to pay any installment of principal
> of, or interest on, this Promissory Note when due and such
> failure shall continue for at least five (5) days; or
>
>       *      *      *      *

then, in any such event and so long as such event is continuing,
the then holder hereof may, without notice of any kind, declare all
unpaid principal and interest on this Promissory Note to be due
and payable, whereupon all unpaid principal of and accrued
interest on this Promissory Note shall forthwith be and become
due and payable.

        \*        \*        \*        \*

If this Promissory Note is not paid when due, whether at maturity
or by acceleration ... the holder hereof shall be entitled to recover
all costs of collection, including without limitation reasonable
attorneys' fees, in addition to and not in lieu of any other right or
remedy at law.

        \*        \*        \*        \*

The undersigned hereby waives demand, protest, notice of default,
and all other notices of any kind or nature, except as otherwise set
forth in this Promissory Note.

39.  In violation of the Note, Diehl did not make its June 2007 payment to WAMCO

on or before June 1, 2007. Moreover, in further violation of the Note, Diehl permitted that

default to continue for five days by failing to make the June 2007 payment to WAMCO.

40.  Instead, WAMCO made its June 2007 payment to the Clerk of the Wabash

County Circuit Court, along with a "supplemental complaint for interpleader" (**Exhibit 4**); the

essence of Diehl's interpleader complaint is that WAMCO and its shareholders (Jay Ehrlich and

Robert Rozman) should have to fight amongst themselves to see who should receive the funds.

41.  Diehl's payment to the Wabash County Circuit Court as part of an "interpleader"

is not a proper tender of payment under Illinois law, which governs the Note. Similarly, it does

not comport with the requirements under either Federal law or Indiana law. In particular, Diehl's

purported interpleader fails because neither Ehrlich nor Rozman has any direct interest in the

debt that is evidenced by the Note. That asset belongs to WAMCO, which has its own corporate

identity; one's ownership of stock in a corporation does not give the stockholder a direct claim in

any portion of the corporation's assets. Moreover, it is worth noting that neither Ehrlich nor Rozman has asserted any claims against Diehl.

42.    Consequently, WAMCO has an independent basis to accelerate the Note, and the entire principal balance on the Note is now due and payable. Moreover, WAMCO is entitled to enforce its rights under the Note and Security Agreement, including its rights to recover its attorneys' fees and costs, and to default interest.

WHEREFORE, Wisconsin Automated Machinery Corp. prays that this Panel enter an Award in its favor, and against Diehl Woodworking Machinery, Inc., for the following relief:

A.    Finding Diehl in default of its obligations under the Note and Security Agreement, and accelerating the entire amount due and payable under the Note;

B.    Awarding the unpaid principal balance due on the Note to WAMCO, plus interest, and other charges, according to the terms of the Note;

C.    Awarding WAMCO its costs of collection, including its reasonable attorneys' fees and costs, as provided in the Note and Security Agreement; and

D.    For such other and further relief as this Panel deems necessary and appropriate.

Respectfully submitted,
**WISCONSIN AUTOMATED MACHINERY CORP.**

By: _____
One of its attorneys

**DATED:** June 7, 2007

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for WAMCO
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

114384-1                                    10

ASSET PURCHASE AGREEMENT
(WOODWORKING PRODUCT LINES)

DATED SEPTEMBER 13, 2002

BETWEEN

WISCONSIN AUTOMATED MACHINERY CORP. (SELLER)

AND

DIEHL WOODWORKING MACHINERY, INC. (PURCHASER)

EXHIBIT
1

<u>LIST OF EXHIBITS AND SCHEDULES</u>
<u>Woodworking Product Lines</u>

Exhibit A　　　　　—　　　Promissory Note

Exhibit B　　　　　—　　　Security Agreement


Schedule 3.2　　　—　　　Payment of Purchase Price

Schedule 3.3　　　—　　　Allocation of Purchase Price

Schedule 4.4　　　—　　　Unfilled Customer Orders

Schedule 4.5　　　—　　　Unfilled Purchase Orders

Schedule 4.6　　　—　　　Litigation

Schedule 6.4　　　—　　　Machines Sold and Subject to Product Warranty Claims


C:\MSOFFICE\WINWORD\Wisconsin\Automated\Product\Unsto\Dleh\List\Exhibits\Schedules\Final\KSP\mer

## ASSET PURCHASE AGREEMENT
### Woodworking Product Lines

THIS ASSET PURCHASE AGREEMENT, made and entered into this 13th day of September, 2002, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "Seller"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Purchaser");

### WITNESSETH:

WHEREAS, Seller is engaged in, among other things, and owns certain assets and properties used in the business of designing, manufacturing, selling and repairing woodworking machinery comprising the McKnight Miller, Bell and Challoner product lines (herein collectively called the "Woodworking Product Lines"), and certain other machinery used in the carpet industry and comprising the Dyken product line (herein called the "Carpet Product Line" and, together with the Woodworking Product Lines, collectively called the "Product Lines" and each individually a "Product Line"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Product Lines and certain other assets and properties of Seller relating to the Product Lines in accordance with all of the terms and subject to all of the conditions herein set forth; and

WHEREAS, Seller is willing to undertake not to compete with Purchaser with respect to the Product Lines;

NOW, THEREFORE, in consideration of the premises hereof (which the parties agree are hereby incorporated into and made a part of their agreement herein), of other good and valuable considerations, the receipt of which is hereby acknowledged, and of the mutual covenants herein set forth, the parties hereby agree as follows:

1.    Definitions

In addition to other terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below for the purposes of this Agreement:

1.1    "Agreement" shall mean this Asset Purchase Agreement.

1.2    "Assumed Liabilities" shall mean collectively all of the specifically identified liabilities and obligations of Seller to be assumed by Purchaser hereunder.

1.3    "Closing" shall mean the act of completion of the closing of the transactions contemplated by this Agreement on the Closing Date as set forth in Article 9 hereof.

1.4    "Closing Date" shall mean the date on which the Closing takes place as set forth in paragraph 9.1 hereof.

1.5    "Contract Date" shall mean the date of this Agreement.

1.6    "Excess Inventory" shall mean the number of each such item of Inventory items that are on hand as of the Closing Date that are in excess of two years usage thereof (being twice the number of such item of Inventory sold by Seller during the twelve (12) month period ended June 30, 2002.

1.7    "Excluded Assets" shall mean collectively all of the assets and properties of Seller other than Sale Assets, including without limitation those specifically being excluded from the Sale Assets as provided in paragraph 2.2 hereof.

1.8    "Inspection Date" shall mean July 31, 2002, on which Purchaser inspected the Sale Assets.

1.9    "Sale Assets" shall mean collectively all of the assets and properties of Seller to be sold, assigned, transferred and conveyed to Purchaser hereunder as provided in paragraph 2.1 hereof.

2.    Properties and Assets to be Sold to Purchaser

2.1    Sale Assets.   On the terms and subject to the conditions herein set forth, at the Closing, Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and acquire from Seller, the Product Lines, as a going concern, and the following assets relating to any of the Product Lines and on hand as of the Closing Date:

2.1.1    All inventories relating to any of the Product Lines, including without limitation all raw materials, work in process, including without limitation a 527 Double End Tenoner machine (the "Incomplete Machine"), finished machinery, purchased parts and components, manufactured parts and assemblies, and loaner chain (herein called collectively "Inventory");

2.1.2    Dies, tools, jigs, fixtures, patterns, special tooling and trade fixtures relating to any of the Product Lines, including without limitation all items set forth on Schedule 3.3 hereto under the heading Fixtures & Tooling (herein called collectively "Miscellaneous Tooling");

2.1.3    All trade names, trademarks, trademark registrations and applications, brand names, logos and applications therefor, if any, and the goodwill symbolized thereby, trade secrets, intellectual property, and all rights under all confidentiality agreements and covenants of non-competition, and all rights to recover for any past infringement of any thereof, owned by Seller and relating solely to any of the Product Lines;

2.1.4    All books, records, computer tapes, files (including cabinets containing same) and other papers and documents of Seller pertaining solely to any of the Product Lines or any of the Sale Assets, including without limitation documents of title,

3

warehouse receipts, customer lists, customer files, mailing lists, product literature and manuals, service manuals, instruction manuals, advertising materials, catalogs, sales literature, sales displays, drawings, designs, engineering data, specifications, engineering prints and know-how;

2.1.5    All of Seller's right, title and interest in, to and under all unfilled customer orders being assigned to and assumed by Purchaser as provided in paragraph 4.4 hereof and all customer deposits, if any, received by Seller against such assumed orders only, and all unfilled purchase orders with suppliers, being assigned to and assumed by Purchaser as provided in paragraph 4.5 hereof;

2.1.6    All of Seller's right, title and interest in, to and under paragraph 6.12 of that certain Asset Purchase Agreement, dated June 19, 1992, among Famco Machine Division of Belco Industries, Inc. (which was assigned to Seller) and Medalist Industries, Inc. (the "Medalist Agreement"), relating to the obligations of Medalist Industries, Inc., which has been succeeded to by Illinois Tool Works, and any successors thereto, with respect to product liability claims relating to any products of the Product Lines sold at or prior to June 29, 1992, or with respect to the Show Machines (as defined in the Medalist Agreement).

2.1.7    All other assets, properties and rights specifically set forth in this Agreement as being transferred or assigned to, or purchased by, Purchaser.

2.2    Excluded Assets.  Without in any way expanding the Sale Assets being sold and transferred hereunder and notwithstanding anything to the contrary contained herein, there is specifically excluded from the Sale Assets, and Seller shall retain and shall not transfer to Purchaser, the following assets and properties owned by Seller:

2.2.1    All of Seller's assets and properties used in or related to any of Seller's business and operations other than the Product Lines.

2.2.2    All cash, bank accounts and similar items.

2.2.3    All accounts receivable, notes receivable, drafts, letters of credit and other receivables of Seller (herein collectively called the "Receivables").

2.2.4    All federal, state, local and foreign tax refunds and all tax deposits.

2.2.5    All right, title and interest of Seller in, to or under any policies of insurance, or any benefits payable or paid thereunder, purchased or maintained by Seller (except as otherwise specifically provided herein).

2.2.6    All records not pertaining solely to the Sale Assets.

2.3    Transfer and Assignment of Sale Assets:  Good and marketable title to the Sale Assets shall be sold, assigned, transferred and conveyed to Purchaser by Seller at the Closing, free and clear of all claims, liabilities, taxes, liens, security interests, encumbrances, restrictions and adverse rights of use or ownership.  Subject to Seller's obligations under paragraph 6.1 above, Purchaser is accepting the Sale Assets in the condition existing on the Inspection Date, or such later date on which the particular Sale Asset was acquired by Seller, ordinary wear and tear excepted, on an "as-is" basis. EXCEPT SOLELY AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, THE SALE ASSETS ARE BEING TRANSFERRED WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANT-ABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES (BOTH EXPRESS AND IMPLIED) SELLER HEREBY DISCLAIMS.

5

2.4    No Assumption of Liabilities.    Except solely for the assumption by Purchaser of the unfilled customer orders (and customer deposits, if any, received by Seller against such customer orders to the extent that same are paid or credited to Purchaser at Closing) and unfilled purchase orders as provided in paragraphs 4.4 and 4.5 hereof, including without limitation the risk of uncollectability of assumed customer orders and warranty claims relating to products shipped by Purchaser pursuant thereto, and any other liability of Seller expressly being assumed by Purchaser hereunder, Purchaser is not assuming and shall not be liable or responsible for any of Seller's debts, liabilities or obligations of any character whatsoever. Seller shall pay and discharge, as they become due and payable, and shall perform and satisfy in accordance with their respective terms, all such debts, liabilities and obligations of Seller not expressly being assumed by Purchaser hereunder. All deposits received by Seller from customers with respect to unfilled customer orders assumed by Purchaser shall be credited against the Purchase Price at the Closing.

3.    Purchase Price and Payment.

3.1    Purchase Price.    Purchaser agrees to pay to Seller, and Seller agrees to accept, as the aggregate purchase price for the Sale Assets (herein called the "Purchase Price"), the sum of $600,000.00, plus or minus any credits or prorations as herein provided.

3.2    Payment.    Payment of the Purchase Price, plus or minus any credits or prorations as herein provided, shall be payable in seventy-two (72) equal monthly installments of $10,000.00 each (comprising principal of, and interest at the rate of 6.198% per annum on, the Purchase Price as shown on Schedule 3.2 attached hereto), the first installment payable on the first day of January, 2003, and each subsequent payment on the first day of each subsequent calendar month until paid in full (i.e. amortizing the Purchase

Price plus interest over the period of repayment in seventy-two (72) equal monthly payments). The Purchaser's obligation to pay the Purchase Price as herein provided shall be evidenced by a Promissory Note, executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit A attached hereto (herein called the "Promissory Note"), which shall be secured and collateralized by the grant of a security interest in all of Purchaser's assets and properties, second in priority solely to the security interest of The LaSalle Bank in such assets, pursuant to a Security Agreement executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit B attached hereto (herein called the "Security Agreement").

     3.3    <u>Allocation of Purchase Price.</u>   The Purchase Price shall be allocated for income tax purposes among the Sale Assets and covenant not to compete set forth in Article 11 hereto as set forth in Schedule 3.3 attached hereto and such allocation shall be binding upon the parties for income tax purposes. The parties shall file their respective income tax returns, including filing with the Internal Revenue Service Form 8594 and all other information as may be required by Section 1060 of the Internal Revenue Code and regulations promulgated thereunder, in accordance with such allocations, and the parties shall not take any position or action inconsistent with such allocation.

4.    <u>Representations, Warranties and Covenants of Seller</u>

     Seller hereby represents, warrants and covenants to Purchaser that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

     4.1    <u>Organization.</u>   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin. Seller has all requisite corporate

power and authority to own, lease and operate its properties and to carry on its business as now conducted and to enter into this Agreement and perform its obligations hereunder.

4.2   Authority and Binding Obligation.  All corporate action necessary to authorize the execution and delivery of this Agreement by Seller and the performance by Seller of its obligations hereunder have been duly taken.  The execution and delivery of this Agreement by Seller and the performance of its obligations hereunder do not and will not result in the creation of any lien, charge or encumbrance upon any of the Sale Assets.  This Agreement is a legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

4.3   Title to Personal Property.  Seller owns and at the Closing will have the right to convey and will convey to Purchaser good and marketable title, free and clear of any tax, lien, security interest, encumbrance, liability, claim, restriction or adverse right of use or ownership to all of the Sale Assets.

4.4   Customer Orders.  Set forth on Schedule 4.4 hereto is a true and correct list of all unfilled customer orders and commitments of Seller on hand as of the Contract Date. All such unfilled customer orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.  Between the Contract Date and the Closing Date, Seller will not accept any customer order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled customer orders and commitments of Seller on hand as of the Closing Date, and Seller shall assign and credit to Purchaser all customer deposits and prepayments received

8

with respect thereto, and Purchaser shall assume the obligations of Seller to fill such assigned unfilled customer orders and commitments accruing from and after the Closing Date in accordance with the terms thereof.

4.5   Purchase Orders.   Set forth on Schedule 4.5 hereto is a true and correct list of all of Seller's unfilled purchase orders and commitments to suppliers on hand as of the Contract Date.  All such unfilled purchase orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.   Between the Contract Date and the Closing Date, Seller will not issue any purchase order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled purchase orders and commitments of Seller on hand as of the Closing Date, and Purchaser shall assume the obligations of Seller accruing from and after the Closing Date in accordance with the terms thereof and the Inventory Purchase Price shall be increased by any prepayments and deposits made by Seller with respect thereto.

4.6   Litigation.   Except as set forth in Schedule 4.6 hereto, there is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Seller, threatened against or relating to Seller's past or present operation of the Product Lines or any of the Sale Assets or that could affect the transactions contemplated by this Agreement, including without limitation relating to products liability, at law, in equity or before any governmental department, commission, board or agency.

4.7   No Material Adverse Change.   Since the Inspection Date, none of the tangible Sale Assets have suffered any destruction or damage, whether or not covered by

insurance, which materially and adversely affects the conduct of the Product Lines business.

4.8    Compliance with Laws.    The business and operations of the Product Lines have been and are being conducted in all material respects in compliance with all applicable laws (including duties imposed by common law), rules and regulations, orders, ordinances, judgments and decrees of all governmental authorities (federal, state and local), including, without limitation, the Clean Water Act, the Clear Air Act, CERCLA, SARA, the Resource Conservation and Recovery Act, as amended ("RCRA"), and all other laws relating to the protection of the environment, human health and safety, including the Occupational Safety and Health Act of 1970, as amended, and any regulations and standards promulgated or issued thereunder.

4.9    Inventory.    The Inventory of Seller other than Excess Inventory will consist of items of a quality which is good, usable and saleable in the usual and ordinary course of business of Seller.

4.10    Product Warranties.    Seller has furnished Purchaser with true and correct copies of all standard written warranties provided to customers of Seller with respect to products of any of the Product Lines (herein called "Product Warranties").

5.    Representations and Warranties of Purchaser.

Purchaser hereby represents and warrants to Seller that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

5.1    Organization, Good Standing and Power.    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and

has all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

5.2　<u>Authority and Binding Obligation</u>.  All corporate action necessary to authorize the execution and delivery by Purchaser of this Agreement and the performance of its obligations hereunder have been duly taken.  This Agreement is a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to, or affecting creditors' rights generally and general principles of equity.

5.3　<u>Litigation</u>.  There is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Purchaser, threatened against or relating to Purchaser at law, in equity or before any governmental department, commission, board or agency, and Purchaser is not in default with respect to any judgment, injunction, order or decree of any court or governmental agency or instrumentality by which it is bound or subject, and no such judgment, injunction, order or decree is now in effect, which in any way restrains or limits Purchaser in the execution and delivery of this Agreement or the performance by Purchaser of its obligations hereunder.

6.　　<u>Additional Covenants</u>

6.1　<u>Conduct of Business</u>.  Seller covenants that from the Contract Date through the Closing Date, Seller will conduct the business of the Product Lines in a manner not materially different from its past practices and only in the usual and ordinary course.

6.2     <u>Negative Covenants.</u>  Between the Contract Date and the Closing Date, Seller represents, warrants, covenants and agrees that Seller will not, without obtaining the prior written consent of Purchaser:

6.2.1     Encumber, mortgage, pledge, or permit any lien to exist against any of the Sale Assets.

6.2.2     Sell, assign, lease or otherwise dispose of any of the Sale Assets, except for the sale of Inventory (including parts but excluding the Incomplete Machine, which shall not be sold) in the ordinary course of business and except for supplies and spare parts used in the ordinary course of business (including in the completion of the Incomplete Machine).

6.2.3.     Make any change in any accounting principle, procedure or practice followed by Seller or in the method of applying same with respect to the Product Lines or write up the value of any Inventory.

6.3     <u>Employees.</u>  Upon the Closing, Seller shall terminate the employment of all of the employees that Purchaser desires to hire in its sole discretion and shall make available to Purchaser and use its reasonable efforts to help Purchaser hire such of employees desired by Purchaser; provided that Purchaser shall not be required or obligated to hire any such employee.  Purchaser shall not be obligated to continue any of Seller's policies or benefits with respect to employees, and all of Seller's employees actually hired by Purchaser shall be considered in all respects as new employees of Purchaser.

Seller and not Purchaser shall be responsible for all payments, lawsuits, defense of suits, judgments, reasonable attorneys' fees, and any other costs sustained by Purchaser, including but not limited to all payments and losses resulting from non-

compliance under the terms of any applicable plant closing laws, losses under any pension, thrift, employee, savings, bonus, or other plan for employee benefits, severance or separation benefits, withholding taxes and contributions, workers or unemployment compensation claims or costs, health care claims or premiums, vacation, sick or other leave or pay, disease or disability claims, discrimination claims, unfair labor practices, safety claims or citations and all other claims against Seller arising out of or relating to any employment relationship with Seller or the termination thereof.

6.4    Product Warranty Claims.    From and after the Closing, Purchaser shall assume and be solely responsible for all claims made by customers within the applicable period arising under Seller's Product Warranties with respect to products relating to the Product Lines sold or delivered by Seller to or for customers at or prior to the Closing Date and listed on Schedule 6.4 hereof or sold by Seller in the ordinary course of business between the Contract Date and Closing Date.

6.5    Product Liability Claims.    From and after the Closing, Seller shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered (or delivered on consignment) by Seller or any predecessor thereto at or prior to June 29, 1992, and Purchaser shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products relating to the Product Lines sold and delivered (or delivered on consignment) by Seller after June 29, 1992 and at or prior to the Closing Date or by Purchaser after the Closing Date. Purchaser shall maintain for a period of at least five (5) years from and after the Closing Date adequate insurance with respect thereto.

6.6    Use of Office Space.  It is understood and agreed that some of the employees hired by Purchaser may not relocate to Purchaser's offices in Indiana.  If so, at Purchaser's request, Seller shall allow such employees to use its offices and facilities in Oshkosh as long as commercially feasible for Seller and Purchaser shall pay Seller a reasonable fee therefor as mutually agreed by the parties.

6.7    Management Fee.  The management fee being paid by Purchaser to Seller and its affiliates for management consulting and services shall be increased to the sum of $15,000.00 per month commencing January 1, 2003, until such time as the parties otherwise mutually agree.

6.8    Completion of Incomplete Machine.  Seller shall use reasonable efforts to complete the Incomplete Machine at or prior to the Closing Date.  If the Incomplete Machine has not been completed at or prior to the Closing Date, Seller shall complete the Incomplete Machine as soon as practicable thereafter.

7.    Conditions Precedent to Obligations of Purchaser.

All of the obligations of Purchaser hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Purchaser) having been fulfilled on or before the Closing Date:

7.1    Representations and Warranties.  The representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Purchaser.

7.2   <u>Performance of Covenants</u>.  Seller shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

7.3   <u>No Litigation</u>.   No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto which in the reasonable opinion of counsel for Purchaser presents a reasonable possibility that any transaction contemplated by this Agreement would be enjoined or prevented, or that the right of Purchaser to acquire, retain or use the Sale Assets without additional cost would be adversely affected.

8.   <u>Conditions Precedent to Obligations of Seller</u>

All of the obligations of Seller hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Seller) having been fulfilled on or before the Closing Date:

8.1   <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Seller.

8.2   <u>Performance of Covenants</u>.  Purchaser shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

8.3   <u>No Litigation</u>.   No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto

which in the reasonable opinion of counsel for Seller presents a reasonable possibility that the transactions contemplated by this Agreement would be enjoined or prevented.

9.    Closing

9.1    Closing Date.  The Closing shall take place on October 1, 2002, at the offices of Lawrence, Kamin, Saunders & Uhlenhop, L.L.C., 208 South LaSalle Street, Suite 1750, Chicago, Illinois, at 11:00 a.m., local time, or at such other date, time and place as shall be fixed in writing by the mutual consent of Purchaser and Seller, or as required for the satisfaction of all conditions precedent hereto.  The Closing shall be deemed to be effective as of the beginning of business on the Closing Date.

9.2    Seller's Deliveries.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following, in form and substance satisfactory to Purchaser and its legal counsel:

9.2.1    Certified copies of the appropriate proceedings of the Boards of Directors of Seller authorizing and approving this Agreement and the transactions contemplated herein.

9.2.2    Bills of Sale, assignments and other instruments transferring to Purchaser as of the Closing Date title as provided in paragraph 2.3 of this Agreement to all of the Sale Assets being acquired by Purchaser hereunder.

9.2.3    Assignment(s) transferring to Purchaser the unfilled customer orders, customer deposits and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3    <u>Purchaser's Deliveries</u>.   At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following, in form and substance satisfactory to Seller and its legal counsel:

9.3.1        Certified copy of the appropriate proceedings of the Board of Directors and shareholders of Purchaser authorizing and approving this Agreement and the transactions contemplated hereby.

9.3.2        The Promissory Note, executed by Purchaser in the amount of the Purchase Price as set forth in paragraph 3.2 hereof.

9.3.3        The Security Agreement, executed by Purchaser as set forth in paragraph 3.2 hereof.

9.3.4        Assumption by Purchaser of the unfilled customer orders and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3.5        A resale certificate certifying Purchaser's sales tax resale number.

9.4    <u>Possession</u>.   Upon the Closing, possession of all of the Sale Assets hereunder shall be delivered to Purchaser.

9.5    <u>Records</u>.  After the Closing, if Seller has any legitimate, business, accounting or tax reason therefor, Seller and its representatives shall have the right of access to all business records of or pertaining to the Product Lines or Sale Assets that are delivered by Seller to Purchaser hereunder and relating to any period on or prior to the Closing Date, at all reasonable times during business hours, and to make copies thereof at Seller's expense. With respect to any financial, tax and accounting records of Seller relating in any way to the Product Lines or Sale Assets not delivered to Purchaser hereunder (herein

collectively called the "Retained Records"), after the Closing, Seller shall retain same and if Purchaser has any legitimate business, accounting or tax reason therefor, Purchaser and its representatives shall have the right of access to the Retained Records at all reasonable times during business hours, and to make copies thereof at Purchaser's expense.  In the event that within a period of five (5) years after the Closing Date, either Purchaser or Seller desires to dispose of any of such records, such party so desiring to dispose shall give the other party at least thirty (30) days prior written notice thereof and the other party shall have the right within said 30-day period to take possession thereof.

10.    Indemnification and Survival.

   10.1    Indemnification by Seller.  Notwithstanding any investigation by or knowledge of Purchaser, Seller hereby agrees to defend, indemnify and hold Purchaser harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, costs and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Seller in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (ii) any breach of covenant, agreement or undertaking of Seller in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (iii) any failure to comply with any Bulk Sales Law, if applicable; (iv) any liability, debt or obligation of Seller not expressly assumed by Purchaser hereunder; and (v) any and all legal proceedings against or related to Seller or any of the Sale Assets, including without limitation the legal proceedings described in Schedule 4.6 hereto.

10.2   <u>Limitations on Indemnification by Seller</u>.  Any liability or undertaking of Seller to indemnify Purchaser under paragraph 10.1, clause (I) hereof, shall be subject to each of the following limitations:

10.2.1    Purchaser shall not be entitled to make a claim for indemnification from Seller under paragraph 10.1, clause (I), hereof unless Purchaser shall have given Seller written notice of such claim prior to two (2) years following the Closing Date; provided, however, that the foregoing limitations period set forth in this paragraph 10.2.1 shall not apply to any indemnification due from Seller arising with respect to any breach of the representations and warranties of Seller contained in paragraphs 4.3 hereof (herein called the "Warranty of Title").

10.2.2    Seller's undertaking to indemnify under paragraph 10.1, clause (I), hereof shall be applicable only if and to the extent that the aggregate indemnification liability from Seller hereunder exceeds Ten Thousand Dollars ($10,000.00); provided, however, that this limitation shall not apply to any indemnification due from Seller with respect to any breach of the Warranty of Title.

10.3   <u>Indemnification by Purchaser</u>.  Notwithstanding any investigation by or knowledge of Seller, Purchaser hereby agrees to defend, indemnify and hold harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, cost and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Purchaser in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement; (ii) any

breach of covenant, agreement or undertaking of Purchaser in this Agreement or in any Exhibit, Schedule or other document or Instrument attached hereto or delivered by Purchaser in connection with this Agreement, (iii) any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products shipped or delivered by Purchaser after the Closing Date, and any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered by Seller (or any predecessor thereto) at or prior to the Closing Date, if and to the extent not covered by insurance maintained by Seller or Purchaser, as provided in paragraph 6.5 hereof, and (iv) any specifically identified debt, liability or obligation of Seller assumed by Purchaser hereunder at the Closing.

10.4  _Survival._   Subject to the limitations period provided in paragraph 10.2.1 hereof, all of the respective representations, warranties and covenants contained in this Agreement or in any other document or instrument delivered by or on behalf of any party hereunder or pursuant hereto, shall survive the Closing Date.

11.    Covenant Not to Compete

Seller hereby covenants and agrees that it shall not, for a period of five (5) years from and after the Closing Date, alone or in conjunction with any other corporation, firm, partnership, person, venture or other entity, directly or indirectly, engage in the design, manufacture, sale or distribution of any products of the type presently being designed, manufactured, sold or distributed by the Product Lines business within the United States of America or in any other geographic area in which the Seller was engaged on the Inspection Date or on the Closing Date.  Seller covenants and agrees that for a period for five (5) years following the Closing Date, it will not induce any employee, customer or supplier of

20

Purchaser to terminate his or its employment or business relationship with Purchaser, and Seller will not use or reveal any secret or confidential information relating to the business of the Product Lines acquired by Purchaser; provided, however, that the foregoing shall not apply to any information which, following the Closing Date, is received by Seller from a third person other than Purchaser who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Purchaser with respect to such information, or which is public knowledge or within the public domain other than as a result of disclosures by Seller after the Closing Date. It is the desire and intent of the parties that the terms and provisions of this paragraph 11 be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. Accordingly, if and to the extent that any portion of this paragraph 11 shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then said portion shall be deemed reformed to the least extent necessary to make such portion valid and enforceable.

12. Assignment

Neither this Agreement nor the rights or obligations contained herein shall be assignable by either party except with the written consent of the other party hereto, except by Purchaser to one or more corporations designated in writing by Purchaser prior to the Closing Date; provided, however, that no such assignment shall relieve the assignor of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the foregoing sentence.

13. Notices

All notices, requests, demands and other communications hereunder shall be in writing, and shall be deemed to have been given when delivered in person or received by first class, registered or certified U.S. mail, return receipt requested, postage and registration or certification fees prepaid, or delivered by reliable overnight delivery service, providing a receipt evidencing delivery, or by facsimile with a copy also delivered by any of the foregoing means:

If to Seller, to:

Wisconsin Automated Machinery Corp.
c/o American M & M
5301 W. Dempster, Suite 308
Skokie, Illinois 60077
Attention: Paul Ehrlich, President
Fax: (847)067-8646

With a copy to:

Kenneth S. Perlman, Esq.
Lawrence, Kamin, Saunders & Uhlenhop, L.L.C.
208 South LaSalle St., Suite 1750
Chicago, Illinois 60604
Fax: (312)372-2389

If to Purchaser, to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana 46992-0465
Attention: Robert Rozman, President
Fax: (219)563-0206

With a copy to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana 46992-0465
Attention: Mike Ruffner
Fax: (219)0206

or at such other address as hereafter shall be furnished by a notice sent in like manner by such addressee to the others.

14.    Miscellaneous

14.1    Severability.  Every provision of this Agreement is intended to be severable, and, if any term or provision is determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

14.2    Exhibits and Headings.  The Exhibits to this Agreement are hereby made a part hereof and shall be construed with and as an integral part of this Agreement.  The headings of the various Articles and paragraphs of this Agreement have been inserted for convenience only, are not a part of this Agreement, and shall not be deemed in any manner to modify, explain, enlarge, or restrict any of the provisions of this Agreement.

14.3    Expenses.  Except where otherwise expressly provided for in this Agreement, each of the parties hereto shall pay their own expenses, including without limitation the fees and expenses of their respective attorneys and accountants, in connection with this Agreement and the transactions contemplated herein, whether or not the Closing takes place.  Seller shall pay all sales and use taxes, if any, required on account of the consummation of the transactions contemplated hereby.

14.4    Waiver.  Failure or delay on the part of any of the parties hereto to exercise any right, power or privilege hereunder, or under any instrument executed pursuant hereto,

shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or of any other right, power or privilege. All waivers hereunder must be in writing.

14.5   _Further Assurances_.  Following the Closing, Seller and Purchaser, without further consideration of any kind, shall each execute and deliver, or cause to be executed and delivered, such other instruments, and take, or cause to be taken, such other action, as shall be reasonably requested by any other party hereto to more effectively carry out the transactions contemplated in this Agreement.  Seller shall use reasonable efforts to assist Purchaser in effecting a smooth transition in ownership and operation of the Sale Assets after the Closing Date, but Seller shall not be required to incur any cost or expense other than as specifically provided herein.

14.6   _Entire Agreement_.  This Agreement (including the Exhibits and Schedules hereto and other documents referred to herein as having been delivered or furnished by either party to the other) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

14.7   _Amendments_.  This Agreement may not be modified or changed except by an instrument or instruments in writing signed by both of the parties hereto..

14.8   _Governing Law_.  This Agreement shall be governed and construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions.

14.9   _Gender and Number_.  Whenever the context requires or permits, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

14.10 Counterparts. This Agreement may be executed in as many counterparts as may be deemed necessary or convenient, each of which when so executed shall be deemed an original; but all such counterparts shall constitute one and the same instrument.

14.11 Public Announcement. The parties will cooperate as to and jointly approve the contents of a general public announcement of this transaction upon the execution and delivery of this Agreement.

14.12 Termination

14.12.1 This Agreement may be terminated any time prior to the Closing Date: (i) by the mutual written consent of the parties; or (ii) by Seller if any of the conditions provided for in Article 8 hereof shall not have been satisfied, complied with or performed, and Seller shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iii) by Purchaser if any of the conditions provided for in Article 7 hereof shall not have been satisfied, complied with or performed, and Purchaser shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iv) otherwise as expressly provided in this Agreement.

14.12.2 In the event that the Closing shall not take place on or before November 30, 2002, either party shall have the right, exercisable upon giving written notice to the other party within five (5) business days after said date, to terminate this Agreement, unless such failure of Closing shall be due to the breach or default of the party so seeking to terminate this Agreement.

14.12.3 Except for a termination pursuant to clause (i) of subparagraph 14.12.1 hereof, and except otherwise as expressly provided in this Agreement, the right of any party to terminate this Agreement as provided in this paragraph 14.12 shall be in addition to, and not in substitution for, any and all other relief to which such party may be entitled, either at law, in equity or by agreement.

14.13. Arbitration. Any controversy, dispute or claim between the parties arising out of, related to or in connection with this Agreement or the performance or breach hereof, including with respect to the arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; provided that the arbitration shall be by a single arbitrator mutually selected by Purchaser and Seller, and if the parties do not agree within twenty (20) days after the date of notification of a request for such arbitration made by either of the parties, the selection of the single arbitrator shall be made by the American Arbitration Association in accordance with said rules. In addition to, and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator and shall be final, binding and conclusive on the parties, and judgment on the arbitrator's award, including without limitation equitable relief and specific performance, may be entered in and enforced by any court having jurisdiction thereof. Fees and expenses of the American Arbitration Association and of the arbitrator shall be borne as shall be determined by the arbitrator, and the arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

14.14 Fax Copies. Purchaser and Seller agree that "Facsimile" transmissions of signed documents shall be regarded and accepted as if they bore original signatures. Promptly after such Facsimile transmission the original documents bearing the original signatures shall be provided to the other party.

--Signature Page Follows--

26

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Seller").

By _____

Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Purchaser")

By _____

Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin Automated Product\LifelabDiehl\Asset Purch Agr Final\KSPxmer

27

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Seller")

By _____

Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Purchaser")

By _____

Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLine\toDiehl\AssetPurchAgtFinal\KSPtmar

EXHIBIT A
TO
ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

<u>PROMISSORY NOTE</u>

$600,000.00

_____, Illinois
_____, 2002

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the order of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM"), the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing on January 1, 2003, and on the 1st day of each successive month thereafter through and including December 1, 2008. Payment of principal hereof and interest hereon shall be made in lawful money of the United States at 5301 West Dempster, Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this Promissory Note may appoint in writing from time to time. All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (herein called the "Purchase Agreement"), between Diehl and WAM, and the payment of this Promissory Note is secured by a Security Agreement, of even date herewith, between Diehl and WAM, covering all of the assets and properties of

Diehl (herein called the "Security Agreement"), and it is expressly agreed that all of the covenants and agreements contained in the Security Agreement and in the Purchase Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that

(a)    the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b)    there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

(c)    the undersigned shall die, become insolvent, or admit in writing its inability to pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to or acquiesce in the appointment of a trustee or receiver for it or any of its property or make a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee or receiver shall be appointed for it or for a substantial part of its property and shall not be discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding shall be instituted by or against it, and if instituted against it, is consented to or acquiesced in by it or remains for thirty (30) days undismissed;

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal of and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

2

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.


By_____
Robert Rozman, President


C:\MSOFFICE\WINWORD\Wisconsin Automated\Product Lines\Diehl\PromissoryNote.doc\KSP/mer

3

EXHIBIT B
TO ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

SECURITY AGREEMENT

THIS SECURITY AGREEMENT, made and entered into as of the _____ day of _____, 2002, by and between DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Debtor"), located at 981 South Wabash Street, P. O. Box 465, Wabash, Indiana 46992-0465, and WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("Secured Party"), located at 5301 West Dempster, Suite 308, Skokie, Illinois 60077;

WITNESSETH:

WHEREAS, Debtor issued a certain Promissory Note, of even date herewith (the "Promissory Note"), in the original principal amount of $600,000, payable to the order of Secured Party, which Promissory Note was issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (the "Purchase Agreement") between Debtor and Secured Party; and

WHEREAS, this Security Agreement is being executed to secure full and prompt payment of the Promissory Note;

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.    Definitions.  In addition to other terms defined elsewhere herein, when used herein, the following terms shall have the following meanings:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party, its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

"Default" shall mean the occurrence of any one or more of the following events:  (a) Debtor fails to pay, when due, any amount on any of the Liabilities; (b) non-performance, misrepresentation or breach by Debtor of any representation, warranty or covenant contained herein or in any other agreement between Debtor and Secured Party; (c) Debtor becomes insolvent or unable to pay its debts as they mature or is adjudicated a bankrupt or applied for, consent to or acquiesces in the appointment of a trustee or receiver for it or any of its property or makes an assignment for the benefit of creditors, or in the

absence of such application, consent or acquiescence, a trustee or receiver is appointed for Debtor or for a substantial part of its property; (d) any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is instituted by or against Debtor; (e) any dissolution, merger or consolidation, or transfer of a substantial part of the property of Debtor; (f) any loss, theft, substantial damage or destruction to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

2.      Grant of Security Interest.  To secure the payment and performance of all Liabilities, Debtor hereby mortgages to Secured Party and hereby grants and assigns to Secured Party a continuing security interest in and to all properties, assets and interests of each Debtor listed on Exhibit A hereto, whether now or hereafter existing or acquired (herein individually and collectively called the "Collateral"), secondary in and subordinate solely to the lien and security interest of The LaSalle Bank in such Collateral.

3.      Representations; Warranties, Covenants and Agreements of Debtor.  Debtor hereby represents, warrants, covenants and agrees that (a) Debtor has been duly organized and is in good standing in the state of its formation listed above; (b) Debtor has full power and authority to execute and deliver this Agreement and perform all of such Debtor's obligations hereunder; (c) Debtor will, from time to time, on request of Secured Party, execute or consent to the execution of such financing statements and other documents (and pay the costs of filing or recording same in all public offices deemed necessary by Secured Party), and do such other acts and things, all as Secured Party may reasonably request, to evidence, perfect and maintain a valid security interest in the Collateral; (d) the Collateral will be kept at Debtor's address shown above, unless Secured Party shall otherwise consent in writing, and Debtor will not sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for the use or sale of Collateral and collection of accounts in the ordinary and usual course of Debtor's business; (e) Debtor will at all times keep the Collateral in first-class order and repair, excepting any loss or damage or destruction that is fully covered by proceeds of insurance; (f) Debtor will at all times keep the Collateral insured against loss, damage, theft and other risks, in such amounts, for such periods and written by such companies, and under such policies and in such form, all as shall be reasonable under all of the circumstances of Debtor's business, and Debtor shall apply any proceeds of such insurance which may be received by either of them toward payment of the Liabilities, whether or not due, in such order of application as Secured Party may determine; (g) Secured Party may examine and inspect the Collateral or any part thereof, wherever located, at any reasonable time or times; and (h) except for the lien and security interest of The LaSalle Bank in the Collateral, to which the lien and security interest granted hereby is secondary in priority and subordinate, and assuming Secured Party has properly perfected, the security interest granted hereby will be a first priority security interest in the Collateral.

2

4.     Remedies Upon Default. Whenever a Default shall be existing, all Liabilities may (notwithstanding any provisions of any other agreements between Debtor and Secured Party), at the option of Secured Party, and without demand or notice of any kind, be declared, and, thereupon, immediately shall become, due and payable, and Secured Party may exercise from time to time any and all rights and remedies available to it under applicable law to the fullest extent permitted thereby, including the rights of a secured party under the Uniform Commercial Code. Debtor agrees, in case of Default, to assemble, at their expense, all the Collateral at a convenient place acceptable to Secured Party, and to pay all costs of Secured Party of collection of all Liabilities and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses. Debtor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, demands, advertisements, hearings or process of law in connection with the exercise by Secured Party of any of its rights and remedies upon Default. Any notification of intended disposition of any of the Collateral shall be deemed reasonable and properly given if given at least five (5) days before such disposition. Any proceeds of any of the Collateral may be applied by Secured Party to the payment of expenses in connection with the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Secured Party toward payment of such of the Liabilities and in such order of application, as Secured Party may from time to time elect.

5.     General. No delay on the part of Secured Party in the exercise of any right or remedy shall operate as a waiver thereof, no waiver of any right or remedy shall operate as a future waiver and no single or partial exercise by Secured Party of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

Any notice from Secured Party to Debtor if mailed shall be deemed given when mailed, by registered or certified mail, return receipt requested, postage prepaid, addressed to Debtor either at Debtor's address shown above, or at any other address of Debtor appearing on the records of Secured Party.

The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of Illinois. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Whenever the context requires or permits words used in the singular herein shall be construed to mean or include the plural and vice-versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

The rights and privileges of Secured Party hereunder shall inure to the benefit of its successors and assigns.

3

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of the day and year first above written.

Secured Party:

Debtor:

WISCONSIN AUTOMATED
MACHINERY CORP.

DIEHL WOODWORKING
MACHINERY, INC.

By_____
Paul Ehrlich, President

By_____
Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin\Automated\Product\_info\Diehl\Security\Ag\Diehl.doc\KSPuner

4

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (hereinafter called "Agreement") is made and entered into as of the _____ day of August, 2005, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "WAM"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Diehl");

### WITNESSETH:

WHEREAS, Diehl has previously paid, and is currently paying, to WAM or its affiliates a monthly management fee for management consulting and services, which fee has varied from time to time upon the mutual agreement of the parties; and

WHEREAS, the parties intend that WAM shall continue to provide such management consulting and services to Diehl, and Diehl shall continue to pay a monthly management fee therefor as business conditions permit and in accordance with the terms and conditions herein set forth;

NOW, THEREFORE, in consideration of the premises hereof (which the parties hereby incorporate and make a part of their agreements herein) and the mutual agreements hereinafter set forth, it is agreed as follows:

1.      Wam hereby waives all unpaid and accrued management fees, if any, due from Diehl prior to July 31, 2005. WAM shall continue to  provide to Diehl from time to time management consulting and services as reasonably requested by Diehl and, effective as of July 31, 2005, Diehl shall pay to WAM,  as consideration for such management consulting and services provided, a management fee of $12,500 per month (increased from the immediately preceding fee of $10,000 per month) through December 31, 2005, and $15,000 per month commencing January 31, 2006, through December 31, 2008; provided however that (a) such mutual commitments to provide such services and to pay such management fee  shall terminate as of January 1, 2009, unless extended by the mutual agreement of the parties, and (b)from time to time the said management fee  might be



EXHIBIT
2

reconsidered and reduced, increased, eliminated and or reinstated by mutual agreement of the parties as Diehl's business conditions requires, and WAM shall only be responsible to provide consulting and services at a level consistent with the then current level of such management fee.

2. The parties shall cooperate and use reasonable efforts to inform each other concerning any change in such business conditions and commensurate change in the management fee level and commensurate level of management consulting and services to be provided.

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as of the day and year first above written.

WISCONSIN AUTOMATED MACHINERY CORP.

By _____

Title _____


DIEHL WOODWORKING MACHINERY INC.

By _____

Title _____PRESIDENT_____

STATE OF INDIANA       )          IN THE WABASH CIRCUIT COURT
                       ) SS:
COUNTY OF WABASH       )          CAUSE NO: 85C01-0508-PL-380


DIEHL WOODWORKING          )
MACHINERY, INC.            )
                           )
        Plaintiff,         )
                           )
    -vs-                   )
                           )
WISCONSIN AUTOMATED        )
MACHINERY CORP., JAY       )
EHRLICH and DIMITRIS       )
LOUKIDIS                   )
                           )
        Defendants.        )


## AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND DAMAGES

### COUNT I

Comes now the plaintiff, Diehl Woodworking Machinery, Inc., (hereinafter "Diehl"), by counsel, and for its first cause of action against defendant, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO") alleges and says as follows:

1.    Diehl is an Indiana corporation with its principal place of business in Wabash County, Indiana.

2.    WAMCO is a Wisconsin corporation.

3.    Defendant, Jay Ehrlich, is a resident of Chicago, Illinois.

4.    Defendant, Dimitris Loukidis, is a resident of Racine, Wisconsin.

5.    In August, 2005, Diehl and WAMCO entered into a Memorandum of Agreement ("Agreement"). A true and exact copy of the Agreement is attached hereto, made a part hereof, and marked as Exhibit "A".

**EXHIBIT
3**

6. The Agreement provides, in pertinent part, that the parties intended that WAMCO should provide management consulting services to Diehl and Diehl pay a monthly management fee therefore.

7. The Agreement further provides that "from time to time said management fee might be reconsidered and reduced, increased, eliminated and/or reinstated by mutual agreement of the parties as Diehl's business conditions require, and WAMCO shall only be responsible to provide consulting services that are consistent with the then current level of such management fee."

8. From the time of the execution of the Agreement, WAMCO has not provided to Diehl any management consulting and services.

9. Diehl's business conditions require the elimination of the management fee.

10. WAMCO has refused to eliminate the fee despite requests to do so by the management of Diehl.

11. Diehl contends that its obligation to pay the monthly management fee to WAMCO should be eliminated as a result of the failure of consideration and pursuant to the provisions of the Agreement.

12. WAMCO is no longer an operating entity and instead, serves only as a conduit for the receipt of payments from Diehl in favor of some of its shareholders, including, Jay Ehrlich.

13. An actual dispute exists between the parties as to whether Diehl's obligation to pay the monthly management fee pursuant to the terms of the Agreement should be terminated.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., prays that the Court enter a judgment declaring the rights of the parties under the Agreement, and declaring that Diehl has no obligation to pay the monthly management fee to WAMCO; for the cost of this action; and for all other just and proper relief in the premises.

## COUNT II

Comes now the plaintiff, Diehl Woodworking Machinery, Inc., by counsel, and for its second cause of action against defendants, Jay Ehrlich and Dimitris Loukidis, alleges and says as follows:

1.     Diehl incorporates herein by this reference the same as if set forth in full the allegations of rhetorical Paragraphs 1 through 11 of Count I of its Complaint.

2.     Defendants, Jay Ehrlich and Dimitris Loukidis, were shareholders and directors of Diehl, which is a closely-held Indiana corporation.

3.     Defendant, Jay Ehrlich, is the President of WAMCO and a shareholder in WAMCO.

4.     Defendant, Dimitris Loukidis, was a shareholder in WAMCO.

5.     Defendants, Jay Ehrlich and Dimitris Loukidis, owned a controlling interest of the shares of WAMCO.

6.     Defendants, Jay Ehrlich and Dimitris Loukidis, as shareholders of Diehl, breached their fiduciary duties owed to Diehl by refusing to permit the termination of the monthly management fee paid by Diehl to WAMCO, despite the fact that WAMCO never provided management consulting and services to Diehl.

7.    Diehl has sustained damages in the sum of $174,000.00 in management fees paid to WAMCO since the execution of the Memorandum of Agreement despite the fact that WAMCO has never provided management and consulting services to Diehl.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., prays that the Court enter a judgment in its favor and against defendants, Jay Ehrlich and Dimitris Loukidis, in an amount sufficient to compensate Diehl for the damages sustained as a result of the breach of fiduciary duties by the defendants; for the cost of this action; and for all other just and proper relief in the premises.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff
Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Amended Complaint.doc

## CERTIFICATE OF SERVICE

This will certify that on this ____ day of March, 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, Esq., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770.

_____

(Larry L. Barnard)

4



**Carson Boxberger**
Attorneys

1400 ONE SUMMIT SQUARE
FORT WAYNE, IN 46802-3173
PHO (260) 423-9411 FAX (260) 423-4329
CARSONBOXBERGER.COM

May 29, 2007

*CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Lori Draper, Clerk
Wabash Circuit Court
69 W. Hill St.
Wabash, Indiana  46992-3151

   Re: Diehl Woodworking v. Wisconsin Automated et al
      Wabash Circuit Court
      Cause No:  85C01-0608-PL-380
      Our File No:  19,554

Dear Ms. Draper:

  Enclosed please find the original and two (2) copies of plaintiff's Supplemental Complaint for Interpleader.  Also enclosed please find a check in the sum of $10,000.00 payable to the Clerk of the Wabash Circuit Court in connection with that Complaint for Interpleader.

  If you have any questions with respect to this matter, please feel free to contact me at your convenience.  Thank you.

        Sincerely,

        CARSON BOXBERGER LLP

        Larry L. Barnard

LLB/skm
cc: R. Steven Hearn, Esq.
   Greg Kotsonis, Esq.
Enclosures

F:\Diehl Woodworking Machinery 19,554\Clerk.ltr. 5.29.07.doc

C O P Y



EXHIBIT
4

SOLUTIONS.

STATE OF INDIANA    )      IN THE WABASH CIRCUIT COURT
                   ) SS:
COUNTY OF WABASH    )      CAUSE NO: 85C01-0608-PL-380

DIEHL WOODWORKING     )
MACHINERY, INC.          )
                   )
      Plaintiff,        )
                   )
  -vs-               )
                   )
WISCONSIN AUTOMATED   )
MACHINERY CORP., JAY    )
EHRLICH and DIMITRIS    )
LOUKIDIS             )
                   )
      Defendants.    )
                   )
    and            )
                   )
ROBERT ROZMAN       )
                   )
      Third-Party Defendant)

## SUPPLEMENTAL COMPLAINT FOR INTERPLEADER

Comes now the plaintiff, Diehl Woodworking Machinery, Inc. (hereinafter "Diehl") by counsel, pursuant to Trial Rule 15(B) and Trial Rule 22 of the Indiana Rules of Procedure, and for its cause of action against defendants, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO"), Jay Ehrlich and third-party defendant, Robert Rozman, alleges and says as follows:

1.      Pursuant to the terms of the Asset Purchase Agreement which is attached as Exhibit A to the WAMCO's Counterclaim, Diehl must pay to WAMCO the sum of $10,000.00 per month.

2.    As is reflected by the pleadings in this matter between defendant Ehrlich and third-party defendant, Robert Rozman, a dispute exists in this matter concerning the proper recipient between the shareholders of WAMCO of any funds paid to WAMCO.

3.    Diehl is willing to pay the funds it owes to WAMCO into Court to be held subject to further order of the Court regarding the proper recipient of those funds.

WHEREFORE, plaintiff, Diehl Woodworking Machinery, Inc., requests the Court to enter judgment as follows:

1.    To direct plaintiff to deposit all funds due and owing to defendant, WAMCO, with the Clerk of the Court and to discharge Diehl from any and all liability to the defendants and third-party defendant;

2.    To require that the defendants, WAMCO and Jay Ehrlich, and third-party defendant, Robert Rozman, to interplead and litigate among themselves their claims to the deposited funds; and

3.    For the costs of this action and all other appropriate relief.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Plaintiff
Diehl Woodworking Machinery

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\Supplemental Complaint.doc

2

## CERTIFICATE OF SERVICE

This will certify that on this _2nd_ day of May, 2007, a true and complete copy of the above and foregoing document was mailed to Gregory A. Kotsonis, Esq., 411 East Wisconsin Avenue, #700, Milwaukee, Wisconsin, 53202 and Steven Hearn, Esq., 212 N. Buffalo St., P.O. Box 770, Warsaw, Indiana 46581-0770.

_____
(Larry L. Barnard)

8

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

WISCONSIN AUTOMATED MACHINERY )
CORP., )
       *Claimant,* )
        )
   v. )       No. 51 180 01918 06
        )
DIEHL WOODWORKING MACHINERY, )
INC., )
       *Respondent.* )

## RESPONDENT'S RESPONSE TO CLAIMANT'S MOTION FOR DISCOVERY OF SANCTIONS

Respondent, Diehl Woodworking Machinery, Inc., ("Diehl") by counsel, responds to Claimant Wisconsin Automated Machinery Corp. ("WAMCO") Motion for Discovery of Sanctions.

### I.    Wabash Litigation - Interrogatories

As stated in Claimant's Motion for Discovery of Sanctions[1], paragraph 12, WAMCO suggested that Diehl submit their interrogatory responses from the "Wabash Litigation" in the present case. Diehl has fully complied with this request. These responses were drafted for litigation dealing with the enforceability of a contract clause requiring the payment of a management fee. If WAMCO asserts that any of the interrogatory responses are deficient for the litigation in which they were intended, then WAMCO should address their concerns in the appropriate court.

---

[1] Indiana Trail Rule 26(F) requires that before any party files any motion to compel or enforce discovery, that party shall make a reasonable effort to reach an agreement concerning the discovery with opposing counsel. WAMCO made no such attempt before filing Claimant's Motion for Discovery Sanctions.

## II.   Bounds of Discovery—Interrogatories

While pre-trial discovery is deliberately broad, "discovery is proper for information reasonably calculated to lead to the discovery of admissible evidence." *Costanzi v. Ryan*, 175 Ind.App. 257, 271, 370 N.E.2d 1333, 1341 (Ind.App. 1978).

### A.   Reasonably Calculated

In Interrogatories No. 5 and 6, WAMCO requests a recounting of any and all communications between Diehl and any other person regarding WAMCO and Loukidis, respectively. While it is possible that responsive documents may be relevant, this request is not calculated at all, much less reasonably calculated, to lead to the discovery of admissible evidence. Such a request is overly broad and burdensome, as it requests not just letters or emails, but every text message, phone conversation and personal conversation from any and every employee of Diehl. It would be impossible for Diehl to recount every communication concerning WAMCO and Loukidis. However, Diehl has still produced 334 pages in response to WAMCO's Request for Production and Interrogatories. If WAMCO has a specific question, a question *reasonably calculated* to lead to the discovery of admissible evidence, and it is unable to locate the answer in Diehl's Response, WAMCO should submit a second set of Interrogatories.

### B.   Admissible Evidence

In Interrogatories 32 through 35, WAMCO requests information pertaining to Diehl's payment of legal fees. Although WAMCO may be curious about this information, it is not relevant to the matter in dispute in the Wabash Litigation, for which these responses were prepared. WAMCO argues Diehl's ability to pay legal fees may somehow impact the arbitrator's decision on this matter. In no way could Diehl's ability to pay legal fees support

2

WAMCO's contention that they are, in fact, insecure. Regardless of its motive, they are not relevant to either this matter or the matter before the Wabash Circuit Court.

### III.    Privilege--Interrogatories

Diehl asserts attorney-client privilege in only one response to an interrogatory. Interrogatory No. 47 asks:

> "Identify all communications with Carson Boxberger relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement."

As this requests only material protected by attorney-client privilege, as it would include only documents/communications between a client and his counsel, Diehl asserts this right. WAMCO suggests that Diehl has also asserted a blanket privilege in response to Interrogatories 5, 6, and 32-35. Diehl has objected to these interrogatories on other grounds. However, because documents responsive to these requests have not been assembled due to the obvious burden of locating and retrieving that which is both unduly broad and/or irrelevant, Diehl is unaware of what documents would be included. Responsive documents may include that which would be protected by attorney-client privilege. Diehl has merely preserved their right to assert this privilege at a latter date, if necessary. It is not currently being asserted in any response, except for Interrogatory No. 47.

### IV.    Allegedly Evasive Answer—Interrogatory

(A)    Interrogatory No. 13 requests documents related to Rozman's purchase of Loukidis' Diehl stock. These documents were inadvertently left out of the voluminous response to Request for Production in the Wabash Litigation. If responsive documents are located, they will be forwarded to the Claimant.

3

(B)    Interrogatory No. 17 asks what services WAMCO was supposed to provide to Diehl. In response Diehl attempts to articulate that immediately after contracting with WAMCO for management services, Diehl became aware that WAMCO was incapable of completing any services.    If unclear, Diehl responds here that no specific management services were contemplated before the execution of any agreement.

(C)    In Response to Interrogatory No. 20 which asks if WAMCO has ever refused service, Diehl again attempts to articulate that WAMCO was incapable of providing management services to Diehl. If unclear, Diehl responds here that WAMCO has not ever refused to provide management services to Diehl.

(D)    In response to Interrogatory No. 22, which requests a description of the change in business conditions which requires the elimination of the management fee, Diehl states:    "While Diehl is capable of paying its creditors, the declining market for Diehl's products has required a closer inspection of Diehl's expenses. See Response to Request for Production No. 6." On page 043 of this Response to Request for Production, a sales statement illustrates that the average monthly sales figure for 2007 is $146,929.00 down from $165,668.00 in 2006, $179,277.00 in 2005, and $203,449.00 in 2004. If unclear, Diehl responds here that they are in the business of selling products. When they sell fewer products, they make less money. The market for Diehl's products is declining, which is to say, they are selling fewer products and making less money, as evidenced by the monthly statement referenced above.

(E)    Interrogatory No. 23 requests documents related to the communication of business conditions from Diehl to Ehrlich. Diehl believes this information was conferred orally. However, if responsive documents are located, they will be forwarded to WAMCO.

4

## V.    Wabash Litigation—Request for Production

As agreed, Diehl has provided those Responses to Request for Production which were prepared for the Wabash Litigation to WAMCO and the Arbitrator in this matter. Diehl never suggested these would be in anyway altered for submission in this matter. If WAMCO asserts that the Response to Request for Production are deficient for the litigation in which they were intended, WAMCO should address their concerns in the appropriate court.

No requests for production were actually submitted in this proceeding; therefore, it would have been impossible for Diehl to object to such, as WAMCO suggests. Diehl has not waived its right to object to any document requests in this matter as there have not been any requests made. The single request was for a submission of Diehl's Response to Request for Production in the Wabash Litigation. Diehl has fully complied with this request.

## VI.    Bounds of Discovery—Requests for Production

While pre-trial discovery is deliberately broad, "discovery is proper for information reasonably calculated to lead to the discovery of admissible evidence." *Costanzi v. Ryan*, 175 Ind.App. 257, 271, 370 N.E.2d 1333, 1341 (Ind.App. 1978).

In Requests for Production No. 16, 17, 23-26, 39-42, 53, 55 and 57-59, WAMCO requests nearly any document Diehl has generated, or received, over the past five years that contains a dollar amount. Although WAMCO may be curious about this information, it is not relevant to the matter in dispute under the Wabash Litigation, for which these responses were prepared. In the matter pending before this Arbitrator, Diehl has not put its financial position in question by attempting to alleviate itself of a contract obligation to pay a management fee, for which it does not receive services. Diehl is not incapable of paying its creditors, and never has suggested otherwise. Diehl has only stated that the declining market for its products, as

. 5

evidenced by the monthly sales statement on page 043 of the response to request for production, has required Diehl to look more closely at it's expenses. Upon inspection, Diehl asserts that the management fee paid to WAMCO is not advantageous to Diehl, nor required to be paid. Because Diehl is capable of paying the management fee the financial position of Diehl, aside from the changing market conditions, is not relevant to either this matter or the matter before the Wabash Circuit Court.

### VII.    Privilege – Requests for Production

Diehl asserts attorney-client privilege in only one response to a Request for Production. Request for Production No. 35 asks for:

> "All communications with Carson Boxberger relating to the lawsuit, the Memorandum of Agreement and/or the Asset Purchase Agreement."

As this requests only material protected by attorney-client privilege, as it would include only documents/communications between a client and his counsel, Diehl asserts this right. WAMCO suggests that Diehl has also asserted a blanket privilege in response to Requests for Production Nos. 24-26. Diehl has objected to these Requests for Production on other grounds. However, because documents responsive to these requests have not been assembled due to the obvious burden of locating and retrieving that which is both unduly broad and/or irrelevant, Diehl is unaware of what documents would be included. Responsive documents may include that which would be protected by attorney-client privilege. Diehl has merely preserved their right to assert this privilege at a latter date, if necessary. It is not currently being asserted in any response, except for Request for Production No 35.

### VIII.    Paul Ehrlich's August 13, 2005 email

This email was inadvertently left out of the voluminous response to Request for Production in the Wabash Litigation. It is attached here as Exhibit A.

6

## IX.    Conclusion

Diehl has complied completely with its obligation to furnish the Claimant in this action with the responses prepared for the Wabash Litigation.

WHEREFORE, Respondent, Diehl Woodworking Machinery, Inc., requests the denial of Claimant's Motion for Discovery Sanctions.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Respondent

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\diehl Woodworking Machinery 19,554\Response to Claimant's Mot for Discovery of Sanctions.doc

## CERTIFICATE OF SERVICE

This will certify that on this 12th day of June, 2007, a true and complete copy of the above and foregoing document was mailed to:

Andrew R. Schwartz, Esq.
Sugar, Friedberg & Felsenthal LLP
30 N. LaSalle Street, Suite 3000
Chicago, IL 60602

_____
(Larry L. Barnard)

Below is the body of the email sent from Paul Ehrlich to Robert Rozman on August 13, 2005.


Bob:

I have reviewed the subject captioned memo.
I believe your 4th paragraph reflects what actions will be taken by a responsible board if future business
conditions dictate.

In my opinion if we continue to use the language that the management fee can be changed by mutual agreement as
business conditions require I am comfortable with that.  I believe the record should indicate that notwithstanding Jay's
position that Diehl doesn't consider it to have a "binding obligation to pay $15,000 per month.
If you concur I will speak to Ken and get language that may be acceptable to all.  This matter needs to be resolved and the minutes approved.
It is not my desire to play hard ball and stop payment of the monthly management fee, but I believe that option needs to be held open if
negotiation fails.

**I am not sending this memo to anyone else until we have agreed on a course.**

You may want to send a copy of yours to Ken and I will follow with a copy of mine or a similar version of same.

I will await you "requests to Wabash, but I believe that Diehl should request options to extend as well as an option to purchase.
At the end of 2008 cash flow from a non required management fee, conclusion of payment of the purchase price to Wamco and completion
of payment on the lease/purchase of equipment  will increase by perhaps $400,000.

Paul

EXHIBIT
tabbies®

9

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| WISCONSIN AUTOMATED<br>MACHINERY CORP. | ) | |
| | ) | |
| | ) | |
| Claimant | ) | |
| | ) | Chicago, Illinois |
| and | ) | |
| | ) | Claim No: 51 180 01918 06 |
| DIEHL WOODWORKING<br>MACHINERY, INC. | ) | |
| | ) | |
| | ) | |
| Respondent | ) | |

## RESPONDENT'S ANSWER TO COUNT V OF
## OF CLAIMANT'S SECOND SUPPLEMENT TO CLAIMS

Comes now the Respondent, Diehl Woodworking Machinery, Inc. (hereinafter "Diehl"), by counsel, and for its Answer to Count V of claimant, Wisconsin Automated Machinery Corp. (hereinafter "WAMCO") Second Supplement to Claims, alleges as says as follows:

1.      Diehl incorporates herein by this reference the same as set forth in full its responses to rhetorical allegations 1 through 36 of WAMCO's Supplemental Claims.

38.      With respect to the allegations of rhetorical Paragraph 38, Diehl states that the terms of the Note speak for themselves.

39.      Diehl denies the allegations set forth in rhetorical Paragraph 39. Diehl promptly made payment of the amounts due and owing to WAMCO into the Wabash Circuit Court so the Court could determine the proper recipient of those payments.

40.      Diehl admits the allegations set forth in rhetorical Paragraph 40 of WAMCO's Second Supplement to Claims.

41.    Diehl denies the allegations set forth in rhetorical Paragraph 41 of WAMCO's Second Supplement to Claims.

42.    Diehl denies the allegations set forth in rhetorical Paragraph 42 of WAMCO's Second Supplement to Claims.

WHEREFORE, Respondent, Diehl Woodworking Machinery, Inc., prays that WAMCO take nothing by way of Count V of its Second Supplement to Claims, that the Arbitrator enter an award in favor of Diehl; and for the costs of this matter.

CARSON BOXBERGER LLP

By _____

Larry L. Barnard (11904-49)
Bruce O. Boxberger (3535-02)
Attorneys for Respondent

1400 One Summit Square
Fort Wayne, Indiana  46802
Telephone:  (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\WAMCO Shares Dispute\Answer to Count V.doc

### CERTIFICATE OF SERVICE

This will certify that on this 26th day of June, 2007 a true and complete copy of the above and foregoing document was emailed and mailed to Andrew Schwartz, 30 N. LaSalle St., #3000, Chicago, Illinois 60602.

_____
(Larry L. Barnard)

2

10

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## CHICAGO, ILLINOIS

| | |
|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP.,<br>     *Claimant,*<br><br>v.<br><br>DIEHL WOODWORKING MACHINERY, INC.,<br>     *Respondent.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 51 180 01918 06

Arbitrator Morsch

# CLAIMANT'S INTERROGATORIES TO BE ANSWERED UNDER OATH BY DIEHL WOODWORKING MACHINERY, INC.

To:   *Bruce O. Boxberger, Esq.*, CARSON BOXBERGER LLP, 1400 One Summit Square, Fort Wayne, IN 46802

Wisconsin Automated Machinery, Corp., by its undersigned counsel, hereby requests that Diehl Woodworking Machinery, Inc. answer the following Interrogatories under oath within 10 days:

## DEFINITIONS AND INSTRUCTIONS

### Definitions

1.    "*Diehl*" shall mean the respondent, Diehl Woodworking Machinery, Inc., and any person acting or purporting to act on behalf of Diehl Woodworking Machinery, Inc.

2.    "*WAMCO*" shall mean the claimant, Wisconsin Automated Machinery, Corp., and any person acting or purporting to act on behalf of Wisconsin Automated Machinery, Corp.

3.    "*Ehrlich*" shall mean Jay Ehrlich.

4.    "*Loukidis*" shall mean Dmitris Loukidis.

5.    "*Rozman*" shall mean Robert F. Rozman and any person acting or purporting to act on behalf of Robert F. Rozman.

6.    "*APA*" shall mean the "Asset Purchase Agreement" attached as **Exhibit 1** to *WAMCO*'s Second Supplement to Claim.

7.    "*MOA*" shall mean the two-page "Memorandum of Agreement" attached as **Exhibit 2** to *WAMCO*'s Second Supplement to Claim.

8.    "*Document*" shall mean any printed, typewritten, handwritten, machine readable, or otherwise recorded matter of any character, including, but not limited to, letters, memoranda, computer records, e-mails, computer data bases, computer printouts, computer cards, computer disks, computer hard drives, computer CD-ROM disks, charges, pleadings, telegrams, notes, catalogues, brochures, advertisements, diaries, reports, calendars, interoffice communications, statements, announcements, printouts, drawings, graphs, charts, photographs, tape recordings, phono records, disks, hard drives or data compilations or any other items included within the definition of "document" under Illinois law, and all nonidentical copies of the *document* by whatever means made.

9.    "*Communications*" shall include all discussions, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, telecopies, e-mails, or other forms of written or verbal intercourse, however transmitted, including reports, notes, memoranda, lists, agenda, and other *documents* and records of *communications*, and when used shall require a statement of the name of the individual who made the *communication*, the person(s) to whom he made it, the date it was made and the form in which it was made.

10.    "*Person*" shall mean a natural person or business entity, as the context may require.

11.    "*Relating to*" shall mean the following: containing, comprising, constituting, stating, setting forth, recording, contradicting, referring to, describing, discussing, reflecting, interpreting, identifying, concerning, or in any way pertaining to, or logically or factually connected to, in whole or in part, that matter, *document*, *communication*, *person* or subject.

12.    "*Identification*," "*identify*"or "*identify*":

a) when referring to a *person*, shall mean that *Diehl* shall set forth the name, present or last known business address, and, if a natural person, their last known home address, telephone number, employer, and title(s). Once a *person* has been *identified* in an interrogatory answer, it shall be sufficient thereafter when *identifying* that *person* to state merely his/her/its name; and

b) when referring to a *document* shall mean that *Diehl* shall set forth the title or other means of *identification* of each such *document*, the date of each *document*, *identification* of the author or originator of that *document*, the names of all recipients, and the *identification* of the *person*(s) who have possession, custody or control of each *document*, or copies of it.

c) when referring to a *communication* means that *Diehl* shall state the following information about each such *communication*, with specificity and particularity, (a) the date the *communication* was made, (b) the manner in which the *communication* was made (i.e., spoken in person, spoken by telephone, via e-mail, etc.), (c) the *identity* of the *person* making the *communication*, (d) the *identity* of each person(s) to whom the *communication* was made, (e) where the *person* making the *communication* was located at the time, and (f) the *identity* of all other *persons* present when the *communication* was made.

13. "*Describe*" and "*description*" shall have their ordinary dictionary meanings, and shall require *Diehl*, with specificity and particularity, to narrate, express, explain, set forth, relate, depict, delineate and/or portray in detail the facts necessary to respond to each interrogatory which asks *Diehl* to *describe*, or to furnish a *description*.

14. Except as otherwise provided herein, all other terms used in these requests are intended to have the same meaning that they have under Illinois law pertaining to discovery, unless the context requires a different meaning.

## Instructions

1. These interrogatories are continuing in nature, and *you* must provide such additional information and documents as *Diehl*, *Diehl's* attorney, or anyone acting on *Diehl's* behalf or in concert with *Diehl* may have or may obtain between the time *Diehl's* answers and/or responses are first served and the time of trial or pertinent hearing. In answer to these interrogatories, *Diehl* must furnish all information available to *Diehl* or *Diehl's* attorney, including, but not limited to, information in the possession of any attorneys, agents,

117084-1                                        3

investigators, representatives, or anyone acting in cooperation or in concert with the case to be defended by *Diehl*.

2.    If any interrogatory cannot be answered in full, after exercising due diligence to secure the information requested, please so state and answer the interrogatory to the extent possible, specifying the inability to answer the remainder of any such interrogatory and stating whatever information or knowledge presently is available concerning the portion of the interrogatory that could not be answered.

3.    If any information is withheld on the basis of privilege, state with respect thereto the privilege on which *Diehl* is relying; the holder of the privilege, and the type of information being withheld, in compliance with Illinois law.

## INTERROGATORIES

1.    *Identify* the *person*(s) answering these interrogatories and, if different, the *person*(s) verifying or certifying the accuracy of these interrogatories.

2.    *Identify* each *person* whom *Diehl* expects to call as a witness at the arbitration hearing. For each witness *identified*, state the subject matter on which the witness is expected to testify. For each expert witness *identified*, state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

3.    *Identify* all *communications* between *Diehl* and any other *person*(s) *relating to Rozman*'s purported claim upon any funds owed by *Diehl* to *WAMCO*.

4.    *Identify* all *documents relating to Rozman*'s purported claim upon any funds owed by *Diehl* to *WAMCO*.

5.    *Identify* all *documents relating to* the *MOA*, including all draft versions of the *MOA*.

6.    Was *Diehl* represented by counsel in connection with the drafting of the *MOA*? If so, *identify* the attorney(s) who represented *Diehl*.

7.    *Identify* all *communications relating to* the *MOA*, including any comments about drafts of the *MOA*.

8.    *Identify* all *documents relating to* the *APA*, including all draft versions of the *APA*.

9.    Was *Diehl* represented by counsel in connection with the drafting of the *APA*? If so, *identify* the attorney(s) who represented *Diehl*.

10.    *Identify* all *communications relating to* the *APA*, including any comments about drafts of the *APA*.

11.    *Identify* all *documents relating to Diehl's* contention that *Rozman* has a direct interest in funds due from *Diehl* to *WAMCO*.

12.    *Identify* all *communications relating to Diehl's* contention that *Rozman* has a direct interest in funds due from *Diehl* to *WAMCO*.

13.    Does *Diehl* contend that *Diehl* faces possible exposure to *Ehrlich* and/or *Rozman* by paying funds directly to *WAMCO*? If so, *identify* all *communications* and/or *documents relating to* that contention.

14.    *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl's* business conditions.

15.    *Identify* all *Diehl* directors who voted to execute the *MOA*.

16.    For each *person identified* in your answer to the preceding interrogatory, state whether that director also:

    a.    Owned shares in *Diehl* at that time;

    b.    Owned shares in *WAMCO* at that time;

17.    *Identify* all *Diehl* directors who voted to execute the *APA*.

18.    For each *person identified* in *Diehl's* answer to the preceding interrogatory, state whether that director also:

      a.   Owned shares in *Diehl* at that time;

      b.   Owned shares in *WAMCO* at that time;

19.     For each year from 2002-present, state the gross revenues earned by *Diehl* from the sale of all product lines identified in ¶2 of the *APA*.

20.     Identify all documents relating to customer orders for products sold and/or to be sold by *Diehl*, including, without limitation, Dyken machines.

Respectfully submitted,

**WISCONSIN AUTOMATED MACHINERY CORP.**

**DATED:** June 27, 2007    By

One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for WAMCO
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

WISCONSIN AUTOMATED MACHINERY )
CORP.,                        )
      *Claimant,*          )
                              )
v.                            )    No. 51 180 01918 06
                              )
DIEHL WOODWORKING MACHINERY, INC., )   Arbitrator Morsch
      *Respondent.*        )

## CLAIMANT'S DOCUMENT REQUESTS TO RESPONDENT DIEHL WOODWORKING MACHINERY, INC.

To:   *Bruce O. Boxberger, Esq.*, CARSON BOXBERGER LLP, 1400 One Summit Square, Fort Wayne, IN 46802

Wisconsin Automated Machinery, Corp., by its undersigned counsel, hereby requests that

Diehl Woodworking Machinery, Inc. produce the following documents within 10 days:

### DEFINITIONS AND INSTRUCTIONS

### Definitions

1.    "*Diehl*" shall mean the respondent, Diehl Woodworking Machinery, Inc., and any

person acting or purporting to act on behalf of Diehl Woodworking Machinery, Inc.

2.    "*WAMCO*" shall mean the claimant, Wisconsin Automated Machinery, Corp., and

any person acting or purporting to act on behalf of Wisconsin Automated Machinery, Corp.

3.    "*Ehrlich*" shall mean Jay Ehrlich.

4.    "*Rozman*" shall mean Robert F. Rozman and any person acting or purporting to

act on behalf of Robert F. Rozman.

5.    "*APA*" shall mean the "Asset Purchase Agreement" attached as **Exhibit 1** to

*WAMCO*'s Second Supplement to Claim.

6.    "*MOA*" shall mean the two-page "Memorandum of Agreement" attached as

**Exhibit 2** to *WAMCO*'s Second Supplement to Claim.

7.    "*Document*" shall mean any printed, typewritten, handwritten, machine readable, or otherwise recorded matter of any character, including, but not limited to, letters, memoranda, computer records, e-mails, computer data bases, computer printouts, computer cards, computer disks, computer hard drives, computer CD-ROM disks, charges, pleadings, telegrams, notes, catalogues, brochures, advertisements, diaries, reports, calendars, interoffice communications, statements, announcements, printouts, drawings, graphs, charts, photographs, tape recordings, phono records, disks, hard drives or data compilations or any other items included within the definition of "document" under Indiana law, and all nonidentical copies of the *document* by whatever means made.

8.    "*Communications*" shall include all discussions, conversations, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, telecopies, e-mails, or other forms of written or verbal intercourse, however transmitted, including reports, notes, memoranda, lists, agenda, and other *documents* and records of *communications*, and when used shall require a statement of the name of the individual who made the *communication*, the person(s) to whom he made it, the date it was made and the form in which it was made.

9.    "*Person*" shall mean a natural person or business entity, as the context may require.

10.    "*Relating to*" shall mean the following: containing, comprising, constituting, stating, setting forth, recording, contradicting, referring to, describing, discussing, reflecting, interpreting, identifying, concerning, or in any way pertaining to, or logically or factually connected to, in whole or in part, that matter, *document, communication, person* or subject.

11.    Except as otherwise provided herein, all other terms used in these requests are intended to have the same meaning that they have under Illinois law pertaining to discovery, unless the context requires a different meaning.

## Instructions

1.      These requests are continuing in nature, and *Diehl* must provide such additional information and *documents* as *Diehl*, *Diehl's* attorney, or anyone acting on *Diehl's* behalf or in concert with *Diehl* may have or may obtain between the time *Diehl's* answers and/or responses are first served and the time of trial or pertinent hearing. In response to these requests, *Diehl* must produce all *documents* available to *Diehl* or *Diehl's* attorney, including, but not limited to, *documents* in the possession of any attorneys, agents, investigators, representatives, or anyone acting in cooperation or in concert with the case to be defended by *Diehl*.

2.      If any request cannot be answered in full, after exercising due diligence to secure the documents requested, please so state and answer the requests to the extent possible, specifying the inability to produce the remainder of any such *documents* and stating whatever information or knowledge presently is available concerning the *documents* that could not be provided.

3.      If any *documents* are withheld on the basis of privilege, provide a privilege log identifying each *document* withheld. With respect to each *document* withheld, *describe* the privilege on which *you* are relying; the holder of the privilege, and the all other information required by Illinois law.

### DOCUMENTS REQUESTED

1.      All *documents identified* in *Diehl's* answers to *WAMCO*'s interrogatories.

2.      All *communications identified* in *Diehl's* answers to *WAMCO*'s interrogatories..

3.      All *documents* on which *Diehl* bases any interrogatory answer.

4.      All *communications* on which *Diehl* base any interrogatory answer.

5.      All *documents relating to* any claims by *Rozman* against *Diehl*.

6.      All *communications relating to* any claims by *Rozman* against *Diehl*.

7.    All *documents relating to* any claims by *Rozman* against *WAMCO*.

8.    All *communications relating to* any claims by *Rozman* against *WAMCO*.

9.    All *documents* on which *Diehl* bases any allegation in any pleading *Diehl* has filed in this arbitration.

10.    All reports prepared by any *person Diehl* expects to call as an expert witness at trial.

11.    All *documents* relied upon by any *person Diehl* expects to call as an expert witness at trial.

12.    All *documents relating to Ehrlich.*

13.    All *communications* between *Diehl* and *Ehrlich* during the last five calendar years.

14.    All *documents relating to Rozman*'s acquisition of all or any part of *Loukidis'* interests in *Diehl*.

15.    All *communications relating to Rozman*'s acquisition of all or any part of *Loukidis'* interests in *Diehl*.

16.    Copies of all receipts, cancelled checks, and/or other *documents relating to* payments by *Diehl* to *WAMCO* since the execution of the *MOA*.

17.    Copies of all receipts, cancelled checks, and/or other *documents relating to* payments by *Diehl* to *WAMCO* since the execution of the *APA*.

18.    *Identify* all *communications* from August 2005 to the present between *WAMCO* and *Diehl* by which *Diehl* notified *WAMCO* about any change in *Diehl*'s business conditions.

19.    All of *Diehl*'s payroll records for the years 2002 through 2007, inclusive.

20.    All *communications relating to* any reductions of the management fee between *WAMCO* and *Diehl*.

21.    All waivers granted by *WAMCO* to *Diehl relating to* contractual obligations owed by *Diehl* to *WAMCO*.

22.    All *communications* with Paul Ehrlich *relating to* the *lawsuit*, the *MOA* and/or the *APA*.

23.    All *communications* between *Carson Boxberger* and any party other than *Diehl relating to* the *MOA* and/or the *APA*.

24.    All *documents* executed by *Diehl* in connection with the *APA*. Include all versions of these *documents*, including drafts.

25.    All *documents* executed by *Diehl* at the closing of the sale contemplated by the *APA*. Include all versions of these *documents*, including drafts.

26.    All credit applications by *Diehl* to any bank or other lender during the last 5 calendar years.

27.    All loan documents executed by *Diehl* in favor of a bank or other lender during the last 5 calendar years.

28.    All *communications* between *Diehl* and any bank or other lender during the last 5 calendar years.

29.    All *documents* executed by *Diehl* and any bank or other lender during the last 5 calendar years.

30.    Annual financial statements prepared by, or on behalf of *Diehl* for the years 2001 – date, inclusive.

31.    Monthly financial reports prepared by, or on behalf of *Diehl* for the years 2001 – date, inclusive.

32.    *Diehl* corporate income tax returns for the years 2001 – date, inclusive. Include all schedules and worksheets.

33.    Monthly transactional reports listing all *Diehl* receipts and disbursements for each month from September 1, 2002 – present, inclusive.

34.    All statements received by *Diehl* from any bank, S&L, credit union, or other fiduciary institutions showing all accounts in which *Diehl* has held any funds or other assets for the years 2002 – present, inclusive.  Include the portions of each such statement itemizing the details of all transactions.

35.    Outstanding customer orders for products to be sold by *Diehl*.

36.    All *documents* and *communications relating to* due diligence provided by *WAMCO relating to* potential acquisitions by *Diehl* within the past five calendar years.

Respectfully submitted,

WISCONSIN AUTOMATED MACHINERY CORP.

**DATED:**  June 27, 2007           By: _____

One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for WAMCO
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

Diehl Woodworking Machinery Inc.
Parts and Tooling Sales by Month
January 2003 through April 2007

|  | Diehl | | | WAMCO | Total Parts | Tooling | Total |
|---|---|---|---|---|---|---|---|
|  | Parts | Recovered | Total |  | | | |
| Jan-03 | 159,591 | 8,515 | 168,106 | 68,507 | 236,613 | 2,060 | 238,673 |
| Feb-03 | 202,338 | 2,895 | 205,233 | 52,448 | 257,681 | 10,131 | 267,812 |
| Mar-03 | 175,721 | 4,840 | 180,560 | 33,801 | 214,361 | 9,388 | 223,749 |
| Apr-03 | 92,119 | 13,762 | 105,881 | 62,977 | 168,858 | 5,126 | 173,984 |
| May-03 | 107,662 | 58 | 107,720 | 98,844 | 206,564 | 2,096 | 208,660 |
| Jun-03 | 156,930 | 2,286 | 159,216 | 46,331 | 205,547 | 1,581 | 207,128 |
| Jul-03 | 119,431 | 6,651 | 126,083 | 21,079 | 147,161 | 14,149 | 161,310 |
| Aug-03 | 134,106 | 8,119 | 142,225 | 57,401 | 199,626 | 5,849 | 205,475 |
| Sep-03 | 107,650 | 15,394 | 123,044 | 48,158 | 171,202 | 12,832 | 184,034 |
| Oct-03 | 132,772 | 19,367 | 152,139 | 61,949 | 214,088 | 13,934 | 228,022 |
| Nov-03 | 108,424 | 3,452 | 111,876 | 23,236 | 135,112 | 5,696 | 140,808 |
| Dec-03 | 104,799 | 8,958 | 113,757 | 27,421 | 141,178 | 26,767 | 167,945 |
|  | 1,601,543 | 94,297 | 1,695,840 | 602,151 | 2,297,991 | 109,609 | 2,407,600 |
| Average | 133,462 | 7,858 | 141,320 | 50,179 | 191,499 | 9,134 | 200,633 |
| Jan-04 | 125,360 | 19,973 | 145,333 | 77,163 | 222,496 | 19,168 | 241,663 |
| Feb-04 | 58,447 | 7,436 | 65,883 | 80,461 | 146,344 | 4,741 | 151,084 |
| Mar-04 | 129,990 | 9,498 | 139,488 | 82,701 | 222,189 | 4,468 | 226,657 |
| Apr-04 | 109,115 | 4,220 | 113,334 | 59,257 | 172,591 | 5,135 | 177,726 |
| May-04 | 162,113 | 5,504 | 167,617 | 58,331 | 225,948 | 11,656 | 237,603 |
| Jun-04 | 87,392 | 9,053 | 96,445 | 99,106 | 195,551 | 7,032 | 202,583 |
| Jul-04 | 152,227 | 10,342 | 162,569 | 16,204 | 178,773 | 6,308 | 185,081 |
| Aug-04 | 114,645 | 12,868 | 127,512 | 51,548 | 179,060 | 12,206 | 191,266 |
| Sep-04 | 198,550 | 10,146 | 208,695 | 35,460 | 244,156 | 2,654 | 246,810 |
| Oct-04 | 159,143 | 20,521 | 179,664 | 17,719 | 197,382 | 6,588 | 203,971 |
| Nov-04 | 129,630 | 11,345 | 140,975 | 58,228 | 199,203 | 3,867 | 203,070 |
| Dec-04 | 127,237 | 13,195 | 140,433 | 27,435 | 167,867 | 6,005 | 173,873 |
|  | 1,553,846 | 134,102 | 1,687,948 | 663,612 | 2,351,560 | 89,827 | 2,441,387 |
| Average | 129,487 | 11,175 | 140,662 | 55,301 | 195,963 | 7,486 | 203,449 |
| Jan-05 | 115,183 | 10,053 | 125,236 | 41,715 | 166,951 | 8,793 | 175,744 |
| Feb-05 | 190,260 | 14,021 | 204,281 | 21,430 | 225,711 | 4,032 | 229,743 |
| Mar-05 | 158,794 | 11,673 | 170,467 | 31,359 | 201,826 | 5,341 | 207,167 |
| Apr-05 | 119,408 | 18,748 | 138,156 | 23,382 | 161,537 | 6,485 | 168,022 |
| May-05 | 114,517 | 16,579 | 131,096 | 48,202 | 179,298 | 12,322 | 191,620 |
| Jun-05 | 131,815 | 11,698 | 143,513 | 34,770 | 178,283 | 2,636 | 180,919 |
| Jul-05 | 92,899 | 21,487 | 114,386 | 25,014 | 139,400 | 4,292 | 143,692 |
| Aug-05 | 130,969 | 23,646 | 154,615 | 44,239 | 198,854 | 12,044 | 210,898 |
| Sep-05 | 114,619 | 13,048 | 127,667 | 68,115 | 195,782 | 2,167 | 197,949 |
| Oct-05 | 116,333 | 7,890 | 124,223 | 22,833 | 147,056 | 7,874 | 154,930 |
| Nov-05 | 78,738 | 10,192 | 88,930 | 22,097 | 111,027 | 785 | 111,812 |
| Dec-05 | 104,036 | 3,278 | 107,314 | 53,788 | 161,102 | 17,724 | 178,826 |
|  | 1,467,570 | 162,314 | 1,629,884 | 436,945 | 2,066,828 | 84,494 | 2,151,322 |
| Average | 122,297 | 13,526 | 135,824 | 36,412 | 172,236 | 7,041 | 179,277 |
| Jan-06 | 139,134 | 3,307 | 142,441 | 38,350 | 180,791 | 3,183 | 183,973 |
| Feb-06 | 103,510 | 8,572 | 112,082 | 52,991 | 165,073 | 3,239 | 168,312 |
| Mar-06 | 151,859 | 15,856 | 167,715 | 58,453 | 226,167 | 3,161 | 229,328 |
| Apr-06 | 105,180 | 15,521 | 120,701 | 32,730 | 153,431 | 1,771 | 155,202 |
| May-06 | 110,797 | 11,818 | 122,615 | 26,922 | 149,538 | 1,765 | 151,303 |
| Jun-06 | 119,647 | 35,167 | 154,814 | 32,696 | 187,510 | 12,327 | 199,837 |
| Jul-06 | 81,949 | 14,067 | 96,016 | 18,505 | 114,521 | 16,236 | 130,757 |
| Aug-06 | 110,723 | 6,510 | 117,233 | 17,914 | 135,146 | 3,163 | 138,309 |
| Sep-06 | 105,267 | 7,510 | 112,777 | 41,159 | 153,936 | 6,037 | 159,973 |
| Oct-06 | 113,264 | 5,672 | 118,936 | 42,222 | 161,158 | 3,781 | 164,939 |
| Nov-06 | 96,247 | 11,581 | 107,828 | 25,170 | 132,999 | 2,228 | 135,226 |
| Dec-06 | 73,023 | 4,750 | 77,773 | 85,439 | 163,211 | 7,648 | 170,859 |
|  | 1,310,600 | 140,330 | 1,450,930 | 472,551 | 1,923,481 | 64,538 | 1,988,019 |
| Average | 109,217 | 11,694 | 120,911 | 39,379 | 160,290 | 5,378 | 165,668 |
| Jan-07 | 117,003 | 11,847 | 128,850 | 20,996 | 149,846 | 5,713 | 155,559 |
| Feb-07 | 105,049 | 14,977 | 120,026 | 18,569 | 138,595 | 6,492 | 145,087 |
| Mar-07 | 126,779 | 13,086 | 139,865 | 14,952 | 154,818 | 10,007 | 164,825 |
| Apr-07 | 87,580 | 12,254 | 99,834 | 20,600 | 120,434 | 1,812 | 122,246 |
|  | 436,411 | 52,165 | 488,576 | 75,117 | 563,692 | 24,024 | 587,717 |
|  | 109,103 | 13,041 | 122,144 | 18,779 | 140,923 | 6,006 | 146,929 |

000043

12

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Central Case Management Center*
Molly Bargenquest
Vice President
Tracey Patten
Assistant Vice President

13455 Noel Road - Suite 1750, Dallas, TX 75240
telephone: 972-702-8222 facsimile: 972-490-9008
internet: http://www.adr.org/

June 29, 2007

**VIA EMAIL ONLY**

Andrew R. Schwartz, Esq.
Sugar, Friedberg & Felsenthal
30 North LaSalle Street, Suite 3000
Chicago, IL  60602

Larry L. Barnard, Esq.
Carson Boxberger LLP
1400 One Summit Square
Ft. Wayne, IN  46802

Re: 51 180 01918 06
    Wisconsin Automated Machinery Corp.
    and
    Diehl Woodworking Machinery
    - Chicago, Illinois
    Claim: 225,000.00

Gentlemen:

This will confirm a preliminary hearing in the above matter was held on June 28, 2007, and the following arrangements were made:

An additional preliminary hearing shall be held on July 10, 2007 at 3:00 p.m. CDT.

Please dial into the conference call using the following telephone number and passcode:

Telephone: 888-537-7715
Passcode: 60867547#

On June 29, 2007, Respondent will produce to Claimant copies of all documents that Respondent furnished to counsel for WAMCO and Jay Ehrlich in the pending U.S. District Court litigation.

On July 5, 2007, Respondent will file its response to Claimant's letter of June 27, 2007 requesting the production of certain documents and other information.

All deadlines shown herein will be strictly enforced. After such deadline, the parties may not file such motions except with the permission of the arbitrator, good cause having been shown.

This order shall continue in effect unless and until amended by subsequent order of the arbitrator.

You may also share and manage correspondence through AAA's WebFile. The Case Manager will determine who should receive viewing privileges and grant access accordingly.

If you have any questions, please do not hesitate to call.

Sincerely,

*Wilma Rooney*

Wilma Rooney
Case Manager
866 440 1796
RooneyW@adr.org

*Supervisor Information: Jennifer L. Bell, 972 702 8222, Bellj@adr.org*

cc:    Thomas H. Morsch, Esq., **VIA EMAIL ONLY**
       Bruce I. Boxberger, Esq., **VIA EMAIL ONLY**

13

American Arbitration Association
*Dispute Resolution Services Worldwide*

Central Case Management Center
Molly Bargenquest
Vice President
Tracey Patten
Assistant Vice President

July 11, 2007

13455 Noel Road - Suite 1750, Dallas, TX 75240
telephone: 972-702-8222 facsimile: 972-490-9008
internet: http://www.adr.org/

**VIA EMAIL ONLY**

Andrew R. Schwartz, Esq.
Sugar, Friedberg & Felsenthal
30 North LaSalle Street, Suite 3000
Chicago, IL 60602

Larry L. Barnard, Esq.
Carson Boxberger LLP
1400 One Summit Square
Ft. Wayne, IN 46802

Re: 51 180 01918 06
    Wisconsin Automated Machinery Corp.
    and
    Diehl Woodworking Machinery
    - Chicago, Illinois
    Claim: $225,000.00
    Counterclaim $225,000.00

Gentlemen:

This will acknowledge receipt of a letter dated July 5, 2007, from Mr. Boxberger, a copy of which we note has been exchanged with the other party.

This will also acknowledge receipt of a letter dated July 9, 2007, from Mr. Schwartz, a copy of which we note has been exchanged with the other party.

This will confirm the aforementioned was submitted directly to the Arbitrator.

This will also confirm a preliminary hearing in the above matter was held on July 10, 2007, and the following arrangements were made:

An additional preliminary hearing shall be held on July 24, 2007 at 3:00 p.m. CDT.

Please dial into the conference call using the following telephone number and passcode:

Telephone: 888-537-7715
Passcode: 60867547#

Respondent will produce its monthly or other periodic financial statements for the period November 1, 2006 to June 30, 2007, including financial statements for Respondent's most recent fiscal year.

Such documents will be produced by July 20, 2007.

Claimant may use the financial statements only for purposes of this arbitration proceeding, and may not furnish copies or disclose the contents thereof to persons not directly involved in the proceeding.

Except as provided above, Claimant's requests are denied.

Sincerely,

*Wilma Rooney*

Wilma Rooney
Case Manager
866 440 1796
RooneyW@adr.org

*Supervisor Information: Jennifer L. Bell, 972 702 8222, Bellj@adr.org*

cc: Thomas H. Morsch, Esq., **VIA EMAIL ONLY**
  Bruce Boxberger, Esq., **VIA EMAIL ONLY**

/4/

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| WISCONSIN AUTOMATED<br>MACHINERY CORP. | )<br>)<br>) |
| Claimant | )<br>)<br>)   Chicago, Illinois |
| and | )<br>)   Claim No: 51 180 01918 06 |
| DIEHL WOODWORKING<br>MACHINERY, INC. | )<br>)<br>) |
| Respondent | )<br>) |

## **MOTION TO CONTINUE HEARING**

COMES NOW the Respondent, Diehl Woodworking Machinery, Inc., by counsel, and hereby moves to continue the hearing on the Arbitration currently set for August 13 and 14, 2007. In support of this Motion, Respondent would show the Arbitrator as follows:

1. This matter is currently set for hearing on August 13 and 14, 2007 in Chicago, Illinois.

2. The United States District Court for the Northern District of Indiana has now scheduled the Motion to Stay Arbitration Proceedings for hearing on August 16, 2007 in South Bend, Indiana.

3. The interest of the convenience of the parties and the Arbitrator will be served by a continuance of the hearing of this Arbitration proceeding until such time as the United States District Court for the Northern District of Indiana has ruled on the Motion to Stay Arbitration Proceedings.

4.  The Arbitrator should wait until the Court has determined whether any or all of this proceeding should be stayed before proceeding to the hearing of this matter so that the Arbitrator knows precisely what issues will be before him at the time of the hearing.

WHEREFORE, Respondent, Diehl Woodworking Machinery, prays that the Arbitrator grant its motion and continue the hearing until after the District Court rules on the Motion to Stay Arbitration, and for all other just and proper relief in the premises.

Respectfully submitted,

CARSON BOXBERGER LLP

By _____

Bruce O. Boxberger (3535-02)
Larry L. Barnard (11904-49)
Attorneys for Respondent

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\WAMCO Shares Dispute\Motion to Continue Hearing.doc

## CERTIFICATE OF SERVICE

This will certify that on this 7th day of August, 2007 a true and complete copy of the above and foregoing document was mailed to Andrew Schwartz, 30 N. LaSalle St., #3000, Chicago, Illinois 60602.

_____
(Larry L. Barnard)

2

$15$

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## CHICAGO, ILLINOIS

| | | |
|---|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP., | ) ) ) | |
| *Claimant,* | ) ) | |
| v. | ) ) | No. 51 180 01918 06 |
| DIEHL WOODWORKING MACHINERY, INC., | ) ) | Arbitrator Morsch |
| *Respondent.* | ) ) | |

## CLAIMANT'S WITNESS LIST

Claimant Wisconsin Automated Machinery Corp. hereby identifies the following

witnesses it intends to call at the arbitration hearing in this matter:

1.    Jay Ehrlich

2.    Robert Rozman

3.    Michael Ruffner

Respectfully submitted,

**WISCONSIN AUTOMATED MACHINERY CORP.**

**DATED:** August 8, 2007       By: _____
One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for Wisconsin Automated Machinery Corp.
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

118611_1.DOC

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
CHICAGO, ILLINOIS

| | | |
|---|---|---|
| WISCONSIN AUTOMATED MACHINERY CORP., | ) ) ) | |
| *Claimant,* | ) ) | |
| v. | ) ) | No. 51 180 01918 06 |
| DIEHL WOODWORKING MACHINERY, INC., | ) ) | Arbitrator Morsch |
| *Respondent.* | ) ) | |

## CLAIMANT'S LIST OF HEARING EXHIBITS

Claimant Wisconsin Automated Machinery Corp. ("WAMCO") hereby identifies the

following exhibits as those it intends to introduce at the hearing in this matter:

The following exhibits were produced by Diehl in the Wabash/Federal litigation, and are

referenced according to the bates numbering by Diehl:

- 000007-000012
- 000018-000020
- 000022
- 000027-000028
- 000036-000037
- 000040
- 000047
- 000049
- 000051-000054
- 000055
- 000060-000061
- 000069-000070
- 000078-000079
- 000080-000081
- 000082
- 000084-000085
- 000087-000088
- 000093-000094
- 000095-000096
- 000102

- 000103-000166
- 000167-000168
- 000195
- 000207-000211
- 000227
- 000228
- 000319
- 000320-000334
- 000343
- 000493-000494
- 000497-000498
- 000506-000508
- 000514-000518
- 000519
- 000528
- 000533
- 000534
- 000536
- 000596
- 000602

- 000604
- 000619
- 000624-000625
- 000656-000657
- 000667-000670
- 000685-000687
- 000706-000707
- 000726
- 000730
- 000753
- 000755-000758
- 000800-000802
- 000803-000804
- 000805-000806
- 000811-000816
- 000827-000828
- 000829-000835
- 000837
- 000855-001446

The following exhibits were produced by WAMCO in the Wabash/Federal litigation, and are referenced according to the bates numbering by WAMCO:

- D0002
- D0015
- D0021-D0024
- D0032-D0034
- D0042-D0043
- D0045-D0048
- D0050-D0051
- D0052

- D0055
- D0057-D0058
- D0060
- D0062
- D0069
- D0071-D0081
- D0099-D0100
- D0103-D0113

- D0122
- D0124
- D0126
- D0127-D0149
- D0150-D0152
- D0176

The following exhibits were generated in the course of the Wabash/Federal litigation, but do not have bates numbers. These documents are already within the possession of Diehl's counsel, and WAMCO will simply reference them here:

- Current docket report for Federal litigation
- Diehl's Interrogatory Answers
- Diehl's Complaint
- Diehl's Amended Complaint
- Diehl's Supplemental Complaint for Interpleader in Federal litigation
- Letter from Bruce Boxberger dated June 27, 2007
- Diehl's Motions for Leave to Tender Funds

The following exhibits are hereby produced:

- September 5, 2006 letter from Michael Moss
- September 21, 2006 Wabash River L.L.C. members' resolution
- WAMCO corporate credit card statement dated 11/21/05 (all but last 4 digits of account number redacted)

WAMCO reserves its right to introduce additional exhibits that were previously produced, as needed for rebuttal.

Respectfully submitted,

**WISCONSIN AUTOMATED MACHINERY CORP.**

**DATED:** August 8, 2007

By: _____
One of its attorneys

*Andrew R. Schwartz, Esq.*
SUGAR, FRIEDBERG & FELSENTHAL LLP
Counsel for Wisconsin Automated Machinery Corp.
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

# MICHAEL H. MOSS

**Attorney at Law**
1550 N. Northwest Highway, Suite #203
Park Ridge, Illinois 60068
(847) 827-8100
Fax: (847) 827-4964

September 5, 2006

<u>For Settlement Purposes Only</u>

Andrew Schwartz, Esq.
30 N. LaSalle Street, Suite 3000
Chicago, Illinois 60602

Dear Andy;

This letter is in response to your request to me for a settlement proposal. Although you believe that any proposal should be a two-way street, I'm not certain that can be accomplished in this situation where there are multiple factors and parties to arrive at any transaction structure. Also, bear in mind that the key management personnel have no desire to give up their stock ownership or their operational rights. I do not represent those individuals or Diehl, but I have met with them and, as a result, can make that statement with much certainty.

In any event, the settlement proposal (which I cannot overemphasize is non-negotiable because it is generous, it is right for everybody's sake, and we are dealing with a small company which has limited funds) is as follows:

1. Based upon a valuation of $500,000 for the stock of Diehl, Jay's stock will be purchased by Bob Rozman for $50,000 cash and a note for $37,500, and Paul's stock will be purchased by Bob Rozman for $187,500 payable as $100,000 cash and a promissory note (payable over some reasonable period and at a going rate of interest) for $87,500. I do not represent Bob Rozman, but I have good reason to believe that these terms will be acceptable to him. Please understand that Jay is not required to sell his shares in Diehl, Bob Rozman is the only shareholder willing to acquire any of Diehl's shares, and Bob's maximum available cash is $150,000 (divided among Jay, Jim and Paul).

2. Paul will waive the approximately $95,000 due to him from Jay, and in addition thereto will assign to Jay his rights in $37,500 of the note due to him from Bob Rozman (relative to the sale of Paul's stock).

3. The management fee due to WAMCO from Diehl will be reduced to $140,000, which amount may be paid in cash subject to the approval of Diehl. Although I do not represent Jim Loukidis or Diehl, I believe that they will accept this resolution.

4. The purchase note payable from Diehl to WAMCO will continue to be paid as due.

5. Paul will purchase Jay's interest in Allenton for $25,000 (with no deferred payout) if Jay desires to sell.

6. Jay and Paul to agree upon a grandparents' visitation schedule with the agreement to be court approved. (This is a significant issue to be resolved, and I sincerely hope that you agree.)

Letter to Andrew R. Schwartz
September 5, 2006
Page 2

Insofar as the economics of this transaction to your client, let me further explain:

On a "best case basis" without consideration of the sale of WAMCO or Allenton which will be at Jay's option, Jay would collect $366,000 as follows:

| | |
|---|---|
| Management Fee: $441,000 x 2/3 ownership | $ 294,000 |
| Purchase Note: 250,000 x 2/3 | 167,000 |
| | $ 461,000 |
| Less: due to Paul | -95,000 |
| | $ 366,000 |

Pursuant to this settlement proposal Jay will collect as follows:

| | |
|---|---|
| Management Fee - $140,000 x 2/3 | $ 93,000 |
| Assignment of Paul's note | 37,500 |
| Purchase Note: 250,000 x 2/3 | 167,000 |
| | $297,500 |

As an added comment, it appears to me as if your evaluation of the management fee issue is based upon the merits of your case for which you are certainly prejudiced (and have a right to be so). For purposes of this settlement, however, our position is that the issues of that matter are:

1. There are hazards of any litigation.

2. Diehl cannot afford to continue to pay the $15,000 per month plus the purchase note plus rent of $4,500 per month (for a building worth approximately only $200,000). In fact, it is "my" belief that if this ugly situation continues it will not be long before Diehl will have to seek protection of the U.S. Bankruptcy Court.

3. As noted above, the total difference from the maximum which Jay can ultimately collect is $68,500 less the costs of litigation.

4. Paul is giving up $132,500 ($95,000 + $37,500) to make all of this happen.

Insofar as the Diehl and Allenton ownership interests being sold, these are not marketable securities and as such if Jay does not sell pursuant to this proposal, he could be otherwise simply holding pieces of paper until a buyout upon his death. Also, I cannot imagine that Jay believes that Diehl's value is any more than its book value of $800,000. Based upon that assumption, Jay will realize only $27,500 less than the maximum as follows:

| | |
|---|---|
| $800,000 @ 17-1/2% = | $140,000 |
| Less: | |
| Buyout proposal ($500,000 @ 17-1/2%) | <87,500> |
| Allenton proceeds | <25,000> |
| | $ 27,500 |

Letter to Andrew R. Schwartz
September 5, 2006
Page 3

As a final comment, please allow me to provide the following quotes from Bob Rozman to Paul after Bob returned last week from a major trade show:

"I have a limited amount of time left in my working career and my energy level is not what it was a couple of years ago. When you combine the basic business challenge ahead of Diehl with the current ownership problems we are having, it becomes difficult to focus on the business of running this business. All I know is that I have to get back to selling more machinery, improving the quality of my people and making sure I'm backing up for the aging management team that's here. I don't want to worry about management fees, what Jay will do to Jim, or what either will have to do without Diehl for financial support. I'm concerned about how Diehl will support me and the other people who have and want to continue to work here to make a living ... and make the company successful in its transition to a more specialized machine builder."

"The only real equity of this company is a nucleus of several people who are here and if I lose, or sense that I would lose that in the next year or so because they can't or don't want to deal with the uncertainty of the situation that exists, I'm no longer a buyer. I think I represent a good portion of that equity, but I absolutely need the cooperation and dedication of these other people and I'm spending way too much time now, working on shoring up their confidence and re-assuring them that things will be ok. In my opinion, the results of the Atlanta show were not that good for us ... not the machine sales I had hoped for and expected. Yes, there are opportunities, but this business will never again generate the easy parts business it did in the past. We'll all work hard to make a living and any success we'll enjoy, we'll have earned."

Andy, I believe that we are all anxious to resolve this matter at the earliest possible date. Thus your response by the end of the day on this Thursday will be greatly appreciated.

Very truly yours,

Michael H. Moss

MHM:mh

WABASH RIVER L.L.C.
981 WABASH STREET
WABASH, INDIANA

Pursuant to Article VII Paragraph 7.1 (c) In lieu of holding a meeting the Members
may vote otherwise take action by a written instrument indicating the consent of
Members holding the required percentage of the membership interests.

Article VI Paragraph 6.3 provides in part as follows:
A manager may be removed and replaced with another manager upon the consent
of the members holding a majority of the Membership interests.

Article V Paragraph 5.1 provides, For purposes hereof at any time a "Majority of
Membership interests" shall mean one or Membership interests that in the
aggregate exceed 50% of all membership interests.

### MAJORITY WRITTEN CONSENT
### OF THE MEMBERS OF WABASH RIVER L.L.C.

The undersigned being the majority of the members of Wabash River L.L.C. do
hereby consent to the adoption of the following resolutions:

Jay Ehrlich shall be removed as Manager of Wabash River L.L.C. and Paul
Ehrlich be elected to replace him.

Rent due and payable from Diehl Woodworking Machinery Inc. (if any) due for the
Months of July, August and September 2006 shall be waived.

21 ST Day of SEPT, 2006

_____
Paul Ehrlich

_____
Dimitris Loukidis

_____
Jay Ehrlich

Detach Here: To ensure proper credit, please return upper portion with remittance to M&I Bank.

## CARDHOLDER SUMMARY

| JAY EHRLICH | Previous Balance | Purchases + And Other Debits | Cash + Advances | Finance - Charges | Credits - Payments | New Balance |
|---|---|---|---|---|---|---|
| 1163 | $378.70 | $1,996.90 | $0.00 | $0.00 | $378.70 | $1,996.90 |
| Cardholder Total | $378.70 | $1,996.90 | $0.00 | $0.00 | $378.70 | $1,996.90 |

## FINANCE CHARGE SUMMARY

| | Average Daily Balance | Monthly Periodic Rate | Corresponding Annual Percentage Rate | Periodic Finance Charge |
|---|---|---|---|---|
| CASH ADVANCES | $0.00 | 1.062% | 12.75% | $0.00 |
| PURCHASES | $0.00 | 1.062% | 12.75% | $0.00 |

PERIODIC RATE MAY VARY
ANNUAL PERCENTAGE RATE 0.00%

GRACE PERIOD
To Avoid a Finance Charge On Purchases, Pay Entire New Balance By Payment Due Date.
Finance Charge Accrues On Cash Advances Until Paid And Will Be Billed On Your Next Statement.

## CARDHOLDER ACTIVITY

| Post Date | Tran Date | Reference Number | Transaction Description | Amount |
|---|---|---|---|---|
| 10-21 | 10-21 | 24210732520050004B0194 | FRANKLIN & WASHINGTON CHICAGO IL | 25.00 |
| 10-24 | 10-21 | 24164075297992698100A0 | AMOCO OIL  01055151 CHICAGO IL | 47.40 |
| 10-25 | 10-24 | 24210732520050050050587 | FRANKLIN & WASHINGTON CHICAGO IL | 20.00 |
| 10-28 | 10-27 | 24210735301050050031444 | FRANKLIN & WASHINGTON CHICAGO IL | 25.00 |
| 10-31 | 10-30 | 24423533032784872854657 | MARATHON ASHLAND 05963 CHICAGO IL | 44.00 |
| 11-01 | 10-31 | 24423533050050050058271 | FRANKLIN & WASHINGTON CHICAGO IL | 25.00 |
| 11-01 | 11-01 | 24210735306050050070975 | FRANKLIN & WASHINGTON CHICAGO IL | 25.00 |
| 11-04 | 11-04 | 74477080531090000701317 | PAYMENT RECEIVED - THANK YOU | 378.70CR |
| 11-08 | 11-07 | 24210735312005005917034 | FRANKLIN & WASHINGTON CHICAGO IL | 25.00 |
| 11-08 | 11-09 | 24610435314043139158833 | ORBITZ H0GO 08005654546 IL | 6.99 |
| 11-10 | 11-09 | 24210735314055005535570 | ILLINOIS CENTER CHICAGO IL | 2.00 |
| 11-10 | 11-09 | 24058671531469190026574S | AMERICAN AIR001154110B117 MANKATO MN | 652.40 |
| | | | ORD AA L LAX AA L ORD                     DEPARTURE DATE 11-15-05 | |
| | | | EHRLICH/JAY | |
| | | | FRANKLIN & WASHINGTON CHICAGO IL | |
| 11-11 | 11-10 | 24210732513500500064621 | FRANKLIN & WASHINGTON CHICAGO IL | 25.00 |

| FOR CUSTOMER SERVICE OR | ACCOUNT NUMBER | | ACCOUNT SUMMARY | |
|---|---|---|---|---|
| LOST/STOLEN CARDS CALL | | | PREVIOUS BALANCE | 378.70 |
| | 1163 | | PURCHASES & OTHER CHARGES | 1,996.90 |
| TOLL FREE  1-866-346-5343 | STATEMENT DATE | PAYMENT DUE DATE | CASH ADVANCES | .00 |
| INTERNATIONAL  1-608-240-1700 | 11/21/05 | 12/18/05 | CASH ADVANCE FEES | .00 |
| | | | LATE PAYMENT CHARGE | .00 |
| | CREDIT LIMIT | AVAILABLE CREDIT | FINANCE CHARGE | .00 |

Detach Here: To ensure proper credit, please return upper portion with remittance to M&I Bank.

## CARDHOLDER ACTIVITY

| Post Date | Tran Date | Reference Number | Transaction Description | Amount |
|---|---|---|---|---|
| 11-11 | 11-10 | 24610435914500408135613 | HYATT HOTELS W. HOLLYWOOD W. HOLLYWOOD CA ARRIVAL: 11-10-05 | 442.32 |
| 11-15 | 11-14 | 24210735319905000676272 1163 | HYATT HOTELS W. HOLLYWOOD CA | 20.00 |
| 11-15 | 11-15 | 24403695203190001415312 | FRANKLIN & WASHINGTON CHICAGO IL | 41.36 |
| 11-16 | 11-16 | 24761075320512170011133 | BIZOU GARDEN BISTRO SANTA MONICA CA | 201.55 |
| 11-17 | 11-17 | 24184055323780008404654 | KOI LA LOS ANGELES CA | 16.33 |
| 11-18 | 11-18 | 24210735323050300176940 | EXXONMOBIL34 015 1562 LOS ANGE CA | 25.00 |
| 11-18 | 11-18 | 24184055323793217022 | FRANKLIN & WASHINGTON CHICAGO IL | 44.49 |
| 11-18 | 11-17 | 24184075323993524650 | AMOCO OIL 01663084 CHICAGO IL | 70.35 |
| 11-18 | 11-17 | 24655755322811393524650 | FOX RENT A CAR INC LOS ANGELES CA | 91.00 |
| 11-18 | 11-17 | 24610435322000409113080 | HYATT HOTELS W. HOLLYWOOD W. HOLLYWOOD CA ARRIVAL: 11-15-05 | |
| 11-18 | 11-17 | 24184075322509000008440 | 1163 O'HARE AIRPORT09101410 CHICAGO IL ARRIVAL:11-15-05 | 102.00 |

$\big/\big/_{\!\!\sigma}$



BEFORE THE AMERICAN ARBITRATION ASSOCIATION

WISCONSIN AUTOMATED       )
MACHINERY CORP.             )
                                )
            Claimant      )
                                )     Chicago, Illinois
     and                )
                                )     Claim No: 51 180 01918 06
DIEHL WOODWORKING        )
MACHINERY, INC.              )
                                )
            Respondent    )

## RESPONDENT'S WITNESS AND EXHIBIT LIST

### I.    WITNESS LIST

Respondent, Diehl Woodworking Machinery, Inc. identifies the following witnesses which it may call at the Arbitration hearing in this matter:

1.    Robert Rozman;

2.    Jay Ehrlich;

3.    Paul Ehrlich;

4.    Dimitris Loukidis; and

5.    All witnesses listed by Claimant.

### II.    EXHIBIT LIST

Respondent, Diehl Woodworking Machinery, Inc. hereby identifies the following exhibits which it may introduce at the hearing of this matter:

1.    All exhibits listed by the Claimant;

2.    Memorandum of Agreement (p. 69-70);

3.    WAMCO purchase note, schedule payment, and actual payment (p. 78-79);

4.    Email dated August 15, 2006 (p. 80-85);

5.    Email dated August 2, 2005 (p. 87-88);

6.    Email dated July 10, 2006 (p. 102);

7.    Asset Purchase Agreement dated September 13, 2002 (p. 103-144);

8.    Record of Special Shareholder's Meeting dated September 19, 2006 (p. 192-194);

9.    Transcript of 2006 Annual Shareholder's Meeting (p. 196-206);

10.   Minutes of 2005 Annual Board Meeting (p. 207-209);

11.   Diehl Woodworking weekly financial reports (p. 855-1026);

12.   Diehl Woodworking monthly financial reports (p. 1027-1446);

13.   Receipts for deposits of payments into Court for Interpleader Action; and

14.   Any other document necessary for rebuttal.

Respectfully submitted,

CARSON BOXBERGER LLP

By _____
Larry L. Barnard (11904-49)
Attorneys for Respondent

1400 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 423-9411
F:\Diehl Woodworking Machinery 19,554\WAMCO Shares Dispute\Witness & Exhibit List.doc

## CERTIFICATE OF SERVICE

This will certify that on this  9th  day of August, 2007 a true and complete copy of the above and foregoing document was mailed to Andrew Schwartz, 30 N. LaSalle St., #3000, Chicago, Illinois 60602.

_____
(Larry L. Barnard)

2