BEFORE THE AMERICAN ARBITRATION ASSOCIATION

WISCONSIN AUTOMATED           )
MACHINERY CORP.               )
                              )
    Claimant              )
                              )        Chicago, Illinois
   and                     )
                              )        Claim No:  51 180 01918 06
DIEHL WOODWORKING             )
MACHINERY, INC.               )
                              )
    Respondent            )

## RESPONDENT'S EXHIBITS

1.    Memorandum of Agreement (p. 69-70);

2.    WAMCO purchase note, schedule payment, and actual payment (p. 78-79);

3.    Email dated August 15, 2006 (p. 80-85);

4.    Email dated August 2, 2005 (p. 87-88);

5.    Email dated July 10, 2006 (p. 102);

6.    Asset Purchase Agreement dated September 13, 2002 (p. 103-144);

7.    Record of Special Shareholder's Meeting dated September 19, 2006 (p. 192-194);

8.    Transcript of 2006 Annual Shareholder's Meeting (p. 196-206);

9.    Minutes of 2005 Annual Board Meeting (p. 207-209);

10.    Diehl receipts for funds paid into Court.

CARSON BOXBERGER LLP

1

MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (hereinafter called "Agreement") is made and entered into as of the _____ day of August, 2005, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "WAM"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Diehl");

### W I T N E S S E T H:

WHEREAS, Diehl has previously paid, and is currently paying, to WAM or its affiliates a monthly management fee for management consulting and services, which fee has varied from time to time upon the mutual agreement of the parties; and

WHEREAS, the parties intend that WAM shall continue to provide such management consulting and services to Diehl, and Diehl shall continue to pay a monthly management fee therefor as business conditions permit and in accordance with the terms and conditions herein set forth:

NOW, THEREFORE, in consideration of the premises hereof (which the parties hereby incorporate and make a part of their agreements herein) and the mutual agreements hereinafter set forth, it is agreed as follows:

1.      Wam hereby waives all unpaid and accrued management fees, if any, due from Diehl prior to July 31, 2005. WAM shall continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl and, effective as of July 31, 2005, Diehl shall pay to WAM, as consideration for such management consulting and services provided, a management fee of $12,500 per month (increased from the immediately preceding fee of $10,000 per month) through December 31, 2005, and $15,000 per month commencing January 31, 2006, through December 31, 2008; provided however that (a) such mutual commitments to provide such services and to pay such management fee shall terminate as of January 1, 2009, unless extended by the mutual agreement of the parties, and (b) from time to time the said management fee might be

reconsidered and reduced, increased, eliminated and/or reinstated by mutual agreement of the parties as Diehl's business conditions requires, and WAM shall only be responsible to provide consulting and services at a level consistent with the then current level of such management fee.

2. The parties shall cooperate and use reasonable efforts to inform each other concerning any change in such business conditions and  anticipated changes in the management fee level and commensurate level of management consulting and services to be provided.

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as of the day and year first above written.

WISCONSIN AUTOMATED MACHINERY CORP.

By _____

Title _____

DIEHL WOODWORKING MACHINERY, INC.

By _____

Title _____

2

000070

2

Diehl Woodworking Machinery, Inc.
WAMCO Purchase Note
Scheduled Payment vs. Actual Payment

|  | Scheduled | Paid |
|---|---|---|
| January-03 | 10,000.00 | 10,000.00 |
| February-03 | 10,000.00 | 10,000.00 |
| March-03 | 10,000.00 | 10,000.00 |
| April-03 | 10,000.00 | 10,000.00 |
| May-03 | 10,000.00 | 10,000.00 |
| June-03 | 10,000.00 | 10,000.00 |
| July-03 | 10,000.00 | 10,000.00 |
| August-03 | 10,000.00 | 10,000.00 |
| September-03 | 10,000.00 | 10,000.00 |
| October-03 | 10,000.00 | 10,000.00 |
| November-03 | 10,000.00 | 10,000.00 |
| December-03 | 10,000.00 | 10,000.00 |
| January-04 | 10,000.00 | 10,000.00 |
| February-04 | 10,000.00 | 10,000.00 |
| March-04 | 10,000.00 | 10,000.00 |
| April-04 | 10,000.00 | 10,000.00 |
| May-04 | 10,000.00 | 10,000.00 |
| June-04 | 10,000.00 | 10,000.00 |
| July-04 | 10,000.00 | 10,000.00 |
| August-04 | 10,000.00 | 10,000.00 |
| September-04 | 10,000.00 | 10,000.00 |
| October-04 | 10,000.00 | 10,000.00 |
| November-04 | 10,000.00 | 10,000.00 |
| December-04 | 10,000.00 | 10,000.00 |
| January-05 | 10,000.00 | 10,000.00 |
| February-05 | 10,000.00 | 10,000.00 |
| March-05 | 10,000.00 | 10,000.00 |
| April-05 | 10,000.00 | 10,000.00 |

Diehl Woodworking Machinery, Inc.
WAMCO Purchase Note
Scheduled Payment vs. Actual Payment

|  | Scheduled | Paid |
|---|---|---|
| May-05 | 10,000.00 | 10,000.00 |
| June-05 | 10,000.00 | 10,000.00 |
| July-05 | 10,000.00 | 10,000.00 |
| August-05 | 10,000.00 | 10,000.00 |
| September-05 | 10,000.00 | 10,000.00 |
| October-05 | 10,000.00 | 10,000.00 |
| November-05 | 10,000.00 | 10,000.00 |
| December-05 | 10,000.00 | 10,000.00 |
| January-06 | 10,000.00 | 10,000.00 |
| February-06 | 10,000.00 | 10,000.00 |
| March-06 | 10,000.00 | 10,000.00 |
| April-06 | 10,000.00 | 10,000.00 |
| May-06 | 10,000.00 | 10,000.00 |
| June-06 | 10,000.00 | 10,000.00 |
| July-06 | 10,000.00 | 10,000.00 |
| August-06 | 10,000.00 | 10,000.00 |
| September-06 | 10,000.00 | 10,000.00 |
| October-06 | 10,000.00 | 10,000.00 |
| November-06 | 10,000.00 | 10,000.00 |
| December-06 | 10,000.00 | 10,000.00 |
| January-07 | 10,000.00 | 10,000.00 |
| February-07 | 10,000.00 | 10,000.00 |
| March-07 | 10,000.00 | 10,000.00 |
| April-07 | 10,000.00 | 10,000.00 |
| May-07 | 10,000.00 | 10,000.00 |

3

**Robert Rozman**

| | |
|---|---|
| **From:** | <Addisonst@aol.com> |
| **To:** | <rfr@diehlmachines.com>; <mike.ruffner@diehlmachines.com> |
| **Cc:** | <jiml@peerlessusa.com>; <jimservi@sbcglobal.net> |
| **Sent:** | Sunday, July 16, 2006 11:01 AM |
| **Subject:** | Management Fee |

Bob:

I have received notice from Jim Servi of a cut in management fees to Wamco.

There has been no agreement to reduce the management fee. Moreover, I made a proposal to reduce it based on loan abatements by Paul Ehrlich to which, I never received a response.

I fully expect that the entire management fee will be paid for July and going forward unless and until we execute some sort of written agreement stating otherwise.

Jay

**Robert Rozman**

| | |
|---|---|
| **From:** | "Michael W. Ruffner" <mike.ruffner@diehlmachines.com> |
| **To:** | "Loukidis, Jim" <jiml@wamcousa.com>; "Ehrlich, Paul" <peerlesssaws@msn.com>; "Ehrlich, Jay" <addisonst@aol.com>; "Rozman, Robert" <rfr@diehlmachines.com> |
| **Sent:** | Monday, June 26, 2006 2:15 PM |
| **Attach:** | Salary Reduction Plan - 060615.xls |
| **Subject:** | Salary Reduction Plan - 060615.xls |

In accordance with Bob Rozman's memo of 06/16/06, salaries and wages for the office have been reduced by 10% effective June 16.  Obviously only half of the monthly decrease will be realized in June.

Mike

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Monday, August 15, 2005 1:06 PM |
| **Subject:** | Diehl Mgmt Fee Obligation, Diehl Lease & Other Issues |

Paul...attached is my repsonse to yours of the 13th.

August 15, 2005

RE:   Your email of August 13, 2005

Paul...

I will send a note to Ken regarding my position about the Mgmt. Fee and Diehl's need to have a flexible, but reasonable obligation regarding the amount.  Given its terminal nature, the entire program essentially represents an exit strategy that I would think wants to preserve Diehl's ability to pay at least something, should its economic conditions revert to those of just a year ago.  As an example, though the opportunity to design and manufacture four Dyken machines for the Knauf organization remains, they shouldn't even be identified as a D-50 anymore.  In the past month, those machines have taken on such a different composition that new numbers will have to be assigned to reflect their configuration.  That means engineering, time, risk and not just replicating what used to be built.  The point is that just like in the case of PELLA, most of the products that Diehl now offers are opportunities, not entitlements like they were.  Nobody wants the "same old-same old", they can get that from China for a lot less.

The real issue here is that Diehl's ability to continue as an ongoing operation and simultaneously support the currently planned cash withdrawal schedule is not automatic. The fact that two separate entities don't really exist in Diehl and WAMCO should make this kind of understanding possible, and that seems to have been the way things have been handled successfully thus far.  Given the makeup of both entities, I see no reason to change that method of operation, and now it's time to make sure that spirit is reflected in the amendment of our formal agreement.

At this point, my development of any strategic plan for Diehl is problematic.  On one hand, there really is no need for me to adjudge the worth any management fees or lease payments being paid as a minority stockholder who has no long-term controlling ownership opportunity with the firm.  On the other hand, if I'm negotiating as a potential successor, I look at the situation more cautiously, seeking to preserve as much of Diehl's base as possible for long-term survival.  When you add to that the constant calls to Mike this year asking about cash position, and it appears that the management fee is clearly about only one thing.  So...while I fully understand that my job is to steer Diehl through the changing marketplace no matter the owner, the ultimate results of this issue will impact my opinions,

000084

as they would yours if you were in my situation.

Given those thoughts, my recommendations are as follows:

1) <u>The Management Fee to WAMCO</u>.  We all know that the management fee is not really a management fee for management services provided.  Consequently, Diehl will make every attempt to meet its obligations, but since we *don't really have two independent parties* here, the agreement should reflect exactly what you indicated in your note to me, "that Diehl doesn't consider it to have a binding obligation to pay $15,000 per month".  Concurrently, Diehl has an obligation to pay and it will pay, provided the business conditions permit, but we all know that can change. All we have to do here is formally reflect the spirit of our original agreement, recognizing the current situation and more volatile nature of our business.  The dramatic downturn in Challoner parts business should have taught all of us how we can't plan for the future in this kind of business anymore.  I think Ken can formally represent that situation for us and let us review it, don't you?

2) <u>The Lease</u>. I would make the following recommendations:  a) amend the lease to reflect the revised $4,500 per month charge; b) a rider should reflect a course of action similar to that of the management fee, indicating that if business conditions deteriorate, the per month charge can be re-negotiated to reflect those conditions; c) a rider should be added to reflect a sharing of any catastrophic repair costs related to the building.  Given the 100 year age of the building, its current condition and the imminent need for major building repair over the next 10 years, in the event we have catastrophic damage or are attempting to prevent it, the payment could be affected; d) ask Wabash for an option to buy both at the lease's current expiration date and for January 1, 2006.

3) <u>The Shareholder Agreement</u>.  I'd be lying if I didn't tell you that this situation affects my thinking.  If the agreement remains the same regarding the purchase of shares and I'm continuing on in my current status, that's fine and I will continue to represent Diehl's interest to the best of may ability…just as I have in the past.

Regards

000085

4

**Robert Rozman**

From:       "Robert Rozman" <rfr@diehlmachines.com>
To:         "Kenneth S. Perlman" <kperlman@bbn-law.com>
Cc:         "Paul Ehrlich" <peerlesssaws@msn.com>; "Jay Ehrlich" <addisonst@aol.com>; "Mike Ruffner" <mike.ruffner@diehlmachines.com>; "Dimitri" <jiml@wamcousa.com>
Sent:       Tuesday, August 02, 2005 10:12 AM
Subject:    The Diehl Mgmt Fee

Gentlemen...

At this point, I'd like to make a few comments regarding Diehl's position with respect to the Management Fee.

First, I think we know the real meaning and intent of the "Management Fee". With all due respect, I acknowledge certain degrees of assistance and direction at times, as well as the creation of an initial financial guarantee that became very important just over a year ago. However, to suggest that we are somehow being managed....please tell me who is managing us? What specifically are they doing? Give me some examples?

Not too long ago, some were ready to completely concede Diehl as a "lost cause". So, whatever good fortune we enjoy for the moment, I believe this business will never be as easy to operate as it was in the past, and any success was primarily a result the dedicated perseverance of the Diehl management team. Beyond that, I claim that through the sole ability of Diehl's personnel, we've done a reasonable job of restoring Challoner's business with PELLA...an achievement most thought impossible. As far as a woodworking machinery manufacturer, I think it's fair to say that Diehl was more grounded than WAMCO and was the foundation of business for the transfer of Challoner. Diehl bought the WAMCO woodworking product based on what Challoner had been rather than what it would in fact be. Diehl's efforts have resulted in re-vitalizing Challoner, despite some rather unexpected, but well planned adversarial efforts by former key WAMCO personnel.

The point is that Diehl has never acted irresponsibly with regard to the obligation of the Management Fee despite what also could be an issue of consideration. Diehl's previous request to virtually eliminate the management fee was based on a very sound need to survive. We believe that trying period is past and that we are on a more positive track for the future. But the situation could reverse itself and I would think we would all act accordingly...and in the interest of preserving Diehl. I think the terms presented in 1.(b) simply reflect that possibility, remote as it may be.

As for the lease, I don't know what will happen and I shudder to think of moving...but given any serious problems with the facility...more roof or boiler concerns, it could happen. I think we need some alternatives and will I be discussing that with Mike. We'll present those requests to Wabash and plan for future alternatives.

000087

Given all those considerations, I would also like to revisit the Shareholder's Agreement regarding preferential treatment in acquiring shares. After what we have been through, and what we are doing to improve Diehl's viability, I no longer believe anyone should have an automatic benefit to company ownership. I've worked as hard as anyone in that process and as it stands, I have no ability to potentially own Diehl. Therefore, I believe that a change in the Shareholder's Agreement is in order to insure that any of us have the ability to purchase the shares of anybody without restriction.

As soon as we get PELLA out of the shop this week, get our Las Vegas Show orders entered and return to normality after the rip saw chain link problems, I want to formally bring this issue before the board.

Bob Rozman

### Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Cc:** | "Mike Ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Monday, July 10, 2006 5:14 PM |
| **Subject:** | Current Situation |

Paul...

I tried to call you about 4:35 today and left a voice mail message.

Friday, the 8th and today we received orders for two saws, one of which will ship in late August ($44K), the other ($23K) later this week.

As you can see the month looks impressive due to the accrual reversals, but scratch, we lost about $14K....not quite enough labor and we needed another machine shipment. This was done to make the quarter look good for the bank, so we could proceed with the buyout of the WAMCO note,

Mike put together a cash projection in response to an email from Jay indicating that things weren't so bad and the pay cuts the other cost saving efforts were not necessary yet. We already have half of the cash from Knauf, and though we received two orders, I don't think the remainder of the year looks that rosy.

If there is no answer to my memo, I want to proceed with the bank and with an attorney to action necessary to declare the WAMCO/Diehl arrangement void based on lack of consideration because there is no exchange of value. Diehl is not receiving any value for any service being performed that is closely commensurate with $9-15K per month. The fact that we never challenged the matter doesn't mean the agreement is valid, it just means that Diehl has gone along with an unenforceable agreement and not exercised its right to void the agreement. Unless you suggest otherwise, I will proceed with contact a local attorney to formally confirm that this position is valid.

Bob

ASSET PURCHASE AGREEMENT
(WOODWORKING PRODUCT LINES)

DATED SEPTEMBER 13, 2002

BETWEEN

WISCONSIN AUTOMATED MACHINERY CORP. (SELLER)

AND

DIEHL WOODWORKING MACHINERY, INC. (PURCHASER)

## LIST OF EXHIBITS AND SCHEDULES
### Woodworking Product Lines

Exhibit A — Promissory Note

Exhibit B — Security Agreement

Schedule 3.2 — Payment of Purchase Price

Schedule 3.3 — Allocation of Purchase Price

Schedule 4.4 — Unfilled Customer Orders

Schedule 4.5 — Unfilled Purchase Orders

Schedule 4.6 — Litigation

Schedule 6.4 — Machines Sold and Subject to Product Warranty Claims

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\ListExhibitsSchedulesFinal\KSP\mer

000104

## ASSET PURCHASE AGREEMENT
## Woodworking Product Lines

THIS ASSET PURCHASE AGREEMENT, made and entered into this 13th day of September, 2002, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "Seller"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Purchaser");

### W I T N E S S E T H:

WHEREAS, Seller is engaged in, among other things, and owns certain assets and properties used in, the business of designing, manufacturing, selling and repairing woodworking machinery comprising the McKnight Miller, Bell and Challoner product lines (herein collectively called the "Woodworking Product Lines"), and certain other machinery used in the carpet industry and comprising the Dyken product line (herein called the "Carpet Product Line" and, together with the Woodworking Product Lines, collectively called the "Product Lines" and each individually a "Product Line"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Product Lines and certain other assets and properties of Seller relating to the Product Lines in accordance with all of the terms and subject to all of the conditions herein set forth; and

WHEREAS, Seller is willing to undertake not to compete with Purchaser with respect to the Product Lines;

NOW, THEREFORE, in consideration of the premises hereof (which the parties agree are hereby incorporated into and made a part of their agreement herein), of other good and valuable considerations, the receipt of which is hereby acknowledged, and of the mutual covenants herein set forth, the parties hereby agree as follows:

1.    <u>Definitions</u>

In addition to other terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below for the purposes of this Agreement:

1.1    "Agreement" shall mean this Asset Purchase Agreement.

1.2    "Assumed Liabilities" shall mean collectively all of the specifically identified liabilities and obligations of Seller to be assumed by Purchaser hereunder.

1.3    "Closing" shall mean the act of completion of the closing of the transactions contemplated by this Agreement on the Closing Date as set forth in Article 9 hereof.

1.4    "Closing Date" shall mean the date on which the Closing takes place as set forth in paragraph 9.1 hereof.

1.5    "Contract Date" shall mean the date of this Agreement.

1.6    "Excess Inventory" shall mean the number of each such item of Inventory items that are on hand as of the Closing Date that are in excess of two years usage thereof (being twice the number of such item of Inventory sold by Seller during the twelve (12) month period ended June 30, 2002.

1.7    "Excluded Assets" shall mean collectively all of the assets and properties of Seller other than Sale Assets, including without limitation those specifically being excluded from the Sale Assets as provided in paragraph 2.2 hereof.

1.8    "Inspection Date" shall mean July 31, 2002, on which Purchaser inspected the Sale Assets.

1.9    "Sale Assets" shall mean collectively all of the assets and properties of Seller to be sold, assigned, transferred and conveyed to Purchaser hereunder as provided in paragraph 2.1 hereof.

2

2.    <u>Properties and Assets to be Sold to Purchaser</u>

2.1    <u>Sale Assets</u>.  On the terms and subject to the conditions herein set forth, at the Closing, Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and acquire from Seller, the Product Lines, as a going concern, and the following assets relating to any of the Product Lines and on hand as of the Closing Date:

2.1.1    All inventories relating to any of the Product Lines, including without limitation all raw materials, work in process, including without limitation a 527 Double End Tenoner machine (the "Incomplete Machine"), finished machinery, purchased parts and components, manufactured parts and assemblies, and loaner chain (herein called collectively "Inventory");

2.1.2    Dies, tools, jigs, fixtures, patterns, special tooling and trade fixtures relating to any of the Product Lines, including without limitation all items set forth on Schedule 3.3 hereto under the heading Fixtures & Tooling (herein called collectively "Miscellaneous Tooling");

2.1.3    All trade names, trademarks, trademark registrations and applications, brand names, logos and applications therefor, if any, and the goodwill symbolized thereby, trade secrets, intellectual property, and all rights under all confidentiality agreements and covenants of non-competition, and all rights to recover for any past infringement of any thereof, owned by Seller and relating solely to any of the Product Lines;

2.1.4    All books, records, computer tapes, files (including cabinets containing same) and other papers and documents of Seller pertaining solely to any of the Product Lines or any of the Sale Assets, including without limitation documents of title,

warehouse receipts, customer lists, customer files, mailing lists, product literature and manuals, service manuals, instruction manuals, advertising materials, catalogs, sales literature, sales displays, drawings, designs, engineering data, specifications, engineering prints and know-how;

2.1.5    All of Seller's right, title and interest in, to and under all unfilled customer orders being assigned to and assumed by Purchaser as provided in paragraph 4.4 hereof and all customer deposits, if any, received by Seller against such assumed orders only, and all unfilled purchase orders with suppliers, being assigned to and assumed by Purchaser as provided in paragraph 4.5 hereof;

2.1.6    All of Seller's right, title and interest in, to and under paragraph 6.12 of that certain Asset Purchase Agreement, dated June 19, 1992, among Famco Machine Division of Belco Industries, Inc. (which was assigned to Seller) and Medalist Industries, Inc. (the "Medalist Agreement"), relating to the obligations of Medalist Industries, Inc., which has been succeeded to by Illinois Tool Works, and any successors thereto, with respect to product liability claims relating to any products of the Product Lines sold at or prior to June 29, 1992, or with respect to the Show Machines (as defined in the Medalist Agreement).

2.1.7    All other assets, properties and rights specifically set forth in this Agreement as being transferred or assigned to, or purchased by, Purchaser.

2.2    <u>Excluded Assets</u>.  Without in any way expanding the Sale Assets being sold and transferred hereunder and notwithstanding anything to the contrary contained herein, there is specifically excluded from the Sale Assets, and Seller shall retain and shall not transfer to Purchaser, the following assets and properties owned by Seller:

000108

2.2.1    All of Seller's assets and properties used in or related to any of Seller's business and operations other than the Product Lines.

2.2.2    All cash, bank accounts and similar items.

2.2.3    All accounts receivable, notes receivable, drafts, letters of credit and other receivables of Seller (herein collectively called the "Receivables").

2.2.4    All federal, state, local and foreign tax refunds and all tax deposits.

2.2.5    All right, title and interest of Seller in, to or under any policies of insurance, or any benefits payable or paid thereunder, purchased or maintained by Seller (except as otherwise specifically provided herein).

2.2.6    All records not pertaining solely to the Sale Assets.

2.3    <u>Transfer and Assignment of Sale Assets</u>:  Good and marketable title to the Sale Assets shall be sold, assigned, transferred and conveyed to Purchaser by Seller at the Closing, free and clear of all claims, liabilities, taxes, liens, security interests, encumbrances, restrictions and adverse rights of use or ownership.  Subject to Seller's obligations under paragraph 6.1 above, Purchaser is accepting the Sale Assets in the condition existing on the Inspection Date, or such later date on which the particular Sale Asset was acquired by Seller, ordinary wear and tear excepted, on an "as-is" basis. EXCEPT SOLELY AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, THE SALE ASSETS ARE BEING TRANSFERRED WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANT-ABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES (BOTH EXPRESS AND IMPLIED) SELLER HEREBY DISCLAIMS.

000109



Price plus interest over the period of repayment in seventy-two (72) equal monthly payments). The Purchaser's obligation to pay the Purchase Price as herein provided shall be evidenced by a Promissory Note, executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit A attached hereto (herein called the "Promissory Note"), which shall be secured and collateralized by the grant of a security interest in all of Purchaser's assets and properties, second in priority solely to the security interest of The LaSalle Bank in such assets, pursuant to a Security Agreement executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit B attached hereto (herein called the "Security Agreement").

3.3    Allocation of Purchase Price. The Purchase Price shall be allocated for income tax purposes among the Sale Assets and covenant not to compete set forth in Article 11 hereto as set forth in Schedule 3.3 attached hereto and such allocation shall be binding upon the parties for income tax purposes. The parties shall file their respective income tax returns, including filing with the Internal Revenue Service Form 8594 and all other information as may be required by Section 1060 of the Internal Revenue Code and regulations promulgated thereunder, in accordance with such allocations, and the parties shall not take any position or action inconsistent with such allocation.

4.    Representations, Warranties and Covenants of Seller

Seller hereby represents, warrants and covenants to Purchaser that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

4.1    Organization. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin. Seller has all requisite corporate

000111

power and authority to own, lease and operate its properties and to carry on its business as now conducted and to enter into this Agreement and perform its obligations hereunder.

4.2 <u>Authority and Binding Obligation</u>. All corporate action necessary to authorize the execution and delivery of this Agreement by Seller and the performance by Seller of its obligations hereunder have been duly taken. The execution and delivery of this Agreement by Seller and the performance of its obligations hereunder do not and will not result in the creation of any lien, charge or encumbrance upon any of the Sale Assets. This Agreement is a legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

4.3 <u>Title to Personal Property</u>. Seller owns and at the Closing will have the right to convey and will convey to Purchaser good and marketable title, free and clear of any tax, lien, security interest, encumbrance, liability, claim, restriction or adverse right of use or ownership to all of the Sale Assets.

4.4 <u>Customer Orders</u>. Set forth on Schedule 4.4 hereto is a true and correct list of all unfilled customer orders and commitments of Seller on hand as of the Contract Date. All such unfilled customer orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business. Between the Contract Date and the Closing Date, Seller will not accept any customer order or commitment except in the ordinary course of business. At the Closing, Seller shall assign to Purchaser all such unfilled customer orders and commitments of Seller on hand as of the Closing Date, and Seller shall assign and credit to Purchaser all customer deposits and prepayments received

000112

with respect thereto, and Purchaser shall assume the obligations of Seller to fill such assigned unfilled customer orders and commitments accruing from and after the Closing Date in accordance with the terms thereof.

4.5    Purchase Orders. Set forth on Schedule 4.5 hereto is a true and correct list of all of Seller's unfilled purchase orders and commitments to suppliers on hand as of the Contract Date. All such unfilled purchase orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business. Between the Contract Date and the Closing Date, Seller will not issue any purchase order or commitment except in the ordinary course of business. At the Closing, Seller shall assign to Purchaser all such unfilled purchase orders and commitments of Seller on hand as of the Closing Date, and Purchaser shall assume the obligations of Seller accruing from and after the Closing Date in accordance with the terms thereof and the Inventory Purchase Price shall be increased by any prepayments and deposits made by Seller with respect thereto.

4.6    Litigation. Except as set forth in Schedule 4.6 hereto, there is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Seller, threatened against or relating to Seller's past or present operation of the Product Lines or any of the Sale Assets or that could affect the transactions contemplated by this Agreement, including without limitation relating to products liability, at law, in equity or before any governmental department, commission, board or agency.

4.7    No Material Adverse Change. Since the Inspection Date, none of the tangible Sale Assets have suffered any destruction or damage, whether or not covered by

000113

insurance, which materially and adversely affects the conduct of the Product Lines business.

4.8    <u>Compliance with Laws</u>.  The business and operations of the Product Lines have been and are being conducted in all material respects in compliance with all applicable laws (including duties imposed by common law), rules and regulations, orders, ordinances, judgments and decrees of all governmental authorities (federal, state and local), including, without limitation, the Clean Water Act, the Clear Air Act, CERCLA, SARA, the Resource Conservation and Recovery Act, as amended ("RCRA"), and all other laws relating to the protection of the environment, human health and safety, including the Occupational Safety and Health Act of 1970, as amended, and any regulations and standards promulgated or issued thereunder.

4.9    <u>Inventory</u>.  The Inventory of Seller other than Excess Inventory will consist of items of a quality which is good, usable and saleable in the usual and ordinary course of business of Seller.

4.10    <u>Product Warranties</u>.  Seller has furnished Purchaser with true and correct copies of all standard written warranties provided to customers of Seller with respect to products of any of the Product Lines (herein called "Product Warranties").

5.    <u>Representations and Warranties of Purchaser</u>

Purchaser hereby represents and warrants to Seller that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

5.1    <u>Organization, Good Standing and Power</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and

has all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

5.2    Authority and Binding Obligation.  All corporate action necessary to authorize the execution and delivery by Purchaser of this Agreement and the performance of its obligations hereunder have been duly taken.  This Agreement is a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

5.3    Litigation.  There is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Purchaser, threatened against or relating to Purchaser at law, in equity or before any governmental department, commission, board or agency, and Purchaser is not in default with respect to any judgment, injunction, order or decree of any court or governmental agency or instrumentality by which it is bound or subject, and no such judgment, injunction, order or decree is now in effect, which in any way restrains or limits Purchaser in the execution and delivery of this Agreement or the performance by Purchaser of its obligations hereunder.

6.    Additional Covenants

6.1    Conduct of Business.  Seller covenants that from the Contract Date through the Closing Date, Seller will conduct the business of the Product Lines in a manner not materially different from its past practices and only in the usual and ordinary course.

6.2    <u>Negative Covenants</u>. Between the Contract Date and the Closing Date, Seller represents, warrants, covenants and agrees that Seller will not, without obtaining the prior written consent of Purchaser:

6.2.1    Encumber, mortgage, pledge, or permit any lien to exist against any of the Sale Assets.

6.2.2    Sell, assign, lease or otherwise dispose of any of the Sale Assets, except for the sale of Inventory (including parts but excluding the Incomplete Machine, which shall not be sold) in the ordinary course of business and except for supplies and spare parts used in the ordinary course of business (including in the completion of the Incomplete Machine).

6.2.3    Make any change in any accounting principle, procedure or practice followed by Seller or in the method of applying same with respect to the Product Lines or write up the value of any Inventory.

6.3    <u>Employees</u>. Upon the Closing, Seller shall terminate the employment of all of the employees that Purchaser desires to hire in its sole discretion and shall make available to Purchaser and use its reasonable efforts to help Purchaser hire such of employees desired by Purchaser; provided that Purchaser shall not be required or obligated to hire any such employee. Purchaser shall not be obligated to continue any of Seller's policies or benefits with respect to employees, and all of Seller's employees actually hired by Purchaser shall be considered in all respects as new employees of Purchaser.

Seller and not Purchaser shall be responsible for all payments, lawsuits, defense of suits, judgments, reasonable attorneys' fees, and any other costs sustained by Purchaser, including but not limited to all payments and losses resulting from non-

000116

compliance under the terms of any applicable plant closing laws, losses under any pension, thrift, employee savings, bonus or other plan for employee benefits, severance or separation benefits, withholding taxes and contributions, workers or unemployment compensation claims or costs, health care claims or premiums, vacation, sick or other leave or pay, disease or disability claims, discrimination claims, unfair labor practices, safety claims or citations and all other claims against Seller arising out of or relating to any employment relationship with Seller or the termination thereof.

6.4    <u>Product Warranty Claims</u>.    From and after the Closing, Purchaser shall assume and be solely responsible for all claims made by customers within the applicable period arising under Seller's Product Warranties with respect to products relating to the Product Lines sold or delivered by Seller to or for customers at or prior to the Closing Date and listed on Schedule 6.4 hereof or sold by Seller in the ordinary course of business between the Contract Date and Closing Date.

6.5    <u>Product Liability Claims</u>.    From and after the Closing, Seller shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered (or delivered on consignment) by Seller or any predecessor thereto at or prior to June 29, 1992, and Purchaser shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products relating to the Product Lines sold and delivered (or delivered on consignment) by Seller after June 29, 1992 and at or prior to the Closing Date or by Purchaser after the Closing Date. Purchaser shall maintain for a period of at least five (5) years from and after the Closing Date adequate insurance with respect thereto.

6.6    <u>Use of Office Space</u>. It is understood and agreed that some of the employees hired by Purchaser may not relocate to Purchaser's offices in Indiana. If so, at Purchaser's request, Seller shall allow such employees to use its offices and facilities in Oshkosh as long as commercially feasible for Seller and Purchaser shall pay Seller a reasonable fee therefor as mutually agreed by the parties.

6.7    <u>Management Fee</u>. The management fee being paid by Purchaser to Seller and its affiliates for management consulting and services shall be increased to the sum of $15,000.00 per month commencing January 1, 2003, until such time as the parties otherwise mutually agree.

6.8    <u>Completion of Incomplete Machine</u>. Seller shall use reasonable efforts to complete the Incomplete Machine at or prior to the Closing Date. If the Incomplete Machine has not been completed at or prior to the Closing Date, Seller shall complete the Incomplete Machine as soon as practicable thereafter.

7.    <u>Conditions Precedent to Obligations of Purchaser</u>.

All of the obligations of Purchaser hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Purchaser) having been fulfilled on or before the Closing Date:

7.1    <u>Representations and Warranties</u>. The representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Purchaser.

14

7.2    <u>Performance of Covenants</u>.  Seller shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

7.3    <u>No Litigation</u>.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto which in the reasonable opinion of counsel for Purchaser presents a reasonable possibility that any transaction contemplated by this Agreement would be enjoined or prevented, or that the right of Purchaser to acquire, retain or use the Sale Assets without additional cost would be adversely affected.

8.    <u>Conditions Precedent to Obligations of Seller</u>

All of the obligations of Seller hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Seller) having been fulfilled on or before the Closing Date:

8.1    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Seller.

8.2    <u>Performance of Covenants</u>.  Purchaser shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

8.3    <u>No Litigation</u>.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto

which in the reasonable opinion of counsel for Seller presents a reasonable possibility that the transactions contemplated by this Agreement would be enjoined or prevented.

9.    Closing

9.1    Closing Date.  The Closing shall take place on October 1, 2002, at the offices of Lawrence, Kamin, Saunders & Uhlenhop, L.L.C., 208 South LaSalle Street, Suite 1750, Chicago, Illinois, at 11:00 a.m., local time, or at such other date, time and place as shall be fixed in writing by the mutual consent of Purchaser and Seller, or as required for the satisfaction of all conditions precedent hereto.  The Closing shall be deemed to be effective as of the beginning of business on the Closing Date.

9.2    Seller's Deliveries.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following, in form and substance satisfactory to Purchaser and its legal counsel:

9.2.1    Certified copies of the appropriate proceedings of the Boards of Directors of Seller authorizing and approving this Agreement and the transactions contemplated herein.

9.2.2    Bills of Sale, assignments and other instruments transferring to Purchaser as of the Closing Date title as provided in paragraph 2.3 of this Agreement to all of the Sale Assets being acquired by Purchaser hereunder.

9.2.3    Assignment(s) transferring to Purchaser the unfilled customer orders, customer deposits and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3   <u>Purchaser's Deliveries</u>.  At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following, in form and substance satisfactory to Seller and its legal counsel:

9.3.1     Certified copy of the appropriate proceedings of the Board of Directors and shareholders of Purchaser authorizing and approving this Agreement and the transactions contemplated hereby.

9.3.2     The Promissory Note, executed by Purchaser in the amount of the Purchase Price as set forth in paragraph 3.2 hereof.

9.3.3     The Security Agreement, executed by Purchaser as set forth in paragraph 3.2 hereof.

9.3.4     Assumption by Purchaser of the unfilled customer orders and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3.5     A resale certificate certifying Purchaser's sales tax resale number.

9.4   <u>Possession</u>.  Upon the Closing, possession of all of the Sale Assets hereunder shall be delivered to Purchaser.

9.5   <u>Records</u>.  After the Closing, if Seller has any legitimate, business, accounting or tax reason therefor, Seller and its representatives shall have the right of access to all business records of or pertaining to the Product Lines or Sale Assets that are delivered by Seller to Purchaser hereunder and relating to any period on or prior to the Closing Date, at all reasonable times during business hours, and to make copies thereof at Seller's expense.  With respect to any financial, tax and accounting records of Seller relating in any way to the Product Lines or Sale Assets not delivered to Purchaser hereunder (herein

000121

collectively called the "Retained Records"), after the Closing, Seller shall retain same and if Purchaser has any legitimate business, accounting or tax reason therefor, Purchaser and its representatives shall have the right of access to the Retained Records at all reasonable times during business hours, and to make copies thereof at Purchaser's expense.  In the event that within a period of five (5) years after the Closing Date, either Purchaser or Seller desires to dispose of any of such records, such party so desiring to dispose shall give the other party at least thirty (30) days prior written notice thereof and the other party shall have the right within said 30-day period to take possession thereof.

10.    Indemnification and Survival

    10.1    Indemnification by Seller.  Notwithstanding any investigation by or knowledge of Purchaser, Seller hereby agrees to defend, indemnify and hold Purchaser harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, costs and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Seller in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (ii) any breach of covenant, agreement or undertaking of Seller in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (iii) any failure to comply with any Bulk Sales Law, if applicable; (iv) any liability, debt or obligation of Seller not expressly assumed by Purchaser hereunder; and (v) any and all legal proceedings against or related to Seller or any of the Sale Assets, including without limitation the legal proceedings described in Schedule 4.6 hereto.

18

10.2 <u>Limitations on Indemnification by Seller</u>.  Any liability or undertaking of Seller to indemnify Purchaser under paragraph 10.1, clause (i) hereof, shall be subject to each of the following limitations:

10.2.1    Purchaser shall not be entitled to make a claim for indemnification from Seller under paragraph 10.1, clause (i), hereof unless Purchaser shall have given Seller written notice of such claim prior to two (2) years following the Closing Date; provided, however, that the foregoing limitations period set forth in this paragraph 10.2.1 shall not apply to any indemnification due from Seller arising with respect to any breach of the representations and warranties of Seller contained in paragraphs 4.3 hereof (herein called the "Warranty of Title").

10.2.2    Seller's undertaking to indemnify under paragraph 10.1, clause (i), hereof shall be applicable only if and to the extent that the aggregate indemnification liability from Seller hereunder exceeds Ten Thousand Dollars ($10,000.00); provided, however, that this limitation shall not apply to any indemnification due from Seller with respect to any breach of the Warranty of Title.

10.3 <u>Indemnification by Purchaser</u>.  Notwithstanding any investigation by or knowledge of Seller, Purchaser hereby agrees to defend, indemnify and hold harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, cost and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Purchaser in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement; (ii) any

19

000123

breach of covenant, agreement or undertaking of Purchaser in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement, (iii) any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products shipped or delivered by Purchaser after the Closing Date, and any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered by Seller (or any predecessor thereto) at or prior to the Closing Date, if and to the extent not covered by insurance maintained by Seller or Purchaser, as provided in paragraph 6.5 hereof, and (iv) any specifically identified debt, liability or obligation of Seller assumed by Purchaser hereunder at the Closing.

10.4  Survival.  Subject to the limitations period provided in paragraph 10.2.1 hereof, all of the respective representations, warranties and covenants contained in this Agreement or in any other document or instrument delivered by or on behalf of any party hereunder or pursuant hereto, shall survive the Closing Date.

11.    Covenant Not to Compete

Seller hereby covenants and agrees that it shall not, for a period of five (5) years from and after the Closing Date, alone or in conjunction with any other corporation, firm, partnership, person, venture or other entity, directly or indirectly, engage in the design, manufacture, sale or distribution of any products of the type presently being designed, manufactured, sold or distributed by the Product Lines business within the United States of America or in any other geographic area in which the Seller was engaged on the Inspection Date or on the Closing Date.  Seller covenants and agrees that for a period for five (5) years following the Closing Date, it will not induce any employee, customer or supplier of

000124

Purchaser to terminate his or its employment or business relationship with Purchaser, and Seller will not use or reveal any secret or confidential information relating to the business of the Product Lines acquired by Purchaser; provided, however, that the foregoing shall not apply to any information which, following the Closing Date, is received by Seller from a third person other than Purchaser who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Purchaser with respect to such information, or which is public knowledge or within the public domain other than as a result of disclosures by Seller after the Closing Date. It is the desire and intent of the parties that the terms and provisions of this paragraph 11 be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. Accordingly, if and to the extent that any portion of this paragraph 11 shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then said portion shall be deemed reformed to the least extent necessary to make such portion valid and enforceable.

12.    <u>Assignment</u>

Neither this Agreement nor the rights or obligations contained herein shall be assignable by either party except with the written consent of the other party hereto, except by Purchaser to one or more corporations designated in writing by Purchaser prior to the Closing Date; provided, however, that no such assignment shall relieve the assignor of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the foregoing sentence.

000125

13.    Notices

All notices, requests, demands and other communications hereunder shall be in writing, and shall be deemed to have been given when delivered in person or received by first class, registered or certified U.S. mail, return receipt requested, postage and registration or certification fees prepaid, or delivered by reliable overnight delivery service, providing a receipt evidencing delivery, or by facsimile with a copy also delivered by any of the foregoing means:

If to Seller, to:

Wisconsin Automated Machinery Corp.
c/o American M & M
5301 W. Dempster, Suite 308
Skokie, Illinois  60077
Attention:  Paul Ehrlich, President
Fax:  (847)067-8646

With a copy to:

Kenneth S. Perlman, Esq.
Lawrence, Kamin, Saunders & Uhlenhop, L.L.C.
208 South LaSalle St., Suite 1750
Chicago, Illinois  60604
Fax:  (312)372-2389

If to Purchaser, to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana  46992-0465
Attention:  Robert Rozman, President
Fax:  (219)563-0206

With a copy to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana  46992-0465
Attention:  Mike Ruffner
Fax:  (219)0206

or at such other address as hereafter shall be furnished by a notice sent in like manner by such addressee to the others.

14.    Miscellaneous

14.1    Severability.  Every provision of this Agreement is intended to be severable, and, if any term or provision is determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

14.2    Exhibits and Headings.  The Exhibits to this Agreement are hereby made a part hereof and shall be construed with and as an integral part of this Agreement.  The headings of the various Articles and paragraphs of this Agreement have been inserted for convenience only, are not a part of this Agreement, and shall not be deemed in any manner to modify, explain, enlarge, or restrict any of the provisions of this Agreement.

14.3    Expenses.  Except where otherwise expressly provided for in this Agreement, each of the parties hereto shall pay their own expenses, including without limitation the fees and expenses of their respective attorneys and accountants, in connection with this Agreement and the transactions contemplated herein, whether or not the Closing takes place.   Seller shall pay all sales and use taxes, if any, required on account of the consummation of the transactions contemplated hereby.

14.4    Waiver.  Failure or delay on the part of any of the parties hereto to exercise any right, power or privilege hereunder, or under any instrument executed pursuant hereto,

000127

shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or of any other right, power or privilege. All waivers hereunder must be in writing.

14.5 <u>Further Assurances</u>. Following the Closing, Seller and Purchaser, without further consideration of any kind, shall each execute and deliver, or cause to be executed and delivered, such other instruments, and take, or cause to be taken, such other action, as shall be reasonably requested by any other party hereto to more effectively carry out the transactions contemplated in this Agreement. Seller shall use reasonable efforts to assist Purchaser in effecting a smooth transition in ownership and operation of the Sale Assets after the Closing Date, but Seller shall not be required to incur any cost or expense other than as specifically provided herein.

14.6 <u>Entire Agreement</u>. This Agreement (including the Exhibits and Schedules hereto and other documents referred to herein as having been delivered or furnished by either party to the other) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

14.7 <u>Amendments</u>. This Agreement may not be modified or changed except by an instrument or instruments in writing signed by both of the parties hereto.

14.8 <u>Governing Law</u>. This Agreement shall be governed and construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions.

14.9 <u>Gender and Number</u>. Whenever the context requires or permits, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

14.10 <u>Counterparts</u>.  This Agreement may be executed in as many counterparts as may be deemed necessary or convenient, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

14.11 <u>Public Announcement</u>.  The parties will cooperate as to and jointly approve the contents of a general public announcement of this transaction upon the execution and delivery of this Agreement.

14.12 <u>Termination</u>

14.12.1     This Agreement may be terminated any time prior to the Closing Date: (i) by the mutual written consent of the parties; or (ii) by Seller if any of the conditions provided for in Article 8 hereof shall not have been satisfied, complied with or performed, and Seller shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iii) by Purchaser if any of the conditions provided for in Article 7 hereof shall not have been satisfied, complied with or performed, and Purchaser shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iv) otherwise as expressly provided in this Agreement.

14.12.2     In the event that the Closing shall not take place on or before November 30, 2002, either party shall have the right, exercisable upon giving written notice to the other party within five (5) business days after said date, to terminate this Agreement, unless such failure of Closing shall be due to the breach or default of the party so seeking to terminate this Agreement.

14.12.3     Except for a termination pursuant to clause (i) of subparagraph 14.12.1 hereof, and except otherwise as expressly provided in this Agreement, the right of any party to terminate this Agreement as provided in this paragraph 14.12 shall be in addition to, and not in substitution for, any and all other relief to which such party may be entitled, either at law, in equity or by agreement.

000139

14.13 <u>Arbitration</u>. Any controversy, dispute or claim between the parties arising out of, related to or in connection with this Agreement or the performance or breach hereof, including with respect to the arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; provided that the arbitration shall be by a single arbitrator mutually selected by Purchaser and Seller, and if the parties do not agree within twenty (20) days after the date of notification of a request for such arbitration made by either of the parties, the selection of the single arbitrator shall be made by the American Arbitration Association in accordance with said rules. In addition to, and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator and shall be final, binding and conclusive on the parties, and judgment on the arbitrator's award, including without limitation equitable relief and specific performance, may be entered in and enforced by any court having jurisdiction thereof. Fees and expenses of the American Arbitration Association and of the arbitrator shall be borne as shall be determined by the arbitrator, and the arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

14.14 <u>Fax Copies</u>. Purchaser and Seller agree that "Facsimile" transmissions of signed documents shall be regarded and accepted as if they bore original signatures. Promptly after such Facsimile transmission the original documents bearing the original signatures shall be provided to the other party.

--Signature Page Follows--

000130

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY
CORP. ("Seller")

By _____
    Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY,
INC. ("Purchaser")

By _____
    Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\Product\UnetoDiehl\AssetPurchAgtFinal\KSP\mer

27

000131

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY
CORP. ("Seller")

By_____
      Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY,
INC. ("Purchaser")

By_____
      Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\AssetPurchAgtFinal\KSP\mer

000132

EXHIBIT A
TO
ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

**PROMISSORY NOTE**

$600,000.00

_____, Illinois
_____, 2002

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the order of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM"), the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing on January 1, 2003, and on the 1st day of each successive month thereafter through and including December 1, 2008. Payment of principal hereof and interest hereon shall be made in lawful money of the United States at 5301 West Dempster, Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this Promissory Note may appoint in writing from time to time. All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (herein called the "Purchase Agreement"), between Diehl and WAM, and the payment of this Promissory Note is secured by a Security Agreement, of even date herewith, between Diehl and WAM, covering all of the assets and properties of

Diehl (herein called the "Security Agreement"), and it is expressly agreed that all of the covenants and agreements contained in the Security Agreement and in the Purchase Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that:

(a)    the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b)    there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

(c)    the undersigned shall die, become insolvent, or admit in writing its inability to pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to or acquiesce in the appointment of a trustee or receiver for it or any of its property or make a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee or receiver shall be appointed for it or for a substantial part of its property and shall not be discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding shall be instituted by or against it, and if instituted against it, is consented to or acquiesced in by it or remains for thirty (30) days undismissed;

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal of and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

**IN WITNESS WHEREOF**, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.


By_____
     Robert Rozman, President



C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\PromissoryNote.doc\KSP/mer

3

000135

EXHIBIT B
TO ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT, made and entered into as of the _____ day of _____, 2002, by and between DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Debtor"), located at 981 South Wabash Street, P. O. Box 465, Wabash, Indiana 46992-0465, and WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("Secured Party"), located at 5301 West Dempster, Suite 308, Skokie, Illinois 60077;

## W I T N E S S E T H :

WHEREAS, Debtor issued a certain Promissory Note, of even date herewith (the "Promissory Note"), in the original principal amount of $600,000, payable to the order of Secured Party, which Promissory Note was issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (the "Purchase Agreement") between Debtor and Secured Party; and

WHEREAS, this Security Agreement is being executed to secure full and prompt payment of the Promissory Note;

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.    Definitions.  In addition to other terms defined elsewhere herein, when used herein, the following terms shall have the following meanings:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party, its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

"Default" shall mean the occurrence of any one or more of the following events: (a) Debtor fails to pay, when due, any amount on any of the Liabilities; (b) non-performance, misrepresentation or breach by Debtor of any representation, warranty or covenant contained herein or in any other agreement between Debtor and Secured Party; (c) Debtor becomes insolvent or unable to pay its debts as they mature or is adjudicated a bankrupt or applied for, consent to or acquiesces in the appointment of a trustee or receiver for it or any of its property or makes an assignment for the benefit of creditors, or in the

absence of such application, consent or acquiescence, a trustee or receiver is appointed for Debtor or for a substantial part of its property; (d) any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is instituted by or against Debtor; (e) any dissolution, merger or consolidation, or transfer of a substantial part of the property of Debtor; (f) any loss, theft, substantial damage or destruction to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

2.    <u>Grant of Security Interest</u>.  To secure the payment and performance of all Liabilities, Debtor hereby mortgages to Secured Party and hereby grants and assigns to Secured Party a continuing security interest in and to all properties, assets and interests of each Debtor listed on Exhibit A hereto, whether now or hereafter existing or acquired (herein individually and collectively called the "Collateral"), secondary in and subordinate solely to the lien and security interest of The LaSalle Bank in such Collateral.

3.    <u>Representations, Warranties, Covenants and Agreements of Debtor</u>.  Debtor hereby represents, warrants, covenants and agrees that (a) Debtor has been duly organized and is in good standing in the state of its formation listed above; (b) Debtor has full power and authority to execute and deliver this Agreement and perform all of such Debtor's obligations hereunder; (c) Debtor will from time to time, on request of Secured Party, execute or consent to the execution of such financing statements and other documents (and pay the costs of filing or recording same in all public offices deemed necessary by Secured Party), and do such other acts and things, all as Secured Party may reasonably request, to evidence, perfect and maintain a valid security interest in the Collateral; (d) the Collateral will be kept at Debtor's address shown above, unless Secured Party shall otherwise consent in writing, and Debtor will not sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for the use or sale of Collateral and collection of accounts in the ordinary and usual course of Debtor's business; (e) Debtor will at all times keep the Collateral in first-class order and repair, excepting any loss or damage or destruction that is fully covered by proceeds of insurance; (f) Debtor will at all times keep the Collateral insured against loss, damage, theft and other risks, in such amounts, for such periods and written by such companies, and under such policies and in such form, all as shall be reasonable under all of the circumstances of Debtor's business, and Debtor shall apply any proceeds of such insurance which may be received by either of them toward payment of the Liabilities, whether or not due, in such order of application as Secured Party may determine; (g) Secured Party may examine and inspect the Collateral or any part thereof, wherever located, at any reasonable time or times; and (h) except for the lien and security interest of The LaSalle Bank in the Collateral, to which the lien and security interest granted hereby is secondary in priority and subordinate, and assuming Secured Party has properly perfected, the security interest granted hereby will be a first priority security interest in the Collateral.

2

000137

4.    <u>Remedies Upon Default</u>.  Whenever a Default shall be existing, all Liabilities may (notwithstanding any provisions of any other agreements between Debtor and Secured Party), at the option of Secured Party, and without demand or notice of any kind, be declared, and thereupon immediately shall become, due and payable, and Secured Party may exercise from time to time any and all rights and remedies available to it under applicable law to the fullest extent permitted thereby, including the rights of a secured party under the Uniform Commercial Code.  Debtor agrees, in case of Default, to assemble, at their expense, all the Collateral at a convenient place acceptable to Secured Party, and to pay all costs of Secured Party of collection of all Liabilities and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses.  Debtor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, demands, advertisements, hearings or process of law in connection with the exercise by Secured Party of any of its rights and remedies upon Default.  Any notification of intended disposition of any of the Collateral shall be deemed reasonable and properly given if given at least five (5) days before such disposition.  Any proceeds of any of the Collateral may be applied by Secured Party to the payment of expenses in connection with the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Secured Party toward payment of such of the Liabilities and in such order of application, as Secured Party may from time to time elect.

5.    <u>General</u>.  No delay on the part of Secured Party in the exercise of any right or remedy shall operate as a waiver thereof, no waiver of any right or remedy shall operate as a future waiver and no single or partial exercise by Secured Party of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

Any notice from Secured Party to Debtor if mailed shall be deemed given when mailed, by registered or certified mail, return receipt requested, postage prepaid, addressed to Debtor either at Debtor's address shown above, or at any other address of Debtor appearing on the records of Secured Party.

The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of Illinois.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  Whenever the context requires or permits words used in the singular herein shall be construed to mean or include the plural and vice-versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

The rights and privileges of Secured Party hereunder shall inure to the benefit of its successors and assigns.

0001?8

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of the day and year first above written.

Secured Party:                                    Debtor:

WISCONSIN AUTOMATED                        DIEHL WOODWORKING
   MACHINERY CORP.                                MACHINERY, INC.


By_____        By_____
        Paul Ehrlich, President                          Robert Rozman, President


C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\SecurityAgtDiehl.doc\KSP\mer

4

000438

EXHIBIT A
TO SECURITY AGREEMENT

## Collateral

The Collateral consists of all of Debtor's right, title and interest in and to the following:

The Product Lines and Sale Assets (as defined in the Purchase Agreement).

All goods and equipment now owned or hereafter acquired, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), including all electronic equipment and industrial supply materials, including grinding wheels, abrasive products and accessories, and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located;

All inventory, now owned or hereafter acquired, including, without limitation, all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products including such inventory as is temporarily out of Debtor's custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above;

All contract rights and general intangibles now owned or hereafter acquired, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind;

All now existing and hereafter arising accounts, contract rights, royalties, license rights and all other forms of obligations owing to Debtor arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Debtor, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Debtor;

All documents, cash, deposit accounts, securities, securities entitlements, securities accounts, investment property, financial assets, letters of credit, certificates of deposit, instruments and chattel paper now owned or hereafter acquired and Debtor's books relating to the foregoing;

All copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or

000140

unpublished, now owned or hereafter acquired; all trade secret rights, including all rights to unpatented inventions, know-how, operating manuals, license rights and agreements and confidential information, now owned or hereafter acquired; all mask work or similar rights available for the protection of semiconductor chips, now owned or hereafter acquired; all claims for damages by way of any past, present and future infringement of any of the foregoing; and

All Debtor's books relating to the foregoing and any and all claims, rights and interests in any of the above and all substitutions for, additions and accessions to and proceeds thereof.

Without limitation of the foregoing, the Collateral shall include all the Debtor's right, title and interest in and to the following categories of assets as defined in the Uniform Commercial Code as adopted by the State of Illinois, as may be amended and in effect from time to time: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables and license fees), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of any thereof, wherever located, whether nor owned or hereafter acquired.

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\SecurityAgtDiehl.doc\KSP\mer

000141



## PROMISSORY NOTE

$600,000.00

Wabash, Indiana
October 1, 2002

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINERY,

INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the order

of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM"),

the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on the

balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called

the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72)

equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing on

January 1, 2003, and on the 1st day of each successive month thereafter through and

including December 1, 2008. Payment of principal hereof and interest hereon shall be

made in lawful money of the United States at 5301 West Dempster, Suite 308, Skokie,

Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this

Promissory Note may appoint in writing from time to time. All past due principal shall bear

interest at the rate equal to the Interest Rate from time to time in effect, plus three percent

(3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agreement

dated September 13, 2002 (herein called the "Purchase Agreement"), between Diehl and

WAM, and the payment of this Promissory Note is secured by a Security Agreement, of

even date herewith, between Diehl and WAM, covering all of the assets and properties of

Diehl (herein called the "Security Agreement"), and it is expressly agreed that all of the

covenants and agreements contained in the Security Agreement and in the Purchase Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that:

(a)     the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b)     there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

(c)     the undersigned shall die, become insolvent, or admit in writing its inability to pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to or acquiesce in the appointment of a trustee or receiver for it or any of its property or make a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee or receiver shall be appointed for it or for a substantial part of its property and shall not be discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding shall be instituted by or against it, and if instituted against it, is consented to or acquiesced in by it or remains for thirty (30) days undismissed;

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal of and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

000143

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

**IN WITNESS WHEREOF**, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.

By _____
Robert Rozman, President

COPY

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\PromissoryNote.doc\KSP/mer

000144

7

Diehl Woodworking Machinery, Inc.
Special Shareholders Meeting
September 19, 2006

The Special Shareholders Meeting called by Robert Rozman, President, in a Notice dated September 7, 2006 and mailed to all Shareholders on that date, was convened at 10:00 AM on September 19, 2006 at the offices of Diehl Woodworking Machinery, Inc. in Wabash, Indiana.  Present at the meeting were the following shareholders:  Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum.  Absent were Dimitris Loukidis and Jay Ehrlich.  The shareholders present own 62.5% of the stock of the Company, thus a quorum was present.

Mr. Rozman noted that the meeting had been called due to concerns as to the validity of the Annual Shareholders Meeting that was held in Chicago, Illinois on August 17, 2006.  The stated purpose of this Special Shareholders Meeting, as outlined in Mr. Rozman's September 7, 2006 Notice, was to consider and vote upon the following:

1. To amend the by-laws of the Company to reduce the number of Directors from five to three.

2. To remove Dimitris Loukidis and Jay Ehrlich as Directors.

3. To elect Robert Rozman, Paul Ehrlich and Michael Ruffner as Directors.

4. To approve and ratify the termination by the Company of payment of the Management Fee to Wisconsin Automated Machinery Corp. ("WAMCO").

5. To approve and ratify the filing by the Company of "Diehl Woodworking Machinery, Inc. vs. WAMCO, et al, in the State of Indiana, Wabash County, Case No.:  85C01-0608-PL-380."

6. To approve and ratify all acts taken by Robert Rozman, Paul Ehrlich or Michael Ruffner, acting as Directors or as Officers of the Company, including, without limitation, ratifying the designation of Robert Rozman as Registered Agent.

Mr. Rozman moved to amend the appropriate sections of the Company By-Laws to reduce the number of Directors from five to three.  Mr. Paul Ehrlich seconded the motion.  Mr. Rozman called for discussion.  There was no discussion, so Mr. Rozman called for a vote.  On this matter, the following Shareholders voted "Aye":  Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum.  The Shareholders present at the meeting carried the motion unanimously.

Mr. Ruffner moved to remove Dimitris Loukidis and Jay Ehrlich as Directors of the Company.  Mr. Rozman seconded the motion.  Mr. Rozman called for

discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting carried the motion unanimously.

Mr. Rozman nominated Mr. Paul Ehrlich to serve as Director of the Company. Mr. Fredrickson seconded the motion. Mr. Rozman called for discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting elected Mr. Paul Ehrlich as a Director unanimously.

Mr. Rozman nominated Mr. Ruffner to serve as Director of the Company. Mr. Paul Ehrlich seconded the motion. Mr. Rozman called for discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting elected Mr. Ruffner as a Director unanimously.

Mr. Paul Ehrlich nominated Mr. Rozman to serve as Director of the Company. Mr. Ruffner seconded the motion. Mr. Rozman called for discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting elected Mr. Rozman as a Director unanimously.

Mr. Rozman moved that the termination by the Company of payment of the Management Fee to WAMCO be approved and ratified. Mr. Zolman seconded the motion. Mr. Rozman called for discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting carried the motion unanimously.

Mr. Ruffner moved that the filing by the Company of "Diehl Woodworking Machinery, Inc. vs. WAMCO, et al in the State of Indiana, Wabash County, Case No.: 85C01-0608-PL-380" be approved and ratified. Mr. Fredrickson seconded the motion. Mr. Rozman called for discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting carried the motion unanimously.

Mr. Rozman moved that all acts taken by Robert Rozman, Paul Ehrlich and Michael Ruffner acting as Directors or Officers of the Company, including, without limitation, the designation of Robert Rozman as Registered Agent, be

approved and ratified. Mr. Paul Ehrlich seconded the motion. Mr. Rozman called for discussion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting carried the motion unanimously.

There being no further business before the Shareholders, Mr. Rozman moved that the Special Shareholders Meeting be adjourned. Mr. Fredrickson seconded the motion. There was no discussion, so Mr. Rozman called for a vote. On this matter, the following Shareholders voted "Aye": Paul Ehrlich, Robert Rozman, Michael Ruffner, Jan Zolman, Gary Fredrickson and Richard Meldrum. The Shareholders present at the meeting carried the motion unanimously.

The Special Shareholders Meeting was adjourned at 10:30 AM.

_Robert F. Rozman_

Robert F. Rozman, President

8

ORIGINAL

1

1

2

3

4          DIEHL WOODWORKING MACHINERY

5          2006 ANNUAL SHAREHOLDERS MEETING

6

7

8

9          REPORT OF PROCEEDINGS had before the

10   Shareholders of Diehl Woodworking Machinery, 135

11   South LaSalle Street, Suite 3950, Chicago,

12   Illinois, 60603.

13          REPORT OF PROCEEDINGS commenced at the

14   hour of approximately 11:30 o'clock a.m. on the

15   17th day of August 2006.

16

17

18

19

20

21

22

2

```
 1    ATTENDANCE:

 2         BAILEY BORLACK NADELHOFFER LLC
           BY:  MR. KENNETH S. PERLMAN
 3         135 South LaSalle Street
           Suite 3950
 4         Chicago, IL  60603
           (312) 629-2700
 5
           appeared on behalf of Diehl Woodworking;
 6

 7
           MR. MICHAEL H. MOSS
 8         1550 North Northwest Highway
           Suite 203
 9         Park Ridge, IL  60068
           (847) 827-8100
10
           appeared on behalf of Paul Ehrlich;
11

12    MEMBERS:

13         Mr. Robert F. Rozman
           Mr. Paul Ehrlich
14         Mr. Michael W. Ruffner

15

16

17
                *       *       *       *       *
18

19

20

21

22
```

3

1        MR. ROZMAN:  I would like to welcome everyone

2   to the Diehl Woodworking Machinery 2006 Annual

3   Shareholders Meeting.  Located here in Chicago,

4   Illinois, on August 17, 2006.

5            I would announce that those present

6   at the meeting are Michael Ruffner, Bob Rozman, Jay

7   Ehrlich -- excuse me, not Jay Ehrlich -- Paul

8   Ehrlich.  Absent are Jay Ehrlich, Jim Loukitis,

9   Gary Fredrickson, Jan Zolman, and Richard Meldrum.

10       MR. PERLMAN:  But they are represented by

11  proxy, as I understand.

12       MR. ROZMAN:  That's correct.  They are

13  represented by proxy.

14       MR. PERLMAN:  The last three.

15       MR. ROZMAN:  The last three individuals are

16  represented by proxy.

17            There are two primary issues before

18  the shareholders today.  The first issue will be a

19  change in the bylaws to alter the number of

20  directors in the corporation, and the second order

21  of business will be the election of directors for

22  Diehl Woodworking Machinery.

4

1          Anybody have any other comments at

2    this time?  Okay.  Then let's proceed with the

3    first order of business to change the bylaws.

4          MR. EHRLICH:  The Indiana law with regard

5    to -- did you want to address the cumulative

6    voting?  Do you want --

7          MR. PERLMAN:  It's my understanding based on

8    looking at the Indiana statute this morning that it

9    provides that unless otherwise set forth in the

10   articles of incorporation, there is no cumulative

11   voting.  Accordingly, since the articles of

12   incorporation, of this corporation, do not provide

13   for cumulative voting, there are no -- there is no

14   cumulative voting.  Notwithstanding that, the

15   bylaws purport that there should be.  That

16   particular bylaw is not valid since it is contrary

17   to Indiana law.

18         MR. ROZMAN:  And as a result, directors are

19   elected by a plurality of votes cast by the

20   shareholders at the meeting.

21         MR. PERLMAN:  Correct.

22         MR. ROZMAN:  All right.  Readdressing our

5

1    attention to the first issue, which is the change

2    in the bylaws to alter the number of directors, I

3    believe I would make that motion that we change.

4        MR. PERLMAN:  It's Article 3, Section 2, on

5    page 5 of the bylaws.  It's the first sentence, the

6    motion is to amend the bylaws, Article 3, Section

7    2, by restating the first sentence thereof.  The

8    number of directors of the corporation shall be

9    three.

10        MR. ROZMAN:  Okay.  Reduced from five.  Do we

11    have a —

12        MR. PERLMAN:  I understand you are making the

13    motion?

14        MR. ROZMAN:  I am making the motion.

15        MR. RUFFNER:  I second the motion.

16        MR. ROZMAN:  Do we have any discussion on that

17    motion?

18        MR. EHRLICH:  Call for a vote.

19        MR. ROZMAN:  There being no discussion, I

20    would call for a vote of the shareholders and that

21    it be resolved that the number of directors in the

22    Diehl Woodworking Machinery Corporation shall be

6

1    reduced from the current five to three directors.

2    And I call for -- Mr. Ruffner, how do you vote?

3        MR. RUFFNER:  Aye.

4        MR. ROZMAN:  For.  Mr. Paul Ehrlich?

5        MR. EHRLICH:  Yes.

6        MR. ROZMAN:  For.  I vote for the change.  And

7    the proxies of Mr. Meldrum, Mr. Zolman, and Mr.

8    Fredrickson vote for the change.

9        MR. PERLMAN:  Do we have copies of those

10   proxies?

11       MR. ROZMAN:  We have copies of the proxies.

12   They are in my possession, and they are assigned to

13   me.

14       MR. PERLMAN:  Therefore, you are voting.

15       MR. ROZMAN:  I am voting.

16       MR. PERLMAN:  Those shares in favor.

17       MR. ROZMAN:  That's correct.  So I believe

18   that we have 62-and-a-half percent of the shares.

19       MR. PERLMAN:  May I see the proxies?

20       MR. ROZMAN:  You may.

21       MR. PERLMAN:  The proxies from Gary

22   Fredrickson, Rich Meldrum, and Jan Zolman are here;

7

```
 1        and they are each dated the 14th of August 2006

 2        appointing Robert Rozman as the proxy to vote at

 3        the shareholders meeting on August 17, 2006, or any

 4        adjournment thereof, for the transaction of any

 5        business which may legally come before the

 6        meeting.

 7                   I verify these proxies have been

 8        given and that you have voted accordingly with the

 9        authority given to you.

10             MR. ROZMAN:  Okay.  Again, by my calculations

11        I believe that 62-and-a-half percent of the shares,

12        of all the shares of Diehl Woodworking Corporation,

13        have voted to make this change.  I believe the

14        matter is resolved.

15             MR. PERLMAN:  The next order of business.

16             MR. ROZMAN:  The next order of business is to

17        elect a board of directors.  I, therefore, again

18        make a motion that the individuals standing for

19        directors as the Diehl Woodworking Machinery

20        Company would be the following:  It would be Robert

21        Rozman, Paul Ehrlich, and Michael Ruffner.

22             MR. EHRLICH:  Second the motion.
```

000202

8

1          MR. ROZMAN:   Okay.  Is there any discussion?

2          MR. PERLMAN:   It may take a little bit longer,

3     but I think we should vote on the three

4     individually.  And I suggest we first vote in the

5     order that you read them.  We first vote on Robert

6     Rozman.

7          MR. ROZMAN:   Okay.

8          MR. PERLMAN:   If you would call the vote.

9          MR. ROZMAN:   I will.  For the voting of Robert

10    Rozman as a director of the Diehl Woodworking

11    Machinery Company, I ask for your vote.

12         MR. EHRLICH:   Paul Ehrlich for.

13         MR. RUFFNER:   Mike Ruffner for.

14         MR. ROZMAN:   Robert Rozman for.  And Robert

15    Rozman as acting proxy for Gary Fredrickson, for;

16    and Robert Rozman as acting proxy for Richard

17    Meldrum, for; and Robert Rozman as acting proxy for

18    Jan Zolman for.

19         MR. PERLMAN:   Robert Rozman is elected a

20    director of the corporation.  The next director to

21    vote upon would be Paul Ehrlich.  And, Bob, if you

22    would call the vote?

9

1          MR. ROZMAN:   Robert Rozman votes for.

2          MR. RUFFNER:   Mike Ruffner votes for.

3          MR. PERLMAN:   Paul.

4          MR. EHRLICH:   Paul Ehrlich votes for.

5          MR. ROZMAN:   Robert Rozman acting as proxy for

6    Gary Fredrickson votes for; and Robert Rozman

7    acting as proxy for Richard Meldrum votes for; and

8    Robert Rozman acting proxy for Jan Zolman votes

9    for.

10          MR. PERLMAN:   Paul Ehrlich is elected as a

11    director of the corporation.  The next person to

12    stand for election is Michael Ruffner.  Would you

13    call the vote, Bob?

14          MR. ROZMAN:   Robert Rozman votes for Michael

15    Ruffner.

16          MR. EHRLICH:   Paul Ehrlich votes for.

17          MR. RUFFNER:   Michael Ruffner votes for.

18          MR. ROZMAN:   Bob Rozman acting as proxy for

19    Gary Fredrickson votes for; Bob Rozman acting as

20    proxy for Richard Meldrum votes for; and Bob Rozman

21    acting as proxy for Jan Zolman votes for.

22          MR. PERLMAN:   Michael Ruffner is elected as

10

1      director of the corporation.

2              MR. ROZMAN:  So the new directors resolved as

3      the new directors of Diehl Woodworking Machinery

4      are Robert Rozman, Paul Ehrlich, and Michael

5      Ruffner.

6                      Is there any other business to be

7      raised by any other shareholder?

8              MR. EHRLICH:  I move this meeting be adjourned

9      and reconvened after the board meeting.

10             MR. ROZMAN:  I second that motion.  All in

11     favor of adjournment vote by saying aye.

12             MR. EHRLICH:  Aye.

13             MR. RUFFNER:  Aye.

14             MR. ROZMAN:  The meeting of Diehl Woodworking

15     Machinery for its 2006 Annual Shareholders Meeting

16     is now concluded.

17             MR. PERLMAN:  Not concluded.

18             MR. ROZMAN:  Is adjourned, excuse me.

19

20                     (WHEREUPON, the meeting was

21                      adjourned.)

22

11

```
 1    STATE OF ILLINOIS )

 2                      ) SS:

 3    COUNTY OF C O O K )

 4

 5

 6         I, RENEE C. GARCIA-RUIZ, a Certified

 7    Shorthand Reporter of the State of Illinois, do

 8    hereby certify that I reported in shorthand the

 9    proceedings had at the hearing aforesaid, and that

10    the foregoing is a true, complete, and correct

11    transcript of the proceedings of said hearing as

12    appears from my stenographic notes so taken and

13    transcribed by me.

14         IN WITNESS WHEREOF, I do hereunto set my hand

15    and affixed my seal this 21st day of August, 2006.

16

17

18

19                          Renee C. Garcia-Ruiz

20                          Renee C. Garcia-Ruiz

21                          Certified Shorthand Reporter

22                          C.S.R. Certificate No. 084-003679
```

"OFFICIAL SEAL"
Renee C. Garcia-Ruiz
Notary Public, State of Illinois
My Commission Exp. 06/16/2008

00020

q

MINUTES OF THE 2005 ANNUAL BOARD OF DIRECTORS MEETING
DIEHL WOODWORKING MACHINERY, INC.
JUNE 28, 2005

THE ANNUAL MEETING OF THE BOARD OF DIRECTORS OF DIEHL WOODWORKING MACHINERY, INC., AN INDIANA CORPORATION WAS HELD AT THE OFFICES OF DIEHL WOODWORKING MACHINERY, INC., 981 S. WABASH, WABASH, INDIANA ON JUNE 28, 2005 AT 10:30 A.M.

THE FOLLOWING INDIVIDUALS, CONSTITUTING THE ENTIRE MEMBERSHIP OF THE BOARD OF DIRECTORS, WERE PRESENT AT THE MEETING: PAUL EHRLICH, JAY EHRLICH, ROBERT ROZMAN, DIMITRIS LOUKIDIS, AND MICHAEL RUFFNER

JAY EHRLICH AS CHAIRMAN CALLED THE MEETING TO ORDER.

MICHAEL RUFFNER THEN DISCUSSED THE RELATIONSHIP OF THE COMPANY WITH NATIONAL CITY BANK. HE SAID THE RELATIONSHIP WAS GOOD AND THAT HE EXPECTS TO RENEW THE LOAN AGREEMENT FOR ONE YEAR. HE INDICATED THAT THE BANK WAS FAVORABLE TO RELEASING THE PERSONAL GUARANTIES OF SHAREHOLDERS ON THE LOAN.

HE THEN RELAYED THE HEALTH INSURANCE INFORMATION AND THAT HE EXPECTED TO FIND A NEW INSURANCE CARRIER BY THE END OF JULY, 2005.

THE NEXT ORDER OF BUSINESS WAS TO DISCUSS THE NEED FOR CAPITAL EXPENDITURES IN 2005.

ROBERT ROZMAN MOVED TO ALLOCATE $53,000 FOR REPAIR OF THE ROOF OVER THE OFFICE. PAUL EHRLICH SECONDED AND AMENDED THE MOTION TO INCLUDE AN ADDITIONAL $19,000 FOR POWER WASHING AND PAINTING THE EXTERIOR OF THE BUILDING. ROBERT ROZMAN THEN SECONDED THE AMENDED MOTION. THE MOTION PASSED BY UNANIMOUS VOICE VOTE.

THE NEXT ORDER OF BUSINESS WAS A DISCUSSION OF LABOR RELATIONS WITH THE UNION.

ROBERT ROZMAN MOVED TO APPROVE AN INCREASE FOR EMPLOYEES IN THE UNION BY THIRTY FIVE CENTS PER HOUR CONTINGENT ON THE UNION'S AGREEMENT WITH THE COMPANY'S INSURANCE PROPOSAL. MICHAEL RUFFNER SECONDED THE MOTION. THE MOTION PASSED BY UNANIMOUS VOICE VOTE.

THE NEXT ORDER OF BUSINESS WAS TO DISCUSS ADDITIONAL EXPENSES AND/OR DEBT REDUCTIONS THAT THE COMPANY COULD AFFORD TO UNDERTAKE. MIKE RUFFNER SUGGESTED THAT THE COMPANY COULD AFFORD AN ADDITIONAL $20,000 IN MONTHLY EXPENSES OR DEBT REDUCTION. PAUL EHRLICH STATED THAT HE THOUGHT SUCH AMOUNT WAS NOT CONSERVATIVE AND WOULD BE TOO MUCH TO HANDLE AT THIS TIME.

PAUL EHRLICH THEN SUGGESTED THAT THE MANAGEMENT FEE BEING POAID TO WAMCO WAS INTENDED FOR MANAGEMENT SERVICES, WHICH HAD BECOME MINIMAL AND THAT HE BELIEVED SUCH FEE COULD BE ELIMINATED. HE SUGGESTED THAT IT WAS WRONG TO BE PAYING SUCH MANAGEMENT FEE WHILE ROBERT ROZMAN'S SALARY WAS STILL DECREASED FROM ITS PRIOR LEVEL.

JAY EHRLICH STATED THAT HE BELIEVED THAT THE MANAGEMENT FEE HAD BEEN AGREED TO AS PART OF THE COMPENSATION FOR THE PURCHASE OF THE WAMCO PRODUCT LINE BY DIEHL AND THAT DIEHL HAD CONTRACTUAL OBLIGATIONS TO MEET. HE FURTHER POINTED OUT THAT DIEHL HAD PAID OUT $100,000 IN 2004 SHAREHOLDER DISTRIBUTIONS. IT WAS BOB ROZMAN'S BELIEF THAT DIEHL DID NOT HAVE A BINDING OBLIGATION TO PAY THE MANAGEMENT FEE AT $15,000 PER MONTHY OR ANY OTHER SPECIFIC AMOUNT AND CONTINUATION OF THE MANAGEMENT FEE AT ANY PARTICULAR LEVEL MUST DEPEND ON BUSINESS CIRCUMSTANCES FROM TIME TO TIME. EXCEPT SOLELY AS PROVIDED IN THE FOLLOWING RESOLUTION, NO OTHER AGREEMENTS WERE REACHED BY THE DIRECTORS WITH RESPECT TO THE MANAGEMENT FEE..

THE BOARD THEN DISCUSSED AND CONSIDERED THE FOLLOWING ITEMS AS A PACKAGE:

1. (A) TO PAY WABASH RIVER LLC IN THE MONTH OF JULY, 2005, RENT ACCRUED THROUGH JUNE 30, 2005, IN THE TOTAL AMOUNT OF $18,000 , AND (B) TO DECREASE MONTHLY RENT TO WABASH RIVER TO $4,500 PER MONTH AS OF JULY 1,2005, AND TO PAY SUCH RENTAL MONTHLY ON A CURRENT BASIS;

2. TO PAY A MANAGEMENT FEE OF $12,500 PER MONTH (INCREASED FROM THE CURRENT $10,000 PER MONTH) TO WISCONSIN AUTOMATED MACHINERY CORP EFFECTIVE AS OF JULY 1,2005 THROUGH DECEMBER 31, 2005, AND $15,000 PER MONTH COMMENCING JANUARY 1, 2006 THROUGH DECEMBER 31, 2008: PROVIDED HOWEVER THAT (A) SUCH COMMITMENT TO PAY ANY MANAGEMENT FEE WOULD TERMINATE AS OF JANUARY 1, 2009, AND (B) THE SAID MANAGEMENT FEE COULD BE RECONSIDERED AND REDUCED OR ELIMINATED BY MUTUAL AGREEMENT OF THE PARTIES AS DIEHL'S BUSINESS CONDITIONS REQUIRED;

3. TO INCREASE ROBERT ROZMAN'S SALARY BY $2500 PER MONTH SO AS TO RESTORE IT TO ITS PRIOR LEVEL EFFECTIVE AS OF JULY 1, 2005;

4. TO PAY $4,150 PER MONTH , COMMENCING JULY 1, 2005, TO PAY DOWN SUBORDINATED DEBT OF SHAREHOLDERS : AND

5. TO RATIFY, CONFIRM AND ADOPT ALL PRIOR ACTS OF THE OFFICERS AND DIRECTORS OF THE CORPORATION.

JAY EHRLICH MOVED TO APPROVE THE PRECEDING PACKAGE OF ITEMS. MIKE RUFFNER SECONDED THE MOTION. THE BOARD APPROVED THE MOTION UNANIMOUSLY.

THE NEXT ORDER OF BUSINESS. WAS A DISCUSSION CONCERNING THE CALCULATION OF THE BUYOUT FORMULA FOR MANDATED PURCHASE OF SHARES OF MANAGEMENT OWNERS AND SHAREHOLDERS AND THE BUY - SELL PROVISIONS AND RIGHTS OF FIRST REFUSAL PRESCRIBED BY THE SHAREHOLDERS AGREEMENT, AS SET FORTH IN THE MEMORANDUM, DATED JUNE 24, 2005, FROM THE CORPORATION'S LEGAL COUNSEL, KEN PERLMAN, TO THE BOARD OF DIRECTORS .

ROBERT ROZMAN MOVED THAT THE BOARD APPOINT A COMMITTEE TO RECOMMEND TO THE BOARD A PURCHASE PRICE FORMULA PURSUANT TO PARAGRAPH 1.11 OF THE SHAREHOLDER AGREEMENT, AND THAT PAUL EHRLICH AND MIKE RUFFNER BE NAMED MEMBERS OF THE COMMITTEE.

PAUL EHRLICH SECONDED THE MOTION.   THE MOTION PASSED WITH UNANIMOUS APPROVAL. NO ACTION WAS TAKEN AT THIS TIME WITH RESPECT TO THE BUY - SELL PROVISIONS AND RIGHTS OF FIRST REFUSAL

THERE BEING NO FURTHER OR NEW BUSINESS TO COME BEFORE THE BOARD OF DIRECTORS, A MOTION TO ADJOURN THE MEETING WAS MADE BY JAY EHRLCH, SECONDED BY ROBERT ROZMAN AND UNANIMOUSLY CARRIED.  THE MEETING WAS ADJOURNED AT APPROXIMATELY 6:00 P.M.

CHAIRPERSON/DIRECTOR/SECRETARY

DIRECTOR

DIRECTOR

DIRECTOR

DIRECTOR

10

Tue Jun 05 2007 22:00:03                                          Page 1

```
                            CIVIL NOTICE
                        WABASH CIRCUIT COURT
                    WABASH COUNTY JUDICIAL CENTER
                        49 WEST HILL STREET
                        WABASH IN 46992


    DIEHL WOODWORKING V WISCONSIN                85C01-0608-PL-380
------------------------------------------------------------------------




    TO: LARRY L BARNARD
        CARSON BOXBERGER
        1400 ONE SUMMIT SQUARE
        FORT WAYNE IN 46802



    --------------------------------------------------------------------
            ATTORNEYS                          PARTIES
    --------------------------------------------------------------------
                                       PLAINTIFF(S)
        11904-49    LARRY BARNARD        DIEHL WOODWORKING MACHINERY INC
        3535-02     BRUCE BOXBERGER


        7618-43     R STEVEN HEARN     DEFENDANT(S)
        7576-02     THEODORE STORER      WISCONSIN AUTOMATED MACHINERY CORP
        591-85      STEPHEN DOWNS
        7618-43     R STEVEN HEARN       DIMITRIS LOUKIDIS
        17576-02    THEODORE STORER      JAY EHRLICH


                                       MEDIATOR
                                         JOHN WHITELEATHER JR

                                       OTHER
        11904-49    LARRY BARNARD        ROBERT F ROZMAN
        3535-02     BRUCE BOXBERGER
    --------------------------------------------------------------------
```

05/24/2007

Defendants file Motion for Continuance along with proposed Order. Motion granted. May 30, 2007 hearing vacated and reset to July 19, 2007 at 9:00 a.m. Court directs counsel for Defendant to reflect in future motions to continue whether or not opposing counsel objects or agrees to proposed continuance, as required by local rule. Motion of Jay Ehrlich for Extension of Time in Which to Respond to Counter Claim filed along with proposed Order. OE. #

06/01/2007

laintiff files Supplemental Complaint for Interpleader along with a check to the Clerk's Office for $10,000.00. Court sets this matter for hearing on June 29, 2007 at 1:00 p.m. If the parties will require more than twenty minutes, they are to contact the Court to reschedule. Clerk to

RECEIPT FOR PAYMENT
UNITED STATES DISTRICT COURT
For the
NORTHERN DISTRICT OF
INDIANA

FORT WAYNE, IN
1193080

RECEIVED FROM:
DIEHL PROVIDERS

Case Number:
3:07CV263

P/D/B/O:
Party ID:

Tender Type:                    CHECK
97-604780                       $10,000.00
Registry Funds

Remarks:

Subtotal:                       $10,000.00

Receipt Total:                  $10,000.00

*Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution.
Date:        7/5/07

Clerk: _____
                LMC

049446
06/29/07

0        10,000.00
0        10,000.00
NET AMOUNT

DETACH BEFORE DEPOSITING — RETAIN VOUCHER FOR YOUR RECORDS

049588

07/27/07

NET AMOUNT

10,000.00
10,000.00