# WAMCO V. DIEHL
## TABLE OF EXHIBITS FOR ARBITRATION HEARING

1.  000007-000012
2.  000018-000020
3.  000022
4.  000027-000028
5.  000036-000037
6.  000040
7.  000047
8.  000049
9.  000051-000054
10. 000055
11. 000060-000061
12. 000069-000070
13. 000078-000079
14. 000080-000081
15. 000082
16. 000084-000085
17. 000087-000088
18. 000093-000094
19. 000095-000096
20. 000102
21. 000103-000166
22. 000167-000168
23. 000195
24. 000207-000211
25. 000227
26. 000228
27. 000319
28. 000320-000334
29. 000343
30. 000493-000494
31. 000497-000498
32. 000506-000508
33. 000514-000518
34. 000519
35. 000528
36. 000533
37. 000534
38. 000536
39. 000596
40. 000602
41. 000604
42. 000619
43. 000624-000625

44.  000656-000657
45.  000667-000670
46.  000685-000687
47.  000706-000707
48.  000726
49.  000730
50.  000753
51.  000755-000758
52.  000800-000802
53.  000803-000804
54.  000805-000806
55.  000811-000816
56.  000827-000828
57.  000829-000835
58.  000837
59.  000855-001446
60.  D0002
61.  D0015
62.  D0021-D0024
63.  D0032-D0034
64.  D0042-D0043
65.  D0045-D0048
66.  D0050-D0051
67.  D0052
68.  D0055
69.  D0057-D0058
70.  D0060
71.  D0062
72.  D0069
73.  D0071-D0081
74.  D0099-D0100
75.  D0103-D0113
76.  D0122
77.  D0124
78.  D0126
79.  D0127-D0149
80.  D0150-D0152
81.  D0176
82.  Diehl's Interrogatory Answers
83.  Diehl's Complaint
84.  Diehl's Amended Complaint
85.  Diehl's Supplemental Complaint for Interpleader in Federal litigation
86.  Letter from Bruce Boxberger dated June 27, 2007
87.  Diehl's Motions for Leave to Tender Funds
88.  September 5, 2006 letter from Michael Moss
89.  September 21, 2006 Wabash River L.L.C. members' resolution

90.   WAMCO corporate credit card statement dated 11/21/05 (all but last 4 digits of account number redacted)

91.   Current docket report for Federal litigation

Date:       July 11, 2006
To:         Jay Ehrlich    cc: P. Ehrlich, J. Loukidis, M. Ruffner
From:       Bob Rozman
RE:         *Situation at Diehl – Your Note to Mike of July 7, 2006*

I read your note to Mike, and with all due respect, I don't see where you're coming from when you suggest that the next three months should be profitable and positive cash flow?

We showed a profit in June because we reversed <u>all</u> ($76,850) of our accruals and did not accrue for building repair, R&D or a mgmt bonus, which we haven't done since March anyway and reduced office salaries by $4250 every two weeks. So no matter how you look at it, scratch, we lost $13,170, and that was with over $35K in recovered parts, which has a 99% margin!

At this moment,
- We have about $135K in outstanding A/P
- There's about $35K more coming on the Dyken alone
- We owe the bank  $232K
- There's a shop payroll four times a month at $10K a pop
- There's two office payrolls at $40K each
- Half of the Dyken payment ($243K) is already received

So, to suggest that July will be both profitable and positive in cash flow is quite questionable. We entered less than $10K in new parts orders during the first week of July and that's on top of being down about $100K in Diehl parts orders YTD. We've shipped a splicer and will ship another SL30 we got yesterday…the MR90 is nip and tuck for July. So if we don't get a good parts base, there's nothing to justify saying that July will be profitable. Where would the profit come from?  The NC tenoner and rip saw will ship in August and there should be reasonable margin on those machines, but if we don't get any parts that month, it will take that to make up for both July and August. Diehl needs $225-$250K in parts a month and 3-1/2 machines to make things work, it's as simple as that. Halfway through the third week of every month, ever since I've been here and before that, we begin focusing

EXHIBIT
C  1

on service parts orders. This company, and any viable machinery company, is alive only because we (it) can still sell parts…and it's the same reason WAMCO could not sustain itself. I'm not trying to grandstand and make things appear dome & gloom, better or worse than they really are; I'm just telling you from realistic experience that unless those parts and machines happen consistently, we don't make money and it doesn't matter how much cash you think you have or can save, the operation doesn't make it.

On a shipment or cash collection schedule, you don't see the labor inefficiency, the outright mistakes and other expenses that are there. Without a consistent production schedule, the start-stop, "work on this-no work on that" situation that develops (as we've been experiencing) makes machinery cost more, discourages the people and creates an all around negative environment. Manufacturing machinery is not like a throttling a valve; you can't just turn it on and off and expect things to just pick up where you left off!

What you have to understand is that Diehl can't sustain shipping a Dyken one month, a Challoner two months later and possibly two Dykens next year if there's not a solid parts and machine base in between. We can't produce enough labor to absorb the manufacturing burden. We went for nearly 10 weeks without a SL rip saw order and that just about demoralized the entire company!

Your interest in the company is short term and to extract as much return as you can during that remaining time frame. Mine is the opposite. You think we have the next two Dykens in the bag; I don't. We have a run off of a completely new machine with people who have never built the machine and don't know what problems they will encounter. The project engineer who bought the machines, Warren Beglin, retired last month and remains on a "consultant basis" to insure the installation of the first machine and that's unsettling because he's not really there defending his decision. Will we complete the project? Yes, but the machine could ship as later as October, and will be tying up 55% of our assembly floor. And every week its here, the cost goes up.

So what do I plan for? At this moment, we have two other rip saws to plan for in the last five months of the year. If we maintain our monthly YTD average of $162K in repair parts, even if we sell two more Dykens, that won't cut it. We have to sell about 20 rip saws to catch up with last year's

results because at this point, we're at 56% of last year's YTD rip saw shipments. There is plenty to be concerned about.

If Atlanta doesn't bring some solid rip saw/splicer business, what is going to make Diehl profitable? Cutting salaries is a difficult decision, and there are a lot of those when you deal with the day-to-day operation of this company. I'm responsible for making the company profitable and insuring it's future. Therefore, at this point, Diehl will take a conservative approach and the rent will be reduced to $500, the funds paid to WAMCO will be $9K.

Finally, with respect to my offer to purchase the stock of Jim and Jay, made last week…I remove any contingency about waiting for the show's results to confirm that offer. It's not that anything better has happened, or that I'm reversing the opinion I've just presented. It's just that I'm committing to the reality that I am resigned to be here no matter the outcome. The situation we're in right now can't continue. Diehl has to either get very very lucky or get smaller. Under the more likely alternative, we have to make the company solvent or the entire thing tips over.

Robert Rozman

| | |
|---|---|
| **From:** | <Addisonst@aol.com> |
| **To:** | <rfr@diehlmachines.com> |
| **Sent:** | Monday, June 19, 2006 12:08 PM |
| **Subject:** | Re: Document2 |

In a message dated 6/16/2006 4:03:51 P.M. Central Daylight Time, rfr@diehlmachines.com writes:

> Gentlemen:
>
> Given our current situation, here is what I propose...and I ask for your additional input. We have to begin acting on this matter.
>
> Bob

Bob:

I think this is on the premature side. There is a proposal on the table. Jim and I came back w/ a structure to Paul. I don't know if you were apprised of it as I wanted to resolve issues with him first. I have not heard back from him or Ken.

I will tell you that one of the things Jim and I put in there was a sale of our 62.5% of W.R. to management. Presumably PE would opt to sell his share at that point too.

We need to see how this plays out before making any draconian moves.

As you consider moves to make down the road though, I think the focus should be off the bank. We have no issues with the bank nor will we.

If you are concerned about cash flow, the accruals are irrelevant.

Should we not resolve the PE proposal, I would submit that the first thing we do is return the S/h distributions of 106k ytd. That takes us virtually out of debt w/ the bank and allows you and extra 35k to absorb losses for 3 months. I presume it's also less painful to management than salary cuts.

Thankfully, we are not at that point yet.

Date:       July 16, 2006
To:         P. Ehrlich. J. Ehrlich, J. Loukidis, M. Ruffner, G. Fredrickson, J. Zolman, R. Meldrum.
From:       R. Rozman

**RE:**     *Proposed Corrective Measures to Reduce Current Financial Situation*

I think it is clear that our current financial situation, despite the D-501/C-900 backlog is not particularly good. As of July 16, shipments for the month total $111,573 and with the existing workload and expense level, I fully anticipate another serious loss in the $55K range. We have the prospect of selling a used rip saw we just took in on trade, and maybe a splicer. For the present however, there are no strong machine order prospects that we can put in our pocket and service parts/tooling and service look to be in the $160-170 category. We can hope and predict that the good fortune of margin on the Dyken and Tenoner, along with some business in Atlanta will correct our situation, but it could also be that we will have created enough a hole that will be hard to crawl out of by year's end...or that this poor order environment will continue. Right now, I expect that the Dyken will ship in September, the Tenoner in August. But currently, there is nothing beyond what parts orders we obtain, excluding Dyken, the NC Prison and an MR90.

I am concerned that the bank, after seeing the results of our second quarter will visit with us to discuss the situation. Three poor months in a row should bring this matter to their attention.

To correct this situation, I propose that we take the following measures:
1)    We will not replace the roof over the weld shop or main hall and instead, patch where necessary. This will allow us to stop accruing $3.5K per month.
2)    We will eliminate $1K per month in literature/advertising.
3)    Office salaries will be cut to save $10K per month, minimum.
4)    We propose to reduce the "management fee" to WAMCO to $5K per month.

5)      We propose to reduce rent to $1K per month.

6)      We propose to eliminate any other additional spending other than absolutely necessary.

7)      We have a health insurance accrual of approximately $17.3K that can be reversed after September 1, 2006 pending no additional claims before that date. This is for claims that would be made prior to September 1, 2005.

I'm not yet certain of what other measures can be taken, but will work on those this weekend. The lack of business these past few months has been as poor as anything I've seen in the 15 years that I have worked as Vice President and President of Diehl. But I am most concerned about Gary's rip saw/splicer/tenoner prospect list, or the lack thereof.

At this point, my concern is most focused on maintaining Diehl's viability and I have met with the managers at Diehl this afternoon to discuss these steps. Items 1, 2 and 3 are in process. Therefore, I ask for any other input to address this important issue.

2

Date: July 7, 2006

To:  J. Ehrlich, J. Loukidis   cc: P. Ehrlich, M. Ruffner

From: Bob Rozman

RE:  *Diehl Stock/Building Purchase Offer*

Gentlemen, my objective in this exercise is to be realistic in values and I understand that you both have an investment, but I can't necessarily base any valuations on that premise. I've seen this company operate for the past 15 years and the opportunity trend is not positive. You've indicated that you see a premium on the value of the company, but I respectfully disagree. As I see it, I will be the last domino. It's only the people combined together here and now that create any real value for this business. It has a parts/break up value to some other firm, but that value is less and it leaves a significant liability in the building. My plan is to continue to run the company, at whatever level, for the collective benefit of those people who will stay and who we wish to stay with no glorious illusions about increasing salary and drawing money out of the company. I expect to cut my salary again next month, and frankly, be happy that I have a job in this industry.

As it looks to me, under the current trend and maintaining the product line we have, Diehl has 3-8 years of life remaining. That's based on the way I see things and using every bit of energy Gary, Jan and I have...and with the company earning less every year. Someone else might have a different opinion. I always thought there would be at least 52 people a year in the world that would buy a new or remanufactured Diehl rip saw, but that hasn't happened for the past three years and while it may happen again, the odds are that it's not in the near future. Over that same period, we'll be replacing 3-4 people in the office and the shop will also make a transition. Trying to find good younger factory people that want to get into and stay in this business is quite a challenge, though not impossible.

Another serious problem is that we're now operating on more of a month to month basis. I know we have the Dyken and 900, but our core business can't support the manufacturing overhead we're carrying so we continually have to worry when the next big machine order will come to carry us through. If there were no prospect of two more Dykens, we'd be downsizing even further now and our current situation would be critical. And we don't have the two other Dykens in our pocket, though they are ours to lose. We can't maintain the current core of people, which isn't big to begin with, and bank on Dykens or Challoners to carry us, not with the parts and rip saw/splicer business we have.

The machinery show will reveal a lot about the next six to eight months of the company's operation. *If we don't sell 12 -18* machines (both at the show and shortly thereafter), we really have nothing to do for the remainder of the year except finish the Dyken ASAP

EXHIBIT
C2

and hope Knauf isn't alarmed by the lack of activity/people when they come in for the first machine's run-off. Without those show machine orders, how do we keep all the people, pay all the bills and stay profitable? We generated $246K in shipments in June, but that was by focusing on every service order possible, at the expense of the 900 and Dyken. You can say focus on the equipment, but if we don't ship something, there are no receivables and that's what's keeping the bank from looking closer. Without that show business, we'll begin changing the company's complexion again because there will be nothing to support the fixed operating expense.

Up to this point, I've agreed to the management fee because my objection, though heard, probably wouldn't really have made a difference. The truth has always been that the management fee can exist as long as Diehl has good business. At out current level, or what has transpired for the past several months, you can continue the fee, but you weaken the company and that's what we're doing right now.

I think it's fair to say that the people of Diehl generated the new generation of PELLA and Dyken business. Yes, we had a door slightly open, but the Challoner machines we sold were almost totally new and the Dyken was totally new. That opportunity to secure those new machine orders is the basis for paying $10K per month, not the WAMCO parts business. So keeping these people together is the real value in Diehl.

I know there are internal obligations between Paul, Jim & Jay, and that some function of the management fee is to maintain those obligations. The problem is that this business really can't support that expense, it's as simple as that. Diehl's market environment today just doesn't provide us enough business opportunity and WAMCO had Diehl to buy them out at a premium, when you include the management fee. So the problem I see is that I can get in, but I'll never get out, an eventuality I accept. The concern I have is that I want it to go on for at least another 7-8 years and that could be tough. How do you keep good people? How do you replace the ones we lost...because only the unproductive ones want to stay. Even ten years ago, you could milk this kind of business or several others, but no one saw the mass exodus of the furniture industry coming...and leaving so quickly. Had we bought Mattison, we'd have been holding another bag with an even bigger hole in the bottom. If I had argued that Bell/Challoner parts would average at best $46K/month over the first 42 in months Wabash, no one would have listened . This month, we did $32.9K in Challoner parts and $35.1K in _reclaimed Diehl_ parts. While the intent, based on the facts at the time of the WAMCO agreement, was founded on reasonable historical data, I think the outcome only substantiates that the potential for our kind business has changed radically. So far this year, WAMCO parts has averaged $40.3K/month. That doesn't cover Rick, the $10K payment and the management fee. So on an annual basis, we go in the hole on the WAMCO deal, and we don't necessarily make it up with machinery.

For the moment, I can pay you gentlemen for their initial investment of your stock and I don't believe it's really worth that. Perhaps someone will pay half of the $1,042K inventory value, but the goodwill and the covenant not to compete won't bring anything. I also think it's a stretch to think we could get $368K for the plant equipment and fixtures, but I'll admit is has a better chance of happening in comparison to the inventory and goodwill. Six years ago, you could have done it and made money, but not today, not in Wabash and not at this facility.

At this point, the bank will lend us the money to buy out the WAMCO note, simply because it's only a transfer of debt which benefits them with the interest revenue. Then, I would agree to Diehl paying a $100K premium over the note's value to "buy out" the management fee, which is a mutually agreed arrangement for the owners to withdraw money from the company.

As for the building, if its' roof were in good repair, it might be worth $225K to Diehl, but the fact is that the remainder of the roof needs to be repaired and it needs an overhaul to a greater degree than the office required. The building has utility for only one tenant, and at this point it has substantial repair liability. This building empty, is a complete liability. There is no marketable asset value, there is no real promise of leasing or renting the building, only the obligation of insurance, taxes and sooner or later, razing the structure to avoid unrecoverable expense. Currently, there are three other manufacturing facilities available in Wabash, with the most recently vacated still available after two years. Also, and probably unlike the other buildings, I would suspect that in a complete transfer of title, ours would not probably pass a code inspection because the weldery, portions of the basement and machine shop remain in violation of current electrical wiring codes, not to mention the structural and maintenance concerns which will increase over the next few years. The building was appraised at $196K two years ago, before the roof in the shop became a more serious problem. It hasn't gone up in value. Diehl would buy the building for $180K, paying $2K per month under the same interest rate, but with a balloon after six years.

My offer therefore looks like this:

1) Bob buys Jim & Jay our for $150K, and this is contingent on item No. 2. & No.4.

2) Diehl transfers the WAMCO debt to the bank at whatever remaining balance exists at the closing, plus $100K an the management fee issue terminates.

3) Diehl buys the building for $180K, paying $24K per year plus 7% and buys out the balloon after six years.

4) But, if the show goes bad and we don't sell anything, or sell less than five machines (which means we don't even sell what's at the show), there's still an offer to make, but not this one.

## Robert Rozman

**From:** "Robert Rozman" <rfr@diehlmachines.com>
**To:** "Paul Ehrlich" <peerlesssaws@msn.com>; "Jay Ehrlich" <addisonst@aol.com>; "Dimitri" <jiml@wamcousa.com>; "Mike Ruffner" <mike.ruffner@diehlmachines.com>
**Sent:** Friday, August 05, 2005 6:04 PM
**Subject:** July 2005 Financial Results



Gentlemen...

July was a difficult month for several reasons.

We absorbed the brunt of our chain link problem and had significant indirect labor associated with that problem. It's over now, but we're making chain links at a slow pace because one of our principle fixtures is just worn out.

We also absorbed a lot of indirect labor on the 900. This first one is tough. As of today, we've logged a total of 189,431 in fully loaded cost on the machine. $90,861 in material, $7,520 in assembly labor(14.67/hr) and $10,060 in machine shop labor (15.13/hr). We'll need another 100-150 labor hours to finish it. We're going to bill it later this month to get the cash and we'll have 95% in our hands until it ships in December. However, despite its incomplete status (sheet metal, guarding and some other items)the machine was qualified in all three functions (trim, cope and notch) by the three people here from PELLA this week. I didn't hear it, but Ken Nollen, the project engineer said they were pleased with our design work, our progress on the tenoner and very happy with the performance.

We were told MJ did not get the Vector type machine orders because PELLA was uncomfortable with their pricing and initiative. They hinted that these machines, (that have synchronized servo-drives) will have haunching units that require that the machine be stopped in three different alternative positions as individual components are machined. I project it to be in the $375-$400K category.

The PELLA people also told us that parts of the operation are running 4 days a week. I think that has something to do with getting one machine instead of two up front. The plant manager of the new plant (who was here this week) told Gary we're getting the order for thi third 900, the one identical to the second.

We should have been over-absorbed in labor, but the combination of these two events cost us dearly. Had we just been absorbed we would have recovered $18K of the loss.

On top of this, we had a bad machine and parts month. Three machines (rip saws that valu just over $100K) didn't ship, so inventory went up. It would have stayed about the same or gone down slightly with these three machines gone. Two left this week and the other is going this coming Tuesday.

We received two of the six down payment checks for machines sold at the Las Vegas show Gary says the remaining four will come in within the next two weeks.

4



September 15, 2005

Paul...

Regarding your email about PELLA and the inventory, I'm equally concerned because we are building and learning at the same time. We met this morning and feel there is about 40 hours left of assembly time, 25 of machine shop and $1500 of material that yet has to be added to the machine. As it sits this morning, we have at full burden, $207.8K in the machine. That includes $92,385 in material and another $14,637 in electrical service charges for the programming. We sold the machine for $230,170. This next machine should go smoother, but it's taking longer because of the learning curve on the first machine.

I've notified PELLA of our delay and given our situation, I don't think we'll be able to ship the second machine before year's end. Maybe I'm wrong, but there is too much to do yet. It's priced at $290K.

I'm still working on the premise that we need to build our relationship with PELLA even stronger. I'm betting that by making all the assembly drawing, putting the entire machine on CD Roms, and meeting all of their electrical and safety requirements, we establish such a high standard that no one can compete. I just don't want to break the firm accomplishing that goal!

Our inventory is high for a couple of reasons:
- ❑ We haven't shipped the first 900, which will relieve $210K. That would take us back to below August 2004 levels.
- ❑ We're buying parts for the second 900.
- ❑ We've got $67K more in used chassis than we had last year this time. We bought them because they were available at a good price and as it has turned out, we could have waited on at least $40K of those purchases. But then, we probably wouldn't be at $128K in recovered parts sales, vs $79K this same time last year.
- ❑ We're actually up in all areas except for Challoner parts, where we stand at just 51% of last year...and shipping at an annualized rate of $410K. Somebody else is making Challoner parts and that's the reason.

A more serious concern is future business and the let down we've felt these past 6-8 weeks. Frankly, we've been somewhat fortunate because we've been working our way through another chapter (a different one, at least!) of the rip saw chain. That is now resolved and we'll ship a couple of more machines this month, but it's not coming in the way we had planned. On the horizon, we see:
- ❑ <u>Knauf and the Dyken 501</u>. Each machine is priced at $453K and the proposal is in their hands. We'll be meeting with them this coming Wednesday to go over the proposal, which has a structured payment that puts 30% down, 20% after 18 weeks, 20% after 32 weeks, 20% after run off at our plant and then the balance in 30 days. Delivery is 38 weeks from order. Once accepted, a second machine would be started immediately. The proposal confirms that they understand we're building one machine and then another, that they provide the conveyors and material for testing and that they pay for the first machine when it's done ahead of their January 2007 schedule. I hedged and bet on the come by hiring the engineer already and have had him working on the design to both insure and hopefully, reduce the 38 week delivery time. The new design also reduces the machine's size, so I can use the existing dock and don't have to fight getting the machine out the

door. We'll know something about this by the end of the month...we have to. There are less than 20 parts we are using from the original D-50 design, that's why it's called a 501.

- Rip Saws/Splicers. We have a couple expensive ones in the works and I really think we'll get them. They are $65K and $77K respectively, but we need a more constant flow...and I don't see that right now. Gary is a bit more optimistic, but he's always that way. We did get the orders from the Las Vegas show that he talked about, but not much more. The business just doesn't generate a big backlog like we were always used to having. We have two more splicers to ship and we thought we'd have had another by this time, but nothing.

- PELLA. There is another (identical to No. 2) 900 that is supposed to be released in December, but our delay on the second may create some problems. They also talked about a Vector machine because they didn't give those orders to M-J. So that's why I'm courting them so hard...we want those machines.

- Kimwood. I've heard nothing and I suspect it's because they are busy, making money and converting some of their slow inventory.

- I heard yesterday, from one of our common dealers, that MJ has to pay a product performance failure $600K verdict to a dealer in NC over several machines they sold with an optimizing system that never worked. I didn't know anything about this, but the dealer (who Gary & I have know for 30 years) is talking about how many orders MJ is loosing to Weinig/Raiman. He says they've raised their prices 20% in the past 15 months and he hasn't sold a MJ system in that time frame. Couple that with PELLA not ordering the MJ tenoners, *like they told us they were going to do*, and maybe there is something going on there? I'll keep an eye on it because that is a perfect match, it's close and *if* it were available, I would forget how to spell Kimwood.

I trust you recall our conversation where I looked at the $20K per month we added during our Board meeting and was initially concerned, only to say shortly thereafter that if things continue as we think, $20K per month is nothing. Diehl or any other machinery builder is successful because of its parts business foundation... we can't lose sight of that. Management helps, but without a solid parts business, it is extremely difficult if not impossible in this business. I'm trying to replace lost new parts sales (for whatever reason) through chassis purchases and the resulting used parts sales, build a relationship with the PELLA's and Knauf to get big orders that cover a lot of burden, put a new high tech dress on our old girl the rip saw, introduce new people so everyone doesn't retire during the same week, reduce inventory and create reasonable cash flow.

If you have any questions, just call.

Bob

5

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com>; "Jay Ehrlich" <addisonst@aol.com>; "Gary Fredrickson" <gary.fredrickson@diehlmachines.com>; "Jan Zolman" <jan.zolman@diehlmachines.com>; "Dick Meldrum" <dick.meldrum@diehlmachines.com>; "Dimitri" <jiml@wamcousa.com>; "Mike Ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Tuesday, June 06, 2006 5:23 PM |
| **Attach:** | Jun 13, Mtg.doc; Jun13 Mtg 019.jpg; Jun13 Mtg 002.jpg; Jun13 Mtg 003.jpg; Jun13 Mtg 004.jpg; Jun13 Mtg 005.jpg; Jun13 Mtg 006.jpg; Jun13 Mtg 007.jpg; Jun13 Mtg 014.jpg; Jun13 Mtg 016.jpg; Jun13 Mtg 018.jpg |
| **Subject:** | Addendum to shareholder's meeting agenda |

Gentlemen:

While I don't want to dilute the matter and detract from the issues raised by Paul for the special shareholder's meeting, I think a little definition of current conditions is in order so that when questions to that topic arise, we have some basis of discussion. As you can see from the backlog, June looks equally challenging.

Bob

EXHIBIT

C5

# Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "paul Ehrlich" <peerlesssaws@msn.com> |
| **Cc:** | "Mike Ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Monday, June 19, 2006 2:05 PM |
| **Subject:** | Special Shareholder Meeting Proposa/Outcome| |

Gentlemen:

At this point, I don't think that the people at WAMCO have an appreciation for the situation at Diehl and I agree that your offer should be revoked. For whatever reason, perhaps because we pulled through the last tight spot, I think Jim and Jay probably believe that I'm over reacting and exaggerating the situation.

Cash flow and earnings before interest, depreciation and amortization can only result from a company that is profitable in the long run, no matter how you want to look at it. And today, the long run is getting shorter all the time. A company our size cannot continue losing money at our present rate and talk about earnings or positive cash flow as though it' a forgone conclusion. The past creates no assurance of future conditions/results.

Perhaps the approach is to run deeper into debt and bank that the potential Dykens will save us, but I don't see it that way. Not at the current level of other machinery and parts sales.

While written just a short time ago when things looked more promising, the memorandum of agreement regarding the management fee specifically makes provision for the situation we face at this particular moment.

Beyond the moves called for in my recent email memo, we will need to do more unless we experience a big pick up in machinery and parts sales. I've tried to keep the people we have together in the event of a turn around, and it doesn't appear that approach will work much longer. So beyond the list I gave you last Thursday, there's a need for more.

I will make the offer, but I doubt it will be accepted at this point.

Bob

## Robert Rozman

**From:** <Addisonst@aol.com>
**To:** <rfr@diehlmachines.com>
**Sent:** Sunday, July 23, 2006 11:22 PM
**Subject:** Meeting

Bob:

Just so we are on the same page, it is not my intent to discuss your purchase offer. Your offer is not in the neighborhood of anything I wish to consider on either the business or the real estate. By way of illustration, when Mike retires, he will get book value for his stock. You offered to take a controlling premium (Jim and my 37.5%) for a fraction of that.

Quite frankly, when the man who controls the business puts that kind of value on it, despite the fact that the backlog yr over year and sales are up, and shows the kind of unbridled pessimism, and hopelessness that was reflected in your July memo to me and your offer, it gives me significant concern about the leadership of the company.

It is my opinion that the performance of the company has been significantly below acceptable standards and I can no longer sit back while management says it cannot survive unless it stays in a free building and avoids its contractual obligations. I happen to disagree strenuously that this company cannot function with its current obligations and that I should sit back and accept it when I am told that this company is going under unless it lives rent free and reneges on its contracts while receiving their benefits.

In the last eight months, Diehl has paid out over $200,000 in shareholder distributions, management debt repayment and bonuses. Wamco forgave a whole lot of management fee in the past for no consideration whatsoever.

Now I am hearing doom and gloom every day despite the fact that the company booked $285,000 more in May and June of 06 than 05. Despite the doom and gloom, this company has more office people than it had a year ago. Despite the doom and gloom, it has an inventory of over $1.1 million. If the company turned inventory over at a paltry four times a year we would have another half a million dollars in cash. Leadership requires optimism, a vision and execution of that vision. I have heard nothing about how Diehl intends to be here in five years. We do not have an agreed upon strategy and vision is for long term survival and profitability.

What I wish to discuss is what Diehl is going to do to meet its obligations now and going forward as well as what to do with the company long term. This company is going to survive and it is going to do so in a fashion that allows a decent return on equity and capital. That means working more efficiently and reducing inventory with a viable inventory reduction plan. it does not mean living rent free and avoiding obligations.

Diehl is hereby put on notice that it is in default of the Asset Purchase Agreement between Diehl and Wamco. Wamco reserves all its legal rights and remedies as a secured creditor pursuant to that Agreement as well as the Security Agreement entered into at that time.

Jay



EXHIBIT
C 6

000

7

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <bob.rozman@diehlmachines.com> |
| **To:** | "Jay Ehrlich" <addisonst@aol.com> |
| **Cc:** | "Mike Ruffner" <mike.ruffner@diehlmachines.com>; "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Thursday, April 29, 2004 10:48 AM |
| **Subject:** | CEMCO - Impending Visit |

Jay:

Have you been able to establish any kind of preliminary schedule for visiting the boys in Tennessee?

Here's a couple of thoughts I have regarding the information I've seen.

1.   I think we need to see five years of financial information because it will probably create a steeper
slope and reveal more about the trend of their business.  It should be following ours and all the other machine builders in our industry.  After all, he mentions the need to re-energize
         CEMCO's dealer and distribution network.
2.   While Art really doesn't care about what happens to the employees after he gets his money, I think the employees will.  Closing it within 6 months, which would have to be done, is going to cause problems.

Regards.

PS   Mike & I could meet you (and Paul?) in Knoxville, pick you up at the airport and then drive to the plant and get you back to the airport.  I estimate that it's about a 7 hour drive for us.

EXHIBIT

C 7

0000-

8

## Robert Rozman

**From:**    "Robert Rozman" <rfr@diehlmachines.com>
**To:**    <Addisonst@aol.com>
**Cc:**    "Mike Ruffner" <mike.ruffner@diehlmachines.com>
**Sent:**    Monday, June 26, 2006 11:09 AM
**Subject:**    Re: Cemco

Jay....

The "man" (Art Galiffa)) closed the place up, but not before the sales manager and the engineering manager took their "brain trust" and went to work for Newman, building special sanders...though we've not heard than any have been sold.

To my knowledge, no one picked up the CEMCO line and Newman makes whatever parts they can, apparently from the drawings these fellows kept.

Bob

> ----- Original Message -----
> **From:** Addisonst@aol.com
> **To:** rfr@diehlmachines.com
> **Sent:** Monday, June 26, 2006 10:15 AM
> **Subject:** Cemco
>
> Bob:
>
> I'm closing up my loop        office and throwing away files.  I came across Cemco.  I know they had crap but it wouldn't hurt to see what's up with them.
>
> Jay

EXHIBIT
C 8

00004

9

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | <Addisonst@aol.com> |
| **Cc:** | "Gary Fredrickson" <gary.fredrickson@diehlmachines.com> |
| **Sent:** | Friday, May 20, 2005 12:35 PM |
| **Subject:** | Re: SACO Lowell Meeting, Thursday, May 26, 2005 |

Jay...

OK, I'll be coming down from Thomasville, North Carolina on Wednesday night, but 10:23 gives me plenty of time to be there.  The airport doesn't look too complicated so I'll pick you up at the center exit as described on page www.gsairport.com/terminal_map.html, one of the web pages for the Greenville airport. You'll note that there is construction at the airport, so if the center exit is blocked, go to the exit on the far left as shown in the illustration.

Do you have the exact address of where we are going?...then I'll get a map on line.  I don't know my way around Greenville, so I'll need that.

I have to be in Sanford, NC Friday morning at about 8 AM...so it's my intention to get going after we've had a chance to discuss initial impressions.  I have two calls on Friday and then have to drive back to Fort Wayne.

Regards.

> ----- Original Message -----
> **From:** Addisonst@aol.com
> **To:** rfr@diehlmachines.com
> **Sent:** Friday, May 20, 2005 10:38 AM
> **Subject:** Re: SACO Lowell Meeting, Thursday, May 26, 2005
>
> **Bob I arrive at Greenville Spartanburg at 10 23  am on the 26th**

EXHIBIT
C 9

00005

**Robert Rozman**

| | |
|---|---|
| **From:** | <Addisonst@aol.com> |
| **To:** | <rfr@diehlmachines.com> |
| **Cc:** | <jiml@peerlessusa.com> |
| **Sent:** | Wednesday, July 26, 2006 3:29 PM |
| **Subject:** | Re: Meeting |

In a message dated 7/26/2006 10:13:17 A.M. Central Daylight Time, rfr@diehlmachines.com writes:

> Unless you have changed your position, there is no reason to waste our time with a meeting.

Bob:
When you declared to Paul last year that you did not want to be at Diehl if I had control of the company and you did not, I did not take it personally. In fact, I believe you and I have always had a cordial relationship on a personal basis, and I saw your interest for what it was. A man who wants to run and control his own company in which he has invested his sweat and tears. As a result, I have tried to keep our communication amicable and professional. I hope since the following will reflect much criticism this time from me towards you that we can still continue our dialogues in that fashion. The purpose of this letter is not to get into a he said she said spat but rather express my position on the status of Diehl and the future.

You recently wrote that I have only short term interest in this company. I don't know exactly what my posture is, but obviously, I would like to maximize return for the shareholders.

We can cancel the meeting but there are still things we need to discuss. First and foremost is the management fee and Diehl's current default.

Diehl's current unilateral default on its loan obligations is not a tenable situation. As a secured creditor of the product lines that Wamco sold, Wamco has certain rights that it expects to enforce. Wamco expects that the shortfall of $6,000 will be cured by the end of the month of July and that unless or until a resolution is made of these many issues, that the management fee and all obligations by Diehl to Wamco will be honored in full.

Second, is what to do about the performance of Diehl. I have made suggestions and made my feelings known on issues in the past but have not interfered in the decision making or execution up to now.

Your extremely disappointing offer leaves me no choice but to explore alternatives on valuation.

The memo to me and the offer letter itself sent off alarm bells. When the man running the company tries to decry the utter worthlessness of the business and then offer to buy it for well below what it could get on the marketplace, it is very troubling. I have long accepted that you were the best man to maximize the value of Diehl. When I see the value you have put on it, that acceptance is no longer a given. I am missing the page with the stock price offer but I recall it was $150,000 for 37.5% of the stock. That values the stock at $400,000 in total. That is one times last years revenue and less than one times last year's ebitda if management bonus and management fee are added back. I have no doubt that the company could be liquidated today for more than you offered and nobody wants to see that happen. Worse yet, I have roughly four times the interest Mike has but for giving you control, I would recognize roughly twice what he will when he retires, on a per share basis.

The company had Ebitda of $170,000 when the management fee gets recast for the first six months of 06. It is my belief that an independent party buying Diehl even as is, could have ebitda in excess of 300k per year including add backs for the management fee, and excessive office head count. I think Mereen Johnson, Dale Willequtte or a Ft. Wayne machine shop could rationalize well over 500k in cash flow on the current business. Moreover, we paid out 106 in distributions this year and we have a govt. order that we could not get our usual deposit on. If that had been a private company purchaser and we had not paid the distributions we would have

0000

virtually 0 bank debt based on the weekly report of 7/21. Furthermore, your memo which spoke of the overvaluation of inventory and a comparison to the Katy purchase is not analogous. Katy had an outside purchaser suggesting the inventory was too high. Your memo and purchase offer has the person responsible for the inventory being too high saying it's too high. Worse yet, bonuses, distributions and income taxes were paid on what I now have come to be told is worthless or discounted inventory.

It should be noted that when Wamco purchased Diehl from Katy, Wamco did not move the business up to Oshkosh which would have displaced many people. As such, Wamco received far less over the years than it would have even factoring in an empty building that would have been sold for nominal dollars. It should be further noted, given your complaints regarding Wamco inventory and the purchase price, that Diehl laid out not one dime of cash for the Wamco asset line at closing. Moreover, it paid nothing for three months. Had Wamco put the line on the market to Mereen Johnson or somebody else at that time, it's reasonable to assume there would have been a significant cash outlay at the time of closing. It is further reasonable to say that if it were not for the Wamco product line, given the decline of Diehl sales, that Diehl would be gone. As importantly, given that fact, the notion that Diehl paid a premium for Wamco when it laid out no cash is just wrong. When evaluating the value to Wamco, the move of people is not part of a "premium". The fact that Diehl had to move items and people did not raise the amount realized for Wamco. The amount of cash since paid by Diehl to Wamco has not been discounted though it has been paid over four years and though Wamco gave up proceeds to which it was entitled with no consideration for same. Had Diehl paid 10k for 42 months at 6.19%, and paid the full 15k for 42 months discounted at 8%, it would have paid a present value of $925,000 to date. Your own figures show a margin of 1.3mm or gross proceeds of 375k from the 925. Even that 925 number is overstated since from September - Dec of 02, Diehl had cash flow from the assets with no cash outlays on the purchase price. Dividing your machine and parts sales margins by 42 months yields 31k a month in cash meaning that even at 25k / month, Diehl is annuitizing 6k /month. This further ignores the abatements and the coverage of overhead by the Wamco line. It also conveniently ignores the $640 of machine business currently in the backlog. Additionally, it ignores the neglect of the parts business by failing to market the product line nor even put Wamco on the website for a very long time, the inclination to sell only standard machine models with limited engineering and accepting a level of parts business being picked off with no perceptible effort to fight that. Given the assertion that this acquisition has been a bad one for Diehl, and the implication that Diehl got taken, perhaps Diehl would be interested in selling the line back to Wamco. One could also take the position that when the Sale to Diehl occurred, the management fee was not capped at the end of the payout of the loan. However, with no consideration, Wamco agreed to terminate the management fee at the end of the buyout.

Over the past few years Diehl has suffered from:

1) inefficient management of inventory
2) Strategy not to market, propose and build specials on the Wamco line thereby rendering the wamco line as a commodity item;
3) Investment in the small saw;
4) commitment to moulders;
5) poor throughput- re #1 alternatively, understatement of cost of sales;
6) no replacement of lost markets with either new markets or new products
7) no discernible effort to have the machines made elsewhere for much lower and competitive cost.
8) Purchase of two machines increasing debt while not increasing throughput or efficiency in any quantifiable fashion

It is no secret that I believe inventory is too high. I've always said inventory is too high or our costs are significantly understated. I made these points within months of the purchase from Katy.

As an investor as well as a lender, I believe it is time for more involvement on my end to work on a day to day basis to see that the inventory gets reduced, that the headcount is right and that Diehl's products get made at a cost that Diehl can afford and show a profit.

As I see it the options are these:

1) A new offer can be made for Jim's and my stock, in which we would take some paper and a much different valuation of the management fee than last offered.
2) We can put the company up for sale.
3) I can roll up my sleeves and have significantly more involvement on the administrative side so that you are

free to explore new products and focus on sales.

4) In combination with 3, we begin the process of getting the cheaper models, if not all of the Diehl product line built in Asia since we are either turning over inventory twice a year or losing money on every saw we ship.

5) Wamco can foreclose on its assets and sell the Wamco product line off to the highest bidder or move the product line into a machine shop and keep the parts business.

6) Reduce headcount in the office.

7) Bring in somebody to be the general manager and focus on a different strategy than the current direction is taking us.

8) Contract out the manufacturing to a local shop and become a sales and marketing company.

9) I can buy your stock at your offering price and make my own deal with Jim. Should you do that, you could retain an option to buy all of our stock after the company is restructured and made more profitable.

I would imagine the most appealing option of those, to you, is # 1. Furthermore, it is not Jim's or my wish to get into adversarial proceedings here. Rather, it is our wish to find an amicable agreement with you, management and the company so that everybody is satisfied with the outcome.

I suggested before that the management fee could be discounted to a buyout of $285,000. With a new term loan over 5 years the monthly payment is $5800 at 8% annually. Unless we are talking about a one time payout at numbers such as these on the management fee, then valuing the Diehl business for purpose of buyout is difficult to do...

Pursuant to the Security Agreement, Wamco has the right to demand Diehl assemble all Wamco's collateral at Diehl's expense if Diehl is in default.

Let us avoid that and come to some type of mutually beneficial agreement.

Although I referenced Jim above, this letter speaks for me solely and does not purport to represent Jim.

Upon his return from vacation, perhaps you should speak with him as well.

Jay

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | <Addisonst@aol.com> |
| **Cc:** | "Mike Ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Friday, October 21, 2005 10:37 AM |
| **Subject:** | Re: O'Sullivan Industries |

Jay...

Was one of the premier RTA (ready to assembly) furniture manufactures in US (Bush & Sauder are the other two). Took particle board and put printed paper on it for TV stands, bookshelves, tables etc.

Located in Lamar, MO. and they have a couple of our older machines.

It was a pretty big outfit...I visited them last when I was with Medalist, but I think Gary's been there in the last ten years regarding a moulder.

Everything they make has probably gone to China.


Bob


----- Original Message -----
**From:** Addisonst@aol.com
**To:** rfr@diehlmachines.com ; mike.ruffner@diehlmachines.com
**Sent:** Friday, October 21, 2005 7:31 AM
**Subject:** O'Sullivan Industries

Do either of you know this company?

They filed for BK last week. Are we a creditor?

EXHIBIT

move to Wabash. To that end, I've noted the need to provide a "moving bonus" to make that issue a reality. Without these three people in Wabash, we will flounder and the revenue/income will be overstated.

- I'm not trying to plan to have Scott leave the firm. However, Gary has emphasized what we all know, that being that he is not leaving the Valley. Therefore, given the transition of BCD to Wabash, the general economic conditions, his working out of a local office rather than within 250 feet of the assembly floor and now his recent remarks to Gary about the engineering firm in Appleton, can we really expect him to stay? Perhaps money can entice him for a while...and just maybe modern technology can bridge the distance between Neenah and Wabash.

- Rick Beyer is another question mark, but given what Gary and you have said about Chris's involvement with parts orders and purchasing, it would be possible to get by without him, though he could be set up somewhere with Scott...or with Peerless just to enter orders. This should not be interpreted as though we don't need a person in this parts order entry position, because we definitely would. It's just that as long as we would be able to retain and move Chris to Wabash, we could train someone here. The ideal outcome though, would be to move Rick to Wabash along with Chris.

- The asset acquisition numbers are estimates and are provided for reference only. They should be viewed as such with the expectation that they move up or down, depending on realistic values.

## Other Political and Potential Concerns

Beyond the potential confusion of the physical move and related organizational concerns, there are also some other issues I think could arise. While I'm not certain we can prevent their occurrence, we should be prepared to act accordingly in the event they do materialize. These issues would be:

- Backlash from former employees who may become new competitors and especially those who might seek employment from the Williquitte/Landowski organization across town. To that end, we at Diehl have had employees read and sign the attached disclosure statement to help prevent ex-employees from become active competitors. Does anything like this exist at WAMCO? While we understand that nothing can really keep them from being honest competitors, we want to be able to protect ourselves from those who would steal engineering documents and the like to assist competition. I think we must assume that someone will be going to the Williquitte organization...or starting his own company. Though we can't stop that activity, we want to make sure that if he takes some drawings or files with him, there will be serious consequences. Certainly, WAMCO's past record in pursuing that kind of activity should remind employees of the consequences.

- Based on our premise that things will continue to slow down throughout the first three quarters of this year, I think we need to at least consider how we can accommodate both the WAMCO and Jenkins "thing" together. I recognize that presents a lot of stretching, but I sense and fear that the opportunity for Jenkins will present itself in the middle of this transition to Wabash. I view the possibility of a Challoner/Jenkins combination as a



EXHIBIT

tremendous opportunity to really begin building a service parts company with very strong financial foundation. Like was mentioned in the meeting, DeVlieg-Bullard has he right idea...they're just not executing properly. I just have that feeling that the chance to get Jenkins will present itself at what would normally be considered the wrong time. However, we have to have some plan available to take advantage of that golden opportunity, despite the fact that we are occupied. The ability to absorb Jenkins service and parts with the Challoner and some Jenkins people will buoy their collective attitude, but most important initiate the kind of service company I think we really want to be.

## Preliminary Transition Time Table

Based on the current economic conditions and the anticipated concerns expressed about WAMCO during our March 13th meeting, I propose we consider the following time table for the transition program.

March 21, 2001       Submit initial transfer outline memorandum.
- Conclude appraised values for equipment.
- Obtain quotes for moving equipment.
- Meet and review proposed transition expenses
- Establish transfer values for BCD inventory

April 13, 2001       Have concluded all current values for WAMCO assets and confirm "quantity and quality" of worksheet numbers.

April 18, 2001       Confirm transition plan, pricing & establish move date.
- Confirm Peerless agenda.

May 1, 2001       Discreetly discuss move w/key people: C. Zeuhl, R. Beyer, M. Berndt & the chosen assembler. (A backup choice for Berdnt & the machinist should also be established.) This issue must be addressed to take advantage of the moving season. Attempting to sell homes in late summer is the wrong time for several important reasons, such as people wanting to be ready for school, the weather and the concern about the economy and any effect that might have on home selling. Allow one month for a decision, during which people can visit Wabash and we can sell the move to them.

June 1, 2001       Know the employees who will and will not move.

September 10, 2001       Begin the physical move of related assets to Wabash.

THIS MEMORANDUM OF AGREEMENT (hereinafter called "Agreement") is made and entered into as of the _____ day of August, 2005, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "WAM"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Diehl");

## W I T N E S S E T H:

WHEREAS, Diehl has previously paid, and is currently paying, to WAM or its affiliates a monthly management fee for management consulting and services, which fee has varied from time to time upon the mutual agreement of the parties; and

WHEREAS, the parties intend that WAM shall continue to provide such management consulting and services to Diehl, and Diehl shall continue to pay a monthly management fee therefor as business conditions permit and in accordance with the terms and conditions herein set forth:

NOW, THEREFORE, in consideration of the premises hereof (which the parties hereby incorporate and make a part of their agreements herein) and the mutual agreements hereinafter set forth, it is agreed as follows:

1.      Wam hereby waives all unpaid and accrued management fees, if any, due from Diehl prior to July 31, 2005. WAM shall continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl and, effective as of July 31, 2005, Diehl shall pay to WAM, as consideration for such management consulting and services provided, a management fee of $12,500 per month (increased from the immediately preceding fee of $10,000 per month) through December 31, 2005, and $15,000 per month commencing January 31, 2006, through December 31, 2008; provided however that (a) such mutual commitments to provide such services and to pay such management fee shall terminate as of January 1, 2009, unless extended by the mutual agreement of the parties, and (b)from time to time the said management fee might be


EXHIBIT
C 12

00006

reconsidered and reduced, increased, eliminated and/or reinstated by mutual agreement of the parties as Diehl's business conditions requires, and WAM shall only be responsible to provide consulting and services at a level consistent with the then current level of such management fee.

2. The parties shall cooperate and use reasonable efforts to inform each other concerning any change in such business conditions and anticipated changes in the management fee level and commensurate level of management consulting and services to be provided.

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as of the day and year first above written.

WISCONSIN AUTOMATED MACHINERY CORP.

By _____

Title _____

DIEHL WOODWORKING MACHINERY, INC.

By _____

Title    PRESIDENT _____

2

0000

Diehl Woodworking Machinery, Inc.
WAMCO Purchase Note
Scheduled Payment vs. Actual Payment



|  | Scheduled | Paid |
|---|---|---|
| January-03 | 10,000.00 | 10,000.00 |
| February-03 | 10,000.00 | 10,000.00 |
| March-03 | 10,000.00 | 10,000.00 |
| April-03 | 10,000.00 | 10,000.00 |
| May-03 | 10,000.00 | 10,000.00 |
| June-03 | 10,000.00 | 10,000.00 |
| July-03 | 10,000.00 | 10,000.00 |
| August-03 | 10,000.00 | 10,000.00 |
| September-03 | 10,000.00 | 10,000.00 |
| October-03 | 10,000.00 | 10,000.00 |
| November-03 | 10,000.00 | 10,000.00 |
| December-03 | 10,000.00 | 10,000.00 |
| January-04 | 10,000.00 | 10,000.00 |
| February-04 | 10,000.00 | 10,000.00 |
| March-04 | 10,000.00 | 10,000.00 |
| April-04 | 10,000.00 | 10,000.00 |
| May-04 | 10,000.00 | 10,000.00 |
| June-04 | 10,000.00 | 10,000.00 |
| July-04 | 10,000.00 | 10,000.00 |
| August-04 | 10,000.00 | 10,000.00 |
| September-04 | 10,000.00 | 10,000.00 |
| October-04 | 10,000.00 | 10,000.00 |
| November-04 | 10,000.00 | 10,000.00 |
| December-04 | 10,000.00 | 10,000.00 |
| January-05 | 10,000.00 | 10,000.00 |
| February-05 | 10,000.00 | 10,000.00 |
| March-05 | 10,000.00 | 10,000.00 |
| April-05 | 10,000.00 | 10,000.00 |

## Diehl Woodworking Machinery, Inc.
## WAMCO Purchase Note
### Scheduled Payment vs. Actual Payment

|  | Scheduled | Paid |
|---|---|---|
| May-05 | 10,000.00 | 10,000.00 |
| June-05 | 10,000.00 | 10,000.00 |
| July-05 | 10,000.00 | 10,000.00 |
| August-05 | 10,000.00 | 10,000.00 |
| September-05 | 10,000.00 | 10,000.00 |
| October-05 | 10,000.00 | 10,000.00 |
| November-05 | 10,000.00 | 10,000.00 |
| December-05 | 10,000.00 | 10,000.00 |
| January-06 | 10,000.00 | 10,000.00 |
| February-06 | 10,000.00 | 10,000.00 |
| March-06 | 10,000.00 | 10,000.00 |
| April-06 | 10,000.00 | 10,000.00 |
| May-06 | 10,000.00 | 10,000.00 |
| June-06 | 10,000.00 | 10,000.00 |
| July-06 | 10,000.00 | 10,000.00 |
| August-06 | 10,000.00 | 10,000.00 |
| September-06 | 10,000.00 | 10,000.00 |
| October-06 | 10,000.00 | 10,000.00 |
| November-06 | 10,000.00 | 10,000.00 |
| December-06 | 10,000.00 | 10,000.00 |
| January-07 | 10,000.00 | 10,000.00 |
| February-07 | 10,000.00 | 10,000.00 |
| March-07 | 10,000.00 | 10,000.00 |
| April-07 | 10,000.00 | 10,000.00 |
| May-07 | 10,000.00 | 10,000.00 |

Diehl Woodworking Machinery, Inc.
Management Fees
Scheduled Payment vs. Actual Payment



EXHIBIT
C 14

|  | Scheduled | Paid |
|---|---|---|
| September-02 | 10,000.00 | 5,000.00 |
| October-02 | 10,000.00 | 5,000.00 |
| November-02 | 10,000.00 | 5,000.00 |
| December-02 | 10,000.00 | 5,000.00 |
| January-03 | 15,000.00 | 10,000.00 |
| February-03 | 15,000.00 | 10,000.00 |
| March-03 | 15,000.00 | 10,000.00 |
| April-03 | 15,000.00 | 10,000.00 |
| May-03 | 15,000.00 | 10,000.00 |
| June-03 | 15,000.00 | 10,000.00 |
| July-03 | 15,000.00 | 10,000.00 |
| August-03 | 15,000.00 | 10,000.00 |
| September-03 | 15,000.00 | 10,000.00 |
| October-03 | 15,000.00 | 10,000.00 |
| November-03 | 15,000.00 | 10,000.00 |
| December-03 | 15,000.00 | 40,000.00 |
| January-04 | 15,000.00 | 10,000.00 |
| February-04 | 15,000.00 | 10,000.00 |
| March-04 | 15,000.00 | 25,000.00 |
| April-04 | 15,000.00 | 10,000.00 |
| May-04 | 15,000.00 | 10,000.00 |
| June-04 | 15,000.00 | 10,000.00 |
| July-04 | 15,000.00 | 10,000.00 |
| August-04 | 15,000.00 | 10,000.00 |
| September-04 | 15,000.00 | 10,000.00 |
| October-04 | 15,000.00 | 10,000.00 |
| November-04 | 15,000.00 | 10,000.00 |
| December-04 | 15,000.00 | 10,000.00 |

## Diehl Woodworking Machinery, Inc.
## Management Fees
## Scheduled Payment vs. Actual Payment

|  | Scheduled | Paid |
|---|---|---|
| January-05 | 15,000.00 | 10,000.00 |
| February-05 | 15,000.00 | 10,000.00 |
| March-05 | 15,000.00 | 10,000.00 |
| April-05 | 15,000.00 | 10,000.00 |
| May-05 | 15,000.00 | 10,000.00 |
| June-05 | 15,000.00 | 10,000.00 |
| July-05 | 12,500.00 | 12,500.00 |
| August-05 | 12,500.00 | 12,500.00 |
| September-05 | 12,500.00 | 12,500.00 |
| October-05 | 12,500.00 | 12,500.00 |
| November-05 | 12,500.00 | 12,500.00 |
| December-05 | 12,500.00 | 12,500.00 |
| January-06 | 15,000.00 | 15,000.00 |
| February-06 | 15,000.00 | 15,000.00 |
| March-06 | 15,000.00 | 15,000.00 |
| April-06 | 15,000.00 | 15,000.00 |
| May-06 | 15,000.00 | 15,000.00 |
| June-06 | 15,000.00 | 15,000.00 |
| July-06 | 15,000.00 | 9,000.00 |
| August-06 | 15,000.00 | 0.00 |

15

## Robert Rozman

| | |
|---|---|
| **From:** | <Addisonst@aol.com> |
| **To:** | <rfr@diehlmachines.com>; <mike.ruffner@diehlmachines.com> |
| **Cc:** | <jiml@peerlessusa.com>; <jimservi@sbcglobal.net> |
| **Sent:** | Sunday, July 16, 2006 11:01 AM |
| **Subject:** | Management Fee |

Bob:

I have received notice from Jim Servi of a cut in management fees to Wamco.

There has been no agreement to reduce the management fee. Moreover, I made a proposal to reduce it based on loan abatements by Paul Ehrlich to which, I never received a response.

I fully expect that the entire management fee will be paid for July and going forward unless and until we execute some sort of written agreement stating otherwise.

Jay

EXHIBIT
C 15

0000

16

## Robert Rozman

From:      "Robert Rozman" <rfr@diehlmachines.com>
To:        "Paul Ehrlich" <peerlesssaws@msn.com>
Sent:      Monday, August 15, 2005 1:06 PM
Subject:   Diehl Mgmt Fee Obligation, Diehl Lease & Other Issues

Paul...attached is my repsonse to yours of the 13th.

August 15, 2005

RE:   Your email of August 13, 2005

Paul...

I will send a note to Ken regarding my position about the Mgmt. Fee and Diehl's need to have a flexible, but reasonable obligation regarding the amount. Given its terminal nature, the entire program essentially represents an exit strategy that I would think wants to preserve Diehl's ability to pay at least something, should its economic conditions revert to those of just a year ago. As an example, though the opportunity to design and manufacture four Dyken machines for the Knauf organization remains, they shouldn't even be identified as a D-50 anymore. In the past month, those machines have taken on such a different composition that new numbers will have to be assigned to reflect their configuration. That means engineering, time, risk and not just replicating what used to be built. The point is that just like in the case of PELLA, most of the products that Diehl now offers are opportunities, not entitlements like they were. Nobody wants the "same old-same old", they can get that from China for a lot less.

The real issue here is that Diehl's ability to continue as an ongoing operation and simultaneously support the currently planned cash withdrawal schedule is not automatic. The fact that two separate entities don't really exist in Diehl and WAMCO should make this kind of understanding possible, and that seems to have been the way things have been handled successfully thus far. Given the makeup of both entities, I see no reason to change that method of operation, and now it's time to make sure that spirit is reflected in the amendment of our formal agreement.

At this point, my development of any strategic plan for Diehl is problematic. On one hand, there really is no need for me to adjudge the worth any management fees or lease payments being paid as a minority stockholder who has no long-term controlling ownership opportunity with the firm. On the other hand, if I'm negotiating as a potential successor, I look at the situation more cautiously, seeking to preserve as much of Diehl's base as possible for long-term survival. When you add to that the constant calls to Mike this year asking about cash position, and it appears that the management fee is clearly about only one thing. So...while I fully understand that my job is to steer Diehl through the changing marketplace no matter the owner, the ultimate results of this issue will impact my opinions,

as they would yours if you were in my situation.

Given those thoughts, my recommendations are as follows:

1) <u>The Management Fee to WAMCO</u>. We all know that the management fee is not really a management fee for management services provided. Consequently, Diehl will make every attempt to meet its obligations, but since we *don't really have two independent parties* here, the agreement should reflect exactly what you indicated in your note to me, "that Diehl doesn't consider it to have a binding obligation to pay $15,000 per month". Concurrently, Diehl has an obligation to pay and it will pay, provided the business conditions permit, but we all know that can change. All we have to do here is formally reflect the spirit of our original agreement, recognizing the current situation and more volatile nature of our business. The dramatic downturn in Challoner parts business should have taught all of us how we can't plan for the future in this kind of business anymore. I think Ken can formally represent that situation for us and let us review it, don't you?

2) <u>The Lease</u>. I would make the following recommendations: a) amend the lease to reflect the revised $4,500 per month charge; b) a rider should reflect a course of action similar to that of the management fee, indicating that if business conditions deteriorate, the per month charge can be re-negotiated to reflect those conditions; c) a rider should be added to reflect a sharing of any catastrophic repair costs related to the building. Given the 100 year age of the building, its current condition and the imminent need for major building repair over the next 10 years, in the event we have catastrophic damage or are attempting to prevent it, the payment could be affected; d) ask Wabash for an option to buy both at the lease's current expiration date and for January 1, 2006.

3) <u>The Shareholder Agreement</u>. I'd be lying if I didn't tell you that this situation affects my thinking. If the agreement remains the same regarding the purchase of shares and I'm continuing on in my current status, that's fine and I will continue represent Diehl's interest to the best of may ability...just as I have in the past.

Regards

17

### Robert Rozman

| | |
|---|---|
| From: | "Robert Rozman" <rfr@diehlmachines.com> |
| To: | "Kenneth S. Perlman" <kperlman@bbn-law.com> |
| Cc: | "Paul Ehrlich" <peerlesssaws@msn.com>; "Jay Ehrlich" <addisonst@aol.com>; "Mike Ruffner" <mike.ruffner@diehlmachines.com>; "Dimitri" <jiml@wamcousa.com> |
| Sent: | Tuesday, August 02, 2005 10:12 AM |
| Subject: | The Diehl Mgmt Fee |

Gentlemen...

At this point, I'd like to make a few comments regarding Diehl's position with respect to the Management Fee.

First, I think we know the real meaning and intent of the "Management Fee". With all due respect, I acknowledge certain degrees of assistance and direction at times, as well as the creation of an initial financial guarantee that became very important just over a year ago. However, to suggest that we are somehow being managed....please tell me who is managing us? What specifically are they doing? Give me some examples?

Not too long ago, some were ready to completely concede Diehl as a "lost cause". So, whatever good fortune we enjoy for the moment, I believe this business will never be as easy to operate as it was in the past, and any success was primarily a result the dedicated perseverance of the Diehl management team. Beyond that, I claim that through the sole ability of Diehl's personnel, we've done a reasonable job of restoring Challoner's business with PELLA...an achievement most thought impossible. As far as a woodworking machinery manufacturer, I think it's fair to say that Diehl was more grounded than WAMCO and was the foundation of business for the transfer of Challoner. Diehl bought the WAMCO woodworking product based on what Challoner had been rather than what it would in fact be. Diehl's efforts have resulted in re-vitalizing Challoner, despite some rather unexpected, but well planned adversarial efforts by former key WAMCO personnel.

The point is that Diehl has never acted irresponsibly with regard to the obligation of the Management Fee despite what also could be an issue of consideration. Diehl's previous request to virtually eliminate the management fee was based on a very sound need to survive. We believe that trying period is past and that we are on a more positive track for the future. But the situation could reverse itself and I would think we would all act accordingly...and in the interest of preserving Diehl. I think the terms presented in 1.(b) simply reflect that possibility, remote as it may be.

As for the lease, I don't know what will happen and I shudder to think of moving...but given any serious problems with the facility...more roof or boiler concerns, it could happen. I think we need some alternatives and will I be discussing that with Mike. We'll present those requests to Wabash and plan for future alternatives.

EXHIBIT
C 17

000

Given all those considerations, I would also like to revisit the Shareholder's Agreement regarding preferential treatment in acquiring shares. After what we have been through, and what we are doing to improve Diehl's viability, I no longer believe anyone should have an automatic benefit to company ownership. I've worked as hard as anyone in that process and as it stands, I have no ability to potentially own Diehl. Therefore, I believe that a change in the Shareholder's Agreement is in order to insure that any of us have the ability to purchase the shares of anybody without restriction.

As soon as we get PELLA out of the shop this week, get our Las Vegas Show orders entered and return to normality after the rip saw chain link problems, I want to formally bring this issue before the board.

Bob Rozman

18

## Robert Rozman

| | |
|---|---|
| **From:** | <Addisonst@aol.com> |
| **To:** | <rfr@diehlmachines.com> |
| **Cc:** | <jiml@peerlessusa.com> |
| **Sent:** | Thursday, August 03, 2006 1:12 PM |
| **Subject:** | Re: Annual Shareholders Meeting - Tentative Date Selection |

In a message dated 7/31/2006 2:25:10 P.M. Central Daylight Time, rfr@diehlmachines.com writes:

> Gentlemen...
>
> I am asking that we gather prior to the Atlanta Show for the Annual Shareholders Meeting to discus the condition of the business, and any other things that each of you may deem appropriate at this point.  Above all, I think it's important that we meet prior to the show and outline our expectations for both good and less favorable sales results.
>
> Our last annual meeting was held June 28th and I believe the timing is appropriate.
>
> I would like to suggest August 10th, 17th or 18th. The 10th would be best because Gary will be gone, beginning the 16th, but will proxy his votes if necessary.
>
> Does that meet with your schedules?
>
> Bob

Bob:

If there is a quorum, I will attend.  Thus, that means I will do whatever Paul and Jim wish.  My thought is we can do an annual meeting via writing as is customarily done in small companies in lieu of an annual meeting, especially given that we just had a shareholders meeting in the last 8 weeks.

I feel, however, that the first order of business is a resolution of the management fee.  That is not a shareholder meeting issue.  It is something I wish to resolve and asap.  You said you would get back to me on my last email.  We cannot discuss the issues raised therein at a shareholder meeting.

Diehl is currently in default on its obligations.  That gives Wamco a right to declare the entire loan due and demand that Diehl collect and hold the secured assets for Wamco so that Wamco can take hold of them and dispose of them.

I have advised you previously that this is not a path I wish to take.  I have held off on retaining counsel to foreclose on the Wamco Assets or demanding their turnover in hopes that you would put an offer on the table that was far more realistic.  This company generated operating cash flow of almost $250k for the first 6 months of the year and that was with a management fee, full salaries to management  and 4500 a month in rent.

At the same time while you purport that business is terrible, the company has booked more "Diehl Machines" business than it has shipped three months in a row. Moreover, if business is so bad, why is there a ratio of 17/15 office to shop when a year ago it was 18/19?

EXHIBIT
C18

00009

I will be sending you and Mike a separate email regarding gross margin analysis. The upshot is that it is not remotely possible to generate a 39% gross margin (49% at the same time last year) on a commodity product line and still only turn inventory over twice a year.

## Robert Rozman

**From:**     <Addisonst@aol.com>
**To:**        <rfr@diehlmachines.com>; <mike.ruffner@diehlmachines.com>
**Cc:**        <ASchwartz@sff-law.com>; <jiml@peerlessusa.com>
**Sent:**      Thursday, August 10, 2006 10:20 AM
**Attach:**    Diehl Demand August 10.doc
**Subject:**   Demand For Collateral

Gentleman:

Attached hereto is formal demand by Wamco for all indebtedness of Diehl to Wamco (approximately $268,682) plus all unpaid and owed amounts on the management fee.

Failure to pay said amounts and turn over the collateral will result in the commencement of litigation by Wamco against Diehl as well as any individual shareholders who have tortiously interfered with the Wamco- Diehl Agreement or oppressed minority shareholders for their own betterment.

Jay Ehrlich



EXHIBIT
C19

00009

August 10, 2006

Mr. Robert Rozman
President
Diehl Woodworking Machinery Inc.
981 S. Wabash St.
Wabash, In. 46992

      Via Facsimile 219 563 0206 and Certified Mail

      Re Notice of Default of Diehl Woodworking Machinery Inc.

Dear Mr. Rozman:

      Pursuant to that Security Agreement dated on or about September 13, 2002, as well as the Asset Purchase Agreement dated on or about the same, Wisconsin Automated Machinery Corp.("Wamco") hereby notifies Diehl Woodwoorking Machinery Inc. ("Diehl") that Diehl is in default of said Security Agreement pursuant to Paragraph 1 section (a), (b) and (g) for its failure to the Management Fee and Rent on its lease with a third party for the premises at 981 S. Wabash, Wabash, Indiana.

      Wamco hereby demands pursuant to Section 4 of the Security Agreement that Diehl assemble at its expense, all Collateral made a part of the Security Agreement including without limitation, all Wamco product line inventory, all contract rights, purchase orders, trade names, blueprints, drawings, and customer lists as well as any other Collateral referenced in the Security Agreement.

      Additionally, Wamco demands all unpaid amounts due and owing pursuant to the Asset Purchase Agreement for Management Fees as well as the entire indebtedness currently owed to Wamco by Diehl along with all attorneys' fees and legal expenses.

      Failure to meet Wamco's demands within five days will result in the immediate commencement of litigation to take possession of the collateral and recover all amounts due and owing from Diehl to Wamco.

Very truly yours,


Jay Ehrlich
President
Wisconsin Automated Machinery Corp.

00003

## Robert Rozman

**From:**     "Robert Rozman" <rfr@diehlmachines.com>
**To:**       "Paul Ehrlich" <peerlesssaws@msn.com>
**Cc:**       "Mike Ruffner" <mike.ruffner@diehlmachines.com>
**Sent:**     Monday, July 10, 2006 5:14 PM
**Subject:**  Current Situation

Paul...

I tried to call you about 4:35 today and left a voice mail message.

Friday, the 8th and today we received orders for two saws, one of which will ship in late August ($44K), the other ($23K) later this week.

As you can see the month looks impressive due to the accrual reversals, but scratch, we lost about $14K....not quite enough labor and we needed another machine shipment. This was done to make the quarter look good for the bank, so we could proceed with the buyout of the WAMCO note,

Mike put together a cash projection in response to an email from Jay indicating that things weren't so bad and the pay cuts the other cost saving efforts were not necessary yet. We already have half of the cash from Knauf, and though we received two orders, I don't think the remainder of the year looks that rosy.

If there is no answer to my memo, I want to proceed with the bank and with an attorney to action necessary to declare the WAMCO/Diehl arrangement void based on lack of consideration because there is no exchange of value. Diehl is not receiving any value for any service being performed that is closely commensurate with $9-15K per month. The fac that we never challenged the matter doesn't mean the agreement is valid, it just means that Diehl has gone along with an unenforceable agreement and not exercised its right to void th agreement. Unless you suggest otherwise, I will proceed with contact a local attorney to formally confirm that this position is valid.

Bob

EXHIBIT
C20

0001

ASSET PURCHASE AGREEMENT
(WOODWORKING PRODUCT LINES)

DATED SEPTEMBER 13, 2002

BETWEEN

WISCONSIN AUTOMATED MACHINERY CORP. (SELLER)

AND

DIEHL WOODWORKING MACHINERY, INC. (PURCHASER)



EXHIBIT
C 21

## LIST OF EXHIBITS AND SCHEDULES
### Woodworking Product Lines

Exhibit A          -          Promissory Note

Exhibit B          -          Security Agreement


Schedule 3.2          -          Payment of Purchase Price

Schedule 3.3          -          Allocation of Purchase Price

Schedule 4.4          -          Unfilled Customer Orders

Schedule 4.5          -          Unfilled Purchase Orders

Schedule 4.6          -          Litigation

Schedule 6.4          -          Machines Sold and Subject to Product Warranty Claims

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDleh\ListExhibitsSchedulesFinal\KSP\mer

## ASSET PURCHASE AGREEMENT
### Woodworking Product Lines

THIS ASSET PURCHASE AGREEMENT, made and entered into this 13th day of September, 2002, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "Seller"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Purchaser");

## W I T N E S S E T H:

WHEREAS, Seller is engaged in, among other things, and owns certain assets and properties used in, the business of designing, manufacturing, selling and repairing woodworking machinery comprising the McKnight Miller, Bell and Challoner product lines (herein collectively called the "Woodworking Product Lines"), and certain other machinery used in the carpet industry and comprising the Dyken product line (herein called the "Carpet Product Line" and, together with the Woodworking Product Lines, collectively called the "Product Lines" and each individually a "Product Line"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Product Lines and certain other assets and properties of Seller relating to the Product Lines in accordance with all of the terms and subject to all of the conditions herein set forth; and

WHEREAS, Seller is willing to undertake not to compete with Purchaser with respect to the Product Lines;

NOW, THEREFORE, in consideration of the premises hereof (which the parties agree are hereby incorporated into and made a part of their agreement herein), of other good and valuable considerations, the receipt of which is hereby acknowledged, and of the mutual covenants herein set forth, the parties hereby agree as follows:

1.    <u>Definitions</u>

In addition to other terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below for the purposes of this Agreement:

1.1    "Agreement" shall mean this Asset Purchase Agreement.

1.2    "Assumed Liabilities" shall mean collectively all of the specifically identified liabilities and obligations of Seller to be assumed by Purchaser hereunder.

1.3    "Closing" shall mean the act of completion of the closing of the transactions contemplated by this Agreement on the Closing Date as set forth in Article 9 hereof.

1.4    "Closing Date" shall mean the date on which the Closing takes place as set forth in paragraph 9.1 hereof.

1.5    "Contract Date" shall mean the date of this Agreement.

1.6    "Excess Inventory" shall mean the number of each such item of Inventory items that are on hand as of the Closing Date that are in excess of two years usage thereof (being twice the number of such item of Inventory sold by Seller during the twelve (12) month period ended June 30, 2002.

1.7    "Excluded Assets" shall mean collectively all of the assets and properties of Seller other than Sale Assets, including without limitation those specifically being excluded from the Sale Assets as provided in paragraph 2.2 hereof.

1.8    "Inspection Date" shall mean July 31, 2002, on which Purchaser inspected the Sale Assets.

1.9    "Sale Assets" shall mean collectively all of the assets and properties of Seller to be sold, assigned, transferred and conveyed to Purchaser hereunder as provided in paragraph 2.1 hereof.

2.      Properties and Assets to be Sold to Purchaser

2.1    Sale Assets.  On the terms and subject to the conditions herein set forth, at the Closing, Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and acquire from Seller, the Product Lines, as a going concern, and the following assets relating to any of the Product Lines and on hand as of the Closing Date:

2.1.1      All inventories relating to any of the Product Lines, including without limitation all raw materials, work in process, including without limitation a 527 Double End Tenoner machine (the "Incomplete Machine"), finished machinery, purchased parts and components, manufactured parts and assemblies, and loaner chain (herein called collectively "Inventory");

2.1.2      Dies, tools, jigs, fixtures, patterns, special tooling and trade fixtures relating to any of the Product Lines, including without limitation all items set forth on Schedule 3.3 hereto under the heading Fixtures & Tooling (herein called collectively "Miscellaneous Tooling");

2.1.3      All trade names, trademarks, trademark registrations and applications, brand names, logos and applications therefor, if any, and the goodwill symbolized thereby, trade secrets, intellectual property, and all rights under all confidentiality agreements and covenants of non-competition, and all rights to recover for any past infringement of any thereof, owned by Seller and relating solely to any of the Product Lines;

2.1.4      All books, records, computer tapes, files (including cabinets containing same) and other papers and documents of Seller pertaining solely to any of the Product Lines or any of the Sale Assets, including without limitation documents of title,

warehouse receipts, customer lists, customer files, mailing lists, product literature and manuals, service manuals, instruction manuals, advertising materials, catalogs, sales literature, sales displays, drawings, designs, engineering data, specifications, engineering prints and know-how;

2.1.5    All of Seller's right, title and interest in, to and under all unfilled customer orders being assigned to and assumed by Purchaser as provided in paragraph 4.4 hereof and all customer deposits, if any, received by Seller against such assumed orders only, and all unfilled purchase orders with suppliers, being assigned to and assumed by Purchaser as provided in paragraph 4.5 hereof;

2.1.6    All of Seller's right, title and interest in, to and under paragraph 6.12 of that certain Asset Purchase Agreement, dated June 19, 1992, among Famco Machine Division of Belco Industries, Inc. (which was assigned to Seller) and Medalist Industries, Inc. (the "Medalist Agreement"), relating to the obligations of Medalist Industries, Inc., which has been succeeded to by Illinois Tool Works, and any successors thereto, with respect to product liability claims relating to any products of the Product Lines sold at or prior to June 29, 1992, or with respect to the Show Machines (as defined in the Medalist Agreement).

2.1.7    All other assets, properties and rights specifically set forth in this Agreement as being transferred or assigned to, or purchased by, Purchaser.

2.2    Excluded Assets.  Without in any way expanding the Sale Assets being sold and transferred hereunder and notwithstanding anything to the contrary contained herein, there is specifically excluded from the Sale Assets, and Seller shall retain and shall not transfer to Purchaser, the following assets and properties owned by Seller:

2.2.1    All of Seller's assets and properties used in or related to any of Seller's business and operations other than the Product Lines.

2.2.2    All cash, bank accounts and similar items.

2.2.3    All accounts receivable, notes receivable, drafts, letters of credit and other receivables of Seller (herein collectively called the "Receivables").

2.2.4    All federal, state, local and foreign tax refunds and all tax deposits.

2.2.5    All right, title and interest of Seller in, to or under any policies of insurance, or any benefits payable or paid thereunder, purchased or maintained by Seller (except as otherwise specifically provided herein).

2.2.6    All records not pertaining solely to the Sale Assets.

2.3    <u>Transfer and Assignment of Sale Assets</u>:  Good and marketable title to the Sale Assets shall be sold, assigned, transferred and conveyed to Purchaser by Seller at the Closing, free and clear of all claims, liabilities, taxes, liens, security interests, encumbrances, restrictions and adverse rights of use or ownership.  Subject to Seller's obligations under paragraph 6.1 above, Purchaser is accepting the Sale Assets in the condition existing on the Inspection Date, or such later date on which the particular Sale Asset was acquired by Seller, ordinary wear and tear excepted, on an "as-is" basis. EXCEPT SOLELY AS OTHERWISE SPECIFICALLY SET FORTH HEREIN, THE SALE ASSETS ARE BEING TRANSFERRED WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANT-ABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES (BOTH EXPRESS AND IMPLIED) SELLER HEREBY DISCLAIMS.

2.4   <u>No Assumption of Liabilities</u>.  Except solely for the assumption by Purchaser of the unfilled customer orders (and customer deposits, if any, received by Seller against such customer orders to the extent that same are paid or credited to Purchaser at Closing) and unfilled purchase orders as provided in paragraphs 4.4 and 4.5 hereof, including without limitation the risk of uncollectability of assumed customer orders and warranty claims relating to products shipped by Purchaser pursuant thereto, and any other liability of Seller expressly being assumed by Purchaser hereunder, Purchaser is not assuming and shall not be liable or responsible for any of Seller's debts, liabilities or obligations of any character whatsoever.  Seller shall pay and discharge, as they become due and payable, and shall perform and satisfy in accordance with their respective terms, all such debts, liabilities and obligations of Seller not expressly being assumed by Purchaser hereunder. All deposits received by Seller from customers with respect to unfilled customer orders assumed by Purchaser shall be credited against the Purchase Price at the Closing.

3.   <u>Purchase Price and Payment</u>.

3.1   <u>Purchase Price</u>.  Purchaser agrees to pay to Seller, and Seller agrees to accept, as the aggregate purchase price for the Sale Assets (herein called the "Purchase Price"), the sum of $600,000.00, plus or minus any credits or prorations as herein provided.

3.2   <u>Payment</u>.  Payment of the Purchase Price, plus or minus any credits or prorations as herein provided, shall be payable in seventy-two (72) equal monthly installments of $10,000.00 each (comprising principal of, and interest at the rate of 6.198% per annum on, the Purchase Price as shown on Schedule 3.2 attached hereto), the first installment payable on the first day of January, 2003, and each subsequent payment on the first day of each subsequent calendar month until paid in full (i.e. amortizing the Purchase