Price plus interest over the period of repayment in seventy-two (72) equal monthly payments). The Purchaser's obligation to pay the Purchase Price as herein provided shall be evidenced by a Promissory Note, executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit A attached hereto (herein called the "Promissory Note"), which shall be secured and collateralized by the grant of a security interest in all of Purchaser's assets and properties, second in priority solely to the security interest of The LaSalle Bank in such assets, pursuant to a Security Agreement executed and delivered to Seller by Purchaser at the Closing in the form of Exhibit B attached hereto (herein called the "Security Agreement").

3.3    Allocation of Purchase Price.  The Purchase Price shall be allocated for income tax purposes among the Sale Assets and covenant not to compete set forth in Article 11 hereto as set forth in Schedule 3.3 attached hereto and such allocation shall be binding upon the parties for income tax purposes.  The parties shall file their respective income tax returns, including filing with the Internal Revenue Service Form 8594 and all other information as may be required by Section 1060 of the Internal Revenue Code and regulations promulgated thereunder, in accordance with such allocations, and the parties shall not take any position or action inconsistent with such allocation.

4.    Representations, Warranties and Covenants of Seller

Seller hereby represents, warrants and covenants to Purchaser that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

4.1    Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin.  Seller has all requisite corporate

7

power and authority to own, lease and operate its properties and to carry on its business as now conducted and to enter into this Agreement and perform its obligations hereunder.

4.2    Authority and Binding Obligation.  All corporate action necessary to authorize the execution and delivery of this Agreement by Seller and the performance by Seller of its obligations hereunder have been duly taken.  The execution and delivery of this Agreement by Seller and the performance of its obligations hereunder do not and will not result in the creation of any lien, charge or encumbrance upon any of the Sale Assets.  This Agreement is a legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

4.3    Title to Personal Property.  Seller owns and at the Closing will have the right to convey and will convey to Purchaser good and marketable title, free and clear of any tax, lien, security interest, encumbrance, liability, claim, restriction or adverse right of use or ownership to all of the Sale Assets.

4.4    Customer Orders.  Set forth on Schedule 4.4 hereto is a true and correct list of all unfilled customer orders and commitments of Seller on hand as of the Contract Date. All such unfilled customer orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business.  Between the Contract Date and the Closing Date, Seller will not accept any customer order or commitment except in the ordinary course of business.  At the Closing, Seller shall assign to Purchaser all such unfilled customer orders and commitments of Seller on hand as of the Closing Date, and Seller shall assign and credit to Purchaser all customer deposits and prepayments received

with respect thereto, and Purchaser shall assume the obligations of Seller to fill such assigned unfilled customer orders and commitments accruing from and after the Closing Date in accordance with the terms thereof.

4.5    Purchase Orders. Set forth on Schedule 4.5 hereto is a true and correct list of all of Seller's unfilled purchase orders and commitments to suppliers on hand as of the Contract Date. All such unfilled purchase orders and commitments of Seller on hand as of the Contract Date have been made in the ordinary course of business. Between the Contract Date and the Closing Date, Seller will not issue any purchase order or commitment except in the ordinary course of business. At the Closing, Seller shall assign to Purchaser all such unfilled purchase orders and commitments of Seller on hand as of the Closing Date, and Purchaser shall assume the obligations of Seller accruing from and after the Closing Date in accordance with the terms thereof and the Inventory Purchase Price shall be increased by any prepayments and deposits made by Seller with respect thereto.

4.6    Litigation. Except as set forth in Schedule 4.6 hereto, there is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Seller, threatened against or relating to Seller's past or present operation of the Product Lines or any of the Sale Assets or that could affect the transactions contemplated by this Agreement, including without limitation relating to products liability, at law, in equity or before any governmental department, commission, board or agency.

4.7    No Material Adverse Change. Since the Inspection Date, none of the tangible Sale Assets have suffered any destruction or damage, whether or not covered by

0001

insurance, which materially and adversely affects the conduct of the Product Line business.

4.8    Compliance with Laws.  The business and operations of the Product Line have been and are being conducted in all material respects in compliance with a applicable laws (including duties imposed by common law), rules and regulations, orders ordinances, judgments and decrees of all governmental authorities (federal, state and local), including, without limitation, the Clean Water Act, the Clear Air Act, CERCLA, SARA the Resource Conservation and Recovery Act, as amended ("RCRA"), and all other laws relating to the protection of the environment, human health and safety, including the Occupational Safety and Health Act of 1970, as amended, and any regulations and standards promulgated or issued thereunder.

4.9    Inventory.  The Inventory of Seller other than Excess Inventory will consist of items of a quality which is good, usable and saleable in the usual and ordinary course of business of Seller.

4.10    Product Warranties.  Seller has furnished Purchaser with true and correct copies of all standard written warranties provided to customers of Seller with respect to products of any of the Product Lines (herein called "Product Warranties").

5.    Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller that the following statements are true and correct as of the Contract Date, and will be true and correct on the Closing Date.

5.1    Organization, Good Standing and Power.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and

has all requisite corporate power and authority to enter into this Agreement and perform its obligations hereunder.

5.2   <u>Authority and Binding Obligation</u>.  All corporate action necessary to authorize the execution and delivery by Purchaser of this Agreement and the performance of its obligations hereunder have been duly taken.  This Agreement is a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization or other similar laws relating to or affecting creditors' rights generally and general principles of equity.

5.3   <u>Litigation</u>.  There is no legal action, suit, arbitration or other legal, administrative or governmental investigation or proceeding pending or, to the knowledge of Purchaser, threatened against or relating to Purchaser at law, in equity or before any governmental department, commission, board or agency, and Purchaser is not in default with respect to any judgment, injunction, order or decree of any court or governmental agency or instrumentality by which it is bound or subject, and no such judgment, injunction, order or decree is now in effect, which in any way restrains or limits Purchaser in the execution and delivery of this Agreement or the performance by Purchaser of its obligations hereunder.

6.   <u>Additional Covenants</u>

6.1   <u>Conduct of Business</u>.  Seller covenants that from the Contract Date through the Closing Date, Seller will conduct the business of the Product Lines in a manner not materially different from its past practices and only in the usual and ordinary course.

6.2    Negative Covenants.  Between the Contract Date and the Closing Date, Seller represents, warrants, covenants and agrees that Seller will not, without obtaining the prior written consent of Purchaser:

6.2.1    Encumber, mortgage, pledge, or permit any lien to exist against any of the Sale Assets.

6.2.2    Sell, assign, lease or otherwise dispose of any of the Sale Assets, except for the sale of Inventory (including parts but excluding the Incomplete Machine, which shall not be sold) in the ordinary course of business and except for supplies and spare parts used in the ordinary course of business (including in the completion of the Incomplete Machine).

6.2.3    Make any change in any accounting principle, procedure or practice followed by Seller or in the method of applying same with respect to the Product Lines or write up the value of any Inventory.

6.3    Employees.  Upon the Closing, Seller shall terminate the employment of all of the employees that Purchaser desires to hire in its sole discretion and shall make available to Purchaser and use its reasonable efforts to help Purchaser hire such of employees desired by Purchaser; provided that Purchaser shall not be required or obligated to hire any such employee.  Purchaser shall not be obligated to continue any of Seller's policies or benefits with respect to employees, and all of Seller's employees actually hired by Purchaser shall be considered in all respects as new employees of Purchaser.

Seller and not Purchaser shall be responsible for all payments, lawsuits, defense of suits, judgments, reasonable attorneys' fees, and any other costs sustained by Purchaser, including but not limited to all payments and losses resulting from non-

12

compliance under the terms of any applicable plant closing laws, losses under any pension, thrift, employee savings, bonus or other plan for employee benefits, severance or separation benefits, withholding taxes and contributions, workers or unemployment compensation claims or costs, health care claims or premiums, vacation, sick or other leave or pay, disease or disability claims, discrimination claims, unfair labor practices, safety claims or citations and all other claims against Seller arising out of or relating to any employment relationship with Seller or the termination thereof.

6.4    _Product Warranty Claims_.    From and after the Closing, Purchaser shall assume and be solely responsible for all claims made by customers within the applicable period arising under Seller's Product Warranties with respect to products relating to the Product Lines sold or delivered by Seller to or for customers at or prior to the Closing Date and listed on Schedule 6.4 hereof or sold by Seller in the ordinary course of business between the Contract Date and Closing Date.

6.5    _Product Liability Claims_.    From and after the Closing, Seller shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered (or delivered on consignment) by Seller or any predecessor thereto at or prior to June 29, 1992, and Purchaser shall be solely responsible for all injuries or death to persons or damage to property arising or claimed to arise from products relating to the Product Lines sold and delivered (or delivered on consignment) by Seller after June 29, 1992 and at or prior to the Closing Date or by Purchaser after the Closing Date.  Purchaser shall maintain for a period of at least five (5) years from and after the Closing Date adequate insurance with respect thereto.

6.6    <u>Use of Office Space</u>. It is understood and agreed that some of the employees hired by Purchaser may not relocate to Purchaser's offices in Indiana. If so, at Purchaser's request, Seller shall allow such employees to use its offices and facilities in Oshkosh as long as commercially feasible for Seller and Purchaser shall pay Seller a reasonable fee therefor as mutually agreed by the parties.

6.7    <u>Management Fee</u>. The management fee being paid by Purchaser to Seller and its affiliates for management consulting and services shall be increased to the sum of $15,000.00 per month commencing January 1, 2003, until such time as the parties otherwise mutually agree.

6.8    <u>Completion of Incomplete Machine</u>. Seller shall use reasonable efforts to complete the Incomplete Machine at or prior to the Closing Date. If the Incomplete Machine has not been completed at or prior to the Closing Date, Seller shall complete the Incomplete Machine as soon as practicable thereafter.

7.    <u>Conditions Precedent to Obligations of Purchaser</u>.

All of the obligations of Purchaser hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Purchaser) having been fulfilled on or before the Closing Date:

7.1    <u>Representations and Warranties</u>. The representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Purchaser.

7.2    <u>Performance of Covenants</u>.  Seller shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

7.3    <u>No Litigation</u>.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto which in the reasonable opinion of counsel for Purchaser presents a reasonable possibility that any transaction contemplated by this Agreement would be enjoined or prevented, or that the right of Purchaser to acquire, retain or use the Sale Assets without additional cost would be adversely affected.

8.    <u>Conditions Precedent to Obligations of Seller</u>

All of the obligations of Seller hereunder are subject to the following express conditions precedent (all or any of which may be waived in writing in whole or in part by Seller) having been fulfilled on or before the Closing Date:

8.1    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except for such changes therein as are expressly required or permitted by the terms of this Agreement or consented to in writing by Seller.

8.2    <u>Performance of Covenants</u>.  Purchaser shall have performed and observed in all material respects all covenants and obligations herein required to be performed or observed by it on or prior to the Closing Date.

8.3    <u>No Litigation</u>.  No claim, proceeding, investigation or litigation, either administrative or judicial, shall be threatened or pending against any of the parties hereto

which in the reasonable opinion of counsel for Seller presents a reasonable possibility that the transactions contemplated by this Agreement would be enjoined or prevented.

9.    Closing

9.1    Closing Date.  The Closing shall take place on October 1, 2002, at the offices of Lawrence, Kamin, Saunders & Uhlenhop, L.L.C., 208 South LaSalle Street, Suite 1750, Chicago, Illinois, at 11:00 a.m., local time, or at such other date, time and place as shall be fixed in writing by the mutual consent of Purchaser and Seller, or as required for the satisfaction of all conditions precedent hereto.  The Closing shall be deemed to be effective as of the beginning of business on the Closing Date.

9.2    Seller's Deliveries.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following, in form and substance satisfactory to Purchaser and its legal counsel:

9.2.1    Certified copies of the appropriate proceedings of the Boards of Directors of Seller authorizing and approving this Agreement and the transactions contemplated herein.

9.2.2    Bills of Sale, assignments and other instruments transferring to Purchaser as of the Closing Date title as provided in paragraph 2.3 of this Agreement to all of the Sale Assets being acquired by Purchaser hereunder.

9.2.3    Assignment(s) transferring to Purchaser the unfilled customer orders, customer deposits and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3    _Purchaser's Deliveries_.  At the Closing, Purchaser shall deliver,  or cause to be delivered, to Seller the following, in form and substance satisfactory to Seller and its legal counsel:

9.3.1    Certified copy of the appropriate proceedings of the Board of Directors and shareholders of Purchaser authorizing and approving this Agreement and the transactions contemplated hereby.

9.3.2    The Promissory Note, executed by Purchaser in the amount of the Purchase Price as set forth in paragraph 3.2 hereof.

9.3.3    The Security Agreement, executed by Purchaser as set forth in paragraph 3.2 hereof.

9.3.4    Assumption by Purchaser of the unfilled customer orders and unfilled purchase orders being assigned to and assumed by Purchaser hereunder.

9.3.5    A resale certificate certifying Purchaser's sales tax resale number.

9.4    _Possession_.  Upon the Closing, possession of all of the Sale Assets hereunder shall be delivered to Purchaser.

9.5    _Records_.  After the Closing, if Seller has any legitimate, business, accounting or tax reason therefor, Seller and its representatives shall have the right of access to all business records of or pertaining to the Product Lines or Sale Assets that are delivered by Seller to Purchaser hereunder and relating to any period on or prior to the Closing Date, at all reasonable times during business hours, and to make copies thereof at Seller's expense.  With respect to any financial, tax and accounting records of Seller relating in any way to the Product Lines or Sale Assets not delivered to Purchaser hereunder (herein

collectively called the "Retained Records"), after the Closing, Seller shall retain same and if Purchaser has any legitimate business, accounting or tax reason therefor, Purchaser and its representatives shall have the right of access to the Retained Records at all reasonable times during business hours, and to make copies thereof at Purchaser's expense. In the event that within a period of five (5) years after the Closing Date, either Purchaser or Seller desires to dispose of any of such records, such party so desiring to dispose shall give the other party at least thirty (30) days prior written notice thereof and the other party shall have the right within said 30-day period to take possession thereof.

10.    Indemnification and Survival

10.1    Indemnification by Seller. Notwithstanding any investigation by or knowledge of Purchaser, Seller hereby agrees to defend, indemnify and hold Purchaser harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, costs and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Seller in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (ii) any breach of covenant, agreement or undertaking of Seller in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Seller in connection with this Agreement; (iii) any failure to comply with any Bulk Sales Law, if applicable; (iv) any liability, debt or obligation of Seller not expressly assumed by Purchaser hereunder; and (v) any and all legal proceedings against or related to Seller or any of the Sale Assets, including without limitation the legal proceedings described in Schedule 4.6 hereto.

10.2   <u>Limitations on Indemnification by Seller</u>.  Any liability or undertaking of Seller to indemnify Purchaser under paragraph 10.1, clause (i) hereof, shall be subject to each of the following limitations:

10.2.1     Purchaser shall not be entitled to make a claim for indemnification from Seller under paragraph 10.1, clause (i), hereof unless Purchaser shall have given Seller written notice of such claim prior to two (2) years following the Closing Date; provided, however, that the foregoing limitations period set forth in this paragraph 10.2.1 shall not apply to any indemnification due from Seller arising with respect to any breach of the representations and warranties of Seller contained in paragraphs 4.3 hereof (herein called the "Warranty of Title").

10.2.2     Seller's undertaking to indemnify under paragraph 10.1, clause (i), hereof shall be applicable only if and to the extent that the aggregate indemnification liability from Seller hereunder exceeds Ten Thousand Dollars ($10,000.00); provided, however, that this limitation shall not apply to any indemnification due from Seller with respect to any breach of the Warranty of Title.

10.3   <u>Indemnification by Purchaser</u>.  Notwithstanding any investigation by or knowledge of Seller, Purchaser hereby agrees to defend, indemnify and hold harmless from and against any and all losses, liabilities, damages, obligations, judgments, actions, demands, suits, proceedings, claims, penalties, interest, cost and expenses, including reasonable legal fees and expenses relating thereto (herein collectively called "Losses"), arising out of or in connection with (i) any misrepresentation or breach of warranty made by Purchaser in this Agreement, or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement; (ii) any

00012

breach of covenant, agreement or undertaking of Purchaser in this Agreement or in any Exhibit, Schedule or other document or instrument attached hereto or delivered by Purchaser in connection with this Agreement, (iii) any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products shipped or delivered by Purchaser after the Closing Date, and any claims arising for injuries or death to persons or damage to property arising or claimed to arise from products sold and delivered by Seller (or any predecessor thereto) at or prior to the Closing Date, if and to the extent not covered by insurance maintained by Seller or Purchaser, as provided in paragraph 6.5 hereof, and (iv) any specifically identified debt, liability or obligation of Seller assumed by Purchaser hereunder at the Closing.

10.4  Survival.   Subject to the limitations period provided in paragraph 10.2.1 hereof, all of the respective representations, warranties and covenants contained in this Agreement or in any other document or instrument delivered by or on behalf of any party hereunder or pursuant hereto, shall survive the Closing Date.

11.  Covenant Not to Compete

Seller hereby covenants and agrees that it shall not, for a period of five (5) years from and after the Closing Date, alone or in conjunction with any other corporation, firm, partnership, person, venture or other entity, directly or indirectly, engage in the design, manufacture, sale or distribution of any products of the type presently being designed, manufactured, sold or distributed by the Product Lines business within the United States of America or in any other geographic area in which the Seller was engaged on the Inspection Date or on the Closing Date.  Seller covenants and agrees that for a period for five (5) years following the Closing Date, it will not induce any employee, customer or supplier of

Purchaser to terminate his or its employment or business relationship with Purchaser, and Seller will not use or reveal any secret or confidential information relating to the business of the Product Lines acquired by Purchaser; provided, however, that the foregoing shall not apply to any information which, following the Closing Date, is received by Seller from a third person other than Purchaser who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Purchaser with respect to such information, or which is public knowledge or within the public domain other than as a result of disclosures by Seller after the Closing Date. It is the desire and intent of the parties that the terms and provisions of this paragraph 11 be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. Accordingly, if and to the extent that any portion of this paragraph 11 shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then said portion shall be deemed reformed to the least extent necessary to make such portion valid and enforceable.

12.    Assignment

Neither this Agreement nor the rights or obligations contained herein shall be assignable by either party except with the written consent of the other party hereto, except by Purchaser to one or more corporations designated in writing by Purchaser prior to the Closing Date; provided, however, that no such assignment shall relieve the assignor of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the foregoing sentence.

13.    Notices

All notices, requests, demands and other communications hereunder shall be in writing, and shall be deemed to have been given when delivered in person or received by first class, registered or certified U.S. mail, return receipt requested, postage and registration or certification fees prepaid, or delivered by reliable overnight delivery service, providing a receipt evidencing delivery, or by facsimile with a copy also delivered by any of the foregoing means:

If to Seller, to:

>Wisconsin Automated Machinery Corp.
>c/o American M & M
>5301 W. Dempster, Suite 308
>Skokie, Illinois  60077
>Attention:  Paul Ehrlich, President
>Fax:  (847)067-8646

With a copy to:

>Kenneth S. Perlman, Esq.
>Lawrence, Kamin, Saunders & Uhlenhop, L.L.C.
>208 South LaSalle St., Suite 1750
>Chicago, Illinois  60604
>Fax:  (312)372-2389

If to Purchaser, to:

>Diehl Woodworking Machinery, Inc.
>981 South Wabash Street
>P. O. Box 465
>Wabash, Indiana  46992-0465
>Attention:  Robert Rozman, President
>Fax:  (219)563-0206

With a copy to:

Diehl Woodworking Machinery, Inc.
981 South Wabash Street
P. O. Box 465
Wabash, Indiana 46992-0465
Attention: Mike Ruffner
Fax: (219)0206

or at such other address as hereafter shall be furnished by a notice sent in like manner by such addressee to the others.

14.    Miscellaneous

14.1   Severability. Every provision of this Agreement is intended to be severable, and, if any term or provision is determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

14.2   Exhibits and Headings. The Exhibits to this Agreement are hereby made a part hereof and shall be construed with and as an integral part of this Agreement. The headings of the various Articles and paragraphs of this Agreement have been inserted for convenience only, are not a part of this Agreement, and shall not be deemed in any manner to modify, explain, enlarge, or restrict any of the provisions of this Agreement.

14.3   Expenses. Except where otherwise expressly provided for in this Agreement, each of the parties hereto shall pay their own expenses, including without limitation the fees and expenses of their respective attorneys and accountants, in connection with this Agreement and the transactions contemplated herein, whether or not the Closing takes place. Seller shall pay all sales and use taxes, if any, required on account of the consummation of the transactions contemplated hereby.

14.4   Waiver. Failure or delay on the part of any of the parties hereto to exercise any right, power or privilege hereunder, or under any instrument executed pursuant hereto,

shall not operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or of any other right, power or privilege. All waivers hereunder must be in writing.

14.5 <u>Further Assurances</u>. Following the Closing, Seller and Purchaser, without further consideration of any kind, shall each execute and deliver, or cause to be executed and delivered, such other instruments, and take, or cause to be taken, such other action, as shall be reasonably requested by any other party hereto to more effectively carry out the transactions contemplated in this Agreement. Seller shall use reasonable efforts to assist Purchaser in effecting a smooth transition in ownership and operation of the Sale Assets after the Closing Date, but Seller shall not be required to incur any cost or expense other than as specifically provided herein.

14.6 <u>Entire Agreement</u>. This Agreement (including the Exhibits and Schedules hereto and other documents referred to herein as having been delivered or furnished by either party to the other) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

14.7 <u>Amendments</u>. This Agreement may not be modified or changed except by an instrument or instruments in writing signed by both of the parties hereto.

14.8 <u>Governing Law</u>. This Agreement shall be governed and construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions.

14.9 <u>Gender and Number</u>. Whenever the context requires or permits, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

000128

14.10 <u>Counterparts</u>. This Agreement may be executed in as many counterparts as may be deemed necessary or convenient, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

14.11 <u>Public Announcement</u>. The parties will cooperate as to and jointly approve the contents of a general public announcement of this transaction upon the execution and delivery of this Agreement.

14.12 <u>Termination</u>

14.12.1    This Agreement may be terminated any time prior to the Closing Date: (i) by the mutual written consent of the parties; or (ii) by Seller if any of the conditions provided for in Article 8 hereof shall not have been satisfied, complied with or performed, and Seller shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iii) by Purchaser if any of the conditions provided for in Article 7 hereof shall not have been satisfied, complied with or performed, and Purchaser shall not have waived such failure of satisfaction, noncompliance or nonperformance; or (iv) otherwise as expressly provided in this Agreement.

14.12.2    In the event that the Closing shall not take place on or before November 30, 2002, either party shall have the right, exercisable upon giving written notice to the other party within five (5) business days after said date, to terminate this Agreement, unless such failure of Closing shall be due to the breach or default of the party so seeking to terminate this Agreement.

14.12.3    Except for a termination pursuant to clause (i) of subparagraph 14.12.1 hereof, and except otherwise as expressly provided in this Agreement, the right of any party to terminate this Agreement as provided in this paragraph 14.12 shall be in addition to, and not in substitution for, any and all other relief to which such party may be entitled, either at law, in equity or by agreement.

14.13 <u>Arbitration</u>. Any controversy, dispute or claim between the parties arising out of, related to or in connection with this Agreement or the performance or breach hereof, including with respect to the arbitrability of such controversy, dispute or claim and the scope and applicability of this paragraph 14.13, shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Chicago, Illinois, in accordance with its commercial arbitration rules as then in effect; provided that the arbitration shall be by a single arbitrator mutually selected by Purchaser and Seller, and if the parties do not agree within twenty (20) days after the date of notification of a request for such arbitration made by either of the parties, the selection of the single arbitrator shall be made by the American Arbitration Association in accordance with said rules. In addition to, and not in substitution for any and all other relief in law or equity, the arbitrator may grant equitable relief and specific performance to compel compliance hereunder. The determination of the arbitrator shall be accompanied by a written opinion of the arbitrator and shall be final, binding and conclusive on the parties, and judgment on the arbitrator's award, including without limitation equitable relief and specific performance, may be entered in and enforced by any court having jurisdiction thereof. Fees and expenses of the American Arbitration Association and of the arbitrator shall be borne as shall be determined by the arbitrator, and the arbitrator may in his discretion award attorneys' fees and expenses in addition to any other remedy that is allowed and regardless of whether such remedy includes an award of damages.

14.14 <u>Fax Copies</u>. Purchaser and Seller agree that "Facsimile" transmissions of signed documents shall be regarded and accepted as if they bore original signatures. Promptly after such Facsimile transmission the original documents bearing the original signatures shall be provided to the other party.

--Signature Page Follows--

IN WITNESS WHEREOF, the parties hereto have executed and delivered this As
Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY
CORP. ("Seller")

By _____

Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY,
INC. ("Purchaser")

By _____

Robert Rozman, President

C:\MSOFFICE\WINWORD\Wisconsin Automated\Product Line\o Diehl\Asset Purch Agt Final\KSP\mer

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Seller")

By_____
  Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Purchaser")

By_____
  Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\AssetPurchAgtFinal\KSP\mer

000133

EXHIBIT A
TO
ASSET PURCHASE AGREEMENT
(Woodworking Product Lines)

**PROMISSORY NOTE**

$600,000.00                                                            _____, Illinois
                                                                       _____, 2002

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the order of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM"), the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on the balance of principal remaining from time to time unpaid at the rate of 6.198% (herein called the "Interest Rate"), such principal sum and interest to be payable in seventy-two (72) equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing on January 1, 2003, and on the 1st day of each successive month thereafter through and including December 1, 2008. Payment of principal hereof and interest hereon shall be made in lawful money of the United States at 5301 West Dempster, Suite 308, Skokie, Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of this Promissory Note may appoint in writing from time to time. All past due principal shall bear interest at the rate equal to the Interest Rate from time to time in effect, plus three percent (3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (herein called the "Purchase Agreement"), between Diehl and WAM, and the payment of this Promissory Note is secured by a Security Agreement, of even date herewith, between Diehl and WAM, covering all of the assets and properties of

Diehl (herein called the "Security Agreement"), and it is expressly agreed that all of the covenants and agreements contained in the Security Agreement and in the Purchase Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that:

(a)    the undersigned shall fail to pay any installment of principal of, or interest on, this Promissory Note when due and such failure shall continue for at least five (5) days; or

(b)    there shall have occurred any default under the Security Agreement or event by which, under the terms of the Security Agreement, the principal amount hereof may become due and payable; or

(c)    the undersigned shall die, become insolvent, or admit in writing its inability to pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to or acquiesce in the appointment of a trustee or receiver for it or any of its property or make a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee or receiver shall be appointed for it or for a substantial part of its property and shall not be discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding shall be instituted by or against it, and if instituted against it, is consented to or acquiesced in by it or remains for thirty (30) days undismissed;

then, in any such event and so long as such event is continuing, the then holder hereof may, without notice of any kind, declare all unpaid principal of and interest on this Promissory Note to be due and payable, whereupon all unpaid principal of and accrued interest on this Promissory Note shall forthwith be and become due and payable.

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

**IN WITNESS WHEREOF**, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.

By_____
      Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\PromissoryNote.doc\KSP/mer

2

0001

EXHIBIT B
TO ASSET PURCHASE AGREEMENT
<u>(Woodworking Product Lines)</u>

<u>SECURITY AGREEMENT</u>

THIS SECURITY AGREEMENT, made and entered into as of the ____ day of
_____, 2002, by and between DIEHL WOODWORKING MACHINERY, INC., an
Indiana corporation ("Debtor"), located at 981 South Wabash Street, P. O. Box 465,
Wabash, Indiana 46992-0465, and WISCONSIN AUTOMATED MACHINERY CORP., a
Wisconsin corporation ("Secured Party"), located at 5301 West Dempster, Suite 308,
Skokie, Illinois 60077;

W I T N E S S E T H:

WHEREAS, Debtor issued a certain Promissory Note, of even date herewith (the
"Promissory Note"), in the original principal amount of $600,000, payable to the order of
Secured Party, which Promissory Note was issued pursuant to a certain Asset Purchase
Agreement, dated September 13, 2002 (the "Purchase Agreement") between Debtor and
Secured Party; and

WHEREAS, this Security Agreement is being executed to secure full and prompt
payment of the Promissory Note;

NOW, THEREFORE, in consideration of the premises, the mutual agreements
herein and other good and valuable consideration, the receipt of which is hereby
acknowledged, the parties agree as follows:

1.    <u>Definitions</u>.  In addition to other terms defined elsewhere herein, when used
herein, the following terms shall have the following meanings:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other
debts, liabilities and obligations of Debtor to Secured Party, its successors and assigns,
howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent,
now or hereafter existing, or due or to become due, including without limitation under the
Promissory Note.

"Default" shall mean the occurrence of any one or more of the following
events:  (a) Debtor fails to pay, when due, any amount on any of the Liabilities; (b) non-
performance, misrepresentation or breach by Debtor of any representation, warranty or
covenant contained herein or in any other agreement between Debtor and Secured Party;
(c) Debtor becomes insolvent or unable to pay its debts as they mature or is adjudicated a
bankrupt or applied for, consent to or acquiesces in the appointment of a trustee or receiver
for it or any of its property or makes an assignment for the benefit of creditors, or in the

absence of such application, consent or acquiescence, a trustee or receiver is appointed for Debtor or for a substantial part of its property; (d) any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is instituted by or against Debtor; (e) any dissolution, merger or consolidation, or transfer of a substantial part of the property of Debtor; (f) any loss, theft, substantial damage or destruction to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or (g) any change in Debtor's financial condition or ability to pay the Liabilities deemed by Secured Party to be materially adverse or the occurrence of any other event as a result of which Secured Party deems itself insecure.

2.    <u>Grant of Security Interest</u>.  To secure the payment and performance of all Liabilities, Debtor hereby mortgages to Secured Party and hereby grants and assigns to Secured Party a continuing security interest in and to all properties, assets and interests of each Debtor listed on Exhibit A hereto, whether now or hereafter existing or acquired (herein individually and collectively called the "Collateral"), secondary in and subordinate solely to the lien and security interest of The LaSalle Bank in such Collateral.

3.    <u>Representations, Warranties, Covenants and Agreements of Debtor</u>.  Debtor hereby represents, warrants, covenants and agrees that (a) Debtor has been duly organized and is in good standing in the state of its formation listed above; (b) Debtor has full power and authority to execute and deliver this Agreement and perform all of such Debtor's obligations hereunder; (c) Debtor will from time to time, on request of Secured Party, execute or consent to the execution of such financing statements and other documents (and pay the costs of filing or recording same in all public offices deemed necessary by Secured Party), and do such other acts and things, all as Secured Party may reasonably request, to evidence, perfect and maintain a valid security interest in the Collateral; (d) the Collateral will be kept at Debtor's address shown above, unless Secured Party shall otherwise consent in writing, and Debtor will not sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for the use or sale of Collateral and collection of accounts in the ordinary and usual course of Debtor's business; (e) Debtor will at all times keep the Collateral in first-class order and repair, excepting any loss or damage or destruction that is fully covered by proceeds of insurance; (f) Debtor will at all times keep the Collateral insured against loss, damage, theft and other risks, in such amounts, for such periods and written by such companies, and under such policies and in such form, all as shall be reasonable under all of the circumstances of Debtor's business, and Debtor shall apply any proceeds of such insurance which may be received by either of them toward payment of the Liabilities, whether or not due, in such order of application as Secured Party may determine; (g) Secured Party may examine and inspect the Collateral or any part thereof, wherever located, at any reasonable time or times; and (h) except for the lien and security interest of The LaSalle Bank in the Collateral, to which the lien and security interest granted hereby is secondary in priority and subordinate, and assuming Secured Party has properly perfected, the security interest granted hereby will be a first priority security interest in the Collateral.

4.   Remedies Upon Default. Whenever a Default shall be existing, all Liabilities may (notwithstanding any provisions of any other agreements between Debtor and Secured Party), at the option of Secured Party, and without demand or notice of any kind, be declared, and thereupon immediately shall become, due and payable, and Secured Party may exercise from time to time any and all rights and remedies available to it under applicable law to the fullest extent permitted thereby, including the rights of a secured party under the Uniform Commercial Code. Debtor agrees, in case of Default, to assemble, at their expense, all the Collateral at a convenient place acceptable to Secured Party, and to pay all costs of Secured Party of collection of all Liabilities and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses. Debtor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, demands, advertisements, hearings or process of law in connection with the exercise by Secured Party of any of its rights and remedies upon Default. Any notification of intended disposition of any of the Collateral shall be deemed reasonable and properly given if given at least five (5) days before such disposition. Any proceeds of any of the Collateral may be applied by Secured Party to the payment of expenses in connection with the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Secured Party toward payment of such of the Liabilities and in such order of application, as Secured Party may from time to time elect.

5.   General. No delay on the part of Secured Party in the exercise of any right or remedy shall operate as a waiver thereof, no waiver of any right or remedy shall operate as a future waiver and no single or partial exercise by Secured Party of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

Any notice from Secured Party to Debtor if mailed shall be deemed given when mailed, by registered or certified mail, return receipt requested, postage prepaid, addressed to Debtor either at Debtor's address shown above, or at any other address of Debtor appearing on the records of Secured Party.

The terms and provisions contained herein shall, unless the context otherwise requires, have the meanings and be construed as provided in the Uniform Commercial Code of Illinois. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Whenever the context requires or permits words used in the singular herein shall be construed to mean or include the plural and vice-versa, and pronouns of any gender or neuter shall be deemed to mean or include any other gender and neuter.

The rights and privileges of Secured Party hereunder shall inure to the benefit of its successors and assigns.

00013

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of the day and year first above written.

**Secured Party:**

WISCONSIN AUTOMATED
  MACHINERY CORP.

**Debtor:**

DIEHL WOODWORKING
  MACHINERY, INC.

By_____
    Paul Ehrlich, President

By_____
    Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\SecurityAgtDiehl.doc\KSPvner

4

0003

EXHIBIT A
TO SECURITY AGREEMENT

Collateral

The Collateral consists of all of Debtor's right, title and interest in and to the following:

The Product Lines and Sale Assets (as defined in the Purchase Agreement).

All goods and equipment now owned or hereafter acquired, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), including all electronic equipment and industrial supply materials, including grinding wheels, abrasive products and accessories, and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located;

All inventory, now owned or hereafter acquired, including, without limitation, all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products including such inventory as is temporarily out of Debtor's custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above;

All contract rights and general intangibles now owned or hereafter acquired, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind;

All now existing and hereafter arising accounts, contract rights, royalties, license rights and all other forms of obligations owing to Debtor arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Debtor, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Debtor;

All documents, cash, deposit accounts, securities, securities entitlements, securities accounts, investment property, financial assets, letters of credit, certificates of deposit, instruments and chattel paper now owned or hereafter acquired and Debtor's books relating to the foregoing;

All copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or

0001

COPY

## PROMISSORY NOTE

$600,000.00

Wabash, Indian[a]
October 1, 200[2]

FOR VALUE RECEIVED, the undersigned, DIEHL WOODWORKING MACHINER[Y,]
INC., an Indiana corporation ("Diehl"), hereby unconditionally promises to pay to the or[der]
of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("WAM[")]
the principal amount of Six Hundred Thousand Dollars ($600,000.00), with interest on [the]
balance of principal remaining from time to time unpaid at the rate of 6.198% (herein ca[lled]
the "Interest Rate"), such principal sum and interest to be payable in seventy-two [(72)]
equal monthly installments of Ten Thousand Dollars ($10,000.00) each, commencing [on]
January 1, 2003, and on the 1st day of each successive month thereafter through [and]
including December 1, 2008. Payment of principal hereof and interest hereon sha[ll be]
made in lawful money of the United States at 5301 West Dempster, Suite 308, Sk[okie,]
Illinois 60077, Attention: Paul Ehrlich, or at such other place as the holder of [this]
Promissory Note may appoint in writing from time to time. All past due principal shal[l bear]
interest at the rate equal to the Interest Rate from time to time in effect, plus three pe[rcent]
(3%) per annum, payable on demand.

This Promissory Note is issued pursuant to a certain Asset Purchase Agree[ment]
dated September 13, 2002 (herein called the "Purchase Agreement"), between Die[hl and]
WAM, and the payment of this Promissory Note is secured by a Security Agreem[ent of]
even date herewith, between Diehl and WAM, covering all of the assets and prope[rty of]
Diehl (herein called the "Security Agreement"), and it is expressly agreed that a[ll]

0[6]

covenants and agreements contained in the Security Agreement and in the Purcha Agreement are hereby incorporated in and made a part of this Promissory Note.

In the event that:

(a)    the undersigned shall fail to pay any installment of principal of, or interest c this Promissory Note when due and such failure shall continue for at least five (5) days; o

(b)    there shall have occurred any default under the Security Agreement or eve by which, under the terms of the Security Agreement, the principal amount hereof m become due and payable; or

(c)    the undersigned shall die, become insolvent, or admit in writing its inability pay its debts as they mature or be adjudicated a bankrupt, or apply for, consent to acquiesce in the appointment of a trustee or receiver for it or any of its property or make general assignment for the benefit of creditors; or in the absence of such applicatic consent or acquiescence, a trustee or receiver shall be appointed for it or for a substant part of its property and shall not be discharged within thirty (30) days; or any bankrupto reorganization, debt arrangement or other proceeding under any bankruptcy or insolven law or any dissolution or liquidation proceeding shall be instituted by or against it, and instituted against it, is consented to or acquiesced in by it or remains for thirty (30) da undismissed;

then, in any such event and so long as such event is continuing, the then holder here may, without notice of any kind, declare all unpaid principal of and interest on t Promissory Note to be due and payable, whereupon all unpaid principal of and accru interest on this Promissory Note shall forthwith be and become due and payable.

2

0001

If this Promissory Note is not paid when due, whether at maturity or by acceleration, or if it is collected through a bankruptcy or other court, whether before or after maturity, the holder hereof shall be entitled to recover all costs of collection, including without limitation reasonable attorneys' fees, in addition to and not in lieu of any other right or remedy at law.

This Promissory Note may be prepaid by the undersigned at any time and from time to time, in whole or in part, without penalty or premium; provided, however, that any partial prepayment shall be in the aggregate amount of at least Twenty Thousand Dollars ($20,000.00), shall be applied first to interest, then to unpaid installments of principal, and principal payments shall be applied in inverse order of maturity.

The undersigned hereby waives demand, protest, notice of default, and all other notices of any kind or nature, except as otherwise set forth in this Promissory Note.

This Promissory Note shall be governed by the laws of the State of Illinois.

**IN WITNESS WHEREOF**, this Promissory Note has been executed as of the date first above written.

DIEHL WOODWORKING
MACHINERY, INC.

By _Robert Rozman_

Robert Rozman, President

COPY

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\PromissoryNote.doc\KSP/mer

3

00014

## ASSIGNMENT AND ASSUMPTION OF
## UNFILLED CUSTOMER ORDERS AND UNFILLED PURCHASE ORDERS

THIS ASSIGNMENT AND ASSUMPTION OF UNFILLED CUSTOMER ORDERS AND UNFILLED PURCHASE ORDERS, made this 1st day of October, 2002, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "Assignor" or "Seller") and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein referred to as "Assignee" or "Purchaser");

### WITNESSETH:

WHEREAS, pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (the "Purchase Agreement"), by and among Assignor and Assignee, Assignor agreed to sell, and Assignee agreed to purchase, the Sale Assets; and

WHEREAS, in accordance with Sections 4.4 and 4.5 of the Purchase Agreement, at the Closing thereunder, Assignee is to assume and agree to satisfy and perform certain obligations and liabilities of Assignor; and

WHEREAS, the Purchase Agreement is hereby incorporated in its entirety herein by reference, and all terms used herein which are defined in the Purchase Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, in accordance with and subject to all of the terms and conditions contained in the Purchase Agreement, and of the mutual covenants herein contained, and of other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, Assignor and Assignee agree as follows:

1.    Assignor hereby transfers and assigns to Assignee, and Assignee hereby accepts the assignment of, all unfilled customer orders and commitments of Assignor listed on Schedule 4.4 to the Purchase Agreement and on hand as of the Closing Date (being the date hereof), all unfilled customer orders and commitments accepted by Assignor in the ordinary course of business between the Contract Date and Closing Date and on hand as of the Closing Date, and all customer deposits and prepayments received with respect thereto, and with respect to all such unfilled customer service orders being assigned to assignee hereunder, Assignee hereby assumes the obligations of Assignor to fill such assigned unfilled customer orders and commitments accruing from and after the Closing Date in accordance with the terms thereof, and Assignee shall be entitled to receive all monies paid hereafter for services performed hereafter by Assignee.

2.    Assignor hereby transfers and assigns to Assignee, and Assignee hereby accepts the assignment of, all of Assignor's unfilled purchase orders and commitments to suppliers listed on Schedule 4.5 to the Purchase Agreement and on hand as of the Closing Date and all unfilled purchase orders and commitments issued by Assignor in the ordinary course of business between the Contract Date and Closing Date and on hand as of the Closing Date, and Assignee hereby assumes the obligations of Assignor accruing from and after the Closing Date in accordance with the terms thereof, and the Inventory Purchase Price shall be increased by any prepayments and deposits made by Assignor with respect thereto.

3.    Except solely as provided herein, Assignee is not assuming and shall not be responsible for any other debt, liability or obligation of Assignor of any character whatsoever (whether accrued, absolute, contingent, known or unknown, due or to become due, or otherwise,

and whether or not disclosed in the Purchase Agreement), all of which are being retained by Assignor.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement and Assumption as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Assignor")

By _Paul Ehrlich_____
    Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Assignee")

By _____
    Robert Rozman, President

\\Fileserver\all access\DLR\Wisconsin Automated\Sale of Woodworking Product Line\Assign of Cust Orders.doc

and whether or not disclosed in the Purchase Agreement), all of which are being retained by Assignor.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement and Assumption as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP. ("Assignor")

By_____
     Paul Ehrlich, President

DIEHL WOODWORKING MACHINERY, INC. ("Assignee")

By_____
     Robert Rozman, President

\\Fileserver\all access\DLR\Wisconsin Automated\Sale of Woodworking Product Line\Assign of Cust Orders.doc

## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT, made this 1st day of October, 2002, by

WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein referred

to as "Assignor" or "Seller"), to DIEHL WOODWORKING MACHINERY, INC., an Indiana

corporation (herein referred to as "Assignee" or "Purchaser");

## W I T N E S S E T H :

For and in consideration of the Purchase Price allocated to all of the Sale Assets set forth

and to be paid as provided in that certain Asset Purchase Agreement, dated September 13, 2002

(herein referred to as the "Purchase Agreement"), between Assignor and Assignee, and of other

good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged,

and in accordance with the terms and conditions of the Purchase Agreement, Assignor has sold,

granted, assigned, transferred, set over, conveyed and confirmed, and by these presents does

hereby sell, assign, transfer and convey unto Assignee, and its successors and assigns, the

Product Lines, as a going concern, and the following assets relating to any of the Product Lines

and on hand as of the Closing Date:

(a)     All inventories relating to any of the Product Lines, including without limitation all raw materials, work in process, including without limitation a 527 Double End Tenoner machine (the "Incomplete Machine"), finished machinery, purchased parts and components, manufactured parts and assemblies, and loaner chain (herein called collectively "Inventory");

(b)     Dies, tools, jigs, fixtures, patterns, special tooling and trade fixtures relating to any of the Product Lines, including without limitation all items set forth on Schedule 3.3 of the Purchase Agreement under the heading Fixtures & Tooling (herein called collectively "Miscellaneous Tooling");

(c)     All trade names, trademarks, trademark registrations and applications, brand names, logos and applications therefor, if any, and the goodwill symbolized thereby, trade secrets, intellectual property, and all rights under all confidentiality agreements and covenants of

non-competition, and all rights to recover for any past infringement of any thereof, owned by Seller and relating solely to any of the Product Lines;

      (d)     All books, records, computer tapes, files (including cabinets containing same) and other papers and documents of Seller pertaining solely to any of the Product Lines or any of the Sale Assets, including without limitation documents of title, warehouse receipts, customer lists, customer files, mailing lists, product literature and manuals, service manuals, instruction manuals, advertising materials, catalogs, sales literature, sales displays, drawings, designs, engineering data, specifications, engineering prints and know-how;

      (e)     All of Seller's right, title and interest in, to and under all unfilled customer orders being assigned to and assumed by Purchaser as provided in paragraph 4.4 of the Purchase Agreement and all customer deposits, if any, received by Seller against such assumed orders only, and all unfilled purchase orders with suppliers, being assigned to and assumed by Purchaser as provided in paragraph 4.5 of the Purchase Agreement;

      (f)     All of Seller's right, title and interest in, to and under paragraph 6.12 of that certain Asset Purchase Agreement, dated June 19, 1992, among Famco Machine Division of Belco Industries, Inc. (which was assigned to Seller) and Medalist Industries, Inc. (the "Medalist Agreement"), relating to the obligations of Medalist Industries, Inc., which has been succeeded to by Illinois Tool Works, and any successors thereto, with respect to product liability claims relating to any products of the Product Lines sold at or prior to June 29, 1992, or with respect to the Show Machines (as defined in the Medalist Agreement).

      (g)     All other assets, properties and rights specifically set forth in the Purchase Agreement as being transferred or assigned to, or purchased by, Purchaser.

     To have and to hold the same, with appurtenances thereof, unto the Assignee, and its successors and assigns, forever, to its and their own proper use and behoof.

     Notwithstanding anything to the contrary contained herein, there is specifically excluded from the Sale Assets being transferred and assigned hereunder, and Assignor is not assigning or transferring to Assignee, the properties and assets specifically described in paragraph 2.2 of the Purchase Agreement and collectively called "Excluded Assets".

     Good, marketable title to the Sale Assets being transferred and assigned hereunder is being sold, assigned, transferred and conveyed to Assignee free and clear of all claims, liabilities, taxes, liens, security interests, encumbrances, restrictions, and adverse rights of use or ownership. Subject to Assignor's obligations under paragraph 6.1 of the Purchase Agreement, Purchaser is

accepting the Sale Assets in the condition existing on the Inspection Date, or such later date on which a particular Sale Asset was acquired by Assignor, ordinary wear and tear excepted, on an "as-is" basis. EXCEPT SOLELY AS OTHERWISE SPECIFICALLY SET FORTH IN THE PURCHASE AGREEMENT, THE SALE ASSETS ARE BEING TRANSFERRED WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES (BOTH EXPRESS AND IMPLIED) ASSIGNOR HEREBY DISCLAIMS.

The Purchase Agreement is hereby incorporated in its entirety herein by reference, and all terms used herein which are defined in the Purchase Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

All the terms and provisions of this Bill of Sale and Assignment shall be binding upon Assignor and its successors and assigns, and shall inure to the benefit of Assignee and its successors and assigns.

IN WITNESS WHEREOF, Assignor has executed and delivered this Bill of Sale and Assignment as of the date first above written.

WISCONSIN AUTOMATED MACHINERY CORP.

By: _____

Paul Ehrlich, President

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT, made and entered into as of the 1st day of October, 2002, by and between DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation ("Debtor"), located at 981 South Wabash Street, P. O. Box 465, Wabash, Indiana 46992-0465, and WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation ("Secured Party"), located at 5301 West Dempster, Suite 308, Skokie, Illinois 60077;

## W I T N E S S E T H :

WHEREAS, Debtor issued a certain Promissory Note, of even date herewith (the "Promissory Note"), in the original principal amount of $600,000, payable to the order of Secured Party, which Promissory Note was issued pursuant to a certain Asset Purchase Agreement, dated September 13, 2002 (the "Purchase Agreement") between Debtor and Secured Party; and

WHEREAS, this Security Agreement is being executed to secure full and prompt payment of the Promissory Note;

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.     Definitions.  In addition to other terms defined elsewhere herein, when used herein, the following terms shall have the following meanings:

"Liabilities" shall mean all obligations of Debtor hereunder, and all other debts, liabilities and obligations of Debtor to Secured Party, its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including without limitation under the Promissory Note.

"Default" shall mean the occurrence of any one or more of the following events:  (a) Debtor fails to pay, when due, any amount on any of the Liabilities; (b) non-performance, misrepresentation or breach by Debtor of any representation, warranty or covenant contained herein or in any other agreement between Debtor and Secured Party; (c) Debtor becomes insolvent or unable to pay its debts as they mature or is adjudicated a bankrupt or applied for, consent to or acquiesces in the appointment of a trustee or receiver for it or any of its property or makes an assignment for the benefit of creditors, or in the absence of such application, consent or acquiescence, a trustee or receiver is appointed for Debtor or for a substantial part of its property; (d) any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is instituted by or against Debtor; (e) any dissolution, merger or consolidation, or transfer of a substantial part of the property of Debtor; (f) any loss, theft, substantial damage or destruction to or of any of the Collateral, or the making of

any levy, seizure or attachment thereof or thereon; or (g) any change in Debtor's financi___ condition or ability to pay the Liabilities deemed by Secured Party to be materially advers___ or the occurrence of any other event as a result of which Secured Party deems its___ insecure.

2.    <u>Grant of Security Interest</u>.  To secure the payment and performance of a___ Liabilities, Debtor hereby mortgages to Secured Party and hereby grants and assigns ___ Secured Party a continuing security interest in and to all properties, assets and interests ___ each Debtor listed on Exhibit A hereto, whether now or hereafter existing or acquire___ (herein individually and collectively called the "Collateral"), secondary in and subordina___ solely to the lien and security interest of The LaSalle Bank in such Collateral.

3.    <u>Representations, Warranties, Covenants and Agreements of Debtor</u>.  Debt___ hereby represents, warrants, covenants and agrees that (a) Debtor has been du___ organized and is in good standing in the state of its formation listed above; (b) Debtor ha___ full power and authority to execute and deliver this Agreement and perform all of su___ Debtor's obligations hereunder; (c) Debtor will from time to time, on request of Secure___ Party, execute or consent to the execution of such financing statements and oth___ documents (and pay the costs of filing or recording same in all public offices deeme___ necessary by Secured Party), and do such other acts and things, all as Secured Party ma___ reasonably request, to evidence, perfect and maintain a valid security interest in th___ Collateral; (d) the Collateral will be kept at Debtor's address shown above, unless Secure___ Party shall otherwise consent in writing, and Debtor will not sell, transfer, lease or otherwi___ dispose of any of the Collateral or any interest therein without the prior written consent ___ Secured Party, except for the use or sale of Collateral and collection of accounts in th___ ordinary and usual course of Debtor's business; (e) Debtor will at all times keep th___ Collateral in first-class order and repair, excepting any loss or damage or destruction that ___ fully covered by proceeds of insurance; (f) Debtor will at all times keep the Collatera___ insured against loss, damage, theft and other risks, in such amounts, for such periods a___ written by such companies, and under such policies and in such form, all as shall ___ reasonable under all of the circumstances of Debtor's business, and Debtor shall apply a___ proceeds of such insurance which may be received by either of them toward payment ___ the Liabilities, whether or not due, in such order of application as Secured Party m___ determine; (g) Secured Party may examine and inspect the Collateral or any part there___ wherever located, at any reasonable time or times; and (h) except for the lien and secur___ interest of The LaSalle Bank in the Collateral, to which the lien and security interest grant___ hereby is secondary in priority and subordinate, and assuming Secured Party has prope___ perfected, the security interest granted hereby will be a first priority security interest in t___ Collateral.

4.    <u>Remedies Upon Default</u>.  Whenever a Default shall be existing, all Liabiliti___ may (notwithstanding any provisions of any other agreements between Debtor a___ Secured Party), at the option of Secured Party, and without demand or notice of any ki___ be declared, and thereupon immediately shall become, due and payable, and Secur___ Party may exercise from time to time any and all rights and remedies available to it un___ applicable law to the fullest extent permitted thereby, including the rights of a secured pa___

2

under the Uniform Commercial Code. Debtor agrees, in case of Default, to assemble, their expense, all the Collateral at a convenient place acceptable to Secured Party, and pay all costs of Secured Party of collection of all Liabilities and enforcement of righ hereunder, including reasonable attorneys' fees and legal expenses. Debtor here expressly waives, to the fullest extent permitted by applicable law, any and all notice demands, advertisements, hearings or process of law in connection with the exercise Secured Party of any of its rights and remedies upon Default. Any notification of intend disposition of any of the Collateral shall be deemed reasonable and properly given if giv at least five (5) days before such disposition. Any proceeds of any of the Collateral may applied by Secured Party to the payment of expenses in connection with the Collate including reasonable attorneys' fees and legal expenses, and any balance of su proceeds may be applied by Secured Party toward payment of such of the Liabilities an such order of application, as Secured Party may from time to time elect.

5. <u>General</u>. No delay on the part of Secured Party in the exercise of any right remedy shall operate as a waiver thereof, no waiver of any right or remedy shall operate a future waiver and no single or partial exercise by Secured Party of any right or reme shall preclude any other or further exercise thereof or the exercise of any other right remedy.

Any notice from Secured Party to Debtor if mailed shall be deemed giv when mailed, by registered or certified mail, return receipt requested, postage prepa addressed to Debtor either at Debtor's address shown above, or at any other address Debtor appearing on the records of Secured Party.

The terms and provisions contained herein shall, unless the context otherw requires, have the meanings and be construed as provided in the Uniform Commer Code of Illinois. Wherever possible, each provision of this Agreement shall be interpre in such manner as to be effective and valid under applicable law, but if any provision of Agreement shall be prohibited by or invalid under applicable law, such provision shall ineffective to the extent of such prohibition or invalidity, without invalidating the remain of such provision or the remaining provisions of this Agreement. Whenever the con requires or permits words used in the singular herein shall be construed to mean or incl the plural and vice-versa, and pronouns of any gender or neuter shall be deemed to m or include any other gender and neuter.

The rights and privileges of Secured Party hereunder shall inure to the be of its successors and assigns.

This Agreement may be executed simultaneously in two or m counterparts, each of which shall be deemed an original, but all of which together s constitute one and the same instrument.

"Facsimile" transmissions of signed documents shall be regarded accepted as if they bore original signatures. Promptly after such facsimile transmission original document bearing the original signatures shall be provided to the other party.

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of the day and year first above written.

**Secured Party:**                                    **Debtor:**

WISCONSIN AUTOMATED                        DIEHL WOODWORKING
  MACHINERY CORP.                                 MACHINERY, INC.

By_____        By_____
    Paul Ehrlich, President                        Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\SecurityAgtDiehl.doc\KSP\mer

IN WITNESS WHEREOF, this Security Agreement has been duly executed as of th[...] day and year first above written.

**Secured Party:**

WISCONSIN AUTOMATED
  MACHINERY CORP.

By_____
      Paul Ehrlich, President

**Debtor:**

DIEHL WOODWORKING
  MACHINERY, INC.

By_____
      Robert Rozman, President

C:\MSOFFICE\WINWORD\WisconsinAutomated\ProductLinetoDiehl\SecurityAgtDiehl.doc\KSP\mer

EXHIBIT A
## TO SECURITY AGREEMENT

### Collateral

The Collateral consists of all of Debtor's right, title and interest in and to the following:

The Product Lines and Sale Assets (as defined in the Purchase Agreement).

All goods and equipment now owned or hereafter acquired, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), including all electronic equipment and industrial supply materials, including grinding wheels, abrasive products and accessories, and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located;

All inventory, now owned or hereafter acquired, including, without limitation, all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products including such inventory as is temporarily out of Debtor's custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above;

All contract rights and general intangibles now owned or hereafter acquired, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind;

All now existing and hereafter arising accounts, contract rights, royalties, license rights and all other forms of obligations owing to Debtor arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Debtor, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Debtor;

All documents, cash, deposit accounts, securities, securities entitlements, securities accounts, investment property, financial assets, letters of credit, certificates of deposit, instruments and chattel paper now owned or hereafter acquired and Debtor's books relating to the foregoing;

All copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published

00015

published, now owned or hereafter acquired; all trade secret rights, including all rights to unpatented inventions, know-how, operating manuals, license rights and agreements and confidential information, now owned or hereafter acquired; all mask work or similar rights available for the protection of semiconductor chips, now owned or hereafter acquired; all claims for damages by way of any past, present and future infringement of any of the foregoing; and

All Debtor's books relating to the foregoing and any and all claims, rights and interests in any of the above and all substitutions for, additions and accessions to and proceeds thereof.

Without limitation of the foregoing, the Collateral shall include all the Debtor's right, title and interest in and to the following categories of assets as defined in the Uniform Commercial Code as adopted by the State of Illinois, as may be amended and in effect from time to time: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables and license fees), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of any thereof, wherever located, whether nor owned or hereafter acquired.

000158

## RESALE CERTIFICATE

Diehl Woodworking Machinery, Inc., an Indiana corporation, hereby certifies that it
registered with the Indiana Department of Revenue as a reseller and its Indiana Reseller Registration
Number is 0104362707 .

DIEHL WOODWORKING MACHINERY, INC.

By _Robert Rozman_

Robert Rozman, President

\\Fileserver\all access\DLR\Wisconsin Automated\Sale of Woodworking Product Line\Resale Cert.doc

UNANIMOUS WRITTEN
CONSENT OF ALL OF THE SHAREHOLDERS
AND THE BOARD OF DIRECTORS OF
WISCONSIN AUTOMATED MACHINERY CORP.

The undersigned, being all of the Shareholders and all of the members of the Board of Directors of WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (the "Corporation"), pursuant to the Wisconsin Business Corporation Laws and the By-laws of the Corporation, do hereby consent to the adoption of the following resolutions:

RESOLVED, that this Corporation is hereby authorized to enter into a certain Asset Purchase Agreement, dated September 13, 2002 (the "Asset Purchase Agreement") by and between the Corporation and Diehl Woodworking Machinery, Inc. ("Diehl"), providing for, among other things, the sale by the Corporation of certain Product Lines and certain other assets and properties of the Corporation to, in substantially the form presented to these Directors, with such changes and amendments as the officer(s) of this Corporation executing the same may deem necessary or advisable to consummate the transactions authorized herein.

FURTHER RESOLVED, that the Board of Directors hereby approves of and ratifies any and all actions taken by any of the officers of this Corporation in connection with the negotiations by this Corporation in connection with the said sale of the Product Lines and certain other assets and properties of the Corporation and the preparation of the Asset Purchase Agreement.

FURTHER RESOLVED, that the proper officers of this Corporation are hereby authorized to take any and all such actions and to execute and deliver on behalf of this Corporation all such instruments and documents, including without limitation the Security Agreement in substantially the form of Exhibit B attached to the Asset Purchase Agreement, as they, or any of them, shall deem necessary or advisable in connection with the Asset Purchase Agreement, and to carry out the intent of the foregoing resolutions, and any such action or execution and delivery of any such instrument or document by any such officer shall be conclusive evidence that such officer deems the same and all the terms and provisions thereof to be necessary or advisable.

This Consent may be executed in any number of counterparts, all of which together shall constitute an original.

IN WITNESS WHEREOF, the undersigned have hereunder set their hand
this 1st day of October, 2002.

_____          _____
Paul Ehrlich                                                    Paul Ehrlich

_____          _____
Jay Ehrlich                                                       Jay Ehrlich

_____          _____
Dimitris Loukidis                                            Dimitris Loukidis

Being all of the Shareholders of                    Being all of the Directors of
WISCONSIN AUTOMATED                          WISCONSIN AUTOMATED
MACHINERY CORP.                                    MACHINERY CORP.

H:\DLR\Wisconsin Automated\Sale of Woodworking Product Line\wamdirectorsresolution.doc

CERTIFIED COPY OF RESOLUTIONS
ADOPTED BY ALL OF THE SHAREHOLDERS
AND THE BOARD OF DIRECTORS OF
WISCONSIN AUTOMATED MACHINERY CORP.

I, JAY EHRLICH, DO HEREBY CERTIFY that I am a duly elected and acting Assistant

Secretary of WISCONSIN AUTOMATED MACHINERY CORP., a corporation organized and

existing under the laws of the State of Wisconsin (the "Corporation"), that the following is a true

and correct copy of resolutions duly adopted by all of the Shareholders and the Board of

Directors of the Corporation, and that said resolutions have not been annulled, amended or

modified in any way or manner and are in full force and effect as of the date hereof.

RESOLVED, that this Corporation is hereby authorized to enter into a certain Asset Purchase Agreement, dated September 13, 2002 (the "Asset Purchase Agreement") by and between the Corporation and Diehl Woodworking Machinery, Inc. ("Diehl"), providing for, among other things, the sale by the Corporation of certain Product Lines and certain other assets and properties of the Corporation to Diehl, in substantially the form presented to these Directors, with such changes and amendments as the officer(s) of this Corporation executing the same may deem necessary or advisable to consummate the transactions authorized herein.

FURTHER RESOLVED, that the Board of Directors hereby approves of and ratifies any and all actions taken by any of the officers of this Corporation in connection with the negotiations by this Corporation in connection with the said sale of the Product Lines and certain other assets and properties of the Corporation and the preparation of the Asset Purchase Agreement.

FURTHER RESOLVED, that the proper officers of this Corporation are hereby authorized to take any and all such actions and to execute and deliver on behalf of this Corporation all such instruments and documents, including without limitation the Security Agreement in substantially the form of Exhibit B attached to the Asset Purchase Agreement, as they, or any of them, shall deem necessary or advisable in connection with the Asset Purchase Agreement, and to carry out the intent of the foregoing resolutions, and any such action or execution and delivery of any such instrument or document by any such officer shall be conclusive evidence that such officer deems the same and all the terms and provisions thereof to be necessary or advisable.

IN WITNESS WHEREOF, I have hereunto set my name as Assistant Secretary this 1st day of October, 2002.

_____
Jay Ehrlich, Assistant Secretary

H:\DLR\Wisconsin Automated\Sale of Woodworking Product Line\Cert Resol Wisconsin Auto.doc

2

000163

## UNANIMOUS WRITTEN
## CONSENT OF THE BOARD OF DIRECTORS
## OF DIEHL WOODWORKING MACHINERY, INC.

The undersigned, being all of the members of the Board of Directors of DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (the "Corporation"), pursuant to the Indiana Business Corporation Laws and the By-laws of the Corporation, do hereby consent to the adoption of the following resolutions:

RESOLVED, that this Corporation is hereby authorized to enter into a certain Asset Purchase Agreement, dated September 13, 2002 (the "Asset Purchase Agreement") by and between Wisconsin Automated Machinery Corp. ("Wisconsin Automated") and the Corporation, providing for, among other things, the purchase by the Corporation of certain Product Lines and certain other assets and properties of Wisconsin Automated, in substantially the form presented to these Directors, with such changes and amendments as the officer(s) of this Corporation executing the same may deem necessary or advisable to consummate the transactions authorized herein.

FURTHER RESOLVED, that this Corporation is hereby authorized to enter into (i) that certain Promissory Note ("Promissory Note") by this Corporation in favor of Wisconsin Automated, and (ii) that certain Security Agreement ("Security Agreement") by and between the Corporation and Wisconsin Automated in substantially the forms of Exhibits A and B, respectively, attached to the Asset Purchase Agreement, with such changes and amendments as the officer(s) of this Corporation executing the same may deem necessary or advisable to consummate the transactions authorized herein.

FURTHER RESOLVED, that the Board of Directors hereby approves of and ratifies any and all actions taken by any of the officers of this Corporation in connection with the negotiations by this Corporation in connection with the said acquisition of the Product Lines and certain other assets and properties of Wisconsin Automated and the preparation of the Asset Purchase Agreement.

FURTHER RESOLVED, that the proper officers of this Corporation are hereby authorized to take any and all such actions and to execute and deliver on behalf of this Corporation all such instruments and documents, as they, or any of them, shall deem necessary or advisable in connection with the Asset Purchase Agreement, Promissory Note and Security Agreement, and to carry out the intent of the foregoing resolutions, and any such action or execution and delivery of any such

instrument or document by any such officer shall be conclusive evidence that such officer deems the same and all the terms and provisions thereof to be necessary or advisable.

This Consent may be executed in any number of counterparts, all of which together shall constitute an original.

IN WITNESS WHEREOF, the undersigned have hereunder set their hand this 1st day of October, 2002.

_____
Paul Ehrlich

_____
Jay Ehrlich

_____
Dimitris K. Loukidis

_____
Howard Kempler

_____
Robert Rozman

Being all of the Directors of
DIEHL WOODWORKING
MACHINERY, INC.

H:\DLR\Wisconsin Automated\Sale of Woodworking Product Line\dwmdirectorsresolution.doc

instrument or document by any such officer shall be conclusive evidence that such officer deems the same and all the terms and provisions thereof to be necessary or advisable.

This Consent may be executed in any number of counterparts, all of which together shall constitute an original.

IN WITNESS WHEREOF, the undersigned have hereunder set their hand this 1st day of October, 2002.

_____
Paul Ehrlich

_____
Jay Ehrlich

_____
Dimitris K. Loukidis

_____
Howard Kempler

_____
Robert Rozman

Being all of the Directors of
DIEHL WOODWORKING
MACHINERY, INC.

H:\DLR\Wisconsin Automated\Sale of Woodworking Product Line\dwmdirectorsresolution.doc



**CERTIFIED COPY OF RESOLUTIONS
ADOPTED BY THE BOARD OF DIRECTORS
DIEHL WOODWORKING MACHINERY, INC.**

I, JAY EHRLICH, DO HEREBY CERTIFY that I am a duly elected and acting Secretary of DIEHL WOODWORKING MACHINERY, INC., a corporation organized and existing under the laws of the State of Indiana (the "Corporation"), that the following is a true and correct copy of resolutions duly adopted by the Board of Directors of the Corporation, and that said resolutions have not been annulled, amended or modified in any way or manner and are in full force and effect as of the date hereof.

RESOLVED, that this Corporation is hereby authorized to enter into a certain Asset Purchase Agreement, dated September 13, 2002 (the "Asset Purchase Agreement") by and between Wisconsin Automated Machinery Corp. ("Wisconsin Automated") and the Corporation, providing for, among other things, the purchase by the Corporation of certain Product Lines and certain other assets and properties of Wisconsin Automated, in substantially the form presented to these Directors, with such changes and amendments as the officer(s) of this Corporation executing the same may deem necessary or advisable to consummate the transactions authorized herein.

FURTHER RESOLVED, that this Corporation is hereby authorized to enter into (i) that certain Promissory Note ("Promissory Note") by this Corporation in favor of Wisconsin Automated, and (ii) that certain Security Agreement ("Security Agreement") by and between the Corporation and Wisconsin Automated in substantially the forms of Exhibits A and B, respectively, attached to the Asset Purchase Agreement, with such changes and amendments as the officer(s) of this Corporation executing the same may deem necessary or advisable to consummate the transactions authorized herein.

FURTHER RESOLVED, that the Board of Directors hereby approves of and ratifies any and all actions taken by any of the officers of this Corporation in connection with the negotiations by this Corporation in connection with the said acquisition of the Product Lines and certain other assets and properties of Wisconsin Automated and the preparation of the Asset Purchase Agreement.

FURTHER RESOLVED, that the proper officers of this Corporation are hereby authorized to take any and all such actions and to execute and deliver on behalf of this Corporation all such instruments and documents, as they, or any of them, shall deem necessary or advisable in connection with the Asset Purchase

Agreement, Promissory Note and Security Agreement, and to carry out the intent of the foregoing resolutions, and any such action or execution and delivery of any such instrument or document by any such officer shall be conclusive evidence that such officer deems the same and all the terms and provisions thereof to be necessary or advisable.

IN WITNESS WHEREOF, I have hereunto set my name as Secretary this 1st day of October, 2002.

_____
Jay Ehrlich, Secretary

H:\DLR\Wisconsin Automated\Sale of Woodworking Product Line\Cert Resol Diehl.doc

23

Diehl Woodworking Machinery, Inc.
Minutes of Special Shareholders Meeting
December 22, 2006

Pursuant to a notice dated December 12, 2006 from Robert Rozman, President of Diehl Woodworking Machinery, Inc., a Special Shareholders meeting was held at the offices of the Company in Wabash, IN.  Present at the meeting were Robert Rozman, Michael Ruffner, Gary Fredrickson, Richard Meldrum and Jan Zolman.  Absent from the meeting was Jay Ehrlich.  The shareholders present represent 82.5% of the outstanding shares; therefore, a quorum was present.

The following issues were discussed at the meeting.  None of these issues required a resolution or a vote and were presented by Mr. Rozman to inform the shareholders of certain facts and events.

- The Dyken D-501 will not ship in 2006.  The customer is satisfied with the machine, but certain changes are to be made to it before shipment, and these changes cannot be completed in December.  Because the sale of this machine will not be recorded in 2006, the year will show a loss.
- Michael Ruffner, Treasurer, Secretary and Controller, will retire effective March 31, 2007.  The Company is currently searching for a replacement.
- The Board of Directors is considering the purchase of stock (representing a 1/3 interest) of Wisconsin Automated Machinery, Inc. ("WAMCO") from Mr. Rozman.  WAMCO holds an indemnification agreement from ITW for certain machinery.  This agreement has value to Diehl as protection from being brought as a defendant into potential product liability cases.
- The Board of Directors has approved the reimbursement of certain legal fees incurred by Mr. Rozman in his acquisition of the WAMCO stock.  This stock was originally to have been purchased by the Company, but, at the last minute, was instead purchased by Mr. Rozman to complete the transaction.
- Business conditions continue to be slow.  Though the Company is fairly certain of receiving orders for two more Dyken machines from Knauf, the core business continues to be slow.  This is especially true for parts business.  As a result, the Company is expected to sustain a loss on $50,000 to $75,000 in 2006, barring unusual adjustments.
- Budgeted sales for 2007 are approximately $5,000,000.  A full budget is currently being prepared.
- Certain plans for cost reductions, if necessary, in 2007 have been made.  These plans involve mostly personnel changes and reductions in force.  The changes will not be made unless business continues to be slow, and, in any circumstances, will not occur until the end of January 2007.

There being no further business to come before the shareholders, the meeting was adjourned.

_Robert Rozman_
Robert Rozman, President

_Michael Ruffner_
Michael Ruffner, Secretary


EXHIBIT
C 23

24

MINUTES OF THE 2005 ANNUAL BOARD OF DIRECTORS MEETING
DIEHL WOODWORKING MACHINERY, INC.
JUNE 28, 2005

THE ANNUAL MEETING OF THE BOARD OF DIRECTORS OF DIEHL WOODWORKING MACHINERY, INC., AN INDIANA CORPORATION WAS HELD AT THE OFFICES OF DIEHL WOODWORKING MACHINERY, INC., 981 S. WABASH, WABASH, INDIANA ON JUNE 28, 2005 AT 10:30 A.M.

THE FOLLOWING INDIVIDUALS, CONSTITUTING THE ENTIRE MEMBERSHIP OF THE BOARD OF DIRECTORS, WERE PRESENT AT THE MEETING: PAUL EHRLICH, JAY EHRLICH, ROBERT ROZMAN, DIMITRIS LOUKIDIS, AND MICHAEL RUFFNER

JAY EHRLICH AS CHAIRMAN CALLED THE MEETING TO ORDER.

MICHAEL RUFFNER THEN DISCUSSED THE RELATIONSHIP OF THE COMPANY WITH NATIONAL CITY BANK. HE SAID THE RELATIONSHIP WAS GOOD AND THAT HE EXPECTS TO RENEW THE LOAN AGREEMENT FOR ONE YEAR. HE INDICATED THAT THE BANK WAS FAVORABLE TO RELEASING THE PERSONAL GUARANTIES OF SHAREHOLDERS ON THE LOAN.

HE THEN RELAYED THE HEALTH INSURANCE INFORMATION AND THAT HE EXPECTED TO FIND A NEW INSURANCE CARRIER BY THE END OF JULY, 2005.

THE NEXT ORDER OF BUSINESS WAS TO DISCUSS THE NEED FOR CAPITAL EXPENDITURES IN 2005.

ROBERT ROZMAN MOVED TO ALLOCATE $53,000 FOR REPAIR OF THE ROOF OVER THE OFFICE. PAUL EHRLICH SECONDED AND AMENDED THE MOTION TO INCLUDE AN ADDITIONAL $19,000 FOR POWER WASHING AND PAINTING THE EXTERIOR OF THE BUILDING. ROBERT ROZMAN THEN SECONDED THE AMENDED MOTION. THE MOTION PASSED BY UNANIMOUS VOICE VOTE.

THE NEXT ORDER OF BUSINESS WAS A DISCUSSION OF LABOR RELATIONS WITH THE UNION.

ROBERT ROZMAN MOVED TO APPROVE AN INCREASE FOR EMPLOYEES IN THE UNION BY THIRTY FIVE CENTS PER HOUR CONTINGENT ON THE UNION'S AGREEMENT WITH THE COMPANY'S INSURANCE PROPOSAL. MICHAEL RUFFNER SECONDED THE MOTION. THE MOTION PASSED BY UNANIMOUS VOICE VOTE.

THE NEXT ORDER OF BUSINESS WAS TO DISCUSS ADDITIONAL EXPENSES AND/OR DEBT REDUCTIONS THAT THE COMPANY COULD AFFORD TO UNDERTAKE. MIKE RUFFNER SUGGESTED THAT THE COMPANY COULD AFFORD AN ADDITIONAL $20,000 IN MONTHLY EXPENSES OR DEBT REDUCTION. PAUL EHRLICH STATED THAT HE THOUGHT SUCH AMOUNT WAS NOT CONSERVATIVE AND WOULD BE TOO MUCH TO HANDLE AT THIS TIME.

PAUL EHRLICH THEN SUGGESTED THAT THE MANAGEMENT FEE BEING POAID TO WAMCO WAS INTENDED FOR MANAGEMENT SERVICES, WHICH HAD BECOME MINIMAL AND THAT HE BELIEVED SUCH FEE COULD BE ELIMINATED. HE SUGGESTED THAT IT WAS WRONG TO BE PAYING SUCH MANAGEMENT FEE WHILE ROBERT ROZMAN'S SALARY WAS STILL DECREASED FROM ITS PRIOR LEVEL.

EXHIBIT
C 24
tabbies

000207

JAY EHRLICH STATED THAT HE BELIEVED THAT THE MANAGEMENT FEE HAD BEEN AGREED TO AS PART OF THE COMPENSATION FOR THE PURCHASE OF THE WAMCO PRODUCT LINE BY DIEHL AND THAT DIEHL HAD CONTRACTUAL OBLIGATIONS TO MEET. HE FURTHER POINTED OUT THAT DIEHL HAD PAID OUT $100,000 IN 2004 SHAREHOLDER DISTRIBUTIONS. IT WAS BOB ROZMAN'S BELIEF THAT DIEHL DID NOT HAVE A BINDING OBLIGATION TO PAY THE MANAGEMENT FEE AT $15,000 PER MONTHY OR ANY OTHER SPECIFIC AMOUNT AND CONTINUATION OF THE MANAGEMENT FEE AT ANY PARTICULAR LEVEL MUST DEPEND ON BUSINESS CIRCUMSTANCES FROM TIME TO TIME. EXCEPT SOLELY AS PROVIDED IN THE FOLLOWING RESOLUTION, NO OTHER AGREEMENTS WERE REACHED BY THE DIRECTORS WITH RESPECT TO THE MANAGEMENT FEE..

THE BOARD THEN DISCUSSED AND CONSIDERED THE FOLLOWING ITEMS AS A PACKAGE:

1. (A) TO PAY WABASH RIVER LLC IN THE MONTH OF JULY, 2005, RENT ACCRUED THROUGH JUNE 30, 2005, IN THE TOTAL AMOUNT OF $18,000 , AND (B) TO DECREASE MONTHLY RENT TO WABASH RIVER TO $4,500 PER MONTH AS OF JULY 1,2005, AND TO PAY SUCH RENTAL MONTHLY ON A CURRENT BASIS;

2. TO PAY A MANAGEMENT FEE OF $12,500 PER MONTH (INCREASED FROM THE CURRENT $10,000 PER MONTH) TO WISCONSIN AUTOMATED MACHINERY CORP EFFECTIVE AS OF JULY 1,2005 THROUGH DECEMBER 31, 2005, AND $15,000 PER MONTH COMMENCING JANUARY 1, 2006 THROUGH DECEMBER 31, 2008: PROVIDED HOWEVER THAT (A) SUCH COMMITMENT TO PAY ANY MANAGEMENT FEE WOULD TERMINATE AS OF JANUARY 1, 2009, AND (B) THE SAID MANAGEMENT FEE COULD BE RECONSIDERED AND REDUCED OR ELIMINATED BY MUTUAL AGREEMENT OF THE PARTIES AS DIEHL'S BUSINESS CONDITIONS REQUIRED;

3. TO INCREASE ROBERT ROZMAN'S SALARY BY $2500 PER MONTH SO AS TO RESTORE IT TO ITS PRIOR LEVEL EFFECTIVE AS OF JULY 1, 2005;

4. TO PAY $4,150 PER MONTH , COMMENCING JULY 1, 2005, TO PAY DOWN SUBORDINATED DEBT OF SHAREHOLDERS : AND

5. TO RATIFY, CONFIRM AND ADOPT ALL PRIOR ACTS OF THE OFFICERS AND DIRECTORS OF THE CORPORATION.

JAY EHRLICH MOVED TO APPROVE THE PRECEDING PACKAGE OF ITEMS. MIKE RUFFNER SECONDED THE MOTION. THE BOARD APPROVED THE MOTION UNANIMOUSLY.

THE NEXT ORDER OF BUSINESS. WAS A DISCUSSION CONCERNING THE CALCULATION OF THE BUYOUT FORMULA FOR MANDATED PURCHASE OF SHARES OF MANAGEMENT OWNERS AND SHAREHOLDERS AND THE BUY - SELL PROVISIONS AND RIGHTS OF FIRST REFUSAL PRESCRIBED BY THE SHAREHOLDERS AGREEMENT, AS SET FORTH IN THE MEMORANDUM, DATED JUNE 24, 2005, FROM THE CORPORATION'S LEGAL COUNSEL, KEN PERLMAN, TO THE BOARD OF DIRECTORS .

ROBERT ROZMAN MOVED THAT THE BOARD APPOINT A COMMITTEE TO RECOMMEND TO THE BOARD A PURCHASE PRICE FORMULA PURSUANT TO PARAGRAPH 1.11 OF THE SHAREHOLDER AGREEMENT, AND THAT PAUL EHRLICH AND MIKE RUFFNER BE NAMED MEMBERS OF THE COMMITTEE.

PAUL EHRLICH SECONDED THE MOTION.   THE MOTION PASSED WITH UNANIMOUS APPROVAL. NO ACTION WAS TAKEN AT THIS TIME WITH RESPECT TO THE BUY - SELL PROVISIONS AND RIGHTS OF FIRST REFUSAL

THERE BEING NO FURTHER OR NEW BUSINESS TO COME BEFORE THE BOARD OF DIRECTORS, A MOTION TO ADJOURN THE MEETING WAS MADE BY JAY EHRLCH, SECONDED BY ROBERT ROZMAN AND UNANIMOUSLY CARRIED.  THE MEETING WAS ADJOURNED AT APPROXIMATELY 6:00 P.M.

_____
CHAIRPERSON/DIRECTOR/SECRETARY

_____
DIRECTOR

_____
DIRECTOR

_____
DIRECTOR

_____
DIRECTOR

00020

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (hereinafter called "Agreement") is made and entered into as of the _____ day of August, 2005, by and between WISCONSIN AUTOMATED MACHINERY CORP., a Wisconsin corporation (herein called "WAM"), and DIEHL WOODWORKING MACHINERY, INC., an Indiana corporation (herein called "Diehl");

### WITNESSETH:

WHEREAS, Diehl has previously paid, and is currently paying, to WAM or its affiliates a monthly management fee for management consulting and services, which fee has varied from time to time upon the mutual agreement of the parties; and

WHEREAS, the parties intend that WAM shall continue to provide such management consulting and services to Diehl, and Diehl shall continue to pay a monthly management fee therefor as business conditions permit and in accordance with the terms and conditions herein set forth:

NOW, THEREFORE, in consideration of the premises hereof (which the parties hereby incorporate and make a part of their agreements herein) and the mutual agreements hereinafter set forth, it is agreed as follows:

1.    Wam hereby waives all unpaid and accrued management fees, if any, due from Diehl prior to July 31, 2005. WAM shall continue to provide to Diehl from time to time management consulting and services as reasonably requested by Diehl and, effective as of July 31, 2005, Diehl shall pay to WAM, as consideration for such management consulting and services provided, a management fee of $12,500 per month (increased from the immediately preceding fee of $10,000 per month) through December 31, 2005, and $15,000 per month commencing January 31, 2006 through December 31, 2008; provided however that (a) such mutual commitments to provide such services and to pay such management fee shall terminate as of January 1, 2009, unless extended by the mutual agreement of the parties, and (b) from time to time the said management fee might be

reconsidered and reduced, increased, eliminated and/or reinstated by mutual agreement of the parti

as Diehl's business conditions requires, and WAM shall only be responsible to provide consulti

and services at a level consistent with the then current level of such management fee.

2. The parties shall cooperate and use reasonable efforts to inform each other concerning a

change in such business conditions and anticipated changes in the management fee level a

commensurate level of management consulting and services to be provided.


IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as

the day and year first above written.


WISCONSIN AUTOMATED MACHINERY CORP.

By_____

Title_____


DIEHL WOODWORKING MACHINERY, INC.

By_____

Title____PRESIDENT_____

Diehl Woodworking Machinery, Inc.
Minutes of Special Board of Directors Meeting
December 22, 2006

At the request of Robert Rozman, Chairman, a Special Board of Directors meeting was held on December 22, 2006 at the offices of the Company in Wabash, IN. Present were all three Board members, Robert Rozman, Gary Fredrickson and Michael Ruffner. Notice of the meeting was waived as all Directors attended the meeting.

The first purpose of the meeting was to discuss a proposal by Mr. Rozman, as President of the Company, to pay a small bonus for 2006. The proposed total bonus was $6,600 (with no bonus to Mr. Rozman.) Mr. Fredrickson moved that the bonuses be paid per the schedule provided by Mr. Rozman. Mr. Ruffner seconded the motion. All Directors voted "aye" and the motion was passed.

The second purpose of the meeting was to approve the payment of the final installment of the shareholder debt, originally due at the end of January 2007, in December 2006 so as to eliminate this debt from the 2006 year-end balance sheet. Mr. Rozman moved that the debt payment be made in December. Mr. Fredrickson seconded the motion. All Directors voted "aye" and the motion was passed.

The third purpose of the meeting was to discuss the legal fees relating to Mr. Rozman's acquisition of one-third of the stock of Wisconsin Automated Machinery, Inc. ("WAMCO") from Jim Loukidis, a former shareholder in Diehl. Diehl was originally scheduled to purchase this stock as part of the agreement among various parties, including Diehl, Rozman and Loukidis. Counsel decided at the last minute that there were reasons that Diehl should not own the WAMCO stock, so Rozman agreed to purchase it from Loukidis. Mr. Rozman incurred certain legal fees as a result of this transaction that Diehl was originally to pay. Mr. Ruffner moved that Diehl reimburse Mr. Rozman for the legal fees he incurred in regards to the WAMCO purchase. Mr. Fredrickson seconded the motion. All Directors voted "aye" and the motion was passed.

The fourth purpose of the meeting was to discuss Diehl's possible purchase of the WAMCO stock from Mr. Rozman. WAMCO holds an indemnification agreement from ITW for certain machinery. This agreement has value for Diehl. The Board discussed the possibility of Diehl purchasing the stock, but took no action.

The meeting was adjourned as there was no further business to come before the Board at this time.

_____
Robert Rozman, Chairman

_____
Michael Ruffner, Secretary

_____
Gary Fredrickson

EXHIBIT
C 25

Diehl Woodworking Machinery, Inc.
Special Board of Directors Meeting
April 20, 2007

A Special Meeting of the Board of Directors was called on April 20, 2007 at the request of the Chairman of the Board, Robert Rozman. All Board members were present, so notice of the meeting was waived. The meeting was called to discuss two issues.

The first issue was the approximately $4,500 of legal expenses incurred by Robert Rozman relating to his minority ownership in Wisconsin Automated Machinery, Inc. ("WAMCO.") Since Mr. Rozman owns this minority interest only because it is in the best interest of Diehl, the issue of Diehl reimbursing Mr. Rozman for these expenses was before the Board. Mr. Ruffner made a motion to have Diehl reimburse Mr. Rozman for these expenses. Mr. Fredrickson seconded the motion. The motion was passed unanimously by the Board.

The second issue was to increase Mr. Rozman's salary to cover the monthly expenditure by Mr. Rozman of approximately $1,046 per month for the purchase of the WAMCO shares from former Diehl stockholder and Board member, Jim Loukidis. Again, Mr. Rozman's purchase of the WAMCO shares is in the best interest of Diehl. It should also be noted that Mr. Rozman's current salary is less than the 90% of previous salary levels that other Diehl employees are being paid. Therefore, Mr. Ruffner made a motion to increase Mr. Rozman's salary by a NET of $1,046, effective April 1, 2007. Mr. Fredrickson seconded the motion. The motion was unanimously passed by the Board.

There being no further business to come before the Board, the meeting was adjourned.


_____
Robert Rozman, Chairman


_____
Michael Ruffner, Secretary


_____
Gary Fredrickson, Director


EXHIBIT
C 26

27

**Other Due Diligence Documents/Communications Provided by WAMCO to Diehl**

R. Rozman recalls discussing five other organizations brought to his attention by Ehrlich/WAMCO and visiting two of the those five firms.

None of the organizations, in my opinion were suitable acquisition candidates and all of the information I possessed that related to those suggested candidates was thrown out.

These organization were:

1.     An airplane flying service in Fort Wayne, Indiana

2.     An automotive aftermarket fiberglass component manufacturer.

3.     A stainless steel fabricating shop.

4.     A woodworking machinery firm in bankruptcy.

5.     A textile machinery parts company in bankruptcy.


EXHIBIT
C 27

28