### Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | <jayehrlich@earlfund.com> |
| **Cc:** | "Mike Ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Wednesday, November 09, 2005 6:19 PM |
| **Subject:** | Re: CTD |

Jay...

A couple of things.

1)  I can fly round trip from Indy to LAX for $203, and from Ft. Wayne, which takes me through Chicago for $750.  I can arrives are AM, 11AM or 1PM.

2)  We have two customers in Chino that I would go to see on the trip, so I will probably stay longer.

3)  In January 2005, CTD's company profile in the WMMA directory showed four (presumable) office employees.  President, Production Mgr., Engineer & CAD designer. One is probably the R&D Wages on B-2, the others, must be in Salaries Office?

4)  If they sell through dealers, where's the commission expense?

5)  What's the disclaimer about on the Business Profile page..."Seller won't compete for 3 years within 100 miles?

6)  There has to be a products liability issue...I would imagine he has extra fingers all over the place!  These are hand operated chop saws and who gets the tail?

Regards.

---

—— Original Message ——
**From:** jayehrlich@earlfund.com
**To:** rfr@diehlmachines.com
**Sent:** Wednesday, November 09, 2005 12:35 PM
**Subject:** Fwd: CTD

Bob, here's some more info.

You'll note that if you use these addbacks rather than what the broker showed originally the recast profits are not nearly as strong.  They were using a multiple of 5 times re cast ebitda to get to 2 million.  Now that multiple produces very little.
-----Original Message-----
**From:** S Probst [mailto:sprobst@earthlink.net]
**Sent:** Tuesday, November 8, 2005 10:25 PM
**To:** jayehrlich@earlfund.com
**Subject:** Fw: CTD

Hi Jay:



EXHIBIT
C 28

Per your request I am forwarding the details re the ADDBACKS, and the Shop Equipment List.

Please let me know you tentative plans to visit CTD in the next few weeks.

I look forward to meeting you.
Regards,
Scott

## Robert Rozman

**From:** "Robert Rozman" <rfr@diehlmachines.com>
**To:** "Paul Ehrlich" <peerlesssaws@msn.com>
**Cc:** "Mike Ruffner" <mike.ruffner@diehlmachines.com>
**Sent:** Tuesday, November 08, 2005 4:52 PM
**Attach:** CTD E-mail docs.pdf
**Subject:** Fw: CTD MAchines Business Offering

Paul..

This is the information I received yesterday from Jay. Mike and I will be looking at it, but as I mentioned, we have the PELLA people here and I have and will be focused on that matter until they leave later tomorrow.

Regards.

----- Original Message -----
**From:** jayehrlich@earlfund.com
**To:** rfr@diehlmachines.com
**Sent:** Monday, November 07, 2005 3:53 PM
**Subject:** Fwd: CTD MAchines Business Offering

-----Original Message-----
**From:** Scott Probst [mailto:probst@sunbeltsocal.com]
**Sent:** Tuesday, November 1, 2005 08:04 PM
**To:** "Ehrlich, Jay"
**Subject:** CTD MAchines Business Offering

Dear Jay:

Thank you for returning the Confidentiality Agreement, Buyer Profile and Dual Agency Agreement.

I am e-mailing the documents you requested for CTD Machines.

Please review this information and call me at your earliest convenience at 310-539-8300. I look forward to working with you.

Thank you.

Very truly yours,

Scott M. Probst
Executive Vice President
Sunbelt Business Sales & Acquisitions

# OFFERING PROSPECTUS

# CTD MACHINES INC
# LOS ANGELES, CA

Presented by

**SUNBELT SALES & ACQUISITIONS**
**2293 W. 190th Street**
**TORRANCE CA 90503**
**(310) 539-8300**

Scott M. Probst
Executive Vice President

 SUNBELT BUSINESS SALES & ACQUISITIONS

## Business Profile

Revised:
Printed:    10/21/2005

**CONFIDENTIALITY IS OF THE UTMOST IMPORTANCE TO THE SELLER.
DO NOT SPEAK TO THE SELLER OR HIS/HER EMPLOYEES.**    ProS.

Listing #:    LA- 1854             SBO-
Type:        Manufacturing - Saws
Firm Name:  CTD Machines Inc.
DBA:
Address:     2300 East 11th Street
City:        Los Angeles, CA 90021          TG:
Business Website:   www.ctdsaw.com
Structure:    C Corporation
Reason for Sale:   Retirement
Established:    46 Yrs      Under Present Owner:      46 Yrs
Biz Hrs:  Mon-Fri 7am-4:30pm
Bldg. Sq Ft:  33,000
Total Monthly Rent:    $11,750        including CAM
Terms & Conditions:    Negotiable
Lease Exp Date:    5/31/2007        Parking:
Options:        @        Yrs ea      Security Deposit:

| | | | | |
|---|---|---|---|---|
| Hourly Employees | 14 FT | 0 PT | Payroll: $29,182 | /mo |
| Salary Employees | 3 FT | 0 PT | Payroll: $12,541 | /mo |
| Total Employees | 17 FT | 0 PT | Payroll: $41,723 | /mo |
| Working Owners: | 1 FT | 1 PT | Payroll: $14,167 | /mo |

Licenses:

Annual Sales:            $2,458,000
Discretionary Earnings:        $422,000
   DE Includes Owner's Salary:      NO
Inventory at Cost:          $600,000

If inventory at closing is more or less, price will be adjusted

FFE at Fair Market Value:    $550,000    subject to change
Real Estate Included?:    NO    Real Estate Available?:  N
Security Deposit Included in Purchase Price?:      NO
Asking Price:            $2,095,000
Down Payment:          $500,000
+Note - Bank/3rd Pty:
+Liabilities to be Assumed

Liabilities to be assumed are capitalized leases and/or loans. D
not include operational leases included in P&L expenses.

**This business sale is proposed as an Asset Sale**

- Seller will not compete against buyer for 3 years within 100 miles
of the present business location.

- Seller will provide training for 5 weeks at 20 hours per week following close of escrow, included in the purchase price.
- *EXCLUDED FROM SALE: Any personal items of Seller (to be identified).*

**CTD Machines, Inc.** is a manufacturer of production High Speed Mitre, Double Mitre and Automatic Cut-Off Saws used for cutting wood, plastic, aluminum, non-ferrous metals and steel. CTD has reputation for building quality machinery that is fast, accurate, and dependable.

Originally founded as a Tool and Die shop in 1953, CTD produced its first industrial saw in 1959 and over the years has become one of the premier American manufacturers of Mitre Saws in the World. Located in Los Angeles, California our plant covers over 30,000 square feet of manufacturing and office space. Using a skilled staff, all machines and parts are manufactured and assembled in CTD's facility.

DISCLAIMER:    The information herein was furnished by the Seller. SUNBELT BUSINESS SALES & ACQUISITIONS ha
not verified this information and makes no representation or warranty as to its accuracy, completeness or authenticity.
Future Discretionary Earnings may differ from past Discretionary Earnings.

# CTD MACHINES INC

## EXECUTIVE SUMMARY

**CTD Machines, Inc.** is a manufacturer of production High Speed Mitre, Double Mitre and Automatic Cut-Off Saws. Our industrial Mitre Saws can be used for cutting wood, plastic, aluminum, non-ferrous metals and steel. CTD has reputation for building quality machinery that is fast, accurate, and dependable.

We've been manufacturing Cut-Off Saws since 1959. Originally founded as a Tool and Die shop in 1953, we've become one of the premier American manufacturers of Mitre Saws in the World. Located in Los Angeles, California our plant covers over 30,000 square feet of manufacturing and office space. Using a skilled staff, all machines and parts are manufactured and assembled in our facility.

CTD Machines are used by professionals, manufacturers and craftsman who seek and demand the highest quality equipment that is designed to last, to handle high volume workloads, and to deliver consistent and precise cuts each and every time. CTD Machines deliver the maximum value for the dollar and provide the an excellent return on investment.

CTD Machines are sold through a network of independent reps, referrals, repeat customers and word of mouth testimonials. The plant is efficiently laid out to handle several times it's current throughput and the staff is well trained and is supported by a full time long term general manager who wants to remain active in this business for the new owner.

PLEASE VISIT THE WEBSITE:  www.ctdsaw.com.

For complete details contact Scott M. Probst Executive Vice President, Sunbelt Sales & Acquisitions 310-539-8300.

## CTD MACHINES INC.

| PERIOD ENDING: | 2002 PER TAX RETURN 6/1/2001-5/31/2002 | | 2003 PER TAX RETURN 5/1/2002-5/31/2003 | | 2004 PER TAX RETURN 6/1/2003-5/31/2004 | | 2005 PER P&L 6/1/2004-5/31/2005 | |
|---|---|---|---|---|---|---|---|---|
| SALES | $ 2,097,782 | | $ 2,131,984 | | $ 2,616,656 | | $ 2,457,540 | |
| COST OF GOODS SOLD | $ 1,224,060 | 58.35% | $ 1,271,107 | 59.62% | $ 1,401,421 | 53.56% | $ 1,487,435 | 60.53% |
| GROSS PROFITS | $ 873,722 | 41.65% | $ 860,877 | 40.38% | $ 1,215,235 | 46.44% | $ 970,105 | 39.47% |
| OPERATING EXPENSES | $ 903,993 | 43.09% | $ 865,083 | 40.58% | $ 1,217,759 | 46.54% | $ 974,000 | 39.63% |
| NET INCOME | $ (30,271) | -1.44% | $ (4,206) | -0.20% | $ (2,524) | -0.10% | $ (3,904) | -0.16% |
| NET INCOME, WITH ADDBACKS | $ 307,949 | 14.68% | $ 342,767 | 16.08% | $ 626,121 | 23.93% | $ 422,000 | 17.17% |
| | | | | | | | | |
| ADDBACKS: | | | | | | | | |
| OWNER'S SALARY | $ 170,000 | | $ 170,000 | | $ 170,000 | | $ 170,000 | |
| PAYROLL TAXES ON SALARY | $ 17,000 | | $ 17,000 | | $ 17,000 | | $ 17,000 | |
| INTEREST | $ - | | $ - | | $ - | | | |
| DEPRECIATION | $ 17,220 | | $ 10,767 | | $ 11,121 | | | |
| DISCRETIONERY EXPENSES | $ 134,000 | | $ 145,000 | | $ 428,000 | | $ 235,000 | |
| TOTAL ADDBACKS | $ 338,220 | | $ 342,767 | | $ 626,121 | | $ 422,000 | |

*This information has been obtained from the Seller and is believed to be accurate; however Sunbelt Business Brokers makes no representations or warrants as to the accuracy or completeness of this information. Any Buyer should rely on his own independent verification of this data from available tax records and company books.

EXHIBIT A

## LIABILITIES AND STOCKHOLDERS EQUITY

|  | 2005 | 2004 |
|---|---|---|
| CURRENT LIABILITIES: | | |
| ACCOUNTS PAYABLE | $      188,003 | $      420,201 |
| DEFERRED SALES | 44,540 | 43,076 |
| PROFIT-SHARING PAYABLE | 55,247 | 65,000 |
| SALARIES PAYABLE | 18,880 | 32,379 |
| SALES TAXES PAYABLE | 359 | 5,042 |
| TOTAL CURRENT LIABILITIES | 307,030 | 565,697 |

## STOCKHOLDERS EQUITY

|  | 2005 | 2004 |
|---|---|---|
| COMMON STOCK | | |
| AUTHORTHIZED 25,000 SHARES, NO PAR VALUE, ISSUED AND OUTSTANDING 700 SHARES: $1.43 STATED VALUE | 12,000 | 12,000 |
| ADDITIONAL PAID-IN CAPITAL | 63,395 | 63,395 |
| RETAINED EARNINGS | 881,993 | 882,617 |
| TOTAL STOCKHOLDERS EQUITY | 957,388 | 958,012 |

| TOTAL LIABILITIES AND STOCKHOLDERS EQUITY | $ 1,264,418 | $ 1,523,70 |
|---|---|---|

EXHIBIT

CTD MACHINES, INC.
STATEMENT OF INCOME AND RETAINED EARNINGS
FOR THE YEARS ENDED
MAY 31

| | 2005 | % | 2004 | % |
|---|---|---|---|---|
| REVENUES | $2,463,411 | 100.40 | $2,570,602 | 100.34 |
| LESS: ADJUSTMENTS | (9,799) | (0.40) | (8,733) | (0.34) |
| NET REVENUES | 2,453,612 | 100.00 | 2,561,868 | 100.00 |
| COST OF SALES (SCHEDULE B-1) | 1,212,682 | 49.42 | 1,189,948 | 46.45 |
| BASIC PROFIT | 1,240,930 | 50.58 | 1,371,920 | 53.55 |
| OTHER DIRECT EXPENSES (SCHEDULE B-2) | 274,763 | 11.20 | 262,129 | 10.23 |
| GROSS PROFIT | 966,168 | 39.38 | 1,109,791 | 43.32 |
| OPERATING EXPENSES: | | | | |
| ADMINISTRATIVE (SCH. B-3) | 790,830 | 32.23 | 1,009,161 | 39.39 |
| SELLING (SCH. B-4) | 183,171 | 7.47 | 158,637 | 6.19 |
| TOTAL OPERATING EXPENSE | 974,000 | 39.70 | 1,167,798 | 45.58 |
| (LOSS) FROM OPERATIONS | (7,833) | (0.32) | (58,007) | (2.26) |
| OTHER INCOME (EXPENSES): | | | | |
| INTEREST INCOME | 4,080 | 0.17 | 3,221 | 0.13 |
| MISCELLANEOUS INCOME | 3,929 | 0.16 | 54,787 | 2.14 |
| OTHER INCOME | 8,009 | 0.33 | 58,009 | 2.27 |
| INCOME BEFORE TAXES | 176 | 0.01 | 2 | 0.00 |
| INCOME TAXES | 800 | 0.03 | 800 | 0.03 |
| NET (LOSS) | (624) | (0.03) | (798) | (0.03) |
| BEGINNING RETAINED EARNINGS | 882,617 | | 883,415 | |
| ENDING RETAINED EARNINGS | $ 881,994 | | $ 882,616 | |

SEE ACCOUNTANT'S COMPILATION REPORT.

CTD MACHINES, INC.
BALANCE SHEET
MAY 31

ASSETS

|  | | 2005 | | 2004 |
|---|---|---|---|---|
| CURRENT ASSETS: | | | | |
| CASH | $ | 458,408 | $ | 649,434 |
| ACCOUNTS RECEIVABLE | | 176,717 | | 229,919 |
| INVENTORIES | | 505,139 | | 517,289 |
| EMPLOYEE ADVANCES | | 1,331 | | 500 |
| TOTAL CURRENT ASSETS | | 1,141,594 | | 1,397,142 |
| | | | | |
| FIXED ASSETS: | | | | |
| IMPROVEMENTS, BUILDINGS | | 232,635 | | 232,635 |
| OFFICE FURNITURE AND EQUIPMENT | | 50,513 | | 37,790 |
| MACHINERY AND EQUIPMENT | | 251,132 | | 251,132 |
| TOTAL FIXED ASSETS | | 534,280 | | 521,557 |
| | | | | |
| LESS: ACCUMULATED DEPRECIATION AND AMORTIZATION (SCHEDULE A-1) | | 411,457 | | 394,990 |
| FIXED ASSETS NET OF ACCUMULATED DEPRECIATION | | 122,823 | | 126,567 |
| | | | | |
| TOTAL ASSETS | | $ 1,264,418 | | $ 1,523,709 |

SEE ACCOUNTANT'S COMPILATION REPORT.

SCHEDULE A-1

CTD MACHINES, INC.
FIXED ASSETS
MAY 31, 2005

NET BOOK V

| | | |
|---|---|---|
| OFFICE FURNITURE AND EQUIPMENT | $        50,513 | |
| LESS: ACCUMULATED DEPRECIATION | 37,669 | |
| | | $        12,8 |
| MACHINERY AND EQUIPMENT | 251,132 | |
| LESS: ACCUMULATED DEPRECIATION | 249,578 | |
| | | 1,5 |
| IMPROVEMENTS, BUILDINGS | 232,635 | |
| LESS: ACCUMULATED DEPRECIATION | 124,210 | |
| | | 108,4 |

TOTAL ASSETS, NET OF ACCUMULATED DEPRECIATION
    NET REVENUE                                                $     122,

SEE ACCOUNTANT'S COMPILATION REPORT

PAGE 7

SCHEDULE B-1

CTD MACHINES, INC.
COST OF SALES
FOR THE YEARS ENDED
MAY 31

| | | 2005 | % | | 2004 | % |
|---|---|---|---|---|---|---|
| COST OF SALES | | | | | | |
| BEGINNING INVENTORY | $ | 517,289 | 21.08 | $ | 523,835 | 20. |
| PURCHASES | | 764,139 | 31.14 | | 701,302 | 27. |
| PURCHASE DISCOUNTS | | (1,770) | (0.07) | | (1,668) | (0.0 |
| PURCHASES, OTHER | | 79,525 | 3.24 | | 148,333 | 5. |
| DIRECT LABOR/REGULAR | | 339,996 | 13.86 | | 315,539 | 12. |
| DIRECT LABOR/OVERTIME | | 18,643 | 0.76 | | 19,896 | 0. |
| ENDING INVENTORY | | (505,139) | (20.59) | | (517,289) | (20. |
| | | | | | | |
| TOTAL COST OF SALES | | $ 1,212,682 | 49.42 | $ 1,189,948 | 46. |

SEE ACCOUNTANT'S COMPILATION REPORT

SCHEDULE B-2

CTD MACHINES, INC.
OTHER DIRECT EXPENSES
FOR THE YEARS ENDED
MAY 31

|  | 2005 | % | 2004 | % |
|---|---|---|---|---|
| OTHER DIRECT EXPENSES: |  |  |  |  |
| DEPRECIATION | $  15,496 | 0.63 | $  19,776 | 0. |
| FREIGHT-IN | 6,380 | 0.26 | 2,290 | 0. |
| GIFTS-SHOP | 150 | 0.01 | 3,100 | 0. |
| INS. GEN./MED. | 21,306 | 0.87 | 34,610 | 1. |
| INS. WOMEN'S COMP. | 37,320 | 1.52 | 30,017 | 1. |
| LEASE EQUIPMENT | 58,680 | 2.39 | 58,680 | 2. |
| PAYROLL TAXES | 31,918 | 1.30 | 27,782 | 1. |
| REPAIRS/MAINTENANCE | 12,932 | 0.53 | 16,497 | 0. |
| SHOP SUPPLIES | 12,164 | 0.50 | 12,739 | 0. |
| TAXES, REAL PROPERTY | 13,009 | 0.53 |  |  |
| UTILITIES | 16,651 | 0.68 | 15,476 | 0. |
| WAGES, R & D | 48,758 | 1.99 | 41,165 | 1. |
| OTHER DIRECT EXPENSES | $  274,763 | 11.20 | $  262,129 | 10 |

SEE ACCOUNTANT'S COMPILATION REPORT

SCHEDULE B-

**CTD MACHINES, INC.**
**ADMINISTRATIVE EXPENSES**
**FOR THE YEARS ENDED**
**MAY 31**

| | 2005 | % | 2004 | |
|---|---|---|---|---|
| ADMINISTRATIVE EXPENSES: | | | | |
| ACCOUNTING | $ 7,684 | 0.31 | $ 10,059 | 0 |
| AUTO | 3,411 | 0.14 | 3,652 | 0 |
| AUTO-LEASE | 2,745 | 0.11 | 2,745 | 0 |
| BANK CHRGS/CR. CARD FEES | 8,073 | 0.33 | 5,903 | 0 |
| DEPRECIATION | 971 | 0.04 | 2,187 | 0 |
| DIRECTOR FEES | 50,000 | 2.04 | 50,000 | 1 |
| DUES & SUBSCRIPTIONS | 1,578 | 0.06 | 2,057 | 0 |
| EMPLOYEE BENEFITS | 7,316 | 0.30 | 7,016 | 0 |
| ENTERTAINMENT/FOOD | 3,806 | 0.16 | 2,992 | 0 |
| GIFTS | 3,325 | 0.14 | | |
| INSURANCE, GENERAL | 23,942 | 0.98 | 8,098 | 0 |
| INSURANCE, MEDICAL | 11,775 | 0.48 | 11,410 | 0 |
| INSURANCE, PRODUCT LIABILITY | 50,369 | 2.05 | 98,152 | 3 |
| LEASE | 3,249 | 0.13 | 3,683 | 0 |
| LEGAL | 54 | 0.00 | 858 | 0 |
| MAINTENAINCE/REPAIRS | 2,100 | 0.09 | | |
| OFFICE SUPPLIES | 4,025 | 0.16 | 6,280 | |
| PAYROLL FEES | 5,045 | 0.21 | 4,731 | |
| PENSION/PROFIT-SHARING PLANS | 55,247 | 2.25 | 65,000 | |
| POSTAGE | 2,899 | 0.12 | 2,443 | |
| PRINTING AND PUBLICATIONS | 3,052 | 0.12 | 3,953 | |
| PROFESSIONAL SERVICES | 6,986 | 0.28 | 9,588 | |
| RENT | 213,879 | 8.72 | 345,040 | 1 |
| ROYALTIES | 25,000 | 1.02 | 95,161 | |
| SALARIES, OFFICERS | 170,000 | 6.93 | 170,000 | |
| SALARIES, OFFICE | 92,167 | 3.76 | 71,862 | |
| TAXES, BUSINESS & LICENSES | 2,828 | 0.12 | 2,390 | |
| TAXES, PAYROLL | 21,205 | 0.86 | 16,059 | |
| TELEPHONE | 5,047 | 0.21 | 6,228 | |
| TRAVEL/LODGING | 3,052 | 0.12 | 1,611 | |
| TOTAL ADMINISTRATIVE EXPENSES | $ 790,830 | 32.23 | $1,009,161 | 3 |

SEE ACCOUNTANT'S COMPILATION REPORT

PAGE 10

SCHEDULE B-

**CTD MACHINES, INC.**
**SELLING EXPENSES**
**FOR THE YEARS ENDED**
**MAY 31**

| | 2005 | % | 2004 |
|---|---|---|---|
| SELLING EXPENSES: | | | |
| ADVERTISING | $ 33,389 | 1.36 | $ 25,460 |
| AUTO | 2,612 | 0.11 | 3,631 |
| AUTO LEASE | 2,745 | 0.11 | 2,745 |
| CONVENTIONS/TRADE SHOWS | 31,972 | 1.30 | 19,560 |
| CRATING | 26,006 | 1.06 | 29,949 |
| INSURANCE, GEN/MED | 543 | 0.02 | 2,501 |
| OUTSIDE SALES COMMISSION | 2,063 | 0.08 | |
| SALARIES, REGULAR | 68,150 | 2.78 | 62,375 |
| SALES COMMISSION, DEALER | 4,663 | 0.19 | 393 |
| TAXES, PAYROLL | 5,647 | 0.23 | 5,796 |
| TELEPHONE | 5,187 | 0.21 | 6,228 |
| TRAVEL/LODGING | 194 | 0.01 | |
| | | | |
| TOTAL SELLING EXPENSE | $ 183,171 | 7.47 | $ 158,637 |

SEE ACCOUNTANT'S COMPILATION REPORT

----- Original Message -----
**From:** paul Ehrlich
**To:** bob rozman
**Cc:** jim loukidis ; bernard schlifke
**Sent:** Wednesday, December 20, 2006 11:30 AM
**Subject:** Wabash River LLC

Bob:

Since my memo and further discussion yesterday I have given a lot of thought to
this.
I understand that Diehl lost $51,000 in November.
Subject to receipt of information requested in my memo yesterday I am willing to
propose the following:

As manager of Wabash River it is willing to reduce the rent for the 1st quarter of 2007 to $1,500
per month.
This assumes we will not close on the sale of Wabash River real estate to Bob or Diehl.
In this scenario we will not have a contract and any sale will need to be negotiated down the
road.  As I indicated the $500 earnest money deposit will be forfeited.

I submit the following alternative.

Wabash River LLC and Diehl or Bob Close on the real estate sale as soon as is practical.
Payments on the purchase note to be reduced to $1,500 for the 1st 6 months of 2007.
Amortization schedule to be adjusted accordingly, so that commencing July 1, 2007
payments shall revert to the $2,500 contemplated by the agreement and to become a balloon at
the end of the payment term.

Let me know Which way you want to go at your early convenience.

Paul

EXHIBIT
C 29

30

Date:      August 16, 2006
To:        Paul Ehrlich
From:      Bob Rozman
RE:        *Stock Purchase Offer for the shares of both Jim & Paul*

I've been thinking about this matter for the past several weeks and rather than call
you as I had originally planned to do, I thought it better to write you first and then
follow up with phone discussion before the shareholders meeting tomorrow. That
meeting will allow us to discuss the matter personally and therefore, this seemed to
be the right timing for this offer and trying to end a lot of uncertainty. And yes, I
know this is how the meeting with Mike Moss started out...until I was a bit
reluctant. (you've actually alluded to this approach before that meeting) But that
has changed and I really need to establish what I believe is my direction for Diehl.

What I am therefore proposing is what you and Mike were discussing when I
walked in a week ago this past Monday. I buy the Diehl stock of both Paul and
Jim on a $500K company valuation basis, with 50% down to both parties, a 3
(maybe 4) year note to both at 5.5%.   That is, unless the Atlanta show is a
complete bust.

I will accept the building purchase offer, provided no further significant building
problems occur throughout *the first year of the purchase*. I say this because just
last week, the corner of my office began leaking and the paneling in my office has
buckled over a three foot section. Repairing the damage is not practical because
it's too much money to spend under our current conditions. My point however, is
that this building, while essential to Diehl, is no prize. $225K is the absolute limit.
Therefore, if we face some catastrophe, i.g., the boiler fails during fire up and has
to be replaced, a portion of the roof collapses, or the 50 year old hydraulic dock lift
breaks down and has to be replaced, I want 50% of the repair cost taken off the
building's (and accordingly the note's) value, up to a maximum concession of
$35K. This won't involve normal repair; and I would consider the internal and
external wall repair above the weld shop we're now performing, or the jacking of
the sunken building support/floor rafters that I depicted in past emails, to be
normal repair. Nor will I consider the $75K that needs to be spent on repairing the
remainder of the roof. I just don't want the sprinkler system to fail, for instance,
and Diehl has to spend $50K immediately repairing the system because without it,
there's no insurance.



EXHIBIT

C30

The management fee issue with WAMCO will be Diehl's issue to handle. My feeling about the management fee is that it was a luxury that we were able to provide for a while, and now it's over. I fully understand and appreciate your help with Jim because I recognize that he has been your loyal friend and associate for many years in business. I also know we need his cooperation to make the necessary changes to the shareholders agreement. Jim has been a silent investor in Diehl because you allowed him to be. With all due respect, his contribution to Diehl's success has been insignificant and his investment has paid a handsome return since 1999. His problem in this situation is that he is a part owner of WAMCO and cannot negotiate on his own…and he has to remember, as Mike told him, he could get nothing. The question is how to we settle with Jim and I guess we'll find that out tomorrow. If you tell Jim you're selling too, that will certainly have an impact on his thinking…and I think it will add more assurance that it's time to go. Jim does have to understand however, that whatever amount we settle with him independently is reduced by any share he receives from any WAMCO settlement. Though I think in return for any settlement, we should obtain Jim's WAMCO stock if possible…that helps us toward resolving the ITW issue.

The problems that have developed with Jay cannot continue to have Diehl caught in the middle. I sincerely have compassion for Jay, but to continue to allow him to be involved with or influence to any degree, the operation of this company is something I cannot and will no longer accept. I wish him no financial or other harm, but by only maintaining a 17.5% share holding in the company, Jay can really do little to affect the company's direction. Perhaps he will sell, perhaps he won't, I'm not sure. However, I do know that I need to get back to running this business and not be involved with the kinds of problems we've had for the past 18 months.

I feel comfortable with our current legal posture regarding the management fee. I know things can change very quickly and I know complaints cost a lot of money. Bruce feels strongly that this matter will not be subject to arbitration, even with the poor choice of the "management fee" words included in the Asset Purchase Agreement, for three reasons. The Memorandum of Agreement is the basis of our complaint not the Purchase Agreement; the Purchase Agreement does not *create* a legal agreement to pay a management fee between Diehl & WAMCO; the Memorandum of Agreement specifically addresses the management fee issue and it will take precedent (over the poor words in the Asset Purchase document) because it is both the only and the most recent legal document specifically addressing that issue. Then it's a matter of consideration and I think we stand on pretty good ground. Do judges want cases to settle? Of course, I went through at

31

Paul...                                            August 30, 2006

After talking to you yesterday, I can certainly sense that this entire situation is having an effect on you, far beyond what I can imagine. I want to assure that it is not my intent to pry into that matter, so please do not construe any of my efforts to that end.

Jim and his attorney will probably continue to defer any meaningful decision because to me, it appears neither is sure of what they want or how they want to obtain it. Jim simply cannot make a decision. Whatever and however the problem that exists between you and Jay has developed, Diehl cannot and should not be responsible for solving that matter, but it is surely caught in the middle.

You have spent a considerable amount of futile time and effort trying to appease both Jay and Jim, considering their interests and attempting to look out for their future well being. To me, it appears that both have had it pretty good and pretty easy for so long they can't deal with the reality that the umbrella you've provided for them is being closed. Most people, including me, would call them ungrateful.

On several occasions you've indicated you just want to get out and I have not encouraged that course of action, instead thinking that the situation will work its way through and we'll settle this thing. At this point though, I'm not so sure what the impact of settling this situation will be. Though it will be very difficult for you to remove yourself from the situation by selling, (because I know you want to provide something for both Jim and Jay), that now appears to be the only way to forge some action on the part of Jim. And, you are right in assuming that I, as the principal owner of Diehl, will not be as accommodating to either of them.

I have a limited amount of time left in my working career and my energy level is not what it was just a couple of years ago. When you combine the basic business challenge ahead of Diehl with the current ownership problems we are having, it becomes difficult to focus on the business of running this business. All I know is that I have to get back to selling more machinery, improving the quality of my people and making sure I'm backing up for the aging management team that's here. I don't want to worry about management fees, what Jay will do to Jim, or what either will have to do without Diehl for financial support. I'm concerned about how Diehl will support me and the other people who have and want to continue to work here to make a living...and make the company successful in its transition to a more specialized machine builder.

EXHIBIT
C31

I thought we had an understanding with Jim and his attorney, but we don't. We've now got more attorneys working on this situation than men on our assembly floor and that can't last for long. Though I'm the president, and the one who has directed the actions of this company through some pretty rough times since 1991, I feel as though my actions are limited by what Jim and Jay think they need to get. Actually, I think they've both received more than enough these past six and one half years, given either their lack of contribution or the grief they've caused. And, I am absolutely convinced that neither of them care one iota about Diehl or its people.

I'm the one taking the risk…because I'm buying out to provide jobs for me and the people here…in as challenging a machinery building business environment as you or I have ever seen. The probability of someone buying me out, though not impossible, is not likely. While I'm certain there is another buyer, another person who can run the business just as well as I can, it is more likely he would liquidate/raid the business just as soon as possible.

The only real equity of this company is a nucleus of several people who are here and if I lose, or sense that I would lose that in the next year or so because they can't or don't want to deal with the uncertainty of the situation that exists, I'm no longer a buyer. I think I represent a good portion of that equity, but I absolutely need the cooperation and dedication of these other people and I'm spending way too much time now, working on shoring up their confidence and re-assuring them that things will be ok. In my opinion, the results of the Atlanta show were not that good for us…not the machine sales I had hoped for and expected. Yes, there are opportunities, but this business will never again generate the easy parts business it did in the past. We'll all work hard to make a living and any success we'll enjoy, we'll have earned.

We are now going around in circles here, waiting for Jay or Jim to do whatever, with both expecting a warm settlement to make them go away. I know that your departure, or your announcement of departure will make Jim act because there is no longer any certainty…no longer the assurance that Paul will take care of things like he always has. The net result will be that we'll all save attorneys fees and begin the resolution of this matter. I am confirming that after these changes in the shareholders agreement to effect a change with 60% of the stock, I will set a timetable for the sale of all but one share of your stock, all of Jim's stock and the building together. Then all the remaining problems will be mine, or they won't.

Bob

32

## Robert Rozman

**From:** "Robert Rozman" <rfr@diehlmachines.com>
**To:** "Paul Ehrlich" <peerlesssaws@msn.com>
**Sent:** Tuesday, September 05, 2006 5:31 PM
**Attach:** No more smoke.doc
**Subject:** The Memo I Shouldn't Have Sent

Paul...

I just finished the draft of this memorandum when you called this morning. It's one I wasn't going to (shouldn't) send it because of what you said in our phone conversation.

I've spent most of today addressing just the right words to call a special shareholders meeting, and the remainder of the time was almost equally as unpleasant.

I know you have Diehl's best interest in mind, but I'm beginning to worry about what will be left of Diehl when this is all over?

We made $4K on the tenoner because I really need a new manufacturing manager and have to address that issue...how do I pay to get the good one I need to find?   Mike's looking for a new controller and we'll have 1.75 times Mike's salary for six months.

I explained the situation with Knauf and while I don't think they are backing off, their delay can be equally damaging.

We don't have enough orders to maintain the work force we've now got unless Gary or I come up with some strong business

People are moping because they're working at 90% of a salary that hasn't been raised in a couple of years, and that "poor me' attitude is becoming too prevalent among the union people, among some others.

While I will calm down, I'm just being overwhelmed, and really should be spending my tim helping Gary get some orders, not focused on this stuff.

Bob

EXHIBIT
C 32

Gentlemen:

I've read the subject letter sent by Andrew Schwartz and want to clarify my position and the course I want to pursue in the matter. I understand that at this point I'm still a minority shareholder, but I think this communication from Mr. Schwartz contains a lot of smoke and is primarily a stalling tactic. The observations I've made are noted in the following:

- Mr. Schwartz is incorrect in indicating that there are a group of shareholders that want to buy the others out. My understanding is that I am the one that has offered to buy the shares of two of the non-operating shareholders and will extend that similar offer to Jay Ehrlich. Where does Mr. Schwartz get his information?

- We certainly want to avoid all unnecessary litigation expense, but the matter of the Management Fee has to be resolved. We either owe the fee or we don't and that one issue, almost instantaneously, resolves all the others. Do you really think we will spend as much trying to win this case as we will trying to settle it?

- The shot-gun procedure suggest by Mr. Schwartz is not based on good faith. If J. Ehrlich has intentions of purchasing the controlling interest of Diehl stock, he already had the opportunity and passed. What has changed is the development of this complaint and the need to resolve the management fee issue.

- I think the probability of J. Ehrlich purchasing the controlling interest of Diehl Machines is possible, but highly unlikely. J. Ehrlich has never bought, sold, liquidated or run a company and the probability of him starting now is unlikely. Smoke.

- The derivative claims and corporate oppression claims are more smoke, and I find them insulting. From someone who seriously suggested that Diehl even consider, let alone purchase, the assets of the Fort Wayne Air Service (in bankruptcy) and operate that business, or consider operating a stainless steel fabricator in Beloit, Wisconsin, this is just more unrealistic dreaming. That was the level of management services we obtained just before the memorandum of agreement and fortunately for the defense, those would probably not be admitted in any testimony.

- We should not grant any extensions. We've done that for Jim Loukidis, someone we consider an ally, and to date, there's really been nothing in return.

- By accepting this extension, *we're preparing to stall* and with so many attorneys already involved in the matter, we certainly will. Just communicating will become a problem, and I hate to think of the time and money that will be spent trying to arrange a meeting where the necessary people are physically present.

- If this were a legitimate offer to resolve the issue, I would concur that we engage the defense and try to reach accord. What I believe is transpiring is that funds and facts don't exist to defend this complaint and if the ball keeps rolling, the defense will very quickly, run out of financial momentum.

- By tomorrow, I'll be sending a notice of a special shareholders meeting to be held in Wabash. This will be to re-address the issues covered in our August 17th meeting, which is alleged to have been conducted illegally. While we may dispute that claim, it is simply much easier to re-conduct the meeting and remove all doubt.

- So, we're either playing hard ball or beach ball.

33

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Thursday, September 28, 2006 4:04 PM |
| **Attach:** | My Ans to Phase 1 & 2.doc |
| **Subject:** | Proceeding with Phase 1 & 2 |

Paul...

Here's my take on this situation and I think it's realistic, but maybe not.  No matter, lets talk about it...and probably face to face.

Bob

EXHIBIT
C 33

Date:        September 27, 2006
To:          Paul Ehrlich
From:        Bob Rozman
RE:          **Phase One & Two Scenarios**
             **Your Email of September 26, 2006**

I have looked at the proposed stages you have outlined and recognize that the second phase is not etched in stone, and that my purchase of Jim's and your stock is the first step, not automatically tied to the subsequent elements that develop. So you understand my thinking, I agree with the purchase of your stock and Jim's at the noted figures we have been discussing, but I am concerned about the purchase of Jim and Jay outright virtually closing my access to the bank for more funds, when coupled with September's numbers, and especially if they ask about our backlog.

I also recognize that in the general scheme of things, the numbers we are talking about are so small that most would laugh at them. But the numbers that Diehl is now generating are equally as small and compared to the deals you have done in the past, I'm sure they seem so small they are automatic to you. When we did WAMCO deal, you felt certain that there was $80-95K per month in parts for a least couple of years and there wasn't. It never will be and now the same is happening to Diehl's parts and that fact has to be part of this evaluation. Sure, we're going to do very well on the D-501 and I'm betting on the premise that we get two more. If I didn't think they were coming in, I wouldn't be going through with the purchase of the stock. Those two machines for Knauf allow Diehl to survive for 2007 because right now, there is nothing else to ship. Nothing else big has come in. Nothing else big that I see is real close to coming in and the parts business, which is absolutely essential to our survival, is weak. Yes, I can lay a few more people off to cut costs, but in the past two months I've already lost two people I didn't want to lose. One was the best electrician/assembler we've had since I've been here (he lead the assembly of the two Pella machines). The other, though not a ball of fire, was the draftsman who did all of the mechanical detail and B/M work on all the single end and DE tenoners we've built...so the next one we get, no one understands the machine, the B/M or even what tenoner does. Do we get through it? Yes. Do we make any money releasing and building it? No. Just look at the margin on that last simple 900 we built. I know you think I'm not looking at the big picture and concentrating on the small things here...but this is a small company now. Every machine we sell is special and we have a far less experienced staff than you did in Oshkosh, taking on just as complicated, if not more complicated projects...and a dwindling parts business to cover the mistakes.

And yes, we may just be in a bad period, but if this period lasts long enough, we're in real trouble.

Forget about me and you, but no one here as gotten a raise in 5 years! In fact, all of them have taken permanent salary losses and currently are working with a 10% cut. Most remain here because they either aren't marketable, or are in the twilight of their careers. A couple really like their job and the money is enough to get by. I don't need both a Rick Beyer and Rob Beckman (Diehl's counterpart) at the parts level we are at and one of those two will be the first to go after we get this thing concluded. But in the past, you've not had to contend with any of these issues because you were selling the company and they just had to get on with their lives…but I have to contend with them and they impact on how I want to conclude this less than global settlement we've been trying to conclude. I see all the inside problems and they are real. We have the two D-501's and absolutely nothing else in terms of big machines that we can say are close. Will something come in? Probably so, but I don't know what it will be or when it will come. I can't plan the commitment to all these cash payments with our level of parts business.

The management fee issue, an agreement I should never have signed, was a gift and has now established itself as an entitlement that Diehl can't afford. We've stopped it, but the cost of concluding it has come at a bad time. When the bank looks at the third quarter statements, I feel certain we will be having discussions with them…if not, we'll just be lucky for a while.

All this leads to the means of addressing the WAMCO note and the management fee settlement. Diehl has to be able to maintain a good relationship with the bank, not start a marginal one. I want to explain where we're going to them, not just write the check(s) and then deal with the issues. We've got a good relationship because we tilted quite a bit the last tough time and came out strong, so they have some good "up and down" experience with us. I don't want to use up that credibility over this deal because I'm going to need it in the future.

Here's how I'm looking at it:

A)    I agree will all of your second proposed version of Phase 1, except item 2. I think Jim gets $3,333.33 per month for 27 months for his share of the WAMCO note, a $20K premium for waiting.

B)    Regarding item 3 of Phase 2, Diehl pays Jay $2,196.63/mo for 60 months to settle the management fee issue. I know Jay will say he won't take paper

from Diehl, but Jay shouldn't always get his way and has to learn the meaning of the word NO. He's the one that thinks Diehl is so flush with business and equity, so this shouldn't be a problem. And, he's getting paper from me because you're assigning him, part of my note to you.

C)    Regarding item 7 of Phase 2, Diehl pays Jay $6,666.67/mo for 27 months to close out the WAMCO note in conjunction with Jim's payment above.

D)    Jim's payment in A) above, coupled with this above payment to Jay in C) are reduced accordingly from 27, by our current payments prior to any accord. At the conclusion of Diehl's WAMCO note obligation, Jim and Jay sell the WAMCO stock to Diehl for a total of $1000.

E)    There is no global settlement. Jay still owns 17.5% of Diehl and though he can't really do anything, he can try and probably will. It's in his makeup and I will have to contend with issues like today…closing the Wabash River account in Chicago. There is nothing to suggest that kind of attitude will ever change and it may get worse…and I accept that fact.

I can keep paying you and Jim for your stock out of other income I have, but if the bank comes to me and says personally guarantee this, I can't. I have one daughter in college and three more to put through, so I won't touch those funds. I have to have something to fall back on in the event this deal doesn't work out and probably, I'm too conservative. You've done a lot of deals…this will be my first…in a declining industry…at a shaky time.

What makes my offer or your offer acceptable is your execution of item 1 in Phase 2. That 1/3 interest of WAMCO stock has been the issue all along. *If you are successful* in recovering the stock, the situation is resolved in the blink of an eye…no matter the payment schedule.

I recognize you're looking for a solution to a problem we should never have had to contend with…at a difficult time in business. I truly appreciate your efforts and don't want you to think I'm being obstinate or ungrateful, but I see the situation from a slightly different perspective. I don't want to go ahead knowing that we're in dis-agreement on the back end of this thing…and yet fully recognize that you & Jim removing yourselves from Diehl is the first step that starts the ball rolling. But we have to be in accord on what happens after I buy you and Jim. I'm here 9 hours a day, and I know the detail of this particular business better than anyone here…and I'm responsible for making the payments. I would never have thought

we'd still have 9 of the 13 rip saw chassis I bought 17 months ago, or that Thomasville would put 4 more Challoner tenoners on the block like they did yesterday.  I just have to play it more conservatively than you would.


Bob


## DIEHL WAMCO SEVICE PART SALES
## YTD 2006

|               | Diehl | WAMCO |
|---------------|-------|-------|
| J             | 139   | 38    |
| F             | 103   | 52    |
| M             | 151   | 58    |
| A             | 105   | 33    |
| M             | 110   | 27    |
| J             | 120   | 33    |
| J             | 81    | 18    |
| A             | 110   | 18    |
| S (projected) | 95    | 20    |
| Average       | 113   | 33    |
| Annualized    | 1,356 | 396   |

## Robert Rozman

**From:**  "Robert Rozman" <rfr@diehlmachines.com>
**To:**  "Paul Ehrlich" <peerlesssaws@msn.com>
**Sent:**  Friday, September 29, 2006 8:01 AM
**Subject:**  Addendum my memo to you yesterday

Paul...a correction and further explanation of my letter to you yesterday.

1. I erred when I indicated we would pay Jim $3,333 for his 1/3 interest in the note. This payment is for his stock, but it also implies that he forgoes any claim to the 1/3 interest in the Diehl WAMCO note.

2. I understand that we can't automatically partition the 1/3 and 2/3 payments to Jim and Jay without Jay's approval, which we won't get.

3. I don't think Jay is going to accept a $115K management fee settlement over time, or up front in a lump sum payment...he thinks he deserves more, despite your other considerations.

4. What will make the difference and cause this thing to settle somehow is the combined/simultaneous effect of:
   a) The sale of Jim's WAMCO stock to Diehl
   b) Bob buying Jim and Paul out
   c) Diehl actively proceeding with the management fee complaint
   d) Paul actively proceeding with the recovery of his WAMCO stock

5. Unless we put full pressure on the situation, it will languish. Only the threat of financially dealing with dual complaints is what will cause Schwartz to realize that the situation requires attention to settlement, and he'll call our bluff for a while.

6. I'm firm about the structured payments to Jim and Jay, unless business turns rosy. Then we'll work something out to pay Jim and Jay quicker, but I can't promise anything at the moment.

Regards.

EXHIBIT C 34

35

**Robert Rozman**

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Monday, October 09, 2006 11:49 AM |
| **Subject:** | Final Clarification of a Phase Two Issue |

Paul...

I think I have all of the elements/events associated with the scenario (Phase I & II) you've developed clear in my mind, but do want to clarify one issue that could be affected by Jay's refusal to agree to this planned settlement, which excludes the sale of his stock. This issue specifically deals with the $115K management fee figure Diehl has committed to as part of his settlement package.

With that in mind, I want to make clear that if the settlement package as orchestrated by you is not initially accepted by Jay and Diehl continues to incur legal expense related to the management fee complaint, any and all of those related legal expenses will be used to reduce and offset the initially proposed $115K offer. I also consider that meter for those expenses will start running on that issue, the moment that my purchase of your and Jim's Diehl stock/Diehl's purchase of Jim's WAMCO stock begins.

I am not backing out of the deal, but we ran into more problems with the Dyken machine last week and I fully expect that the run off/delivery of the machine will probably be delayed, placing Diehl in a further cash crunch. We are having problems with the State of North Carolina paying for the second half of the tenoner/rip saw order ($100K) as a result of their dis-organization, and failure to even be able to start the machines in the prison's new furniture plant. While I expect things like this, the timing is particularly bad and I want to make certain this issue is covered up front.

Bob

EXHIBIT

C-35

000

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Friday, November 03, 2006 4:43 PM |
| **Subject:** | Diehl |

We just closed October and on $258K in sales, we lost $28K.

We damaged a servo motor testing the Dyken this morning and have to wait until Monday for a replacement.  We have two machine orders in house, a $36K rip saw for Austria and a $31K grinder (we now import) for a firm in Indiana.

We begin installing the taping units and resume testing on the Dyken next week.

The state of North Carolina said they would send another 25%, or $50K toward payment of the tenoner and rip saw...and indicated that the final payment would be when the machines are ready to run in January?  Obviously, I'm trying to improve that situation, but arguing with a bureaucracy isn't easy.

Don't let anyone ever think Bob isn't willing to take a risk.


Bob

EXHIBIT
C3L

## Robert Rozman

**From:**     "Robert Rozman" <rfr@diehlmachines.com>
**To:**       "Paul Ehrlich" <peerlesssaws@msn.com>
**Sent:**     Tuesday, November 07, 2006 6:22 PM
**Subject:**  Today's Crisis

Paul...

This morning, our internal computer system crashed and we are not able to enter/process customer orders, shop orders, invoice customers etc. It is a real mess!

Doug Adams has been working on the problem all day with our former system provider because they no longer support the software we are operating. The problems appears to be in the IBM 320H, which was purchased in 1991 and upgraded in '95.

We believe that we can boot up by later tonight and try to run batch, invoices, back up the files we entered etc., but there is no guarantee yet...or that it won't crash again. The system provider believes the problem is heat related and something is getting too warm because the insulation is old, etc. The system we operate cost $43K in 1991, and the back up unit in 95 was another $6K. I'm not sure what it will cost now because this system will require some other upgrades. We would buy a remanufactured IBM unit.

I'm not beginning to suggest that I'm backing out of our deal, but between what this inciden costs and the deteriorating sales environment, we *may* have to adjust some payment schedules. I expect to lay 2/3 more people off this week unless the order entry level change rapidly...and with that, we'll be down to 25 people.

I keep expecting something will break loose...but it doesn't. Just things like the computer keep happening.

Bob



38

Date:        November 22, 2006
To:          Paul Ehrlich
From:        Bob Rozman
RE:          *Considerations in Diehl -WAMCO Settlement*

I called Bruce and he is in Reno and won't be back until Monday, so I haven't had any conversations about this matter, other than to let him know that you said Jay will being curing the default on his note with you.

In reviewing a settlement approach, I have a couple critical considerations.

1)    Gaining access to my 1/3 share of the WAMCO note payment.
2)    Trying to determine the outcome of the Knauf project along with determining what Diehl's basic business conditions will be in the next six months and how long this order lull will last. As I see it, the situation with Knauf can:
   a)    Go great: This machine works fine and they immediately order two more.
   b)    Go so-so and then good: They take this machine and play with it for a while before ordering two more.
   c)    Go so-so and then bad: Take this machine and don't order two more.

   d)    Along with one of the above, contend with the slowest period I've seen since coming to Diehl. So even if alternative a) comes about, it may be that I use all those funds just to keep Diehl afloat.

Another real issue I see is that because Jay has come up with funds even you didn't think he had, he is now really pinched for cash and both my 1/3 share of the WAMCO payment and a reasonable management fee settlement number is less likely. If Jay's plan is to live solely off Diehl, that really complicates the matter, but I could be wrong. My purchase of Diehl and 1/3 of WAMCO no doubt was a factor in him getting together whatever funds he could to cure the note default and because of those actions, he may now be more realistic in his settlement requirements.

One approach for a management fee settlement is to pay a fixed amount per month, but I don't want significant debt on the balance sheet, because I've got enough already with the computer, legal fees, the impending roof repair and planning for the buyout of Mike's stock. The possibility of sharing income is risky, unless of course, Jay thinks that we'll be rolling in the money…and still, I think he won't go that route because I believe he needs the cash now. Perhaps the best solution is a combination of lower fixed monthly payments and a share of pre-tax/pre-bonus profits. But before finalizing any payout formula, we first need to establish the management fee settlement figure, which I think would be the $115K figure I confirmed in my original <u>Clarification of Rozman/Diehl's Offer Memo</u> to Bruce, dated October 4, 2006 and copied to you. This settlement figure is your Item No. 3, in Phase 2. I can live with that as long as we can structure it to deal with the poor business problems I'm now facing and the less favorable Knauf alternatives that could develop.

I'm not trying to be punitive with Jay, but I've not yet seen a realistic compromise from him. I know I've been erratic in my offers, but I've haven't seen any real effort to compromise from and I'm the one providing all the sweat equity and have taken the risk to keep this company going so Jay could get a reasonable payout for not having to do very much.

Let me know what you think.

EXHIBIT
C38

00

39

Robert Rozman

From:      "paul Ehrlich" <peerlesssaws@msn.com>
To:        "bob rozman" <rfr@diehlmachines.com>
Cc:        "jim loukidis" <jiml@warncousa.com>
Sent:      Tuesday, December 19, 2006 1:41 PM
Subject:   wabash River LLC

**Wabash River LLC**
**c/o Paul Ehrlich Manager**
**1270 Fairfield Road**
**Glencoe, Illinois 60022**

Bob:

In our telephone conversation you indicated That Diehl and/or Bob are not
inclined to close on the purchase of the subject captioned real estate.

You made it very clear that your personal financial situation is deteriorating
and that Diehl has continued to suffer financially as well.
You also suggested that additional help in the form of a reduced rent during these
tough times would be helpful.

As the manager of Wabash River LLC I am willing to consider your request and offer
some temporary relief. Under the current lease the rent is $4,500 per month.
This amount has been reduced temporarily until the closing at your request.
It should be noted a deposit of $500.00 will be forfeited.   You should also be aware
that Wabash River LLC has spent a not insignificant amount in legal fees
for this transaction.

As a former shareholder I am not privy to current financial information.
I prefer it that way, but as manager of Wabash River LLC I feel it is necessary
that I receive the latest Balance sheet and Income statement and other information
that will allow for an informed decision. I would also like any projections you have for
the first one half of 2007.

I will keep any information you provide me with currently on a confidential basis.

Paul

EXHIBIT
C 39

40

Robert Rozman

| | |
|---|---|
| From: | "paul Ehrlich" <peerlesssaws@msn.com> |
| To: | "bob rozman" <rfr@diehlmachines.com> |
| Sent: | Tuesday, April 10, 2007 9:56 PM |
| Subject: | Fw: Wabash River LLC |

Bob:
I assume you are back from your vacation.

I realize there have been subsequent memos to this one.
Also that we have had a couple of conversations.
Note below that I agreed to reduce the 1st quarter rent to $1,500 per month.
It is not my intent as manager of Wabash River LLC to forgo rent if in fact Diehl can afford to pay it.
My suggestion is we meet mid way between Wabash and Chicago as we have in the past.
We can if you prefer handle this on the phone and any other maters that need discussion.

Best regards,

Paul

EXHIBIT
C4n

00006

6/24/2007

**Robert Rozman**

| | |
|---|---|
| **From:** | "paul Ehrlich" <peerlesssaws@msn.com> |
| **To:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **Sent:** | Friday, April 27, 2007 10:02 AM |
| **Subject:** | Re: Wabash River Matters |

Bob:
That is what we agreed.
Please arrange for Rick to be placed on the checking account.
Paul

> ----- Original Message -----
> From: Robert Rozman
> To: Paul Ehrlich
> Cc: Rick Sober
> Sent: Friday, April 27, 2007 9:00 AM
> Subject: Wabash River Matters
>
> Paul...
>
> Per our meeting on Wednesday, I want to confirm that Diehl will be able to maintain the $1,500 per month payment through June of 2007. You also indicated that depending on how things go, you wanted to achieve $30K annually for the property rental.
>
> Also, since Mike is no longer available on a day to day basis, I suggest we use Rick Sober as the Registered Agent for Wabash River and put him on the check signing list, unless you want to do the book work.
>
> I still want to conclude the purchase as quickly as is reasonable.
>
> Bob



EXHIBIT
C 41

0006

6/24/2007

42

## Robert Rozman

**From:** "Robert Rozman" <rfr@diehlmachines.com>
**To:** "Paul Ehrlich" <peerlesssaws@msn.com>
**Cc:** "Mike Ruffner" <mike.ruffner@diehlmachines.com>
**Sent:** Monday, July 10, 2006 5:14 PM
**Subject:** Current Situation

Paul...

I tried to call you about 4:35 today and left a voice mail message.

Friday, the 8th and today we received orders for two saws, one of which will ship in late August ($44K), the other ($23K) later this week.

As you can see the month looks impressive due to the accrual reversals, but scratch, we lost about $14K....not quite enough labor and we needed another machine shipment. This was done to make the quarter look good for the bank, so we could proceed with the buyout of the WAMCO note,

Mike put together a cash projection in response to an email from Jay indicating that things weren't so bad and the pay cuts the other cost saving efforts were not necessary yet. We already have half of the cash from Knauf, and though we received two orders, I don't think the remainder of the year looks that rosy.

If there is no answer to my memo, I want to proceed with the bank and with an attorney to action necessary to declare the WAMCO/Diehl arrangement void based on lack of consideration because there is no exchange of value. Diehl is not receiving any value for any service being performed that is closely commensurate with $9-15K per month. The fact that we never challenged the matter doesn't mean the agreement is valid, it just means that Diehl has gone along with an unenforceable agreement and not exercised its right to void the agreement. Unless you suggest otherwise, I will proceed with contact a local attorney to formally confirm that this position is valid.

Bob


EXHIBIT
C 42

000619

6/22/2007

Date:      July 16, 2006
To:        P. Ehrlich. J. Ehrlich, J. Loukidis, M. Ruffner, G. Fredrickson,
           J. Zolman, R. Meldrum.
From:      R. Rozman

RE:        *Proposed Corrective Measures to Reduce Current Financial
           Situation*

I think it is clear that our current financial situation, despite the D-501/C-900 backlog is not particularly good. As of July 16, shipments for the month total $111,573 and with the existing workload and expense level, I fully anticipate another serious loss in the $55K range. We have the prospect of selling a used rip saw we just took in on trade, and maybe a splicer. For the present however, there are no strong machine order prospects that we can put in our pocket and service parts/tooling and service look to be in the $160-170 category. We can hope and predict that the good fortune of margin on the Dyken and Tenoner, along with some business in Atlanta will correct our situation, but it could also be that we will have created enough a hole that will be hard to crawl out of by year's end…or that this poor order environment will continue. Right now, I expect that the Dyken will ship in September, the Tenoner in August. But currently, there is nothing beyond what parts orders we obtain, excluding Dyken, the NC Prison and an MR90.

I am concerned that the bank, after seeing the results of our second quarter will visit with us to discuss the situation. Three poor months in a row should bring this matter to their attention.

To correct this situation, I propose that we take the following measures:

1)    We will not replace the roof over the weld shop or main hall and instead, patch where necessary. This will allow us to stop accruing $3.5K per month.
2)    We will eliminate $1K per month in literature/advertising.
3)    Office salaries will be cut to save $10K per month, minimum.
4)    We propose to reduce the "management fee" to WAMCO to $5K per month.

EXHIBIT
C 43

0000

5)   We propose to reduce rent to $1K per month.

6)   We propose to eliminate any other additional spending other than absolutely necessary.

7)   We have a health insurance accrual of approximately $17.3K that can be reversed after September 1, 2006 pending no additional claims before that date. This is for claims that would be made prior to September 1, 2005.

I'm not yet certain of what other measures can be taken, but will work on those this weekend. The lack of business these past few months has been as poor as anything I've seen in the 15 years that I have worked as Vice President and President of Diehl. But I am most concerned about Gary's rip saw/splicer/tenoner prospect list, or the lack thereof.

At this point, my concern is most focused on maintaining Diehl's viability and I have met with the managers at Diehl this afternoon to discuss these steps. Items 1, 2 and 3 are in process. Therefore, I ask for any other input to address this important issue.

**Robert Rozman**

From: "Robert Rozman" <rfr@diehlmachines.com>
To: "Paul Ehrlich" <peerlesssaws@msn.com>
Sent: Tuesday, March 28, 2006 2:24 PM
Subject: Current Conditions

Paul...

I know you're just returning to Chicago and I'll be leaving for our family Spring Break vacation this Friday morning, and will be gone next week. But a couple of things.

1) The month looks "iffy" because we have an order of three machines ($200K) for the sam customer that all have to ship together and one has a motor problem. We'll get it fixed, bu don't know if it can all be done by this Friday. If not, we're around $250K. April has nothing except parts.

2) Then, there is our internal political situations that now need to be resolved.

a) Clearly, the original stock structure/buy sell formula of the company did not anticipate our current situation. Then again, it probably never does. The stock value for buyout purposes is clear in definition, but a realistic value will become an issue, as it did in the Kempler episode. That's because too often, the value stockholders establish for themselves as sellers, never holds up when they are buyers of the same. The current agreement and ones like it really only work when you all sell together.

b) The issue of the management fee has to be resolved. Initially, it was established as a method to fund the primary stock holders, though no formal reference is made to it in the original purchase of Diehl by WAMCO/WAMCO to DWW Machinery Assignment. In the acquisition of WAMCO by Diehl, formal reference is made to increasing the management fee to $15K. And again, reference is made to possible adjustment in that paragraph 6.7 as well as in the corporate minutes. If Diehl were to immediately pay off the WAMCO obligation, that would end any formal relationship between WAMCO. How could a management fee apply in this situation? What does WAMCO provide for Diehl?

c) Then there is the possible Kimwood acquisition. That will further complicate the political issue, though I think it makes perfect sense because it adds repair parts base. I talked to Moyer last Friday and the hold up is tying down Progressive on the royalty agreement, and a particular point involving "improvements made by Progressive" to the existing parts. That issue is addressed in their agreement, but the lapse of time/association/new owners between Kimwood and Progressive appears to be making the negotiations go much slower than planned. Mike said he knows Progressive is critical to the deal...in fact, he said it's got to get resolved under any circumstance and he is working on it.

d) Finally, there is the issue of Diehl's real future. I think you understand that while there is



wonderful talk/promise related to $500K Dyken orders, businesses like this exist and surviv on parts orders. The $120K/year recovered parts business we've developed has replaced the margin at least $220K in new parts business that no longer exists. In my opinion, the next 2 3 years are very critical for Diehl. The existing parts business isn't enough. It appears (Kimwood?) as though we have to transition our foundation from our traditional rip saw/splicer business to tenoner/wrapping/special machinery where engineering cost is higher, "one time" machine margins are a problem and risk is much higher. Then I've got to hire Jan's replacement because it will take 4-5 years to train someone, and we'll need a real good design man with electrical experience who wants to come to Wabash. Make sure find a man I can *trust* in Mike's replacement. Then there's the building and related roof problems. It can all be done, but it would be a lot easier and safer selling six rip saws/mo and parts.

I have no answers yet, but I have some definite thoughts. When you come to Wabash, or I go to Chicago in the near future, we'll talk.

Bob

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Jay Ehrlich" <addisonst@aol.com>; "Paul Ehrlich" <peerlesssaws@msn.com>; "Dimitri" <jiml@wamcousa.com> |
| **Cc:** | "Mike Ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Thursday, November 10, 2005 6:08 PM |
| **Attach:** | Doc2.doc |
| **Subject:** | CTD Machines |

Jay...

Here are the notes I was putting together for the trip.

Regards.

Bob

EXHIBIT C45

Date:        November 10, 2005
To:          Jay Ehrlich
From:        Bob Rozman

RE:          *CTD   Review of firm as Acquisition Candidate*

Following our conversations, the information you sent to me, and the fact that I will not be going with you on your initial visit to the firm, I have the following questions and check list of items that I had intended to

1        The following is the Due Diligence Check list I would have brought to the meeting . I recognize that this firm is not going to have a lot of this stuff, but the topics have to bee addressed in a check off format and this is what I would us.

**1.    Material Contracts**
1.1    Five largest suppliers in each of past three years.
1.2    Ten largest customers in each of past three years.
1.3    Any Oral agreements with any suppliers or customers.
1.4    Any written agreement with any suppliers or customers.
1.5    Distribution agreements.
1.6    Commitments that would terminate as the result of this sale.
1.7    Equipment leases.
1.8    Consultant agreements.
1.9    Confidentiality agreements with employees or third parties.
1.10   Orders with values over $10K.
1.11   Related party contracts.
1.12   Employee contracts.
1.13   Non-Compete agreements.
1.14   Other contracts that commit the firm to more than $10K.
1.15   Standard terms of sale.

**2.    Intellectual Property**
2.1    Patents, trademarks and copyrights.
2.2    License agreements.
2.3    Claims of legal infringement.

**3.    Employment and personnel**
3.1    Organization Chart

000

3.2    Employee list and census.
3.3    Consulting agreements.
3.4    Severance agreements.
3.5    Company employee manual.
3.6    Employee benefit plans.
3.6    Employee confidentiality agreement.
3.7    Collective bargaining agreement.
3.8    Any employee loans.
3.9    Commission policies.


**4.    Financial Information**
4.1    Financials for past 36 months.
4.2    Current budget, income statement, balance sheet.
4.3    Auditor's letters.
4.4    Accounting policies.
4.5    Sales by product.
4.6    Returns and allowances history for past three years.
4.7    Gross margin.
4.8    Detail of selling, G&A expenses.
4.8    Detail of manufacturing overhead, burden rate calculation.
4.9    Detail of scrap.
4.10   A/R aging.
4.11   Bad debt history.
4.12   Inventory detail for past three years, including WIP valuation
4.13   Result of book to physical for past three years.
4.14   Procedure for slow and excess inventory.
4.15   Consigned inventory, both in and out.
4.16   Detail of equipment and machinery assets.
4.17   Current machinery/equipment appraisals.
4.18   History of warranty costs.


**5.    Other Operational Data**
5.1    Quality procedures.
5.2    Production planning process description.
5.3    Router format.
5.4    System software.
5.5    Part number inventory.
5.6    Internal procedures manual.

6.    **Marketing Data**
6.1    Price schedule.
6.2    Sales representative listing: internal/external/independent.
6.3    Pricing policies.
6.4    Direct sales description.
6.5    Normal terms and conditions of sale.
6.6    Open customer contracts applicable.
6.7    Salesman/serviceman incentive programs.
6.8    Current marketing plan.
6.9    Current advertising program.
6.10    Market share projections/repair parts/machine service

2    Another is issue will be products liability. To what do they attribute the 50% drop in their premium? And, we need some history. I would think they've got case going all the time. I don't want to jinx us, but we haven't had a complaint filed in eight years.

3    I'm puzzled by their claim that they sell through dealers, yet there is no commission expense. Do they sell net? It would appear that most is direct... from responses to trade ads and shows.

4    Their cost structure appears to preclude integration into Diehl...even their direct cost is significantly less than ours. Keeping it as a separate entity means you have to have someone there you can trust. Forgetting the asking price problem, how do we accomplish that?

5    As for planning a wind down that would establish offshore manufacturing or significant offshore parts procurement of the product, I'm not the expert in that.

6    As I mentioned before, the non-compete text must be boiler plate. If he's serious, it's a notice of future competition.

Just my preliminary thoughts.

Regards.

46

<u>Robert Rozman</u>

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Monday, August 15, 2005 3:37 PM |
| **Subject:** | Your memo of the 13th & my follow up response earlier today |

Paul...

I think we agree on the course of action regarding the "binding obligation" of Diehl with respect to making Mgmt Fee payments.

The purpose of this email memo is to *confirm that you will contact Ken* and not me, as I noted in the first line of my response. Despite the fact that its clear in your memo, I erred in thinking that I was supposed to contact Ken regarding my position.

Regards.

EXHIBIT
C 46

OOO
6/22/2007

## Robert Rozman

| | |
|---|---|
| **From:** | "Robert Rozman" <rfr@diehlmachines.com> |
| **To:** | "Paul Ehrlich" <peerlesssaws@msn.com> |
| **Sent:** | Monday, August 15, 2005 1:06 PM |
| **Subject:** | Diehl Mgmt Fee Obligation, Diehl Lease & Other Issues |

Paul...attached is my repsonse to yours of the 13th.

August 15, 2005

RE:   Your email of August 13, 2005


Paul...

I will send a note to Ken regarding my position about the Mgmt. Fee and Diehl's need to have a flexible, but reasonable obligation regarding the amount.  Given its terminal nature, the entire program essentially represents an exit strategy that I would think wants to preserve Diehl's ability to pay at least something, should its economic conditions revert to those of just a year ago.  As an example, though the opportunity to design and manufacture four Dyken machines for the Knauf organization remains, they shouldn't even be identified as a D-50 anymore. In the past month, those machines have taken on such a different composition that new numbers will have to be assigned to reflect their configuration. That means engineering, time, risk and not just replicating what used to be built.  The point is that just like in the case of PELLA, most of the products that Diehl now offers are opportunities, not entitlements like they were.  Nobody wants the "same old-same old", they can get that from China for a lot less.

The real issue here is that Diehl's ability to continue as an ongoing operation and simultaneously support the currently planned cash withdrawal schedule is not automatic. The fact that two separate entities don't really exist in Diehl and WAMCO should make this kind of understanding possible, and that seems to have been the way things have been handled successfully thus far.  Given the makeup of both entities, I see no reason to change that method of operation, and now it's time to make sure that spirit is reflected in the amendment of our formal agreement.

At this point, my development of any strategic plan for Diehl is problematic.  On one hand, there really is no need for me to adjudge the worth any management fees or lease payments being paid as a minority stockholder who has no long-term controlling ownership opportunity with the firm.  On the other hand, if I'm negotiating as a potential successor, I look at the situation more cautiously, seeking to preserve as much of Diehl's base as possible for long-term survival.  When you add to that the constant calls to Mike this year asking about cash position, and it appears that the management fee is clearly about only one thing.  So...while I fully understand that my job is to steer Diehl through the changing marketplace no matter the owner, the ultimate results of this issue will impact my opinions,

as they would yours if you were in my situation.

Given those thoughts, my recommendations are as follows:

1)    The Management Fee to WAMCO.  We all know that the management fee is not really a management fee for management services provided.  Consequently, Diehl will make every attempt to meet its obligations, but since we *don't really have two independent parties* here, the agreement should reflect exactly what you indicated in your note to me, "that Diehl doesn't consider it to have a binding obligation to pay $15,000 per month".  Concurrently, Diehl has an obligation to pay and it will pay, provided the business conditions permit, but we all know that can change. All we have to do here is formally reflect the spirit of our original agreement, recognizing the current situation and more volatile nature of our business.  The dramatic downturn in Challoner parts business should have taught all of us how we can't plan for the future in this kind of business anymore.  I think Ken can formally represent that situation for us and let us review it, don't you?

2)    The Lease. I would make the following recommendations:  a) amend the lease to reflect the revised $4,500 per month charge; b) a rider should reflect a course of action similar to that of the management fee, indicating that if business conditions deteriorate, the per month charge can be re-negotiated to reflect those conditions; c) a rider should be added to reflect a sharing of any catastrophic repair costs related to the building.  Given the 100 year age of the building, its current condition and the imminent need for major building repair over the next 10 years, in the event we have catastrophic damage or are attempting to prevent it, the payment could be affected; d) ask Wabash for an option to buy both at the lease's current expiration date and for January 1, 2006.

3)    The Shareholder Agreement.  I'd be lying if I didn't tell you that this situation affects my thinking.  If the agreement remains the same regarding the purchase of shares and I'm continuing on in my current status, that's fine and I will continue to represent Diehl's interest to the best of may ability...just as I have in the past.

Regards

## Robert Rozman

| | |
|---|---|
| From: | "Robert Rozman" <rfr@diehlmachines.com> |
| To: | "paul Ehrlich" <peerlesssaws@msn.com> |
| Sent: | Thursday, April 14, 2005 5:30 PM |
| Subject: | Re: Saco Lowell |

Paul:

I have done nothing other than agree to visit because I would have been (will be) in that area anyway. So, to pick up Jay at the Greenville airport and look at the company's products and engineering/ manufacturing documentation wouldn't be using a lot of extra effort.

In my conversation with Jay, he indicated that the $3,012M and $2,444M sales figures for 2003 and 2004 respectively represent parts business only. Those are respectable numbers, so now I would think we have to see how they are manufacturing the items and determine if we can make the them...and whether we think for less or more, can we raise the prices, etc.

At that point, I would offer my opinion regarding our ability and then my interest. There could be other problems...and given my total lack familiarity with textile machinery, other marketing or unknown problem issues could be present that preclude further interest.

A structured $700K sounds very (too) attractive, so why would they sell for that low a figure, but they could just want out. If parts drop to $1.5MM, it should still cover itself, provided we can make the parts. If just parts drop from $2.4MM to $1MM in one year, something else is causing it. The Chinese are eating (have eaten) away at the textile business even faster than wood processing, so maybe the machines are being shut down even faster than we can imagine. Kimwood remains my first choice primarily because I'm familiar with the industry and the kind of risk involved...unless this turns out to be an offer we can't pass up.

That's all I know.

Bob

> ----- Original Message -----
> From: paul Ehrlich
> To: bob rozman
> Sent: Thursday, April 14, 2005 3:16 PM
> Subject: Fw: Saco Lowell
>
> Bob:
> Have you and Mike agreed we should be looking at this deal?
>
> Discussing a price with Mike is beside the point. Why spend the money to look if what these people want is book value or 50 % of book?
>
> Do you think this can be " self financing "?
>
> Paul



EXHIBIT
C 47
tabbies

0007
6/22/2007

----- Original Message -----
From: Addisonst@aol.com
Sent: Thursday, April 14, 2005 9:04 AM
To: peerlesssaws@msn.com
Subject: Re: Saco Lowell

**Saco Lowell is a declining replacement parts business in the textile equipment industry. This is basically a forced sale and self financing. I have discussed a price with Mike of 700k for the a/r inv and ffe. We believe that there is probably no more than 300k of good inventory for sale or 4 turns based on last year's cgs.**

**It's a much simpler and safer deal than Kimwood and would entail much less difficulty in moving and engineering.**

**Bob and Mike already agree we should be looking at this deal. Even if sales decline to 1million annually it's still a good deal at that price.**

48

## Robert Rozman

| | |
|---|---|
| **From:** | "paul Ehrlich" <peerlesssaws@msn.com> |
| **To:** | "Michael W. Ruffner" <mike.ruffner@diehlmachines.com>; "bob rozman" <rfr@diehlmachines.com> |
| **Cc:** | "jim loukidis" <jiml@wamcousa.com>; "jay ehrlich" <addisonst@aol.com> |
| **Sent:** | Tuesday, April 13, 2004 2:44 PM |
| **Subject:** | Reduced cost operating plan |

Bob and Mike:
We talked about a lot of things yesterday.  However I want to memorialize how I believe we left things to reduce operating costs or increase margins going forward.

The following adjustments are monthly and except for parts are reduced expenses..

| | | |
|---|---|---|
| Advertising and literature | $   3,500 | |
| Trade Shows | $   2,000 | |
| Product liability  Mike to get actual # | $   4,000 | This may not happen. |
| Management fee to Wamco | $   5,000 | |
| Parts price increase 8 % x $ 200,000 | $  16,000 | |
| Wages Shop and office/supervisory | $  20,000 | |
| | | |
| Total | $  50,500 | |

We actually talked about wages in the $ 15,000 range.  Any combination of layoff or short months is OK as long as we get the totals for May and June which may continue for July and August.  Using $ 180,000 of compensation for 2 months and taking out one week for everyone is 12.5% of $ 180,000 or $ 22,500.  All of this is subject to discussion and finalization, but we must achieve the goal. **( MAKING MONEY)**

**Paul**

EXHIBIT
C 48

000'7
6/22/2007

**Robert Rozman**

| | |
|---|---|
| **From:** | "paul Ehrlich" <peerlesssaws@msn.com> |
| **To:** | "bob rozman" <rfr@diehlmachines.com> |
| **Sent:** | Saturday, August 13, 2005 8:45 PM |
| **Subject:** | Diehl management fee & your email of august 2, 2005 |

Bob:

I have reviewed the subject captioned memo.
I believe your 4th paragraph reflects what actions will be taken by a responsible board if future business
conditions dictate.

In my opinion if we continue to use the language that the management fee can be changed by mutual agreement as
business conditions require I am comfortable with that. I believe the record should indicate that notwithstanding Jay's
position that Diehl doesn't consider it to have a "binding obligation to pay $15,000 per month.
If you concur I will speak to Ken and get language that may be acceptable to all. This matter needs to be resolved and the minutes approved.
It is not my desire to play hard ball and stop payment of the monthly management fee, but I believe that option needs to be held open if
negotiation fails.

**I am not sending this memo to anyone else until we have agreed on a course.**

You may want to send a copy of yours to Ken and I will follow with a copy of mine or a similar version of same.

I will await you "requests to Wabash, but I believe that Diehl should request options to extend as well as an option to purchase.
At the end of 2008 cash flow from a non required management fee, conclusion of payment of the purchase price to Wamco and completion
of payment on the lease/purchase of equipment will increase by perhaps $400,000.

Paul



50

**Robert Rozman**

| | |
|---|---|
| From: | "paul Ehrlich" <peerlesssaws@msn.com> |
| To: | "bob rozman" <rfr@diehlmachines.com>; "mike ruffner" <mike.ruffner@diehlmachines.com> |
| Sent: | Friday, June 02, 2006 11:50 AM |
| Subject: | management fee |

Bob and Mike:

We had discussion in the past about paying out the Wamco loan and your suggestion that we would be then
able to discontinue the management fee.  In the event I would like to bring this up as part of the discussions I
would like to know it is ok with both of you.
If you would prefer this remain with the 3 of us I will refrain.  However, I believe Jay and jim
whould be aware that all options will be considered.

Paul



EXHIBIT
C 50

0007

6/22/2007

51

**Robert Rozman**

| | |
|---|---|
| **From:** | "paul Ehrlich" <peerlesssaws@msn.com> |
| **To:** | "bob rozman" <rfr@diehlmachines.com>; "mike ruffner" <mike.ruffner@diehlmachines.com> |
| **Sent:** | Saturday, June 17, 2006 10:11 PM |
| **Attach:** | paul comments on Jay proposals re wabash diehl management and purchase note.doc |

Bob and Mike:

I wrote the attached as a reply to Jays email to Ken which he forwarded with comment.
Decided to 1st send it to you both as a draft.

In my proposal I specifically omitted any discussion of a sale of Wabash River.

The draft may need a finishing touch.
Let me know if it is ok with you.

I am puzzled as to whether any cash is being suggested by Jay for either the purchase note or the management fee.

Possibly a take it or leave it proposal by Bob may be the next step.
I may have a few ideas.

Paul

EXHIBIT
CS1

000'7

6/22/2007

Draft

Bob and Mike:

It is obvious based upon the attached that the proposal I made at the shareholder meeting Tuesday is not going to be accepted by Jay and Jim. It is also clear to me that I will be unable to be a seller of my Diehl shares.

**I hereby withdraw my proposal in its entirety.**

Apparently Jay speaks for Jim or appears to have the authority to do so. I will be discussing this matter with Jim directly.
To say that I am disappointed with Jim and his attitude is to put it mildly.

**Sale of Diehl shares**
While I am prepared to sell my shares on the basis of a value of $450,000 or even $400,000 Jay and Jim are looking to be sellers, but on the basis of $700,000 or on some other EBITA cash flow basis. Worse they are requesting a put to sell their shares, but in effect they are not obligated to do so.
There is no suggestion as to who the buyer is or how the purchase price is to be paid.
I can however guarantee that I will not be a buyer. I seriously doubt Bob would be a buyer at book value.
**No Diehl director considering his fiduciary duty to Diehl could agree in the current climate that the company buy any shares.**

**Wabash River**
Both Jay and Jim were extremely upset when Wabash River was valued at $300,000 in the arbitration.
Now they want to **"cash out of Wabash River valuing it as a whole at $400,000 by selling it to the management group."**
Obviously I am not a buyer since I have heretofore indicated I would sell my interest in Wabash based upon a value of $200,000 and perhaps $150,000 as a part of a package deal. Both Bob and Mike (part of the management group) indicated they believe the Wabash real estate to be worth in the $150,000 range.

**Purchase note and management fee**
Payment of $315,000 over 5 years would be $5,250 per month, but Jay has a number of $6,390 per month.
Interest was not discussed on the $315,000 so I don't know where the $6,390 comes from.
The interest rate on the note is currently 6+ %. The suggested change in the interest rate on the note to 8% ($1,850) doesn't make sense to me. It is unclear whether the note is to be paid as currently with last payment in December 2008, or if it is to be extended to 5 years.
Jay's net savings number $16,750 per month doesn't compute.

## Robert Rozman

| | |
|---|---|
| **From:** | "paul Ehrlich" <peerlesssaws@msn.com> |
| **To:** | "bob rozman" <rfr@diehlmachines.com>; "mike ruffner" <mike.ruffner@diehlmachines.com> |
| **Cc:** | "jim loukidis" <jiml@wamcousa.com>; "Kenneth S. Perlman" <kperlman@bbn-law.com> |
| **Sent:** | Tuesday, June 20, 2006 1:06 PM |
| **Attach:** | Diehl shareholder meeting re settlement proposal.doc |
| **Subject:** | Paul Ehrlich proposal |

Bob and Mike:

In our discussions you have both indicated the management fee should be resolved at a
maximum of $100,000.
So your number is lower than mine and Jay and Jim's is much higher.

It is obvious based upon the attached that the proposal I made at the shareholder meeting
Tuesday is not
going to be accepted by all of the parties. It is also clear to me that I will be unable to be a seller
of my Diehl shares.

**I hereby withdraw my proposal in its entirety.**

Apparently Jay speaks for Jim or appears to have the authority to do so. I have discussed this
matter with Jim and he has indicated there is some flexibility on his part.

**Sale of Diehl shares**
While I am prepared to sell my shares on the basis of a value of $450,000 or even $400,000 Jay
and Jim are looking to be sellers, but on the basis of $700,000 or on some other EBITA cash flow
basis. Worse they are requesting a put to
sell their shares, but in effect they are not obligated to do so.
There is no suggestion as to who the buyer is or how the purchase price is to be paid.  Obviously
this requires clarification
by Jay.
I can however guarantee that I will not be a buyer. I seriously doubt Bob would be a buyer at
book value.

**No Diehl director considering his fiduciary duty to Diehl could agree in the current
climate that the company buy any shares at book value except where required by the
shareholder agreement.**

**Wabash River**
Both Jay and Jim were extremely upset when Wabash River was valued at $300,000 in the
arbitration.
Now they want to **"cash out of Wabash River valuing it as a whole at $400,000 by selling
it to the management group."**
Obviously I am not a buyer since I have heretofore indicated I would sell my interest in Wabash
based upon a value of $200,000 and perhaps $150,000 as a part of a package deal.  Both Bob
and Mike (part of the management group)
indicated they believe the Wabash real estate to be worth in the $150,000 range.

**Purchase note and management fee**
Payment of $315,000 over 5 years would be $5,250 per month, but Jay has a number of $6,390
per month.
Interest was not discussed on the $315,000 so I don't know where the $6,390 comes from.

The interest rate on the note is currently 6+ %. The suggested change in the interest rate on the note to 8% ($1,850) doesn't make sense to me. It is unclear whether the note is to be paid as currently with last payment in December 2008,
or if it is to be extended to 5 years.
Jay's net savings number $16,750 per month doesn't compute.
I am puzzled as to whether any cash is being suggested for either the purchase note or the management fee.
Jay needs to clarify this entire section.

Upon clarification from Jay, bob has indicated he would consider making a final proposal.
I will consider leaving my exhibit D proposal to Jay in place pending any proposal Bob may make.

Paul

**Ken please forward to Jay.**

----- Original Message -----
From: Kenneth S. Perlman
To: paul Ehrlich
Sent: Wednesday, June 14, 2006 3:37 PM
Subject: Fwd: (no subject)

Paul,
Jay called me today and said that he and Jim had discussed your proposal and thought that the Buy out for the WAM Note and Management fee were not high enough and that there were other stumbling blocks as well.On the buy out they want $600,000 not $400,000 but he has some payment over time schedule set up so that he says it will be even less cash flow. Essentially, he (and Jim ) want to be sellers (along with you) and not buyers of their Diehl interests. He said he doesn't want to be a minority shareholder with the management group in the future, even if he has veto power over major issues. He (and Jim ) also want to cash out of Wabash River (valuing WR as a whole at $400,000 , of which they have 62.5% ) by selling to the management group and you could be a buyer or seller. He also added a personal item concerning he and his sister getting the remainder interest in their grandmother's estate trust (which I'm not sure he discussed with Jim), but which he claims he is "adamant" about. He wanted me to discuss their thoughts with you in my capacity as "intermediary"(my word) .

I asked him to put it down in writing to make sure I understood his thinking correctly. Here it is. Call me if you want to hear more about the conversation or discuss this further.

Ken

Begin forwarded message:

> From: Addisonst@aol.com