57

Date:        August 28, 2002

To:          P. & J. Ehrlich          cc: M. Ruffner

From:        R. Rozman

RE:          *Review and notes to Asset Purchase Agreement, dated 8/14/02*

1.  At this moment, we still haven't received a copy of one year's usage from Amber, but Mike expects to clear that matter up during his visit to Oshkosh during the first week of September, when the physical inventory is taken. Both Gary and I made a somewhat careful review of the woodworking inventory list and we suspect that we will need to establish a reserve for a reasonable amount of this based on two year's usage. (1.6)

2.  We need to establish values for the loaner chains, especially the 1-1/8" chains which I believe will fall into the excess category. (2.1.1)

3.  Since the purchase price is entirely goodwill, we expect that we will amortize that amount over five years, or the maximum time that Bob Winter will allow, unless it becomes more advantageous from a tax perspective. (3.1.1)

4.  We believe that the Miscellaneous Tooling reflects all of the special or unique equipment related to the product line *and in particular*, includes the four machines used specifically for tenoner chain link production, even though one, the vibratory deburring machine, is somewhat questionably defined as a unique machine. Given that, we believe this tenoner chain manufacturing equipment belongs under the category of Miscellaneous Tooling, and includes:
    a)  All machining and test fixtures related to tenoner chain link manufacture
    b)  All cutters and tools related to tenoner chain manufacture
    c)  All measuring devices, jigs and tools for assembling and measuring tenoner chains
    d)  The tenoner chain boring machine
    e)  The tenoner chain reaming/honing machine
    f)  The tenoner chain vibratory deburring machine
    g)  The chain drive sprocket broaching machine and broaching tools



EXHIBIT
C 52

00080

h)      The tenoner chain assembly table (3.1.2)

5.      Why is the tenoner being transferred at list price, since it falls under the category of inventory?  Given this number, its cost to transfer to Diehl and make any changes due to customer request (most likely since it will be finished in a given format) will certainly result in a loss.  In light of the corrections that will have to be made to the 7200, I think that a September 30 completion of 527 *may be* somewhat optimistic, given that all resources will be directed at that machine.  (3.1.3)

6.      We talked about a delayed initiation of the payment schedule based on the fact that no cash will be generated from the woodworking product line for approximately 60 days.  I think a delayed payment range of 60-90 days will make dealing with the cash crunch more realistic. (3.2)

7.      We've talked more about the employees that won't come to Wabash, but it would appear that one, Rick Beyer, *may* just make the move.  Our understanding is that WAMCO will maintain the employment of two individuals, Rick Beyer and Scott Ode, until the end of September.  Effective October 1, 2002, these individuals become employees of Diehl Machines at their current pay levels.  You have also made separate bonus arrangements (which will be paid by WAMCO) with both of these individuals to be redeemed based upon their cooperative efforts for periods of six and four months respectively.  It will be our intention to motivate Rick to move to Wabash, but we both recognize that Scott will probably be a short term employee, though that may change.  In the interim, Scott will maintain a predominant location at your new Oshkosh facility (though he will be expected to travel to Wabash) and Rick will commute with a predominant presence in Wabash.  The exact detail of their employment agreements and longevity will be determined in the next several months. (6.3)

8.      We will need a warranty reserve if there is serious problem on the Challoner 7200, but it appears as though this reserve is going to be a casualty of the nature of the transaction? (6.4)

9.      Since Diehl is only buying assets of WAMCO, we would expect that our liability exposure is limited.  However, I think we are a mere continuation and suspect that we will be liable for those machines built by WAMCO.  Accordingly, with our leveraged position, our premiums will probably

increase to address that potential exposure, even though you've had no formal complaints on the equipment you've built. The bank will probably insist on coverage to protect their interest and it appears as though liability is being treated like warranty. (6.5)

10.   The management fee can be increased, but as I previously mentioned in item number 6., there's not going to be any immediate cash generation with this transfer. The receivables are all yours and with no experienced individuals coming to Wabash, the initial manufacture and shipment of service parts on a timely basis is going to be a challenge. I understand your desire to reinstate the management fee program as soon as possible, but without the receivables and with the start up problems, we're not going to generate a sudden surge of cash immediately after the transition. (6.7)

Finally, I want to reiterate that its our intention not to add one person in our machine shop (we currently have ten direct and one indirect) as we integrate the work load of WAMCO's woodworking product lines. As required, we may add more assembly people, but Pat insists, and I completely agree, that we add machinery instead. In fact, we may be able to reduce the machine shop head count and continue to absorb WAMCO and the increased load the develops with new equipment because two individuals are poised for retirement  That will be our approach, so I raise this issue so that you are aware of our strategy and requests to lease some more product equipment.

Diehl Woodworking Machinery, Inc.
Purchase Agreement – WAMCO
Questions and Comments

1. Excess inventory is determined as twice the last 12 months usage. Does this mean that there will be a reserve established for any such items as a reduction of the selling price? Will we subsequently have to pay for these items if and when we use or sell them? (1.6)

2. Loaner chain is apparently not included in the perpetual records. Can we get a list of the locations of these chains? How is the cost determined? (2.1.1)

3. We are to get "computer tapes" relating to the product lines we are purchasing. Since WAMCO used MAPICS on an AS/400, these records will not be readable by anything we have. Is there a plan for converting these records or for making an AS/400 available if needed? (2.1.4)

4. Purchase price for the Product Lines is currently set at $275,000. What is the tax treatment for this? What period can be used for books to write this off? (3.1.1)

5. Diehl is to pay $25,000 for Miscellaneous Tooling. Is this tooling not already written off on WAMCO's books? Is there $25,000 of value there for Diehl? (3.1.2)

6. The allocation for the 527 Double End Tenenor is set at $75,000. This is the estimated selling price of the machine. Should this be transferred at cost rather than selling price? Will the machine be completed by WAMCO before transfer? (3.1.3)

7. No mention is made that I can see of the cost of moving the inventory and records to Wabash. Who is to pay these moving costs?

8. The first payment of the Purchase Price is to be made on the first day of the month following the closing date. We will generate little or no cash from this transaction until one and a half months after this because sales will go to accounts receivable, not to cash. Can the first payment be delayed? (3.2)

9. The terms of the section concerning payment include the use of a promissory note. This note is to be subordinated only to the bank debt. This further reduces the likelihood that the original loans from the Wabash shareholders or the interim loans from all shareholders will be repaid in the foreseeable future. (3.2)

10. Is Diehl to pay the cost of moving any employees transferred to Wabash? (6.3)

11. Diehl is to be responsible for warranty for WAMCO's sales. There should be a reserve established for the estimated amount of such claims and this reserve should be treated as a reduction of the selling price. Adjustment to

1



the actual cost, either way, can be made when the warranty period has expired for all WAMCO sales. (6.4)

12. WAMCO is responsible for product liability for items sold by them. The paragraph dealing with this mentions that the Purchaser shall maintain insurance, but should WAMCO not also be required to carry insurance?  (6.5)

13. Management fee is to be increased to $15,000 per month. Will this be $10,000 temporarily in light of the recent reduction from $10,000 to $5,000? Can the increase start in the second month after close for the same cash flow reasons as stated above concerning the repayment of the Purchase Price? (6.7)

14. What equipment, if any, will be leased?  (7.4)

00085

54

*[Handwritten notes at top: "NO WARRANT, RESERVE OR $10,000+ PELLA, PUFFERDER, TENDONER, JUST TAKE IT PROD LIAB — WE JUST TAKE IT MAY"]*

Date:        September 5, 2001

To:          Paul Ehrlich        cc:    J. Ehrlich, J. Loukidis, M. Ruffner

From:        Bob Rozman

RE:          *Diehl Acquisition of Bell, Challoner, Dyken Product Lines*
             *Preliminary Review of Proposed Asset Agreement*

Both Mike and I made independent reviews of the referenced contract that we received from Mr. Perlman at Lawrence, Kamin, Saunders & Uhlehop. After those conversations, I have put together my thoughts which are presented in the following.

The first issue is selection of an attorney to examine the agreement and not run up a charge that reflects the unnecessary expense of a more scrutinizing review usually associated with such a transaction. To this end, I have made preliminary arrangements to meet with an attorney at the law firm of Miller, Carson, Boxberger & Murphy, in Fort Wayne. I forwarded a copy of the proposed agreement to Mr. Boxberger today and expect to meet with him sometime in mid September.

The only two real issues that I think need to be reviewed are the express assumption of warranty and to a lesser extent, products liability, and particularly, the cost associated with those issues. While I think we fully understand that this transfer of production from Oshkosh to Wabash is essentially a gift and we don't want to sound ungrateful, there has to be some understanding in the event of some unusual expenses developing...say within the first year after the transition on warranty and maybe two or three years on products liability.

*Warranty.* Though our projected plans to manufacture almost exclusively parts should essentially eliminate any real concern for warranty issues, I anticipate that at the time of our transition, there will a new or re-manufactured machine coming off the line in Oshkosh...and what specifically comes to mind is the new, first edition door rail machine for Buffelen. Some reserve should be established for that unit because it's not reasonable to expect it to be 100% functional and whatever warranty cost will be magnified by its location in Tacoma. Therefore, "in the event that machine warranty exposure exceeds $10,000.00 on the sum of *all Challoner or Dyken machines* Diehl inherits at the transition, WAMCO will assume that additional expense".

EXHIBIT
C 54

*Products Liability*. Because WAMCO does not have exposure to the vast majority of Bell, Challoner & Dyken machines manufactured, our assumed exposure to products liability is limited from 1992 to the present. Consequently, there is only one issue that concerns me regarding the Challoner equipment and that is the lack of spindle brakes as standard equipment on the tenoners Oshkosh built. Diehl has had a spindle brake as standard equipment on its rip saws and moulders since 1986 (on moulders since 1950) and that's the only open avenue I can see for any potential complaint on a tenoner. I think that the majority of WAMCO built Challoner tenoner customers bought your optional spindle brakes, so the potential exposure is further reduced. Therefore, I would ask that WAMCO cover just that issue for the first three years following the transition, at which point, Diehl will assume full liability. Accordingly, the language would read something like, "WAMCO assumes products liability for those Challoner tenoners it manufactured and sold without integral spindle brakes for a period of three years after the closing date."

**Other Issues**. In talking with Jay about the agreement we received from Ken, he indicated that about 13 pages of more traditional contract text was removed. There are however, some things we would like to see as quickly as possible, with the understanding that your ability to generate this date could/would trigger some suspicion in Oshkosh. These items are:

a) Schedule of the machinery to be leased
b) Schedule of the miscellaneous tooling
c) Bulk value of the raw steel inventory value
d) Copies of all previous, formal products liability complaints addressed to WAMCO for Bell, Challoner & Dyken machinery
e) The top twenty WAMCO vendors for B,C&D products
f) Any vendor agreements that would terminate with this sale
g) Any current vendor contracts or other contract with a commitment value over $5K
h) Any related party contracts
i) Any oral agreements with vendors
j) Detail of inventory defined as excess or slow moving
k) Three year history of B,C&D warranty costs
l) Any employee confidentiality agreements

Unlike most of the deals we have been associated with, there are no "deal breaker issues" present in these conversations. Our efforts are to create a sound and beneficial arrangement that allows both WAMCO and Diehl to make this asset transition as smooth as possible, yet insure that we maintain the proper level of fiducial responsibility to both of our firms.

Date:        May 30, 2001

To:          Paul Ehrlich                    cc:   J. Ehrlich
                                                   J. Loukidis
From:        Bob Rozman                            M. Ruffner
                                                   P. Rich
RE:          *Second Memorandum relating to the proposed transfer of Bell,*
             *Challoner & Dyken product lines from WAMCO to Diehl facility*

Following our referenced conversations and your subject memorandum of the
sixteenth instant, we've revised the original projections related to the proposition
of moving the Bell, Challoner and Dyken product lines to Wabash. Based on this
revaluation, we present this altered strategy.

## Machinery Requirements

Based on our impending decision to lease the Haas vertical machining center and a
second, more conservative review of our real equipment requirements, this list of
equipment is what *we really require* rather that what we'd like to have.

An important factor in this revised list is our presumption that at most, we would
need only one of the two Mitsubishi VMC's to continue manufacture of the
tenoner chain links with your existing programs and fixtures. But we really should
review that process to make absolutely certain of the equipment requirement. It
may well be that those fixtures fit well on the machine we are leasing, eliminating
the need for even one of the units. If at all possible, Pat would like to continue our
standardization of the Fanuc control systems, rather than add a new proprietary
Mitsubishi control system that means training our operators on yet another control
system. Given that we can eliminate the need for either VMC, our equipment
requirements diminish dramatically, unless we are unaware of some other special
equipment absolutely necessary to an important service part manufacturing
process.

Not listed however, are the fixtures that you possess along with what is probably a
reasonable amount of tooling that we should acquire. For this, we've put a blanket
figure we think should cover those items we don't yet know that we need. As a
result, even with only one of the VMC's, the '92 book value drops dramatically
and I think we're now talking about $100-125K for machinery, at the upper end.

EXHIBIT
55

| Items | Description | '92 BV | Today |
|---|---|---|---|
| 6) | Davis Keyseater, with tooling. | 4,000 | _____ |
| 7) | LaPointe Broach, with tooling. | 200 | _____ |
| 18) | Walter, dividing head. | 600 | _____ |
| 26) | Bridgeport, 1.5 HP Vertical Mill | 3,000 | _____ |
| 39) | Lathe, American Pacemaker, 16" x 78" | 3,000 | _____ |
| 46) | LeBlond, 18' engine lathe | 4,000 | _____ |
| 42) | Collins, 48" x 72" Granite table. | 1,000 | _____ |
| 50) | Hyde recycling system | 500 | _____ |
| 63) | Cincinnati 12" x 36" Universal Cylindrical grinder | 3,000 | _____ |
| 72) | Hyde portable sump cleaner | 800 | _____ |
| 80) | Mitsubishi, Model V60 | 100,000 | _____ |
| 89) | Allen, Drill Bench | 5,000 | _____ |
| 92) | Heald, DEB Machine | 400 | _____ |
| 93) | New Britain Model 50, DEB Machine | 600 | _____ |
| 98) | Peerless Model 1400A | 8,500 | _____ |
| 124) | Miller 300 AMP wire welder | 1,000 | _____ |
| 129) | Famco No. 3-1/2 Arbor Press | 125 | _____ |
| 140) | Hyster fork lift  (or 157) | 10,000 | _____ |
| 157) | Caterpillar fork lift  (or 140) | 12,500 | _____ |
| 177) | Famco No. 2 Arbor Press | 150 | _____ |
| | Miscellaneous Tooling | 25,000 | _____ |
| | Totals | 171,175 | _____ |

## Payback Analysis Data

Your May 16th memorandum, along with other assumption revisions we made, changed our income and cash flow projections. Also, we have several other questions regarding your calculations of income and cash flow. These are now added to our list of assumptions itemized in the following.

- That parts will decrease about 5% per year, though margins will slightly increase to offset the decline in the machinery base.
- Given a worst case scenario, during the first five years we can ship one rebuilt machine per year. Gary knows there is more business (at least one machine a year for the next five years) to be had at Pella, but we'd lose that business if Scott is no longer associated with Challoner. They have a strong comfort level with him and, with him, I think we can bridge their concern about the factory/personnel transition. Without Scott, the business goes somewhere else.

- We shouldn't expect Scott to stay longer than two years under my conservative sales scenario, if that long. If we are able to sell several new machines, that observation could change, but with one rebuild projected per year, there is really nothing to keep him busy and his interest in the company will rapidly diminish. Given that this is what will happen with Scott, it becomes absolutely essential that we get Chris Zeuhl, Mark Berndt and one machinist to move to Wabash. To that end, I've noted the need to provide a "moving bonus" to make that issue a reality. Without these three people in Wabash, we will flounder and the revenue/income will be overstated.

- Depending on business conditions, and in particular the impending plans of Pella, we may want to consider making these four people contract employees which would clearly define their tenure and our expenses. I would think we could accommodate that for at least 18 months and give us time to retain them while we bridge this economic slow down.

- I'm not trying to plan to have Scott leave the firm. However, Gary has emphasized what we all know, that being that he is not leaving the Valley. Therefore, given the transition of BCD to Wabash, the general economic conditions, his working out of a local office rather than within 250 feet of the assembly floor and now his recent remarks to Gary about the engineering firm in Appleton, can we really expect him to stay? Perhaps money can entice him for a while...and just maybe modern technology can bridge the distance between Neenah and Wabash.

- Rick Beyer is another question mark, but given what Gary and you have said about Chris's involvement with parts orders and purchasing, it would be possible to get by without him, though he could be set up somewhere with Scott...or with Peerless just to enter orders. This should not be interpreted as though we don't need a person in this parts order entry position, because we definitely would. It's just that as long as we would be able to retain and move Chris to Wabash, we could train someone here. The ideal outcome though, would be to move Rick to Wabash along with Chris.

- However, given the potential leaking of proprietary technical information which I discuss later, I am very concerned about having an office with that information in Oshkosh. The temptation to germinate another competitor that works in conjunction with the one that already exists in Oshkosh is something that I want to take every precaution to avoid. Perhaps I am overly zealous about this matter, but I've seen it happen too many times and I don't want it to occur in this transition.

- The asset acquisition numbers are estimates and are provided for reference only. They should be viewed as such with the expectation that they move up or down, depending on realistic values.

## Specific Changes to the Income/Cash Flow/Payback Calculation

- Removing new Challoner machines from the projection reduces income by $8K.
- It appears that you did not subtract the increased management fee of $60K per year from income.
- It appears that you did not subtract the projected royalty fees based on $1,290K of income which translate to $51.6K.

- We estimate an approximate 8-10% salary increase for the Diehl Management (some of us have not have based salary raises for four years and everyone for at least two years) which translates into $52.3K which was not deducted.
- It appears you added your projection of reduced transition expenses to the continuing income figure as one of the factors used to develop your $611,953 based number. However, the transition expenses were never part of the $497,153 continuing income figure to begin with so it can't be added back in as a positive effect on income.
- We are confused as to why you added Gary & Jack's proportional salaries back to income. While it remains true that without Bell/Challoner Gary's portion becomes a complete Diehl expense, he would then spend 100% of his time selling Diehl.  Gary the Challoner salesman, because of our ultimate strategy of service & parts promotion, becomes less necessary as a machine promotion salesman because new machines are taken out of income and a salesman could not be justified for promotion of remanufactured machines. Jack, or another technician, would be necessary for the Bell/Challoner product line and it's difficult to see how that expense can be eliminated from income. But no matter the rational for expense application, cash flow is reduced by those numbers.
- We don't know how to interpret a payment schedule to WAMCO for the product line, but it would appear that a more favorable repayment schedule could be established that would reduce our projected interest expense...but by how much?
- Your suggestion that we don't purchase the A/R saves investment, but sales on account for the first year would generate A/R that would in turn reduce cash flow by about $164.4K.
- We had not factored anything in for warranty, but we suspect there should be a contingency equal to your last twelve months for that. No, we don't expect to build any new machines, but we will encounter some for the machines you are shipping now, especially the 800, which is a new product.
- We had not factored anything in for products insurance, but our acquisition of WAMCO's wood products line will make us the successor based on the "continuation theory" and we will assume that liability for everything from 1992 to the present. We estimate that Dann will initially increase the premium by about $20K annually. (Reference Winch v. Yates-American & UIS 613 N.Y.S. 2d 980, & Ray v. Alad Sup., 136 Cal. Rptr. 574)

The net impact of the above translates into a fist year negative cash flow of $ 132,250 in comparison to your $311,953, less any payments to WAMCO for any assets.


## Other Political and Potential Concerns

Beyond the potential confusion of the physical move and related organizational concerns, there are also some other issues I think could arise. While I'm not certain we can prevent their occurrence, we should be prepared to act accordingly in the event they do materialize. These issues would be:

I think we have to expect former employees will become new competitors and that the Williquitte/Landowski organization across town will view this as a great opportunity to expand their parts and service business at our expense. For example, we know that just recently, Williquitte secured the rebuild order for Morgans 823 to Andinos in Chile at our expense. Granted, there may be some parts business from this event, but based on my personal experience with that individual, I wouldn't be surprised if he is already pilfering some of WAMCO's prints. However, when he and the WAMCO employees (especially the shop) learn that the operation is being transferred to Wabash, I feel certain that a lot of proprietary information will be transferred via clandestine methods. This will be Williquitte's one great chance to secure that information and *he will stop at nothing to obtain it.* I also suspect a serious level of animosity toward Diehl and especially myself, Gary and you, which in turn may cause some other individuals to reason that this too will be their only real chance to get even with the action being taken. I therefore do not anticipate a smooth transition and in the aftermath, I expect that the Williquitte organization will disparage the Diehl organization to the extent necessary for its own benefit. And unlike most other situations, you have a technically knowledgeable competitor in place ready to react and take advantage of a situation that he knows will be a great benefit.

While we can't stop everything, I think that some near term measure has to taken to protect the transfer of information (specifically drawings and machine files) to this organization. Once the knowledge of this transition becomes known, *there will be* several people who will clandestinely seek some form of revenge. This is the one aspect of the entire transition that concerns me the most because...on this issue, though I hope I am wrong, I know I am correct. Is there something that your friend (Ronny) can develop to minimize this kind of activity? I recognize that drawings have already been copied and are carefully tucked away in preparation or this situation, but we have to take some measures to minimize this to this extent possible. Diehl will have enough to contend with in this transition and we don't want to be competing with former employees who will no doubt be trying to glean the most lucrative portion of the parts business.

When the time is right, I want to make strong approaches to the four individuals that were determined to be key transition employees. But I don't think having them sit in an office in Oshkosh is the best environment given my suspicions above. That kind of environment only serves to leak important technical information and could well be nothing more than our paying for the meeting hall that establishes a new competitor.

## Preliminary Transition Time Table

Based on this review and the continued modifications that will undoubtedly need to be made to this transition proposal, I suggest we consider the following time table for the program.

June 15, 2001          Submit initial transfer outline memorandum.
                       - Conclude appraised values for equipment.
                       - Obtain quotes for moving equipment.
                       - Meet and review proposed transition expenses

- Establish transfer values for MBCD inventory

| | |
|---|---|
| June 29, 2001 | Have concluded all current values for WAMCO assets and confirm "quantity and quality" of worksheet numbers. |
| July 6, 2001 | Confirm transition plan, pricing & establish move date. <br> - Confirm Peerless agenda. |
| July 30, 2001 | Discreetly discuss move w/key people: C. Zeuhl, R. Beyer, M. Berndt & the chosen assembler. (A backup choice for Berdnt & the machinist should also be established.) This issue must be addressed to take advantage of the moving season. Attempting to sell homes in late summer is the wrong time for several important reasons, such as people wanting to be ready for school, the weather and the concern about the economy and any effect that might have on home selling. Allow one month for a decision, during which people can visit Wabash and we can sell the move to them. |
| August 31, 2001 | Know the employees who will and will not move. |
| To be Determined | Begin the physical move of related assets to Wabash. |

56

May 16, 2001

Memo to: Bob Rozman

From: Paul Ehrlich

Re: Your March 21, 2001 memo " Proposed Transfer of Bell Challoner
Product lines from WAMCO to Diehl facility

You previously wrote a memo regarding the subject captioned  and we had deferred any
follow up discussions until we had a game plan for our Oskosh operations. After our
meeting with the city yesterday we have concluded we must consider all our options and
be prepared to move quickly.
That said we would like to make some observations regarding the subject captioned so
that further beneficial discussions may be held.
With regard to the machinery package even in to-days market the value will be $ 200,000
to $300,000.  To eliminate this as an issue we can agree based  upon appraisals or allow
the major pieces to go through auction and Diehl can bid them.  It is possible Diehl is
acquiring too much machinery for the job at hand.
As to the pay back analysis you should consider the possibility of no new machines and
focus more on the rebuilt machines, parts and service.
We have talked about the people, the political concerns, and Jenkins and I won't
comment further now.  We can discuss this in a meeting.

Preliminary Transition Time Table

Change estimated dates as follows:
        March 21, 2001  To June 1, 2001
        April 13, 2001 To June 22, 2001
        April 18, 2001 To July  2, 2001
        May 1, 2001 To July 30, 2001
        June 1, 2001 To August  31, 2001
        September 10, 2001 To  be determined

Purchase price to include the business, machinery, and inventory is estimated to be as
follows:

| | | |
|---|---|---|
| Inventory including loaner chain @ standard cost | $ 600,000 | * |
| Machinery and equipment | $ 250,000 | |
| Business | $ 100,000 | |
| | | |
| Total | $ 950,000 | |

EXHIBIT
C56

Purchase price to be adjusted to actual for inventory and machinery and equipment. In addition to the forgoing we will expect an additional purchase price of the greater of 4% of sales of the Wamco product line or 10% of Diehl pre-tax , pre-bonus income in excess of $ 500,000 for 5 years.

We also contemplate that after the closing the management fee would be increased by $ 60,000 annually. You could consider key players at Diehl simultaneously.

We have excluded Accounts receivable since there is no real need for you to have them and increase your capitalized cost.

Payment of purchase price to be discussed.

For discussion purposes Bob why don't you add back Jack and Gary costs to income, an increase of $ 75,300. These will be Diehl costs in the future whether it acquires the Wamco product line or not. Reduce transition expenses to $150,000 increasing income another $ 39,500. This would make continuing income $ 611,953.

As to the capitalized items assume they will be as follows:

|                     |           |
|---------------------|-----------|
| Transition expenses | $ 150,000 |
| Moving              | $  75,000 |
| Installation        | $  50,000 |
| Plant Modification  | $  25,000 |
| Total               | $ 300,000 |

The forgoing results in a $ 311,953 positive cash flow in year 1 less any payments to Wamco for any of the above.

Notes Payable to Wamco should not be considered as a negative to cash flow.

After you have reviewed the forgoing and applied your own analysis we should get together and try to come to some resolution.

\*     If we assume the inventory will be written down by 1/3 the net for inventory would be $ 400,000.

Paul

57

Diehl Woodworking Machinery, Inc.
WAMCO Acquisition
Comments on Paul Ehrlich's Fax of 05/16/01

## Income Statement:

1. Removing the new WAMCO machine from the projection reduces net income by $8,000.

2. Paul did not deduct the additional management fee of $60,000 per year from income.

3. Based on estimated sales of $1,290,000 (excluding service income), Diehl would have to pay a royalty of $51,600. Paul did not deduct this from income.

4. Estimated salary increases for Diehl management of 10% would amount to $52,300 of additional expense. Paul did not deduct this from income.

5. Although it may be true that Fredrickson and Passmore would be Diehl employees who would have to be paid even if Diehl did not acquire WAMCO, the fact still remains that the portion of the salaries now paid by WAMCO would now be a Diehl expense. These salaries would reduce the income from WAMCO sales. Paul added these salaries back to income. I do not agree with this.

6. Paul added his estimated decrease in transition expenses back to income. I did not include these expenses in continuing income, so I have deducted them from his estimated income.

7. If there is no payment for the inventory, fixed assets and business value of WAMCO in the first year, there is a significant savings in interest expense. This is partly offset by the above factors, but still results in a savings in interest expense from my first projection of $36,500.

## Cash Flow:

8. The above differences result in a reduction in first year cash flow of $250,153 from Paul's analysis.

9. While we might not buy any existing accounts receivable from WAMCO as part of the purchase, we would still generate accounts receivable from WAMCO sales made after the purchase. Using an estimate of 45 days sales, this results in accounts receivable of $164,400. Cash flow is reduced by a like amount.

10. The two above items change Paul's first year estimate for cash flow from a positive $311,953 to a negative $102,600.



EXHIBIT
C57

Diehl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Reconciliation of Income per Per Paul Ehrlich
to Revised Income per Diehl Analysis

Per Paul:

| | |
|---|---|
| Continuing Income from previous worksheet | 497,153 |
| Fredrickson and Passmore | 75,300 |
| Transition expense reduction | 39,500 |
| | 611,953 |

Reconciliation to attached:

| | |
|---|---|
| Remove margin on one new machine sale | (8,000) |
| Additional management fee | (60,000) |
| Royalty | (51,600) |
| Management salary increases | (52,300) |
| Fredrickson and Passmore | (75,300) |
| Decrease in transition expenses not part of continuing | (39,500) |
| Interest difference | 36,547 |
| | 361,800 |

Diehl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Reconciliation of Cash Flow per Per Paul Ehrlich
to Revised Income per Diehl Analysis


Per Paul                                    311,953

Differences in income
    per attached                           (250,153)

Accounts receivable                    (164,400)


                                             (102,600)

**Diehl Woodworking Machinery, Inc.**
**Bell Challoner Dyken Acquisition**
**Revised for Paul Ehrlich Fax of May 16, 2001**
**Five Year Projection**

| | One (A) | Two (E) | Three (E) | Four (E) | Five (E) | Total |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Parts | 1,200,000 | 1,140,000 | 1,085,000 | 1,030,000 | 985,000 | 5,440,000 |
| Remanufactured Machines | 90,000 | 90,000 | 95,000 | 100,000 | 105,000 | 480,000 |
| Service Revenue | 25,000 | 26,000 | 30,000 | 35,000 | 38,000 | 154,000 |
| Total | 1,315,000 | 1,256,000 | 1,210,000 | 1,165,000 | 1,128,000 | 6,074,000 |
| | | | | | | |
| **Gross Margin:** | | | | | | |
| Parts | 65.0% — 780,000 | 65.0% — 741,000 | 67.0% — 727,000 | 67.0% — 690,100 | 67.0% — 660,000 | 3,598,100 |
| Remanufactured Machines | 15.0% — 13,500 | 20.0% — 18,000 | 25.0% — 23,800 | 30.0% — 30,000 | 30.0% — 31,500 | 116,800 |
| Service Revenue | 100.0% — 25,000 | 100.0% — 26,000 | 100.0% — 30,000 | 100.0% — 35,000 | 100.0% — 38,000 | 154,000 |
| Total | 818,500 | 785,000 | 780,800 | 755,100 | 729,500 | 3,868,900 |
| | | | | | | |
| **Other Continuing Expenses:** | | | | | | |
| **Salaries (2.5% per year increase):** | | | | | | |
| Scott Ode | (60,000) | (61,500) | | | | |
| Chris Zeuhl | (46,000) | (47,200) | (48,400) | (49,600) | (50,800) | |
| Rick Beyer | (38,000) | (39,000) | (40,000) | (41,000) | (42,000) | |
| Jack Passmore (75%) | (30,000) | (30,800) | (31,600) | (32,400) | (33,200) | |
| Accounting Clerk | (20,000) | (20,500) | (21,000) | (21,500) | (22,000) | |
| Fringe Benefits @ 25% | (48,500) | (49,800) | (35,300) | (36,100) | (37,000) | |
| Telephone and fax (customers) | (1,400) | (1,400) | (1,400) | (1,400) | (1,400) | |
| Telephone and fax (Ode) | (2,400) | (2,500) | | | | |
| Current Fredrickson chargeback | (37,800) | (37,800) | (37,800) | (37,800) | (37,800) | |
| Additional management fee | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | |
| Royalty (percentage of WAMCO sales) 4.0% | (51,600) | (49,200) | (47,200) | (45,200) | (43,600) | |
| Product liability expense | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | |
| Warranty | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | |
| Diehl management increases | (34,450) | (35,500) | (36,600) | (37,700) | (38,800) | |
| | | | | | | |
| Interest 8.5% | (11,200) | 29,000 | 35,500 | 32,800 | 30,000 | |
| | | | | | | |
| Total Continuing Expenses | (486,350) | (451,200) | (368,800) | (374,900) | (381,600) | |
| | | | | | | |
| Continuing Income | 332,150 | 333,800 | 412,000 | 380,200 | 347,900 | |

Diehl Woodw... ...g Machinery, Inc.
Bill Challoner Dyken Acquisition
Revised for Paul Ehrlich Fax of May 16, 2001
Five Year Projection

| | One | Two | Three | Four | Five | Total |
|---|---|---|---|---|---|---|



*DAVE FREDRICK – ALTERNATE*

**Transition Expenses:**

| | One |
|---|---|
| Move drawings, files, etc. | (5,000) |
| Move employees: | |
| Assembler (Mark Berndt): | |
| Physical moving cost | (8,000) |
| Move bonus | (15,000) |
| Loss on sale of house | (10,000) |
| Machinist: | |
| Physical moving cost | (8,000) |
| Move bonus | (15,000) |
| Loss on sale of house | (10,000) |
| Engineer (Chris Zuehl): | |
| Physical moving cost | (8,000) |
| Move bonus | (20,000) |
| Loss on sale of house | (10,000) |
| Sales Clerk (Rick Beyer): | |
| Physical moving cost | (8,000) |
| Move bonus | (12,500) |
| Loss on sale of house | (10,000) |
| Other expenses (attorney fees, etc.) | (10,500) |
| Total Transition Expenses | (150,000) |

Diehl Woodworking Machinery, Inc.
Bill Challoner Dyken Acquisition
Revised for Paul Ehrlich Fax of May 16, 2001
Five Year Projection

| | One | Two | Three | Four | Five | Total |
|---|---|---|---|---|---|---|
| Capitalized Items: | | | | | | |
| Inventory (2 years usage from WAMCO - 3 turns per year thereafter) | | | | | | |
| Accounts Receivable (45 days) | 164,400 | (7,400) | (5,700) | (5,700) | (4,600) | |
| Fixed Assets: | | | | | | |
| Cost | 75,000 | | | | | |
| Moving | 50,000 | | | | | |
| Installation | 25,000 | | | | | |
| Plant Modifications | | | | | | |
| Total Capitalized Items | 314,400 | (7,400) | (5,700) | (5,700) | (4,600) | |
| NET CASH FLOW | (132,250) | 341,200 | 417,700 | 385,900 | 352,500 | |

Diehl Woodw......ng Machinery, Inc.
Bell Challoner Dyken Acquisition
Revised for Paul Ehrlich Fax of May 16, 2001
Five Year Projection

**Assembly Hours:**

|        | One | Two | Three | Four | Five | Total |
|--------|-----|-----|-------|------|------|-------|
| Note A | 270 | 0   | 0     | 0    | 0    |       |
| Note B | 400 | 0   | 0     | 0    | 0    |       |
| Note C | 0   | 750 | 0     | 0    | 0    |       |
| Note D | 0   | 0   | 525   | 525  | 525  |       |
| Note E | 0   | 170 | 170   | 170  | 170  |       |
| Total  | 670 | 920 | 695   | 695  | 695  |       |

**Machine Shop Hours:**

|        | One | Two | Three | Four | Five | Total |
|--------|-----|-----|-------|------|------|-------|
| Note A | 80  | 0   | 0     | 0    | 0    |       |
| Note B | 200 | 0   | 0     | 0    | 0    |       |
| Note C | 0   | 450 | 425   | 425  | 425  |       |
| Note D | 0   | 80  | 80    | 80   | 80   |       |
| Note E | 0   | 80  |       |      |      |       |
| Total  | 280 | 530 | 505   | 505  | 505  |       |

58

Date:       September 3, 2003

To:        Paul & Jay Ehrlich                    cc:  M. Ruffner

From:       Bob Rozman

RE:        *Schedule of Bell, Challoner, Dyken Orders Shipments by Month*

Since we were talking about the low order/shipment level of service items related to the Oshkosh products, I thought I put together a summary of the situation from the transition to date.

| Month | Parts Orders | Part Shipments |
|-------|-------------|----------------|
| Sep 02 | 33,744 | 17,823 |
| Oct 02 | 63,330 | 30,811 |
| Nov 02 | 37,351 | 24,335 |
| Dec 02 | 58,325 | 35,344 |
| Jan 03 | 96,039 | 68,507 |
| Feb 03 | 67,652 | 52,448 |
| Mar 03 | 30,237 | 33,801 |
| Apr 03 | 78,780 | 62,977 |
| May 03 | 21,156 | 98,844 |
| Jun 03 | 49,929 | 46,331 |
| Jul 03 | 19,202 | 21,079 |
| Aug 03 | 100,782 | 57,401 |
| Average 03 | 57,972 | 55,174 |

As you can see from the table, we're shipping 55% of the amount we projected when we put together the cash flow projection in March of 2001...but that was a different time and no one could project conditions to be as they are now.

Our standard cost for the WAMCO parts category is 35%, so the product line is contributing just shy of $36K per month to our operation. Hopefully, this past month's order trend will continue and we'll get through the learning curve of the unique parts we're encountering as we make service components for the Challoner product line.

If you have any questions, please let me know.

EXHIBIT
C 58

0008