6C



Diehl Woodworking Machinery, Inc.
Diehl, B.M. Root, Bell, Challoner, McKnight & Dyken

September 26, 2005

Members of the Board of Directors
Diehl Woodworking Machinery, Inc.

Gentlemen:

The minutes of the June 28, 2005 board meeting have not been signed and returned to Ken Perlman. While both Paul and I disagree that the management fee was "compensation" for the purchase of the WAMCO Product Line (that would make it capital gain to WAMCO and non deductible to Diehl), the board agreed to change the monthly management fee to $12,500 monthly effective July 1, 2005. The board also agreed the lease with Wabash River would be revised to monthly rent of $4,500 effective July 1, 2005, and that the amount accrued for the first six months ($18,000) would be paid to Wabash River.

These changes and payments were conditional and subject to the execution of an amended lease, execution of the minutes of the board of directors meeting and execution of a memorandum of agreement with regard to the management fee payments.

Until these matters are resolved and documents are executed, I believe Diehl should return to the payments it was making at the time of the board meeting, i.e., $10,000 monthly management fee to WAMCO and $500 monthly rent to Wabash River. (In addition to the paying the $500 monthly, we were accruing an additional $3,000 in each of the first six months of 2005.)

My suggestion is if we are unable to get these documents signed we call a board meeting to resolve any issues.

Best regards,

Bob

EXHIBIT
C60

D 0002

61

Diehl Woodworking Machinery, Inc.
Top Management Reviews

| | Last Review | Prior Salary | Current Salary | $ INCREASE | % increase |
|---|---|---|---|---|---|
| Fredrickson, Gary | 10/01/99 | $84,000.00 | $86,500.00 | $2,500.00 | 3.0% |
| Meldrum, Dick | 10/01/99 | $61,000.00 | $63,000.00 | $2,000.00 | 3.3% |
| Rich, Pat | 10/01/99 | $73,500.00 | $75,500.00 | $2,000.00 | 2.7% |
| Rozman, Bob | 01/01/98 | $134,200.00 | $141,200.00 | $7,000.00 | 5.2% |
| Ruffner, Mike | 04/19/99 | $79,800.00 | $82,500.00 | $2,700.00 | 3.4% |
| Zolman, Jan | 05/10/99 | $70,500.00 | $72,300.00 | $1,800.00 | 2.6% |

Date :      December 15, 1999

To:         J. Ehrlich

From:       R. Rozman

RE:         *Management Reviews*
            *Our phone conversation of December 13, 1999*

Following our referenced phone conversation the other day, I attach documentation confirming the 1999 reviews and salary increases for the respective management team personnel. As I mentioned, those people that work for me are reviewed annually on their employment anniversary date.

If there are any questions, please let me know.

EXHIBIT
C 61

D 0015

DIEHL MACHINE                                                    PAGE   01

Post-It® Fax Note     7671     Date Jan 22      # of pages ▸ FIVE
To  J. EHRLICH                 From A. ROZMAN
Co./Dept. WAMCO                Co.   DIEHL
Phone #                        Phone #
Fax # 847·967·2646             Fax #

Date:        December 15, 2000

To:          J. Zolman

From:        R. Rozman                    Cc:  G. Fredrickson
                                               P. Rich
RE:
             *Diehl Model 10
             Economy Rip Saw*

EXHIBIT
C 62

While we've had several informal conversations regarding the development of this machine, I want to formally clarify it as a viable project and offer a preliminary outline of the machine's characteristics as I view them. You can certainly plan that we will have other valuable opinions regarding the machine's configuration, involving manufacturing and service people, but so that we have a basis of discussion, I offer the following outline for your initial thoughts.

**Basic Design Objectives**
1.    The dominating purpose of this machine is to effectively compete in the lower end economy, straight line rip saw market. Essentially, this machine is to be aimed at those people who do not own a rip saw and don't require the production capability of even the ESL20 category of saw, our current entry level machine. Therefore, let's fully understand that the premier objective in this complete exercise is developing a saw that we can manufacture, given all of our limitations, for a full burden cost of $6500.00. If we can't be more than reasonably assured of meeting that objective, then *we will not proceed*. Remember, we are targeting this machine at a market segment that...
   –    has never owned a straight line rip saw before
   –    is now using a hand fed table saw to cut his lumber
   –    looks at price more than any other feature
   –    will keep using the table saw or buy a Taiwanese saw if he can't afford the one we offer
Also, we are not designing a machine commensurate with the ESL20/25 Series. This is a disposable machine that should have a 7-10 useable life span. Could it be remanufactured after 12 years? Yes, but at that point a new machine should cost less than the expense to remanufacture. In other words, it should be built like a quality electric razor...strong and durable enough to do the job for 8 years, but when it fails...you buy a new one.

DEIHL MACHINE

PAGE 02

2. In meeting this market's requirements, we have to understand that the most dominant machine buying influence is price. As such, we have to be below $12,000.00 in sell price, a number that still makes us 20% higher than the Taiwanese saw we are competing against. In turn, this sell price results in a total manufactured cost of not more than $6,500.00. In comparison, the basic ESL20 now has a total manufactured cost of $ 11,765.00. Thus the Model 10 must be manufactured for 45% less than the ESL20. If we were to make a comparative analysis of the manufacturing components they would be as follows:

## Proportional Cost Comparison of ESL20 and proposed Model 10 Rip Saws

| Dollars(Hours) | ESL20 | Model 10 |
|---|---|---|
| Machine Labor | 348(25) | 190(14) |
| Assembly Labor | 726(52.5) | 400(29) |
| Machine Burden | 1689 | 922 |
| Assembly Burden | 4103 | 2260 |
| Material | 4899 | 2728 |
| Total | 11762 | 6500 |

3. Another important concern is to make both the Model 10 and the ESL20 mutually exclusive from a marketing standpoint. Essentially, while we can't prevent the logical cost conscious nature of most of all buyers, we want to insure that we don't design the Model 10 to effectively perform the tasks of the ESL20. The implication of this goal is that we have to think outside the normal Diehl approach, and even disregard some of the recommendations I make in this memorandum because they follow too traditional an approach.

4. Where appropriate, we want to use an existing component to save cost, but that's a very complicated decision. Certain items can be substituted with significant cost savings while others cannot. A similar component that's only smaller in size, but with a proportional amount of machine labor will almost always cost more than our existing part because of quantity...and the prime examples here are the chain, the arbor spindle, saw collars and in general, those items we make in high quantity. It's a difficult call and we will just have to work our way through.

One important issues though, is that from a marketing perspective, having the same chain links and race creates a greater level of comfort and confidence in the mind of the potential buyer regarding the machine's ability. Thus, I want to confirm that we should use these components in our new design. It's our link (no pun intended) to the production machine that will be used for rhetorical marketing purposes.

[E]HL MACHINE

PAGE  03

## Specific Machine Characteristics

5.0    <u>Stock Feed</u> -

    5.1    We have discussed the concept of a single chain machine and I see this as a fundamental way in which we can meet our cost objective and keep the machine models mutually exclusive in certain areas of capability. More specifically, I think we talked about a single chain version of the 20/25 chain and race configuration length, though the race will have to be a new single track design. But can we get by with an even shorter chain/track length?

    5.2    Is it possible to cast a single, J-formed, chain track component and machine the track and return cam in one piece...on the Niigata? Can we take the existing 20/25 drive cam, drill two set screw holes, then cut them in half on the band saw?

    5.2    Beyond the cost savings, I also think that with our wider and completely milled surface chain, we can make some small machine performance claims that can't be equaled by out Taiwanese competition. Finally, I think the single chain approach is distinctly unique...and something that Diehl can and should author in the market place.

6.0    <u>Blade Position, Relative to Chain</u> -

    6.1    Our conversations have also included which side is the optimal location for a the blade with a single chain machine. Both approaches have merit, but I think positioning the blade to the right of the chain (as viewed from the infeed) allows the use of a smaller blade, saw collars and arbor housing. There may well be some over-riding limitation to this approach so we want to review it carefully.

    6.2    The older model 71 rip saw had a holddown roller off the side of the beam and an idler in the table below, located at the outfeed to support that portion of the stock not being transported by the chain. This may be necessary in the single chain design, no matter the location of the blade.

7.0    <u>Arbor Drive</u> -

    7.1    To insure a distinction of capability, the machine should be offered with a 5 HP motor standard and a 7-1/2 HP motor optional. This serves to create a clear distinction between the Model 10 and the ESL20.

    7.2    An approach we discussed was slinging the motor under the saw since we don't have to have a saw pit exhaust pipe out the back of the machine.

    7.3    Can we develop a simplified belt drive combination dead man brake design using a fixed position arbor design? You had talked about using the MR90 spindle housing to accommodate the shorter throat, but I'd like us to consider a truncated version of the ELS20 arbor housing with

DEIHL MACHINE

PAGE 02

pattern that allows for both lengths. This would then simplify spindle, bearing and related parts to the existing design. However, a new spindle design is acceptable, provided we can save expense. The problem I see with the MR90 is that the housing/bore itself is so big that the smaller blade feature benefit of the single chain design is might be eliminated.

8.0 <u>Pressure Bar</u> -
   8.1  Your thoughts of a bell crank type elevation system appear to be the kind of design that will both save money and accomplish the limited the 1-3/8" elevation adjustment necessary.
   8.2  It appears that a new roll yoke, similar in design but different from the 75 is necessary to achieve a closer (4" to 3") center spacing of the rolls. The only distinction is that the roll itself should rotate on bearings.

9.0 <u>Machine Capacities</u>
   Thickness      1/8" to 1-1/2"
   Minimum Length  6"
   Throat capacity  13-14"
   Feed Speed   Approximately 30 FPM - Here we reference approximately 30 FPM because somewhere around that point we should be able to obtain a speed that avoids any chain hopping due to chordal action.

10.0 <u>Safety</u> -
   10.1  We won't make any compromises here, so incorporate both the upper and lower fingers as well as both side guards. I also think it's necessary to have the same full width of fingers as we do on the 20/25, even though there's only one chain.
   10.2  I also wonder if it's possible, due to the limited thickness capacity, to use the existing 20/25 lower fingers on both the top and bottom of this machine?

11.0 <u>Electrical Application</u> -
   11.1  Make whichever phase arrangement (single or three) is least expensive standard equipment.
   11.2  Make the more expensive phase arrangement optional.
   11.3  It would probably be most economical if we could use the same electrical box and lexan warning placard on the front of the box.
   11.4  It would also appear that with single phase application, we use a manual disconnect switch in place of the contactor, so let's make sure that can fit in the box.

D 0024

12.0 **Stock Guide** -

   12.1   We need to develop a less convenient and less expensive unit. For some reason, use of an extruded aluminum guide arm and position locking system similar to the Mattison/Diehl 75 (cylindrical handle with threaded end that pinches on the guide bar with a brass plug) sounds like it would be less expensive.

   12.2   I think the guide can also be shorter length than the 21" 20/25 design. Taking the unit down to 16"-17" will take some of the load off the transverse rail.

13.0 **Frame** -

   Since we are looking at an entirely different market segment, the segment that looks primarily at price and has never bought a straight line rip saw before, I think we have much more licence in developing a frame structure that is not as substantial as our traditional production saws. To reiterate on of our most important design objectives, this should not be a saw that is capable of being remanufactured after 30 years of use. Instead, it must be a semi disposable design machine that has a 7 to 10 year useful life span. As such, the frame will set the overall format for the machine in general and if it follows or departs from our traditional designs and related cost, so goes the machine.

14.0 **Timing** -

   It is our goal to have this machine's premier display at the Anaheim Show, in August of 2001.

   We'll meet on this memorandum Monday, the 18th at 9 AM in the conference room.

63

Proposed Variable Compensation Plan for Diehl Management

Net Income Before Taxes- 40% of weighting.
Operating Cash Flow – 60% of weighting,

Operating Cash Flow is Defined as the following:

Net Income Before Taxes plus Depreciation, Amortization, minus capital expenditures (or plus if fixed assets are liquidated) and plus or minus all balance sheet items that are related to operating activities.

Management shall get compensated for hitting 80% of the stated goal for Net Income and Operating Cash flow.

However, each component shall be computed independently. Thus, hitting 100% of one does not result in reward for the other.

In light of the fact that this year's net income target is actually 10% less than 2000's target, the 20% cap is put back into place.

2001 Targets

Net Income - $537,700
Operating Cash Flow- 821,800 Capital Expenditure Budget lowered to $105,900.

Any acquisitions, will be figured into the targets accordingly.

EXHIBIT

C 63

0032

**Diehl Woodworking Machinery, Inc.**

981 S. Wabash St., P.O. Box 465
Wabash, Indiana 46992-0465
(219) 563-2102, FAX (219) 563-020
www.diehlmach.com

Date:       June 14, 2001

To:         Paul/Jay Ehrlich                                  cc:   M. Ruffner

From:       Bob Rozman

RE:         *Variable Compensation Plan*
            *Diehl Machines, 2001*

Following our meeting in Chicago on Monday, the 11th instant, I reviewed the proposed variable compensation plan and along with Mike, have come to the same conclusions. Given the situation of the economy and our performance for these first six months, establishing a formula for this year is probably a moot point. We hope for a pick up in the economy during the fourth quarter, but the vast majority of our actions this year have to be defensive, as I'm sure you understand. I don't want to display a "giving-up" attitude, but to expect to generate $430K in income & $657K in cash flow is a real stretch.

Given the impact of the current situation, here are some other thoughts.

- Why did you reduce the capital expenditure budget, since it was approved just a couple of months earlier?
- Putting a 20% cap is fine based on the lower performance levels, but if those levels were over achieved, say to the point of 145%, then some consideration should be made to reinstate a "kicker".
- While we all recognize that "cash is king" in our current situation, I don't know that pushing the ratio beyond 50/50 accomplishes your desire to focus on that issue. It causes us to be more selective in December shipments, opting for the biggest machinery rather than parts.  Given the situation this year, December could well be the only possible month that could help us out and all of those receivables loose value under the cash favored arrangement.
- Regarding the "aggregate" terminology that caused some confusion in basing the 2000. It's not a matter of hitting 100% of one objective that qualifies one for the other and both are computed independently. The rules now are that there is no aggregate relationship between the two objectives. Therefore, if we achieve 88% of one goal and 130% of another goal, the respective weighted over achievement of one does cannot positively impact the over achievement of the other to reach an aggregate achievement of over 100%

D 0033

TO: Bob Rozman
From: Jay Ehrlich

Date: June 29, 2001

RE: Variable Compensation Calculation for 2001 and Subsequently

Bob, I am in receipt of you memo of June 14, 2001.

With regard to the capital expenditure budget, we never signed off on the 2001 capital expenditure request. Consequently, I lowered the figures in my March 13, 2001 proposal. Our rationale for that was that the capital expenditures proposal we used was significantly less that budget in both 1999 and 2000. This allowed for a lowering of the bar by not making capital purchases that weren't necessary in the first place.

The 20% cap was specifically removed in the proposal because earnings were forecasted to be less in 2001 than 2000 which in turn were lower than 1999. A business that has declining earnings is not growing in value and consequently, going over a lower target is not, something that should be rewarded extra compensation. If the cap were removed than it should be after a number hit in 1999 or the past.

Your statement that "It causes us to be more selective in December shipments, opting for the biggest machinery rather than parts" is not something we look at as a problem. We believe that management will do what is best what is best for the company.

As far as the relationship between hitting the targets and the original plan under Katy, I'm convinced that despite the ambiguity the two were intended to be connected. Regardless, of what was the intent, they should be connected. If less than 80% of the target is hit, that component of the bonus should not be paid because the other part was.

I made it clear that I felt the bonus as calculated for 2000 was highly disproportionate to the results and that it should not be expected that it would happen again. But let's review the results so you can appreciate my position.

The company earned $630,000 before taxes in 2000 with the VC added back. Minus the increase in "inventory valuation" of $265,000 the before tax income was $365,000. After taxes, the company earned $378,000 and $219,000 discounting the inventory valuation.. Other than tax distributions there was no money available for shareholder distribution whatsoever. Yet management received 34% of the after tax profits and 59% of the after tax profits minus the inventory valuation.

The argument usually is that we will offset the profits from the ever increasing inventory valuations when we sell of the excess inventory. Except that we never seem to sell off the excess inventory. It's up $211,000 year to date. So what the non management shareholders have is taxable profits in inventory, less money for dividend distribution and higher management bonuses.

It is the Board of Directors' responsibility to set the philosophy of the company. And the philosophy is Management's bonus will be tied to cash flow and profits. If one target is not hit, there will not be a bonus paid on that part. I fail to see how this is unreasonable. Having $750,000 of profits and $150,000 of operating cash flow for instance does not justify paying the bonus on both components. It ends up leaving negative cash flow for the business.

If your suggestion is to split the calculations for profitablity and cash flow to 50/50 that is acceptable. We can also look at the cap, so long as large bonuses are paid due to outstanding, not merely fair years. Other than that my inclination is that the proposal will be in place.



D 0034

Subj:      Re:
Date:      2/2/2005
To:

It's not tons of money.

These guys are not going to litigate a la marvel.  They are a couple of pishers.

Besides we don't have to sue them.  we can rattle their cages.  They're probably costing us 20k a month in biz.

D 0042



Page 1 of 1

Subj:    Fwd: WINTERNITZ, INC. - WOODWORKING AUCTION SALE ANNOUNCEMENT
Date:    11/18/2004
To:

FYI

D 0043

65

Subj:     Insurance Update
Date:     12/15/2004
To:

Mike:

Have you heard back from the attorney?

If not we need to push him to get a move on this. I would like to have their demand letter out before the Christmas slowdown.

D 0045



EXHIBIT
C65

Subj:    Re: Fw: Ode/Williquitte Organization
Date:    1/10/2005
To:
CC:

My thinking is that we should have Barbara Boxer put us in touch with somebody at her firm who does trade secret law.

This is not deep pockets Marvel.   This is a couple of small timers and with a big Milwaukee firm on them we might be able to get them to stop using our stuff without authorization.

I'd be happy with a royalty from them which would make them ad hoc sales reps.

D 0046

Page 1 of 1

Subj:     Fwd: FOR SALE-MASTERCRAFT IND., MT. PLEASANT, TX
Date:     1/12/2005
To:

D 0047

Subj:    Mt. Pleasant
Date:    1/14/2005
To:

Bob,

Did you have a chance to get the info on that deal in Texas from Winternitz?

Jay

D 0048

66

Subj:    Update
Date:    1/24/2005
To:

Bob,

Any word on that Texas liquidation?

Jay

D 0050



Page 1 of 1

Subj:     Willoquette/Ode
Date:     2/2/2005
To:
CC:

Back in December I suggested that we retain counsel in Wisconsin to go after Willoquette and Ode for stealing our parts business.

In January we booked 27k of Wamco parts.

Enough is enough.

Unless I hear strong dissent I am going to retain counsel and recover our parts business.

These guys are not Marvel.  They will not fight this thing at the cost of hundreds of thousands of dollars.

Please delete this email from your records.

D 0051

67

Subj:    Wamco Funds
Date:    2/14/2005
To:
CC:

After the Diehl money hits tomorrow, Wamco will have 23k in the bank.  Mikey has not paid his Feb payment unless it went to Glencoe.

Between car payments and credit cards, I don't believe Servi can distribute 18k at the moment unless/until Mikey pays the Feb monies.

On that matter, it is my feeling that it is time for Diehl to pay the entire contractual amount of its management fees.

I realize Jan/Feb were not good.  But there is no reason for Diehl not to live up to its obligations any further.

I will welcome your comments prior to discussing it with Bob.  But it is my intent to stop the management abatement to Wamco.

D 0052

EXHIBIT
C 67

68

Subj:     Re: Wamco Funds
Date:     2/14/2005
To:

It's long since passed with the change in ownership structure after Howard was bought out that the original reason for buying this company existed. It is not surprising however, that a company that was bought with the purpose of providing me a future is completely and inextricably under your control. Afterall, that is inevitably how you do things. Back in 1998 had I known realized how controlling and unable to let go you you are, I would not have invested in the first place. Do you really think I envisioned having no say in a company 6 years after it was bought when I was the one who found and structured the deal in the first place?

The facts are these:

Wamco is a creditor of Diehl.
Creditors come ahead of shareholders and employees on the food chain.
While running Wamco you made a deal to abate management fees. That deal was not in perpetuity. I'd be shocked if you have a letter agreement stating the same. But given that you made such a deal and then sold your interest in Wamco your blatant conflict of interest is obvious.
Nonetheless, there was no consideration on Wamco's part. In my legal opinion, it's not binding. It's also not surprising that 82.5 % of ownership, though Jim might be excepted ,would rather pay out 100k to themselves and additional dollars in back salary than pay Wamco. Afterall, like yourself, they like you however, are deeply conflicted.

Diehl made over $150,000 the last 6 months of last year. It then took care of everybody, except Bob Rozman and Wamco and to a lesser extent Wabash Riverf. At no time did I acquiesce to a payout of funds which stiffs Wamco.

You are tortiously interfering with a contract for your own naked greed and need to be controlling.

I will have this conversation with Bob. I expect Diehl in March to pay the full managment fee and debt.

In the meantime I shall direct Servi to stop paying you out of my distributions.

Furthermore, I am going to start negotiating with Diehl's bank immediately to get myself removed off the guarantee. Under no circumstances am I going to be a party to futher borrowing for an acquisition that requires me to be at risk for far more than I can make.

D 0055


EXHIBIT
C 68

Subj:     Financial Statement Summary - 2005 Budget.xls
Date:     1/27/2005 6:24:34 AM Central Standard Time
From:
To:

Attached is the 2005 Budget.  Please contact me if there are any questions.

Mike

D 0057



Subj:     (no subject)
Date:     1/31/2005 6:48:14 PM Central Standard Time
From:
To:
CC:

Bob:

Please review the attached and call me.

D 0058

70

Subj:     RE: Personnel Records
Date:     2/2/2005 9:58:39 AM Central Standard Time
From:
To:

Hi Jay:

I haven't contacted Winternitz yet. Doing several company tax returns and auditors all over. Talked to my attorney and am trying to follow some of the deals he is chasing. He has your e-mail. I know he can find us a deal so I'll keep after him. I should be able to find Scott Ode's file in the garage. How hot is it? Do you need it tonight or can it wait until Saturday when I can rummage through the stuff in daylight. No lights in our storage garage.  Did you get your W-2?

Jim Servi

    -----Original Message-----
From: Addisonst@aol.com [mailto:Addisonst@aol.com]
Sent: Wednesday, February 02, 2005 9:51 AM
To: Jim Servi
Subject: Personnel Records

Jim Do we still have Scott Ode's file?

If so I need to get a copy.

D 0060



EXHIBIT
C 70

71

Subj:     Re:
Date:     2/2/2005 12:27:51 PM Central Standard Time
From:
To:

I don't have a problem with rattling there cages. Demanding they stop and return all illegally obtained documents is hardly going to stop them. Can't use Barbie's office on this. They are too expensive.

----- Original Message -----
From:
To:
Sent: Wednesday, February 02, 2005 11:37 AM
Subject: Re:

It's not tons of money.

These guys are not going to litigate a la marvel. They are a couple of pishers.

Besides we don't have to sue them. we can rattle their cages. They're probably costing us 20k a month in biz.

D 0062



Tuesday, July 31, 2007 AOL: Addisonst

72

Subj:    Fw: Ode/Williquitte Organization
Date:    1/10/2005 12:07:46 PM Central Standard Time
From:
To:

----- Original Message -----
From: Robert Rozman
Sent: Monday, January 10, 2005 8:21 AM
To: Paul Ehrlich
Subject: Ode/Williquitte Organization

Paul:

Just to confirm things, I think I mentioned that when Gary visited Scott/Dale during the Christmas break, he saw a tenoner chain link that was clearly made from cintered metal, like the blank we've purchased from Wakefield foundry in MA for the past 25 years.  Rick now confirms that they are competing with us on tenoner chains and track because we had a situation last week where we found out from a firm called Tectum (in Ohio) who called us and indicated that the boys in Oshkosh are offering those items.

I'm having Rick call Tectum back to determine how the chain is made and if they also are offering sprockets, sleeves etc  While it's quite possible to remember chain and track dimensions, (you could get them by coping existing ones) the drive sprocket and brackets are another question.  It would now appear that the boys decided to borrow a good number of prints prior to their departure and that Dale's unescorted visits to the plant had the strategic purpose we assumed all along.

Bob

D 0069



73

DIEHL MACHINES

# Diehl Woodworking Machinery, Inc.



Diehl Woodworking Machinery, Inc.
881 S. Wabash St.
P. O. Box 465
Wabash, IN 46992

Phone: (219) 563-2102
FAX: (219) 563-0206
email: accounting@diehlmach.com

# Facsimile

To:        Jay Ehrlich
@Fax:     (847) 967-8646
From:     Michael W. Ruffner
Date:      Monday, April 30, 2001 @ 7:21AM
Re:        Tower Bank Proposal
Pages:    4, including this

Attached is the proposal I got late Friday from Tower Bank. They quoted 1/2% over prime, but I told them that might not be good enough in light of the LaSalle commercial rate of prime. They are going to rethink that and get back to me by Wednesday.

In virtually all other respects, other than rate, their proposal is equal to or better than LaSalle's. Note that they will advance 50% on WIP. Fees, etc., would be very nominal. Because of no personal guarantee, they will require a reviewed statement. I have not had a chance to put the covenants on paper, but I don't think they will cause us any problems.

I also mentioned the possibility of a separate LLC for the equipment. He said that the only requirement if the LLC borrowed money from Tower would be a guarantee from the operating company, not from any of the shareholders. I forgot to discuss the interest rate on the term loan, but I think we can negotiate that, too.

Let me know what you think.

mike



D 0071

FOURTH AMENDMENT

DATED AS OF JULY 31, 2002

TO THE

LOAN AND SECURITY AGREEMENT

BETWEEN

DIEHL WOODWORKING MACHINERY, INC.

AND

LASALLE BANK NATIONAL ASSOCIATION

ORIGINALLY DATED MAY 7, 1999

D 0072

# FOURTH AMENDMENT
## TO
## LOAN AND SECURITY AGREEMENT

THIS FOURTH AMENDMENT (this "Fourth Amendment") is made as of the 31st day of July, 2002, to the Loan and Security Agreement by and between LASALLE BANK NATIONAL ASSOCIATION ("Lender") and DIEHL WOODWORKING MACHINERY, INC. ("Borrower") originally dated May 7, 1999 (the "Original Loan Agreement").

## WITNESSETH:

WHEREAS, Borrower is presently obligated to Lender for funds borrowed pursuant to the Original Loan Agreement, and ancillary documents related thereto; and

WHEREAS, Lender and Borrower desire to modify the lending relationship upon the terms and conditions set forth herein and in documents ancillary thereto.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree to amend the Original Loan Agreement as follows:

SECTION 1. Section 2.1 is deleted and the following Section 2.1 is substituted in its place:

2.1 Total Facility. Lender shall, provided that a Default does not then exist or would not then be created thereby, make available for Borrower's use from time to time during the term of this Agreement, upon Borrower's request therefore certain loans and other financial accommodation not to exceed the principal amount of One Million Seven Hundred Ninety-Five Thousand Eight Hundred Sixty-Five and 00/100 Dollars ($1,795,865.00) ("Total Facility"). The Total Facility shall be subject to all of the terms and conditions of this Agreement and the Ancillary Agreements and shall consist of:

(A)  a Revolving Line of Credit consisting of advances against Eligible Accounts and Eligible Inventory (the "Revolving Loan"), in an aggregate principal amount not to exceed, at any time outstanding, the lesser of (i) One Million Seven Hundred Ninety-Five Thousand and no/100 Dollars ($1,750,000.00) or (ii) the amount of Collateral Availability (the "Borrowing Base," as hereinafter defined). The Borrowing Base shall mean and, at any particular time and from time to time, be equal to the sum of:

(1)  up to eighty percent (80%) of the net amount (after deduction of such reserves as Lender reasonably deems proper and necessary) of Eligible Accounts (as hereinafter defined) plus

(2)  up to fifty percent (50%) of Eligible Inventory (determined on

D 0073

the basis of first-in, first out, lower of cost or market value, and net of such reserves as Lender reasonably deems proper and necessary); provided, however, that loans and advances based on Eligible Inventory of any type shall not exceed One Million Two Hundred Thousand and no/100 Dollars ($1,200,000.00) in aggregate principal amount outstanding.

The Revolving Loan shall be repayable as provided in Section 4.2 of this Agreement and shall be evidenced by a Revolving Credit Note (2002) in the form attached hereto as Exhibit D-3.

(B)     a Term Loan in the original principal amount of Four Hundred Twenty-Five Thousand and no/100 Dollars ($425,000.00) evidenced by a Term Loan Note in the form attached to the Original Loan Agreement as Exhibit D-2 and repayable in accordance with the terms thereof.

It is expressly understood and agreed by Borrower that nothing contained in this Agreement shall, at any time, require Lender to make loans or other extensions of credit to Borrower and the making and amount of such loans or other extensions of credit to Borrower under this Agreement shall at all times, be in Lender's sole and absolute discretion. Upon thirty (30) days' prior written notice to Borrower, Lender may, in the exercise of such discretion, increase or decrease the advance percentage to be applied to Eligible Accounts and Eligible Inventory which is contained in this Section 2.1 and, in the event such percentage is decreased, such decrease shall become effective at the end of the thirty (30) day period for the purpose of calculating the amount which Lender may be willing to advance, or allow to remain outstanding, against Eligible Accounts and Eligible Inventory.

SECTION 2. Section 2.3 is deleted and the following Section 2.3 is substituted in its place:

2.3 Interest Rate. Borrower shall pay Lender interest on the outstanding principal balance of the Revolving Loan monthly in arrears at a varying rate equal to one-half percent (0.5%) plus the Prime Rate and, in case of the Term Loan, at the rate set forth in the Term Loan Note evidencing such loan. Interest shall be computed on the basis of a year of three hundred sixty (360) days and actual days elapsed and shall be payable as provided in Section 4.2 of this Agreement. Any change in the Prime Rate shall be effective as of the effective date stated in the announcement by the Bank of such change. From and after occurrence of a Default (as hereinafter defined) Borrower shall pay Lender interest on the outstanding principal balance of the Liabilities at a varying rate equal to three and one-half percent (3.5%) per annum plus the Prime Rate.

DIEHL MACHINES

In no contingency or event whatsoever shall the rate of interest paid by Borrower under this Agreement or any of the Ancillary Agreements exceed the maximum amount permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that Lender has received interest hereunder in excess of the maximum rate permitted by any such law, (i) Lender shall apply the excess amount of interest paid by Borrower to any unpaid principal owed by Borrower to Lender or, if the amount of such excess exceeds the unpaid balance of such principal, Lender shall promptly refund such excess interest to Borrower, and (ii) the provisions hereof shall be deemed amended to provide for such permissible rate. All sums paid, or agreed to be paid, by Borrower which are, or hereafter may be construed to be, compensation for the use, forbearance or detention of money shall, to the extent permitted by applicable law, be amortized, prorated, spread and allocated throughout the full term of all such indebtedness until the indebtedness is paid in full.

SECTION 3.   Section 2.4 is deleted and the following Section 2.4 is substituted in its place:

2.4   Term of Agreement. This Agreement shall be in effect until April 15, 2003 (the "Extended Term") unless the term is further extended by the execution of an Amendment hereto by and between Lender and Borrower for an additional term (the "Renewal Term") or unless the term is terminated earlier as hereinafter provided. Either party shall have the right to terminate this Agreement at the end of the Extended Term or at the end of any Renewal Term by giving the other party sixty (60) days' prior notice of such termination. This Agreement may also be terminated by Lender upon the occurrence of a Default as provided in Section 10 of this Agreement. Upon the effective date of termination, all of the Liabilities shall become immediately due and payable without notice or demand. Notwithstanding any termination, until all of the Liabilities shall have been fully paid and satisfied, Borrower shall continue to pay interest to Lender as provided in Section 2.3 of this Agreement, Lender shall be entitled to retain its security interest in the Collateral, Borrower shall continue to remit collection of Accounts and proceeds of Collateral as provided in this Agreement, and Lender shall retain all of its rights and remedies under this Agreement.

SECTION 4.   Section 9.1(A) as amended is deleted and the following Section 9.1(A) is substituted in its place.

9.1   Affirmative Covenants.   Borrower covenants that it shall:

(A)   Financial Covenants.

(i)   Tangible Net Worth.   Borrower shall have Tangible Net Worth of not less than Seven Hundred Thousand and NO/100 Dollars ($700,000.00) at all times subsequent to the date hereof.  The Lender hereby waives for the benefit of the Borrower the Tangible Net Worth Covenant that was

D 0075

applicable during the period September 30, 2001 through May 31, 2002.

(ii)  Ratio of Unsubordinated Debt.  Borrower shall have a ratio of Unsubordinated Debt to Tangible Net Worth of no more than 3.5:1.0 at all times.

(iii)  Minimum Subordinated Debt.  Borrower shall have a minimum of Subordinated Debt of Two Hundred Thousand and NO/100 Dollars ($200,000.00) at all times.

SECTION 5.  Except as modified by this Fourth Amendment, all of the terms, covenants and provisions of the Original Loan Agreement by and between Lender and Borrower are reaffirmed and shall remain in full force and effect. The Original Loan Agreement, together with the First Amendment, Second Amendment, Third Amendment and this Fourth Amendment shall henceforth be referred to as the "Agreement."  In the event of any conflict between the Fourth Amendment and the Original Loan Agreement or any of the First, Second or Third Amendments, the terms of the Fourth Amendment shall govern and control.

IN WITNESS WHEREOF, this Fourth Amendment has been duly executed as of the day and year specified at the beginning hereof.

DIEHL WOODWORKING MACHINERY, INC.

By: _____

Its: ___Chairman___

LASALLE BANK NATIONAL ASSOCIATION

By: _____

Its: ___Loan Officer___

D 0076

LASALLE BANK

15 East Townline Road
Vernon Hills, Illinois 60061-1536
(847) 816-0650

December 18, 2001

Jay Ehrlich
Diehl Woodworking Machinery, Inc.
5301 W. Dempster #308
Skokie, IL 60077

Dear Jay:

Thanks for taking the time to meet with Doug and me this past Thursday.  We are both happy to hear that Diehl has managed to keep its head above water in a tough economic environment.

We appreciate the proactive approach you have taken in signaling the chance that Diehl might come up short in its financial covenants for the year.  Please recognize that when LaSalle agreed to revise the credit arrangement this past spring the covenants, pricing parameters, and release of guarantee were all inter-connected.  With what we know to date, in order to maintain current pricing and the guarantee arrangement and provide waivers/ resets, it would be advantageous to work on the note receivable situation and inventory advance along the lines of what we spoke about.

Please feel free to call me or Doug (847-990-3920) with any questions on these issues.  We hope you have a great holiday and Happy New Year!

Sincerely,

Matthew P. Sloan
Commercial Loan Representative
(847) 990-3905

CC:   D. Banzuly

D 0077

LASALLE BANKS

35 West 95th Street
Lawn, Illinois 60453
3) 424-2600

May 3, 2001

Jay Ehrlich, Managing Partner
The Earl Fund L.L.C.
5301 W. Dempster St.
Skokie, IL 60077

RE: Diehl Woodworking Machinery, Inc. (DWM)

Dear Jay,

Please be advised that LaSalle Bank has renewed DWM's revolving credit facility for an additional one (1) year period to expire on May 31, 2002, subject to the following terms and conditions:

| | ASSET BASED LENDING | COMMERCIAL LENDING |
|---|---|---|
| LINE AMOUNT | $2,250,000 | $1,750,000 |
| A/R ADVANCE | 85% | 80% |
| INVENTORY ADVANCE | 50% | 50% |
| INVENTORY CAP | $1.5 million | $1.2 million |
| INTEREST RATE | Prime + 1%, Floating | Prime, Floating |
| UNUSED LINE FEE | ¼% | None |
| BORROWING BASE REPORTS | Weekly | Monthly |
| LOCKBOX REQUIREMENT | Yes | N/A |
| FIELD EXAMS | Semi-Annually | Annually |
| PERSONAL GUARANTY | $250,000 | None |
| MINIMUM TANGIBLE NET WORTH: | | |
| @ 12/31/00 | $750,000 | $750,000 |
| @12/31/01 | N/A | $850,000 |
| MINIMUM SUBORDINATED DEBT | $100,000 | $100,000 |
| MAX. UNSUB. DEBT / TNW | 6.0:1 | 4.0:1 |
| EXPIRATION DATE | 5/31/01 | 5/31/02 |

Following is the calculation of DWM's Tangible Net Worth Calculation:

| | 12/31/00 | 3/31/01 | PRO FORMA 12/31/01 |
|---|---|---|---|
| Net Worth | $1,006,000 | $1,079,000 | $1,367,000 |
| + Subordinated Debt Capital Funds | 100,000 | 100,000 | 100,000 |
| | $1,106,000 | $1,179,000 | $1,467,000 |
| Less: Prepaid Expenses | 32,000 | 9,000 | 9,000 |
| Less: Other Intangibles | 150,000 | 125,000 | 73,000 |
| Tangible Net Worth | $ 924,000 | $1,045,000 | $1,385,000 |
| Less: Loan Covenant | 750,000 | 750,000 | 850,000 |
| Cushion | $ 174,000 | $ 295,000 | $ 535,000 |

member of the ABN AMRO Group

Apr-10-2001 09:52pm  From-LASALLE BANK NA

T-875  P.002/002  F-818

5 West 95th Street
Lawn, Illinois 60453
3) 424-2600

**LASALLE BANKS**

Jay Ehrlich, Managing Partner
The Earl Fund L.L.C.
5301 W. Dempster St.
Skokie, IL 60077

Dear Jay,

It was a pleasure meeting with you to discuss the transition of Diehl Woodworking Machinery, Inc. from LaSalle's Asset Based Lending area to Commercial Lending. Based upon our discussions and review of the current credit structure, I have outlined some of the modifications that we discussed at our meeting:

| | ASSET BASED LENDING | COMMERCIAL |
|---|---|---|
| LINE AMOUNT | $2,250,000 | $1,750,000 |
| A/R ADVANCE | 85% | 80% |
| INVENTORY ADVANCE / CAP | 50% / $1.5 Million | 50% / $1.2 Million |
| INTEREST RATE | Prime + 1%, Floating | Prime + ½%, Floating. |
| UNUSED LINE FEE | ¼% | N/A |
| BORROWING BASE REPORTS | Weekly | Monthly |
| LOCKBOX REQUIREMENT | Yes | N0 |
| FIELD EXAMS | Semi-Annually | Annually |
| PERSONAL GUARANTY | $250,000 | N/A |
| MINIMUM TANGIBLE NET WORTH | $750,000 | $800,000 |
| MINIMUM SUBORDINATED DEBT | $100,000 | $100,000 |
| MAX. UNSUB. DEBT / TNW | 6.0:1 | 4.0:1 |

After you have had a chance to review, please call to discuss any questions you may have and to arrange an appropriate time to visit the company.

Sincerely,

Joseph K. Hani
Loan Officer

TO. Mike

CC: Deb Hennessy

ur of the ABN AMRO Group

LASALLE BANK

To: Jay Erlich

From: Gina McAveeney

Memo: Checklist

Jay,

per our telephone conversation, listed below is information we need as soon as possible to keep this process moving towards the April 30, 1999 closing date:

1. Legal questionnaire- faxed yesterday 4/15/99 - please fax to Mike Weissman (our attorney) at (312)993-9350

2. Biography on the Erlich Fund, Loukadis Group, Kempler Group (1 paragraph is sufficient)

3. 1998 year end financial on Wisconsin Automated Machinery

4. Copy of new purchase agreement - please send one copy to: Mike Weissman
   McBride Baker & Coles
   500 West Madison Street
   40th Floor
   Chicago, IL 60661

5. Determination of Company's name ASAP for our legal documents

6. Signed Commitment Letter with deposit.

7. Personal Financial Statement for Paul Erlich.

8. ProForma Balance Sheet as of closing.

9. Review, receipt and assignment of Katy Guaranty on receivables

Thanks.

If you have questions, please call me.

D 0080

LASALLE BANK N.A.

5535 West 95th Street
k Lawn, Illinois 60453
8) 424-2600

LASALLE BANK

(1)  12/31/01 Pro Forma Net Worth was based upon the company's 2001 projections.

(2)  Estimated dividend distributions of $250M during FY 2001 represents 46.5% of projected earnings.

(3)  Other intangibles for interim 3/31/01 consists of $117M note receivable, $6M unamortized covenant not to compete from Katy, and $2M in unamortized loan costs. The 12/31/01 Pro Forma TNW calculation assumes that the note receivable balance will be approximately $65M.

We appreciate this opportunity to provide this revised credit accommodation and looking forward to continuing a mutually beneficial relationship.

If you have any questions or concerns, please feel free to call us at your convenience.

Sincerely,

Joseph K. Hani
Commercial Loan Officer

Debra J. Hennessy
First Vice President

CC: M. Ruffner

74

EXHIBIT
C 74
tabbies

May 3, 2001

Memo to:  Bob Rozman

From:  Paul Ehrlich

Re:  Your March 21, 2001 memo " Proposed Transfer of Bell Challoner
     Product lines from WAMCO to Diehl facility

We would like to make some observations regarding the subject captioned so that further
beneficial discussions may be held.
With regard to the machinery package even in to-days market the value will be $ 200,000
to $300,000.  To eliminate this as an issue we can agree based  upon appraisals or allow
the major pieces to go through auction and Diehl can bid them.  It is possible we are
acquiring too much machinery for the job at hand.
As to the pay back analysis you should consider the possibility of no new machines and
focus more on the rebuilt machines, parts and service.
We have talked about the people, the political concerns, and Jenkins and I won't
comment further now.  We can discuss this in a meeting.

Preliminary Transition Time Table

Change estimated dates as follows:
    March 21, 2001  To June 1, 2001
    April 13, 2001 To June 22, 2001
    April 18, 2001 To July  2, 2001
    May 1, 2001 To July 30, 2001
    June 1, 2001 To August  31, 2001
    September 10, 2001 To  be determined

Purchase price to include the business, machinery, and inventory is estimated to be as
follows:

| | |
|---|---|
| Inventory including loaner chain @ standard cost | $ 600,000   * |
| Machinery and equipment | $ 250,000 |
| Business | $ 100,000 |
| | ———————— |
| Total | $ 950,000 |

Purchase price to be adjusted to actual for inventory and machinery and equipment.  In
addition to the forgoing we will expect an additional purchase price of the greater of  4%

D 0099

of sales of the Wamco product line or 10% of Diehl pre-tax , pre-bonus income in excess of $ 500,000 for 5 years.
We also contemplate that after the closing the management fee would be increased by $ 60,000 annually.  You could consider key players at Diehl simultaneously.
We have excluded Accounts receivable since there is no real need for you to have them and increase your capitalized cost.
Payment of purchase price to be discussed.

For discussion purposes Bob why don't you add back Jack and Gary costs to income, an increase of $ 75,300.  These will be Diehl costs in the future whether it acquires the Wamco product line or not.  Reduce transition expenses to $150,000 increasing income another $ 39,500. This would make continuing income $.611,953.
As to the capitalized items assume they will be as follows:

| | |
|---|---|
| Transition expenses | $ 150,000 |
| Moving | $ 75,000 |
| Installation | $ 50,000 |
| Plant Modification | $ 25,000 |
| Total | $ 300,000 |

The forgoing results in a $ 311,953 positive cash flow in year 1 less any payments to Wamco for any of the above.
Notes Payable to Wamco should not be considered as a negative to cash flow.
After you have reviewed the forgoing and applied your own analysis we should get together and try to come to some resolution.

\*      If we assume the inventory will be written down by 1/3 the net for inventory would be $ 400,000.

Paul

75

EXHIBIT
C75

**DIEHL MACHINES**
Diehl Woodworking Machinery, Inc.

981 S. Wabash St., P.O. Box 465
Wabash, Indiana 46992-0465
(219) 563-2102, FAX (219) 563-020
www.diehlmach.com

Date:    May 30, 2001

To:    Paul Ehrlich

From:    Bob Rozman

cc:    J. Ehrlich
J. Loukidis
M. Ruffner
P. Rich

RE:    *Second Memorandum relating to the proposed transfer of Bell,
Challoner & Dyken product lines from WAMCO to Diehl facility*

Following our referenced conversations and your subject memorandum of the
sixteenth instant, we've revised the original projections related to the proposition
of moving the Bell, Challoner and Dyken product lines to Wabash. Based on this
revaluation, we present this altered strategy.

## Machinery Requirements

Based on our impending decision to lease the Haas vertical machining center and a
second, more conservative review of our real equipment requirements, this list of
equipment is what *we really require* rather that what we'd like to have.

An important factor in this revised list is our presumption that at most, we would
need only one of the two Mitsubishi VMC's to continue manufacture of the
tenoner chain links with your existing programs and fixtures. But we really should
review that process to make absolutely certain of the equipment requirement. It
may well be that those fixtures fit well on the machine we are leasing, eliminating
the need for even one of the units. If at all possible, Pat would like to continue our
standardization of the Fanuc control systems, rather than add a new proprietary
Mitsubishi control system that means training our operators on yet another control
system. Given that we can eliminate the need for either VMC, our equipment
requirements diminish dramatically, unless we are unaware of some other special
equipment absolutely necessary to an important service part manufacturing
process.

Not listed however, are the fixtures that you possess along with what is probably a
reasonable amount of tooling that we should acquire. For this, we've put a blanket
figure we think should cover those items we don't yet know that we need. As a
result, even with only one of the VMC's, the '92 book value drops dramatically
and I think we're now talking about $100-125K for machinery, at the upper end.

D 0103

Diehl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Reconciliation of Income per Per Paul Ehrlich
to Revised Income per Diehl Analysis

Per Paul's May 16, 2001 Memo:

Continuing Income
from previous worksheet

Fredrickson and Passmore                    497,153

Transition expense reduction                 75,300

                                             39,500

Reconciliation to attached:                 611,953

Remove margin on one new
machine sale

Additional management fee                    (8,000)

Royalty                                      (60,000)

Management salary increases                  (51,600)

Fredrickson and Passmore                     (34,450)

                                             (75,300)

Decrease in transition expenses
not part of continuing

Product liability insurance                  (39,500)

Warranty                                     (20,000)

Interest difference                          (25,000)

                                              34,047

                                             332,150

D 0104

Diehl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Reconciliation of Cash Flow per Per Paul Ehrlich
to Revised Income per Diehl Analysis

| | |
|---|---:|
| Per Pau's May 16, 2001 Memo | 311,953 |
| Differences in income per attached | (279,803) |
| Accounts receivable | (164,400) |
| | (132,250) |

D 0105

Diehl Woodworking Machinery, Inc.
Executive Salaries
As of May 31, 2001

| | Current Rate | Last Raise | Proposed Rate | Percentage Increase |
|---|---|---|---|---|
| Fredrickson | 86,500.00 | 01-Oct-99 | 92,500.00 | |
| Meldrum | 63,000.00 | 01-Oct-99 | 66,150.00 | 6.9% |
| Rich | 75,500.00 | 01-Oct-99 | 80,300.00 | 5.0% |
| Rozman | 141,200.00 | 01-Jan-98 | 151,000.00 | 6.4% |
| Ruffner | 84,600.00 | 16-Apr-00 | 90,600.00 | 6.9% |
| Zolman | 72,300.00 | 19-Apr-99 | 77,000.00 | 7.1% |
| | | | | 6.5% |
| | 523,100.00 | | 557,550.00 | |

D 0106

We shouldn't expect Scott to stay longer than two years under my conservative sales scenario, if that long. If we are able to sell several new machines, that observation could change, but with one rebuild projected per year, there is nothing to keep him busy and his interest in the company will rapidly diminish. Given that this is what will happen with Scott, it becomes absolutely essential that we get Chris Zeuhl, Mark Berndt and one machinist to move to Wabash. To that end, I've noted the need to provide a "moving bonus" to make that issue a reality. Without these three people in Wabash, we will flounder and the revenue/income will be overstated.

Depending on business conditions, and in particular the impending plans of Pella, we may want to consider making these four people contract employees which would clearly define their tenure and our expenses. I would think we could accommodate that for at least 18 months and give us time to retain them while we bridge this economic slow down.

I'm not trying to plan to have Scott leave the firm. However, Gary has emphasized what we all know, that being that he is not leaving the Valley. Therefore, given the transition of BCD to Wabash, the general economic conditions, his working out of a local office rather than within 250 feet of the assembly floor and now his recent remarks to Gary about the engineering firm in Appleton, can we really expect him to stay? Perhaps money can entice him for a while...and just maybe modern technology can bridge the distance between Neenah and Wabash.

Rick Beyer is another question mark, but given what Gary and you have said about Chris's involvement with parts orders and purchasing, it would be possible to get by without him, though he could be set up somewhere with Scott...or with Peerless just to enter orders. This should not be interpreted as though we don't need a person in this parts order entry position, because we definitely would. It's just that as long as we would be able to retain and move Chris to Wabash, we could train someone here. The ideal outcome though, would be to move Rick to Wabash along with Chris.

However, given the potential leaking of proprietary technical information which I discuss later, I am very concerned about having an office with that information in Oshkosh. The temptation to germinate another competitor that works in conjunction with the one that already exists in Oshkosh is something that I want to take every precaution to avoid. Perhaps I am overly zealous about this matter, but I've seen it happen too many times and I don't want it to occur in this transition.

The asset acquisition numbers are estimates and are provided for reference only. They should be viewed as such with the expectation that they move up or down, depending on realistic values.

## Specific Changes to the Income/Cash Flow/Payback Calculation

Removing new Challoner machines from the projection reduces income by $8K.

It appears that you did not subtract the increased management fee of $60K per year from income.

It appears that you did not subtract the projected royalty fees based on $1,290K of income which translate to $51.6K.

D 0107

| Items | Description | '92 BV | Today |
|---|---|---|---|
| 6) | Davis Keyseater, with tooling. | | |
| 7) | LaPointe Broach, with tooling. | 4,000 | |
| 18) | Walter, dividing head. | 200 ? | |
| 26) | Bridgeport, 1.5 HP Vertical Mill | 600 | |
| 39) | Lathe, American Pacemaker, 16" x 78" | 3,000 ? | |
| 46) | LeBlond, 18' engine lathe | 3,000 | |
| 42) | Collins, 48" x 72" Granite table. | 4,000 | |
| 50) | Hyde recycling system | 1,000 | |
| 63) | Cincinnati 12" x 36" Universal Cylindrical grinder | 500 | |
| 72) | Hyde portable sump cleaner | 3,000 | |
| 80) | Mitsubishi, Model V60 | 800 | |
| 89) | Allen, Drill Bench | 100,000 ? | |
| 92) | Heald, DEB Machine | 5,000 ? | |
| 93) | New Britain Model 50, DEB Machine | 400 ? | |
| 98) | Peerless Model 1400A | 600 ? | |
| 124) | Miller 300 AMP wire welder | 8,500 | |
| 129) | Famco No. 3-1/2 Arbor Press | 1,000 | |
| 140) | Hyster fork lift   (or 157) | 125 | |
| 157) | Caterpillar fork lift   (or 140) | 10,000 | |
| 177) | Famco No. 2 Arbor Press | 12,500 | |
| | Miscellaneous Tooling | 150 | |
| | Totals | 25,000 | |
| | | 171,175 | |

## Payback Analysis Data

Your May 16th memorandum, along with other assumption revisions we made, changed our income and cash flow projections. Also, we have several other questions regarding your calculations of income and cash flow. These are now added to our list of assumptions itemized in the following.

- That parts will decrease about 5% per year, though margins will slightly increase to offset the decline in the machinery base.
- Given a worst case scenario, during the first five years we can ship one rebuilt machine per year. Gary knows there is more business (at least one machine a year for the next five years) to be had at Pella, but we'd lose that business if Scott is no longer associated with Challoner. They have a strong comfort level with him and, with him, I think we can bridge their concern about the factory/personnel transition. Without Scott, the business goes somewhere else.

[E]HL MACHINE

**Diehl Woodworking Machinery, Inc.**
**Bell Challoner Dyken Acquisition**
**Five Year Projection**

| | One | | Two | | Three | | Four | | Five | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | |
| Parts | 1,200,000 | 85.0% A | 1,140,000 | 65.0% E C | 1,085,000 | 67.0% E D | 1,030,000 | 67.0% E D | 985,000 | 67.0% E D | 5,440,000 |
| Remanufactured Machines | 90,000 | 15.0% B | 90,000 | 20.0% | 95,000 | 25.0% | 100,000 | 30.0% | 105,000 | 30.0% | 480,000 |
| New Machines | 160,000 | 5.0% | 250,000 | 6.0% | 250,000 | 7.0% | 250,000 | 8.0% | 250,000 | 9.0% | 1,160,000 |
| Service Revenue | 25,000 | 100.0% | 26,000 | 100.0% | 30,000 | 100.0% | 35,000 | 100.0% | 38,000 | 100.0% | 154,000 |
| | 1,475,000 | | 1,506,000 | | 1,460,000 | | 1,415,000 | | 1,378,000 | | 7,234,000 |
| | | | | | | | | | | | |
| **Gross Margin:** | | | | | | | | | | | |
| Parts | 780,000 | | 741,000 | | 727,000 | | 690,100 | | 660,000 | | 3,598,103 |
| Remanufactured Machines | 13,500 | | 18,000 | | 23,800 | | 30,000 | | 31,500 | | 116,801 |
| New Machines | 8,000 | | 15,000 | | 17,500 | | 20,000 | | 22,500 | | 83,000 |
| Service Revenue | 25,000 | | 26,000 | | 30,000 | | 35,000 | | 38,000 | | 154,004 |
| | 826,500 | | 800,000 | | 798,300 | | 775,100 | | 752,000 | | 3,951,800 |
| | | | | | | | | | | | |
| **Other Continuing Expenses:** | | | | | | | | | | | |
| Salaries (2.5% per year increase): | | | | | | | | | | | |
| Scott Ode | (60,000) | | (61,500) | | | | | | | | |
| Chris Zeuhl | (46,000) | | (47,200) | | (48,400) | | (49,800) | | (50,800) | | |
| Rick Beyer | (38,000) | | (39,000) | | (40,000) | | (41,000) | | (42,000) | | |
| Jack Passmore (75%) | (30,000) | | (30,800) | | (31,600) | | (32,400) | | (33,200) | | |
| Accounting Clerk | (20,000) | | (20,500) | | (21,000) | | (21,500) | | (22,000) | | |
| Fringe Benefits @ 25% | (48,500) | | (49,800) | | (35,300) | | (36,100) | | (37,000) | | |
| Telephone and fax (customers) | (1,400) | | (1,400) | | (1,400) | | (1,400) | | (1,400) | | |
| Telephone and fax (Ode) | (2,400) | | (2,500) | | | | | | | | |
| Current Fredrickson chargeback | (37,800) | | (37,800) | | (37,800) | | (37,800) | | (37,800) | | |
| Interest | (45,247) | 8.5% | 45,194 | 8.5% | 56,000 | 8.5% | 52,800 | 8.5% | 49,900 | 8.5% | |
| | | | | | | | | | | | |
| **Total Continuing Expenses** | (329,347) | | (245,306) | | (159,500) | | (167,000) | | (174,300) | | |
| | | | | | | | | | | | |
| **Continuing Income** | 497,153 | | 554,694 | | 638,800 | | 608,100 | | 577,700 | | |

Page 1 of 4

D 0109

DieHl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Five Year Projection

| | One | Two | Three | Four | Five | Total |
|---|---|---|---|---|---|---|
| Transition Expenses: | | | | | | |
| Move drawings, files, etc. | (5,000) | | | | | |
| Move employees: | | | | | | |
| Assembler (Mark Berndt): | | | | | | |
| Physical moving cost | (8,000) | | | | | |
| Move bonus | (15,000) | | | | | |
| Loss on sale of house | (10,000) | | | | | |
| Machinist: | | | | | | |
| Physical moving cost | (8,000) | | | | | |
| Move bonus | (15,000) | | | | | |
| Loss on sale of house | (10,000) | | | | | |
| Engineer (Chris Zuehl): | | | | | | |
| Physical moving cost | (8,000) | | | | | |
| Move bonus | (20,000) | | | | | |
| Loss on sale of house | (10,000) | | | | | |
| Sales Clerk (Rick Beyer): | | | | | | |
| Physical moving cost | (8,000) | | | | | |
| Move bonus | (12,500) | | | | | |
| Loss on sale of house | (10,000) | | | | | |
| Other expenses (attorney fees, etc.) | (50,000) | | | | | |
| Total Transition Expenses | (189,500) | | | | | |

D 0110

DIEHL MACHINE

PAGE 08

Diehl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Five Year Projection

| | One | Two | Three | Four | Five | Total |
|---|---|---|---|---|---|---|
| Capitalized Items: | | | | | | |
| Net two years' cash flow | (627) | | | | | |
| Inventory (2 years usage from WAMCO - 3 turns per year thereafter) | 216,200 | 19,100 | (14,700) | (7,300) | (4,600) | |
| Accounts Receivable (45 days) | 184,400 | 3,900 | (5,800) | (5,600) | (4,600) | |
| Fixed Assets: | | | | | | |
| Cost | 150,000 | | | | | |
| Moving | 200,000 | | | | | |
| Installation | 65,000 | | | | | |
| Plant Modifications | 25,000 | | | | | |
| Total Capitalized Items | 839,973 | 23,000 | (20,500) | (12,900) | (9,200) | |
| NET CASH FLOW | (532,321) | 531,694 | 659,300 | 621,000 | 586,900 | |
| TOTAL PURCHASE PRICE | 549,973 | | | | | |

D 0111

DEIHL MACHINE

PAGE 09

Diehl Woodworking Machinery, Inc
Bell Challoner Dyken Acquisition
Five Year Projection



| | One | Two | Three | Four | Five | Total |
|---|---|---|---|---|---|---|
| **Assembly Hours:** | | | | | | |
| Note A | 270 | 0 | 0 | 0 | 0 | |
| Note B | 400 | 0 | 0 | 0 | 0 | |
| Note C | 0 | 750 | 0 | 0 | 0 | |
| Note D | 0 | 0 | 525 | 525 | 525 | |
| Note E | 0 | 170 | 170 | 170 | 170 | |
| Total | 670 | 920 | 695 | 695 | 695 | |
| **Machine Shop Hours:** | | | | | | |
| Note A | 80 | 0 | 0 | 0 | 0 | |
| Note B | 200 | 0 | 0 | 0 | 0 | |
| Note C | 0 | 450 | 0 | 0 | 0 | |
| Note D | 0 | 0 | 425 | 425 | 425 | |
| Note E | 0 | 80 | 80 | 80 | 80 | |
| Total | 280 | 530 | 505 | 505 | 505 | |

D 0112

DIEHL MACHINES

Diehl Woodworking Machinery, Inc.
Bell Challoner Dyken Acquisition
Revised for Paul Ehrlich Fax of May 16, 2001
Five Year Projection

| | One | Two | Three | Four | Five | Total |
|---|---|---|---|---|---|---|
| | A | E | E | E | E | |
| **Revenue:** | | | | | | |
| Parts | 1,200,000 | 1,140,000 | 1,085,000 | 1,030,000 | 985,000 | 5,440,000 |
| Remanufactured Machines | 90,000 | 90,000 | 95,000 | 100,000 | 105,000 | 480,000 |
| Service Revenue | 25,000 | 26,000 | 30,000 | 35,000 | 38,000 | 154,000 |
| | 1,315,000 | 1,256,000 | 1,210,000 | 1,165,000 | 1,128,000 | 6,074,000 |
| | | | | | | |
| **Gross Margin:** | | | | | | |
| Parts | 780,000 (65.0%) | 741,000 (65.0%) | 727,000 (67.0%) | 690,100 (67.0%) | 660,000 (67.0%) | 3,598,103 |
| Remanufactured Machines | 13,500 (15%) | 18,000 (20%) | 23,800 (25%) | 30,000 (30%) | 31,500 (30%) | 116,801 |
| Service Revenue | 25,000 (100.0%) | 26,000 (100.0%) | 30,000 (100.0%) | 35,000 (100.0%) | 38,000 (100.0%) | 154,004 |
| | 818,500 | 785,000 | 780,800 | 755,100 | 729,500 | 3,868,900 |
| | | | | | | |
| **Other Continuing Expenses:** | | | | | | |
| *Salaries (2.5% per year increase):* | | | | | | |
| Scott Ode | (60,000) | (61,500) | | | | |
| Chris Zeuhl | (46,000) | (47,200) | (48,400) | (49,600) | (50,800) | |
| Rick Beyer | (38,000) | (39,000) | (40,000) | (41,000) | (42,000) | |
| Jack Passmore (75%) | (30,000) | (30,800) | (31,600) | (32,400) | (33,200) | |
| Accounting Clerk | (20,000) | (20,500) | (21,000) | (21,500) | (22,000) | |
| Fringe Benefits @ 25% | (48,500) | (49,800) | (35,300) | (36,100) | (37,000) | |
| Telephone and fax (customers) | (1,400) | (1,400) | (1,400) | (1,400) | (1,400) | |
| Telephone and fax (Ode) | (2,400) | (2,500) | | | | |
| Current Fredrickson chargeback | (37,800) | (37,800) | (37,800) | (37,800) | (37,800) | |
| Additional management fee | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | |
| Royalty (percentage of WAMCO sales) 4.0% | (51,600) | (49,200) | (47,200) | (45,200) | (43,600) | |
| Product liability expense | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | |
| Warranty | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | |
| Diehl management increases | (34,450) | (35,500) | (36,600) | (37,700) | (38,800) | |
| | | | | | | |
| Interest 8.5% | (11,200) | 28,000 | 35,500 | 32,800 | 30,000 | |
| | | | | | | |
| Total Continuing Expenses | (486,350) | (451,200) | (368,800) | (374,900) | (381,600) | |
| | | | | | | |
| Continuing Income | 332,150 | 333,800 | 412,000 | 380,200 | 347,900 | |

D 0113





EXHIBIT
C 76

### DIEHL MACHINES

Diehl Woodworking Machinery, Inc.
Diehl, B.M. Root, Bell, Challoner, McKnight & Dyken

Date: March 15, 2005
To: J. Ehrlich, J. Loukidis
From: R. Rozman                    cc: P. Ehrlich, M. Ruffner
RE: *WAMCO Management Fee*

During recent conversations, Paul asked that Diehl consider restoring the management fee that had been reduced to $5K per month. He also asked that we consider restoring the rent paid to the Wabash River organization along with my salary reduction. The total restoration of these items would result in a monthly expense increase of $20K.

In review of these matters, I asked Mike to prepare a schedule that defines the reductions made to both the people at Diehl along with WAMCO and Wabash. The attached worksheet depicts the salary and expense concessions that were made over the past several years. The figures basically reveal that:

✓ All employee salaries were both restored to December 2001 levels and made whole for the year 2004 in December, except mine. I recovered $13K of my 2004 reduction and chose to retain my salary at 78%.
✓ In April of 2004, the management fee was reduced as a result of the difficult economic conditions that prevailed in the first quarter and continued until last summer.
✓ The rent paid to Wabash River had been reduced much earlier as an initial step to reduce the impact of worsening economic conditions.
✓ We have also not repaid the remaining original shareholder loans which we due in May of 2004.

Based on the results of 2004 and the current outlook for 2005, I believe we could well have a year that demonstrates good improvement. However, I don't believe we can restore all of reductions simultaneously or completely. Instead, I would like to carefully review this matter over the next quarter and make recommendations in June for implementation on July First. By that time, we will have a sound comfort level regarding the remainder of the year in light of both the continued upturn in business and the impact of the potential Kimwood acquisition, which though cooled the time, could develop. The requirements of this latter opportunity will no doubt strain our resources and I believe we need to know more about that situation before any conclusions are made to increase expenses. Given the current pace conversations with Kimwood, I think we'll know where we stand with that opportunity by June and can act with much better information.

If you have any questions, please let me know.

D 00122



DIEHL MACHINES

PAGE 03

Diehl Woodworking Machinery, Inc.
Management Fees
Scheduled Payment vs. Actual Payment

| | Scheduled | Paid | Accrued | Difference By Month | Cumulative |
|---|---|---|---|---|---|
| January-02 | 10,000.00 | 10,000.00 | 0.00 | 0.00 | |
| February-02 | 10,000.00 | 10,000.00 | 0.00 | 0.00 | 0.00 |
| March-02 | 10,000.00 | 10,000.00 | 0.00 | 0.00 | 0.00 |
| April-02 | 10,000.00 | 10,000.00 | 0.00 | 0.00 | 0.00 |
| May-02 | 10,000.00 | 10,000.00 | 0.00 | 0.00 | 0.00 |
| June-02 | 10,000.00 | 10,000.00 | 0.00 | 0.00 | 0.00 |
| July-02 | 10,000.00 | 5,000.00 | 0.00 | 5,000.00 | 5,000.00 |
| August-02 | 10,000.00 | 5,000.00 | 0.00 | 5,000.00 | 10,000.00 |
| September-02 | 10,000.00 | 5,000.00 | 0.00 | 5,000.00 | 15,000.00 |
| October-02 | 10,000.00 | 5,000.00 | 0.00 | 5,000.00 | 20,000.00 |
| November-02 | 10,000.00 | 5,000.00 | 0.00 | 5,000.00 | 25,000.00 |
| December-02 | 10,000.00 | 5,000.00 | 0.00 | 5,000.00 | 30,000.00 |
| January-03 | 15,000.00 | 10,000.00 | 5,000.00 | 5,000.00 | 35,000.00 |
| February-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| March-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| April-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| May-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| June-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| July-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| August-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| September-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| October-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| November-03 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| December-03 | 15,000.00 | 40,000.00 | (25,000.00) | 0.00 | 35,000.00 |
| January-04 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| February-04 | 15,000.00 | 10,000.00 | 5,000.00 | 0.00 | 35,000.00 |
| March-04 | 15,000.00 | 25,000.00 | (10,000.00) | 0.00 | 35,000.00 |
| April-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 40,000.00 |
| May-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 45,000.00 |
| June-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 50,000.00 |
| July-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 55,000.00 |
| August-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 60,000.00 |
| September-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 65,000.00 |
| October-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 70,000.00 |
| November-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 75,000.00 |
| December-04 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 80,000.00 |
| January-05 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 85,000.00 |
| February-05 | 15,000.00 | 10,000.00 | 0.00 | 5,000.00 | 90,000.00 |

0124



EXHIBIT
C 77

78



Diehl Woodworking Machinery, Inc.
Building Rent Paid to Wabash River, LLC
Scheduled Payment vs. Actual Payment



EXHIBIT
C 78

| | Scheduled | Paid | Accrued | Difference By Month | Cumulative |
|---|---|---|---|---|---|
| December-01 | 12,000.00 | 3,000.00 | | | |
| January-02 | 12,000.00 | 3,000.00 | 0.00 | 9,000.00 | 9,000.00 |
| February-02 | 12,000.00 | 3,000.00 | 0.00 | 9,000.00 | 18,000.00 |
| March-02 | 12,000.00 | 3,000.00 | 0.00 | 9,000.00 | 27,000.00 |
| April-02 | 12,000.00 | 3,000.00 | 0.00 | 9,000.00 | 36,000.00 |
| May-02 | 12,000.00 | 3,000.00 | 0.00 | 9,000.00 | 45,000.00 |
| June-02 | 12,000.00 | 3,000.00 | 0.00 | 9,000.00 | 54,000.00 |
| July-02 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 65,500.00 |
| August-02 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 77,000.00 |
| September-02 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 88,500.00 |
| October-02 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 100,000.00 |
| November-02 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 111,500.00 |
| December-02 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 123,000.00 |
| January-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 134,500.00 |
| February-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 146,000.00 |
| March-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 157,500.00 |
| April-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 169,000.00 |
| May-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 180,500.00 |
| June-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 192,000.00 |
| July-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 203,500.00 |
| August-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 215,000.00 |
| September-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 226,500.00 |
| October-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 238,000.00 |
| November-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 249,500.00 |
| December-03 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 261,000.00 |
| January-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 272,500.00 |
| February-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 284,000.00 |
| March-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 295,500.00 |
| April-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 307,000.00 |
| May-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 318,500.00 |
| June-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 330,000.00 |
| July-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 341,500.00 |
| August-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 353,000.00 |
| September-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 364,500.00 |
| October-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 376,000.00 |
| November-04 | 12,000.00 | 500.00 | 0.00 | 11,500.00 | 387,500.00 |
| December-04 | 12,000.00 | 36,500.00 | 0.00 | 11,500.00 | 399,000.00 |
| January-05 | 12,000.00 | 500.00 | 3,000.00 | (24,500.00) | 374,500.00 |
| February-05 | 12,000.00 | 500.00 | 3,000.00 | 8,500.00 | 383,000.00 |
| | | | | 8,500.00 | 391,500.00 |

D 0126